Steven A. Sherman, Esq., Bar No. 113621
**FERGUSON, PRAET & SHERMAN**
A Professional Corporation
1631 East 18th Street
Santa Ana, California 92705-7101
(714) 953-5300 Telephone
(714) 953-1143 Facsimile
ssherman@law4cops.com

Attorneys for City of Garden Grove Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUYEN KIM DANG, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR KENNY MINH CAO TRAN, A MINOR, AND PERSONAL REPRESENTATIVE OF ANDY TRAN, DECEASED; KENNY MINH CAO TRAN, A MINOR BY AND THROUGH HIS GUARDIAN AD LIETM, QUYEN KIM DANG; NAM VAN TRAN, BIOLOGICAL FATHER OF ANDY TRAN, DECEASED; BUA THI PHAN, BIOLOGICAL MOTHER OF ANDY TRAN, DECEASED, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF GARDEN GROVE; GARDEN GROVE CHIEF OF POLICE JOSEPH M. POLISAR; GARDEN GROVE POLICE OFFICER GENDREAU; GARDEN GROVE POLICE OFFICER KARSCHAMROOM; TASER INTERNATIONAL, INC., AND DOES 1 TO 10, INDIVIDUALS; AND ROES 1 TO 10, ENTITIES, INCLUSIVE, <br><br> Defendants. | NO. SACV10-00338 DOC(MLGx) <br><br> **DECLARATIONS AND EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES** <br><br> **DATE: July 25, 2011** <br> **TIME: 10:00 a.m.** <br> **CTRM: 9-D** <br><br> *[Notice of Motion, Points and Authorities; Declarations and Exhibits in Support Thereof; [Proposed] Order filed concurrently herewith]* |

Defendants attach the following declarations in support of their Motion for Summary Judgment or alternatively, Summary Adjudication of Issues.

1

# INDEX OF DECLARATIONS

2

3   Exhibit A          Declaration of Chief Kevin Raney

4   Exhibit B          Declaration of Richard Gendreau

5   Exhibit C          Declaration of Daniel Karschamroon

6   Exhibit D          Declaration of Amir El-Farra

7   Exhibit E          Declaration of Steven A. Sherman

8   DATED: June 27, 2011              FERGUSON, PRAET & SHERMAN
                                      A Professional Corporation
9

10                                        /s/ Steven A. Sherman
                                      Steven A. Sherman,
11                                    Attorneys for City of Garden Grove
                                      Defendants
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

# DECLARATION OF KEVIN RANEY

I, Chief Kevin Raney, declare and state as follows:

1.      I am currently the Chief of Police of the City of Garden Grove and in that capacity, declare that the following facts are within my own personal knowledge.  If called upon to testify, I could and would competently testify to the following facts under oath.

2.      I was not the Chief of Police when this lawsuit was filed.  However, as the current Chief of Police, I am a policymaker for the Garden Grove Police Department's policies and practices and with regard to all aspects of police administration and conduct.  The written policies of the Department which are valid and constitutional are accessible to the public on the Department's website. The policies on that site and attached to this declaration have never been found to be unconstitutional in any legal forum.

3.      The City of Garden Grove has a General Orders Manual.  The General Orders contained within that manual are designed to guide employees of the Police Department in carrying out the duties and responsibilities imposed upon them by law or necessarily in carrying out the department's objectives.

4.      It is important to remember that these General Orders are "guidelines."  No rules or procedures can be established which embrace all situations; some things must be left to the discretion of the individual employee. The intention of these General Orders is clearly set forth in the Statement by the Chief of Police, a true and correct copy of which is attached hereto as Exhibit "1".

5.      The City of Garden Grove Police Department has never had a policy, practice or custom, written or otherwise, authorizing or condoning of any kind of use of excessive force, unlawful stop, unlawful arrest, unlawful detention, unlawful seizure or unlawful search, pursuant to warrant or otherwise.  The City does not have a custom, policy and practice that encourages, tolerates, or ratifies the

1

1  employment, deployment and retention of persons as peace officers who are
2  unsuitable due to bias, prejudice.

3       6.     The City has a valid Use of Physical Force policy which includes a
4  review process which is General Order 2.6, attached hereto as Exhibit "2".  The
5  City has a valid Citizen Complaint Procedures Policy which is General Order 4.8,
6  attached hereto as Exhibit "3."

7       7.     The City of Garden Grove Police Department is accredited by the
8  Commission on Accreditation for Law Enforcement Agencies ("CALEA") and has
9  been since July 24, 1988.  The City was most recently re-accredited in November
10 2010.  This accreditation shows that the City of Garden Grove Police Department
11 meets the national standards for policies, procedures, and training since the
12 CALEA Accreditation requires that the City develop a comprehensive, well
13 thought out, uniform set of written directives with directions to personnel  and
14 have a preparedness program in place.  CALEA accreditation is the primary
15 method for an agency to voluntarily demonstrate their commitment to excellence in
16 law enforcement.

17      8.     I have read the allegations contained in the Complaint in the matter of
18 *Quyen Kim Dang, Individually and as Guardian Ad Litem for Kenny Minh Cao*
19 *Tran, a Minor, and Personal Representative of Andy Tran, Deceased; Kenny Minh*
20 *Cao Tran, a Minor by and Through His Guardian Ad Lietm, Quyen Kim Dang;*
21 *Nam Van Tran, Biological Father of Andy Tran, Deceased; Bua Thi Phan,*
22 *Biological Mother of Andy Tran, Deceased v. City of Garden Grove; Garden*
23 *Grove Chief of Police Joseph M. Polisar; Garden Grove Police Officer Gendreau;*
24 *Garden Grove Police Officer Karschamroom and Does 1 through 10,* SACV10-
25 00338 DOC(MLGx).

26 ///
27 ///
28

2

Declaration of Raney

1    Specifically, the City of Garden Grove has no policy allowing and does not:
2    a) subject individuals to excessive force;  b) subject individuals to unlawful arrests;
3    c) arrest individuals without probable cause;  d) employ or retain peace officers
4    who are unsuitable due to bias, or prejudice; e) abridge any constitutional right of
5    any citizen including the rights provided by the First, Fourth or Fourteenth
6    Amendments;  f) arrest individuals based on race, ethnicity or political views; g)
7    allow officers to engage in any type of conspiracy to deny any individual of a
8    constitutional right secured by the United States or California Constitution; and h)
9    allow officers to engage in the "code of silence" or fail to report the use of force.

10       9.    Specifically the Plaintiffs' Complaint claims that the City of Garden
11   Grove:

12       11.    Plaintiffs are informed and believe, and on the basis of such
13              information and belief allege, that the GOVERNMENTAL
14              DEFENDANTS and their decision maker, with deliberate
15              indifference, gross negligence, and reckless disregard to the
16              safety, security, and federal and state constitutional and
17              statutory rights of the decedent ANDY TRAN and the
18              plaintiffs, acquiesced in and applied policies, practices, or
19              customs and usages of, among other things:
20         a.    Subjecting people to unreasonable uses of force against
21              their persons.
22         b.    Selecting, retaining, and assigning employees with
23              demonstrable propensities for excessive force, violence,
24              and other misconduct.
25         c.    Failing to adequately train., supervise, and control
26              employees in the dangers associated with Taser
27              applications, for the taking into custody of persons such
28              as plaintiffs' decedent ANDY TRAN, who was

3

Declaration of Raney

knowingly suffering from a mental illness and/or mental condition, but otherwise not engaged in criminal activity, and as such deploying a Taser BCD device was unreasonably dangerous.  Further, the failure to render any medical care to decedent, ANDY TRAN within a reasonable amount of time following the Taser BCD application further demonstrates a failure to adequately train, supervise, and control employees in the dangers associated with Taser BCD applications and subsequent death suffered there from.

d.    Failing to adequately discipline officers involved in misconduct; and

e.    Condoning and encouraging officers in the belief that they can violate the rights of persons such as the decedent in this action with impunity, and to further engage in a pattern of hiding and/or covering up the conduct of officers engaged in misconduct and as such conduct will not adversely affect their opportunities for promotion and other employment benefits.

12.    Plaintiffs are informed and believe and, and on the basis of such information and belief allege that the GOVERNMENTAL DEFENDANTS and their decision makers ordered, authorized, acquiesced in, tolerated, permitted or maintained custom and usages permitting the other defendants herein to engage in the unlawful and unconstitutional actions, policies, practices, and customs or usages set forth in the foregoing paragraph. Defendants' conduct as alleged herein constitutes a pattern of constitutional violations based either on a deliberate plan by

4

Declaration of Raney

1    defendants or on defendants' deliberate indifference, gross
2    negligence, or reckless disregard to the safety, security, and
3    rights of PLAINTIFFS and decedent, ANDY TRAN.

4    10.    While vague and ambiguous, none of the above has transpired.
5    Plaintiffs' allegations as set forth in their Complaint are that Garden Grove officers
6    used excessive force, denied them due process, and conspired to deprive them of
7    federal constitutional rights.

8    11.    As set forth in detail, the City of Garden Grove has no policy, written
9    or otherwise, which allows, ratifies or condones the conduct described by the
10   Plaintiffs in their Complaint. The Plaintiffs' allegations have no support or basis in
11   any formal or informal policy of the City of Garden Grove and the allegations of
12   the Complaint are nothing more than assumptions made by the Plaintiffs in order to
13   bring this lawsuit.

14   12.    Prior to the hiring of a police officer, there is an extensive background
15   investigation of applicants pursuant to the Commission on Peace Officer Standards
16   and Training guidelines [hereinafter "P.O.S.T."], including a psychological
17   examination and evaluation. The City undertakes recruitment and training
18   pursuant to P.O.S.T. standards.

19   13.    The City requires extensive and lawful training of police officers at
20   certified academies. All Garden Grove police officers attend only P.O.S.T.
21   certified academies which provide training that complies with the laws of the State
22   of California and the standards set by the Commission on Peace Officer Standards
23   and Training. The Commission on P.O.S.T. is the entity that establishes the
24   standards that must be met by law enforcement agencies and peace officers in
25   California

26   ///
27   ///
28   ///.

5

Declaration of Raney

14.    The Department closely monitors  arrest procedures and the use of force, and investigations by its officers.  There is a review procedure concerning any alleged misconduct,  and a disciplinary procedure concerning any alleged misconduct.

15.    The City of Garden Grove has a lawful procedure for citizen's complaints and a review procedure to monitor and take appropriate action if there is an alleged unlawful arrest, use of force, or other inappropriate action by police officers.  The City has a policy and practice that when a citizen complaint is filed, an internal affairs investigation is undertaken.  The Citizen's Complaint Procedure is designed, and is adequate to alert or advise supervisors of misconduct.

16.    With regard to the incident addressed in this litigation, neither my predecessor, Joseph Polisar, or I did not set in motion, a series of acts by others, or knowingly refuse to terminate a series of acts by others, which I knew or reasonably should have known or was plainly obvious, would cause others to inflict constitutional injury.

17.    I have ultimate authority to recommend hiring and firing of employees.  Neither my predecessor or I have taken no culpable action or inaction with regard to the hiring, training, supervision, control or discipline of subordinates at the Garden Grove Police Department, nor have I failed to remove an officer known to be unfit for duty.  Neither my predecessor or I have not created, nor do I nurture, an atmosphere in which unlawful or biased arrests by police officers are condoned or encouraged, or where arrests are based on race or a person's political views.

18.    Neither I, or Joseph Polisar, acquiesced to any alleged constitutional deprivation claimed by the Plaintiffs.  I have not condoned, ratified or encouraged unlawful use of force, arrests, detentions, or seizures or searches.

///

///

6

Declaration of Raney

19. When complaints of unlawful use of force, unlawful arrest, or other misconduct come to my attention, even when they are not sustained, corrective actions are often taken. If I am aware of a deficiency in performance, a lack of judgment in a police officer, or of inappropriate action by a police officer, I take appropriate action to preclude any recurrence. Specifically:

> A. I have not, pursuant to official policy, custom or practice, intentionally, knowingly, recklessly or with deliberate indifference, failed to instruct, supervise, control and/or discipline on a continuing basis, Officers Gendreau and/or Karschamroon. I am not aware of any practice by myself or the City of Garden Grove that has made it plainly obvious to me that a constitutional violation would occur from this practice. To the contrary, I have reviewed the personnel files of Officers Gendreau and Karschamroon which contain no information of a sustained citizen complaint or a performance criticism that excessive force was used in an arrest, or that an arrest was made in violation of the constitution.

Furthermore, I have reviewed the training of Officers Gendreau and Karschamroon and they are graduates from a P.O.S.T.-certified academy. While at the City of Garden Grove, Officers Gendreau and Karschamroon met or exceeded the number of hours of continuing education required by P.O.S.T. Likewise, officers, in addition to Officers Gendreau and Karschamroon, documented P.O.S.T. certified education, participated in formal and informal department-provided training on a constant and on-going basis.

///

///

///

7

20.     The City of Garden Grove has not directly or indirectly approved or ratified any unlawful, deliberate, malicious, reckless or wanton conduct of Officers Gendreau or Karschamroon or any other Garden Grove Police Department employee, specifically the City does not have a custom, policy, or practice, nor acted with deliberate indifference:

      a)     by allowing or condoning arrests made without probable cause;

      b)     by allowing or condoning the use of excessive force,

      c)     by allowing or condoning the writing of false reports, and/or;

      d)     by allowing arrests due to bias, ethnicity, race or political views;

      e)     by allowing officers to engage in the code of silence or any type of  conspiracy to deprive any individual of any right,

      f)     or by otherwise depriving citizens of their constitutional and statutory rights, privileges and immunities.

21.     In summary, the City undertakes a number of measures to monitor and assure that unlawful arrests, use of force, or other misconduct did not occur.  They include the following:

      a)     review procedures when there is an allegation of an unlawful arrest, or other misconduct;

      b)     close monitoring, review and supervision of police officers;

      c)     internal affairs investigations;

      d)     citizen complaint procedure;

      e)     disciplinary proceedings and measures;

      f)     extensive and continuous training of officers;

      g)     compliance with P.O.S.T. standards.

Declaration of Raney

22.   I deny that I had any reason to believe that any actions that I took or neglected to take were violative of Plaintiffs' constitutional rights or were otherwise unlawful.  On the contrary, at all relevant times, I reasonably believed that everything that I did as it relates to Plaintiff was entirely proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27ᵗʰ day of June 2011, at Garden Grove, California.

Kevin Raney, Chief of Police
Declarant

9

Declaration of Raney

**EXHIBIT 1**

# City of Garden Grove
# Police Department

# **General Orders Manual**



## Kevin Raney
## Chef of Police

## Courage   λ   Courtesy   λ   Commitment

## STATEMENT BY THE CHIEF OF POLICE

Welcome to the Garden Grove Police Department, a nationally accredited law enforcement agency. The men and women of the Garden Grove Police Department are committed to professional standards and to providing the very best police services to our community.

This manual contains our Mission and Values statements as well as our General Orders. Familiarize yourself with the contents of this book as this will help guide you in your successful career with one of the finest law enforcement agencies in the United States.

By the authority vested in the Chief of Police by the Laws of the State of California and the Ordinances of the City of Garden Grove, I, Kevin J. Raney, adopt these General Orders for the administration of the Garden Grove Police Department. I reserve the right to alter, amend, revoke, or make additions to any of these General Orders. ALL PREVIOUSLY ISSUED GENERAL ORDERS ARE RESCINDED.

These General Orders are designed to guide employees of the Garden Grove Police Department in carrying out the duties and responsibilities imposed upon by them by law or necessarily assumed in carrying out the department's objectives.

It is important to remember that these General Orders are "guidelines." No rules or procedures can be established which embrace all situations; some things must be left to the discretion of the individual employee. Our style of policing encourages officers and employees to initiate problem-solving strategies and address community concerns. Employees must "balance" this high level of responsibility with the expectation that they adhere to the Department's written policies. Deviation from the policy requires demonstration that the action was necessary.

Any violations of these General Orders may be made the subject of discipline against employees responsible for such violations. When there is doubt as to the meaning or intent of a General Order, the employee should seek an interpretation.

The Garden Grove Police Department has adopted Community Policing - Garden Grove Style. Community Policing encourages a partnership between the community, the Police Department and private and public agencies. In support of Community Policing, our Mission Statement, our Values Statement, and these General Orders serve as your "guiding lights" and are to be considered aids in accomplishing your important tasks. Your willingness to adopt our Mission, Values and General Orders as your personal and professional code of behavior will be critical components of your success as an employee.

Again, welcome to the Garden Grove Police Department.

Sincerely,

Kevin J. Raney
Chief of Police
February 3, 2011

**EXHIBIT 2**

# GARDEN GROVE POLICE DEPARTMENT

**GENERAL ORDER 2.6**

Effective Date: January 1, 1988
Last Amended: December 28, 2006

Index as:

---

## USE OF PHYSICAL FORCE

---

## PURPOSE

The purpose of this General Order is to establish department policy and procedures for the use of physical force and to govern the use of less-lethal department-authorized weapons.

## PHYSICAL FORCE DEFINED

PHYSICAL FORCE IS THAT FORCE NECESSARY TO OVERCOME RESISTANCE, ACHIEVE COMPLIANCE, OR ANY USE OF DEPARTMENT ISSUED AND/OR APPROVED LETHAL OR LESS-LETHAL WEAPONS.

## AUTHORITY FOR THE USE OF FORCE

Section 835a of the California Penal Code states:

"Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

A peace officer who makes or attempts to make, an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance."

## **POLICY**

It is the policy of this department that each incident involving the application of any degree of physical force upon the person of another must be evaluated upon the facts of the particular incident.

Whenever any officer of this department, while in the performance of his official law enforcement duties, deems it necessary to utilize any degree of physical force upon the person of another, the degree of physical force shall only be that which the officer believes reasonable and necessary to effect the arrest, prevent escape or overcome resistance.

An officer of this department will use only the force necessary to accomplish lawful objectives.

A punch is not a recommended substitute for a control hold or a pain compliance technique, when dealing with <u>non-combative resistance</u>.  Non-combative resistance is defined as:

1. An individual does not respond to an officer's requests or commands and may be argumentative, or
2. An individual's verbal or non-verbal actions indicate he is not complying with the officer's requests or demands, or
3. An individual is actively resisting handcuffing techniques, but is reasonably under control by the officer(s).

## **USE OF LESS-LETHAL WEAPONS**

Officers are authorized to carry only the following less-lethal weapons:

1. Approved baton
2. Approved Chemical Agent
3. Approved "Less Lethal" Shotgun
4. M-26 Advanced Taser (Refer to General Order 2.24)

Community Service Officers assigned as Field Report Writers are authorized to carry only the following less-lethal weapon:

1. Approved Chemical Agent

Employees are encouraged to suggest use of alternate less-lethal weapons. All such suggestions should be contained in a memorandum to the Chief of Police.

Officers will be trained in and will demonstrate proficiency in the use of these weapons at a POST certified recruit academy and through an in-house retraining program.  A certified Department instructor will train the Community Service Officers in the use of the approved chemical agent who must demonstrate proficiency in its use.

Any employee who doesn't demonstrate proficiency will be provided remedial training until they are able to do so.  In-service training in the use of less-lethal weapons will occur at least biennially, except for the carotid control hold, which will be done annually.

As with any use of force, the force must be reasonable to the situation applied. Taking into consideration the facts confronting the officer, approved less-lethal weapons may be used in a variety of situations, including but not limited to the following:

1. To de-escalate a dangerous or potentially dangerous situation.
2. When there is a potential threat of public or officer safety, including situations in which self-inflicted injury by a suspect may occur.
3. When immediate control is needed due to tactical considerations, such as safety and/or the potential for harm.

CARE SHOULD ALWAYS BE EXERCISED DURING THEIR USE. THE USE OF A LESS-LETHAL WEAPON(S) MUST BE DOCUMENTED IN THE FORMAT DESCRIBED BELOW.

## <u>REPORTING THE USE OF FORCE</u>

Whenever an officer applies any degree of physical or non-lethal force upon a person while in the performance of his official duties, the officer will articulate the use of force in his arrest report.

The report will detail:

1. Justification for the use of physical force
2. The type of force applied (specify less-lethal weapon, if applicable)
3. The effect of the force upon the person
4. The subsequent actions taken by the officer

Note:  If the District Attorney's Office is requested to investigate the matter, the involved officer(s) interview with the District Attorney's Investigator will suffice for the official report.  Any necessary arrest and crime incident face page reports will be completed by the officer(s) involved.  If the officer(s) elects not to give a voluntary statement to the District Attorney's Investigator, and the suspects remain outstanding or are subject to prosecution for related offenses, the Department shall retain the authority to require involved officers to provide sufficient information in related criminal reports to facilitate the apprehension and prosecution of those individuals.

The officer will notify a field supervisor as soon as possible, but no later than the end of shift, if the application of physical force results in one of the following injuries:

1. Unconsciousness
2. Temporary vision impairment caused by a chemical agent
3. Any other injury requiring medical treatment

In the case where a baton, less-lethal shotgun, M-26 Advanced Taser or other instrument/object is used, a field supervisor will be notified as soon as possible.

In the case of a dog bite, the canine handler will complete a Garden Grove Police Department K-9 Incident Report in addition to the above notification.

The on duty division Sergeant will review arrest reports that involve the use of physical force.

## DEADLY FORCE OR SERIOUS INJURY

When an incident involving the discharge of deadly force occurs, the reporting and investigative procedures established in General Order 2.8 - Discharge of Deadly Force will be followed.

Any other use of force that results in a death or serious injury shall also follow the reporting and investigative procedures established in General Order 2.8 - Discharge of Deadly Force.

## MEDICAL TREATMENT

When an arrestee requires medical treatment as a result of physical force being applied, the procedures established in General Order 10.9 - Arrestee Transportation are to be followed.

## REVIEW OF THE USE OF FORCE

A field supervisor must submit a Use of Force Review memorandum, directed to the Chief of Police, when the use of force is applied by use of a baton, less-lethal shotgun, M-26 Advanced Taser, or other less-lethal instrument/object; or any other use of force that results in death or serious injury.  A field supervisor may submit a Use of Force memorandum after any use of physical force incident in which the supervisor feels it is necessary to report the incident in writing up the chain of command.

The memorandum will accompany all relevant reports and documents that pertain to the incident. The employee's Division Commander and Bureau Commander will review the package. The Bureau Commander may request that the Use of Deadly Force Review Board convene to review the circumstances of the incident. If a Use of Force incident is referred to the Use of Force Review Board, the employee (s), involved in the incident will be interviewed by the Internal Affairs Sergeant prior to the Board's review of the incident. The completed internal investigation, along with all reports, and any other necessary information requested by the board, will be provided to them. Refer to General Order 2.9 - Use of Deadly Force Review Board.

If a formal investigation is initiated, it will be conducted in compliance with the procedures established in General Order 1.2 - Disciplinary Procedures.

If the use of force involves death or traumatic/serious injury to a person, the involved employee(s) will be placed on administrative leave with pay pending a mandatory interview with a department-recognized psychologist.  If the psychologist is not called out or is unavailable at the time of the incident, the involved employee(s) Unit or Division Commander will request that the Training Manager arrange an appointment with the psychologist.  The employee(s) Unit or Division Commander will insure that a City of Garden Grove Personnel Action Form is completed to document the administrative leave with pay.  After consultation with the department psychologist, and a preliminary review of the incident, the employee(s) may be returned to full duty or modified duty based on what is in the best interest of the employee(s) and the department.

## CRIMINAL AND CIVIL LIABILITY

The following state and federal code sections are relevant to the use of force and treatment of arrestees. All employees should be familiar with them.

147 PC - Inhumanity to Prisoners
148 PC - Resisting Public or Peace Officers
149 PC - Assault by Officers Under the Color of Authority
673 PC - Cruel and Unusual Punishments
692 PC - Lawful Resistance
694 PC - Lawful Resistance
835 PC - Method of Effecting Arrests/Resistance
843 PC - Force that May Be Used to Arrest Under a Warrant
43 Civil Code - Personal Rights
820a Government Code - Peace Officer Liability Same As a Citizen
Title 18, Section 241, 245 of the U.S. Code - Civil Rights Act

**GARDEN GROVE POLICE DEPARTMENT**
**INTRA-DEPARTMENT MEMORANDUM**


**To:**

**From:**                                                      **Date:**

**Subject:  USE OF FORCE REVIEW**

This review is to be completed by an on-duty or on-scene supervisor when the use of force is applied by use of a baton, less-lethal shotgun, M-26 Advanced Taser, or other less-lethal instrument/object; or any other use of force that results in death or serious injury. Or when an employee discharges a firearm, on or off duty, intentionally or accidentally.

DR # _____

DATE OF INCIDENT _____

TIME OF INCIDENT _____

LOCATION OF THE INCIDENT _____

OFFICER(S) INVOLVED _____

NATURE OF THE CALL OR INCIDENT _____

_____

_____

_____

_____

TYPE OF FORCE USED ☐ PHYSICAL ☐ LESS-LETHAL WEAPON  ☐ FIREARM

NATURE OF THE INJURIES AND MEDICAL TREATMENT REQUIRED _____

_____

_____

SUMMARY OF THE ACTIONS OF THE OFFICER(S) INVOLVED _____

_____

_____

_____

_____

_____

WAS AN OFFICER, POLICE EMPLOYEE, OR CITIZEN INJURED? ☐ YES ☐ NO

**USE OF FORCE REVIEW**
Page 2

IF YES, NATURE OF THE INJURIES AND MEDICAL TREATMENT REQUIRED

_____

_____

_____

WAS AN ACCIDENT REPORTING FORM COMPLETED? ☐ YES     ☐ NO

IF YES, ATTACH A COPY

INVESTIGATOR(S) AND IDENTIFICATION TECHNICIAN(S) WHO RESPONDED, IF CALLED _____

_____

_____

_____

SUPERVISOR'S COMMENTS _____

_____

_____

_____

_____

_____

_____

_____

SUPERVISOR'S SIGNATURE _____

**EXHIBIT 3**

## GARDEN GROVE POLICE DEPARTMENT

**GENERAL ORDER 4.8**

Effective Date:   September 1, 1973
Last Amended:   July 1, 2009

Index as:  Citizen Complaint Procedures

---

## INTERNAL AFFAIRS UNIT

---

### PURPOSE

The purpose of this General Order is to establish an internal procedure for the thorough and impartial investigation of allegations arising out of actual or perceived misconduct by employees of the Garden Grove Police Department.  To accomplish this task and meet the requirements of state law, the Internal Affairs Unit of this department has been formed.  The Administrative Services Bureau Commander is responsible for the operation of the Internal Affairs Unit and reports directly to the Chief of Police.

### POLICY

It is the policy of the Garden Grove Police Department that all members of this department shall encourage both citizens and fellow employees to bring forth legitimate grievances regarding inadequate service or employee misconduct. All complaints against our agency or its employees shall be investigated, including anonymous complaints.

### RECEIVING COMPLAINTS

Any member of this department may receive a complaint from any person. Complaints are received in two basic forms:

1.   Written
2.   Verbal

The written complaint is either delivered in person or by mail.  The verbal complaint is received either in person or over the telephone. Both sworn and non-sworn personnel are responsible for receiving citizen complaints.  A citizen complaint may be referred to an on-duty supervisor or the Internal Affairs Sergeant for reception.  A citizen must not be told to call back or contact a specific supervisor under any circumstances.

When a complaint is received in person, the department member receiving the complaint must complete Citizen Complaint Form (GGPD Form 322a) and give the

complaining party the yellow copy of the form.  The Narrative Description of Events section should be filled out in detail to include all relevant information.

When a complaint is received by telephone, the member receiving the complaint must complete the Citizen Complaint Form and indicate on the form that the complaint was received on the phone.  The yellow copy of the complaint is mailed or delivered to the complaining party.

The person receiving the verbal complaint must decide whether to handle it informally, i.e., verbally, or reduce the complaint to writing.

The person receiving the verbal complaint must not handle informally those complaints of a serious nature and/or those complaints which are not resolved to the COMPLETE satisfaction of the complainant.  When in doubt, the person receiving the complaint shall fill out a citizens complaint form and forward the original IMMEDIATELY to Internal Affairs.

When a complaint is received on policy or procedure, the complainant does not receive a copy of the Citizen Complaint Form.  A notation must be made on the form stating that department policy or procedures have been explained to the complaining party.

Internal Affairs is the central controlling point for logging, assigning, investigating and filing of citizens complaints.  All written complaints shall be forwarded IMMEDIATELY to the Internal Affairs Unit.

## **CRITERIA**

A Citizen Complaint Form must be completed on any alleged complaint of misconduct of any member, either sworn or non-sworn, of the Garden Grove Police Department.  A citizen complaint must be completed on a complaint about policy or procedure.  It is not necessary to complete a Citizen Complaint Form on disputes of guilt or innocence on a traffic citation.  The employee accepting the Citizen Complaint shall immediately notify their supervisor of the complaint as required by department procedures.

## **COMPLAINTS RECEIVED BY INTERNAL AFFAIRS**

Once a complaint is received by Internal Affairs, it is logged and processed, and is either investigated by Internal Affairs personnel or sent to the appropriate Division, Unit or Bureau Commander for an investigation by a supervisor under his command.

Investigations will fall into two categories.  They are as follows:

Category I Complaints

1.  Department initiated confidential or sensitive investigations
2.  Allegations of serious misconduct, i.e., excessive force, corruption, alleged or suspected breach of integrity in a case of moral turpitude
3.  Allegations that may result in a criminal investigation
4.  Other investigations as assigned by the Chief of Police or Bureau Commander

Category II Complaints

1. Complaints of a minor nature involving discourtesy, disrespect, attitude or perceived rudeness
2. Complaints of abusive or foul language
3. Complaints that on review of the allegations will not require extensive interviews or lengthy complex investigations

Category I complaints will normally be investigated by Internal Affairs personnel. Category II complaints will normally be handled by supervisory personnel from the employee's division or unit.

The first option to investigate a complaint against an employee in Category II complaints will be afforded the affected Bureau, Unit or Division Commander.

If an Internal Affairs investigation reveals the potential that a crime has occurred and a criminal investigation must be completed, a separate criminal investigation shall be conducted by investigation personnel assigned to that task by the Chief of Police or Bureau Commander.

It will be the responsibility of the Administrative Services Bureau Commander to notify the Chief of Police immediately of any Category I complaints.

The Internal Affairs Unit maintains a liaison with the Special Prosecutions Unit of the Orange County District Attorney's office.  The Special Prosecutions Unit is charged with the investigation of any criminal act committed by a public official.  On any allegations of a criminal act being committed by an employee, the resulting criminal investigation is reviewed by the District Attorney's office for appropriate action.

## HANDLING OF CITIZENS COMPLAINTS

Policy/procedure complaints are directed to the Bureau Commander of the involved employee.  Once the problem has been resolved, the complaint and record of any action taken are then routed to Internal Affairs for filing.

Category I Complaints

Category I complaints will be logged onto the complaint log, and Section A of Routing Form (GGPD Form 326) will be completed.  A copy of the complaint will be forwarded to the employee's Division Commander and Bureau Commander.  Sections B, C, and D on the Routing Form will not be filled in until the completion of the investigation.

Category I complaints will be handled by an assigned Internal Affairs investigator. Once the investigation is complete, the Internal Affairs investigator sends the completed investigation to the Professional Standards Division Lieutenant and to the Administrative Services Commander for review and distribution to the appropriate Division Manager.

The employee's supervisor reviews the facts of the investigation and makes recommendations.   Based on the facts of the investigation, the conclusion recommendation must be from one of the following:  exonerated, unfounded,

sustained, or not sustained.   The Division Manager also reviews the facts of the investigation and makes recommendations.

The Division Manager then forwards the completed investigation and recommendations via the chain of command to the Chief of Police.  Each manager in the chain of command makes his recommendation on the attached Routing Form.  Depending upon the final disposition of the complaint, the employee will review and sign the acknowledgment section of the Routing Form.

If the disposition of the complaint results in disciplinary action, the procedures outlined in General Order 1.2 - Disciplinary Procedures will be followed.

The completed investigation is then sent to the Internal Affairs Office for logging and filing.

Category II Complaints

Category II complaints will be routed to the Division or Unit and Bureau Commander of the employee(s) involved.  Supervisory personnel will be assigned to investigate that complaint.  The assigned investigator will, within five calendar days, conduct a tape recorded telephonic or personal interview with the complainant to try and resolve the problem without it requiring additional investigation.

Whenever the assigned Division Commander or supervisor contacts the complainant and resolves the problem, he shall:

1.  Prepare a memo or utilize the comment section on the Routing Form and forward it, along with pertinent information, to the Bureau Commander.  Contents of the memo are to include a brief summary of the complaint, and any other actions or recommendations.
2.  Fill in the appropriate additional sections on the Routing Form and have the involved employee sign the acknowledgment form.
3.  Forward the entire package through the chain of command to Internal Affairs for filing.

Whenever the Division Commander or supervisor contacts the complainant and cannot resolve the problem without additional investigation, he shall:

1.  Conduct a complete investigation into the allegations;
2.  Have each supervisor in the chain of command make his recommendation on the Routing Form;
3.  Ensure that a conclusion recommendation(s) will be included in the package;
4.  Submit the completed investigation to the Bureau Commander via the chain of command.

Based on the facts of the investigation, the conclusion recommendation must be: exonerated, unfounded, sustained, or not sustained.

All misconduct must either be informally resolved by the Unit Commander as previously outlined or formally investigated by Internal Affairs.  The only exception to this requirement will be if the complaint is to be classified as pending.

A pending classification applies only in the following circumstances:

1. The complainant withdraws the complaint prior to the investigation;
2. It is learned that the complainant did not witness the incident, was not involved in the incident, and is not the parent of a juvenile who is involved in or a witness to the incident;
3. Recommendation of the City Attorney because a civil suit has been or is likely to be filed.

INVESTIGATION INTO CITIZENS COMPLAINTS WILL BE COMPLETED WITHIN 30 DAYS FROM THE DATE THE CASE IS ASSIGNED TO AN INTERNAL AFFAIRS INVESTIGATOR OR A DIVISION OR UNIT COMMANDER FOR INVESTIGATION.

COMPLAINT STATUS REPORTS ON ANY ASSIGNED INVESTIGATION (INTERNAL AFFAIRS OR DIVISION) WILL BE REPORTED TO INTERNAL AFFAIRS EVERY SEVEN DAYS.  The Internal Affairs Sergeant or the supervisor conducting the investigation shall contact the complainant at least once every 15 days to advise them of the status of the investigation.

If a complete investigation cannot be done within the 30-day limit, the Internal Affairs investigator or the supervisor conducting the investigation must notify his/her Bureau Commander of the reason for the delay and request permission for an extension.  The Internal Affairs investigator or the supervisor conducting the investigation must then contact the complainant and advise him of the reasons for extending the investigation beyond the 30-day limit.

## DEFINITIONS COMPLAINT FINDING

1. Sustained:  A true finding supported by the facts.
2. Not Sustained:  Facts revealed do not substantiate the allegation(s) - insufficient evidence available.
3. Unfounded:  Not true - actions alleged did not occur.
4. Exonerated:  Allegation is true but actions were lawful.

## ACTION UPON COMPLETION OF INVESTIGATION

If the complaint is sustained or some form of misconduct is found to have been committed by an employee, appropriate disciplinary action shall be initiated from within the bureau that the employee was assigned at the time of the misconduct.

Should a complaint of misconduct arise from a situation involving an area where a policy or procedure has changed or there is no policy or procedure in place to regulate conduct, the department will make the necessary changes or implement new policy to prevent future allegations of misconduct.

## FILING OF REPORTS

1. A copy of all complaints and relevant reports, regardless of their disposition, shall be forwarded to Internal Affairs for filing and storage. These reports shall be filed under the name of the employee(s) involved in the complaint. Complaints

concerning department policy and procedure, and those where the name of the employee cannot be determined shall be placed in a file labeled "Department File". The I.A. office is a secured office, with limited access.

2.  A copy of all complaints, relevant reports, and their disposition shall be kept on file in Internal Affairs. This material is CONFIDENTIAL and maintained only at the Internal Affairs office and shall be purged only at the direction of the Chief of Police.

## NOTIFICATION OF COMPLAINT

At the conclusion of the investigation, whether investigated by the operational division or Internal Affairs, it shall be the responsibility of the Internal Affairs Sergeant to notify the complainant that the matter has been thoroughly investigated and that appropriate action has been taken.

## ANNUAL STATISTICAL SUMMARIES

During January of each calendar year, the Internal Affairs Sergeant will post the annual report of citizens complaints against peace officers which is supplied by the department to the Department of Justice pursuant to California Penal Code Section 13012(d). This report will be posted on the department bulletin board, and show the total number of citizens complaints received by the department during the previous year, and the number of complaints which were unfounded and those sustained.

These summaries are public record and, as such, are available from the Department of Justice Bureau of Criminal Statistics.

**EXHIBIT B**

## DECLARATION OF RICHARD GENDREAU

I, Richard Gendreau, declare and state as follows:

1.     I am a police officer with the Garden Grove Police Department and I make this declaration in support of Defendants' Motion for Summary Judgment or Summary Adjudication of Issues in the matter of *Quyen Kim Dang, Individually and as Guardian Ad Litem for Kenny Minh Cao Tran, a Minor, and Personal Representative of Andy Tran, Deceased; Kenny Minh Cao Tran, a Minor by and Through His Guardian Ad Lietm, Quyen Kim Dang; Nam Van Tran, Biological Father of Andy Tran, Deceased; Bua Thi Phan, Biological Mother of Andy Tran, Deceased v. City of Garden Grove; Garden Grove Chief of Police Joseph M. Polisar; Garden Grove Police Officer Gendreau; Garden Grove Police Officer Karschamroom and Does 1 through 10*, SACV10-00338 DOC(MLGx).

2.     Except where expressly stated to the contrary, I make this declaration from personal knowledge and if called as a witness to testify, I would testify in conformity with this declaration.

3.     I have been a police officer with the City of Garden Grove since September 9, 2005.  My current rank is Master Officer I.  This status within Patrol allows me to also serve as a field training officer.

4.     On September 3, 2008, I was assigned to Patrol.  I was driving a marked police unit and wearing my full uniform.  The uniform is blue in color, and consists of a badge, departmental patches, name tag, duty belt, etc.  It is clearly identifiable as a police uniform.

5.     On September 3, 2008, I responded to a call concerning a violent male subject in a residence.  The residence was located at 13252 Barnett Way, in the City of Garden Grove.

///

///

09-015

6.     Dispatch as well as the CAD printout noted the male's (decedent Andy Tran) description as "mental case." (See attached CAD printout as Exhibit "1". The "event" remarks on the printout noted that the calling party (Plaintiff Nam Van Tran, Andy's father) indicated his son was crazy. When asked if his son had weapons, Plaintiff Tran affirmed. Dispatch could hear a child crying in the background. Plaintiff Tran also indicated to Dispatch he was dizzy and he kept repeating to "send someone right now, send someone right now. Take to hospital." Dispatch indicated that Plaintiff Tran was out of breath and would not answer any questions as to the whereabout of his son, Andy Tran, at the moment.

7.     I arrived at the residence on Barrett Way to find Officer Karshamroon with the subject out on the front lawn.

8.     I could also see Officer Karshamroon looking to his left and right, clearly struggling with Andy Tran's hands behind his head. I immediately ran to assist Officer Karschamroon.

9.     As it turned out, the issue was really not "resistance" as struggle or fight; Andy's resistance was complete rigidity. Both arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.

10.     Concerned about Andy attempting to flee or run, I moved in front of him to block that avenue of escape. From this position, I could clearly see him shaking and he actually began to growl.

11.     Andy was not blinking, his pupils appeared to be dialated and he had saliva coming from the corner of his mouth, almost as though foaming at the mouth. He also appeared to be looking straight through me.

///

///

///

12. Officer Karschamroon continued to try to gain Andy's compliance and get Andy to bring his hands down behind his back. He had managed to get one handcuff on, but the other remained dangling. It was my opinion that should Andy now elect to swing his arm, this dangling handcuff could become a weapon.

13. I also told Andy to relax, to put his hands behind his back and that we were not there to hurt him. He continued to stare at me as though I wasn't there. Andy gave no real verbal or physical acknowledgment of what I was telling him.

14. Andy continued to ignore the orders of myself and Officer Karschamroon. There was no physical recognition of what was being requested, nor was there any compliance.

15. I could see that Andy was still shaking and Officer Karschamroon was still trying to separate his hands and get his arms behind his back.

16. At that point, Officer Karschamroon had a hold of Andy's left wrist so I grabbed Andy's left hand to assist in pulling down his arm. Even with the efforts of both Officer Karschamroon and myself combined, we could not get Andy's arm down from the flexed/locked position. Even an applied pain compliance technique I performed did nothing.

17. At this point in time, I moved back in front of Andy, and instructed him to put his hand behind his back. I again informed him that we were not there to hurt him, we just needed to talk with him.

18. Andy failed to even acknowledge I was there; he continued to snarl, drool and I still had not seen him blink. He continued with his blank stare as if I wasn't even there.

///

///

///

19.     Given the strength that Andy had exhibited, i.e. the inability of Officer Karschamroon, and then Officer Karschamroon and myself, being unable to pull down his arms from their flexed position, I knew that if this turned into a fight, it was going to be a bad one. It appeared that Andy felt nothing, saw nothing.

20.     At that point I decided to take out my taser. I also attempted to activate my audio recording system by pushing the button on my microphone. I also pushed the button to activate the recording system in my police unit. Although I had tested both these systems at the beginning of my shift, neither activated. It was later determined that my vehicle was too far away from my position (100 or more feet) for the systems to be remotely activated.

21.     In any event, I held the taser in my right hand, and took off the safety. I focused the laser site on Andy's thigh and instructed Officer Karscharoon to prepare for a taser deployment.

22.     I have been trained that one of the best ways to get a subject on the ground is to tase them in the leg. My goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or myself.

23.     Prior to deployed my taser, I warned Andy several times that should he not comply with our orders, he would be tased. Andy continued to resist and I therefore deployed my taser. I then instructed Andy to get down on the ground. I deployed just one cycle.

24.     I could see Andy start to go down to the ground, and it appeared that Officer Karschamroon was laying him on the ground, or assisting him down so that Andy didn't hurt himself.

25.     Andy then was on the ground, on his stomach. Officer Karschamroon and I were then able to secure the remaining handcuff.

///

///

26.     After securing the handcuffs, I radioed Dispatch and requested that medics and a supervisor respond to the scene due to taser deployment. This is pursuant to Garden Grove Police Department policy and my training.

27.     After he was handcuffed and while still on the ground, Andy looked up, to his right and to his left. I continued to instruct him to relax. I informed him we were in the process of getting him medical attention. I inquired as to whether he was doing okay. Andy remained unresponsive to my statements and questions. He continued looking around.

28.     After looking around few times, Andy put his head down to the side. At that time, Andy did not appear to be in any type of physical distress.

29.     Officer Karschamroon and I then rolled Andy over to check on his welfare, and at that time I noticed that he was experiencing short, rapid breaths. His eyes were closed, but he was still breathing.

30.     I checked Andy's pulse. It was rapid and his breathing was labored.

31.     During this time, another officer, Amir El-Farra, responded to the scene. He arrived shortly after Andy had been handcuffed.

32.     After some discussion, we then elected to place Andy in a sitting position while we waited for medics. We thought it might help with his breathing, and help snap him out of the trance he appeared to be in.

33.     I asked Officer El-Farra to stay with Andy while waiting on the medics as Officer Karschamroon and I had yet to ascertain the welfare or condition of the calling party or family.

34.     Andy was still experiencing labored breathing. At about this time, I could hear the sirens of the approaching medics from a relatively short distanced. Based on this and the nature of the call, I felt comfortable leaving Andy with Officer El-Farra and checking on the condition/welfare of the other parties.

35.     We then contacted Andy's family to see if any of them were hurt, because in their call to Dispatch, they had indicated someone had been assaulted. It appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.  Attached hereto as Exhibit "2" is a true and correct copy of said photograph.

36.     I then asked if I could check the house for anyone else that might have been injured.  They showed me to the residence and when I inquired as to where Andy slept, they showed me his bedroom.  After doing so, it was determined that the residence was secure.

37.     Up to this point, I had no indication that other than his possible mental illness, that there was anything wrong with Andy.  Given his dilated pupils in bright sunlight and his rapid pulse, I had a concern he may be under the influence of a controlled substance, but I never had the opportunity to do a full evaluation.

38.     Apparently when the medics arrived, they found Andy to have stopped breathing.  I found this very surprising as I never saw Andy at a time when he wasn't breathing.

39.     Andy was then provided immediate CPR and medical attention, and then transported to the hospital.

40.     I deployed my taser because I believed it to be the least amount of force necessary to get Andy into handcuffs, under control and into custody.

///

///

///

///

///

///

1       I declare under penalty of perjury that the foregoing is true and correct.

2   Executed this _26_ day of June 2011, at Garden Grove, California

3

4

5   Rich Gendreau
    Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

09-015

–7–

**EXHIBIT 1**

```
Sep  3 13:31 2008                                                    Page 1


EVENT DISPLAY RECORD
      Agency: GGP                          Class: P
      Event #: 08067312                    Time: 03-Sep-2008/11:28:59
      Status: SEC                          Type: 5150
      Type Descr: MENTAL CASE              Priority: 2
      Response Level: 1                    Loc: 13252 BARNETT WAY ,GG
      Near:                                Info:
      Caller: TRAN TRINH                   Phone: (714)530-3945
      Address: 13252 BARNETT WY ,GG
      Contact:


EVENT CHRONOLOGY
      Date/Time            Segment Name     Workstation     Description
      ------------------   ------------     -----------     ---------------------
      03-Sep-2008/11:28:59  ENTRY           CMP5
      03-Sep-2008/11:28:59  DTFLW           CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:29:21  LOCINFOV        DSP1
   LocInfo Viewed by 3368 DSP1
      03-Sep-2008/11:29:27  DTFLW           CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:29:27  CHNG            CMP5            Remarks Entered;
      03-Sep-2008/11:29:59  DSP             DSP1
   121B (T/PAT; O/3622 KARSCHAMROON, DANIEL V.) 123C (T/PAT)
      03-Sep-2008/11:29:59  PRIUNIT         DSP1            121B
      03-Sep-2008/11:30:03  DSP             DSP1
   S12 (T/SGT; O/1977 LADD, ROBERT )
      03-Sep-2008/11:30:06  ENR             DSP1            121B,GILBERT/GG
      03-Sep-2008/11:30:44  ENR             DSP1            123C,HOOVER/GG
      03-Sep-2008/11:30:58  DE              DSP1
   253B (T/PAT; O/3282 GENDREAU, RICK )
      03-Sep-2008/11:30:59  DTFLW           CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:30:59  CHNG            CMP5            Remarks Entered;
      03-Sep-2008/11:31:00  CLEAR           DSP1            S12
      03-Sep-2008/11:32:40  DTFLW           CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:32:40  CHNG            CMP5            Remarks Entered;
      03-Sep-2008/11:33:05  CHNG            CMP5            Remarks Entered;
      03-Sep-2008/11:33:49  ASSTER          DSP1
   123B (T/PAT; O/2861 FLANDERS, ROGER )
      03-Sep-2008/11:34:21  DE              DSP1
   223C (T/PAT; O/3740 ELFARRA, AMIR )
      03-Sep-2008/11:34:43  REMINQ          DSP1
   253B,Nam/TRAN, ANDY Dob/19750919 Sex/M
      03-Sep-2008/11:35:09  CHNG            CMP5            Remarks Entered;
      03-Sep-2008/11:36:10  ONS             DSP1            121B
      03-Sep-2008/11:36:12  ONS             DSP1            253B
      03-Sep-2008/11:37:59  CLEAR           DSP1            123B
      03-Sep-2008/11:38:01  CLEAR           DSP1            123C
      03-Sep-2008/11:38:04  SEC             DSP1            253B
      03-Sep-2008/11:38:18  EVTMSGU         DSP1            253B ,START 72 PLS
```

Sep  3 13:31 2008                                                          Page 1


EVENT DISPLAY RECORD
    Agency: GGP                          Class: P
    Event #: 08067312                    Time: 03-Sep-2008/11:28:59
    Status: SEC                          Type: 5150
    Type Descr: MENTAL CASE              Priority: 2
    Response Level: 1                    Loc: 13252 BARNETT WAY ,GG
    Near:                                Info:
    Caller: TRAN TRINH                   Phone: (714)530-3945
    Address: 13252 BARNETT WY ,GG
    Contact:


EVENT CHRONOLOGY
    Date/Time              Segment Name      Workstation     Description
    ------------------     ------------      -----------     -----------------------
    03-Sep-2008/11:28:59   ENTRY             CMP5
    03-Sep-2008/11:28:59   DTFLW             CMP5            DETAILS TO FOLLOW
    03-Sep-2008/11:29:21   LOCINFOV          DSP1
  LocInfo Viewed by 3368 DSP1
    03-Sep-2008/11:29:27   DTFLW             CMP5            DETAILS TO FOLLOW
    03-Sep-2008/11:29:27   CHNG              CMP5            Remarks Entered;
    03-Sep-2008/11:29:59   DSP               DSP1
  121B (T/PAT; O/3622 KARSCHAMROON, DANIEL V.) 123C (T/PAT)
    03-Sep-2008/11:29:59   PRIUNIT           DSP1            121B
    03-Sep-2008/11:30:03   DSP               DSP1
  S12 (T/SGT; O/1977 LADD, ROBERT )
    03-Sep-2008/11:30:06   ENR               DSP1            121B,GILBERT/GG
    03-Sep-2008/11:30:44   ENR               DSP1            123C,HOOVER/GG
    03-Sep-2008/11:30:58   DE                DSP1
  253B (T/PAT; O/3282 GENDREAU, RICK )
    03-Sep-2008/11:30:59   DTFLW             CMP5            DETAILS TO FOLLOW
    03-Sep-2008/11:30:59   CHNG              CMP5            Remarks Entered;
    03-Sep-2008/11:31:00   CLEAR             DSP1            S12
    03-Sep-2008/11:32:40   DTFLW             CMP5            DETAILS TO FOLLOW
    03-Sep-2008/11:32:40   CHNG              CMP5            Remarks Entered;
    03-Sep-2008/11:33:05   CHNG              CMP5            Remarks Entered;
    03-Sep-2008/11:33:49   ASSTER            DSP1
  123B (T/PAT; O/2861 FLANDERS, ROGER )
    03-Sep-2008/11:34:21   DE                DSP1
  223C (T/PAT; O/3740 ELFARRA, AMIR )
    03-Sep-2008/11:34:43   REMINQ            DSP1
  253B,Nam/TRAN, ANDY Dob/19750919 Sex/M
    03-Sep-2008/11:35:09   CHNG              CMP5            Remarks Entered;
    03-Sep-2008/11:36:10   ONS               DSP1            121B
    03-Sep-2008/11:36:12   ONS               DSP1            253B
    03-Sep-2008/11:37:59   CLEAR             DSP1            123B
    03-Sep-2008/11:38:01   CLEAR             DSP1            123C
    03-Sep-2008/11:38:04   SEC               DSP1            253B
    03-Sep-2008/11:38:18   EVTMSGU           DSP1            253B ,START 72 PLS

```
        03-Sep-2008/11:38:30   ONS            MCT031         223C
        03-Sep-2008/11:38:42   EVTMSGU        DSP1
253B ,START 72 PLS SUBJ WAS TASED
        03-Sep-2008/11:39:41   CHNG           CMP5           Remarks Entered;
        03-Sep-2008/11:41:39   ASSTER         DSP1
221C (T/PAT; O/3712 ALARCON, CLAUDIA )
        03-Sep-2008/11:46:01   MISC           DSP1           253B,NEED SUPERVISOR
        03-Sep-2008/11:46:15   ASSTER         DSP1
S22 (T/SGT; O/9103 WAGNER, RICK )
        03-Sep-2008/11:47:05   ONS            MCT039         221C
        03-Sep-2008/11:49:27   SUPP           CMP2
        03-Sep-2008/11:53:31   ENR            DSP1
253B[GGMC],FOLLOWING AMBULANCE
        03-Sep-2008/11:57:09   ONS            DSP1           253B
        03-Sep-2008/11:57:30   EVTMSG         DSP1           253B ,T22 STA 47 PLS
        03-Sep-2008/12:01:53   MISC           CMP4
S22,CAP IS ENRT OUR LOCATION
        03-Sep-2008/12:02:06   SUPP           CMP4
        03-Sep-2008/12:05:42   MISC           PCWKS113       223C,CDL=B4760334 **
        03-Sep-2008/12:12:45   CASE           DSP1           ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
        03-Sep-2008/12:18:53   ASSTOS         CMP2           666D (T/DET)
        03-Sep-2008/12:19:07   CLOCOS         CMP2           666D[GGMC]
        03-Sep-2008/12:34:09   ENR            DSP1           253B[GGPD]
        03-Sep-2008/12:57:13   ASSTOS         DSP3           519S (T/PAT)
        03-Sep-2008/12:57:19   CLOC           DSP3           519S[GGMC]
        03-Sep-2008/13:04:52   ASSTOS         DSP3           639D (T/DET)

EVENT REMARKS
        03-Sep-2008/11:28:59   3401           CMP5
        E911 Answer Time: 03-Sep-2008/11:28:00 Received Time: 03-Sep-2008/11:28:35
SAID SON IS CRAZY, WITH WPNS


        03-Sep-2008/11:29:27   3401           CMP5
HE 242'D CP


        03-Sep-2008/11:30:59   3401           CMP5
SUBJ TOOK CP, HEAR CHILD CRYING , CP COULD NOT ANSWERCQUESTIONS, SAID HE'S
DIZZY, SAID YOU SEND SOMEONE RIGHT NOW, OVER AND OVER


        03-Sep-2008/11:32:40   3401           CMP5
SUBJ: POSS EDDY, CP KEEPS HANGING UP, JUST SAYING" YOU COME RIGHT NOW, TAKE
THE HOSPITAL", CP OUT OF BREATH


        03-Sep-2008/11:33:05   3401           CMP5
UNK TYPE OF WPNS, WHEN ASKED IF WPNS CP SAID YES
```

```
    03-Sep-2008/11:35:09  3401          CMP5
    CP WOULD NOT ANSWER ANY QUESTIONS AS TO WHERE HIS SON IS RIGHT NOW, MAJOR
LANGUAGE BARRIER


    03-Sep-2008/11:39:41  3401          CMP5
    T39 TO METRO


    03-Sep-2008/11:49:27  3762          CMP2
    STA 47 T21 ADV OFCR ENROUTE, ETA DRIVING TIME TO LOCN FROM WESTMINSTER


    03-Sep-2008/12:02:06  3395          CMP4
    STA 47 CANCELLED
```

**EXHIBIT 2**









**EXHIBIT C**

## DECLARATION OF DANIEL KARSCHAMROON

I, Daniel Karschamroon, declare and state as follows:

1.      I am a police officer with the Garden Grove Police Department and I make this declaration in support of Defendants' Motion for Summary Judgment or Summary Adjudication of Issues in the matter of *Quyen Kim Dang, Individually and as Guardian Ad Litem for Kenny Minh Cao Tran, a Minor, and Personal Representative of Andy Tran, Deceased; Kenny Minh Cao Tran, a Minor by and Through His Guardian Ad Lietm, Quyen Kim Dang; Nam Van Tran, Biological Father of Andy Tran, Deceased; Bua Thi Phan, Biological Mother of Andy Tran, Deceased v. City of Garden Grove; Garden Grove Chief of Police Joseph M. Polisar; Garden Grove Police Officer Gendreau; Garden Grove Police Officer Karschamroom and Does 1 through 10*, SACV10-00338 DOC(MLGx).

2.      Except where expressly stated to the contrary, I make this declaration from personal knowledge and if called as a witness to testify, I would testify in conformity with this declaration.

3.      I have been a police officer with the City of Garden Grove since November 17, 2007.  My current rank is police officer.

4.      On September 3, 2008, I was assigned to Patrol.  I was driving a marked police unit and wearing my full uniform.  The uniform is blue in color, and consists of a badge, departmental patches, name tag, duty belt, etc.  It is clearly identifiable as a police uniform.

5.      On September 3, 2008, I responded to a call concerning a violent, mentally ill male.  The residence was located at 13252 Barnett Way, in the City of Garden Grove.  I remember the residence requiring a three unit response.

///

///

6.     The call that went out stated that the subject (later learned to be decedent Andy Tran) had assaulted someone and that there was a weapon involved.  I tried to clarify with Dispatch if there was any further description of the weapon(s), and was informed that it was unknown as to what type of weapon.

7.     When I arrived at the residence, I could see the house directly.  As described by Dispatch, there was a male individual who appeared to be trying to break into or enter the residence through a window.  There was a broken screen window next to him and as I approached him, I could see his body half-way into the window.  It appeared he was trying to grab something from inside the window.

8.     As I started to walk toward the subject, there was another male who was standing in the middle of the street.  This individual was yelling over to the subject, "Hey, hey, hey!" trying to get his attention.

9.     As Dispatch had advised me that the subject's name was "Andy Tran," I, too, called out.  I believe I called his name, Andy, three to four times.

10.    At that time, Andy stopped what he was doing at the window, slowly turned around, and faced me.  I instructed him to come down from the porch, which he eventually did.  He approached me with his hands at his sides.

11.    When Andy got close enough to me, I could see his eyes and his face; Andy had a blank stare.  It appeared to me that he was confused or unsure of what was going on and that something was wrong.

12.    Andy stopped his approach when he was approximately 20 feet from me.  I asked him to come closer and he slowly came to within 10 feet of me.  I then instructed him to stop.  Andy did stop, but he maintained his blank expression.

///

///

13.     I then instructed him to put his hands on top of his head and turn
around.  He moved very slowly, but he did eventually comply with that
directive.

14.     At the point when Andy had his hands on top of his head, I
approached him and told him to interlock his fingers, which he did.  I grabbed
his hands while talking to him stating Andy, there's nothing wrong.  We're just
here to help you; calm down and relax.  It was important to get Andy secured
and handcuffed as the call indicated he was a violent mental individual with a
weapon.

15.     As I placed the first handcuff on Andy's right wrist, I felt his
hands immediately tense up.  He essentially released his interlocking grip and
closed his hands into fists. While I was trying to unsuccessfully separate
Andy's now-clenched hands, Officer Gendreau arrived.

16.     I immediately informed Officer Gendreau that I had one handcuff
secured, however, Andy not allowing me to cuff him; he was resisting and he
was not obeying my commands nor speaking.  I informed Officer Gendreau
that previously, Andy had been compliant.  Now, he had tensed up and he was
just not listening or doing what he was told.

17.     At this point in time, I had a concern that the situation may
become violent given the way Andy reacted when I secured the first handcuff.

18.     Andy never spoke to me but at this time, he did appear to
understand what I was saying.

19.     Officer Gendreau went in front of Andy and began speaking to
him.  He spoke to him in a casual manner, *i.e.* something like, Hey, dude, just
calm down.  At the same time, I was shaking Andy's hands; not to agitate him,
but to let him know I was still behind him and I needed to get him handcuffed.

///

///

20.     I also continued to speak to Andy asking that he calm down and relax.  Officer Gendreau continued giving instructions to Andy as well reminding him that he just needed to relax.

21.     Apparently at one point in time, both Officer Gendreau and I were pulling on Andy's arm and it simply would not move.  This was concerning; that takes a tremendous amount of strength to resist those handcuffing efforts.

22.     As Andy failed to comply with our commands by remaining rigid and non-responsive, Officer Gendreau informed him that if he did not comply, he would be tased.

23.     Andy continued to remain frozen and I still could not break his hold.  At that point, Officer Gendreau informed me that he was going to deploy his taser to Andy's leg; I therefore stepped slightly to the side.

24.     Once Andy was tased, he began to fall backward toward me.  I caught him and laid him forward onto the ground. He also finally released his grip and despite another brief tensing up, once the taser cycle stopped I was able to bring his left arm behind his back and apply the other handcuff.

25.     Officer Gendreau applied just one taser cycle of five seconds.

26.     After being handcuffed, Andy ceased his struggle and I believed we had the situation under control.

27.     Officer Gendreau then called for medics and a sergeant for the taser incident per Garden Grove Police Department policy.

28.     Another officer briefly stopped by to check on things, but he never got out of his car and left about 30 seconds later.

29.     At that point a third officer arrived on scene, Officer Amir El-Farra.

///

///

///

30.     While Andy was on the ground, I noticed he was breathing heavily. I therefore tilted his head to the left so that he could have a clearer breathing area.

31.     I continued trying to talk to Andy, but I still could not get a response. I went to check his pulse and he started to nod his head as if he didn't want to be touched.

32.     At that point, Officers Gendreau, El-Farra and I decided to roll Andy over on his back so that we could see him from the front. His eyes were closed. Officer Gendreau opened Andy's eyes and they were dilated. Because of that and his labored breathing, we decided to sit him up against Officer El-Farra's leg.

33.     I checked Andy's pulse as he remained unresponsive; he still did not respond to any verbal commands or any type of action.

34.     I had also suggested that we move Andy to the shade on the residence's porch. It was a hot day and I thought the shade might be beneficial. However, I could hear the paramedics approaching and therefore, we believed it best to leave Andy where he was at.

35.     At this point in time and with the medics imminent arrival, Officer Gendreau and I went inside to check on the welfare of the residents. Andy was sitting upright and leaning against Officer El-Farra's leg. He was not exhibiting any behavior that I would consider life-threatening.

36.     The initial call had come out as a mentally ill individual who was violent, had struck someone, and that weapons were involved. It was important to ascertain that no one in the residence had been injured or attacked by Andy.

///

///

///

37.     I talked with the parents, but it was difficult.  I encountered a significant language barrier.  Andy's parents kept repeating that Andy had something wrong with his head.

38.     The only injury appeared to involve Plaintiff Bua Thi Phan, Andy's mother.  She sustained a scrapped elbow which was measured and photographed.  Attached hereto as exhibit "1" is a true and correct copy of said photograph.

39.     After we had cleared the house, we started toward the front door and I could see the paramedics performing CPR on Andy.  This shocked me in that when I left him, he was breathing.  I was very surprised to see the medics were performing CPR.

40.     At that point, Officer Gendreau went to speak with the paramedics and I stayed in the residence with Andy's parents.

41.     Based on the nature of the call and in my rush to handle same, I did not activate my IVS recorder or my in-unit video during this incident.  The situation evolved so rapidly that activation was not at the forefront of my thoughts.

42.     At no time did I use anymore force that I deemed reasonable and necessary to control Andy and the situation.  At no time did I observe any other Garden Grove officer use any more force than reasonable and necessary to control Andy and the situation.  My actions were not intended to be reckless, malicious, careless and/or anything else for the matter.  My sole intention was to bring Andy under control.

///

///

///

///

///

///

43.   All of my actions with regard to Andy were due solely to my assessment of the situation at hand and the totality of the circumstances.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 day of June 2011, at Garden Grove, California

Daniel Karschamroon
Declarant

**EXHIBIT 1**









**EXHIBIT D**

# DECLARATION OF AMIR EL-FARRA

I, Amir El-Farra, declare and state as follows:

1.      I am a police officer with the Garden Grove Police Department and I make this declaration in support of Defendants' Motion for Summary Judgment or Summary Adjudication of Issues in the matter of *Quyen Kim Dang, Individually and as Guardian Ad Litem for Kenny Minh Cao Tran, a Minor, and Personal Representative of Andy Tran, Deceased; Kenny Minh Cao Tran, a Minor by and Through His Guardian Ad Lietm, Quyen Kim Dang; Nam Van Tran, Biological Father of Andy Tran, Deceased; Bua Thi Phan, Biological Mother of Andy Tran, Deceased v. City of Garden Grove; Garden Grove Chief of Police Joseph M. Polisar; Garden Grove Police Officer Gendreau; Garden Grove Police Officer Karschamroom and Does 1 through 10,* SACV10-00338 DOC(MLGx).  I am not a named party to this action.

2.      Except where expressly stated to the contrary, I make this declaration from personal knowledge and if called as a witness to testify, I would testify in conformity with this declaration.

3.      I have been a police officer with the City of Garden Grove since April 2008.  My current rank is police officer.

4.      On September 3, 2008, I was assigned to Patrol.  I was driving a marked police unit and wearing my full uniform.  The uniform is blue in color, and consists of a badge, departmental patches, name tag, duty belt, etc.  It is clearly identifiable as a police uniform.

///

///

///

///

5.     On September 3, 2008, I responded to a call at 13252 Barnett Way, in the City of Garden Grove.  The call concerned male mental subject in the front yard trying to break into the residence.  I believe I was the third unit to respond.

6.     When I arrived at the residence, Officers Karschamroon and Gendreau were already there.  I observed them standing over a subject, later identified as Andy.  Andy was handcuffed and laying on his stomach in the front yard.

7.     I noticed that Andy had a taser dart in his leg. When I inquired, Officer Gendreau confirmed that he had deployed his taser.

8.     I also noted that Andy appeared to have labored breathing.  I suggested that we sit him upright.  I thought by sitting him up, it might make it easier for him to breathe.

9.     I also asked whether medics had been summoned and was informed by Officer Gendreau that they had pursuant to Garden Grove Police Department policy.

10.     At that time, Andy was seated upright and leaning against my right leg.  His breathing continued to be labored, but he was breathing and I could see his chest moving up and down, rising and falling.

11.     While Andy remained against my leg, Officers Karschamroon and Gendreau went inside the residence to check on the condition of the family/ calling party.

12.     I estimate I was in front of the residence, with Andy, for approximately 15 to 20 seconds prior to medics arriving.

///

///

///

///

16.   At no time during my time with Andy did he speak to me at all.

17.   As I stated earlier, I believe it was mere seconds between when the medics arrived and Andy stopped breathing.  My attention was diverted away from Andy toward the medics while I conveyed the situation, but up to that point, I had a visual on Andy the entire time.  His chest was rising and falling.  He was breathing.

18.   Andy was then provided immediate CPR and medical attention, and transported to the hospital.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of June 2011, at Garden Grove, California

Amir El-Farra
Declarant

09-015                                                                                  –3–

**Exhibit E**

# DECLARATION OF STEVEN A. SHERMAN

I, Steven A. Sherman, declare and state as follows:

1.      I am a partner with the law offices of Ferguson, Praet & Sherman, licenced to practice in both the state and federal court systems.  If called upon to do so, I could and would testify in conformance with the statements made herein.

1.      Attached as Exhibit "1" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, is a true and correct copy of Plaintiffs' operative Complaint.

2.      Attached as Exhibit "2" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, is a true and correct copy of the 911 transcript.  An audio tape of the call has been lodged concurrently herewith.

3.      Attached as Exhibit "3" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, is a true and correct copy of the CAD Printout dated September 3, 2008, concerning this incident.

4.      Attached as Exhibit "4" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, are true and correct photographs of injuries sustained by Plaintiff Bua Thi Phan.

5.      Attached as Exhibit "5" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, are true and correct photographs the screen and window of the Tran/Dang residence.

6.      Attached as Exhibit "6" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, is a true and correct copy of the Orange County Sheriff's Department Toxicological report concerning Andy Tran.

7.      Attached as Exhibit "7" to Defendants' Exhibits in Support of Motion for Summary Judgment or Summary Adjudication of Issues, is a true and correct

1

copy of the Orange County Sheriff-Coroner Cause of Death summary concerning Andy Tran.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 27th day of June 2011, at Santa Ana, California

Steven A. Sherman
Declarant

2

**EXHIBIT 1**

1  Sean Hennessey, State Bar No. 157005
   THE LAW OFFICE OF SEAN HENNESSEY
2  8231 Westminster Blvd.
   Westminster, CA 92683
3  (949) 280-1257

4  Liem H. Do, State Bar No. 129029
   Liem H. Do & Associates, APLC
5  8231 Westminster Blvd.
   Westminster, CA 92683
6  Tel. (714) 898-7579

7  Attorneys for Plaintiffs

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 03 2009

ALAN CARLSON, Clerk of the Court

BY _____ J. TRAN _____, DEPUTY

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF ORANGE

30-2009

10  QUYEN KIM DANG, individually and as    Case No.:
    guardian ad litem for KENNY MINH CAO
11  TRAN, a minor, and personal representative       00325347
    of ANDY TRAN, deceased; KENNY MINH
12  CAO TRAN, a minor by and through his     COMPLAINT FOR DAMAGES FOR:
    Guardian ad Litem, QUYEN KIM DANG; NAM
13  VAN TRAN, biological father of ANDY TRAN,    1.  WRONGFUL DEATH
    deceased; BUA THI PHAN, biological mother         (42 U. S. C. section 1983-)
14  of ANDY TRAN, deceased,
                                             2.  SURVIVAL ACTION
15                                               (42 U.S.C. section 1983-)

16                                           3.  DEPRIVATION OF THE RIGHTS OF
                Plaintiffs,                      PLAINTIFFS' TO FAMILIAL
17                                               RELATIONSHIPS WITH THE DECEDENT
    vs.                                          (42 U.S.C. section 1983-)
18
    CITY OF GARDEN GROVE; GARDEN             4.  VIOLATION OF CIVIL RIGHTS
19  GROVE POLICE DEPARTMENT; GARDEN             (CAL. CIV. CODE section 52.1[b])
    GROVE CHIEF OF POLICE JOSEPH M.
20  POLISAR; GARDEN GROVE POLICE            5.  ASSAULT and BATTERY
    OFFICER GENDREAU;  GARDEN GROVE
21  POLICE OFFICER KARSCHAMROOM;            6.  NEGLIGENCE
    TASER INTERNATIONAL, INC.; and DOES
22  1 to 10, Individuals; and ROES 1 to 10,    7.  NEGLIGENT INFLICTION OF
    Entities, Inclusive.                         EMOTIONAL DISTRESS;
23
                Defendants.                   8.  INTENTIONAL INFLICTION OF
24                                               EMOTIONAL DISTRESS;

25                                           9.  PRODUCTS LIABILITY-
                                                 NEGLIGENCE
26
                                             10.  PRODUCTS LIABILITY-
27                                                STRICT LIABILITY

28  DEMAND FOR JURY TRIAL

Judge Linda S. mark:
dept. W11

_____

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

## <u>INTRODUCTORY ALLEGATIONS</u>

1.      Jurisdiction lies in this Court by reason of the fact that the events described in this Complaint occurred in the County of Orange, State of California, and within the boundaries of this judicial district.

2.      Plaintiffs' claims herein arise out of an incident involving the GOVERNMENTAL DEFENDANTS, in the City of Garden Grove, County of Orange, State of California, and within this judicial district.

3.      Plaintiff QUYEN KIM DANG is a competent adult who appears individually and as guardian ad litem for KENNY MINH CAO TRAN, a minor, and the biological child of Plaintiff QUYEN KIM DANG and decedent ANDY TRAN. Plaintiff QUYEN KIM DANG was the wife of decedent ANDY TRAN at the time of the incidents set forth in more detail below and also appears as the personal representative of ANDY TRAN, deceased, pursuant to *Code of Civil Procedure section 337.32.5.*

4.      Plaintiff KENNY MINH CAO TRAN, a minor by and through his guardian ad litem QUYEN KIM DANG, is the biological child of QUYEN KIM DANG and decedent ANDY TRAN. In or about November, 2009, Plaintiff QUYEN KIM DANG complied with the provisions of *Code of Civil Procedure section 377.32* by, concurrently with the filing of this Complaint, signing and filing the affidavit referred to therein with the Superior Court of the County of Orange, in her individual capacity and as the Guardian Ad Litem appointed in this action on behalf of minor Plaintiff KENNY MINH CAO TRAN.

5.      Plaintiffs NAM VAN TRAN and BUA THI PHAN are the biological father and mother of decedent ANDY TRAN and personally observed the incidents set forth in more detail below.

6.      Defendant CITY OF GARDEN GROVE is a governmental entity operating pursuant to the laws of California. Defendant GARDEN GROVE POLICE DEPARTMENT is a public agency subject to suit.

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

7.      Defendant JOSEPH M. POLISAR is the Garden Grove Chief of Police. He is the decision maker for the GARDEN GROVE POLICE DEPARTMENT.

8.      Defendants GENDREAU and KARSCHAMROON are/were Garden Grove Police Officers. In doing the acts herein alleged, they acted within the scope of their agency and employment, and under color of state law.

9.      At all times material to this action, defendant TASER INTERNATIONAL, INC. (hereafter, "TASER INC."), was and is a Delaware corporation with its principal place of business in the State of Arizona, and doing substantial business in and yielding substantial revenue from the business it does with residents of the State of California. Said business includes, but is not limited to: operating a business office in Santa Barbara, California; shipping thousands of its products yearly into the State of California for purposes of retail sale and holding dozens of training sessions yearly, for those who make use of its products, in the State of California. TASER INC. manufactured, designed, and sold the Taser guns which are repeatedly referred to throughout this Complaint, including but not limited to Taser Electronic Control Devices ("ECD"), the "Advanced Taser ECD" and/or another "laser" ECD, and which Taser guns were the cause, in substantial part, of ANDY TRAN's death.

10.      Plaintiffs sue defendants Does 1 to 10, Individual and ROES 1 to 10, Entities, by their fictitious names and will amend this complaint to allege their true identities when ascertained.

## FACTS

### A. General Allegations on Policy and Practice

11.      Plaintiffs are informed and believe, and on the basis of such information and belief allege, that the GOVERNMENTAL DEFENDANTS and their decision maker, with deliberate indifference, gross negligence, and reckless disregard to the safety, security, and federal and state constitutional and statutory rights of the decedent ANDY TRAN and the plaintiffs, acquiesced in and applied policies, practices, or customs and usages of, among other things:

     a.    Subjecting people to unreasonable uses of force against their persons.

---

3

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

b.  Selecting, retaining, and assigning employees with demonstrable propensities for excessive force, violence, and other misconduct.

c.  Failing to adequately train, supervise, and control employees in the dangers associated with Taser applications, for the taking into custody of persons such as plaintiffs' decedent ANDY TRAN, who was knowingly suffering from a mental illness and/or mental condition, but otherwise not engaged in criminal activity, and as such deploying a Taser ECD device was unreasonably dangerous. Further, the failure to render any medical care to decedent, ANDY TRAN within a reasonable amount of time following the Taser ECD application further demonstrates a failure to adequately train, supervise, and control employees in the dangers associated with Taser ECD applications and subsequent death suffered there from.

d.  Failing to adequately discipline officers involved in misconduct; and

e.  Condoning and encouraging officers in the belief that they can violate the rights of persons such as the decedent in this action with impunity, and to further engage in a pattern of hiding and/or covering up the conduct of officers engaged in misconduct and as such conduct will not adversely affect their opportunities for promotion and other employment benefits.

12.  Plaintiffs are informed and believe and, and on the basis of such information and belief allege that the GOVERNMENTAL DEFENDANTS and their decision makers ordered, authorized, acquiesced in, tolerated, permitted or maintained custom and usages permitting the other defendants herein to engage in the unlawful and unconstitutional actions, policies, practices, and customs or usages set forth in the foregoing paragraph. Defendants' conduct as alleged herein constitutes a pattern of constitutional violations based either on a deliberate plan by defendants or on defendants' deliberate indifference, gross negligence, or reckless disregard to the safety, security, and rights of PLAINTIFFS and decedent, ANDY TRAN.

---

4

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

**B.  Allegations Regarding the Death of Andy Tran**

13.    On September 3, 2008, Plaintiff NAM VAN TRAN placed several calls to 911 requesting assistance for his son, decedent ANDY TRAN who resided at 13252 Barnett Way in the City of Garden Grove. Approximately seven (7) minutes after the first 911 call was placed, Garden Grove Police Officers responded to the call. Garden Grove Officers GENDREAU and KARSCHAMROON responded and saw decedent ANDY TRAN in the front yard of 13252 Barnett Way. One or both of the Officers ordered decedent ANDY TRAN to put his hands on his head and walk toward them; decedent ANDY TRAN complied. While decedent, ANDY TRAN, was within several feet of Officer GENDREAU, Officer GENDREAU fired his Taser ECD at least once into decedent ANDY TRAN's thigh. Decedent ANDY TRAN went immediately face down onto his chest following the Taser ECD discharge. Officers GENDREAU, KARSCHAMROON and perhaps other Garden Grove Officers then failed to render any medical aid to decedent, ANDY TRAN. Plaintiffs NAM VAN TRAN, biological Father of decedent and BUA THI PHAN, biological Mother of decedent both personally observed all events set forth immediately above. Ultimately paramedics arrived and transported decedent to the hospital where he was pronounced dead.

14.    Throughout this incident, decedent presented with a medical problem, not a law enforcement problem. Defendants GENDREAU, KARSCHAMROOM and other Garden Grove Police Officers acted with deliberate indifference to his medical needs, as alleged below.

**C.  Allegations Regarding Damages**

15.    Plaintiffs QUYEN KIM DANG and KENNY MINH CAO TRAN have lost support, decedent's love, guidance, comfort and society, and have sustained emotional distress, all in amounts in accordance with proof. Plaintiffs have incurred burial and other related expenses. The decedent sustained general and special damages, including the loss of enjoyment of his life, in an amount in accordance with proof. Plaintiffs NAM VAN TRAN and BUA THI PHAN have suffered severe emotional distress for personally witnessing the tasering and death of their son.

16.    The conduct of the individual defendants was willful, malicious, oppressive and in

5

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

reckless disregard for the constitutional rights of plaintiffs and the decedent himself, thus justifying

punitive damages against the defendants (except the immune entity defendants) in an amount in

accordance with proof. Plaintiffs will also be seeking attorneys' fees for civil rights violation by the

GOVERNMENTAL DEFENDANTS. They have suffered general and special damages in an

amount in accordance with proof at trial.

**D. Allegations Regarding Compliance with Governmental Proof of Claims Statutes**

17.     Plaintiffs timely filed an administrative claim with the CITY OF GARDEN GROVE

pursuant to *California Government Code section* 910. The CITY OF GARDEN GROVE has not,

to date, formally denied the claims filed by the Plaintiffs. However, because negotiations

concerning the Plaintiffs claims have reached an impasse the Plaintiffs claims have been

constructively denied by the CITY OF GARDEN GROVE.

**FIRST CAUSE OF ACTION**

(42 U.S.C. section 1983-Wrongful Death)

(All Defendants except TASER INTERNATIONAL, INC.)

18.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-17, and

each and every part thereof with the same force and effect as though set out at length herein.

19.     Defendants, acting under color of state authority, deprived the decedent of rights,

privileges, and immunities secured by the Constitution and laws of the United States and/or the

State of California, including those secured by the Fourth and Fourteenth Amendments to the

Constitution, by among other things, subjecting the decedent to excessive force, and acting with

deliberate indifference to the decedent's medical needs.

20.     The foregoing wrongful acts of the GOVERNMENTAL DEFENDANTS killed the

decedent.

21.     Plaintiffs are the proper parties with standing pursuant to *Code of Civil Procedure*

*section 377.60* (incorporated herein by virtue of 42 U.S.C. section 1988), to pursue their remedies

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1    for wrongful death, including pecuniary loss and other compensable injuries resulting from the loss

2    of society, comfort, attention, services and support of the decedent.

3          22.     As a further proximate result of the acts of defendants, as alleged above, plaintiffs

4    have incurred expenses, including funeral and burial expenses, in an amount in accordance with

5    proof.

6          23.     In doing the foregoing wrongful acts, defendants, and each of them, acted in reckless

7    and callous disregard for the constitutional rights of decedent and plaintiffs. The wrongful acts, and

8    each of them, were willful, oppressive, fraudulent and malicious, thus warranting the award of

9    punitive damages against each individual defendant (but not the entity defendants, which are

10    immune from such damages) in an amount adequate to punish the wrongdoers and deter future

11    misconduct.

12

13                        **SECOND CAUSE OF ACTION**

14                  (42 U.S.C. Section 1983-Survival Action)

15           (All Defendants except TASER INTERNATIONAL, INC.)

16

17         24.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-23, and

18    each and every part thereof with the same force and effect as though set out at length herein.

19         25.     Plaintiff QUYEN KIM DANG brings this claim for relief in her capacity as the

20    successor in interest and personal representative of the decedent, for whom there is no estate

21    opened.

22         26.     The foregoing claim for relief arose in the decedent's favor, and the decedent would

23    have been a plaintiff with respect to this claim had he lived.

24         27.     Defendants, acting under the color of state law, deprived the decedent of rights,

25    privileges and immunities secured by the Constitution and laws of the United States and/or the State

26    of California, including those secured by the Fourth and Fourteenth Amendments to the

27

28

7

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1    Constitution, by, among other things, subjecting the decedent to excessive force; and acting with

2    deliberate indifference to the decedent's medical needs.

3        28.     The foregoing acts of defendants killed the decedent.

4        29.     As a proximate result of the foregoing wrongful acts of defendants, and each of

5    them, the decedent sustained general damages, including pain and suffering, and loss of the

6    enjoyment of life and other hedonic damages, in an amount in accordance with proof.

7        30.     In doing the foregoing wrongful acts, defendants, and each of them, acted in

8    reckless and callous disregard for the constitutional rights of decedent and plaintiffs. The wrongful

9    acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the

10    award of punitive damages against each individual defendant (but not the entity defendants, which

11    are immune from such damages) in an amount adequate to punish the wrongdoers and deter future

12    misconduct.

13

14                          **THIRD CAUSE OF ACTION**

15    (42 U.S.C. section 1983-Deprivation of the Rights of Plaintiffs to Familial Relationships with the

16                               Decedent)

17              (All Defendants except TASER INTERNATIONAL, INC.)

18

19        31.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-30, and

20    each and every part thereof with the same force and effect as though set out at length herein.

21        32.     Defendants, acting under color of state law, deprived plaintiffs of their rights to

22    familial relationships in violation of the Fourth Amendment and without due process of law in

23    violation of the Fourteenth Amendment by the use of unreasonable, unjustified force and violence,

24    causing injuries which resulted in the decedent's death, all without provocation, and all in violation

25    or rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the

26    United States Constitution.

27

28

---

8

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

33.     As a proximate result of the foregoing wrongful acts of defendants, and each of them, plaintiffs sustained general damages, including grief, emotional distress and pain and suffering and loss of comfort and society, and special damages, including loss of support, in an amount in accordance with proof.

34.     In doing the foregoing wrongful acts, defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of decedent and plaintiffs. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the award of punitive damages against each individual defendant (but not the entity defendants, which are immune from such damages) in an amount adequate to punish the wrongdoers and deter future misconduct.

## FOURTH CAUSE OF ACTION

(Cal. Civ. Code section 52.1- Violations of Civil Rights)

(All Defendants except TASER INTERNATIONAL, INC.)

35.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-34, and each and every part thereof with the same force and effect as though set out at length herein.

36.     The United States Constitution, Amendment IV, and Cal. Const. Art. I section 13 guarantees the rights of persons to be free from excessive force. Both constitutions guarantee the right to appropriate medical attention for people in police custody. Defendants, by engaging in the wrongful conduct alleged herein, denied these rights to decedent and plaintiffs, thus giving rise to claims for damages pursuant to *California Civil Code section 52.1(b)*.

37.     As a direct and proximate cause of the aforementioned acts of defendants, decedent and plaintiffs were injured as set forth above, and are entitled to statutory damages under *California Civil Code section 52*, attorneys' fees and costs, as well as compensatory and punitive damages according to proof.

38.     In doing the foregoing wrongful acts, defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of decedent and plaintiffs. The wrongful acts, and

9

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1  each of them, were willful, oppressive, fraudulent and malicious, thus warranting the award of

2  punitive damages against each individual defendant (but not the entity defendants, which are

3  immune from such damages) in an amount adequate to punish the wrongdoers and deter future

4  misconduct.

5

6  **FIFTH CAUSE OF ACTION**

7  (Assault and Battery)

8  (All Defendants except TASER INTERNATIONAL, INC.)

9

10  39.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-38, and

11  each and every part thereof with the same force and effect as though set out at length herein.

12  40.    Defendants assaulted and battered the decedent, causing his death.

13  41.    As a direct and proximate cause of the aforementioned acts of defendants, the

14  decedent and plaintiffs were injured as set forth above, and are entitled to compensatory damages.

15

16  **SIXTH CAUSE OF ACTION**

17  (Negligence)

18  (All Defendants except TASER INTERNATIONAL, INC.)

19

20  42.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-41, and

21  each and every part thereof with the same force and effect as though set out at length herein.

22  43.    By virtue of the foregoing, defendants owed decedent and plaintiffs a duty of due

23  care, and that duty was breached in that defendants' negligence and failure to exercise due care in

24  dealing with the decedent proximately caused his death.

25  44.    As a direct and proximate cause of the aforementioned acts of defendants, decedent

26  and plaintiffs were injured as set forth above, and are entitled to compensatory damages according

27  to proof.

28

10

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

## SEVENTH CAUSE OF ACTION

Negligent Infliction of Emotional Distress

(All Defendants except TASER INTERNATIONAL, INC.)

45.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-45, and each and every part thereof with the same force and effect as though set out at length herein.

46.    Officers GENDREAU and KARSCHAMROON knew that Decedent ANDY TRAN complied with their order without any resistance. Yet when Decedent ANDY TRAN, with his hands on his head, walked towards them as ordered, Officer GENDREAU fired his Taser ECD least once into Decedent ANDY TRAN's thigh. When ANDY TRAN fell face down onto his chest, Officers GENDREAU, KARSCHAMROOM and other officers at the scene failed to render any medical aid to the decedent or even call for medical aid. The entire incident was personally witnessed with horror by Decedent ANDY TRAN's parents, Plaintiffs NAM VAN TRAN and BUA THI PHAN.

47.    The conduct of the GOVERNMENTAL DEFENDANTS, and DOES 1 to 10, Individual and ROES 1 to 10, Entities, and each of them was outrageous and beyond the bounds of decency and that no reasonable person could be expect to endure it. This conduct has proximately caused the pain and sufferings to the Decedent and to the Plaintiff and the sole cause of the Decedent's wrongful death.

48.    As police officers, the GOVERNMENTAL DEFENDANTS and DOES 1 to 10, Individual and ROES 1-10, Entities, and each of them, was sworn to serve and to protect the public. The GOVERNMENTAL DEFENDANTS and each of them knew that they have to follow the laws and regulations in the performance of their duties. They also knew that the lives of the public were at risk when they failed to meet such duties including but not limited to refrain from using deadly force when it is not required or needed. In breaching their duties to Plaintiffs and Decedent ANDY TRAN, the GOVERNMENTAL DEFENDANTS, and each of them, acted negligently in causing

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1  the death of ANDY TRAN and Plaintiffs' emotional distress caused by the witnessing of their son's

2  sufferings and death.

3      49.    As a direct and proximate cause of the negligent acts of Defendants, as aforesaid,

4  Plaintiffs sustained severe and serious injuries to their persons, including but not limited to severe

5  emotional distress, all to Plaintiffs' damage in a sum to be shown according to proof.

6

7  **EIGHTH CAUSE OF ACTION**

8  Intentional Infliction of Emotional Distress

9  (All Defendants except TASER INTERNATIONAL, INC.)

10

11      50.    Plaintiffs incorporate by reference the allegations contained in paragraph 1-50, and

12  each and every part thereof with the same force and effect as though set out at length herein.

13      51.    Officers GENDREAU and KARSCHAMROOM knew that Decedent ANDY TRAN

14  complied with their order without any resistance. Yet when Decedent ANDY TRAN, with his hands

15  on his head, walked towards them as ordered, Officer Gendreau fired his Taser at least once into

16  Decedent ANDY TRAN's thigh. When ANDY TRAN fell face down onto his chest, Officers

17  GENDREAU, KARSCHAMROOM and other officers at the scene failed to render and medical aid

18  to the decedent or even call for medical aid. The entire incident was personally witnessed with

19  horror by Decedent ANDY TRAN's parents, Plaintiffs NAM VAN TRAN and BUA THI PHAN.

20      52.    The conduct of the GOVERNMENTAL DEFENDANTS, and DOES 1 to 10,

21  Individual and ROES 1 to 10, Entities, and each of them was outrageous and beyond the bounds of

22  decency and that no reasonable person could be expect to endure it. This conduct has proximately

23  caused the pain and sufferings to the Decedent and to the Plaintiff s and was the sole cause of the

24  Decedent's wrongful death.

25      53.    As police officers, the GOVERNMENTAL DEFENDANTS and DOES 1 to 10,

26  Individual and ROES 1-10, Entities, and each of them, were sworn to serve and to protect the

27  public. The GOVERNMENTAL DEFENDANTS and each of them knew that they have to follow

28

12

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1   the laws and regulations in the performance of their duties. They also knew that the lives of the

2   public were at risk when they failed to meet such duties including but not limited to refrain from

3   using unlawful and/or deadly force when it is not required or needed. In breaching their duties to

4   Plaintiffs and Decedent ANDY TRAN, the GOVERNMENTAL DEFENDANTS, and each of

5   them, acted intentionally in causing the death of ANDY TRAN and Plaintiffs' emotional distress

6   caused by the witnessing of their son's sufferings and death.

7        54.    As a direct and proximate cause of the intentional acts of Defendants, as aforesaid,

8   Plaintiffs sustained severe and serious injuries to their persons, including but not limited to severe

9   emotional distress, all to Plaintiffs' damage in a sum to be shown according to proof.

10       55.    By reason of the foregoing, Defendants have acted with malice, fraud and

11  oppression, and an award of punitive damages in a sum according to proof at trial is justified,

12  warranted and appropriate.

13

14                          **NINTH CAUSE OF ACTION**

15                          (Products Liability-Negligence)

16                          (Against Defendant Taser International, Inc.)

17

18       56.    Plaintiffs incorporate by reference the allegations contained in paragraph 1-56, and

19  each and every part thereof with the same force and effect as though set out at length herein.

20       57.    At all times herein mentioned, defendant TASER INC. and DOES 1 to 10,

21  Individually and ROES 1 to 10, Entities and each of them, were engaged in the business and

22  profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling,

23  buying, inspecting, testing, servicing, repairing, marketing, warranting, and advertising Taser

24  Electronic Control Devices ("ECD") which these defendants knew or, in the exercise of reasonable

25  care should have known, would be used without inspection for defects or dangers in their parts,

26  mechanisms or design. Defendants' product is unreasonably dangerous and defective for use on

27  human beings because, among other reasons, it is sold without warning as to the effects of

28

---

13

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1   potentially multiple or prolonged use, the dangers of using as Taser ECD who have mental

2   impairments and may reasonably be on medications, and because there exists no adequate warnings

3   as to what should be done when a deployed Taser ECD renders a person unconscious, unresponsive,

4   results in respiratory arrest or results in death.

5          58.       Defendant TASER INC. and DOES 1 to 10, Individuals and ROES 1 to 10, Entities

6   and each of them, sold Taser ECD's to local law enforcement agencies such as the

7   GOVERNMENTAL DEFENDANTS without adequate warning of or training in its potential for

8   causing death and great bodily injury.

9          59.       At all times herein mentioned, defendant TASER INC., DOES and ROES

10  negligently and carelessly designed, manufactured, sold, distributed, installed, fabricated,

11  assembled, bought, inspected, altered, maintained, serviced, tested, repaired, marketed, warranted,

12  and advertised their unreasonably dangerous and defective Taser ECD's, in that it was capable of

13  causing, and in fact did cause, personal injuries to persons while being used in a manner reasonably

14  foreseeable, thereby rendering the product unsafe and dangerous for use in its intended manner.

15         60.       As alleged above, defendants utilized a Taser ECD on decedent, ANDY TRAN,

16  when they knew decedent had a history of mental illness and was experiencing a disoriented state of

17  mind. As a direct and proximate result of the aforementioned conduct of the defendant TASER

18  INC., DOES and ROES, alone and in combination with the foreseeable wrongful conduct of the

19  other defendants as alleged above, plaintiffs were injured and sustained damages as alleged herein,

20  including the killing of decedent ANDY TRAN.

21         61.       Plaintiffs are informed and believe and thereon allege that defendants TASER INC.,

22  DOES and ROES, acted in a despicable, malicious and oppressive manner, in conscious disregard

23  of the rights of decedent ANDY TRAN and other people they knew or reasonably should have

24  known were likely to have Taser ECD's utilized by law enforcement officers not adequately warned

25  or trained about the extreme and unreasonable danger of this product, and that the Taser ECD

26  weapons posed an unreasonable risk of serious bodily injury or death to people such as decedent

27  ANDY TRAN.

28

14

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1    62.    Based upon these facts, defendants TASER INC. and DOES 1 to 10, Individuals and

2  ROES 1 to 10, Entities and each of them,  knew that the Taser ECDs' could not be used safely for

3  the purposes for which it was intended and that this weapon was defective and dangerous, but

4  despite that knowledge, in conscious disregard of the safety of the public, defendants TASER INC.,

5  DOES and ROES placed this product on the market without warning customers or the unknowing

6  public of the defects and dangers, and knew when it did so that this weapon would be sold to and

7  used by law enforcement agencies without adequate knowledge of its defects and dangers, and

8  expressly and impliedly represented that it was safe for the purpose for which it was intended. In

9  doing the aforementioned things, defendants TASER INC., DOES and ROES were guilty of malice

10  and oppression and despicable conduct, and plaintiffs are therefore entitled to recover exemplary

11  and punitive damages in an amount to be determined at trial.

12

13                        **TENTH CAUSE OF ACTION**

14                  (Products Liability- Strict Liability)

15            (Against Defendants Taser International, Inc.)

16

17    63.    Plaintiffs incorporate by reference the allegations contained in paragraph 1-63, and

18  each and every part thereof with the same force and effect as though set out at length herein.

19    64.    Defendants TASER INC. and DOES 1 to 10, Individuals and ROES 1 to 10, Entities

20  and each of them, designed, manufactured, sold, distributed, installed, fabricated, assembled,

21  bought, inspected, tested, serviced, marketed, warranted, and advertised the subject Taser ECD

22  which contained design and/or manufacturing defects, which were capable of causing and in fact

23  did cause, personal injuries to people while being used in a manner reasonably foreseeable, thereby

24  rendering same unsafe and dangerous for its intended use.

25    65.    As a direct and proximate result of the above-described defects in the subject

26  product, as aforementioned, and the conduct of defendants TASER INC., DOES and ROES as

27  alleged above, in combination with the wrongful conduct of the other defendants, plaintiffs and

28

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

1    their decedent, ANDY TRAN, sustained serious personal injuries and other injuries as alleged

2    herein.

3          66.    With respect to the subject Taser ECD, defendants TASER INC., DOES and ROES

4    were the designers, assemblers, manufacturers, sellers, distributers, installers, fabricators, buyers,

5    inspectors, testers, servicers, repairers, marketers, maintainers, warrantors, and/or advertisers

6    thereof, or were otherwise involved in the stream of commerce to the extent that the laws of the

7    State of California impose strict liability in tort for injuries caused by defects therein.

8          67.    Plaintiffs are informed and believe and thereon allege that defendants TASER INC.,

9    DOES and ROES knew that the Taser ECDs design, manufacture, assembly, marketing, and

10   distribution, by them was defective and dangerous; that each of the defendants knew that the

11   because of the defects the Taser ECD could not be used safely for the purpose for which it was

12   intended; that defendants, and each of them, knowing that its Taser ECD was defective and

13   dangerous, in conscious disregard of the safety of the public placed this product on the market

14   without warning customers or the unknowing public of the defects and dangers and knew when it

15   did so that the Taser ECD would be sold and used without knowledge of the defects and dangers;

16   and that the defendants and each of them, by placing the defective and dangerous ECD on the

17   market, expressly and impliedly represented that it was safe for the purpose for which it was

18   intended. The other defendants herein, in purchasing and using the defective ECD as herein alleged,

19   did rely on each of the defendants' representations. In doing the things aforementioned, defendant

20   Taser International, Inc., and Does and each of them, were guilty of malice, oppression and fraud,

21   and plaintiffs are therefore entitled to recover exemplary and punitive damages in an amount to be

22   determined at trial.

23

24

25

26

27

28

16

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

## PRAYER

WHEREFORE, plaintiffs pray for judgment as follows:

<u>On All Causes of Action</u>

(a)     Compensatory general and special damages in accordance with proof;

(b)     Costs of suit necessarily incurred herein; and

(c)     Such further relief as the Court deems just or proper.


<u>On the First, Second, Third, and Fourth Causes of Action</u>

(d)     Reasonable attorney's fees and expenses of litigation;

<u>On the Fourth Cause of Action</u>

(e)     Statutory damages;

<u>On the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth and Tenth Causes of Action</u>

(f)     Exemplary damages against the defendants (except the immune entity defendants) in an amount sufficient to make an example of those defendants and to deter future misconduct.


Dated:  November 16, 2009

_Sean Hennessey_
Sean Hennessey
Attorney for the Plaintiffs


### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues in this action.


Dated:  November 16, 2009

_Sean Hennessey_
Sean Hennessey
Attorney for the Plaintiffs

---

17

COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS AND WRONGFUL DEATH

**EXHIBIT 2**

## TRANSCRIPT OF ORIGINAL 911 CALL OF SEPTEMBER 23, 2008

D:              [Click]  911 emergency.

Caller:         Hello......ho...ha...(heavy breathing)

D:              What's wrong?

Caller:         (heavy breathing)

D:              Do you need police or paramedics?

Caller:         You come . . (gasp) 1- . . . (heaving breathing)

D:              I have your address; 13252.  What's wrong?

Caller:         (Inaudible).  Son crazy....very crazy (heaving breathing)

D:              Your son's crazy?

Caller:         Police....yes (heaving breathing)

D:              What's going on?

Caller:         Police come.....police come here....(heaving breathing)

D:              What's going on?   Does he have any weapons?

Caller:         Yea...(heaving breathing) he's mental....(heaving breathing)

D:              What weapons?   What weapons does he have?

Caller:         He's mental....(heaving breathing)

D:              What kind of weapons does he have?

Caller:         He.....he...he..he......he hit me.....Mother and Father.....you come right

now....(gasping-heaving breathing)

D:              Yeah, yeah, yeah.....can you tell me what kind of weapons he has?

Caller:         Ha...he's very crazy....(heaving breathing)...he....he tied me (inaudible)

me...(heaving breathing)...he...(inaudible) tied me....

D:          He found you?

Caller:     ...he tied me....he tied ma..... his mother.....(heaving breathing) can you.....please come right now...(heaving breathing)

D:          What is...what happen to his mother?

Caller:     Please come right now....(gasping-heaving breathing)...please...

D:          Yes...were sending police right now, but tell me what happened to his mother!!

Caller:     He...he....he have mental......(heaving breathing)...he..

D:          Right...he's mental...

Caller:     He take me...he take me....(inaudible)..he hit me.....(heaving breathing)...oh...oh...(heaving breathing)

D:          Where did he....He hit you?

Caller:     (Gasping)  Oh....(heaving breathing).. I am very tired....(heaving breathing)....

D:          Okay....calm down....take a deep breath.....

Caller:     You come right now please?

D:          Yes, but I need information from you..okay....

Caller:     You come right now...

D:          Yes, I'm sending officers, but I'm going to need information from you...just calm down......

Caller:     Okay....(heaving breathing)

D:          Okay...Where is your son right now?

Caller:     Yeah, you come right now take him.....please......

D:            No..listen to me....where is your son?   Where is he right now?


Caller:       Okay..you come right now? (gasping)

D:            Yes..no, listen...do you speak Vietnamese?

Caller:       He....he..really big..busy...(heaving breathing)...

D:            Your really busy?

Caller:       Yea....(heaving breathing)

D:            Okay....

Caller:       He (inaudible) mother and father...oh...oh..(heaving breathing) ...oh...

Unknown:      Sit down mommie......sit down.....[child in back ground]: (Crying/laughing)

              ha..ha..ha..ha...ha..ha..ha..

Caller:       Oh....(heaving breathing).....You come right now?....(heaving breathing)...

D:            Yes, were....were sending someone right now.....where is your son right now?

Caller:       Yea, you come right now?...

D:            Yes...(inaudable) ...okay Sir, listen...listen to me....where is your son.....where did

              he go?.

HANG UP/DISCONNECT

D:      Sighs....


BLANK TAPE UNTIL REDIAL

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

**CASE # SACV10-0338 DOC**

INTERVIEWEE(s):        DISPATCH  [TRACK 4 OF 8]

INTERVIEW DATE:        9-23-08                              CD NO: 001-4A-11

1

CD NO. E-001, TRACK 4, BEGINS AT 0:00 MIN/SEC

[dial tone…dialing…ringing]

UNK:  Hello?

D:     Okay.  This is the Garden Grove Police Department.  Is there someone--

UNK:  Okay.

D:     --is there someone else there I can talk to…

UNK:  You--

D:     …that speaks English?

UNK:  You come right now?

D:     Yes.  Can I talk [unclear]--

UNK:  (..?) now.

D:     Okay, let me talk to someone else.

UNK:  I…I am very tired.

D:     I know you're very tired.  Let me talk to someone else, please.

UNK:  Because I don't understand English well…[D talking-FE inaudible]…

D:     Okay.  Is there someone else that speaks English?

UNK:  Yeah--no.

D:     Oh [in unison]--

UNK:  No.

D:     No?

UNK:  Nobody, uh, speak English.

D:     Okay.  Just, uh, tell me this;  where-where is your son right now?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

| INTERVIEWEE(s): | DISPATCH  [TRACK 4 OF 8] | |
|---|---|---|
| INTERVIEW DATE: | 9-23-08 | CD NO: 001-4A-11 |

2

UNK:  Yeah, you come right now?

D:      Okay, yes, but…

UNK:  [inaudible interjection]--

D:      …your son -- what is your son's name?

UNK:  You take, uh, you take him, uh…

D:      What is his name?

UNK:  …(..?) hospital.

D:      What is his name?  We'll take him to the hospital.  What's his name?

UNK:  Uh…Andy.  Andy.

D:      Okay.  Okay, where's Eddie?  Where is Eddie right now?

UNK:  (..?)…Andy Tran….yeah.

D:      Where is he right now?

UNK:  Yeah, you hurry [unclear] right now?

D:      Okay.  Where--

UNK:  Thank you.

D:      --where's Eddie?  Where is Eddie?

UNK:  Yeah, thank you.

D:      [sigh]…sir?

UNK:  [hangs up]

[end of call]

CD NO. 001, TRACK 4, SEGMENT A, ENDS AT 1:15 MIN/SEC

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | | |
|---|---|---|
| INTERVIEWEE(s): | DISPATCH  [TRACK 4 OF 8] | **1** |
| INTERVIEW DATE: | 9-23-08 | **CD NO: 001-4B-11** |

CD NO. E-001, TRACK 4, SEGMENT B, BEGINS AT 6:10 MIN/SEC

[There is about a 5-minute break in recording between SEGMENT A and SEGMENT B.]

[dial tone…dialing…ringing]

UNK: [mumbling-inaudible]…can I help you?

D:      Hi, um, can I place an order, please?

UNK: Yes.

D:      Pick up?  Can I get a Chicken Bowl with extra onions?

UNK: Uh huh.

D:      And then can I get a Chicken Veggie bowl?

UNK: Uh huh.

D:      That's all.

UNK: Okay.  So, you want one small Chicken  Bowl with green onions?

D:      Yeah.

UNK: And one small Chicken Veggie?

D:      Yes.

UNK: Okay.  Can I have your name, Miss?

D:      Sandy.

UNK: I'm sorry?

D:      Sandy.

UNK: Sandy.

D:      Yeah.

UNK: Are you going to [mumbling-inaudible], Sandy?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **DISPATCH [TRACK 4 OF 8]** | **2** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 001-4B-11** |

D:     Yes.

UNK:   Okay.  Your order's gonna be ready in 10 minutes.

D:     Thank you.

UNK:   Thank you.

D:     Bye.

CD NO. 001, TRACK 4, SEGMENT B, ENDS AT 6:56 MIN/SEC

**EXHIBIT 3**

Sep  3 13:31 2008                                                      Page 1


EVENT DISPLAY RECORD
      Agency: GGP                          Class: P
      Event #: 08067312                    Time: 03-Sep-2008/11:28:59
      Status: SEC                          Type: 5150
      Type Descr: MENTAL CASE              Priority: 2
      Response Level: 1                    Loc: 13252 BARNETT WAY ,GG
      Near:                                Info:
      Caller: TRAN TRINH                   Phone: (714)530-3945
      Address: 13252 BARNETT WY ,GG
      Contact:


EVENT CHRONOLOGY
      Date/Time                 Segment Name      Workstation     Description
      -----------------         ------------      -----------     ----------------------
      03-Sep-2008/11:28:59      ENTRY             CMP5
      03-Sep-2008/11:28:59      DTFLW             CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:29:21      LOCINFOV          DSP1
   LocInfo Viewed by 3368 DSP1
      03-Sep-2008/11:29:27      DTFLW             CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:29:27      CHNG              CMP5            Remarks Entered;
      03-Sep-2008/11:29:59      DSP               DSP1
   121B (T/PAT; O/3622 KARSCHAMROON, DANIEL V.) 123C (T/PAT)
      03-Sep-2008/11:29:59      PRIUNIT           DSP1            121B
      03-Sep-2008/11:30:03      DSP               DSP1
   S12 (T/SGT; O/1977 LADD, ROBERT )
      03-Sep-2008/11:30:06      ENR               DSP1            121B,GILBERT/GG
      03-Sep-2008/11:30:44      ENR               DSP1            123C,HOOVER/GG
      03-Sep-2008/11:30:58      DE                DSP1
   253B (T/PAT; O/3282 GENDREAU, RICK )
      03-Sep-2008/11:30:59      DTFLW             CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:30:59      CHNG              CMP5            Remarks Entered;
      03-Sep-2008/11:31:00      CLEAR             DSP1            S12
      03-Sep-2008/11:32:40      DTFLW             CMP5            DETAILS TO FOLLOW
      03-Sep-2008/11:32:40      CHNG              CMP5            Remarks Entered;
      03-Sep-2008/11:33:05      CHNG              CMP5            Remarks Entered;
      03-Sep-2008/11:33:49      ASSTER            DSP1
   123B (T/PAT; O/2861 FLANDERS, ROGER )
      03-Sep-2008/11:34:21      DE                DSP1
   223C (T/PAT; O/3740 ELFARRA, AMIR )
      03-Sep-2008/11:34:43      REMINQ            DSP1
   253B,Nam/TRAN, ANDY Dob/19750919 Sex/M
      03-Sep-2008/11:35:09      CHNG              CMP5            Remarks Entered;
      03-Sep-2008/11:36:10      ONS               DSP1            121B
      03-Sep-2008/11:36:12      ONS               DSP1            253B
      03-Sep-2008/11:37:59      CLEAR             DSP1            123B
      03-Sep-2008/11:38:01      CLEAR             DSP1            123C
      03-Sep-2008/11:38:04      SEC               DSP1            253B
      03-Sep-2008/11:38:18      EVTMSGU           DSP1            253B ,START 72 PLS

Sep  3 13:31 2008                                                    Page 1

EVENT DISPLAY RECORD
      Agency: GGP                        Class: P
      Event #: 08067312                  Time: 03-Sep-2008/11:28:59
      Status: SEC                        Type: 5150
      Type Descr: MENTAL CASE            Priority: 2
      Response Level: 1                  Loc: 13252 BARNETT WAY ,GG
      Near:                              Info:
      Caller: TRAN TRINH                 Phone: (714)530-3945
      Address: 13252 BARNETT WY ,GG
      Contact:


EVENT CHRONOLOGY
      Date/Time                Segment Name      Workstation      Description
      -----------------        ------------      -----------      -----------------------
      03-Sep-2008/11:28:59     ENTRY             CMP5
      03-Sep-2008/11:28:59     DTFLW             CMP5             DETAILS TO FOLLOW
      03-Sep-2008/11:29:21     LOCINFOV          DSP1
   LocInfo Viewed by 3368 DSP1
      03-Sep-2008/11:29:27     DTFLW             CMP5             DETAILS TO FOLLOW
      03-Sep-2008/11:29:27     CHNG              CMP5             Remarks Entered;
      03-Sep-2008/11:29:59     DSP               DSP1
   121B (T/PAT; O/3622 KARSCHAMROON, DANIEL V.) 123C (T/PAT)
      03-Sep-2008/11:29:59     PRIUNIT           DSP1             121B
      03-Sep-2008/11:30:03     DSP               DSP1
   S12 (T/SGT; O/1977 LADD, ROBERT )
      03-Sep-2008/11:30:06     ENR               DSP1             121B,GILBERT/GG
      03-Sep-2008/11:30:44     ENR               DSP1             123C,HOOVER/GG
      03-Sep-2008/11:30:58     DE                DSP1
   253B (T/PAT; O/3282 GENDREAU, RICK )
      03-Sep-2008/11:30:59     DTFLW             CMP5             DETAILS TO FOLLOW
      03-Sep-2008/11:30:59     CHNG              CMP5             Remarks Entered;
      03-Sep-2008/11:31:00     CLEAR             DSP1             S12
      03-Sep-2008/11:32:40     DTFLW             CMP5             DETAILS TO FOLLOW
      03-Sep-2008/11:32:40     CHNG              CMP5             Remarks Entered;
      03-Sep-2008/11:33:05     CHNG              CMP5             Remarks Entered;
      03-Sep-2008/11:33:49     ASSTER            DSP1
   123B (T/PAT; O/2861 FLANDERS, ROGER )
      03-Sep-2008/11:34:21     DE                DSP1
   223C (T/PAT; O/3740 ELFARRA, AMIR )
      03-Sep-2008/11:34:43     REMINQ            DSP1
   253B,Nam/TRAN, ANDY Dob/19750919 Sex/M
      03-Sep-2008/11:35:09     CHNG              CMP5             Remarks Entered;
      03-Sep-2008/11:36:10     ONS               DSP1             121B
      03-Sep-2008/11:36:12     ONS               DSP1             253B
      03-Sep-2008/11:37:59     CLEAR             DSP1             123B
      03-Sep-2008/11:38:01     CLEAR             DSP1             123C
      03-Sep-2008/11:38:04     SEC               DSP1             253B
      03-Sep-2008/11:38:18     EVTMSGU           DSP1             253B ,START 72 PLS

Sep  3 13:31 2008                                                        Page 2

```
     03-Sep-2008/11:38:30   ONS          MCT031          223C
     03-Sep-2008/11:38:42   EVTMSGU      DSP1
253B ,START 72 PLS SUBJ WAS TASED
     03-Sep-2008/11:39:41   CHNG         CMP5            Remarks Entered;
     03-Sep-2008/11:41:39   ASSTER       DSP1
221C (T/PAT; O/3712 ALARCON, CLAUDIA )
     03-Sep-2008/11:46:01   MISC         DSP1            253B,NEED SUPERVISOR
     03-Sep-2008/11:46:15   ASSTER       DSP1
S22 (T/SGT; O/9103 WAGNER, RICK )
     03-Sep-2008/11:47:05   ONS          MCT039          221C
     03-Sep-2008/11:49:27   SUPP         CMP2
     03-Sep-2008/11:53:31   ENR          DSP1
253B[GGMC],FOLLOWING AMBULANCE
     03-Sep-2008/11:57:09   ONS          DSP1            253B
     03-Sep-2008/11:57:30   EVTMSG       DSP1            253B ,T22 STA 47 PLS
     03-Sep-2008/12:01:53   MISC         CMP4
S22,CAP IS ENRT OUR LOCATION
     03-Sep-2008/12:02:06   SUPP         CMP4
     03-Sep-2008/12:05:42   MISC         PCWKS113        223C,CDL=B4760334 **
     03-Sep-2008/12:12:45   CASE         DSP1   *
     03-Sep-2008/12:18:53   ASSTOS       CMP2            666D (T/DET)
     03-Sep-2008/12:19:07   CLOCOS       CMP2            666D[GGMC]
     03-Sep-2008/12:34:09   ENR          DSP1            253B[GGPD]
     03-Sep-2008/12:57:13   ASSTOS       DSP3            519S (T/PAT)
     03-Sep-2008/12:57:19   CLOC         DSP3            519S[GGMC]
     03-Sep-2008/13:04:52   ASSTOS       DSP3            639D (T/DET)
```

EVENT REMARKS
```
     03-Sep-2008/11:28:59   3401         CMP5
```
     E911 Answer Time: 03-Sep-2008/11:28:00 Received Time: 03-Sep-2008/11:28:35
SAID SON IS CRAZY, WITH WPNS


```
     03-Sep-2008/11:29:27   3401         CMP5
```
     HE 242'D CP


```
     03-Sep-2008/11:30:59   3401         CMP5
```
     SUBJ TOOK CP, HEAR CHILD CRYING , CP COULD NOT ANSWERCQUESTIONS, SAID HE'S
DIZZY, SAID YOU SEND SOMEONE RIGHT NOW, OVER AND OVER


```
     03-Sep-2008/11:32:40   3401         CMP5
```
     SUBJ: POSS EDDY, CP KEEPS HANGING UP, JUST SAYING" YOU COME RIGHT NOW, TAKE
THE HOSPITAL", CP OUT OF BREATH


```
     03-Sep-2008/11:33:05   3401         CMP5
```
     UNK TYPE OF WPNS, WHEN ASKED IF WPNS CP SAID YES

```
    03-Sep-2008/11:35:09  3401        CMP5
    CP WOULD NOT ANSWER ANY QUESTIONS AS TO WHERE HIS SON IS RIGHT NOW, MAJOR
LANGUAGE BARRIER


    03-Sep-2008/11:39:41  3401        CMP5
    T39 TO METRO


    03-Sep-2008/11:49:27  3762        CMP2
    STA 47 T21 ADV OFCR ENROUTE, ETA DRIVING TIME TO LOCN FROM WESTMINSTER


    03-Sep-2008/12:02:06  3395        CMP4
    STA 47 CANCELLED
```

**EXHIBIT 4**









**EXHIBIT 5**





**EXHIBIT 6**





# Orange County Sheriff-Coroner
## Forensic Science Services / Toxicology Laboratory
### Report of Toxicological Examination

R342386
08-51745
PMTox
Original

**FR NUMBER:**          08-51745          **CORONER CASE NUMBER:** 08-05116WI

**NAME OF DECEASED:**   TRAN, Andy

**INVESTIGATOR:**       WILLIAMS / FUKUMOTO                    **AGE:** 32 Year(s)        **SEX:** Male

**SPECIMENS SUBMITTED:** ☒ Postmortem Blood   ☒ Brain   ☒ Stomach Contents   ☒ Urine
                         ☐ Antemortem Samples   ☒ Liver   ☒ Vitreous Humor   ☒ Peripheral Blood
*Other Specimens:*

**BLOOD RECEIVED BY:** Dalie                          **FROM:** Smith
**TISSUE RECEIVED BY:** Lehman                        **FROM:** Smith

---

*Page 1 of 1*

---

*A sample was removed for testing from each matrix listed.*

| Drug | Matrix | Method | Results and Interpretations | Scientist |
|------|--------|--------|------------------------------|-----------|
| *Findings* | | | | |
| Diphenhydramine | Postmortem Blood | GC/NPD-GC/MS | 7.9 mg/L | DWR/DCM |
| Diphenhydramine | Peripheral Blood | GC/NPD | 6.2 mg/L | DWR/DCM |
| Diphenhydramine | Liver | GC/NPD | 56 mg/kg | DWR/DCM |
| Diphenhydramine | Stomach Contents | GC/NPD | 7.1 mg | DWR/DCM |
| Valproic Acid | Postmortem Blood | GC/FID-GC/MS | Detected | QTD |
| Trihexylphenidyl | Postmortem Blood | GC/NPD-GC/MS | Detected | DWR/DCM |
| *Examinations* | | | | |
| Ethanol/Volatiles | Postmortem Blood | Headspace/GC | None Detected | KSP/DCM |
| Barbiturates | Postmortem Blood | Immunoassay | Negative | SAM/JMB |
| Cocaine and/or Metabolite | Postmortem Blood | Immunoassay | Negative | SAM/JMB |
| Phenethylamines | Postmortem Blood | Immunoassay | Negative | SAM/JMB |
| Opiates | Postmortem Blood | Immunoassay | Negative | SAM/JMB |
| Cannabinoids | Postmortem Blood | Immunoassay | Negative | SAM/JMB |
| Alkaline Drugs | Postmortem Blood | GC/NPD-GC/MS | See Findings | DWR/DCM |
| Weak Acid/Neutral Drugs | Postmortem Blood | GC/FID-GC/MS | See Findings | QTD |
| Benzodiazepines | Postmortem Blood | LC/MS/MS | None Detected | MJS |

*Remarks*

---

Tests indicate that atropine may also be present.  This was not confirmed with a second analysis.

LIMS_____  TR 12-2-08 AR                    **Forensic Scientist:** BAISZ                    December 2, 2008
*Rev (2 3)*

**EXHIBIT 7**

# ORANGE COUNTY SHERIFF-CORONER
## 1071 W. Santa Ana Blvd.
## Santa Ana, CA  92703
### Coroner Division

| | |
|---|---|
| **DECEDENT:**    TRAN, Andy Long Phi | **CASE NUMBER: 08-05116-WI** |
| **AGE: 32 Years**          **DOB: 9/19/1975**     **SEX: Male**          **RACE:  Asian** | |

**PLACE OF DEATH:**    **Garden Grove Hospital & Medical Center**

**DATE/TIME OF DEATH:**    **09/03/2008 12:17**

**AUTOPSY DATE/TIME:**    **09/04/2008  9:30**

**PLACE OF AUTOPSY:**    **Sheriff-Coroner Forensic Science Center**

**1071 W. Santa Ana Blvd.**

**Santa Ana, CA  92703**

**AUTOPSY ATTENDANTS:**    **Tara Christian, OCSD**

**Dominique Riley, OCSD**

**Elaine A. Noce, GGPD**

**Claudia Alarcon, GGPD**

**Dave Kivler, GGPD**

**Ted Peaslee, GGPD**

**Ernie Gomez, OCDA**

**Curtis McLean, OCDA**

**Timothy M. Fritch, OCCO**

**CAUSE OF DEATH:**    **Cardiac arrhythmia during struggle with law enforcement**

**Due to:**    **Dilated hypertrophic cardiomyopathy with diphenhydramine and trihexylphenidyl intoxication**

**OTHER CONDITIONS:**    **Fatty liver; paranoid schizophrenia, clinical**

**MANNER:**    **Accident**

**CERTIFICATE ISSUED:**    **9/4/2008**

**AMENDMENT:**    **2/25/2009**

**Richard I. Fukumoto, M.D.**
**Forensic Pathologist**