Sean Hennessey, State Bar No. 157005
THE LAW OFFICE OF SEAN HENNESSEY
8231 Westminster Blvd.
Westminster, CA 92683
Tel. (949) 280-1257
Fax: (714) 898-7449
Email: seanhennesseyesq@gmail.com

Liem H. Do, State Bar No. 129029
LIEM H. DO & ASSOCIATES, APLC
8231 Westminster Blvd.
Westminster, CA 92683
Tel. (714) 898-7579

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

QUYEN KIM DANG, INDIVIDUALLY AND AS A GUARDIAN AD LITEM FOR KENNY MINH CAO TRAN, A MINOR, AND PERSONAL REPRESENTATIVE OF ANDY TRAN, DECEASED; KENNY MINH CAO TRAN, A MINOR BY AND THROUGH HIS GUARDIAN AD LITEM, QUYEN KIM DANG; NAM VAN TRAN, BIOLOGICAL FATHER OF ANDY TRAN, DECEASED; BUA THI PHAN, BIOLOGICAL MOTHER OF ANDY TRAN, DECEASED,

        Plaintiffs,

v.

CITY OF GARDEN GROVE; GARDEN GROVE CHIEF OF POLICE JOSEPH M. POLISAR; GARDEN GROVE POLICE OFFICER GENDREAU; GARDEN GROVE POLICE OFFICER KARSCHAMROON; TASER INTERNATIONAL, INC., AND DOES 1 TO 10, INDIVIDUALS; AND ROES 1 TO 10, ENTITIES, INCLUSIVE,

        Defendants.

Case No.  SACV10-00338 DOC (MLGx)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR ALTERNATIVELY, SUMMARY ADJUDICATION OF ISSUES; TABLE OF CONTENTS; TABLE OF AUTHORITIES; MEMORANDUM OF POINTS AND AUTHORITIES**

**DATE: July 25, 2011
TIME: 8:30 a.m.
CTRM: 9-D**

*[filed concurrently with Plaintiffs' Statement of Undisputed Material Facts; and Declarations and Exhibits in Support of Plaintiffs' Opposition]*

///

# TABLE OF CONTENTS

TABLE AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii- v

I.    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   A.  PLAINTIFF'S FIRST, SECOND, AND THIRD CAUSES OF ACTION ARE VALID AND
       PROPER DETERMINATIONS FOR A TRIER OF FACT. . . . . . . . . . . . . . . . . . . . . . 12

       1.  THE OFFICERS' FORCE WAS EXCESSIVE UNDER THE CIRCUMSTANCES OF
           THIS CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       2.  THE FACTS SHOW THAT THE OFFICERS ARE NOT ENTITLED TO
           QUALIFED IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       3.  THE OFFICERS' DELIBERATE INDIFFERENCE TO THE DECEDENT'S
           MEDICAL NEEDS WAS A CONSTITUTIONAL VIOLATION. . . . . . . . . . . . . 17

       4.  ENTITY DEFENDANTS AND THE POLICE CHIEF ARE LIABLE FOR
           VIOLATING DECEDENT'S AND PLAINTIFFS' CIVIL RIGHTS. . . . . . . . . . . 18

       5.  PLAINTIFFS AS RELATIVES OF THE DECEDENT HAVE VALID CAUSE OF
           ACTION FOR CONSTIUTIONAL VIOLATIONS. . . . . . . . . . . . . . . . . . . . . 20

       6.  PLAINTIFFS HAVE A VALID CAUSE OF ACTION SUBSTANTIVE DUE
           PROCESS CLAIM UNDER THE FOURTEENTH AMENDMENT. . . . . . . . . . . 20

   B.  PLAINTIFFS HAVE VALID CAUSE OF ACTION UNDER THE BANE ACT (CAL.
       CIV. CODE SECTION 52.1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   C.  PLAINTIFFS HAVE VALID CAUSE OF ACTION FOR ASSAULT AND BATTERY. . . .
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   D.  PLAINTIFFS' HAVE A VALID CAUSE OF ACTION FOR NEGLIGENCE . . . . . . . . . . .
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   E.  PLAINTIFFS HAVE A VALID CAUSE OF ACTION FOR NEGLIGENT INFLICTION
       OF EMOTION DISTRESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F.   PLAINTIFFS HAVE VALID CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

III.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). . . . . . . . . . . . . . . . . . 11

Allen v. Toten,  172 Cal.App.3d 1079 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Balistreri v. Pacifica Police Dept., 901 F.2d 696 (9th Cir. 1990) . . . . . . . . . . . . . 12

Barner v. Leeds, 24 Cal.4th 676 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Bryan v. MacPherson, 630 F.3d 805 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 13

Burgess v. Superior Court, (1992) 2 Cal.4th 1064 (1992). . . . . . . . . . . . . . . . . . . 24

Caldwell v. Montoya, 10 Cal.4th 972 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

City of Canton v. Harris, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Curnow By v. Ridgecrest Police, 952 F. 2d 321 (9th Cir. 1991) . . . . . . . . . . . . . . .20

Drummond v. City of Anaheim 343 F.3d 1052 (9th Cir. 2003). . . . . . . . . . . . 12, 13

Edgerly v. City and County of San Francisco, 599 F.3d 946 (9th Cir. 2010). . . . . . 19

Edson v. City of Anaheim, 63 Cal.App.4th 1269 (1998) . . . . . . . . . . . . . . . . . . . . 22

Espinosa v. City and County of San Francisco, 598 F.3d 528 (9th Cir. 2010) . . . . . 15

House v. Bell, 547 U.S. 518 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Inouye v. Kemna, 504 F.3d 705 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Graham v. Connor, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Liberal v. Estrada, 632 F.3d 1064 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 24

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . 11

McCorkle v. City of Los Angeles, 70 Cal.2d 252 (1969) . . . . . . . . . . . . . . . . . . . . 24

McMahon v. Craig, 176 Cal.App.4th 1502 (2009). . . . . . . . . . . . . . . . . . . . . . . . 24

Merritt v. County of Los Angeles, 875 F.2d 765 (9th Cir. 1989) . . . . . . . . . . . . . . 19

Monell v. Department of Social Services of City of New York, 436 U.S. 658(1978) .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365 (9th Cir. 1998) .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

1  Pearson v. Callahan, 555 U.S. 223 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

2  Price v. Sery, 513 F.3d 962 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3  Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965 (1993) . . . . . . . . . . . . . . . 25

4  Santos v. Gates, 287 F.3d 846 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5  Saman v. Robbins, 173 F.3d 1150 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 22

6  Saucier v. Katz, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

7  Serrano v. Francis, 345 F.3d 1071 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 15

8  Smith v. City of Fontana, 818 F.2d 1411 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . 20

9  Smith v. City of Hemet, 394 F.3d 689 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 13

10  Susag v. City of Lake Forest, 94 Cal.App.4th 1401 (2002) . . . . . . . . . . . . . . . . . 22

11  Tatum v. San Francisco, 441 F.3d 1090 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . 17

12  Tennison v. City and County of San Francisco, 570 F.3d 1078 (9th Cir. 2009) . . . 21

13  Van Ort v. Estate of Stanewich, 92 F.3d 831 (9th Cir. 1996). . . . . . . . . . . . . . . .18

14  Wilkinson v. Torres, 610 F.3d 546 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 21

15

16  **United States Code**

17      42 U.S.C. § 1988(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18  **Federal Rules of Civil Procedure**

19      Fed.R.Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20  **California State Statutes**

21      Civil Code

22          Cal. Civ. Code 52.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

23      Code of Civil Procedure

24          Cal. Code Civ. Proc. § 377.20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

25          Cal. Code Civ. Proc. § 377.30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

26

27  Government Code

28          Cal. Gov't Code § 815. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cal. Gov't Code § 815.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Cal. Gov't Code § 820.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. STATEMENT OF FACTS

On September 3, 2008, Mr. Andy Tran ("Andy") lived at 13253 Barnett Way in the City of Garden Grove. (Plaintiff's Separate Statement of Undisputed Facts and Conclusions of Law (hereinafter "SUF") No. 326). 13253 Barnett Way is located at the corner of Paloma Drive and Barnett Way. (SUF No. 327). Independent Witness Mark Zimmerman ("Zimmerman") lived directly across the street from Andy's residence on the opposite corner of Paloma Drive and Barnett Way. (SUF No. 328). Zimmerman had lived across from the Tran's for several years (SUF No. 329). Zimmerman testified that sometimes Andy appeared normal and other times he appeared a bit mentally unstable. (SUF No. 330). Zimmerman never felt threatened by Andy or seen him act violently. (SUF No. 331).

At approximately 11:30 a.m., Zimmerman drove home, parked his truck in front of his house and saw Andy sitting on the curb in front of Andy's house.. (SUF No. 332-333). Zimmerman watched as Andy got up from the curb, move to a grassy section of his lawn and went to his knees letting out a moan or cry. (SUF No. 334). Zimmerman next watched Andy get up, walk to his front door and remove a window screen from a window next to the front door. (SUF No. 335-337). Zimmerman could see Andy's father, Mr. Nam Tran, ("Nam") inside the house as well as an adult woman. (SUF No. 338).

Zimmerman began walking across the street towards Andy and yelled at Andy "that's enough" and "stop". (SUF No. 339). Zimmerman testified Andy was wearing a tight fitting t-shirt wearing work-out-type shorts. (SUF No. 347). Zimmerman said it was clear by the way Andy was dressed that he did not have any weapons on him. (SUF No. 348). Zimmerman was unaware, Nam had called the Garden Grove Police Department ("GGPD") and requested Andy be taken to the hospital. (SUF No. 340). Three (3) GGPD Officers were dispatched to Andy's house as a result of Nam's 911 call. (SUF No. 341). The dispatched Officers Richard Gendereau, Daniel Karschamroon and Amir El-Farra. (hereinafter "Gendreau", "Karschamoon" and "El-Farra"). (SUF No. 342). Because of a language barrier, between the dispatcher and Nam the dispatcher mistakenly believed Mr. Nam Tran said Andy had a weapon. (SUF No. 343). Dispatch made

responding officers aware they were responding to a California Welfare and Institutions 5150 call ("5150"); a gravely disabled individual who may be a danger to himself or others. (SUF No. 344). Dispatch also made responding officers aware that officers had been dispatched on several prior occasions to 5150 calls involving Andy at the same address. (SUF No. 345).

As soon as Zimmerman yelled at Andy he saw Karschamroon park adjacent to Zimmerman's house exit his car and yell to Andy to stop. (SUF No. 346, 349). Zimmerman said that Andy immediately snapped out of whatever state he was in when he heard Mr. Zimmerman and Karschamroon yell towards him and that Andy turned towards Zimmerman and Karschamroon and stopped what he was doing with the window screen. (SUF No. 350). Zimmerman testified he went back towards his truck and stayed there, 40 feet away, and watched the entire encounter between Andy and the police; without any obstructions in between. (SUF No. 351).

Karschamroon knew he was responding to a 5150 call and knew that dealing with the mentally ill was part of his job responsibilities. (SUF No. 352). However, Karschamroon stated that he could not recall anything specifically he was trained to do with 5150/mentally ill suspects. (SUF No. 353). Karschamroon further stated he could not recall training he received regarding the 4th or 14th Amendments to the United States Constitution, excessive force, the proper use of the GGPD IVS Unit, or taser policies. (SUF No. 355). Both he and Gendreau testified that they had been trained at the Academy and during GGPD Field Training to use the minimum amount of force required under the circumstances. (SUF No. 356).

Karschamroon testified that he became a sworn GGPD Officer on November 17, 2007. (SUF No. 357). Before becoming a police officer Karschamroon testified he had been in the United States Marine Corps since 2003 and remained in the reserves from the time he became a police officer until September 3, 2008. (SUF No. 358). Karschamroon testified that on September 3, 2008, he was a Staff Sergeant in the Marine Corps reserves and was a brown belt martial instructor in the Marine Corps. (SUF No. 359). As a brown belt martial instructor he would train fellow Marines in pain compliance moves, wrist control, arm bar take downs, hip throws and other techniques to subdue people. (SUF No. 360).

Karschamroon said he positioned his car in such a fashion that his In-Car Video System ("IVS Unit") would have video/audio taped the encounter between he and Andy. (SUF No. 361, 362363).  GGPD General Order ("General Order") 5.31 requires that all officers **shall** (mandatory) activate their IVS Unit anytime they are going to detain someone. (SUF No. 364).  Karschamroon said he thought he had complete discretion to either activate or not activate the IVS Unit and could not articulate any mandatory use situations. (SUF No. 365).

Karschamroon testified, inconsistently with Zimmerman, that Andy had part of his body inside the window where the screen was removed when he arrived; Zimmerman stated that Andy had just taken the screen on the window when he and Karschamroon began yelling at Andy. (SUF No. 366).  Zimmerman never saw Andy reach inside the window. (SUF No. 366).  Karschamroon testified when he yelled at Andy, Andy immediately stopped what he was doing and turned towards Karschamroon. (SUF No. 367).  Karschamroon testified he called Andy by his name and was uncertain if he learned Andy's name from hearing Zimmerman saying it or hearing Andy's name from dispatch. (SUF No. 368).

Karschamroon commanded Andy to walk towards him and Andy complied. (SUF No. 369).  While Andy was walking towards Karschamroon, Andy appeared confused, puzzled, and appeared in need of some type of medical help. (SUF No. 370).  Andy appeared confused throughout his entire encounter with Karschamroon. (SUF No. 371).  Zimmerman also stated that Andy appeared confused during his time with the police. (SUF No. 372).

Karschamroon stated that Andy was approximately 10-15 feet from him when ordered Andy to stop, which Andy did. (SUF No. 373).  Karschamroon then told Andy to turn around with his back facing Karschamroon and Andy complied. (SUF No. 374).   When Andy turned around, Karschamroon told Andy to put his hands on his head and Andy complied. (SUF No. 375).  Once Andy had his back towards Karschamroon with his hands on his head,  Karschamroon approached Andy and told him to interlock his fingers and Andy complied (SUF No. 376).  Karschamroon wanted Andy to have his back to him so that he would be in position of advantage (SUF No. 377).  Karschamroon then went "hands on" with Andy by placing a handcuff on Andy's right wrist and placing his other hand on Andy's left wrist in order to maintain control of Andy. (SUF No. 378).

Karschamroon testified that up to this point, Andy had followed every order given, that he had not seen Andy be violent at all, that Andy made no aggressive moves of any kind, and did not look as if he may try to flee. (SUF No. 379). Karschamroon had been trained to not approach a suspect or go "hands on" with a suspect if he reasonably believed the suspect was armed. (SUF No. 380). Karschamroon knew two other officers were also responding but he did not feel he needed to wait for back-up because Andy had complied with all commands and he could see Andy's hands. (SUF No. 381).

Karschamroon testified that telling Andy to interlock his fingers was the last "command" he or anyone ever gave to Andy. (SUF No. 382). Karschamroon stated, that once he put a handcuff on Andy's right wrist Andy's hands tensed. (SUF No. 383). Karschamroon testified he did not know whether Andy's fingers tensed in an effort to obey the last command given; to interlock his fingers. (SUF No. 384). Up to this point, Karschamroon stated the encounter was between 20-45 seconds. (SUF No. 385).

Karschamroon never saw Andy's hands become non interlocked. (SUF No. 386). He told Internal Affairs ("I.A.") following the incident and testified repeatedly that *he never saw Andy's hands ball into fists*. (SUF No. 387). Karschamroon testified he was aware Gendreau told I.A. that Andy's hands balled into fists and he was also present when Gendreau testified he saw Andy's hands ball up into fists yet Karschamroon repeatedly said he never saw Andy's hands ball into fists at any time. (SUF No. 388).

Karschamroon told I.A. and during his deposition that Andy never actively resisted any command at anytime; Karschamroon said and testified that at most he thought Andy may resist. (SUF No. 389). Zimmerman also testified that while Karschamroon was alone with Andy, there was no struggle and everything looked "routine" and under control. (SUF No. 390).

Karschamroon testified that when Andy's hands tensed up he told Andy to "relax" yet acknowledged that he did not know if this was relaxed for Andy and that he had never been trained that "relax" or "calm down" were lawful orders; unlike put your hands behind your back (SUF No. 391, 392). Karschamroon testified he never told Andy to separate his fingers, put his hands behind his back, or inform Andy that he was going to be handcuffed. (SUF No. 393). Given Andy's

confused stated, Karschamroon could not explain why he did not tell Andy to un-interlock his fingers, or to put his hands behind back or that he was going to handcuff Andy. (SUF No. 394). Zimmerman testified that it was right after Karschamroon put his hands near Andy's hands on top of Andy's head when Gendreau arrived. (SUF No. 395).

Karschamroon testified that he had never worked with Gendreau, did not know him personally, and had never responded to a call Gendreau was present at either before or after September 3, 2008. (SUF No. 396). Karschamroon testified that Gendreau was positioned one to three feet away from Karschamroon at all times. (SUF No. 397). Karschamroon told I.A. and testified repeatedly that *he never saw Gendreau ever touch Andy*. (SUF No. 398).

Gendreau testified that he became a GGPD Officer on September 9, 2005. (SUF No. 399). Gendreau testified that before he became a police officer he had taken martial arts training years and was a brown belt in karate. (SUF No. 400).

Gendreau knew he was responding to a 5150. (SUF No. 401). Gendreau told I.A. that dispatch informed him of Andy's mental health history prior to arriving at the scene. (SUF No. 402). Gendreau testified the only training he received concerning the mentally ill was that they could become violent (SUF No. 403). Gendreau was unable to articulate his training dealing with the mentally ill or the 4th or 14th Amendments, excessive force, the IVS unit, or the GGPD Taser policies (SUF No. 404). Regarding the IVS Unit, Gendreau testified he knew the IVS Unit should be activated when a subject was being detained. (SUF No. 405). However, Gendreau testified he did not attempt to activate his IVS Unit upon arrival notwithstanding he knew Andy was being detained. (SUF No. 406).

Gendreau testified he arrived 20-30 seconds after Karschamroon (SUF No. 407). Gendreau testified when he arrived he saw an elderly couple and a small boy, Plaintiffs Bua Phan, Van Tran and Kenny Tran, near Andy's front door when he arrived. (SUF No. 408). Bua Phan testified she and her husband watched the entire encounter and watched in horror while Andy was tasered for no reason and died immediately. (CITE)

Gendreau *never testified that he ever saw Karschamroon struggling with Andy* (SUF No. 409). Gendreau testified that Karschamroon had a hold of both of Andy's arms and maintained

control of Andy's hands. (SUF No. 410).  Further, *Karschamroon testified he never struggled with Andy* in the presence of Gendreau.  (SUF No. 411).

In truth, Gendreau testified that he knew of no criminal act Andy had committed (such as resisting arrest), he saw nothing to believe Andy was armed, Andy never attempted to break away from Karschamroon,  he saw no movements by Andy indicative that he was attempting to run or flee,  and saw no movements by Andy which led him to believe Andy was trying to hit, kick, or push he or Karschamroon. (SUF No. 412).   Gendreau testified that it did not appear Andy understood anything he told him.  (SUF No. 413).  However, Gendreau said he "did not feel it prudent to try and spend time trying to make sure he understood" prior to tasering Andy. (SUF No. 415).  Gendreau testified that Andy was not "actively resisting" when he was tasered.  (SUF No. 416).  Both Karschamroon and Gendreau testified Gendreau was on scene between 30-60 seconds before Gendreau tasered Andy. (SUF No. 417).

General Order 5.9 (GGPD Mental Illness & 5150 Bookings) states in pertinent part: "When responding to a call that involves a person who is mentally ill, officers should obtain as much information as possible to assess and stabilize the scene"; "Communication: It's better to spend 15 minutes talking than 5 minutes fighting"; "Time is on your side (a) slow down, (b) reassess". (SUF No. 418).

Karschamroon testified he was one to three feet away from Gendreau, told I.A. and only heard Gendreau say things like "dude calm down" to Andy and never heard Gendreau say get "your hands behind your back." (SUF No. 419).  Karschamroon testified he was one foot from Andy and never heard him growl and *never saw Andy drool or froth coming from Andy's mouth at anytime.* (SUF No. 420).

Gendreau testified that he stood in front of Andy for several seconds and then moved to Andy's side and placed both of his hands on Andy's left arm and Karschamroon also had one of his hands on Andy's left arm. (SUF No. 421).  Gendreau testified that he and Karschamroon then together tried to pull Andy's left arm behind his back but could not move Andy's arm at all. (SUF No. 422).  However, Karschamroon told I.A. and testified repeatedly that *he never saw Gendreau*

*touch Andy and he did not try to force Andy's arm behind his back either alone or with Gendreau.* (SUF No. 423).

Zimmerman stated that he *never saw Gendreau step to Andy's side and place two hands on Andy's arm and try to force Andy's arm behind his back.* (SUF No. 424). Mr. Zimmerman said he *never saw any type of struggle* of any kind involving Andy the officers. (SUF No. 425).

Zimmerman testified that Karschamroon appeared to have everything under control and Gendreau brought with him a "cowboy" attitude and appeared overzealous, impatient, and instantly raised the "stress level" of what was happening. (SUF No. 426). Karschamroon and Zimmerman both testified that the only time Gendreau stepped to the side of Andy was when he tasered Andy. (SUF No. 427).

Gendreau claims that once he decided to taser Andy he attempted to activate his IVS Unit by flipping a switch on his belt and it did not work for some unexplained. (SUF No. 429, 430). Gendreau never documented his IVS Unit's alleged failure to activate as was required by General Order 5.31. (SUF No. 431).

Both Gendreau and Karschamroon testified they were trained on how to use a taser by then Sergeant Lux. (SUF No. 432). Lux testified that during Taser training he would read verbatim GGPD General Order 2.24 and make sure each trainee understood the Order, he would show videos of taser deployments and conduct a powerpoint presentation of proper and improper taser deployments (SUF No. 434).

Lux testified that a taser should never be used against Non Combative Subjects as defined in General Order 2.6: Use of Physical Force. (SUF No. 435). GGPD General Order 2.6 defines Non Combative Subjects as: (1) An individual does not respond to an officer's requests or commands and may be argumentative, or (2) An individual's verbal or non-verbal actions indicate he is not complying with the officer's requests or demands, or (3) An individual is actively resisting handcuffing techniques, but is reasonably under control by the officer(s). (SUF No. 436). Lux said an example of a Non Combative Subject would be someone who lays on their stomach with their hands beneath them in order to not be handcuffed (SUF No. 437). Lux testified that someone who

may try to frustrate the handcuffing process but is not actively violent or assaultive would be a Non Combative Subject and should not be tasered. (SUF No. 438).

Lux testified that he trained that tasers should be used with extreme caution against suspects believed to be under the influence of Central Nervous System stimulants because those suspects can suffer immediate death from the tasering. (SUF No. 439). Lux testified that he trained pursuant to General Order 2.24 that before a taser is used a Supervisor must be summoned before the use of taser and paramedics should be called before a taser is used. (SUF No. 440). Mr. Lux testified it would take 1-3 seconds to call for a supervisor or paramedics. (SUF No. 441). General Orders 2.6 and 2.24  mandate that whenever a taser is used, the involved officers must write a report documenting their use of a taser. (SUF No. 441). Lux testified that a Use of Force Memo addressed to the Chief of Police must be written by the Field Sergeant, Sergeant Wagner ("Wagner"), following a taser deployment (SUF No. 442).

Gendreau does not believe a taser application to be painful. (SUF No. 443). Gendreau testified before he decided to Taser Andy he believed Andy was under the influence of a Central Nervous System stimulant and was trained that tasering Andy could cause him to die immediately. (SUF No. 444, 445). Gendreau said that when he took out his taser, Andy was not being violent and did not believe Andy was attempting to assault anyone or to flee  (SUF No. 446). Karschamroon told I.A. and testified that he saw no reason to withdraw any weapon against Andy, he had no idea why Gendreau was going to taser Andy and he made no efforts to determine why Gendreau was going to taser Andy. (SUF No. 447). Karschamroon testified that because Andy would not "calm down" Gendreau told him "hey Danny I'm just going to tase him" to which Karschamroon said "O.K." (SUF No. 448).  Lux said as the first responding officer, Karschamroon should have determined why Gendreau was going to deploy a taser. (SUF No. 449). Karschamroon testified the only thing Andy failed to do before being the tasering was to "relax". (SUF No. 450).

Zimmerman testified he saw Gendreau step to Andy's side, withdraw his Taser and immediately fire the Taser into Andy's right thigh. (SUF No. 451).  He said Andy fell forward "like a sack of potatoes" and landed face down on his stomach hitting the ground very hard. (SUF No. 452). Zimmerman said because Andy's shirt was too small and tight part of Andy's stomach became

exposed when he hit the ground. (SUF No. 453). Zimmerman and Andy's mother, Ms. Bua Phan, stated that Andy showed absolutely no signs of life when he hit the ground and both believed he was dead when he hit the ground. (SUF No. 454, 455).

Zimmerman testified that after Andy was on the ground, that the three officers stood around doing nothing to help Andy and appeared to become increasingly concerned with Andy not moving. (SUF No. 456). He said Gendreau leaned over Andy and slapped him several times on the face saying "stop faking" (SUF No. 457). Karschamroon testified that Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. (SUF No. 458). Zimmerman testified that Karschamroon, Gendreau and El-Farra all remained outside near Andy until the paramedics arrived. (SUF No. 459). Zimmerman said he saw the police roll Andy's lifeless body into a seated position leaning against an officer's legs and he could clearly Andy was neither moving nor breathing. (SUF No. 460).

Gendreau declared in paragraph 26 that he contacted dispatch in order for a supervisor and medics to arrive "pursuant to GGPD policy and my training". However, General Order 2.24 requires a supervisor and medic to be called before deploying a taser. (SUF No. 465). Further, his supervisor, Wagner wrote he was not requested until 11:46, 8 minutes or more minutes post tasering. (SUF No. 461). Further, paramedics were not dispatched until 11:39:48 and arrived at Andy's house at 11:44. (SUF No. 462). When paramedics arrived Andy was in full cardiac arrest, meaning he had no heart beat and was not breathing (SUF No. 463). The first responding paramedic immediately ordered the handcuffs on Andy be removed. (SUF No. 464). General Order 2.6 and 2.24 required Karschamroon and Gendreau to either (1) write a report about the use of force that resulted in an in-custody death or (2) provide a statement to Orange County District Attorney (hereinafter "OCDA") Investigators. (SUF No. 465). Karschamroon and Gendreau stated they did not write reports about the incident and refused to provide an interview to investigators from the OCDA's Office. (SUF No. 466). Gendreau testified that after he refused to be interviewed by investigators from the OCDA's Office he spoke with then Sergeant Ted Peaslee ("Peaslee"). (SUF No. 467). Peaslee was assigned to the Crimes Against Persons Unit of the GGPD on September 3, 2008. (SUF No. 468).

Peaslee testified that Wagner called him and told him a subject had been tasered, the subject was in full cardiac arrest, the subject was on his way to the hospital and not expected to live and he wanted someone from the Crimes against Persons Unit to respond to the location. (SUF No. 469). Peaslee testified that he instructed Gendreau to not write a report about his taser use and allegedly did not inquire whether Gendreau had already refused to be interviewed by the OCDA's Office. (SUF No. 470).  Karschamroon also said Peaslee instructed him to not write a report about the force used against Andy. (SUF No. 471).  General Orders 2.6 and 2.24 require a Use of Force Memo to be written by a Field Supervisor to the Chief of Police after a taser deployment and a use of force resulting in a death (SUF No. 472).  Wagner was the Field Supervisor who responded to the scene following the tasering of Andy. (SUF No. 473).  However, Wagner never wrote a Use of Force Memo addressed to the Chief of Police as required by General Orders 2.6 and 2.24. (SUF No. 474).

Wagner did take statements from Gendreau and Karschamroon when the paramedics were still present at the scene, and Wagner told Peaslee what the officers said. (SUF No. 475).  Peaslee told Wagner to write a report about what the officers told him and he reviewed the report later and found no difference from what Wagner told him at the scene. (SUF No. 476).  Wagner's report is devoid of any statements by Gendreau and/or Karschamroon about Gendreau ever touching Andy and there is nothing about Gendreau and/or Karschamroon struggling to get Andy's hand behind his back. (SUF No. 477).

On September 4, 2008, Orange County Forensic Pathologist Dr. Richard Fukumoto performed an autopsy on the body of Andy Tran.  (SUF No. 479).  Dr. Fukumoto has performed numerous autopsies involving police involved in-custody deaths including deaths following taserings. (SUF No. 481).  Dr. Fukumoto has done extensive research on the effects of tasering on the human body prior to the time of Andy Tran's autopsy. (SUF No. 482).  In preparation for his deposition testimony Dr. Fukumoto fully reviewed all relevant files including Karschamroon's deposition. (SUF No. 483).   Dr. Fukumoto, testified he has been deemed an expert in interpretting toxicology results and testified no drugs or medications played a role in Andy's death. (SUF No. 484).  Dr. Fukumoto testified there is no evidence showing Andy was suffering from cardiac symptoms prior to the time he was tasered. (SUF No. 487).  Dr. Fukumoto did find Andy had an

enlarged heart but determined Andy died from the tasering. (SUF No. 488, 489, 490). Dr. Fukumoto testified that people with similarly enlarged hearts can live long lives (SUF No. 489).

Dr. Fukumoto testified that the records from the paramedics reasonably show that Andy died almost immediately after the tasering event because the tasering happened around 11:38 a.m., paramedics were dispatched at 11:39:38, the paramedics arrived around 11:43 a.m. and when they arrived Andy was in full cardiac arrest and his eyes were fixed and dilated. (SUF No. 491). Dr. Fukumoto explained that once a person goes into full cardiac arrest the brain can continue to function for six to eight minutes and because Andy's eyes were fixed and dilated indicates that brain activity has totally stopped thereby showing Andy went into full cardiac arrest immediately after the tasering. (SUF No. 491) Dr. Fukumoto also testified that if the police saw Andy suffering from labored breathing, breathing rapidly and/or breathing heavily these would have been clear indications Andy was suffering cardiac distress (cardiac arrhythmia) which would have been further exacerbated by Andy's hands being handcuffed behind his back based because the handcuffs would have limited his ability to breath fully. (SUF No. 493). Dr. Fukumoto ultimately concluded that Andy died as a direct result of the tasering based upon the symptoms of cardiac arrest presenting either immediately or within moments of the tasering event and the absence of any indication of cardiac distress presenting prior to the tasering event. (SUF No. 494).

## II.    LEGAL ARGUMENT

Summary judgment should only be granted if there are no genuine issues of material fact. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986). Material facts are those which may affect the outcome of the case, and a dispute as to a material fact is "genuine" when there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court draws all reasonable inferences that may be taken from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he district court does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." House v. Bell, 547 U.S. 518, 559–560 (2006).

## A.  PLAINTIFF'S FIRST, SECOND, AND THIRD CAUSES OF ACTION ARE VALLID AND PROPER DETERMINATIONS FOR A TRIER OF FACT

To sustain an action under 42 U.S.C. § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right.  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).

In the instant case, there is can be no dispute that the Defendants were all acting under color of the law when they came into contact with Andy Tran on September 3, 2008. Further there can be no dispute that the conduct of each of the Defendants deprived Andy Tran of his most basic Constitutional right; his life. Before he was killed, Andy Tran also was deprived of his rights under the Fourth and Fourteenth Amendments of the Constitution to be free from unreasonable searches and seizures and unconscionable conduct. The Plaintiffs have clearly set forth a multitude of facts which clearly show Andy Tran was subjected to excessive force and the Defendants acted with deliberate indifference to Andy Tran's Constitutional rights which directly resulted in Andy Tran's wrongful death in violation of his Fourth and Fourteenth Amendments under the United States Constiution.

### 1.  . THE  OFFICERS'  FORCE  WAS  EXCESSIVE  UNDER  THE CIRCUMSTANCES OF THIS CASE

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness. *See* Graham v. Connor, 490 U.S. 386, 395 (1989); Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003).   The reasonableness of any particular use of force is judged "from the perspective of a reasonable officer on the scene." Id. *at 395*. The inquiry is an objective one, and the question is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them. Id. at 397.

In order to determine whether this level of force was objectively reasonable, the Court must consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to

evade arrest by flight. Id. at 396. Further, where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed. *See* Drummond, 343 F.3d at 1058. "In some cases ..., the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005). To determine whether force is reasonable requires careful attention to the facts and circumstances of the particular case and a careful balancing of the individual's liberty interest against the government's interest in the application of force. Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002). Because such balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has "held on many occasions that summary judgment ... in excessive force cases should be granted sparingly." Id.

In Bryan v. MacPherson, the Ninth Circuit considered the use of a Taser in dart mode; such as was used against Andy. 630 F.3d at 824. The Bryan court explained the Taser delivers an electrical charge and "[t]he electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." Id. Based on its analysis of the "physiological effects, the high levels of pain, and foreseeable risk of physical injury," the Ninth Circuit concluded that the use of a Taser in this manner constituted an "intermediate, significant level of force that must be justified by the governmental interest involved." Id. at 825–26.

In the instant case, both Officers Karschamroon and Gendreau testified they knew they were responding to a 5150 call and Officer Gendreau testified prior to his arrival dispatch made him aware of Andy Tran's mental health history. Both Mr. Zimmerman and Officer Karschamroon testified that Andy looked confused during the entire contact and Officer Karschamroon further testified Andy appeared puzzled and in need of some type of medical help.

*The severity of the crime at issue:* Both Officers Karschamroon and Gendreau testified they were not aware of any criminal act committed by Andy at anytime. Therefore, given neither Officers Karschamroon and Gendreau could articulate any crime committed by Andy the first factor the Court needs to consider is inapplicable to the instant facts.

*Whether the suspect poses an immediate threat to the safety of the officers or others.*

Officer Karschamroon testified that Andy followed numerous lawful orders. He and Zimmerman testified Andy clearly was unarmed. Karschamroon testified Andy never became violent with him, never tried to push, kick or hit him at anytime. The only thing Karschamroon articulated Andy did "wrong" was to not "relax" or "calm down". Karschamroon testified Andy's hands tensed when he placed a handcuff on one of Andy wrist and grabbed ahold of his other wrist. However, Karschamroon aknowledged the tension in Andy's hand may have been his attempt to obey the last order given; to interlock his fingers. Karschamroon  said he never struggled with Andy and never saw Gendreau lay a hand on Andy. Zimmerman testified he never saw signs of a struggle between Andy and any officer.  Karschamroon testified he only heard Gendreau tell Andy "dude calm down" and then Gendreau said "Danny I'm just going to tase him" Karschamroon had no idea why Andy was being tasered and made no inquiries to figure out why Gendreau was going to taser Andy. Gendreau said at the time he tasered Andy he was not actively resisting, he did not feel he was going to flee and had not witnessed Andy engage in any type of assaultive behavior.

Therefore, the Defendants have failed to articulate a single articulable fact that Andy posed an immediate threat to anyone when the taser was deployed against him. Gendreau testified he did not believe a taser was painful yet knew knew Andy could die instantly from the tasering. The facts show based upon the actions and/or inactions of Gendreau and Karschamroon that they posed an imminent danger to Andy and not the other way.

*3. whether he is actively resisting arrest or attempting to evade arrest by flight.*

Both Karschamroon and Gendreau testified that they had no concerns Andy was going to flee. Further, both Karschamroon and Gendreau testified Andy was not actively resisting before he was shot with the taser. Given the Defendants have failed to produce any articulable facts that Andy was either actively resisting or attempting to flee when he was tasered the Court must find the Defendants failed to satisfy this third factor.

**2.      THE DEFENDANTS ARE NOT ENTITLED TO QUALIFED IMMUNITY**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223 (2009). In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?" 533 U.S. at 201. Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition. Saucier, 533 U.S. at 201.

Summary judgment is not appropriate where genuinely disputed issues of fact exist concerning a defendant's entitlement to qualified immunity. See Espinosa v. City and County of San Francisco, 598 F.3d 528, 532 (9th Cir. 2010) (affirming denial of summary judgment because there were genuine issues of fact regarding whether officers violated plaintiff's Fourth Amendment rights and whether those rights were clearly established); Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir. 2003) ("If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial.").

*Step one:  the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?*

Gendreau tasered Andy at a time when Andy was not actively resisting, did not believe was a flight risk and had not engaged in any type of assaultive behavior against either Gendreau or Karschamroon.  Karschamroon testified Andy had complied with numerous lawful orders and the only thing Andy had done "wrong" was failing to relax or calm down. Both Karschamroon and Gendreau knew Andy was mentally ill and Karschamroon and Mr. Zimmerman testified that Andy looked confused during his contact with the police. Gendreau testified he did not believe Andy understood anything he said; which according to Karschamroon was limited to "dude calm down" before Andy was tasered. Gendreau testified notwithstanding he had been with Andy for as little as

30 seconds and was unsure whether Andy was understanding anything, Gendreau did not want to take any more time trying to communicate with Andy.

Garden Grove General Order 5.9 mandate GGPD Officers to take their time with mentally ill patients who are not outwardly assaultive; It is better to spend 15 minutes talking that 5 minutes fighting and "time is on your side." Given Garden Grove General Order 5.9 and the fact a third officer was still on the way, there was no reason why Officer Gendreau had to rush to taser Andy under circumstances he knew could result in instant death to Andy. Gendreau ackowledged shooting Andy with a gun would be exessive force. Yet given he knew tasering Andy could instantly kill him there exists no difference under these facts between a bullet and a taser the end result is they could both kill Andy. Karschamroon's inactions are as disturbing as Gendreau's actions.

Lux testified during taser training he trains to follow General Order 2.24 and call a supervisor and medic before deploying a taser. Further, he taught to not taser "Non Combative Resisting Suspects":1.An individual does not respond to an officer's requests or commands and may be argumentative, or 2. An individual's verbal or non-verbal actions indicate he is not complying with the officer's requests or demands, or 3. An individual is actively resisting handcuffing techniques, but is reasonably under control by the officer(s).

Lux gave the example of a suspect laying on his stomach with his hands underneath him attempting to frustrate being handcuffed as a Non Combative resisting Suspect who should never be tassered. Clearly, the actions of the suspect described by Lux is engaging in much more aggregious conduct Andy is ever claimed to have exhibited.  Clearly had GGPD General Orders 2.6, 2.24 and 5.9 been followed and zealousness not overtaken reason, Andy would have been appropriately treated and taken to a hospital as the original dispatch call requested. Instead Gendreau subjected Andy to knowing potentially deadly force and Karschamroon stood idely by and allowed it to happen.

*Step two:   The court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry."*

Maybe it is the fact that due to improper training or general ignorance Karschamroon and Gendreau are unfamiliar with the Fourth and Fourteenth Amendments, unfamiliar with excessive

force, unfamiliar with the GGPD General Orders dealing with the mentally ill (GGPD General Order 5.9), unfamiliar with GGPD General Orders dealing with Non-Combative Resistance (GGPD General Order 2.6), unfamiliar with proper Taser policies (GGPD General Order 2.24) such as calling for a supervisor and medics before deploying a taser, unfamiliar with proper use of the IVS Units (GGPD General Order 5.31) and the fact their IVS Unit were required to be running from the moment their contact with Andy began and being unfamiliar with their obligations to properly report their Use of Force against Andy (GGPD General Order  2.6 and 2.24). However, their improper training or general ignorance can not shield them from their obligations as officers to know that Andy Tran should not have been exposed to a taser deployment they knew may kill him.

Further, impatience and/or frustration with a confused mentally ill man does not override these officers responsibility to provide Andy with the equal protections afforded every citizen. There exists no articulable reason other than impatience or cruelty as to why Gendreau tasered Andy after spending as little as 30 second with him. Instead of taking a few more minutes to speak with Andy and call for an ambulance and wait for more officers, impatience and cruelty carried the day and as a result Andy was killed probably wondering what he did wrong as he was electrocuted to death.

### 3.   THE OFFICERS' DELIBERATE INDIFFERENCE TO THE DECEDENT'S MEDICAL NEEDS WAS A CONSTITUTIONAL VIOLATION

Defendants' cite Tatum v. San Francisco, 441 F.3d 1090 (9th Cir. 2006), as legal authority to dispute the officers need to provide prompt medical care for decedent Andy Tran.  The Tatum court held that not performing CPR on a handfcuffed arresstee and laying him on his stomach was reasonable under the circumstances of the case, although the arrestee later died. Id. at 1097-1100. However, the facts of Tatum are vastly different from the instant case. The arrestee in Tatum case was not tasered.  The arrestee in Tatum also kicked and struggled while the officers detained and handcuffed him requiring the officers to protect themselves. Id. at 1098.

Officers were dispatched and requested to take Andy to the hospital. Karschamroon saw Andy was confused and in need of some type of medical. General Order 2.24 required officers to contact medics before tasering; which would take 1-3 seconds. Further, Gendreau knew before he tasered Andy that it could result in his immediate death. Andy he was not attempting to flee, was

not being aggressive and was not resisting when he was tasered. It was clearly foreseeable to Gendreau and Karshamroon that the use of a taser against Andy could be catastrophic. Finally, Karshamrron, Gendreau and El-Farra all articulate in the Declarations that Andy was suffering from labored breathing following being tasered. Dr. Fukumoto articulates these symptoms are a clear indication Andy is suffering from cardiac arrythmia and the handcuffing of Andy exacerbated his breathing difficulties. The officers all declare they moved Andy against the legs of an officer to help him breath yet no officer attempted to help him by merely removing the handcuffs.

4.     **ENTITY DEFENDANTS AND THE POLICE CHIEF ARE LIABLE FOR VIOLATING DECENDENT'S AND PLAINTIFFS' CIVIL RIGHTS**

Defendants correctly point out that local governments are considered "persons" under 42 U.S.C. § 1983 and may be held liable for monetary damages in cases where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978). For a local government to be held liable a plaintiff must demonstrate that the government's official policy or custom was the "moving force" responsible for infliction of her injuries. Id. at 694. Municpal liability for violations of Section 1983 actions can occur in one of three ways: " (1) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." Price v. Sery, 513 F.3d 962, 966 (9th Cir. 2008).

Four conditions must be satisfied to hold the municipality liable for failing to act to preserve constitutional rights: "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996).

Additionally, inadequate police training is a basis for liability under section 1983 if the following factors are established: (1) the training is inadequate for the tasks that police officers

perform; (2) the failure to train amounts to deliberate indifference to the rights of persons like Plaintiff who come into contact with the police; and (3) the inadequate training actually caused the constitutional injury. *See* City of Canton v. Harris, 489 U.S. 378, 388-89, (1989); Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989).

Supervisors may be held liable under section 1983 for 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others. Edgerly v. City and County of San Francisco, 599 F.3d 946, 961 (9th Cir. 2010).

To support this argument the Defendants rely solely and exclusively upon the Declaration of the present GGPD Chief of Police Raney. However, Chief Raney's Declaration contains no admissible evidence which this Court can accept and/or rely upon. Chief Raney points out in paragraph 2 of his Declaration that he has no foundation to render any opinions about what the GGPD policies and procedures were on or before September 3, 2008. Chief Raney acknowledges he had no policy making position within the GGPD until long after September 3, 2008. Chief Raney never describes what, if any, knowledge he had of the GGPD General Orders on or before September 3, 2008, never declares he ever spoke to Former Chief Polisar or determined what, if anything, Chief Polisar may have done as far as training on and/or enforcing the GGPD General Orders on or before September 3, 2008. Chief Raney states the GGPD General Orders to be valid and constitutional yet fails to lay any foundation as to his ability to render such an expert legal opinion nor does he articulate any knowledge of the GGPD General Orders in place on or before September 3, 2008.  Chief Raney's Declaration is mountain of speculation with no foundation to support a single assertion set forth.

If the Court were to deem Chief Raney's Declaration somehow admissible then the Plaintiffs have provided overwhelming evidence that on or before September 3, 2008, officers within the GGPD were improperly trained, failed to follow written policies and procedures defined in the GGPD General Orders  which resulted in a culture wherein use of excessive force was condoned and tolerated without consequence. Assuming for purposes of argument that each and every GGPD

General Orders in place on or before September 3, 2008, were valid and constitutional; the involved officers and others have testified they did not know what most, if not all, of the GGPD General Orders required them to do concerning (1) Use of Force and the reporting of same; (2) policies and procedures concerning the proper use of a taser and the reporting requirements, (3) a complete lack of understanding of the 4th and 14th Amendments; (4) a complete lack of understanding as to what constitutes unreasonable and/or excessive force; (5) a complete lack of understanding about how to deal with the mentally ill and/or 5150 subjects; (6) a complete lack of understanding of the proper use of the IVS Units; and (7) a complete failure as to providing any type of medical aid to those clearly in medical distress following force used by GGPD officers.

### 5. PLAINTIFFS AS RELATIVES OF THE DECEDENT HAVE VALID CAUSE OF ACTION FOR CONSTITUTIONAL VIOLATIONS

In section 1983 actions the rightful heirs of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. 42 U.S.C. § 1988(a); Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365, 369 (9th Cir. 1998); Smith v. City of Fontana, 818 F.2d 1411, 1416-1418 (9th Cir. 1987). California Code of Civil Procedure sections 377.20 and 377.30 specifically allows for survival action.

Since there are highly disputed facts as to violations of Andy's rights against excessive force and wrongful death under the Fourth Amendment, Andy Tran's successor's in interest are entitled to bring actions under Section 1983. As previously discussed, Defendants used excessive force and are not entitled to qualified immunity given the facts of this case.

### 6. PLAINTIFFS HAVE A VALID SUBSTANTIVE DUE PROCESS CLAIM UNDER THE FOURTEENTH AMENDMENT

Since Curnow By v. Ridgecrest Police, 952 F. 2d 321 (9th Cir. 1991), the Ninth Circuit has consistently recognized that its precedent recognizes a Fourteenth Amendment liberty interest of parents in the companionship and society of their adult children, even when the deprivation of that interest is incidental to the state action. A child's interest in his relationship with a parent is also a cognizable interest under the Fourteenth Amendment. See Id. at 325.

Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process. <u>Wilkinson v. Torres</u>, 610 F.3d 546, 554 (9th Cir. 2010). In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." <u>Id</u>.   Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. <u>Id</u>. Where state officials have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly. <u>Tennison v. City and County of San Francisco</u>, 570 F.3d 1078, 1089.

As has been set forth above, Gendreau was aware prior to tasering Andy could cause his sudden death. Gendreau testified he considered and weighed the possibility of killing Andy yet decided to taser Andy anyway and his actions did cause Andy to die. Gendreau testified that when he made this  decision he did not believe Andy understood anything he said and Andy was not combative, resisting or attempting to flee. Gendreau testified he did not feel like spending any more time trying to communicate and with Andy. Gendreau testified he had time to try and activate his IVS Unit yet failed to take the time to call for medics, call for a supervisor or wait for Officer El-Farra to arrive. Time was on Gendreau's side yet he chose to act with deliberate indifference to the deadly consequences which he knew could befall Andy.

Karschamroon testified Andy was confused and puzzled yet followed numerous commands. Karschamroon testified that Andy never actively resisted, fought him, got aggressive with him or attempted to flee. Karschamroon testified Gendreau was a complete stranger. Karschamroon testified when Gendreau said he was going to taser Andy he had no idea why Andy was being tasered Andy. Lux testified Karschamroon had an obligation as the first responding officer to inquire why the Use of Force was escalating when Karschamroon saw or heard no need for such escalation.

There has been no reasonable or justifiable facts to explain why Gendreau decided to taser Andy with the exception of malice and cruelty.  His actions were unwarranted, unjustified and he knew his actions could cause a non combative, mentally ill man, who did not seem to understand

him to die. Gendreau's conduct is disturbing and the fact Karschamroon watched and did nothing as Gendreau tasered Andy not knowing why is equally disturbing.

### B.   PLAINTIFFS HAVE VALID CAUSE OF ACTION UNDER THE BANE ACT (CAL. CIV. CODE SECTION 52.1)

Civil Code section 52.1 provides that a person may bring a cause of action "in his or her own name and on his or her own behalf" against anyone who "interferes by threats, intimidation or coercion, with the exercise or enjoyment" of any federal or state constitutional or statutory right. Defendants argues that Section 52.1 does not provide a right of action for parents or children of a decedent for constitutional violations.

However, California Code of Civil Procedure section 377.20(a) provides "[e]xcept as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period."  Furthermore section California Code of Civil Procedure section 377.30 provides that "[a] cause of action that survives the death of person passes on to the decedent's successor in interest . . . ."

Without analyzing a survival action and the state statutes again this issue has been discussed fully above and it is clear that the Plaintiffs can bring the instant causes of action and can raise their own personal Fourteenth Amendment claim for their deprivation of familial rights and lost of companionship and society for the death of unnecessary, cruel, malicious death of Andy Tran.

### C.   PLAINTIFFS HAVE VALID CAUSE OF ACTION FOR ASSAULT AND BATTERY

Under California law, law enforcement officers are explicitly permitted to use reasonable force to effect an arrest, prevent escape, or overcome the resistance of a person being arrested. Cal. Penal Code § 835a. Accordingly, a law enforcement officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable.  <u>Edson v. City of Anaheim,</u> 63 Cal.App.4th 1269, 1272–73 (1998). For this reason, battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims and require the same evidentiary showing. <i>See</i> <u>Id.</u> at 1274; <u>Susag v. City of Lake Forest,</u> 94 Cal.App.4th 1401, 1413 (2002); <u>Saman v. Robbins,</u> 173 F.3d 1150, 1156–57 & n. 6

1  (9th Cir. 1999). Thus, the analysis of Plaintiff's Section 1983 claim applies equally to Plaintiff's

2  claim for assault and battery.

3      As previously discussed at length above when addressing the Fourth and Fourteenth

4  Amendment, excessive force claims, qualified immunity claims, failure to render medical attention

5  and all other arguments set forth above to support each and every cause of action brought by the

6  Plaintiffs; it can not be disputed that Plaintiffs have raised more than ample factual issues to support

7  an assault and battery cause of action against the Defendants.

8      **D.    PLAINTIFFS' HAVE A VALID CAUSE OF ACTION FOR NEGLIGENCE**

9      Defendants argue that they are immune from a negligence  based on California

10  Government Code Sections 815 (dealing with public entity immunity) and 820.02 (dealing with

11  public employee immunity) and 820.4.

12      However, Government Code section 815.2(a) of the Government Code clearly states,  that

13  "A public entity is liable for injury proximately caused by an act or omission of an employee of the

14  public entity within the scope of his employment. . . ."  Similarly, under section 820 states "(a)

15  Except as otherwise provided by statute . . . .a public employee is liable for injury caused by his act

16  or omission to the same extent as a private person."

17      Defendants heavily rely on Government Code section 820.2 which provides that a public

18  employee is not liable for injury when the act or omission upon which liability is premised "was the

19  result of the exercise of discretion vested in him. . . ."  The scope of immunity under section 820.2

20  is limited.  California case law establishes that "not all acts requiring a public employee to choose

21  among alternatives entail the use of 'discretion' within the meaning of <u>section 820.2</u>." <u>Barner v.</u>

22  <u>Leeds,</u> 24 Cal.4th 676, 684–85 (2000). In analyzing the discretionary immunity conferred by section

23  820.2, the California Supreme Court has drawn a distinction between policy decisions, which are

24  immunized, and ministerial or operational decisions, which are not. In <u>Caldwell v. Montoya</u>, the

25  California Supreme Court explained that immunity is reserved for areas of quasi-legislative policy-

26  making and applies only to *"deliberate and considered* policy decisions, in which a [conscious]

27  balancing [of] risks and advantages ... took place." 10 Cal.4th 972, 981(1995).  In contrast, day-to-

28  day operational decisions are not immunized by section 820.2, even if they require "exercise of

considerable judgmental skills." Barner, 24 Cal.4th at 686–87.   While a police officer's initial decision to investigate a may constitute a discretionary decision immunized by section 820.2, the officer is not immunized from any negligence in conducting the investigation.   McCorkle v. City of Los Angeles, 70 Cal.2d 252, 261–262 (1969); See Liberal v. Estrada, 632 F.3d 1064, 1084 (9th Cir. 2011) ("As a matter of law, section 820.2 immunity does not apply to an officer's decision to detain or arrest a suspect.").

As set forth in detail above Officer Gendreau knew tasering Andy could kill him and Gendreau actions were knowing, and deliberate. Karschamroon stood by and did nothing.

### E.   PLAINTIFFS HAVE A VALID CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTION DISTRESS

The   negligent causing of emotional distress is not an independent tort but the tort of negligence.   McMahon v. Craig, 176 Cal.App.4th 1502, 1509-1510 (2009).   The traditional elements of duty, breach of duty, causation, and damages apply. Id.  In bystander situations a plaintiff seeks to recover damages as a percipient witness to the injury of another." Id. "In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." Burgess v. Superior Court (1992) 2 Cal.4th 1064, 1073 (1992).

As discussed in the previous section, Defendants are not immune from the Plaintiff's negligence claim in the present case.   Furthermore, Plaintiffs as bystanders have their own separate claim for emotional distress and are not "survival actions" which Defendant arguesin their moving papers.

Defendant cites Allen v. Toten stating that bystanders cannot recover for emotion distress even if they are witnessing upsetting events.   In Allen, the California appellate court held a wife did not had no cause of action for emotional distress after her husband was shot and wounded by police when police brought wife to the scene in the hope that she might persuade her suicidal husband to surrender.   The Allen explained that the policy considerations prevented this police conduct from being a tort because the utility of the conduct involved (saving lives) outweighed the

gravity and likelihood of the harm (emotional distress) threatened. <u>Allen v. Toten</u>, 172 Cal.App.3d 1079 (1985). The facts of the instant case are therefore completely distinguishable from the <u>Allen</u> case. Here, Bua Phan and Nam Tran watched in horror as their son was tasered for no reason and watched Andy die on their front lawn after not resisting and following the officer's instructions. There can no clearer example of properly alleged negligent infliction of emotional distress action.

**F.     PLAINTIFFS HAVE VALID CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendants with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation*1180 of the emotional distress by the defendant's outrageous conduct. <u>Potter v. Firestone Tire & Rubber Co.</u>, 6 Cal.4th 965, 1001 (1993).  For conduct to be extreme and outrageous, it must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." <u>Id</u>.

As discussed above Ms. Phan and Mr. Tran watched in horror as the Defendants killed their son before their eyes. Plaintiffs have articulated above how the conduct of the Defendants will clearly shock the conscience of any ordinary reasonable person. Plaintiffs request the Court consider the same analysis of the outrageous nature of the Defendants conduct set forth when denying the Defendants request to dismiss Plaintiffs valid Intentional Infliction of Emotional Distress arguments.

**III.    CONCLUSION**

For all the aforementioned reasons Plaintiffs respectfully requests Defendants Motion for Summary Judgment be denied in all regards.

Date: July 5    , 2011               LAW OFFICE OF SEAN HENNESSEY

                                    SEAN HENNSSEY
                                    ATTORNEY FOR PLAINTIFFS

---