Sean Hennessey, State Bar No. 157005
THE LAW OFFICE OF SEAN HENNESSEY
8231 Westminster Blvd.
Westminster, CA 92683
Tel. (949) 280-1257
Fax: (714) 898-7449
Email: seanhennesseyesq@gmail.com

Liem H. Do, State Bar No. 129029
LIEM H. DO & ASSOCIATES, APLC
8231 Westminster Blvd.
Westminster, CA 92683
Tel. (714) 898-7579

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

QUYEN KIM DANG, INDIVIDUALLY AND AS A GUARDIAN AD LITEM FOR KENNY MINH CAO TRAN, A MINOR, AND PERSONAL REPRESENTATIVE OF ANDY TRAN, DECEASED; KENNY MINH CAO TRAN, A MINOR BY AND THROUGH HIS GUARDIAN AD LITEM, QUYEN KIM DANG; NAM VAN TRAN, BIOLOGICAL FATHER OF ANDY TRAN, DECEASED; BUA THI PHAN, BIOLOGICAL MOTHER OF ANDY TRAN, DECEASED,

          Plaintiffs,

v.

CITY OF GARDEN GROVE; GARDEN GROVE CHIEF OF POLICE JOSEPH M. POLISAR; GARDEN GROVE POLICE OFFICER GENDREAU; GARDEN GROVE POLICE OFFICER KARSCHAMROON; TASER INTERNATIONAL, INC., AND DOES 1 TO 10, INDIVIDUALS; AND ROES 1 TO 10, ENTITIES, INCLUSIVE,

          Defendants.

*Case No.  SACV10-00338 DOC (MLGx)*

**PLAINTIFFS' DECLARATIONS AND EXHIBITS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR ALTERNATIVELY, SUMMARY ADJUDICATION OF ISSUES**

**DATE: July 25, 2011**
**TIME: 8:30 a.m.**
**CTRM: 9-D**

[*Filed concurrently with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Plaintiffs' Statement of Genuine Disputes and Plaintiffs' Separate Statement of Undisputed Facts and Conclusions*]

# **INDEX OF EXHIBITS**

Exhibit A          Deposition of Mark Zimmerman

Exhibit B          Deposition of Daniel Karschamroon

Exhibit C          Deposition of Richard Gendreau

Exhibit D          Deposition of Richard Fukumoto, M.D.

Exhibit E          Deposition of Bua Thi Phan

Exhibit F          Deposition of Benedict Lux

Exhibit G          Deposition of Ted Peaslee

Exhibit H          Garden Grove Police Department ("GGPD") General Orders: 2.6, 2.24, 5.9, 5.31

Exhibit I          Gendreau GGPD Internal Affairs Interview

Exhibit J          Karschamroon GGPD Internal Affairs Interview

Exhibit K          Sergeant Wagner's police report

Exhibit L          Karschamroon Response to Request for Admissions (Set One), number 39

///

1  | Date: July   05  , 2011          LAW OFFICE OF SEAN HENNESSEY

2

3

4

5                                   SEAN HENNESSEY

6                                   ATTORNEY FOR PLAINTIFFS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

Plaintiffs' Complaint for Damages, which was filed on December 3, 2009, alleges ten (10) causes of action.  (Exb. 1, Complaint for Damages).  Two causes of action were directed only at Taser International for products liability and negligence, although those claims have since been dismissed.

This motion addresses only the eight (8) causes of action directed at the City of Garden Grove, the Garden Grove Police Department, Police Chief Joseph Polisar, and Police Officers Richard Gendreau and Daniel Karschamroon.  Those causes of action are: (1) Wrongful Death – 42 U.S.C. § 1983; (2) Survival Action – 42 U.S.C. § 1983; (3) Deprivation of Familial Relationships – 42 U.S.C. § 1983; (4) Violation of Civil Rights – Cal.Civ. Code 52.1(b); (5) Assault and Battery; (6) Negligence; (7) Negligent Infliction of Emotional Distress; and (8) Intentional Infliction of Emotional Distress.

In the more 11/2 years which have passed since this lawsuit was filed, a substantial amount of written discovery has been exchanged and the depositions of all percipient witnesses have now been completed.  As such, the "facts" of this case have now been established and, while the parties might differ on the interpretation of those facts and the legal theories applicable to them, this case has ripened to the point where summary judgment is appropriate, especially on the threshold issue of qualified immunity.

Although the outcome of this case was the unfortunate death of Andy Tran, the undisputed facts of this case will demonstrate that the minimal use of force applied by the involved officers (i.e. a single application of the Taser), as dictated by the totality of the circumstances, was objectively reasonable and that there is no need for this case to be presented to a jury in order to reach the same conclusion.

## II.     STATEMENT OF FACTS

On September 3, 2008, at approximately 11:29 a.m., Garden Grove police officers Richard Gendreau and Daniel Karschamroon were dispatched, separately,

1   to 13252 Barnett Way, in the City of Garden Grove.  The officers responded to a
2   report of a "violent, mentally ill male" that was trying to break into the residence,
3   that someone had been assaulted, and that there was a "weapon" involved.  Prior to
4   arriving on scene, Officer Karschamroon tried to clarify with Dispatch if there was
5   any further description of the weapon(s), and was informed that it was unknown as
6   to what type of weapon was involved. (Karschamroon Decl., ¶¶ 1-5; Gendreau
7   Decl., ¶¶ 1-5; Exb. 2 Transcript/Audio 911 recording; Exb. 3, Dispatch CAD.

8        Police Dispatch as well as the CAD printout noted the male's (decedent Andy
9   Tran) description as "mental case."  The "event" remarks on the printout noted that
10  the calling party (Plaintiff Nam Van Tran, Andy's father) indicated his son was
11  crazy.  When asked if his son had weapons, Plaintiff Tran affirmed.  Dispatch could
12  hear a child crying in the background.  Plaintiff Tran also indicated to Dispatch he
13  was dizzy and he kept repeating to "send someone right now, send someone right
14  now. Take to hospital."  Dispatch indicated that Plaintiff Tran was out of breath and
15  would not answer any questions as to the whereabouts of his son, Andy Tran, at the
16  moment.  (Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exb. 2, Transcript/Audio
17  911 recording; Exb. 3, Dispatch CAD.).

18       Both Officer Karschamroon and Officer Gendreau arrived at approximately
19  11:36 a.m. However, Officer Karschamroon was the first to arrive at the residence.
20  As described by Dispatch, there was a male individual who appeared to be trying to
21  break into or enter the residence through a window.  There was a broken screen
22  window next to him and as Officer Karschamroon approached him, his body
23  halfway into the window.  It appeared he was trying to grab something from inside
24  the window. (Karschamroon Decl., ¶ 7; Exb.3, Dispatch CAD).

25       Officer Karschamroon, who had been advised by Dispatch that the subject's
26  name was Andy Tran, called out "Andy" three to four times to get his attention.  At
27  that time, Andy Tran stopped what he was doing at the window, slowly turned
28  around, and faced Officer Karschamroon.  Andy was instructed to come down from

# DECLARATION OF SEAN HENNESSEY

I, SEAN HENNESSEY, declare and state as follows:

1.      I am an attorney at law duly licensed to practice before all of the courts of the State of California and the Central District of California. I am the attorney of record for the Plaintiffs Quyen Kim Dang, Kenny Minh Cao Tran, Nam Van Tran, and Bua Thi Phan. I have personal knowledge of all the facts asserted in this declaration and if called upon to testify, I could and would competently testify thereto. I make this declaration in support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment.

2.      Attached hereto as **Exhibit "A"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Mark Zimmerman.

3.      Attached hereto as **Exhibit "B"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Daniel Karschamroon.

4.      Attached hereto as **Exhibit "C"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Richard Gendreau.

5.      Attached hereto as **Exhibit "D"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Richard Fukumoto, M.D.

6.      Attached hereto as **Exhibit "E"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Bua Thi Phan.

7.      Attached hereto as **Exhibit "F"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Benedict Lux.

8.      Attached hereto as **Exhibit "G"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of portions of the Deposition of Ted Peaslee.

9.      Attached hereto as **Exhibit "H"** to Evidentiary Appendix and incorporated herein by reference are true and correct copies of the relevant segments of the Garden Grove Police Department ("GGPD") General Orders, available to the general public at the following web address: http://www.ci.garden-grove.ca.us/internet/pdf/pd/gen_orders.pdf. Specifically GGPD General Order 2.4, 2.24, 5.9 and 5.31.

10.     Attached hereto as **Exhibit "I"** to Evidentiary Appendix and incorporated herein by reference is a true and correct copy of Gendreau's GGPD Internal Affairs Interview, which Defendants provided pursuant to Plaintiffs' discovery request.

11.     Attached hereto as **Exhibit "J"** to Evidentiary Appendix and incorporated herein by reference is a true and correct copy of Karschamroon's GGPD Internal Affairs Interview, which Defendants provided pursuant to Plaintiffs' discovery request.

12     Attached hereto as **Exhibit "K"** to Evidentiary Appendix and incorporated herein by reference is a true and correct copy of Sergeant Wagner's police report.

13.    Attached hereto as **Exhibit "L"** to Evidentiary Appendix and incorporated herein by reference is a true and correct copy of Karschamroon Response to Request for Admissions (Set One), number 39.

I declare under penalty of perjury that the foregoing is true and correct. Dated this 5th day of July 2011, at Westminster, California.

Date: July   05  , 2011                    LAW OFFICE OF SEAN HENNESSEY


                                            _____

                                            SEAN HENNESSEY
                                            ATTORNEY FOR PLAINTIFFS

**EXHIBIT A**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


QUYEN KIM DANG, et al.,        )  CASE NO.
SACV10-03388DOC
                               )              (MLGx)
          Plaintiffs,          )
                               )
     vs.                       )
                               )
CITY OF GARDEN GROVE, et       )
al.,                      )
                               )
          Defendants.          )
_____)



VIDEOTAPED DEPOSITION OF
MARK ZIMMERMAN

Westminster, California

Tuesday, June 7, 2011



REPORTED BY:  Jennifer K. Abe, CSR No. 10753
              Registered Professional Reporter

2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


QUYEN KIM DANG, et al.,     )   CASE NO. SACV10-03388DOC
                            )             (MLGx)
              Plaintiffs,   )
                            )
        vs.                 )
                            )
CITY OF GARDEN GROVE, et    )
al.,                        )
                            )
              Defendants.   )
_____ )


          Videotaped Deposition of MARK ZIMMERMAN, taken

before Jennifer K. Abe, a Certified Shorthand Reporter

for the State of California, beginning at 10:20 a.m. and

ending at 4:25 p.m., on Tuesday, June 7, 2011, in the

Law Offices of Sean Hennessey, 8231 Westminster

Boulevard, Westminster, California.

3

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF:

 3           LAW OFFICES OF SEAN HENNESSEY
              BY:  SEAN HENNESSEY, ESQ.
 4           8231Westminster Boulevard
              Westminster, California  92683
 5           TEL:  (949) 280-1257  FAX:  (714) 898-7449

 6                     - and -

 7           LAW OFFICES OF LIEM H. DO & ASSOCIATES
              BY:  PAUL MINHTHU PHAM, ESQ.
 8                CAROLYN HOANG, LAW CLERK
              8231 Westminster Boulevard
 9           Westminster, California  92683
              TEL:  (714) 898-7579

10

11    FOR DEFENDANT CITY OF GARDEN GROVE, ET AL.:

12           LAW OFFICES OF FERGUSON, PRAET & SHERMAN
              BY:  STEVEN SHERMAN, ESQ.
13           1631 East 18th Street
              Santa Ana, California  92705
14           TEL:  (714) 953-5300

15

      ALSO PRESENT:
16
             CHUCK GOSWITZ, LEGAL VIDEOGRAPHER
17           OFFICER GENDREAU
             OFFICER KARSCHAMROON
18

19

20

21

22

23

24

25
```

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

18

```
 1    break, any break, just say it and it will be granted.
 2    I guaranty you.  It's same the favor that's been
 3    given to every single person that's been questioned
 4    in this case; okay?
 5              MR. SHERMAN:  Don't be bashful.  Don't be
 6    shy.
 7              THE WITNESS:  All right.
 8    BY MR. HENNESSEY:
 9    Q    All right.  Now, we were discussing a little
10    about your relationship, if any, with the neighbors
11    across the street prior to September 3rd, 2008.
12              And how would you describe, just in general,
13    what, if any, relationship you had with the people
14    that lived at 1325- -- when I say "13252 Barnett
15    Way," do you know what house I'm talking about?
16    A    Yeah.  The house directly across the street
17    from my house.
18    Q    Okay.  On September 3rd, 2008, what was your
19    address?
20    A    13251 Barnett Way.
21    Q    All right.  And was that at like a corner of
22    any streets?
23    A    His house is on a corner.  My house is on a
24    corner directly across the street.
25    Q    What is the corner of the streets that the
```

10:31:33  5
10:31:37  10
10:31:54  15
10:32:03  20
10:32:16  25

19

houses are on?

A     Barnett Way and Paloma.

Q     Okay.  So if you were standing on your porch of your house, what would you see of the Tran residence?

A     I would be looking directly at the front of his house, his porch, his front door, his front windows, his front yard.

Q     Okay.  And let's say from your front porch, how far would you say -- how far would you estimate the distance is from your front porch to, say, the front sidewalk?

I'm sorry.  How far would you say the distance from -- do you have a sidewalk in front of your house?

A     Um, not really.  It kind of comes around and stops right where my entrance --

Q     How about --

A     -- my walkway is.

Q     I'm sorry.  Do you have a curb?

A     Yeah.  There is a curb.

Q     From the curb in front of your house to the front lawn of about midway down the front lawn of Andy's house, how far would you estimate in feet that is?

23

1    do now, what, if anything, changed as to how you

2    became aware of who lived there?

3        A    Well, through all this, you know, and

4    meeting the family, you know, I found out that the

10:36:14    5    mom and the -- her husband and the little boy and

6    then their parents.

7            And before that, I really didn't -- you

8    know, I had an idea who I saw; but I really didn't

9    know who the relation of each person was or anything

10:36:30   10    like that.

11           I don't really -- you know, as far as

12    neighbors go, I try not to, you know, pay too much

13    attention.  I mean, you know what I mean?  I'm not

14    real neighborly.

10:36:41   15        Q    I know exactly what you mean.

16        A    My wife is probably more neighborly than I

17    am, but I'm not really too forward when it comes to

18    meeting people in the street.

19        Q    It sounds like we're cut from the same

10:36:49   20    cloth.  That's fine.

21            MR. SHERMAN:  You keep to yourself?

22            THE WITNESS:  Pretty much.

23    BY MR. HENNESSEY:

24        Q    And how did -- the Tran Family, did they

10:36:57   25    seem the same way?  Did they kind of keep to

24

1    themselves?

2         A    Oh, yeah, a very close-knit family.

3         Q    Okay.  Did you see them out together

4    socializing at times?

10:37:07  5         A    Just coming and going.

6              MR. SHERMAN:  Objection; vague.

7    BY MR. HENNESSEY:

8         Q    How about like did you ever see the father

9    out with the son?

10:37:12  10         A    Yeah.  The yard, sometimes the little boy

11   would be out playing.  Actually, I think probably I

12   had more communication with the little kid than

13   anyone else.  You know, we'd say "hi" to him or talk

14   to the little boy, and their dad would be out.  Maybe

10:37:25  15   he'd be out playing gardener, washing his car or

16   whatever; and it would be the mom coming home with

17   the groceries maybe, waving, that kind of thing.

18        Q    Okay.  And back on September 3rd, 2004,

19   (sic) do you have -- when you say "the little boy,"

10:37:38  20   do you have any idea how old the little boy would

21   have been approximately around that time?

22        A    I think he was three or four.

23        Q    Okay.  All right.  And you have children

24   yourself?

10:37:47  25        A    Yes.

28

1    that you personally observed between members of the

2    Garden Grove Police Department and Andy Tran?

3         A    Yes.

4         Q    Okay.  I want to talk about that; all right?

10:40:18   5         Now, did you see Mr. Andy Tran before any

6    police officers arrived on September 3rd, 2008?

7         A    Yes.

8         Q    Okay.  And what did you observe?

9         A    Um --

10:40:38  10         Q    Go ahead.  Sorry.

11         A    Well, my first observation was, as I

12   approached my own house, I saw Mr. Tran sitting on

13   the side of the street, on the corner on the curb in

14   a sitting position.

10:40:51  15         Q    And when you say that you were approaching

16   your house, when you say you were approaching your

17   house -- were you approaching your house on foot?  In

18   a vehicle?

19         A    In a vehicle.

10:40:59  20         Q    And what type of vehicle?

21         A    A work vehicle, a utility-type truck.

22         Q    Okay.  And -- excuse me.  I'm sorry.

23         MR. SHERMAN:  He's been sick.  So if you

24   shook his hand, go scrub it now.

10:41:14  25         THE WITNESS:  Don't do that to me.

29

|  |  |
|---|---|
| | 1 |

```
              MR. HENNESSEY:  You have kids, too, so you

1    MR. HENNESSEY:  You have kids, too, so you
2    know.  I'm sorry.
3    BY MR. HENNESSEY:
4         Q     So you -- how would you describe your work
5    vehicle on September 3rd, 2008, the appearance of it?
6         A     You know, it was an old Water & Light truck
7    from the L.A. vehicle pool.  It's pretty noticeable.
8    It's kind of a yellowish-orange.  It's got a utility
9    box in the back, a lot of equipment in the back.
10   I've got a welder on it and a few other things, but
11   it's that orange-type truck.  It looks like a city
12   truck or something, a DWP truck, I guess it was.
13        Q     Okay.  And that's what you used as your --
14   in your trucking business?
15        A     Yes.
16        Q     Okay.  And you said that you made -- you saw
17   Andy sitting on the curb.
18              Where were you coming from when you saw him?
19        A     I was coming -- I think it's north towards
20   Euclid from Newhope on Paloma.
21        Q     Okay.
22        A     And --
23        Q     I'm sorry.
24        A     And as I come up Paloma Street, I pass right
25   next to his house before I take the left onto Barnett
```

Timestamps in left margin:
10:41:23 — line 5
10:41:43 — line 10
10:41:54 — line 15
10:42:05 — line 20
10:42:15 — line 25

30

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:42:26 | 5 |

Way, which I end up parking right in front of my

house, and which is inadvertently in front of his

house, also.

    Q    Okay.  So you're coming up Barnett Way?

    A    No.  I'm coming up Paloma.

    Q    Sorry.  You're coming up Paloma, and then

you take a left onto Barnett Way, which would have

gone directly in front of Mr. Tran's house at 13252.

    And where did you ultimately park your

truck?

    A    In front of my house, which is, as I said,

in front of his house, also, but across the street.

    Q    Like directly across the street?

    A    Yes.

    Q    Like you're both -- would it be fair to say

that you both have corner-lot houses on the

intersection of Barnett Way and Paloma?

    A    Yes.

    MR. SHERMAN:  Objection; vague.

BY MR. HENNESSEY:

    Q    Okay.  Would that be fair?

    You saw Mr. Tran sitting on the curb.  And

then what, if anything else, did you see next?

    A    I parked my vehicle.  And when I did, I got

out; and I noticed that Mr. Tran had gotten up from

Line numbers with timestamps:
- 10:42:26  5
- 10:42:39  10
- 10:42:49  15
- 10:42:59  20
- 10:43:11  25

31

the curb and walked into his front yard.  In other
words, he walked from the street curb in front of his
house, past his walkway, into the grassy area, which
was his front yard.

10:43:26    Q    And what, if anything -- well, do you have
any idea, one way or the other, whether Mr. Tran
acknowledged you at all?

        MR. SHERMAN:  Speculation; vague.

BY MR. HENNESSEY:

10:43:36    Q    I mean, for instance, did he wave to you?
Did he gesture his head?  You know, did he do
anything that to you suggested some type of, you
know, recognition that he was seeing you?  You know,
a wave or a nod of the head or anything?

10:43:50        MR. SHERMAN:  Same objections.

        MR. HENNESSEY:  If you remember.

        THE WITNESS:  I would say -- I would say
physically, no.

        MR. HENNESSEY:  Okay.

10:43:57        THE WITNESS:  But I think that -- if I can
speculate, is that possible?  No?

        MR. SHERMAN:  We really don't want you to
speculate or guess.

        THE WITNESS:  All right.

10:44:05 BY MR. HENNESSEY:

32

1      Q     Do you have any reason to believe that -- do

2   you have any reason to believe that Mr. Tran, you

3   know, recognized that you were there?

4      A     I think he knew I was there.

10:44:12  5      Q     And what makes you believe that?

6      A     Well, he was kind of carrying on a little

7   bit, and I think that a little bit of it was for my

8   benefit, possibly.

9      Q     When you say "he was carrying on a little

10:44:26  10   bit," can you describe what you mean by that?

11      A     Yeah.  He seemed a little bit distraught.  I

12   heard him -- actually, I don't know if it was a

13   little bit like crying or moaning, some type of

14   whining-type noise.

10:44:41  15      Q     Did you hear any words coming out of his

16   mouth?

17      A     No words.

18      Q     Now, prior to September 3rd, 2008, had you

19   ever felt for any reason that Mr. Tran had any type

10:44:57  20   of problems of any type?

21      A     Yes.

22         MR. SHERMAN:   Objection; speculation; vague

23   and ambiguous; foundation; assumes facts not in

24   evidence; lacks foundation.

10:45:04  25   BY MR. HENNESSEY:

1      Q    Prior to September 3rd, 2008, what, if

2 anything, did you think Mr. Tran's problems may be?

3      A    Well, he was a little bit -- he was mentally

4 unstable.

**10:45:14** 5      Q    When you say "he was mentally unstable,"

6 what are you basing that opinion on?

7      A    Well, based upon some stuff that I had heard

8 previously that, you know, they had a problem with

9 his prior -- you know, had to call an ambulance and,

**10:45:33** 10 you know, and this kind of thing.

11      He -- he just looked a little bit -- you

12 know, when I say "normal," I mean, he didn't look

13 normal at times mentally, a little bit unstable, I

14 mean. You know, that's just my opinion, I guess.

**10:45:51** 15      Q    Did he sometimes look normal and sometimes

16 look a little mentally abnormal?

17      MR. SHERMAN: Vague; speculation;

18 foundation.

19      THE WITNESS: If you -- if you were to see

**10:46:01** 20 him occasionally, you'd think nothing of it; but then

21 other times, I mean living across the street, I would

22 see some things that seemed a little bit out of the

23 ordinary that, you know, right now, I probably

24 wouldn't be able to put my finger on it; but, you

**10:46:15** 25 know, when you're parents and, you know, you know

34

```
 1    that -- you know, watch out.  Just keep an eye on
 2    this guy.  He's not all there, and I think that the
 3    wife had actually possibly talked to my mom and, you
 4    know, maybe told her some things about Andy and this
 5    kind of thing.
 6             I personally didn't hear it from anybody;
 7    but, you know, my mom talked to the family once in a
 8    while.
 9    BY MR. HENNESSEY:
10        Q    Okay.  So you would hear conversations that
11    your mom would have with the family?  And through
12    those communications, you learned --
13        A    Probably some hearsay-type situations, yeah.
14        Q    Okay.  All right.  All right.  So you heard
15    some things from other people, and then you made some
16    personal observations yourself that led you to
17    believe that there was something mentally off about
18    Mr. Tran; is that fair?
19        A    Yeah.
20        Q    Okay.  And you indicated you had heard some
21    information about previous calls for ambulances and
22    things like that.
23             Did you ever personally observe any
24    ambulances arrive at the house yourself and --
25        A    I think there was, and it's very vague
```

10:46:32 — 5
10:46:39 — 10
10:46:50 — 15
10:47:00 — 20
10:47:15 — 25

36

1          Now, when you got out of your truck, did you

2     go inside your house and come back out?  Did you stay

3     outside?  I mean, how would you --

4          A    Stayed outside.

10:48:25  5     Q    Was there any particular reason that you

6     stayed outside as opposed to going into your house?

7          A    Yeah.  I detected a little bit of a -- I

8     detected some -- a little bit of drama that I hadn't

9     seen before.

10:48:40  10    Q    So what you were seeing from Mr. Tran on

11    September 3rd, 2008, you hadn't seen that type of

12    behavior from him before?

13         A    No.

14         Q    Okay.  What about the behavior that you saw

10:48:52  15   caused you to stay outside?

16         A    Well, he -- he was on the ground and, like I

17    said, he was upset.  And so I thought it would be a

18    good idea just to kind of stay there and, you know,

19    just to stay and see if anything, you know, just to

10:49:12  20   kind of -- you know, I live there.  So I just wanted

21    to make sure everything was going to be okay.

22         Q    Okay.  Did you ever feel personally

23    threatened by Mr. Tran yourself?

24              MR. SHERMAN:  Objection; vague.

10:49:22  25             THE WITNESS:  No.

38

1    the ground; and he walked over to the front porch

2    area.

3         Q    Okay.  And what, if anything, did you see

4    him do at the front porch area?

10:50:50  5         A    Well, at this time, he was a little more

6    agitated; and he took the screen and pulled it off of

7    the front window.

8         Q    Okay.  Now, when you say "he was a little

9    more agitated," can you describe what you mean by

10:51:03  10   that statement?

11        A    Well, he pulled the screen off and, you

12   know, that's probably a little more agitated than

13   just being on his hands and knees, so --

14        Q    And what, if anything, did you do when you

10:51:15  15   saw him -- when you say he pulled the screen off the

16   window, which window are you talking about that --

17        A    There is a window on the front porch next to

18   the front door.  Actually, it's a double window.

19        Q    Okay.

10:51:28  20        A    And I believe it had two screens on it, and

21   he pulled the screen off of the one window that was

22   closest to the door; and I think the window goes up

23   and down, slides up and down.  So I think he wanted

24   to get back into the house.

10:51:41  25             I'm going to assume they locked him out, and

39

1    he was agitated.  He wanted to get back in.

2            So he pulled the screen off.  And at the

3    same time he went up there and pulled the screen off,

4    that's when I started walking towards the patio.

10:51:53  5    Q    Okay.

6    A    And I had told him at that time, "That's

7    enough."

8    Q    All right.  Hold on.

9            So you see him physically pull the screen

10:52:04 10    off the window?

11    A    Right.

12    Q    You're making some assumptions about why he

13    may have done that.  He may have been locked out of

14    the house.

10:52:11 15    A    I'm making some assumptions now.

16    Q    Okay.  That's fair.

17            MR. SHERMAN:  Just tell us that.  I mean --

18            MR. HENNESSEY:  Yes.  I mean, if you know

19    exactly why he pulled the screen off, that's fine.

10:52:21 20    Okay.  If you think you know why he pulled the screen

21    off --

22            THE WITNESS:  At the time, I didn't know

23    why.

24    BY MR. HENNESSEY:

10:52:25 25    Q    Okay.  You just saw -- it was -- would you

40

```
 1    say it was out-of-the-ordinary behavior?

 2         A    Yes.

 3         Q    Okay.  And was it behavior that caused you

 4    to react in any certain way?

 5         A    Yes.

 6         Q    How did it cause you to react?

 7         A    I began walking towards the front porch.

 8         Q    When you say you began walking towards the

 9    front porch, walking towards the front porch of your

10    house or his house?

11         A    His house.

12         Q    Okay.  And why did you do that?

13         A    I was going to try to, you know, calm him

14    down and get him to not pull the screen off any

15    more -- get him not to do anything else that's going

16    to cause a problem.

17         Q    Now, do you have any law enforcement

18    experience?

19         A    No.

20         Q    Okay.  Do you remember how Mr. Tran was

21    dressed that day?

22         A    Yes.

23         Q    How was Mr. Tran dressed that day?

24         A    He had a T-shirt and some shorts, kind of a

25    thin shirt, thin shorts.
```

Timestamps (left margin):
10:52:34 — line 5
10:52:44 — line 10
10:52:53 — line 15
10:53:01 — line 20
10:53:10 — line 25

41

       1          Q    Okay.  And the shorts themselves -- when you

       2     say "a thin shirt," are you talking about like the

       3     type of T-shirt that goes under a dress shirt or are

       4     you talking like a -- you know, the T-shirt the kids

10:53:24   5     wear with the logos on them?

       6          When you say "T-shirt," what type are you

       7     talking about?

       8          A    Yeah, a thin T-shirt.  It probably had a

       9     logo, perhaps maybe like a gym shirt, something you'd

10:53:35  10     wear in the gym.

      11          Q    Okay.  And the shorts, are you talking about

      12     like basketball shorts?  Cargo shorts?  Some type of,

      13     you know, jean shorts?  What type of shorts?

      14          A    These would be shorts that you'd wear in a

10:53:49  15     gym, also, short, thin basketball shorts, let's say.

      16          Q    All right.  Do you remember anything else

      17     about the way he was dressed?

      18          A    No.

      19          Q    Okay.  When you made the decision to walk

10:54:04  20     over there and move towards the porch in the fashion

      21     that you've said, was there anything about the manner

      22     in which Mr. Tran was dressed that led you to believe

      23     that he may be armed?

      24          MR. SHERMAN:  Objection; vague; ambiguous;

10:54:20  25     assumes facts not in evidence; lacks foundation;

42

1    speculation.

2         THE WITNESS:  His clothing was pretty

3    flimsy, pretty thin.  He wasn't hiding any weapons.

4    BY MR. HENNESSEY:

10:54:31   5    Q    Okay.  Meaning, like did he appear to have

6    any bulges?  I mean, he wasn't wearing like those

7    kind of baggy gang-type clothing and stuff like that?

8         MR. SHERMAN:  Compound.

9         THE WITNESS:  No.  As a matter of fact, his

10:54:42  10   shirt was a little bit -- probably a little too small

11   for him.  So you could see his belly sticking out at

12   times.  I mean, he was a little bit -- he was a

13   bigger guy.

14   BY MR. HENNESSEY:

10:54:51  15   Q    Okay.  Did you have any concerns, as you

16   walked towards the house, that you may be walking

17   towards an armed individual?

18   A    No.

19        MR. SHERMAN:  Objection; asked and answered.

10:54:59  20   BY MR. HENNESSEY:

21   Q    Did you ever see -- other than the screen in

22   his hand, you indicated you saw him take the screen

23   off and do something with it, have it in his hands.

24        Other than the screen, did you see any other

10:55:07  25   objects of any type in his hands?

43

```
 1        A     No.

 2        Q     Okay.  So you walk over to the house.

 3              And do you actually verbally say anything to

 4        him?

 5              MR. SHERMAN:  Objection; misstates

 6        testimony.

 7              THE WITNESS:  I didn't actually walk to the

 8        house.  I proceeded -- I started to go, and I started

 9        to say some things; and it was pretty much

10        simultaneous.

11              As I walked toward the house and as I began

12        to tell him to "stop" or "that's about enough,"

13        that's when the first officer arrived.

14        BY MR. HENNESSEY:

15        Q     Okay.  Now, you believe that the words you

16        used were "stop" or "that's enough" to that effect?

17        A     Yes.

18        Q     Do you recall, was your voice raised?

19        A     Yes.

20        Q     Do you believe your voice was raised to a

21        level where Mr. Tran would have been able to hear

22        you?

23        A     Yes.

24              MR. SHERMAN:  Speculation; foundation;

25        assumes facts not in evidence.
```

Timestamps (left margin):
10:55:17 (line 5)
10:55:25 (line 10)
10:55:40 (line 15)
10:55:49 (line 20)
10:55:56 (line 25)

44

BY MR. HENNESSEY:

Q     And do you recall how many times you may have used the words "stop" or "that's enough"?

A     Just a couple.

10:56:05   Q     Okay.  When you say "a couple," are you talking one?  Two?  Three?  Four?

A     Probably once or twice for each.

Q     All right.  And did your voice get progressively louder?  Did it stay the same tone?

10:56:18   How would you describe it?

A     It was a pretty firm tone right from the beginning.

Q     So you were using a loud, firm voice with Mr. Tran?

10:56:24   A     Yes.

Q     And why did you choose to use a loud, firm voice with Mr. Tran?

A     I wanted to get his attention.

Q     Why did you want to get his attention?

10:56:33   A     I wanted him to stop doing what he was doing.

Q     And what, if anything, happened after -- well, where did you get -- in relation to where you said you stepped behind, you know, to the rear of

10:56:41   your truck originally and made some observations,

45

1    where did you get to ultimately when you were saying

2    anything to Mr. Tran?

3         A    I didn't get to the curb of his property,

4    but I got past the middle of the street.

10:56:54  5         Q    Okay.  So you were somewhere between the

6    middle and his curb when what happened?

7         A    When the first officer pulled up on the

8    scene.

9         Q    All right.  And the first officer who pulled

10:57:06 10   up on the scene, did you see a marked patrol car?

11        A    Yes.

12        Q    And where did that marked patrol car park?

13        A    He parked on Paloma Street.  He would be

14   going the other direction south towards Newhope, and

10:57:21 15   the car was parked right next to my property.

16        Q    Would it have been the -- it was parked

17   adjacent to your property?

18        A    Next to my property.

19        Q    On Paloma Street?

10:57:31 20        A    Yes.

21        Q    Would the front of his vehicle -- what

22   direction would the front of his vehicle be facing?

23   Would it be facing towards Mr. Tran's house or away

24   from Mr. Tran's house?

10:57:41 25        A    Towards Mr. Tran's house.

49

| | | |
|---|---|---|
| | 1 | Q    How about the lights? |
| | 2 | A    I don't believe so, but I can't be |
| | 3 | 100 percent sure of that. |
| | 4 | Q    What's the first thing that you recognize of |
| 11:00:11 | 5 | that officer?  Meaning, what's the first thing that |
| | 6 | you observed him do?  Hear?  What's the first |
| | 7 | thing -- |
| | 8 | A    I looked at him, and I thought he was ready |
| | 9 | to take over the situation; and I was going to back |
| 11:00:21 | 10 | off. |
| | 11 | Q    And what about the appearance of the first |
| | 12 | officer made you believe that he was ready to take |
| | 13 | over the situation and you were going to back off? |
| | 14 | MR. SHERMAN:  Speculation; foundation. |
| 11:00:30 | 15 | THE WITNESS:  Well, he's an officer, and |
| | 16 | he's equipped to handle these situations.  So that's |
| | 17 | when my -- I felt that's when my job was over -- |
| | 18 | MR. HENNESSEY:  Okay. |
| | 19 | THE WITNESS:  -- as a neighbor or whoever. |
| 11:00:41 | 20 | MR. HENNESSEY:  As a good citizen? |
| | 21 | THE WITNESS:  Yeah, whatever. |
| | 22 | BY MR. HENNESSEY: |
| | 23 | Q    Did you hear the officer ever say anything? |
| | 24 | A    Yeah.  He started right away giving |
| 11:00:51 | 25 | commands. |

50

    1        Q    Okay.  Did he -- where was the officer in
    2   relation to Andy Tran's house from the position that
    3   you say the car was when you first heard him making
    4   any types of commands?
11:01:08  5        A    I think as soon as he got out of the
    6   vehicle, he started, you know, commanding.
    7             (Mr. Pham enters the deposition
    8   proceedings.)
    9   BY MR. HENNESSEY:
11:01:15 10        Q    When you say "commanding," what type of
   11   commands do you remember hearing?
   12        A    I think he had, you know, "stop."
   13             MR. SHERMAN:  I've got to be worried about
   14   "I think."  That always calls for speculation.  If
11:01:31 15   you can recall, tell us.  If you can't --
   16             THE WITNESS:  Yeah.  As far as I remember,
   17   you know, it was basically the same types of things
   18   that I had said previously, "stop," um, you know,
   19   that kind of thing.
11:01:41 20   BY MR. HENNESSEY:
   21        Q    And was the officer speaking in the same
   22   type of tone that you were using, meaning a loud,
   23   commanding voice or was he soft-spoken?  Casual?
   24        A    Oh, it was commanding.
11:01:53 25        Q    Okay.  Would you say -- again, was it of the

51

1    same level or, you know, loudness, for lack of a

2    better word --

3        A    Yes.

4        Q    -- that you were describing?

11:02:02   5        A    That's fair.

6        Q    All right.  Did Mr. Tran ever stop what he

7    was doing, relating to what you saw him doing to the

8    screen?

9        A    Like I said, when I began walking over

11:02:13  10    there, everything kind of happened a little

11    simultaneously.

12            The officer arrived on the scene just about

13    the time when I, like I said, I started to cross.

14    And so things kind of stopped right then.  As soon as

11:02:23  15    the officer got out, things kind of stopped and --

16        Q    When you say "things kind of stopped," what

17    things kind of stopped?

18        A    You know, I -- I'm going to -- in my

19    opinion, I think Andy kind of came to himself.  I

11:02:40  20    think he was a little bit kind of off, and then I

21    think he kind of realized that -- he kind of came to

22    himself.  Let me just say that.

23        Q    What did you personally observe that makes

24    you -- that leads you to believe that Andy came to

11:02:55  25    himself or realized something was going on?

52

1        A      Well, he directed his attention --

2               MR. SHERMAN:  Let me just object as

3        speculation; foundation; assumes facts not in

4        evidence.

11:03:03    5           Sorry.  Go ahead.

6        BY MR. HENNESSEY:

7        Q      You say he directed his attention.

8        A      He was directing his attention towards

9        opening that window and getting in the house.

11:03:11   10    Q      Okay.

11       A      Okay.  So all of a sudden, he stopped.

12       Q      Okay.

13       A      Okay.  The screen was down on the porch.  He

14       kind of, you know, stopped being aggressive; and he

11:03:24   15    kind of, you know, began to start paying attention to

16       what was going on around him, I think.

17       Q      What about what you saw of Mr. Tran leads

18       you to believe that he started to pay attention about

19       what was going on around him?

11:03:39   20    A      It just looked like the aggravation factor

21       was a little bit different.  He wasn't trying to --

22       like I said, he wasn't trying to get into the house

23       anymore.  He kind of -- I think he kind of realized

24       things had kind of changed a little bit.

11:03:55   25           MR. SHERMAN:  Speculation --

65

|  | | |
|---|---|---|
| | 1 | Q    On Plaintiff's 4, you wrote a Z1 where you |
| | 2 | were.  In relation to 4 to where you said the officer |
| | 3 | was on -- this is getting confusing -- Plaintiff's 3, |
| | 4 | if you look at 4 to 3, in your position from Z1 on 4 |
| 11:14:34 | 5 | to the position from officer and Andy in Plaintiff's |
| | 6 | 3, how many feet would you say you were from the |
| | 7 | scene? |
| | 8 | A    40 feet, maybe. |
| | 9 | Q    Okay. |
| 11:14:43 | 10 | A    Maybe 50, at the tops. |
| | 11 | MR. SHERMAN:  40 to 50 feet? |
| | 12 | THE WITNESS:  40 feet probably, 50 tops. |
| | 13 | BY MR. HENNESSEY: |
| | 14 | Q    Why did you move to the back of your truck |
| 11:14:53 | 15 | when the police officer came there and stayed? |
| | 16 | A    I just moved back to that position because I |
| | 17 | felt like the officers had everything under control. |
| | 18 | Q    I mean, why not go back into your house? |
| | 19 | MR. SHERMAN:  Objection; relevancy; |
| 11:15:06 | 20 | immateriality; speculation. |
| | 21 | THE WITNESS:  I just wanted to stay and |
| | 22 | watch and see what happened.  You know, I mean, I'm |
| | 23 | right there and everything is happening, and I wanted |
| | 24 | to see. |
| 11:15:14 | 25 | BY MR. HENNESSEY: |

71

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
|         | 1  | officer, was he walking in what you would describe as    |
|         | 2  | an aggressive fashion like, you know, kind of a --       |
|         | 3  | how would you describe it?                               |
|         | 4  | MR. SHERMAN:  Vague.                                      |
| 11:19:37 | 5 | THE WITNESS:  Andy wasn't upset.  He was               |
|         | 6  | confused.                                                |
|         | 7  | MR. HENNESSEY:  Okay.                                     |
|         | 8  | THE WITNESS:  He wasn't aggressive in my                 |
|         | 9  | opinion, and he complied with the officer.  He had       |
| 11:19:48 | 10 | his hands on his head.                                  |
|         | 11 | BY MR. HENNESSEY:                                        |
|         | 12 | Q    When you say that Andy looked confused, why         |
|         | 13 | do you use the word he said he looked confused?          |
|         | 14 | A    Well, he was kind of, you know, dealing with        |
| 11:19:56 | 15 | the situation with his family in the house, which I     |
|         | 16 | could see through the window the family inside there,    |
|         | 17 | and, you know, the officers are telling him to do one    |
|         | 18 | thing; and, you know, you could just kind of tell he     |
|         | 19 | was a little confused about what was going to happen     |
| 11:20:11 | 20 | or what was happening or any of that.                   |
|         | 21 | Q    Okay.  But did he look aggressive?  Meaning,        |
|         | 22 | did he look like -- did he walk towards the officer      |
|         | 23 | in a fast pace?                                          |
|         | 24 | THE WITNESS:  I have to use the restroom.                |
| 11:20:24 | 25 | MR. HENNESSEY:  Oh, absolutely.                         |

73

```
 1    towards the officer was confusion?
 2            MR. SHERMAN:  Foundation; speculation;
 3    leading.
 4            THE WITNESS:  Yes.  He seemed a little
 5    confused to me.
 6    BY MR. HENNESSEY:
 7        Q    Now, you also said something about you can
 8    see that there was family inside the house?
 9        A    Yes.
10        Q    How were you able to see any type of family
11    inside the house?
12        A    Through this front window that he pulled the
13    screen off.
14        Q    The one that you had previously marked on
15    Plaintiff's 3 in A3?
16        A    A3, yes.
17        Q    In A3, the window looks like the shades are
18    down?
19        A    Right.
20        Q    Would the shades have been up at the point?
21        A    Either up or open, but I had a visual right
22    into the house.
23        Q    Could you see into the house whether the
24    people inside were old, young, male, female?
25        A    Well, I could see the old guy; and I just
```

11:34:18   5
11:34:25  10
11:34:34  15
11:34:43  20
11:34:58  25

74

1    know by look, you know.  I didn't really -- couldn't

2    see his face to tell you, you know, he was the

3    50-year-old or he was the 20-year-old or whatever.  I

4    just know by looking at him.  He was a little

11:35:14  5    slouched down, and I've seen him before.  So I

6    assumed he was the older one.

7         Q    When you say --

8         A    He was there.

9         Q    I'm sorry.  When you say "the older one,"

11:35:19 10    are you talking about --

11         A    The dad.

12         Q    Okay.  Andy's dad?

13         A    Yes.

14         Q    Okay.  How about Andy's mom?  Did you ever

11:35:26 15    see or hear a female?

16         A    There was a woman in there.

17         Q    Okay.  Old?  Young?  Anybody that you had

18    seen before?  Like his wife?

19         A    That, I couldn't tell you.

11:35:34 20         Q    Okay.  Could you hear voices coming from

21    inside the house?

22         A    I could hear something inside the house,

23    meaning, that there was some life in there, you know.

24         Q    Okay.  Could you make out any words of any

11:35:49 25    type that you heard coming from inside the house at

78

| | |
|---|---|
| 1 | Q    Would you say did he appear to be frothing |
| 2 | at the mouth?  Growling?  Doing anything like that? |
| 3 | A    On his way back to the officer, I don't |
| 4 | recall that.  No. |
| 11:38:33  5 | Q    Okay. |
| 6 | A    Standing in front of the officer, he had his |
| 7 | back to me at that time, also. |
| 8 | Q    Did you ever hear Andy say anything to the |
| 9 | first officer at any time? |
| 11:38:45  10 | A    I believe there was some communication, but |
| 11 | I couldn't -- I couldn't hear exactly. |
| 12 | Q    The question was:  Could you personally hear |
| 13 | with your own ears Andy Tran ever say any single word |
| 14 | to the police officer at any point in time? |
| 11:39:02  15 | A    I believe he was speaking. |
| 16 | Q    Okay. |
| 17 | A    But I don't know what he said. |
| 18 | Q    Why do you believe he was speaking? |
| 19 | A    I believe there was some communication back |
| 11:39:09  20 | and forth between the officers and Andy. |
| 21 | Q    And what -- what makes you believe that? |
| 22 | A    I just -- what -- you know, I could hear it, |
| 23 | but I couldn't hear exactly.  I could hear some -- |
| 24 | you know, as Andy was close to the officers, there |
| 11:39:24  25 | was some verbal back and forth, I believe. |

79

| | | |
|---|---|---|
| | 1 | Q    Okay. |
| | 2 | A    But I couldn't tell what it was. |
| | 3 | Q    Meaning, you couldn't hear what the officer |
| | 4 | was saying to Andy or what Andy was saying to the |
| 11:39:34 | 5 | officer, but they seemed to be communicating in some |
| | 6 | fashion? |
| | 7 | A    It seemed like there was some communication. |
| | 8 | Q    Okay.  At any point in time while Andy was |
| | 9 | walking back towards the officer, did he, you know, |
| 11:39:46 | 10 | pick up his pace towards the officer? |
| | 11 | Did he ever, you know, get in like a more |
| | 12 | aggressive stance to walk towards the officer? |
| | 13 | Anything like that? |
| | 14 | MR. SHERMAN:  Vague; compound. |
| 11:39:57 | 15 | THE WITNESS:  No.  And I feel like if there |
| | 16 | was a problem between the time Andy was on the porch |
| | 17 | and the time he got back to the officer, I believe |
| | 18 | the officer would have took some action; but it just |
| | 19 | seemed like it was a little bit routine in that way, |
| 11:40:12 | 20 | and he ended up in front of the officer. |
| | 21 | BY MR. HENNESSEY: |
| | 22 | Q    And you're pointing to People's 3.  You said |
| | 23 | Andy ended up in front of the officer. |
| | 24 | A    Andy ended up in front of the officer, and |
| 11:40:20 | 25 | then it seemed a little bit routine, you know, like |

1    there was -- he was going to be arrested; and this

2    was just, you know, how it was.

3          I didn't see any sign of him frothing at the

4    mouth or, you know, anything like that.  It just

11:40:35  5    seemed a little bit routine.  He ended up in front of

6    the officer, and then he had his hands on his head.

7          And so, in my own mind, I just assumed,

8    yeah, they're going to probably handcuff him and away

9    he goes.

11:40:47 10    Q    From the time that you saw Andy walk towards

11    the officer until the time that you saw the officer

12    with his hands on his head with Andy facing towards

13    his house, did you see anything that in your mind

14    looked like an aggressive move from Andy towards

11:41:01 15    Officer 1?

16    A    No.

17          MR. SHERMAN:  Objection; asked and answered;

18    vague and ambiguous; overbroad in both scope and

19    time.

11:41:03 20          THE WITNESS:  No.

21          MR. HENNESSEY:  No.  Okay.

22    BY MR. HENNESSEY:

23    Q    And when I say "aggressive," I'm talking

24    about like leaning his shoulder into the officer or,

11:41:11 25    you know, putting his fists up, you know, trying to

81

| | |
|---|---|
| 1 | kick at him, knee him?  He pushed back on him? |
| 2 | Did you see anything like that on him? |
| 3 | MR. SHERMAN:  Foundation; speculation. |
| 4 | THE WITNESS:  It seemed to me that the |
| 11:41:22  5 | officer had him in control. |
| 6 | BY MR. HENNESSEY: |
| 7 | Q    Okay.  And when you say that "it seemed that |
| 8 | the officer had him in control," what are you seeing |
| 9 | that leads you to believe that the officer seemed to |
| 11:41:33  10 | have Andy in control at the time that you've |
| 11 | described? |
| 12 | A    His hands were on his head.  He seemed to be |
| 13 | complying.  Like I said, I didn't hear what was said; |
| 14 | but, obviously, his hands were on his head, and the |
| 11:41:44  15 | officer had his hands on top of Andy's hands.  So I |
| 16 | just assumed that everything is under control. |
| 17 | Q    Was the voice that the officer used when he |
| 18 | exited his car and you say when he directed his |
| 19 | attention to when Andy was on the porch, was he using |
| 11:42:00  20 | that same tone of voice when he was with Andy in the |
| 21 | position that you've described them in in People's 3? |
| 22 | A    No. |
| 23 | MR. SHERMAN:  Foundation. |
| 24 | BY MR. HENNESSEY: |
| 11:42:08  25 | Q    What was the difference between the tone of |

83

```
 1   going on?
 2        A    No.
 3             MR. SHERMAN:   Objection; asked and answered.
 4   BY MR. HENNESSEY:
 5        Q    And you were in the same position at both
 6   times; correct?
 7        A    Yes.
 8        Q    Okay.  So the tone from the officer got
 9   lower when he was with Andy with his hands on Andy?
10        A    Yeah and -- yes.  And I just assumed that
11   everything had kind of come to an end here.
12        Q    Now, why would you assume that --
13             MR. SHERMAN:  I'll move to strike as
14   nonresponsive.
15   BY MR. HENNESSEY:
16        Q    Why did you assume that everything now had
17   come to an end?
18        A    It just seemed like the officer had him in
19   control.  And, like I just said, I just thought
20   they'd throw the cuffs on him and throw him in the
21   car.  That would be it.
22             I didn't see -- I didn't see anything happen
23   and really to lead me to believe that head for the
24   hills.  There is bad stuff going to happen.  You know
25   what I mean?  I just thought everything was under
```

11:43:02  5
11:43:11  10
11:43:21  15
11:43:30  20
11:43:42  25

85

THE WITNESS:  -- what I've seen in the past. You know, when officers -- this guy seemed like he had everything under control.  I mean, it looked pretty standard to me.

11:44:33   BY MR. HENNESSEY:

Q    Okay.  Did you have any concerns that, hey, this is going to turn violent from the police towards Andy or Andy towards the police?

A    No.  Like I said, I just thought everything was coming to a close here.

Q    Okay.  And how long would you say from the time the officer exited his car until he got his hands on top of Andy's -- until he got Andy's hands on top of his head with one of his hands on top of Andy's head and his other hand free?

How much time do you think passed?

A    It couldn't have been more than a minute or a minute and a half.

Q    Okay.

A    I mean, it was pretty short.

Q    Okay.  And during -- from the time that the officer first arrived on scene, how long did it take for Andy to go from, you know, the screen facing that to appearing to recognize that the police were there, somebody was there?

87

 1    speculation; foundation.

 2    BY MR. HENNESSEY:

 3        Q    So at the time that the first officer is

 4    there alone with Andy, you didn't see any problems at

11:46:27  5    all between -- appearing to be between that officer

 6    and Andy or Andy and that officer?

 7        A    No.

 8            MR. SHERMAN:  Objection; asked and answered;

 9    vague; compound.

11:46:36  10   BY MR. HENNESSEY:

11        Q    You didn't see any aggressive acts between

12    Andy and the first officer or the first officer and

13    Andy during that time?

14            MR. SHERMAN:  Objection; vague; asked and

11:46:42  15   answered.

16            THE WITNESS:  Just that, you know, Andy

17    standing with his hands on his head.  He is moving a

18    little; but, you know, the officer is moving a

19    little.

11:46:52  20            But, like I said, I didn't see anything that

21    caused me concern, you know, that it's time to head

22    for the hills, like I said, or things are getting out

23    of control or whatever.

24    BY MR. HENNESSEY:

11:47:01  25       Q    When you say they're both moving a little,

94

1    officer?  Like, "Are you okay?"  "Do you need help?"

2    Anything like that?

3         A    I don't recall anything like that.

4         Q    Okay.  When he took a position up in front

11:52:03   5    of Andy, would it be fair to say that Officer 1, the

6    first officer, was behind Andy?  The second officer

7    comes and stands in front of Andy?

8         A    Yes.

9         Q    And then what, if anything, does the second

11:52:14   10   officer do?

11        A    He's in front of Andy, and there was some

12   communication; and I really don't -- like I said, I

13   don't know what the communication was.  I don't know.

14   It could have been anything, but it didn't take long

11:52:29   15   for this second officer to come around the side of

16   him and pull his Taser out and shoot him in the leg.

17        Q    Okay.  Just -- we're going to take it step

18   by step.

19        A    All right.

11:52:39   20        Q    The second officer arrives, and you say that

21   he takes up a position in front of Andy?

22        A    That's right.

23        Q    You say that you believed there was some

24   communication going on.

11:52:48   25             What do you base that on?  Meaning, can you

97

1    Anything?

2            Did you see anything like that?

3            MR. SHERMAN:  Compound; speculation; lacks

4    foundation; assumes facts not in evidence.

11:54:34  5            THE WITNESS:  I didn't see anything

6    different than what had already been going on.

7    BY MR. HENNESSEY:

8        Q    Okay.  So when the second officer arrived,

9    things seemed to just kind of remain the same?

11:54:42  10       A    No, not exactly.

11       Q    What changed?

12       A    As far as Andy goes, yeah, everything kind

13    of the same; but I think this second officer brought

14    a different level of -- a different level of

11:55:00  15    commitment, stress, something to the situation.

16       Q    What do you mean by that?

17       A    You know, are we to the point where he's in

18    front of Andy and then he comes beside him and Tasers

19    him?

11:55:11  20       Q    No.  Let's just say while he's in front of

21    him.  Just stick with while he's in front of him.

22    You said that he had brought a different type of

23    level or stress or whatever.

24            What are you basing that statement on?

11:55:19  25       A    I'm basing that on his old action, not just

1    from standing in front of Andy; but after that,

2    Tasering him.

3        Q    Okay.  Let's go back to him standing in

4    front of him.

11:55:28  5        You said that the first officer did

6    something with his hands.  I'm sorry.  The second

7    officer did something with his hands.

8        What did you see the second officer do with

9    his hands?

11:55:36  10       A    He put them up there with Andy's --

11       Q    Okay.

12       A    -- you know, and, you know, the first

13   officer had Andy's hands; and the second officer had

14   Andy's hands, but the hands were on his head.  Now, I

11:55:53  15  don't know what the intention was, and I don't know

16   what the communication was.

17       It could be Andy, you know, maybe didn't

18   want his hands on his head.  I don't know.  I'm just

19   going to assume that this officer was there to help

11:56:04  20  the other officer.  That's what I saw.

21       And it looked like everything was way under

22   control.  I mean, the first officer had everybody

23   under control.  This guy shows up, and it seemed like

24   the stress level went up a little bit.

11:56:16  25       Q    Okay.

100

                    that?

                            MR. SHERMAN:   I'm going to object as it's compound.  It's vague and ambiguous.   It assumes facts not in evidence, calls for speculation.

11:57:24            THE WITNESS:   I don't recall.

                    BY MR. HENNESSEY:

                        Q    I mean, do you ever recall what appeared to be the officer struggling at any time with Andy's arms, body, legs?  Anything?

11:57:34            MR. SHERMAN:   Same objections.

                            THE WITNESS:  Well, I don't know what happened with that.  All's I know is his hands were on his head the whole time.

                            Now, if I wanted my hands off of my head, you know, I could probably get them off a little bit;

11:57:46            but, you know, I mean, his hands were on his head the whole time; and that's all I know.

                            I don't know how much there was a real struggle going on.  You had two officers there.  And

11:57:56            if there even was a struggle, I'm not real sure.

                    BY MR. HENNESSEY:

                        Q    Do you remember from reading any of your statements, from reading anything, do you ever remember describing to any person that you ever saw

11:58:06            any resistance from Andy of any type?

102

1    hands on his head.  I didn't see any escalation that

2    way.

3    BY MR. HENNESSEY:

4        Q    You didn't see any struggling between the

11:59:26  5    officer and Andy or --

6        A    No.

7        Q    -- anything?

8            MR. SHERMAN:  Vague; asked and answered.

9            THE WITNESS:  No.

11:59:30  10  BY MR. HENNESSEY:

11       Q    Did you ever see what appeared to be

12   attempts by any of the officers to sweep Andy's legs,

13   to kick under his legs from out from under him?

14           Did you ever see any attempts of any officer

11:59:39  15  to do something like that?

16           MR. SHERMAN:  Foundation; speculation;

17   compound.

18           THE WITNESS:  No.

19   BY MR. HENNESSEY:

11:59:44  20       Q    Did you ever see the officers appear to work

21   together to try to gain control of Andy and throw him

22   to the ground?

23           Any actions like that?

24       A    No.

11:59:51  25       Q    Okay.

103

```
 1        A    Officer No. 1 had -- in my opinion, had
 2   control of the situation.
 3        Q    Okay.  And then something changed when
 4   Officer 2 arrived?
 5        A    Something changed.  Now, you can say
 6   whatever you want.  I mean, yeah, there might have
 7   been words.  There might have been this.  There might
 8   have been that, but I saw him with his hands on his
 9   head the whole time.  And, like I said, it didn't
10   escalate beyond that.
11        Q    And there was never any loud words?
12        A    No.  Nothing like in the beginning where
13   you're giving commands and you're -- you know.
14        Q    When the first officer arrived and commanded
15   "Come on," "walk towards me," "put your hands on your
16   head," I mean, you heard those commands very clearly?
17        A    I heard them.
18             MR. SHERMAN:  Objection; asked and answered.
19   BY MR. HENNESSEY:
20        Q    But after that point in time between both of
21   these officers, okay, there was never that level of
22   commanding authority voice that you ever heard again?
23        A    No.
24             MR. SHERMAN:  Foundation; asked and
25   answered.
```

12:00:00 — line 5
12:00:14 — line 10
12:00:24 — line 15
12:00:32 — line 20
12:00:40 — line 25

104

BY MR. HENNESSEY:

Q    In fact, you could never hear a single word said by the second officer at any time prior to the time he deployed his Taser against Andy?

12:00:53    A    Nothing that I could understand, no.

Q    So you see -- well, how long was the second officer there before he Tasered Andy?

A    Pretty quickly.  Right in front of Andy, it seemed like the officer was, I would say, a little

12:01:12    frustrated about something and immediately got to Andy's side and pulled out his Taser and hit him in the leg with it.

Q    Did the officer appear to stand in front of Andy for any length of time and appear to be holding

12:01:26    the Taser at Andy for 5, 10, 15 seconds and appearing to be saying anything to Andy?

A    I didn't see that.

Q    Okay.  What did you see?

A    I saw the Officer 2, the one that was in

12:01:40    front of Andy, move around to the side.  He pulled out his Taser and pulled the trigger.

Q    Did you see the first officer ever move?

A    No.  He had ahold of Andy's hands.

Q    So the first officer remained in the same

12:01:53    position --

105

```
 1          A        Right behind -- I'm sorry.
 2          Q        It is okay.  It's all right.
 3               The first officer remained in the same
 4      position right behind Andy with his hands on his head
12:02:04  5      the entire time the second officer came and then took
 6      out his Taser and shot Andy in the leg -- shot Andy
 7      somewhere?
 8          A        Right.
 9            MR. SHERMAN:  Vague; speculation.
12:02:16 10     BY MR. HENNESSEY:
11          Q        Okay.  So you never saw the first officer
12      move during this entire time?
13               MR. SHERMAN:  Vague; speculation.
14               THE WITNESS:  No.  Everything pretty much
12:02:23 15     stayed the same as far as Andy's position,
16      Officer 1's position.  The only thing that changed
17      was the second officer's position.
18      BY MR. HENNESSEY:
19          Q        Okay.  And that was going from the front to
12:02:30 20     the side to that?
21          A        Right.
22          Q        Now, when you say he went from the front to
23      the side, I mean, how many seconds did it take from
24      the officer to go from the front, take out -- well,
12:02:40 25     did you actually see him take out something?
```

1     the side of Andy and Tasered him?

2          A     Less than five seconds.  I mean, it was

3     pretty fast.

4          Q     Okay.  So would it be fair to say -- when

12:03:39  5     did he take his Taser out?  When he was in front of

6     Andy or when he got to the side of Andy?

7          A     It looked like when he was coming around the

8     side of Andy.

9          Q     Okay.  And then just pulled the trigger?

12:03:50  10     A     Yeah.

11               MR. SHERMAN:  Speculation; foundation.

12               THE WITNESS:  I don't think Andy really even

13     saw that Taser, to tell you the truth.  Because the

14     officer came around the side of him.  He might have

12:04:00  15     seen him out of his side vision, but I don't think he

16     really knew it until --

17     BY MR. HENNESSEY:

18          Q     Did it appear that Andy had a lot of

19     opportunities to look at the Taser before it was shot

12:04:11  20     at him?

21          A     No.

22          Q     Because you said that this happened in

23     seconds?

24          A     Yeah.  It was pretty quickly.

12:04:16  25     Q     Okay.  And then what happened?

1      A     As I recall, Andy just dropped to the

2   ground.

3      Q     How do you recall Andy dropping to the

4   ground?

**12:04:31**  5      A     He dropped to his knees first and then fell

6   face first into the grass.

7      Q     When you say he fell to his knees first and

8   fell down to the grass, did he -- did you see him do

9   anything with his hands, like try to break his fall

**12:04:47** 10   or anything like that?

11      A     No.

12      Q     Okay.  How would you describe, to the best

13   of your recollection, the way that Andy's body fell?

14          Meaning, did it fall gently, forcefully,

**12:04:57** 15   somewhere in between?

16          MR. SHERMAN:  Objection; vague; speculation;

17   compound.

18          THE WITNESS:  Well, Andy was a little

19   overweight.  And when he hit the ground there, you

**12:05:06** 20   know, you could see his fat kind of move a little

21   bit.  You know, there was nothing really protecting

22   him from falling to the ground.  I mean, he just fell

23   like a bag of potatoes, you know.  He just -- that's

24   it.

**12:05:18** 25   BY MR. HENNESSEY:

1      Q    Did it appear that either one of the

2    officers were trying to gently place Andy onto the

3    ground after the Tasering?

4            MR. SHERMAN:  Foundation; speculation.

5            THE WITNESS:  No.  I don't think they could

6    have, even if they tried.  He just fell like that.

7    BY MR. HENNESSEY:

8      Q    Okay.  So you didn't see anything that

9    appeared to be either one of the officers trying to

10   gently guide Andy's body from being Tasered gently

11   down onto the ground?

12     A    No.

13     Q    And Andy is -- was a pretty big guy?

14     A    He was a bigger guy.  Yeah.

15     Q    Okay.  So when you saw Andy, you know, hit

16   his knees and go face down, did you ever see Andy --

17   did you see -- well, what did you see next?

18     A    Um, he just -- he was just there and then

19   the officers cuffed him and, you know, of course,

20   there was no resistance.  Why would there be?

21     Q    Why wouldn't there be any resistance at that

22   point?

23          Why do you say there wouldn't be any

24   resistance at that point when Andy was down on the

25   ground like that?

12:05:26  (line 5)
12:05:37  (line 10)
12:05:46  (line 15)
12:06:07  (line 20)
12:06:17  (line 25)

110

1      A      When somebody gets Tasered and any time I've

2   ever seen it, you know, the body gets a jolt.  I

3   mean, you see the officers in a car and somebody

4   won't comply, they're in there jumping around and

12:06:28  5   jolting around and "No, Dude, don't Tase me."  I

6   mean, we've all seen that video.

7          As soon as this guy gets the Taser, in my

8   opinion, he's dead.  It shocked the life out of him

9   or something.  There was no flinch.  There was no

12:06:41  10   electric jolt.  This guy dropped like a bag of

11   potatoes.  I mean, that's all there was to it.  I

12   mean, when he hit the ground, in my opinion, he was

13   dead.

14      Q      Why do you say that?

12:06:50  15      A      Because I feel like he was dead.

16          MR. SHERMAN:  Foundation; speculation.

17   BY MR. HENNESSEY:

18      Q      When you say that you feel that he was dead,

19   did you see --

12:06:56  20      A      There was no life in him.

21      Q      What do you mean by that?

22      A      There was no flinching.  There was no -- his

23   stomach wasn't moving.  His chest wasn't moving.

24   There was no flinching of the body at all, you know.

12:07:09  25   Everything was still, and that was -- it was like it

111

1    was done.  I was kind of in shock.

2        Q    Okay.  Why were you kind of in shock?

3        A    Because I thought this guy is probably dead

4    laying there now, you know.  And I'm looking at it,

12:07:23  5    and there is nothing going on; and I felt --

6        Q    When you say "there is nothing going on,"

7    what do you mean "there is nothing going on"?

8        A    There is nothing going on with Andy.

9        Q    Okay.

12:07:31  10        A    There is no breathing.  You know, I'm

11    looking at -- like I said, his stomach.  His shirt is

12    up, you know.  You can see his bare stomach and, you

13    know, his shorts are there; and, you know, you could

14    just see -- I mean, the guy didn't have any clothes

12:07:46  15    on hardly.  He just had a short and light T-shirt,

16    and, you know, he's just laying there and pretty

17    lifeless.

18        Q    You say "pretty lifeless."

19            Did you ever see any signs of life from Andy

12:07:54  20    after the time he went down in the manner that you

21    described?

22        A    None.

23            MR. SHERMAN:  Vague; speculation;

24    foundation.

12:08:02  25            MR. HENNESSEY:  None.

118

|   |   |
|---|---|
| 1 | THE WITNESS:  Nothing that I could really |
| 2 | detect, no.  Nothing enforceful or a loud voice, no. |
| 3 | BY MR. HENNESSEY: |
| 4 | Q    How about in time frame? |
| 12:13:35  5 | A    Excuse me? |
| 6 | Q    From what you described before from the time |
| 7 | frame that you described, you say he basically walked |
| 8 | to the side, took out his Taser, and fired? |
| 9 | A    Right. |
| 12:13:45  10 | Q    I mean, was there any hesitation from the |
| 11 | time he took his Taser out? |
| 12 | Did he wait for any period of time before |
| 13 | firing? |
| 14 | MR. SHERMAN:  Objection; vague; |
| 12:13:53  15 | argumentative; compound. |
| 16 | THE WITNESS:  When he got around to the side |
| 17 | of him, it was instantaneous. |
| 18 | MR. HENNESSEY:  Okay. |
| 19 | THE WITNESS:  He pulled it out and shot him |
| 12:13:59  20 | right then.  I mean, there was no, you know, "wait" |
| 21 | or no communication that I can remember. |
| 22 | BY MR. HENNESSEY: |
| 23 | Q    Okay.  Certainly no loud commanding "knock |
| 24 | it off or I'm going to Tase you" or -- |
| 12:14:08  25 | A    No. |

119

                    MR. SHERMAN:  Objection; asked and answered;
1

2    vague.

3                    THE WITNESS:  No.

4    By MR. HENNESSEY:

12:14:12  5        Q    Anything like that?

6        A    No.

7        Q    And it was very fast, as you described?

8        A    It was very fast.  And going back to the

9    stress level that the second officer brought, the

12:14:21 10   only thing that I can -- the only thing that I could

11   describe it at the time was this cavalier cowboy

12   attitude.

13        Q    What do you mean by that?

14        A    I mean --

12:14:31 15                   MR. SHERMAN:  I'll move as no question

16   pending.

17                   THE WITNESS:  "Here I am."  And, you know,

18   "I'm going to get my way," and "damn the torpedoes,"

19   you know.

12:14:40 20                   You know, this guy seemed a little bit

21   cowboy to me; but I don't know.  I mean, that's just

22   the attitude I say.  Meaning, you know, I do what I

23   want when I want to do it and I don't really care,

24   you know.  And, you know --

12:14:53 25                   MR. SHERMAN:  What do you base that on?

120

```
 1              THE WITNESS:  I'm reading a lot into that.
 2    I'm reading a lot into that, but it's the attitude I
 3    felt.  That's all I can say.
 4    BY MR. HENNESSEY:
 5        Q    Just the general things that you saw between
 6    what you saw, the actions by the first officer --
 7        A    Yeah.
 8        Q    -- the way he handled the scene --
 9        A    Yes.
10        Q    -- versus the way the second officer handled
11    the scene?
12        A    Exactly.
13        Q    Is that fair?
14        A    The first one seemed -- it seemed, like I
15    said, very routine, very professional.  The second
16    one seemed pretty cowboy-ish.
17        Q    And when you say he seemed cowboy-ish, what
18    do you mean?
19        A    I mean --
20              MR. SHERMAN:  Speculation; foundation.
21              THE WITNESS:  -- kind of a little bit of
22    a -- kind of a -- I don't know, just kind of a wild
23    card, let's say.  You know, just had this attitude
24    that, you know -- you know, it seemed a little
25    unprofessional to me.
```

12:15:01  5
12:15:10  10
12:15:15  15
12:15:24  20
12:15:42  25

121

BY MR. HENNESSEY:

    Q    What about it seemed unprofessional about what you saw him do?

          MR. SHERMAN:  Objection; misstates testimony; speculation; vague.

          THE WITNESS:  Just that everything was a little abrupt, you know.  I don't think he had to go to this extent.  And when Andy was sitting on the ground with his torso leaning against the officer, you know, he reached down and said, "Don't be faking it here," and he started --

BY MR. HENNESSEY:

    Q    Hold on.  Hold on.

        Who said what?

    A    This is the same officer that when Andy was on the ground up against the officer's leg, he reached down and he apparently thought Andy was faking this situation where he wasn't moving.  He's faking the fact that he's out cold or whatever the case may be, and he did hit him in the face a couple times, slight, not strong, not like I'd slap somebody in the face if they offended my wife or anything like that, just like "wake up," "wake up," you know, that type of thing.

    Q    Okay.

12:15:49  (line 5)
12:16:04  (line 10)
12:16:11  (line 15)
12:16:28  (line 20)
12:16:41  (line 25)

122

```
 1        A    And that type of attitude.  That's why I say
 2   that.
 3        Q    Okay.
 4        A    It's the whole picture, not just because he
 5   shot him with a Taser.  People get shot with a Taser
 6   by professional officers all the time.  I'm just
 7   putting the whole thing together and saying this guy
 8   seemed a little bit out of line to me.
 9        Q    Based upon everything that you've already
10   said?
11        A    Yes.
12             MR. SHERMAN:  I'll move to strike.
13   BY MR. HENNESSEY:
14        Q    When you saw the second officer, the one who
15   Tasered him, slap Andy in the face in the manner that
16   you described, kind of not hard like you're, you
17   know, trying to -- like if somebody, as you put it,
18   offended your wife, you know, you're not going to do
19   that.
20             What exactly did you see in relation to any
21   attempts to determine Andy's health?
22        A    None.
23        Q    You saw the slap on the face.
24             Other than that, did you see anything from
25   these officers -- have you ever seen on television,
```

Time stamps in left margin:
12:16:49 (line 5)
12:17:03 (line 10)
12:17:08 (line 15)
12:17:20 (line 20)
12:17:34 (line 25)

124

|              | 1  | little more concern as time went on.  We're talking, |
|--------------|----|
|              | 2  | you know, as time went on, maybe a minute or two. |
|              | 3  | Q    What was happening during that minute or two |
|              | 4  | with Andy? |
| 12:18:42     | 5  | A    Nothing. |
|              | 6  | Q    When you say "nothing," did you see any |
|              | 7  | signs of life from the time that Andy went down after |
|              | 8  | being Tasered until this minute or two later? |
|              | 9  | MR. SHERMAN:  Objection; asked and answered; |
| 12:18:48     | 10 | vague and ambiguous; calls for speculation; lacks |
|              | 11 | foundation. |
|              | 12 | THE WITNESS:  No. |
|              | 13 | BY MR. HENNESSEY: |
|              | 14 | Q    When you saw Andy resting -- |
| 12:18:53     | 15 | MR. SHERMAN:  Expert opinion, too. |
|              | 16 | BY MR. HENNESSEY: |
|              | 17 | Q    When you saw Andy resting against this |
|              | 18 | officer's leg, could you see his chest? |
|              | 19 | A    Yes. |
| 12:19:02     | 20 | MR. SHERMAN:  Objection; vague. |
|              | 21 | BY MR. HENNESSEY: |
|              | 22 | Q    Could you see his chest going up and down? |
|              | 23 | A    No. |
|              | 24 | Q    Could you see any heavy breathing from Andy |
| 12:19:06     | 25 | at any point? |

150

1      And then after I spoke with the family, I

2  felt, you know, I'm either going to not say anything

3  and go on my merry way or, you know, do the right

4  thing.  Here I am.

01:15:04  5  BY MR. HENNESSEY:

6      Q    You're under subpoena.

7           You don't want to be here; is that true?

8      A    Well, I've got other things better to do

9  than this.

01:15:10  10     Q    But, I mean, you are here under a subpoena?

11     A    Yeah.  I have the subpoena right here.

12     Q    And would it be fair to say that you would

13  prefer to not be involved in this case?

14     A    Yeah.  Sure.  I've got my own life.  I don't

01:15:25  15  need all this.  As a matter of fact, there was

16  several reporters come to the area and, you know, I

17  refused to talk to anybody.  I didn't want to have

18  anything to do with it.  I had not planned to have

19  this -- have it come to this point or anything like

01:15:43  20  that.  I just wanted it all go away.

21     Q    Do you remember me asking you this question,

22  did you ever see any attempts for like one police

23  officer to try to grab one of Andy's arms and the

24  other police officer to try to grab the other arm and

01:15:58  25  try to put his hand behind his back?  Did you see

151

1    any?  And your response, "no."

2           Do you remember that?

3       A    Uh-huh.  Yes.

4           MR. SHERMAN:  Objection; foundation; assumes

01:16:04  5  facts not in evidence; asked and answered.

6    BY MR. HENNESSEY:

7       Q    When you told me that, was that truthful?

8       A    Yes.

9       Q    And do you recall saying, "I didn't see the

01:16:10  10  officers try to force his hands down.  You know, like

11    it happened pretty quick"?

12           Do you remember saying that?

13           MR. SHERMAN:  Objection --

14           THE WITNESS:  Yes.

01:16:18  15  BY MR. HENNESSEY:

16       Q    Was that truthful?

17           MR. SHERMAN:  -- the document speaks for

18    itself.

19           THE WITNESS:  Yes.

01:16:23  20           MR. SHERMAN:  You're not going to go through

21    the entire hour and something?

22           MR. HENNESSEY:  No.

23           MR. SHERMAN:  Okay.  Thank you.

24           MR. HENNESSEY:  I'm actually almost done,

01:16:32  25  so.  I actually may be done if you can just give me

197

1    do the right thing.

2              When you spoke to them, how long was that

3    meeting?

4         A    I think they came in, and they were there

01:58:52  5    for maybe, I don't know, half an hour, probably.

6         Q    Was there crying going on?  Tears?  Things

7    of that nature?

8         A    Um, the nephew, I don't remember there being

9    any tears.  I think the father might have been upset,

01:59:08 10    but I don't recall -- you know, I think there was

11    some choking back, but I don't remember anybody just

12    breaking down.

13        Q    Not that you can recall?

14        A    Not that I can recall.

01:59:17 15        Q    Okay.  You've made it very clear.  I'm going

16    to draw -- we're going back to the first officer and

17    Mr. Tran.

18              You've made it very clear that at all times

19    Mr. Tran had his hands on his head?

01:59:31 20        A    As far as I can remember.

21        Q    Right.  And you never saw his hands move

22    from that?

23        A    I don't think they really could move from

24    that position.

01:59:39 25        Q    Why?

198

|     |     |
| --- | --- |
|  | 1 |
|  | 2 |
|  | 3 |
|  | 4 |
| 01:59:52 | 5 |

1    A    Well, the officer had his hands on there.  I

2  think I would have -- you know, it would have caught

3  my attention if there would have been some thrashing

4  around or, you know, this kind of thing.  Like I

5  said, everything seemed pretty routine.

6    Q    Okay.  How long was Mr. Tran's hands on top

7  of his head?

8    A    Not very long.

9    Q    How long?

10    A    Um, as he walked back, he probably stood

11  there probably a minute or so.

12    Q    So his hands were on top of his head for

13  about a minute?

14    A    Or so.

15    Q    Or so.  And when you say "or so," what does

16  that mean?

17    A    That means the officer -- the other officer

18  came, and then his hands were still on his head and

19  everything happened pretty quickly, you know.

20         And then as soon as he got Tasered, of

21  course, his hands weren't on his head anymore.

22    Q    Right.  Let's go --

23    A    Everything happened real fast.

24    Q    Let me back you up, if I can, before that.

25         How long are Mr. Tran's hands on top of his

199

1    head before the second officer arrives?

2        A    Um, not very long.  I mean, that second

3    officer -- as soon as the officer had his hands on

4    Mr. Tran's hands, the other officer arrived.

02:00:49  5        Q    Okay.  And how long do you think that the

6    first officer had his hands on Mr. Tran's hands?

7        A    I think everything happened, it was about a

8    minute or so.

9        Q    So Mr. Hands -- Mr. Tran's hands --

02:01:05  10       A    I got you.

11       Q    Thank you.  I'm glad you do.

12            Mr. Tran's hands are on top of his head for

13    about a minute before the first officer -- second

14    officer arrived?

02:01:11  15       A    Yes, not very long in total.  Because, like

16    I said, everything happened pretty quick.  I mean,

17    the officer got Mr. Tran back, got his hands on his

18    head, and the other officer was there very quickly,

19    and then -- yeah, probably a minute or so.

02:01:24  20       Q    And that's what I'm trying to figure out.

21            How long were Mr. Tran's hands on top of his

22    head before the second officer arrived?  About a

23    minute or so?

24       A    Before the second officer arrived?

02:01:34  25       Q    Or --

209

wasn't like right next to him.  He'd come around to the side, but he probably left about a three-foot gap there.

Q    Is that when he put his hands on top of each other?

02:09:31    A    No.

Q    When were his hands on top?

A    When he was in front.

Q    Okay.  Going to the side is when he Tasered him?

02:09:36    A    Yes.

Q    Okay.  How long did he have his hands on top of Mr. Tran's hands?

A    Not long.

02:09:40    Q    How long?

A    Maybe, I don't know, 20 seconds, not very long.

Q    Do you know what he was doing with his hands on top?

02:09:48    A    I just assumed he was -- I don't know.  I just assumed he was keeping control of the guy there, Mr. Tran, keep more control of him.

Q    Did Mr. Tran look like he was out of control?

02:10:05    A    No, not really.  I felt like the first

220

```
 1        A    It wasn't on his head.  No.

 2        Q    Okay.  Where was it?

 3        A    It was just -- I don't know what it was

 4   doing.  It wasn't doing anything significant.  I

 5   mean, if he would have had a gun in his hand or a

 6   billy club or something like that, I probably would

 7   have paid more attention, but I didn't.

 8        Q    Okay.  I understand.

 9        A    But I don't think there was really much

10   going on there.  I think he had his hand free just in

11   case, in case he needed to use his other hand for

12   some other reason.

13        Q    Was it down to his side?

14        A    More towards his side probably, yeah, I

15   would say.  Because I didn't notice it being up above

16   his head or anything.

17        Q    "Probably" always concerns me.

18             So was it your best estimate that it was

19   probably to his side?

20        A    Yes.  That's my best estimate.

21        Q    Okay.  So we have the first officer with his

22   left hand on top of Andy's hands.  We have his right

23   hand probably down by his side.  We have the second

24   officer with his hands on Mr. Tran's hands.

25        A    Hand, probably his hand.  I only saw him put
```

02:34:26    5
02:34:35   10
02:34:46   15
02:34:54   20
02:35:11   25

222

|       |    |   |                                                      |
|-------|----|---|------------------------------------------------------|
|       | 1  | Q | Okay.  But you can't tell us which hand?             |
|       | 2  | A | No.                                                  |
|       | 3  | Q | What was he doing with his other hand then           |
|       | 4  |   | if it was only one on top?                           |
| 02:36:15 | 5 | A | I don't know.  I don't recall.                     |

        1       Q    Okay.  But you can't tell us which hand?

        2       A    No.

        3       Q    What was he doing with his other hand then

        4   if it was only one on top?

02:36:15  5     A    I don't know.  I don't recall.

        6       Q    Was it to his side?

        7       A    I don't recall that, either.

        8       Q    Anything in his hands -- the other hand at

        9   that time?

02:36:21 10     A    Not that I noticed.

       11       Q    Did you ever see slight body movements of

       12   the officers going a couple of inches in one

       13   direction or the other?

       14       A    Oh, yes.  Both -- everyone had some slight

02:36:31 15  body movements.

       16       Q    Okay.  And what do you mean by that?

       17       A    You know, I mean, they weren't standing

       18   there like statues, you know.  You had, you know, the

       19   officer in front and one behind; and there is some

02:36:45 20  body movement, you know.  I mean, it's nothing like I

       21   said out of the ordinary.  Nothing that's going to

       22   catch your attention.

       23       Q    Nothing violent?

       24       A    Nothing real violent, no.  Nothing violent,

02:36:56 25  just minimal body movement, you know.  A couple, you

224

1    really basically stood in one spot; and he didn't

2    move from that one spot.

3         Q    Okay.  And when you say "move from that

4    spot," you're talking about his feet; correct?

02:38:10  5    A    Right.

6         Q    Let's talk about his upper portion of his

7    body.  Is it like moving and swaying a little bit?

8         A    Um, a little bit.

9         Q    Nothing extraordinary?  No violent

02:38:22  10   gyrations; correct?

11        A    No.  There is no crazy stuff going on.  No,

12   just some movement, moving around.

13        Q    How so?

14        A    Um, slight body movements.  You know, the

02:38:33  15   guy's got his hands on his head.  Like I said, they

16   check themselves.  I mean, you've got to stay in

17   balance.  You've got one hand, and your legs are

18   spread.  You're an officer.  You've got your hands on

19   your head.  You know, everybody is slightly moving

02:38:45  20   around, trying to keep their balance probably, you

21   know, that kind of thing, just standing upright.

22   Everybody is just moving slightly.

23        Q    Okay.

24        A    Just normal movements for a guy that you

02:38:58  25   have ahold of, and you're standing there behind him,

232

| | |
|---|---|
| 1 | let's say.  I don't -- I don't -- I try not to get |
| 2 | any tickets, especially, lately because they're |
| 3 | expensive, and they're changing the laws as far as |
| 4 | that goes. |
| 02:45:03  5 | So it doesn't pay to -- now, if you get a |
| 6 | ticket, you're going to get -- your vehicle is going |
| 7 | to get inspected and you go through this whole thing. |
| 8 | So it's better just don't speed anymore and call it |
| 9 | good. |
| 02:45:15  10 | Q    I hate the traffic cameras myself. |
| 11 | Going back to the incident, however, the |
| 12 | second officer has his hands up or hand, at least |
| 13 | one, up on top of Mr. Tran for approximately 20 |
| 14 | seconds, and then he moves to Mr. Tran's right side? |
| 02:45:31  15 | A    Yeah. |
| 16 | Q    How does he position himself in relation to |
| 17 | Mr. Tran?  Is he at an angle? |
| 18 | A    Yeah.  He's -- he's at a -- kind of at a |
| 19 | perpendicular angle.  So let's say they were in a |
| 02:45:45  20 | straight line here, he's a little bit this way, |
| 21 | probably a 45-degree angle. |
| 22 | Q    Okay.  And you're doing a wonderful job |
| 23 | describing it, and 45 degrees means something; but, |
| 24 | you know, we have to have a plane to look at it. |
| 02:46:04  25 | I'm going to draw a wonderfully out-of-scale |

238

|   |   |   |
|---|---|---|
| 1 | | him pull the gun out or the Taser gun out? |
| 2 | | A    Yeah. |
| 3 | | Q    Okay.  Yes? |
| 4 | | A    Yes. |
| 02:50:40 | 5 | Q    And that was a black-and-yellow gun I |
| 6 | | believe you described? |
| 7 | | A    I believe it was.  Yes. |
| 8 | | Q    Okay.  And when he did that, you had |
| 9 | | indicated that he fired it almost immediately? |
| 02:50:54 | 10 | A    Yeah. |
| 11 | | Q    Was there any gap or lapse of time? |
| 12 | | A    Very minimal. |
| 13 | | Q    What's that?  A few seconds? |
| 14 | | A    No. |
| 02:51:04 | 15 | Q    What's "very minimal"? |
| 16 | | A    Maybe a second or two. |
| 17 | | Q    Okay.  So he pulled it and fired it within a |
| 18 | | second or two? |
| 19 | | A    Yeah. |
| 02:51:11 | 20 | Q    Yes? |
| 21 | | A    After he got around -- he got into position. |
| 22 | | Q    Okay.  And that's the position -- |
| 23 | | A    It took him a second or two probably to get |
| 24 | | to that position.  Once he got into that position |
| 02:51:21 | 25 | quickly, it escalated from there. |

249

|   |   |
|---|---|
|   | 1 | Q   Can you tell me what the first officer is |
|   | 2 | doing while the second officer is handcuffing him? |
|   | 3 | A   Just hanging out there, not doing much. |
|   | 4 | Q   Okay.  And the second officer, that's the |
| 03:00:31 | 5 | one that Tasered him? |
|   | 6 | A   I believe so. |
|   | 7 | Q   What did he do with his Taser? |
|   | 8 | A   Um, I don't recall. |
|   | 9 | Q   Did he re-holster it? |
| 03:00:43 | 10 | A   I don't recall. |
|   | 11 | Q   Did he lay it on the ground? |
|   | 12 | A   I don't recall. |
|   | 13 | Q   He didn't hand it to Mr. Tran, did he? |
|   | 14 | A   Um -- |
| 03:00:53 | 15 | Q   Well, I'm trying to eliminate possibilities. |
|   | 16 | A   I don't recall what he did with that Taser, |
|   | 17 | you know.  I don't want to assume anything.  So I'm |
|   | 18 | just going to say I'm really not sure. |
|   | 19 | Q   Okay.  Well, when he was handcuffing |
| 03:01:04 | 20 | Mr. Tran, he obviously didn't have them in his hands; |
|   | 21 | correct? |
|   | 22 | A   He must have holstered it, I guess. |
|   | 23 | Q   Well, when he was handcuffing him, did you |
|   | 24 | see the Taser in his hand at that time? |
| 03:01:13 | 25 | A   No. |

267

```
 1        Q    Thank you.
 2             Prior to the ambulance or emergency
 3   personnel arriving via ambulance or fire truck, did
 4   you ever see any of the officers, three officers,
 5   leave the grassy area?
 6        A    You know, other than the third officer I
 7   wasn't sure of, but the other two were pretty much
 8   right there with Andy.
 9        Q    Okay.  When you say "the other two," we're
10   talking about Officer 1 and Officer 2; correct?
11        A    Yes.
12        Q    So they were pretty much always there with
13   Andy?
14        A    I think so.
15        Q    And then you told us the paramedic rolls up
16   and Officer 2 has to go to the car to get the key?
17        A    Yes.
18        Q    Where is that car located?  Is that the one
19   next to your house?
20        A    No.  I don't think so.
21        Q    Well, you saw him go to the car; correct?
22        A    I saw him go to the car.  And, you know, it
23   might have been the closest car to the scene.
24        Q    Okay.  Well --
25        A    I don't know -- I don't think he ran all the
```

03:27:18   5
03:27:28  10
03:27:32  15
03:27:45  20
03:28:03  25

276

```
 1        Q    But that wasn't, in your opinion, meant to

 2   harm him or hurt him; correct?

 3        A    No.  I think it was meant to wake him up.

 4        Q    Okay.  So, no, I want to exclude that.

 5             So we have him come up.  We have him put his

 6   hands on top of Mr. Tran's hand or the other

 7   officers' hands for approximately 20 seconds.

 8             I'm trying to figure out why he's cavalier

 9   or cowboy-ish, what he did that made you think that.

10        A    Well, he walked around to the side of him

11   and shot him with a Taser for, in my opinion, no

12   apparent reason.

13             Everything was under control.  Everything

14   was fine, and then this happened; and I can't help

15   but understand, you know, when you're in compliance,

16   why you need to go to that next level.

17        Q    And what makes you think Mr. Tran was in

18   compliance?

19        A    Just by what I told you.  His hands were on

20   his head, and I didn't see anything violent

21   happening, I mean.

22        Q    There were subtle movements?

23        A    There could be a whole 'nother set of

24   scenarios going on that I didn't see, but this was

25   what I saw.
```

03:36:33  (line 5)
03:36:47  (line 10)
03:36:59  (line 15)
03:37:10  (line 20)
03:37:23  (line 25)

277

1        Q     You didn't see anything overt occurring?

2        A     No, nothing overt, nothing criminal, nothing

3    violent, you know.

4        Q     But there were subtle movements going on

03:37:33  5    between the three individuals; correct?

6        A     Yes.

7        Q     You saw the body -- the upper bodies moving?

8    The feet never moved.

9        A     The feet, you know, I can't say they never

03:37:42  10    moved; but they stayed in the same place; but, you

11    know, the legs move a little.  You know, your hands

12    are moving.  You know, your lips are moving.  Things

13    are moving, you know, but not -- you know, I mean,

14    you know, they're moving.  They're alive, and things

03:37:55  15    are going on, you know.

16        Q     Not frozen like statues?

17        A     Not frozen like statues, no.

18        Q     You just made a statement that makes me want

19    to pick up with something, and I realize you've said

03:38:05  20    they stayed in the same general area.

21        A     Right.

22        Q     And I've always assumed, and that's what

23    happens when you assume, that the feet placement has

24    always remained the same.

03:38:12  25        A     It's pretty much been the same throughout.

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

278

1    They didn't really move off this particular area

2    right here.  And you can see by the sidewalk, it's

3    easier to measure things, because you have these

4    lines that are in the sidewalk.  You have different

03:38:28  5    lines, and things like this can be measured, you

6    know, I mean, to your eye.

7         You know, you use these things when

8    you're -- you know, when you're doing things.  You

9    use lines as a reference point.  And so it was really

03:38:42  10   to see things that things stayed pretty much right

11   there, you know.

12        Q    But is it possible that during this

13   encounter, that the officers' feet were moving in

14   slight directions?

03:38:53  15        A    Is it possible?  Yeah.  I suppose anything

16   is possible.

17        Q    Did you see it happening?

18        A    No.  I didn't see it happening to a degree

19   where they were on, you know, one side of the line

03:39:02  20   and pushing back and forth, anything like that.

21   Everything pretty much stayed in one area.

22        Q    And I appreciate the one area.  But, for

23   example, if you look at me --

24        A    Yes.

03:39:10  25        Q    -- my -- I'm moving.

282

```
 1        A     Right.

 2        Q     They never moved over to where the mailbox

 3   is?

 4        A     Right.

 5        Q     They never moved over to where the front

 6   door was?

 7        A     They never moved even halfway over to where

 8   the mailbox was.  Everything pretty much specifically

 9   happened in this area.

10              Are you asking me if there was some

11   movement?  Yes.

12        Q     That's what I'm asking.  So the answer is

13   "yes"?

14        A     Yes.

15        Q     Okay.  Just no -- you know, they're not

16   moving by the mailbox, big movements; correct?

17        A     Yes, small movement.

18        Q     Going back to the attitude, the cowboy

19   attitude, is it based upon what you just said as far

20   as, you know, his hands are on top of his head and

21   then all of a sudden, he goes to the side and Tasers

22   him?  Is that what you based it on?

23        A     Um, partly.

24        Q     What's the other part?

25        A     I don't know.  I guess I just -- I have no
```

03:41:27   5
03:41:33   10
03:41:39   15
03:41:54   20
03:42:07   25

283

1   basis for it, but I guess it's just kind of an

2   intuition thing.  I've dealt with people before,

3   different types of personalities and, you know,

4   you -- you know, it was like this just went

03:42:25   5   overboard, in my opinion, too quickly; and sometimes

6   people get zealous of their job or what have you, and

7   that's what I called it.

8           You know, it's not -- it may not be that,

9   but I called it maybe being a little bit overzealous,

03:42:42   10   you know, basically just the demeanor and this, that,

11   and the other thing.

12           I mean, I can't really put a specific, oh,

13   he did this and this is what I detected.  This is

14   what I determined.  No.  It's something more subtle

03:42:58   15   than that, I think.

16       Q    Well, you've described the act of going to

17   the side and Tasering him as being part of it, and

18   the other part is this gutt feeling you told us

19   about.

03:43:07   20       A    Yes.

21       Q    Do you know the names of any of these

22   officers?

23       A    No.

24       Q    Have you ever met any of these officers?

03:43:13   25       A    No.

286

1    that you have not told us about?

2        A    As far as?

3        Q    As far as it relates to this incident that

4    relate to this cowboy-cavalier-type attitude?

03:44:52  5        A    Oh, oh, no, no.  There is nothing that I

6    can -- you know, just like I said, from start to

7    finish, I mean, you know, the slapping of the face,

8    you know, the Taser, the this and the that, and you

9    know, just the whole thing is a package.

03:45:08  10       Q    Well, did you think the slapping -- I think

11   you indicated a couple times now that you thought the

12   slapping of the face was an attempt to wake him up.

13       A    But was it really necessary?  I don't think

14   so.

03:45:20  15       Q    Why not?

16       A    Because the guy is dead.

17       Q    Okay.  Do you think the officers knew that?

18       A    I don't know what they knew.

19            MR. HENNESSEY:  Objection; speculation.

03:45:28  20            THE WITNESS:  I don't know that we knew.

21   BY MR. SHERMAN:

22       Q    Okay.  So --

23       A    All's I know, there was -- you know, after

24   things didn't quite go right, there was a lot of

03:45:36  25   concern here and you know -- and now we've got a

294

1     A    Oh, you know, anything is possible.

2     Q    Okay.  So it's a possibility?

3     A    Sure.

4     Q    You don't necessarily think it's a big

03:52:08   5   possibility, but it's possible?

6     A    Yeah.  I don't think it's -- I don't think

7   it actually happened; but, yeah, it's possible.  I

8   mean, I said this from the beginning.  I think he was

9   dead when he -- before he hit the ground.

03:52:22  10        And I'm not basing that on any evidence that

11   I have.  I'm just a witness that saw it, and that's

12   what I think happened.

13     Q    You think the Taser killed him?

14     A    I do.  You know, things happen chemically in

03:52:39  15   people's body, and this guy was -- you know, he was

16   probably on some kind of medication.  Who knows?

17   Everything interacts.  You know, you take a -- even

18   in your regular life, if you take a pill, you have

19   side effects.

03:52:50  20        And this guy, you know -- you know, when

21   you're not -- there is an electrical problem in your

22   body when you're not all there, and there is a

23   disconnect and it connects, and somehow maybe he got

24   connected a little bit too much here when this Taser

03:53:05  25   got him.  I don't know.

328

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name. _____.

Dated: _____

**EXHIBIT B**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


QUYEN KIM DANG, et al.            )
                                  )
          Plaintiff,              )
                                  )
                                  )
    vs.                           )   Case No. SACV10-0338
                                  )
CITY OF GARDEN GROVE, et al.      )
                                  )
          Defendants.             )
                                  )
----------------------------------)




DEPOSITION OF DANIEL KARSCHAMROON

Westminster, California

Tuesday, March 22, 2011




Reported by:

Amber N. Jensen, CSR

Certificate Number 13525

1

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4    QUYEN KIM DANG, et al.            )
                                        )
 5              Plaintiff,              )
                                        )
 6                                      )
           vs.                          )   Case No. SACV10-0338
 7                                      )
      CITY OF GARDEN GROVE, et al.      )
 8                                      )
                Defendants.             )
 9    ----------------------------------)

10

11

12

13

14

15

16

17              Deposition of DANIEL KARSCHAMROON, taken on

18    behalf of Plaintiff, at the law offices of

19    Sean Hennessey, 8231 Westminster Boulevard, Westminster,

20    California beginning at 9:47 a.m., and ending at

21    3:48 p.m., on Tuesday, March 22, 2011 before

22    Amber N. Jensen, Certified Shorthand Reporter,

23    No. 13525.

24

25
```

2

```
 1      APPEARANCES OF COUNSEL:

 2

 3      FOR PLAINTIFF:

 4              Law offices of
                SEAN HENNESSEY
 5              By  Sean Hennessey, Esq.
                8231 Westminster Boulevard
 6              Westminster, CA 92683
                TEL: (949) 280-1257
 7              FAX: (714) 898-7449

 8      FOR PLAINTIFF:

 9              Law offices of
                LIEM H. DO & ASSOCIATES
10              By  Paul Minhthu Pham, Esq.
                8231 Westminster Boulevard
11              Westminster, CA 92683
                TEL: (714) 898-7579

12

13      FOR DEFENDANTS, CITY OF GARDEN GROVE, ET AL.:

14              Law offices of
                FERGUSON, PRAET & SHERMAN
15              By  Steven Sherman, Esq.
                1631 E. 18th Street
16              Santa Ana, CA 92705
                TEL: (714) 953-5300

17

18      ALSO PRESENT:

19              Courtney Bates, Videographer
                Richard Gendreau
20

21

22

23

24

25
```

3

| | |
|---|---|
| 10:07:04 | 1 |

anything like that?

2      A    No actual courses.

3      Q    Anything that dealt with self-defense at all

4  in any capacity?

10:07:09  5      A    Yes.  I joined the United States Marine Corps.

6      Q    When did you join the Marine Corps?

7      A    In 2003.

8      Q    Did you join as a reservist at that time?

9      A    Yes, I did.

10:07:21  10      Q    And what type of training did you receive,

11  beginning in 2003 at the United States Marine Corps that

12  may deal with issues of self-defense, hand-to-hand

13  combat, martial arts?

14      A    It was basic boot camp that dealt with

10:07:40  15  intensity and hands and -- hands-on activity as well as

16  rifle and dealing with situations.

17      Q    Specifically in relation to hand-to-hand --

18  hands-on contacts, how long was the basic training that

19  you went through?

10:07:55  20      A    Specifically for hand --

21      Q    Well, start with the basic training in its

22  entirety.

23      A    Basic training's for six -- correction.  It's

24  three months.

10:08:05  25      Q    Okay.  About 12 weeks?  Is that about right?

25

| | |
|---|---|
| 10:31:32 | 1 |

viewing -- having individuals raise their hands and turn

2  around and show if they did have any types -- any types

3  of weapons at a distance at first, for fear of suicide

4  bombers.

10:31:45  5       Q     And also from anybody who may have any type of

6  weapon; correct?

7       A     That's correct.

8       Q     So would it be fair to say in your capacity as

9  in the Marine Corps and in your capacity as a police

10:31:55  10  officer, you have always been trained to keep people at

11  a distance, if possible, to determine if they have

12  weapons?

13            MR. SHERMAN:  Objection.  It's compound.

14  Vague and ambiguous.

10:32:04  15            THE WITNESS:  Depending on the situation, it's

16  viewed as much safety as first, and then continuing on.

17  BY MR. HENNESSEY:

18       Q     In your role as a police officer, it's police

19  officer safety first; correct?

10:32:16  20       A     That's correct.

21       Q     And that's what you've been trained; correct?

22       A     That's correct.

23       Q     And you have followed that training throughout

24  the time you've been a Garden Grove police officer;

10:32:25  25  fair?

50

10:32:26  1          MR. SHERMAN:  Objection.  Vague and ambiguous.

2     Overbroad.  Scope and time.  Go ahead.

3          THE WITNESS:  That's correct.

4     BY MR. HENNESSEY:

10:32:30  5     Q    And as well as in the Marine Corps; correct?

6          MR. SHERMAN:  Same objection.

7          THE WITNESS:  Yes, I have.

8     BY MR. HENNESSEY:

9     Q    And you also tried to teach others under your

10:32:36  10    command in the Marine Corps to be safe?  To conduct

11    pat-downs in a safe manner?  To do in a safe manner;

12    fair?  To protect the Marines; correct?

13    A    That's correct.  To protect the Marines.

14    Q    While in the Marine Corps, did you receive any

10:32:56  15    training in the use of any type of electronic control

16    devices?

17    A    No.

18    Q    Were electronic control devices of any type

19    a -- used by anybody -- used by yourself or anybody

10:33:08  20    under your command during any time in the Marine Corps?

21    A    Never in the Marine Corps.

22    Q    During the time in the Marine Corps, did you

23    have opportunities to personally detain people yourself?

24    A    Yes, I have.

10:33:28  25    Q    Personally pat them down?

51

| | | |
|---|---|---|
| 10:39:31 | 1 | A    It would also vary. |
| | 2 | Q    How would -- what would be the longest period |
| | 3 | of instruction? |
| | 4 | A    For continuous instruction? |
| 10:39:40 | 5 | Q    Yes.  Of the -- |
| | 6 | A    Probably -- |
| | 7 | Q    I'm sorry, go ahead. |
| | 8 | A    Probably for one day. |
| | 9 | Q    And what would be the shortest length?  The |
| 10:39:47 | 10 | two hours? |
| | 11 | A    Yes. |
| | 12 | Q    And during those 20 to 30 sessions, did you |
| | 13 | provide instruction in pain compliance techniques? |
| | 14 | A    Yes, I did. |
| 10:39:55 | 15 | Q    In wrist control situations? |
| | 16 | A    Yes, I did. |
| | 17 | Q    In how to detain suspects? |
| | 18 | A    No. |
| | 19 | Q    How to handcuff suspects? |
| 10:40:02 | 20 | A    No. |
| | 21 | Q    How to take suspects down to the ground? |
| | 22 | A    Yes. |
| | 23 | Q    What did -- specifically did you train as to |
| | 24 | how to take suspects down to the ground? |
| 10:40:11 | 25 | A    It was arm bar take-downs, hip throws, |

58

| | | |
|---|---|---|
| 10:44:16 | 1 | Q    Web belt.  Okay.  And how long were you in |
| | 2 | that role? |
| | 3 | A    That's during the six-month -- or the |
| | 4 | three-month course of basic boot camp. |
| 10:44:23 | 5 | Q    Okay.  So that would have been back in 2003? |
| | 6 | A    Yes. |
| | 7 | Q    So if you're a tan belt for three and a half |
| | 8 | years, that puts you into 2006.  Somewhere around 2007. |
| | 9 | Do you remember approximately when it was that you |
| 10:44:37 | 10 | became a brown belt? |
| | 11 | A    It was when I was in Africa. |
| | 12 | Q    Are there any type of continuous proficiency |
| | 13 | testing in relation to keeping your brown belt? |
| | 14 | A    No, but there is for an instructor status. |
| 10:44:56 | 15 | Q    How many continuing proficiency tests have you |
| | 16 | taken since, um, 2006 in order to be a brown belt |
| | 17 | instructor? |
| | 18 | A    I have not taken any. |
| | 19 | Q    Have you become a brown belt instructor? |
| 10:45:09 | 20 | A    At that time, I was. |
| | 21 | Q    In Africa? |
| | 22 | A    Yes. |
| | 23 | Q    At some point, did you -- were you no longer |
| | 24 | considered a brown belt instructor? |
| 10:45:16 | 25 | A    Yes. |

63

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 10:46:19   | 1  | Q    '10.  Okay.  Do you remember that you ended             |
|            | 2  | that -- in June of 2010 -- so from June of 2010 until        |
|            | 3  | when did you instruct in the Marine Corps as a brown         |
|            | 4  | belt?  Did that -- did I get that wrong?                     |
| 10:46:34   | 5  | A    No, that's right.  During -- when we came back          |
|            | 6  | from our deployment, we have a period where we're trying     |
|            | 7  | to adjust back to regular -- regular life, per se.           |
|            | 8  | Q    All right.                                              |
|            | 9  | A    And in that time, we did some martial arts              |
| 10:46:49   | 10 | training, and I assisted with that training.                 |
|            | 11 | Q    Do you remember the last time since June of             |
|            | 12 | 2010 you instructed in any -- any Marine in any martial      |
|            | 13 | arts?                                                         |
|            | 14 | A    It was that period between June of 2010 and             |
| 10:47:01   | 15 | September of 2010.                                           |
|            | 16 | Q    Okay.  So at -- in September 3rd of 2008, you           |
|            | 17 | would have been a -- a green belt instructor?  Does that     |
|            | 18 | sound right?                                                 |
|            | 19 | A    A brown belt instructor.                                |
| 10:47:24   | 20 | Q    In September 3rd of 2008, you would have been           |
|            | 21 | considered a brown belt instructor?                          |
|            | 22 | A    Either a brown belt instructor or brown belt.           |
|            | 23 | Q    So on the date of this incident involving              |
|            | 24 | Andy Tran -- on the date of that incident, you would         |
| 10:47:39   | 25 | either be considered a brown belt or a brown belt            |

65

| | | |
|---|---|---|
| 10:50:32 | 1 | A    I want to say November 17th of 2007.  I can't |
| | 2 | be sure on that date. |
| | 3 | Q    That's okay.  And what happened upon |
| | 4 | graduation?  What I mean by that is, were you assigned |
| 10:50:43 | 5 | to any particular law enforcement agency during that |
| | 6 | time? |
| | 7 | A    Yes, I was. |
| | 8 | Q    You heard Officer Gendreau talk about the |
| | 9 | hands-on training he received while at |
| 10:50:54 | 10 | Goldenwest Academy.  Is the hands-on training that you |
| | 11 | received different in any manner than what he described |
| | 12 | yesterday, if you remember how he described it? |
| | 13 | A    I -- |
| | 14 | MR. SHERMAN:  Let me object to the question as |
| 10:51:07 | 15 | it assumes facts not in evidence.  Lacks foundation. |
| | 16 | Calls for speculation. |
| | 17 | MR. HENNESSEY:  I'll withdraw it. |
| | 18 | BY MR. HENNESSEY: |
| | 19 | Q    What hands-on training did you receive at the |
| 10:51:13 | 20 | Goldenwest Academy yourself from June, 2007 until |
| | 21 | November, 2007, approximately? |
| | 22 | A    From the Academy? |
| | 23 | Q    Yes. |
| | 24 | A    It was approximately 40 to 80 hours of ACT |
| 10:51:26 | 25 | training. |

69

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

| | | |
|---|---|---|
| 11:14:24 | 1 | instructors specifically with compliance? |
| | 2 | A    I cannot recall. |
| | 3 | Q    Can you give any estimation? |
| | 4 | A    No, I can't. |
| 11:14:30 | 5 | Q    Can you give any estimation as to whether |
| | 6 | you're talking about one hour, one day, one week? |
| | 7 | A    It would range from either one hour to three |
| | 8 | days, four days. |
| | 9 | Q    Do you recall the names of the instructors who |
| 11:14:41 | 10 | gave those lectures? |
| | 11 | A    No, I don't. |
| | 12 | Q    Do you recall any of the substance of those |
| | 13 | lectures? |
| | 14 | MR. SHERMAN:  Objection.  Asked and answered. |
| 11:14:48 | 15 | Go ahead. |
| | 16 | THE WITNESS:  It was referring to the |
| | 17 | Bill of Rights, Constitution, and the amendments. |
| | 18 | BY MR. HENNESSEY: |
| | 19 | Q    I'm talking specifically about the |
| 11:14:55 | 20 | Fourth Amendment. |
| | 21 | A    During that instruction? |
| | 22 | Q    During your time at Goldenwest Academy. |
| | 23 | A    Yes. |
| | 24 | Q    What specifically do you remember being taught |
| 11:15:03 | 25 | to you about compliance with the Fourth -- well, what do |

87

| 11:15:07 | 1 | you understand the Fourth Amendment to be? |
| | 2 | A    It is unreasonable search and seizure. |
| | 3 | Q    And did you receive instruction as to how to |
| | 4 | avoid committing unreasonable searches and seizures? |
| 11:15:19 | 5 | A    During the Academy? |
| | 6 | Q    Yes. |
| | 7 | A    I cannot recall. |
| | 8 | Q    Do you recall ever -- any instructor at any |
| | 9 | time ever saying anything about attempting to avoid |
| 11:15:25 | 10 | unreasonable searches and seizures during your time at |
| | 11 | the Goldenwest Academy? |
| | 12 | A    Yes. |
| | 13 | Q    What do you specifically recall any person |
| | 14 | saying about that issue? |
| 11:15:35 | 15 | A    I cannot recall specific sayings.  I just |
| | 16 | remember it as learning terminal during the -- during |
| | 17 | the policy academy. |
| | 18 | Q    Okay.  So you were involved in one, possibly |
| | 19 | two lectures, but you -- what you remember most about |
| 11:15:50 | 20 | the teaching related to the Fourth Amendment at |
| | 21 | Goldenwest Academy came from these booklets? |
| | 22 | Is that fair? |
| | 23 | A    No.  It -- it wasn't one or two lectures.  It |
| | 24 | was one or two instructors teaching during the time |
| 11:16:04 | 25 | frame of either one hour to three -- three days, based |

11:16:08   1   on learning terminal that was based on the Constitution,

2   Bill of Rights, and the Amendments.

3         Q     So were the instructors going -- like, did you

4   have a booklet that you were looking at and they were

11:16:18   5   going over the booklets with you?

6         A     That's correct.

7         Q     And do you specific -- do you still have those

8   booklets?

9         A     No, I don't.

11:16:26   10         Q     Do you know whether the curriculum at

11   Goldenwest College has changed since the time you left?

12         A     I'm unaware of it.

13         Q     Do you remember approximately the length of

14   these booklets that were being used for instruction on

11:16:42   15   compliance with the fourth Amendment specifically?

16         MR. SHERMAN:   You mean how -- page?

17         MR. HENNESSEY:   Yeah.   Pages.

18         MR. SHERMAN:   Okay.   It was vague.   Go ahead.

19         THE WITNESS:   Probably from 1 to 100 pages.

11:16:54   20   BY MR. HENNESSEY:

21         Q     At any point in time, did you sit down there

22   and read continuously each of the pages?

23         A     Yes.

24         Q     Did you -- did you seem to understand what was

11:17:06   25   in those pages?

89

| | |
|---|---|
| 11:17:08 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:17:16 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:17:26 | 10 |

11:17:08   1           MR. SHERMAN:  Objection.  Vague.  Go ahead.

2           THE WITNESS:  At that time, yes.

3    BY MR. HENNESSEY:

4       Q    Did you receive live instruction on different

11:17:16   5    types of contacts with citizens that may rise to the

6    level of an unreasonable search and seizure?

7           MR. SHERMAN:  Objection.  Vague.

8    BY MR. HENNESSEY:

9       Q    If -- do you understand what I'm talking

11:17:26   10   about?

11      A    No.  At that time, did I receive --

12      Q    At Goldenwest Academy, did you receive any

13   live instruction where a police officer has demonstrated

14   different types of maneuvers, such as choke holds, such

11:17:38   15   as deployment of various devices that may be

16   unreasonable under the circumstances?

17          Did they explain to you, "Don't do this"?  Did

18   they do things like that?

19      A    Yes.

11:17:48   20      Q    Okay.  What do you remember -- do you remember

21   them ever saying anything in relation to the deployment

22   of an electronic control device in violation of some --

23   of -- let me start that again.

24          Do you remember any instruction while at

11:18:01   25   Goldenwest Academy about the deployment of an electronic

90

| | | |
|---|---|---|
| 11:28:44 | 1 | A    He had a blank stare on his face and he |
| | 2 | looked -- had a puzzled look on his face. |
| | 3 | Q    When do you mean by a "blank stare"? |
| | 4 | A    He was staring off into space, but in my |
| 11:28:56 | 5 | direction. |
| | 6 | Q    Okay.  What do you mean by a "puzzled look" on |
| | 7 | his face? |
| | 8 | A    There was a slight sense of confusion on his |
| | 9 | face. |
| 11:29:05 | 10 | Q    What about anything about his appearance led |
| | 11 | you to believe that he had a sense of confusion going |
| | 12 | on?  What about -- |
| | 13 | MR. SHERMAN:  On his face? |
| | 14 | BY MR. HENNESSEY: |
| 11:29:14 | 15 | Q    What about your personal observations of his |
| | 16 | face led you to believe that he may have been in a sense |
| | 17 | of confusion?  A state of confusion? |
| | 18 | A    That he had a blank stare. |
| | 19 | Q    So the blank stare in and of itself led you to |
| 11:29:26 | 20 | believe that he may be confused or puzzled?  Was it the |
| | 21 | stare itself or anything else? |
| | 22 | A    Yes, it was the stare. |
| | 23 | Q    Have you seen anybody else prior to |
| | 24 | September 3rd, 2008 exhibit that type of stare before |
| 11:29:36 | 25 | that you saw on Andy Tran's face on September 3rd, 2008? |

103

| | | |
|---|---|---|
| 11:32:01 | 1 | officers? |
| | 2 | A    I was not asked.  It was more of -- they were |
| | 3 | supervising. |
| | 4 | Q    Did they sometimes critique the style you may |
| 11:32:10 | 5 | have used, or give suggestions as to how things could be |
| | 6 | done differently? |
| | 7 | A    Yes. |
| | 8 | Q    Was that a continuous training that you |
| | 9 | received over the three months of this observation |
| 11:32:19 | 10 | followed by critique, or explanations as to how things |
| | 11 | could be done differently? |
| | 12 | A    Yes. |
| | 13 | Q    Okay.  Were you also trained from all three of |
| | 14 | these officers, um, of the use of excessive force?  What |
| 11:32:32 | 15 | constitutes excessive force? |
| | 16 | A    Yes. |
| | 17 | Q    Did you receive training in the -- what |
| | 18 | constitutes excessive force -- constitutes excessive |
| | 19 | force at Goldenwest Academy? |
| 11:32:41 | 20 | A    I believe so. |
| | 21 | Q    Do you remember what specifically you were |
| | 22 | trained at the Goldenwest Academy as to what constituted |
| | 23 | excessive force, or what the standard was? |
| | 24 | A    I -- I cannot recall specifically. |
| 11:32:51 | 25 | MR. SHERMAN:  That's compound.  But go ahead. |

107

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 11:35:41 | 1  | THE WITNESS:  No.                                                     |
|          | 2  | BY MR. HENNESSEY:                                                     |
|          | 3  | Q    In relation to the scenarios that you were                      |
|          | 4  | trained on in relation to dealing with mental health                 |
| 11:35:47 | 5  | issues, the various block -- the various block                       |
|          | 6  | instruction that's you were trained, were you shown                  |
|          | 7  | actual examples of how to speak with somebody who may be             |
|          | 8  | suffering from a mental illness?                                      |
|          | 9  | MR. SHERMAN:  I think it's compound.  Go                             |
| 11:36:01 | 10 | ahead.                                                                |
|          | 11 | BY MR. HENNESSEY:                                                     |
|          | 12 | Q    If you understand it.                                           |
|          | 13 | A    I -- there wasn't an example for it.                           |
|          | 14 | Q    When you say there was or was not examples?                    |
| 11:36:10 | 15 | A    Was not.  It was based on scenarios and                        |
|          | 16 | critique after the scenarios.                                        |
|          | 17 | Q    Can you give examples of specifically relating                 |
|          | 18 | to contacts with people who may suffer from mental                  |
|          | 19 | illness, what types of scenarios were taught and what              |
| 11:36:23 | 20 | types of critiques were given?                                       |
|          | 21 | A    I cannot recall specific examples.                             |
|          | 22 | Q    Can you recall any one particular example of                   |
|          | 23 | any type of training that you received at                            |
|          | 24 | Goldenwest College as it relates to scenarios involving             |
| 11:36:34 | 25 | people with mental illnesses?                                         |

111

11:36:36  1         A    Not that I can recall.

       2         Q    From the time that you became a

       3    Garden Grove Police Department officer in November of

       4    2007 until September 3rd of 2008, do you remember

11:36:46  5    receiving any further instruction on techniques with --

       6    for dealing with people who may suffer from mental

       7    illness?

       8         A    Not that I can recall.

       9         Q    Have you heard of the Americans with

11:36:56 10    Disabilities Act?

      11         A    Yes, I have.

      12         Q    Where have you heard of that?

      13         A    I cannot recall.

      14         Q    Do you recall hearing that term at the

11:37:02 15    Goldenwest College?

      16         A    Possibly.

      17         Q    Do you recall hearing that term as a police

      18    officer at the Garden Grove Police Department between

      19    November, 2007 and September 3rd of 2008?

11:37:14 20         A    Possibly.

      21         Q    Have you ever been -- received any training as

      22    to complying with the Americans with Disabilities Act?

      23              MR. SHERMAN:  Objection.  Vague and ambiguous.

      24    Overbroad.  You may answer.

11:37:24 25              THE WITNESS:  I cannot recall.

                                                                    112

| | |
|---|---|
| 11:39:17 | 1 |

     A     Dealing with individuals with mentally

2    disabled needs some calm, patience, and just overviewing

3    the situation ahead.

4        Q     How about calling for potential medical help?

**11:39:28**  5        A     Yes.

6            MR. SHERMAN:  Objection.  Vague.

7    BY MR. HENNESSEY:

8        Q     How about 5150s?  Have you heard of that term

9    before September 3rd of 2008?

**11:39:37** 10        A     Yes, I have.

11        Q     What did you understand the term to mean prior

12    to September 3rd of 2008?

13        A     As an individual that's gravely disabled or a

14    grave danger to himself or to herself or to others.

**11:39:49** 15        Q     And that's a definition that you knew prior to

16    September 3rd of 2008; fair?

17        A     That's correct.

18        Q     Because you learned that both at

19    Goldenwest Academy and during your training at the

**11:39:59** 20    Garden Grove Police Department; fair?

21        A     Yes.

22        Q     And did you also learn -- do you know what

23    Health and Safety Code section 11550 is?

24        A     Yes.

**11:40:07** 25        Q     Did you know what that was prior to

115

| | | |
|---|---|---|
| 11:46:10 | 1 | this person is suffering from a mental illness as |
| | 2 | opposed to something induced by drugs or alcohol; fair? |
| | 3 | A    Yes. |
| | 4 | Q    Okay.  And I'm assuming you've also seen |
| 11:46:20 | 5 | people you believe were suffering from the effects of |
| | 6 | controlled substances or alcohol as opposed to mental |
| | 7 | illness; is that fair? |
| | 8 | A    Yes. |
| | 9 | Q    In your training as a police officer, have you |
| 11:46:37 | 10 | been trained to use the least amount -- the least amount |
| | 11 | of force under any given situation possible? |
| | 12 | MR. SHERMAN:  Objection.  Vague.  Ambiguous. |
| | 13 | Go ahead. |
| | 14 | THE WITNESS:  I've been trained on using the |
| 11:46:49 | 15 | reasonable -- reasonable amount of force. |
| | 16 | BY MR. HENNESSEY: |
| | 17 | Q    As part of your training, have you been |
| | 18 | trained to use the least amount of force necessary under |
| | 19 | the circumstances?  Does that sound familiar?  Does that |
| 11:46:57 | 20 | terminology sound familiar? |
| | 21 | A    Yes. |
| | 22 | Q    Where do you remember hearing that terminology |
| | 23 | before? |
| | 24 | A    I cannot recall. |
| 11:47:02 | 25 | Q    Do you remember hearing that at the |

123

| | | |
|---|---|---|
| 12:30:50 | 1 | on the X26? |
| | 2 | A    Yes. |
| | 3 | Q    Do you recall your attendance with any |
| | 4 | particular instructors during that time frame? |
| 12:30:58 | 5 | A    Yes. |
| | 6 | Q    Who do you remember giving any type of |
| | 7 | presentations at that time?  During that time? |
| | 8 | A    It was Sergeant Lux. |
| | 9 | Q    L-U-X? |
| 12:31:07 | 10 | A    Yes. |
| | 11 | Q    Do you recall attending any other types of |
| | 12 | training with any other officers at the |
| | 13 | Garden Grove Police Department between September -- I'm |
| | 14 | sorry.  November of '07 and September of '08 relating to |
| 12:31:20 | 15 | the X26? |
| | 16 | A    Yes.  It was informal training during |
| | 17 | briefing. |
| | 18 | Q    So just whatever sergeant may have been giving |
| | 19 | a briefing that day, issues on the X26 may have come up? |
| 12:31:30 | 20 | A    Yes. |
| | 21 | Q    Do you remember any specific issues that may |
| | 22 | have come up during those briefings prior to |
| | 23 | September 3rd of 2008? |
| | 24 | MR. SHERMAN:  I believe it's been asked and |
| 12:31:39 | 25 | answered.  Go ahead. |

136

| 12:36:19 | 1 | Q    Do you have any idea as to the year? |
| | 2 | A    No, I don't. |
| | 3 | Q    Prior to September 3rd, 2008, how many times |
| | 4 | have you patrolled with Officer Gendreau?  What I mean |
| 12:36:30 | 5 | by that is, how many times have you been working the |
| | 6 | same shift and potentially responded to the same calls? |
| | 7 | A    This would have been the only day. |
| | 8 | Q    Would it be fair to say that prior to |
| | 9 | September 3rd, 2008, you had never worked with |
| 12:36:44 | 10 | Officer Gendreau before in a capacity as a police |
| | 11 | officer? |
| | 12 | MR. SHERMAN:  Objection.  Vague.  Misstates -- |
| | 13 | you mean on the same shift?  Because they're both police |
| | 14 | officers with Garden Grove. |
| 12:36:51 | 15 | BY MR. HENNESSEY: |
| | 16 | Q    Have you ever responded to a scene with |
| | 17 | Officer Gendreau together prior to September 3rd, 2008, |
| | 18 | if you recall? |
| | 19 | A    I can't recall. |
| 12:37:01 | 20 | Q    Do you recall working the same shifts that |
| | 21 | Officer Gendreau was working prior to September 3rd of |
| | 22 | 2008? |
| | 23 | A    I don't recall working any same shifts. |
| | 24 | Q    Do you recall being present at the scene of |
| 12:37:13 | 25 | any dispatch calls with Officer Gendreau prior to |

142

| | | |
|---|---|---|
| 12:38:10 | 1 | A    Not that I can recall. |
| | 2 | Q    Do you -- have you -- have you worked -- have |
| | 3 | you responded to scenes of dispatch calls where you have |
| | 4 | seen Officer Gendreau since September 3rd, 2008? |
| 12:38:21 | 5 | A    Not that I can recall. |
| | 6 | Q    Is that out of choice?  Have you made a |
| | 7 | request not to be assigned on calls with |
| | 8 | Officer Gendreau? |
| | 9 | A    No, that is not a request. |
| 12:38:32 | 10 | Q    Can you make such a request? |
| | 11 | MR. SHERMAN:  Objection.  Foundation.  Go |
| | 12 | ahead. |
| | 13 | THE WITNESS:  Just when we're dispatched. |
| | 14 | BY MR. HENNESSEY: |
| 12:38:41 | 15 | Q    Are you able to go to a commanding officer and |
| | 16 | say, "I no longer want to respond to dispatch calls with |
| | 17 | this particular officer"? |
| | 18 | A    That is -- that is a possibility. |
| | 19 | Q    Has that ever -- have you ever exercised that |
| 12:38:52 | 20 | possibility in relation to Officer Gendreau? |
| | 21 | A    No, I haven't. |
| | 22 | Q    Do you recall any work with Officer Gendreau |
| | 23 | in law -- in a role as a law enforcement officer prior |
| | 24 | to September 3rd of 2008?  And what I mean by that, |
| 12:39:08 | 25 | attendance at sergeant briefings, in the field -- |

144

| | |
|---|---|
| 12:39:12 | 1 |

1    anything?

2                    MR. SHERMAN:   Objection.   Vague.   Ambiguous.

3    Overbroad.   Possibly asked and answered.   Are you asking

4    him does he recall any contacts, in general, out in the

12:39:22  5    field?

6                    MR. HENNESSEY:   In the station, out in the

7    field -- anything.

8                    MR. SHERMAN:   Objection.   Even in the station.

9                    MR. HENNESSEY:   Prior to September 3rd of

12:39:27  10    2008.

11    BY MR. HENNESSEY:

12         Q    Do you recall that?

13         A    I don't recall specific meetings.

14         Q    Do you recall being at the same meetings that

12:39:34  15    he was present at?   I mean, do you recall seeing him

16    there?   Maybe not communicated, but seeing him?

17                    MR. SHERMAN:   Objection.   Relevance.

18    Immateriality.   Go ahead.

19    BY MR. HENNESSEY:

12:39:46  20         Q    Did you have any communication with him on the

21    day, September 3rd, 2008, prior to the time you

22    responded to Andy Tran's house?

23         A    I don't believe so.

24         Q    You just recall seeing him at the sergeant's

12:39:56  25    briefing?

145

12:54:59  1     policies relating to the IVS unit, if you recall?

2          A     Possibly in between an hour to five hours.

3          Q     Do you recall it being at one time or at

4     different times over the course of the two-week --

12:55:13  5     A     It was just during one time.

6          Q     Okay.  Do you recall receiving any

7     supplemental training on the policies at

8     Garden Grove Police Department relating to the IVS units

9     after the two-week training that you've talked about?

12:55:28  10    A     I don't recall.

11         Q     Do you -- do you recall the subject coming up

12    during any of the sergeant briefings prior to shifts?

13         A     Possibly.

14         Q     Do you recall seeing any written material

12:55:39  15    prior to September 3rd, 2008 on the

16    Garden Grove Police Department policies relating to the

17    use of IVS units?

18         A     I don't recall.

19         Q     Now, the IVS unit -- is it fair to say that

12:55:49  20    the IVS unit, uh, has two cameras on it?  One of which

21    faces out from your patrol unit and another camera that

22    points towards the backseat of your patrol unit?

23         A     That's fair to say.

24         Q     Is the IVS unit a fixed unit or is it

12:56:08  25    adjustable, if you understand what I'm talking about, as

161

13:12:05  1    off during -- or based on situations.

2    BY MR. HENNESSEY:

3        Q    What type of training did you receive as to

4    the types of dispatch calls received that would warrant

13:12:13  5    turning on the IVS system?

6        A    I can't recall of any specific examples on

7    which calls.

8        Q    So you weren't trained on -- you can't recall,

9    as you sit here today, being trained on any particular

13:12:26 10    type of call that the IVS unit should be activated for;

11    is that fair?

12            MR. SHERMAN:   Other than the two he's already

13    talked about?   I don't know if that was training either.

14    BY MR. HENNESSEY:

13:12:37 15        Q    Well, have you described any particular types

16    of calls that you were trained should be recorded?

17    Let's say you receive a call for a burglary, you receive

18    a call for, you know, a sexual assault.   You receive a

19    call for -- I mean, are there any calls in particular

13:12:56 20    based upon their very nature that you've been trained,

21    those calls, you turn the IVS unit on?

22        A    Not that I can recall.

23        Q    How about the -- the -- have you ever been

24    trained as to the nature of the call itself?   You know,

13:13:13 25    person armed with a gun, person mentally ill, person

168

| | | |
|---|---|---|
| 13:13:17 | 1 | apparently on drugs, person suicidal?  Has there been |
| | 2 | any calls like that where you've been trained that you |
| | 3 | should activate the IVS unit? |
| | 4 | A    Not that I can recall either. |
| 13:13:29 | 5 | Q    So is it your understanding that the |
| | 6 | activation of the IVS unit is completely discretionary |
| | 7 | to you? |
| | 8 | A    Yes. |
| | 9 | Q    Okay.  Have you, prior to September 3rd, 2008, |
| 13:13:40 | 10 | had occasions where you felt it necessary to record |
| | 11 | contacts with citizens? |
| | 12 | A    I -- |
| | 13 | MR. SHERMAN:  Objection.  Relevancy and |
| | 14 | immateriality.  Go ahead. |
| 13:13:48 | 15 | THE WITNESS:  I can't recall. |
| | 16 | BY MR. HENNESSEY: |
| | 17 | Q    Can you recall, as you sit here today, between |
| | 18 | the dates of November, 2007 and September 3rd, 2008, of |
| | 19 | ever activating your IVS system in response to a call? |
| 13:14:00 | 20 | A    I can't recall. |
| | 21 | Q    You heard Officer Gendreau talk about training |
| | 22 | that he received about activating the IVS unit based |
| | 23 | upon the potential dangerousness of the situation. |
| | 24 | Do you recall that testimony? |
| 13:14:20 | 25 | MR. SHERMAN:  Objection.  Foundation. |

169

13:14:21  1   Speculation.  Assumes facts not in evidence.  Go ahead.

2   BY MR. HENNESSEY:

3       Q    Do you recall that testimony by

4   Officer Gendreau yesterday?

13:14:27  5            MR. SHERMAN:  May misstate.  Go ahead.

6            THE WITNESS:  Yes, I do.

7            MR. HENNESSEY:  Is that -- is what he

8   described, the training that he received in relation to

9   activating the IVS unit, similar to the training that

13:14:39  10  you remember receiving?

11           MR. SHERMAN:  Speculation.  Foundation.

12           THE WITNESS:  The training I received was just

13  on how to activate.  It wasn't specified on which calls

14  to activate the IVS system.

13:14:54  15  BY MR. HENNESSEY:

16      Q    So would it be fair to say yesterday, when

17  Officer Gendreau was -- was talking about particular

18  types of calls -- high priority, low priority,

19  et cetera -- particular types of calls that he was

13:15:07  20  trained to activate the IVS unit, you don't remember

21  receiving similar training?

22      A    I can't recall.

23      Q    Okay.  On September 3rd, 2008, do you recall

24  where you were when you were dispatched to Andy Tran's

13:15:26  25  house?

170

13:22:00   1   time I was on scene, it -- it was longer than two

2   seconds from when I went on scene and Officer Gendreau

3   went on scene.

4         Q   So your independent recollection of the events

13:22:08   5   was that you were there for more than two seconds on

6   site before you saw Officer Gendreau arrive?

7         A   That's correct.

8         Q   Okay.  Do you know approximately how long you

9   had been -- how long -- do you know approximately what

13:22:21   10   time -- how much -- let me start all over.

11         Do you have any idea how much time passed from

12   the time that you parked your car until the time that

13   you first saw Officer Gendreau?

14         A   From the time I first parked my car to the

13:22:39   15   time I first saw Officer Gendreau --

16         Q   Yes.

17         A   -- would roughly be between 20 and 45

18   seconds.

19         Q   Okay.  And just so I'm clear, do you believe

13:22:52   20   that you were on scene for approximately 20 to 45

21   seconds doing whatever, meaning your car was parked

22   there for 20 to 45 seconds before the first time you

23   laid eyes on Officer Gendreau?

24         A   That's correct.

13:23:05   25         Q   Could it have been longer?  Could you have

177

13:38:47    1        Q    Okay.  And how -- in what capacity did you see

2    these types of dispatch records, prior to this case?  Or

3    prior to September 3rd of 2008?

4        A    It would be in reports from other cases.

13:39:03    5        Q    Okay.  So you've looked at those and seen

6    those in other cases that you may have been involved in

7    ongoing investigations or testimony or things like that;

8    is that fair?

9        A    That's correct.

13:39:17   10        Q    Now, you understood that you were responding,

11    um, to this location as a result of a 51 -- 5150 call?

12        A    Yes.

13        Q    When you're responding to a 5150 call, you

14    know you're responding to a 5150 call.  Are there -- are

13:39:39   15    you trained to take any -- are you trained to do

16    anything differently than, say, a call for a petty

17    theft?

18             MR. SHERMAN:  Objection.  Vague.  Go ahead.

19    BY MR. HENNESSEY:

13:39:51   20        Q    If you understand it?  I mean, are there any

21    particular policies that you're taught to implement

22    specifically relating to receiving a 5150 call?

23             MR. SHERMAN:  Same objection.  Go ahead.

24             THE WITNESS:  Relating to a 5150 call, as in

13:40:07   25    personnel I'm supposed to have there, just for

193

| | |
|---|---|
| 13:58:38 | 1 |

answer.

       2         THE WITNESS:  I don't recall asking for any

3  other information.

4         MR. SHERMAN:  But is it possible?

**13:58:45**  5         THE WITNESS:  It is possible.

6         MR. HENNESSEY:  Okay.

7         MR. SHERMAN:  I'm sorry?  Yeah.  You just got

8  to answer his question.

9         THE WITNESS:  Okay.

**13:58:51**  10  BY MR. HENNESSEY:

11    Q   Now, in relation to responding to a 5150 call,

12  have you received any particularized training as to how

13  to potentially handle that call versus a petty theft or

14  other call?

**13:59:12**  15         MR. SHERMAN:  I think it's been asked and

16  answered, but go ahead.

17         THE WITNESS:  I don't recall any

18  particularized or specific training other than

19  on-the-job experience.

**13:59:23**  20  BY MR. HENNESSEY:

21    Q   Okay.  In relation to -- did you write any

22  police reports about the 9-3-08 incident involving you

23  and Andy Tran?

24    A   I did not write any physical reports.

**13:59:33**  25    Q   Okay.  When you say you did not write any

210

| | | |
|---|---|---|
| 14:11:26 | 1 | force? |
| | 2 | MR. SHERMAN:  Objection.  Relevancy. |
| | 3 | Immateriality.  Go ahead. |
| | 4 | THE WITNESS:  Yes, I do. |
| 14:11:31 | 5 | BY MR. HENNESSEY: |
| | 6 | Q    Prior to September 3rd, 2008, what was your |
| | 7 | understanding as to the concept of continuum of force? |
| | 8 | MR. SHERMAN:  Same objection. |
| | 9 | THE WITNESS:  The force that is needed to -- |
| 14:11:41 | 10 | that is escalated or needed to subdue a subject that is |
| | 11 | being combatant and passive resistant, or actively |
| | 12 | resistant. |
| | 13 | BY MR. HENNESSEY: |
| | 14 | Q    Okay.  When you arrived on scene and -- on |
| 14:11:57 | 15 | 9-3-08, did you -- did you attempt to activate your IVS |
| | 16 | system when you arrived -- when you parked your car? |
| | 17 | A    No, I didn't. |
| | 18 | Q    Why not? |
| | 19 | MR. SHERMAN:  Objection.  Argumentative. |
| 14:12:08 | 20 | Relevancy.  Immateriality.  Go ahead. |
| | 21 | THE WITNESS:  I didn't think about it. |
| | 22 | MR. HENNESSEY:  It never entered your mind? |
| | 23 | MR. SHERMAN:  Objection.  Argumentative.  Go |
| | 24 | ahead. |
| 14:12:17 | 25 | THE WITNESS:  No, it didn't. |

224

BY MR. HENNESSEY:

Q    Okay.  So when you say you didn't think about it, it never entered your mind to potentially videotape a encounter with someone you knew who potentially had mental health issues to protect yourself?

MR. SHERMAN:  Argumentative.  Go ahead.

THE WITNESS:  I did not know he had mental health issues, and I did not -- I did not think about.

BY MR. HENNESSEY:

Q    On dispatch, you indicated you were responding to a 5150 call; correct?

A    That's correct.

Q    Does that, to you, mean that you're responding to somebody who may have mental health issues?

A    That is correct.  May have mental health issues.

Q    Okay.  So when you arrived on scene, you knew that you may be encountering somebody with mental health issues?

A    Yes, it was a possibility.

Q    And you knew that going in?

A    Yes, it was a possibility.

Q    And you, however, did not feel the need to turn on your video camera to protect yourself against allegations that may come from some mentally ill person?

225

| | |
|---|---|
| 14:14:01 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 14:14:07 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 14:14:23 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 14:14:34 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 14:14:49 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 14:14:55 | 25 |

1  pants?  Pockets?  Without pockets?  Anything specific

2  about the pants?

3          A     I don't recall.

4          Q     Shoes or not shoes?

5          A     I don't recall.

6          Q     Is the manner in which somebody dressed

7  something that you consider when -- when determining how

8  best to approach a suspect?

9              MR. SHERMAN:  Vague.  Go ahead.

10             THE WITNESS:  Just for clarification, just by

11  the way he is dressed determines my manner on approach?

12  BY MR. HENNESSEY:

13         Q     Yes.  For instance, if you walk up to somebody

14  who appears to be wearing just a bathing suit and no

15  shirt as opposed to somebody who may be wearing baggy

16  clothing and sweatshirts, you would -- I'm assuming

17  you'd look at that person differently as to their

18  ability to hide weapons on them; is that fair?

19             MR. SHERMAN:  Objection.  Hang on.  Compound.

20  Vague and ambiguous.  Incomplete hypothetical.  Go

21  ahead.

22             THE WITNESS:  That's fair.

23  BY MR. HENNESSEY:

24         Q     Okay.  And have you been trained at the

25  Garden Grove Police Department to remain at a distance

227

14:14:59   1    from somebody, if able, to determine whether they have

2    weapons before going hands-on with them?

3         A    That's correct.

4         Q    Okay.  That is part of your training?

14:15:10   5    A    That is part of the on-the-job training and

6    experience.

7         Q    And that is something that you utilized during

8    your contact with Mr. Tran on 9-3-08?

9         A    That's correct.

14:15:19  10    Q    To keep him at a distance prior to going

11    hands-on with him to determine whether he did or did not

12    have weapons?

13         A    That's correct.

14         Q    When Mr. -- when you arrived on scene, what

14:15:32  15    was Mr. Tran doing?

16         A    When I parked my vehicle on the west side of

17    Bar -- Barnett?  One second.  Was it Barnett Street?

18         Q    Just for -- if you need to look at any

19    documents to refresh your recollection as to the

14:15:44  20    location of the event, feel free to do so.  But just if

21    you could indicate that you are looking at a document to

22    refresh your recollection.

23         A    Okay.  I need to look at this document just

24    to --

14:15:55  25    Q    Sure.  Looking at document Exhibit B, does

228

| | |
|---|---|
| 14:15:57 | 1 |

1   that help refresh your recollection as to the location

2   of the incident?

3        A     Yes, it does, as 12352 Barnett.

4             I parked on the west side of Barnett Street on

14:16:08  5   Paloma, on the south curb line of Paloma.  And as I

6   parked my vehicle, I can see the subject partially

7   inside a window with the screen window away -- or off

8   the window and on the ground.

9        Q     Did you position your car so that it was

14:16:25 10  facing -- so it was facing directly at

11  13252 Barnett Way, if you remember?

12             MR. SHERMAN:  Objection.  Vague.  Go ahead.

13             THE WITNESS:  Yes.

14  BY MR. HENNESSEY:

14:16:33 15       Q     Okay.  Would it have been in a position, had

16  you chosen to activate your IVS unit, that it would have

17  been in a position to videotape your encounter with

18  Mr. Tran?

19             MR. SHERMAN:  Objection.  Speculation.

14:16:45 20  Relevancy.  Immateriality.  Go ahead.

21             THE WITNESS:  Yes, it is in a position that

22  can see the incident.

23  BY MR. HENNESSEY:

24       Q     Meaning from your training -- I'm sorry.

14:16:56 25             From your experience with that IVS unit, from

229

| | |
|---|---|
| 14:33:50 | 1 |

1   vehicle within my beat.

2   BY MR. HENNESSEY:

3        Q    Okay.  So within -- if possible, you try to

4   use the same unit, but there's no policy saying that you

5   have to; is that fair?

6             MR. SHERMAN:  Objection.  Misstates his

7   testimony.  Go ahead.

8             THE WITNESS:  Yes, that's correct.

9   BY MR. HENNESSEY:

10        Q    Um, in relation to when you arrived and saw,

11   um, Mr. Tran, you indicated that he was on the porch of

12   his house; is that fair?  Or a porch of some house?

13        A    He was on the porch and partially inside a

14   window.

15        Q    When you say that he was partially inside a

16   window, can you describe the observations that you made?

17        A    His head was inside the window, and I would

18   assume part of his body.  His upper torso.

19        Q    When you say you would assume part of his

20   upper body, is that based upon something that you could

21   actually see with your own eyes or -- or something else?

22        A    Just depending on the angle and what I saw.

23        Q    Um, in relation to the priority of calls, what

24   type of priority would this call have been?

25             MR. SHERMAN:  Object.

Timestamps in left margin:
14:33:58 at line 5
14:34:03 at line 10
14:34:21 at line 15
14:34:37 at line 20
14:34:53 at line 25

235

| | | |
|---|---|---|
| 14:38:06 | 1 | are expected to interact with people who may have mental |
| | 2 | problems; correct? |
| | 3 |      MR. SHERMAN:  Objection.  Vague.  I think it's |
| | 4 | been asked and answered.  Go ahead. |
| 14:38:16 | 5 |      THE WITNESS:  That's correct. |
| | 6 | BY MR. HENNESSEY: |
| | 7 |    Q   And that's something that you've been |
| | 8 | specifically -- you've specifically received some |
| | 9 | training in relation to dealing with potential mentally |
| 14:38:28 | 10 | ill suspects, or civilians; correct? |
| | 11 |      MR. SHERMAN:  I believe that's been asked and |
| | 12 | answered as well.  Go ahead. |
| | 13 |      THE WITNESS:  That's correct. |
| | 14 | BY MR. HENNESSEY: |
| 14:38:42 | 15 |    Q   Did you see -- at any time prior to the |
| | 16 | Tasering event, did you see any other people exit |
| | 17 | 13252 Barnett Way at any time? |
| | 18 |    A   Prior? |
| | 19 |    Q   Prior to the Tasering event? |
| 14:39:00 | 20 |    A   I cannot recall. |
| | 21 |    Q   So you don't recall one way or another whether |
| | 22 | you saw any two older people, maybe in their 60s, and a |
| | 23 | four-year-old child?  Do you recall ever seeing anybody |
| | 24 | matching that description prior to the Tasering event? |
| 14:39:15 | 25 |    A   I cannot recall if they exited the house.  I |

239

14:43:28  1    assess what's going on?

2         A    That's correct.

3         Q    That you've been trained that if you have a

4    significant fear that somebody may be armed, that you

14:43:35  5    should not approach that person; is that fair?

6              MR. SHERMAN:  Objection.  Asked and answered.

7    Go ahead.

8              THE WITNESS:  That's correct.

9    BY MR. HENNESSEY:

14:43:41  10        Q    And you employed that training when you

11   approached Mr. Tran on 9-3-08?

12        A    That's correct.

13        Q    When you stopped, what, if anything, did you

14   do?

14:43:53  15        A    I attempted to call Andy from the porch.  He

16   replied by standing up slowly and turning towards me,

17   and at that time, he seemed like he was complying.

18             And I was assessing the situation that he

19   didn't have any weapons in his hand at that time, and I

14:44:14  20   called him towards me to see if he would comply, and he

21   started walking down the steps and towards me.

22             And I told him to stop when he was

23   approximately 10 to 15 feet away from me, and I told him

24   to put his hands in the air and behind his head.  At

14:44:29  25   that time, he still complied.

244

14:44:31   1          And I told him to turn around, and he slowly
           2   turned around, and that's when I approached him and
           3   grabbed with both hands his -- his hands and told him to
           4   interlock his fingers, because he didn't interlock his
14:44:48   5   fingers.
           6          And once he did that, I then grabbed with my
           7   left hand the interlocked portion of his fingers and was
           8   reaching with my right hand to get my handcuffs.
           9          MR. SHERMAN:  Seems like a wonderful
14:45:02  10   narrative.
          11          MR. HENNESSEY:  I'm going to break it down
          12   piece-by-piece.
          13          MR. SHERMAN:  Gosh, I knew you would.
          14   BY MR. HENNESSEY:
14:45:08  15     Q    When you indicated that you called Andy, did
          16   you know his name at the time, or did you suspect his
          17   name at the time that you were approaching the house?
          18     A    I suspected.
          19     Q    Where did you -- where did you receive the
14:45:20  20   information that led you to believe that the person on
          21   the porch may be named Andy?
          22     A    It might have been broadcasted from dispatch,
          23   or it might have been the individual yelling, "Hey, hey,
          24   hey."  He might have mentioned the name Andy, and that's
14:45:34  25   where I might have gotten it.

245

14:45:36  1        Q    Do you know for certain, as you sit here

2    today, whether you actually used the term "Andy" when

3    addressing the individual on the porch?

4        A    Yes, I -- I am for sure I used the name Andy.

14:45:49  5        Q    Okay.  And as I understand it, when -- did

6    Mr. Tran -- from the time that you walked out of your

7    car until the time that you got to the point where you

8    say that you stopped, did Mr. Tran do anything other

9    than what you described?  Meaning, be partially inside

14:46:09 10    the window and appear to be grabbing or something?

11        A    No, he didn't do anything other than that.

12        Q    Okay.  When you -- when you had Mr. -- when

13    you called him by name, "Andy," what if anything was his

14    immediate reaction?

14:46:25 15        A    He stopped from reaching inside the window.

16             MR. SHERMAN:  I'm just going to object as

17    vague and ambiguous.

18    BY MR. HENNESSEY:

19        Q    When, um, he stopped what he was doing, what

14:46:39 20    does that mean?

21        A    He stopped from reaching inside the window.

22        Q    Did he, um, basically come fully out from the

23    window?

24        A    Yes.

14:46:50 25        Q    Did he -- um, was he facing you when he, um,

246

|           |    |                                                        |
|-----------|----|--------------------------------------------------------|
| 14:46:54  | 1  | came out from the window?  Meaning, did he turn to face |
|           | 2  | you in your direction?                                  |
|           | 3  |     A    I had to call him one -- one more time, or a   |
|           | 4  | couple more times, and then he faced me.                |
| 14:47:03  | 5  |     Q    Okay.  And what, if any directions did you     |
|           | 6  | give to him after calling him by name?  What, if        |
|           | 7  | anything, did you specifically say to him?              |
|           | 8  |     A    I told him to come towards me.                  |
|           | 9  |     Q    Okay.  And what, if anything, did Mr. Tran do  |
| 14:47:17  | 10 | when you told him to come towards you?                   |
|           | 11 |     A    At that time, he complied and was starting to  |
|           | 12 | walk slowly towards me.                                  |
|           | 13 |     Q    Did you tell him to come towards you slowly?    |
|           | 14 |     A    No.  I didn't.  I just said, "Come towards      |
| 14:47:34  | 15 | me."                                                    |
|           | 16 |     Q    So there was nothing about the actions at that |
|           | 17 | moment that -- well, did you have your -- any weapons in |
|           | 18 | your hand while you stopped in the position that you    |
|           | 19 | described?                                              |
| 14:47:46  | 20 |     A    No, I didn't.                                   |
|           | 21 |     Q    Why not?                                        |
|           | 22 |     A    I --                                            |
|           | 23 |         MR. SHERMAN:  Objection.  Relevancy.            |
|           | 24 | Immateriality.  Argumentative.  Go ahead.               |
| 14:47:55  | 25 |         THE WITNESS:  I did not see a need to at that   |

247

14:50:38   1          Q     What I'm getting at, and not eloquently, was

2     did you not withdraw a weapon because you did not want

3     to frighten Mr. Tran, or excite him because of the

4     nature of the call?  Was that a consideration that you

14:50:51   5     made?

6          A     Yes, that was a consideration.

7          Q     So you did not want to -- because you knew

8     that you were responding to a potential 5150, you made a

9     conscious discussion to not remove your -- any weapons

14:51:03  10     because you did not want to excite or antagonize

11     Mr. Tran?  Was that a consideration that you made?

12              MR. SHERMAN:  Compound.  Misstates prior

13     testimony.  Go ahead.

14              THE WITNESS:  I did not see a reason to draw

14:51:16  15     my weapon at the time.

16     BY MR. HENNESSEY:

17          Q     Okay.  And you never saw a reason to draw your

18     weapon at any time during this encounter with Mr. Tran;

19     true?

14:51:25  20          A     From my point of view.

21          Q     From all the observations you made from

22     Mr. Tran during your entire -- during your entire

23     encounter, from the observations you made, you never

24     felt it necessary to take out any weapons on Mr. Tran;

14:51:39  25     fair?

251



| 14:51:42 | 1 | A | Up to which point? |
| | 2 | Q | At any time. |
| | 3 | A | Before the Tasing? |
| | 4 | Q | Yes. |
| 14:51:48 | 5 | A | Up to the point where I placed one handcuff on |
| | 6 | | his hand. |
| | 7 | Q | Well, you did not ever take out a Taser; fair? |
| | 8 | A | That's correct. |
| | 9 | Q | You did not ever direct Officer Gendreau to |
| 14:52:00 | 10 | | take out a Taser, did you? |
| | 11 | A | No, I didn't. |
| | 12 | Q | And you personally, as you sit here today, |
| | 13 | | don't know what made Officer Gendreau take out his |
| | 14 | | Taser; true? |
| 14:52:15 | 15 | | MR. SHERMAN: Objection. Foundation. |
| | 16 | | Speculation. Argumentative. Go ahead. |
| | 17 | | THE WITNESS: I could not see what |
| | 18 | | Officer Gendreau saw. |
| | 19 | | BY MR. HENNESSEY: |
| 14:52:21 | 20 | Q | So you -- there was no conversations between |
| | 21 | | you and Officer Gendreau where you were indicating it |
| | 22 | | may be necessary to take out, or at least to display a |
| | 23 | | Taser to Mr. Tran? There was no communication between |
| | 24 | | you and Officer Gendreau related to that subject; |
| 14:52:35 | 25 | | correct? |

252

| | | |
|---|---|---|
| 14:55:05 | 1 | recall when and at what point it was. |
| | 2 | Q    Okay.  When he turned to face you, did you |
| | 3 | notice anything about his appearance that caused you any |
| | 4 | type of concern? |
| 14:55:16 | 5 | MR. SHERMAN:  Objection.  Vague and ambiguous. |
| | 6 | Overbroad.  Go ahead. |
| | 7 | THE WITNESS:  That he had a blank stare on his |
| | 8 | face and he looked confused. |
| | 9 | BY MR. HENNESSEY: |
| 14:55:23 | 10 | Q    Did he appear to be sweating? |
| | 11 | A    I don't recall if he was or wasn't. |
| | 12 | Q    Could you see his breathing at that point in |
| | 13 | time?  Could you hear his breathing or see his chest |
| | 14 | going up and down at that point when he immediately |
| 14:55:40 | 15 | turned around? |
| | 16 | MR. SHERMAN:  Objection.  Vague.  Compound. |
| | 17 | Go ahead. |
| | 18 | THE WITNESS:  I wasn't watching for his |
| | 19 | breath.  I was just mainly focused on his hands. |
| 14:55:47 | 20 | BY MR. HENNESSEY: |
| | 21 | Q    Would you -- that's my next question.  Would |
| | 22 | it be fair to say that your -- your attention was, um, |
| | 23 | directed at his hands to make -- because you had heard |
| | 24 | that there may be a weapon involved, to make sure that |
| 14:55:59 | 25 | he never had a weapon in his hand or attempted to motion |

256

14:56:02  1    as if he was trying to get a weapon; is that fair?

2        A    Yes, that's fair.  I was only focusing --

3    mainly focusing on his hand.

4        Q    Okay.  And did you tell him to walk towards

14:56:15  5    you, and did he comply with that request?

6             MR. SHERMAN:  Objection.  Asked and answered.

7    Go ahead.

8             THE WITNESS:  Yes, he did.

9    BY MR. HENNESSEY:

14:56:21 10        Q    And I'm assuming this conversation's occurring

11    in English?

12        A    That is correct.

13        Q    Do you speak Vietnamese?

14        A    No, I don't.

14:56:28 15        Q    When he walked towards you, did you tell him

16    at any point in time to stop walking towards you?

17        A    Yes, I did.

18        Q    Why did you tell him to stop walking towards

19    you?

14:56:38 20        A    So that he can -- there can be some distance

21    between me and him before I told him to put his hands up

22    and turn around.

23        Q    Okay.  Was there anything about what you

24    recall about his clothing?  Did there appear to be any

14:56:50 25    lumps?  Did there appear to be anything about the manner

257

| | | |
|---|---|---|
| 14:57:49 | 1 | that he turned around from the porch and walked towards |
| | 2 | you and stopped 10 or 15 feet away?  Did he continue to |
| | 3 | look confused that entire time, at least to you? |
| | 4 | A    He had the same facial expression. |
| 14:58:03 | 5 | Q    So is the answer yes, he did continue to look |
| | 6 | confused to you? |
| | 7 | A    Yes, that's correct. |
| | 8 | Q    When -- when you had him -- when he was 10 or |
| | 9 | 15 feet away, was he walking facing you at that point in |
| 14:58:13 | 10 | time? |
| | 11 | A    Yes, he was. |
| | 12 | Q    When you had him stop 10 or 15 feet way, did |
| | 13 | you have him turn around? |
| | 14 | A    Yes.  I asked him to turn around. |
| 14:58:21 | 15 | Q    And did he comply? |
| | 16 | A    Yes, he did. |
| | 17 | Q    Did he comply immediately or did it take more |
| | 18 | than one request? |
| | 19 | A    It was not immediately, but he complied by |
| 14:58:31 | 20 | moving slowly. |
| | 21 | Q    Okay.  And what did you tell him to do next? |
| | 22 | A    I then told him to place his hands on top of |
| | 23 | his head. |
| | 24 | Q    And did he comply with that request? |
| 14:58:41 | 25 | A    Yes, he did. |

259

14:59:34   1    did anything else happen between that time and the time

            2    that you ultimately approached him?

            3         A    No.  Nothing else happened, and I started to

            4    approach Mr. Tran.

14:59:42   5         Q    You indicated at some point in time, you

            6    requested that he interlock his fingers on his head.

            7              Do you recall that?

            8         A    Yes, I do.

            9         Q    At what point in time did that occur?

14:59:52  10         A    That occurred when I grabbed both of his

           11    wrists and told him to interlock his fingers.

           12         Q    Okay.  Up until that point, Mr. Tran had not

           13    done anything to you that suggested he was preparing to

           14    attack you; is that fair?

15:00:05  15         A    That's fair.

           16         Q    He did not make any motions that caused you

           17    immediate concern of him attacking you; is that fair?

           18         A    That's fair.

           19         Q    When you approached Mr. Tran, did you utilize

15:00:22  20    the training that you've received in the Marine Corps

           21    and at the Garden Grove Police Department to place him

           22    in any type of particular hold on his wrists?

           23              MR. SHERMAN:  Objection.  Compound.  Vague and

           24    ambiguous.  Foundation.  Go ahead.

15:00:36  25              THE WITNESS:  No.  I just grabbed his wrist.

                                                                    261

15:00:37   1    BY MR. HENNESSEY:

2        Q     When you say you grabbed his wrist, did you

3    grab a single wrist or both wrists?

4        A     Both wrists.

15:00:42   5    Q     Okay.  Now, at that point in time, had he

6    interlocked his fingers?

7        A     Not until I told him to.

8        Q     Okay.  When you did tell him to interlock his

9    fingers, how did you say that to him?

15:00:56  10    A     I believe it was, "Andy, interlock your

11   fingers."

12       Q     And can you just demonstrate what interlocking

13   your fingers means?  Or when you say interlock your

14   fingers, what do you mean?

15:01:08  15    A     Interlock fingers, just like that.

16                      (Indicating)

17            MR. HENNESSEY:  And just for the record, even

18   though there's a video camera here, the officer has

19   placed his hands together, placing his fingers in

15:01:16  20   between each other so that the -- well, hopefully that's

21   enough.  Hopefully the video's working.

22            MR. SHERMAN:  If not, hopefully you don't have

23   to pay for it.

24   BY MR. HENNESSEY:

15:01:26  25    Q     And when you asked Mr. Tran to interlock his

262

| | | |
|---|---|---|
| 15:02:12 | 1 | the request to interlock -- is it safer for you as a |
| | 2 | police officer to have a person's fingers interlocked? |
| | 3 | Is that what you've been trained, that it's safer for |
| | 4 | you for a person to interlock their fingers as opposed |
| 15:02:24 | 5 | to keeping their hands separated? |
| | 6 | MR. SHERMAN:  Objection.  Vague.  Incomplete |
| | 7 | hypothetical.  Go ahead. |
| | 8 | THE WITNESS:  Just for clarification, in my |
| | 9 | opinion, is it safer to have them interlock before -- |
| 15:02:33 | 10 | BY MR. HENNESSEY: |
| | 11 | Q    Yeah.  Why don't we start with what your |
| | 12 | opinion is.  Do you believe it's safer for you to |
| | 13 | approach a subject who has interlocked fingers or a |
| | 14 | subject who has his hands on his head without |
| 15:02:44 | 15 | interlocked fingers? |
| | 16 | A    It would depend on the situation. |
| | 17 | Q    How about this particular situation? |
| | 18 | A    I felt it was safe enough to approach and |
| | 19 | grab -- or contact Andy and then tell him to interlock |
| 15:02:56 | 20 | his fingers since he was already complying. |
| | 21 | Q    Okay.  Now, when you went hands-on with |
| | 22 | Mr. Tran, did you notice anything about his skin? |
| | 23 | Meaning, did it feel hot?  Did it feel cold?  Did it |
| | 24 | feel sweaty?  Did it feel clammy?  Did it feel -- was |
| 15:03:09 | 25 | there anything about the texture of his skin that you |

264

15:04:02  1    much time had elapsed?

2         A    I would estimate between 15 and 45 seconds.

3         Q    Okay.  In relation to what you've described,

4    Andy interlocking his fingers, when was it in relation

15:04:22  5    to that event that you first saw Officer Gendreau?

6         A    It was approximately -- from the time he

7    interlocked his fingers until I saw Officer Gendreau, it

8    was probably 5 to 15 seconds.

9         Q    Okay.  What was occurring during those 5 to 15

15:04:42 10    seconds from the time that Andy interlocked his fingers

11    until the time that you observed Mr. -- I'm sorry,

12    Officer Gendreau?

13         A    During that time, I pulled out my handcuffs

14    from behind my back and placing it on his right wrist,

15:04:57 15    and at that point, I can feel my other hand had shifted

16    towards his fingers to control the interlocked fingers,

17    and I could feel him -- as soon as the handcuff went on,

18    I could feel him tense up.

19              So I grabbed the chain of the handcuff that

15:05:15 20    was attached to his right wrist and his left wrist with

21    my left hand and just attempted to hold him just in case

22    he acted up, because at that point when the handcuff

23    went on, he tensed up and it felt like it was going to

24    be a fight.

15:05:32 25         Q    Now, at the time that you were placing

                                                                    266

15:05:36   1    handcuffs on Mr. Tran, he was facing away from you; is

2    that fair?

3         A    That's correct.

4         Q    Officer Gendreau would have been facing from

15:05:42   5    your rear, meaning that you would not -- he would have

6    been facing -- you would have -- you would have had your

7    back to him; is that fair?

8         A    That's a possibility.

9         Q    Well, I'm just asking as you remember the

15:05:53  10    events.  When you were placing handcuffs on Mr. Tran,

11    was he facing the house?

12         A    Yes, he was.

13         Q    Were you placing handcuffs on him from a rear

14    position, side position --

15:06:03  15         A    Yes.

16         Q    -- or front position?

17         A    From a rear position.

18         Q    Okay.  And you -- you -- you followed your

19    training in positioning yourself in a position of

15:06:14  20    advantage when you were placing the handcuffs on him in

21    the rear?

22              MR. SHERMAN:  Objection.  Compound.  It's

23    vague and ambiguous.  Go ahead.

24              THE WITNESS:  That's correct.

15:06:23  25    ///

267

15:07:17  1          MR. SHERMAN:  Objection.  Relevancy.

2    Argumentative.  Immaterial.  Go ahead.

3          THE WITNESS:  I don't know why I didn't.

4    BY MR. HENNESSEY:

15:07:21  5     Q    Okay.  Were you -- what type of manner were

6    you speaking to him?  What I -- what I mean by that,

7    were you speaking to him in a calm voice?  Were you

8    speaking to him in a loud voice?  How would you describe

9    it?

15:07:32  10    A    In a calm voice.

11    Q    Can you -- can you demonstrate here how you

12    remember speaking to Mr. Tran about putting his hands on

13    his head and interlocking his fingers?  Can you just try

14    to demonstrate to the best of your ability the manner

15:07:48  15    and tone in which you used --

16    A    Sure.  It's similar to how I'm talking now, in

17    a calm way.  And just telling, "Andy, come down from the

18    stairs."

19          It's a little elevated because there's more

15:07:58  20    distance between us.  And as soon as he approached us --

21    or approached me, told him to turn around and place his

22    hands on top of his head.  And once I grabbed him from

23    behind, or grabbed his wrist from behind, I told him to

24    interlock his fingers.  And as I placed my handcuff on

15:08:15  25    his right wrist, I could feel him tense up.

269

15:08:19  1          And that's when I started talking to him like

2     this:  "Andy, just relax.  We're here to help you.  You

3     know, we're not here to hurt you.  We are just here to

4     help."

15:08:28  5          Q    Okay.  And at that point in time, he never

6     actively pulled away from you; is that fair?  His

7     hand -- his fingers remained interlocked; is that fair?

8              MR. SHERMAN:  Objection.  It's compound.

9     Vague.  Go ahead.

15:08:40  10             THE WITNESS:  I cannot recall if his hands

11    were interlocked at that time.

12    BY MR. HENNESSEY:

13         Q    Do you have an independent recollection of his

14    hands, prior to the Tasering event, ever being -- ever

15:08:50  15    being anything other than interlocked?

16         A    I cannot recall if they were ever not

17    interlocked or interlocked.

18         Q    Okay.  In -- would that have been a concern to

19    you, if you noticed that his hands were no longer

15:09:01  20    interlocked?

21             MR. SHERMAN:  Objection.  Vague as to time.

22    BY MR. HENNESSEY:

23         Q    At the time you were attempting to handcuff

24    him?

15:09:09  25         A    At the time I was attempting to handcuff, they

270

15:09:13   1   weren't interlocked.

2        Q    And again, based upon your observations and

3   what Mr. Tran was doing, you did not feel it necessary

4   to wait for backup before -- before taking the actions

15:09:21   5   that you've made; correct?

6        A    That's correct, because he was complying.

7        Q    And you knew that there were up to two

8   additional units responding; correct?

9        A    That's correct.

15:09:29  10        Q    And based upon your observations, you could

11   have waited for backup to arrive before doing anything;

12   true?

13             MR. SHERMAN:  Objection.  Argumentative.

14   Irrelevant.  Go ahead and answer.

15:09:38  15             THE WITNESS:  Depending on the -- because of

16   the situation of him inside, or partially inside the

17   window, I made a decision to try and attempt to call him

18   back, and -- so no further actions or harm can come to

19   any person inside the building.

15:09:52  20   BY MR. HENNESSEY:

21        Q    And again, you have no idea whether any harm

22   came to anybody inside the building at any point that

23   day; fair?

24             MR. SHERMAN:  Objection.  Asked and answered.

15:10:00  25   Overbroad.  Scope and time.  Vague and ambiguous.

271

| | |
|---|---|
| 15:11:05 | 1 You haven't suffered any type of head trauma or head |
| | 2 injuries between September 23rd, 2008 and today's date, |
| | 3 have you? |
| | 4          MR. SHERMAN:  Vague.  Vague.  Ambiguous. |
| 15:11:15 | 5 Compound.  Go ahead. |
| | 6          THE WITNESS:  No, I haven't. |
| | 7 BY MR. HENNESSEY: |
| | 8      Q    You never saw Officer Gendreau ever touch |
| | 9 Andy Tran, did you?  Prior to the Tasering event? |
| 15:11:30 | 10          MR. SHERMAN:  Objection.  Vague.  Go ahead. |
| | 11          THE WITNESS:  Not that I can recall. |
| | 12 BY MR. HENNESSEY: |
| | 13      Q    And that's what you told Internal Affairs when |
| | 14 you were asked when they specifically asked you, "Did |
| 15:11:39 | 15 you ever observe Officer Gendreau touch Andy Tran?"  You |
| | 16 indicated no; correct? |
| | 17          MR. SHERMAN:  Objection.  Argumentative. |
| | 18 Document speaks for itself, or something speaks for |
| | 19 itself.  Asked and answered.  Go ahead. |
| 15:11:50 | 20          THE WITNESS:  That's correct.  That's what the |
| | 21 document says. |
| | 22 BY MR. HENNESSEY: |
| | 23      Q    And you were -- well, that's -- you listened |
| | 24 to the audio portion.  That was you talking; correct? |
| 15:11:57 | 25      A    That is correct. |

273

15:11:58   1        Q     Okay.  I mean, you don't have any reason to

2     believe that the statements on that tape were made by

3     anybody other than yourself; true?

4        A     That's true.

15:12:07   5        Q     Okay.  And when you were speaking to

6     Internal Affairs, you were being truthful with them;

7     correct?

8              MR. SHERMAN:  Objection.  Asked and answered.

9     Go ahead.

15:12:13  10              THE WITNESS:  That's correct.

11   BY MR. HENNESSEY:

12        Q     You were attempting to tell them -- you were

13   attempting to respond to any question they asked in a

14   truthful, honest, and forthright fashion; fair?

15:12:23  15              MR. SHERMAN:  Same objection.  Compound too.

16   Go ahead.

17              THE WITNESS:  That's correct.

18   BY MR. HENNESSEY:

19        Q     And is there any reason that you would have

15:12:28  20   had to have not told the truth to Internal Affairs?

21        A     There is no reason why I wouldn't tell the

22   truth.  There is a statement at the end of my summary

23   stating that I -- I did not recall if Officer Gendreau

24   did touch Mr. Tran or not.

15:12:45  25        Q     Okay.  But not on the tape; correct?

274

| | |
|---|---|
| 15:16:47 | 1 |

Q    Okay.  Can you think of anything other than

medical help that he needed based upon your

observations?

MR. SHERMAN:  Objection.  Asked and answered.

It's argumentative.  Go ahead.

THE WITNESS:  I can't think of any.

BY MR. HENNESSEY:

Q    So is it reasonable to believe that when you

told them it looked like he needed help, you were

talking about medical help?

MR. SHERMAN:  Objection.  Argumentative.

Asked and answered.  Foundation.  Go ahead.

Speculation.

THE WITNESS:  I still wanted to determine what

type of help he needed.  I guess the severity of medical

help that was needed.

BY MR. HENNESSEY:

Q    So based upon your observations, you

determined that he needed some type of medical help, you

just weren't sure what type of medical help may be

required?  Whether it's to treat a wound, whether it's

to treat a mental illness, whether it's to treat a drug

problem; fair?

A    Not -- I want to say he just needed help.

He -- I don't know if it was medical help or if he

279

15:18:57  1    fingers; fair?

       2         A    I cannot recall if I told him to release.

       3         Q    Well.  You never told Internal Affairs that

       4    you told him to release and he failed to do so, did you?

15:19:07  5              MR. SHERMAN:  Objection.  Document speaks for

       6    itself.

       7              THE WITNESS:  I don't recall.

       8    BY MR. HENNESSEY:

       9         Q    Okay.  You do -- well, is it fair to say that

15:19:12 10    as you sit here today, the only command you told him to

      11    do was to interlock his fingers?  That's the only

      12    specific command you remember telling him to do at that

      13    point in time when you're trying to place handcuffs on

      14    him?

15:19:24 15              MR. SHERMAN:  Objection.  Misstates testimony.

      16    Go ahead.

      17              THE WITNESS:  Up to that point, that's -- were

      18    the only commands I did tell him.

      19    BY MR. HENNESSEY:

15:19:32 20         Q    Okay.  So at the time that you were trying to

      21    place handcuffs on him and you say that he tensed up,

      22    for all you know, he was still attempting to comply with

      23    your orders to interlock his fingers; correct?

      24              MR. SHERMAN:  Objection.  Speculation.

15:19:44 25    Foundation.  Argumentative.  Go ahead.

                                                              281

| | |
|---|---|
| 15:19:46 | 1 |

THE WITNESS:  At that time, I felt he wasn't complying and he was --

BY MR. HENNESSEY:

Q    In what manner was he not complying?  What did you tell him to do that he failed to do?

A    I told him to relax because he had tensed up.

Q    Okay.  Well, do you know how this guy is ordinarily?  Whether what you saw was him normally or whether what you saw was him relaxed?  Do you have any idea?

MR. SHERMAN:  Foundation.  Argumentative.  Go ahead.

THE WITNESS:  No, I don't.

BY MR. HENNESSEY:

Q    Okay.  So other than appearing to not relax, what order had he disobeyed?

A    I cannot recall any other orders.

Q    Okay.  So up until this point in time, Mr. Tran had abided by every single command you had issued to him; true?

MR. SHERMAN:  Objection.  Argumentative.  Misstates.  Go ahead.

THE WITNESS:  I did tell him to relax and he did not.  By relax, I mean stop tensing up.

///

282

| | |
|---|---|
| 15:21:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 15:21:36 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 15:21:49 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 15:21:54 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 15:22:02 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 15:22:12 | 25 |

1    with your command to relax?  Is that what you're saying

2    he disobeyed?

3         A    That's correct.

4         Q    Well, did you clarify with him, "Andy, listen.

5    I'm going to put handcuffs on you; okay?  I'm not here

6    to hurt you; okay?  Can you please just separate your

7    fingers so I can place the handcuffs on you and then

8    we'll get you some help?"

9         Did you ever say anything like that to him?

10        MR. SHERMAN:  It's a little compound.  Go

11   ahead.

12        THE WITNESS:  I don't recall saying

13   anything -- or anything similar to that.

14   BY MR. HENNESSEY:

15        Q    Okay.  Why not?

16        MR. SHERMAN:  Objection.  Argumentative.

17   Irrelevant.  Go ahead.

18        THE WITNESS:  Because I was trying to calm him

19   down by just talking to him and telling him to, "Relax.

20   We're just here to help."

21   BY MR. HENNESSEY:

22        Q    Okay.  But I mean, this is a guy who clearly

23   looked confused, clearly looked like he needed some type

24   of medical help, and had complied with every order

25   issued to him up until that point; correct?

284

|         |    |                                                             |
|---------|----|-------------------------------------------------------------|
| 15:22:15 | 1  | MR. SHERMAN:  Objection.  It's compound.  It |
|         | 2  | misstates prior testimony.  It lacks foundation.  It |
|         | 3  | calls for speculation.  Go ahead. |
|         | 4  | THE WITNESS:  Up to that point, he was |
| 15:22:25 | 5  | complying. |
|         | 6  | BY MR. HENNESSEY: |
|         | 7  | Q    Okay.  And when Officer Gendreau arrived, what |
|         | 8  | do you remember telling him? |
|         | 9  | MR. SHERMAN:  Telling him -- who? |
| 15:22:33 | 10 | MR. HENNESSEY:  Gendreau. |
|         | 11 | THE WITNESS:  I believe I told |
|         | 12 | Officer Gendreau that he was complying, and I have one |
|         | 13 | handcuff on, and he's tensed up. |
|         | 14 | BY MR. HENNESSEY: |
| 15:22:44 | 15 | Q    Okay.  Do you remember telling |
|         | 16 | Officer Gendreau, "Hey, I got one handcuff on, and uh, |
|         | 17 | he started resist, or resistance.  Just not obeying or |
|         | 18 | saying anything.  I'm feeling at this point, probably |
|         | 19 | he's going to be resistant." |
| 15:22:58 | 20 | Do you remember saying anything like that? |
|         | 21 | MR. SHERMAN:  What page are you on? |
|         | 22 | MR. HENNESSEY:  On page 7. |
|         | 23 | MR. SHERMAN:  Let me object as it's compound. |
|         | 24 | Where on page 7? |
| 15:23:09 | 25 | MR. HENNESSEY:  I'm sorry.  The -- |

285

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

15:24:05 1    you say that you thought that he probably was going to

2    be resistant?

3            MR. SHERMAN:  At this point in time?

4            MR. HENNESSEY:  Yes.

15:24:19 5            MR. SHERMAN:  He's asking if that's what it

6    says right there.

7            THE WITNESS:  Yeah.  It doesn't say that

8    there.

9    BY MR. HENNESSEY:

15:24:23 10     Q    Okay.  I mean, you don't -- at least you

11    didn't tell Internal Affairs that he had done any single

12    act that was resist -- that resisted a command that you

13    had made; correct?

14            MR. SHERMAN:  Well, objection.  Lacks

15:24:35 15    foundation.  Assumes facts not in evidence.  Go ahead.

16    It's compound.

17            THE WITNESS:  I need to review this again.  I

18    thought I told him that he was tense and I wasn't able

19    to get him handcuffed at that time.

15:24:50 20    BY MR. HENNESSEY:

21     Q    But you never mention -- you never directed an

22    order to Andy to, you know, to stop interlocking his

23    fingers.  To relax his hands.  You never issued that

24    order to him --

15:25:03 25            MR. SHERMAN:  Objection.

287

15:25:04  1          MR. HENNESSEY:  -- in any fashion?

2                    MR. SHERMAN:  Objection.  Asked and answered.

3        Argumentative.  You can answer it again.

4                    THE WITNESS:  Okay.  I don't believe I did.  I

15:25:10  5      told him to relax.

6        BY MR. HENNESSEY:

7            Q    Okay.  Now, when Officer Gendreau arrived;

8        okay?  His hands were interlocked at that point where

9        you first laid eyes on Officer Gendreau; correct?

15:25:21 10                  MR. SHERMAN:  Objection.  Might misstate prior

11       testimony.  Go ahead, but it's compound.

12                   MR. HENNESSEY:  If it misstates it, please

13       explain how.

14                   THE WITNESS:  I can't recall seeing if it was

15:25:29 15      interlocked or not.

16       BY MR. HENNESSEY:

17           Q    Do you recall telling Internal Affairs that in

18       any point in time Mr. Tran took his fingers out of the

19       position of the interlocked position that you told him

15:25:39 20      to be in?

21           A    No, I do not remember telling Internal Affairs

22       that I -- that I ever saw his hands or ordered him to

23       not interlock his fingers.

24           Q    Okay.  In fact, what you told Internal Affairs

15:25:51 25      was that "his fingers were all tense and he was just not

                                                                    288

15:26:55  1    anything on that aspect.

2         Q    Did you ever see Mr. Tran's hands ball up into

3    fists at any point in time?

4         A    I cannot recall.

15:27:05  5        Q    Do you recall telling that to

6    Internal Affairs?  That at some point in time, you saw

7    his hands ball up into fists?

8         A    I don't think I did.

9         Q    Is the reason that you didn't tell that to

15:27:14 10    Internal Affairs because you never made that

11    observation, yourself personally?  Seeing his hands ball

12    up into fists?

13        A    I didn't tell Internal Affairs because it was

14    never asked, and I can't recall at this time.

15:27:26 15        Q    Okay.  So your -- your testimony is that you

16    never said anything to Internal Affairs about his hands

17    being balled up into fists because they never asked, but

18    you don't have an independent recollection, as you sit

19    here today, of his hands being balled up into fists.

15:27:40 20             Is that what you're saying?

21        A    That's correct.

22        Q    Well, you were giving -- they asked you, "What

23    happened?  And then what happened?"

24             And you were responding to questions like

15:27:51 25    that; correct?

290

15:27:52    1          A     That's correct.

            2          Q     I mean, they weren't asking you, "Were his

            3    hands unclenched?  Were his hands in fists?"

            4                They weren't asking you questions like that.

15:28:03    5    They were asking you to explain to them what happened in

            6    a narrative fashion; correct?

            7                MR. SHERMAN:  Objection.  Argumentative.

            8    Foundation.  Speculation.  Document is what it is.  Go

            9    ahead.

15:28:13   10                THE WITNESS:  That's correct.

           11    BY MR. HENNESSEY:

           12          Q     And you were responding -- you were trying to

           13    provide them as full and accurate a statement as to what

           14    you remember occurring on September 3rd when you were

15:28:24   15    speaking to them; correct?

           16                MR. SHERMAN:  Objection.  Asked and answered.

           17    Go ahead.

           18                THE WITNESS:  That's correct.

           19    BY MR. HENNESSEY:

15:28:29   20          Q     Do you remember his hands balling up into

           21    fists?

           22                MR. SHERMAN:  Objection.  Asked and answered.

           23    Go ahead.

           24                THE WITNESS:  I cannot recall.

15:28:34   25    ///

                                                                          291

BY MR. HENNESSEY:

    Q    Okay.  You heard Officer Gendreau testify yesterday that Mr. Tran's hands were balled up into fists.

        Do you recall that?

        MR. SHERMAN:  Foundation.  Go ahead.

        THE WITNESS:  Yes, I do.

BY MR. HENNESSEY:

    Q    Do you remember that happening?

    A    I cannot recall.

    Q    Okay.  Do you -- did Officer Gendreau try to help you try to handcuff Mr. Tran at any point in time?

        MR. SHERMAN:  Objection.  Vague and ambiguous. Go ahead.

        THE WITNESS:  I cannot recall.

BY MR. HENNESSEY:

    Q    Did you tell Internal Affairs when they asked, "Okay.  Did Gendreau try to help you before that, um, handcuff him by grabbing the guy?"

        Do you remember that question being asked?

    A    Yes, I believe so.

    Q    And what was your response?

    A    I believe my response was no.

    Q    And what did you mean by that response?

        MR. SHERMAN:  Objection.  Argumentative.

292

15:29:28  1           THE WITNESS:  That he did not help me.

        2      BY MR. HENNESSEY:

        3           Q    And what does that mean?  Does that mean that

        4      you did not remember Officer Gendreau ever laying his

15:29:37  5      hands on Mr. Tran in a fashion to help you handcuff him?

        6      You don't remember that ever happening, do you?

        7           A    I don't recall if it did or not.

        8           Q    So you're saying maybe it did, maybe it

        9      didn't, but if it did, you didn't tell Internal Affairs?

15:29:51 10           MR. SHERMAN:  Objection.  Argumentative.

       11      Counsel, at least change the tone of your voice when

       12      you're going to be sarcastic and nasty.

       13           THE WITNESS:  I don't recall, and from

       14      reviewing the state -- the summary of the IA, it states

15:30:02 15      at the end of it, that I made a comment saying that I

       16      could not recall if Officer Gendreau was helping or not.

       17      BY MR. HENNESSEY:

       18           Q    But on the tape, you didn't say anything about

       19      that; correct?

15:30:14 20           A    That's correct.

       21           MR. SHERMAN:  Objection.  Asked and answered.

       22           THE WITNESS:  That's correct.

       23      BY MR. HENNESSEY:

       24           Q    Okay.  And you don't know who wrote that

15:30:17 25      summary, did you?  You didn't write it, did you?

                                                                    293

| | | |
|---|---|---|
| 09:09 | 1 | recall saying that? |
| 09:09 | 2 | A   Yes, I do. |
| 09:09 | 3 | Q   Okay.  Is your memory now refreshed? |
| 09:09 | 4 | A   Yes, it is. |
| 09:09 | 5 | Q   Okay.  And having refreshed your recollection, |
| 09:09 | 6 | was that truthful, what you told Internal Affairs? |
| 09:09 | 7 | A   Yes, it was. |
| 09:09 | 8 | Q   And did you also say, "And at the same time I am |
| 09:09 | 9 | just shaking both hands, not to agitate him, but to just, |
| 09:09 | 10 | 'Hey, I am still behind you.  You know, just calm down'"? |
| 09:09 | 11 | Do you recall saying words to those effects? |
| 09:09 | 12 | A   Yes, I do. |
| 09:09 | 13 | Q   Okay.  When you shook his hands, did they move? |
| 09:09 | 14 | When you say -- when you described as shaking both of his |
| 09:09 | 15 | hands, were they -- did they move? |
| 09:09 | 16 | MR. SHERMAN:  Objection.  Vague as to "move." |
| 09:09 | 17 | Go ahead. |
| 09:09 | 18 | BY MR. HENNESSEY: |
| 09:09 | 19 | Q   In any fashion.  Did they move in any fashion? |
| 09:10 | 20 | MR. SHERMAN:  It's still vague. |
| 09:10 | 21 | Go ahead. |
| 09:10 | 22 | BY MR. HENNESSEY: |
| 09:10 | 23 | Q   Can you describe for the record what you did -- |
| 09:10 | 24 | what you did by shaking both hands? |
| 09:10 | 25 | A   I can show. |

328

| | | |
|---|---|---|
| 09:10 | 1 | Q   Please. |
| 09:10 | 2 | A   So this would be his right wrist, and I have the |
| 09:10 | 3 | chain.  I would be shaking where -- the fact it is just |
| 09:10 | 4 | moving about that much. |
| 09:10 | 5 | Q   Okay. |
| 09:10 | 6 | A   Just to let him know that I was still behind |
| 09:10 | 7 | him. |
| 09:10 | 8 | Q   Now, you said, "I am shaking both hands."  You |
| 09:10 | 9 | just demonstrated on one hand. |
| 09:10 | 10 | Is that what you meant to describe?  Were his |
| 09:10 | 11 | fingers interlocked at this point in time? |
| 09:10 | 12 | A   I cannot recall if they were or not. |
| 09:10 | 13 | Q   Okay.  Do you recall his fingers ever becoming |
| 09:10 | 14 | anything other than interlocked at any time? |
| 09:10 | 15 | A   Anything other than interlocked? |
| 09:10 | 16 | Q   Yes. |
| 09:10 | 17 | A   I did mention that they were starting to close. |
| 09:10 | 18 | From that point I don't know if they became interlocked |
| 09:10 | 19 | or I never saw them not become interlocked. |
| 09:10 | 20 | Q   Do you recall telling Internal Affairs -- in the |
| 09:10 | 21 | quotes there it says, "Hey, I am still behind you.  You |
| 09:11 | 22 | know, just calm down." |
| 09:11 | 23 | Is that something that you were telling them you |
| 09:11 | 24 | were thinking, or is that something -- or words that you |
| 09:11 | 25 | told to Mr. Tran? |

329

09:11 1          A    Those were words I was telling Mr. Tran.

09:11 2          Q    "Just calm down," words to that effect?

09:11 3          A    That's correct.

09:11 4          Q    Okay.  Then you say, "I am still telling, 'Hey,

09:11 5    Andy, just calm down.  Calm down.'"

09:11 6          Do you recall saying words to the effect of that

09:11 7    to Mr. Tran while shaking his hands in the manner that

09:11 8    you have described?

09:11 9          A    That's correct.  I was telling Mr. Tran to calm

09:11 10   down.

09:11 11         Q    And when you were shaking his hands, there was

09:11 12   some movement in his hands, fair?

09:11 13         MR. SHERMAN:  Objection.  Misstates, vague.

09:11 14         Go ahead.

09:11 15         THE WITNESS:  Yes, that's fair to say.

09:11 16   BY MR. HENNESSEY:

09:11 17         Q    And Gendreau, as far as there's an unclear, and

09:11 18   he is telling him the same thing, quote, "Hey, dude, hey,

09:11 19   dude, you just need to relax.  Calm down."

09:11 20         Do you recall Officer Gendreau saying words to

09:11 21   those -- to that effect?

09:11 22         A    Yes, I do.

09:11 23         Q    Is that based upon your independent recollection

09:11 24   having been refreshed with that document?

09:12 25         A    That's correct.

330

09:12  1          Q    Okay.  "And that's when he pulled out his

09:12  2     Taser."

09:12  3               Are you referring to Officer Gendreau at that

09:12  4     point in time?

09:12  5          A    Yes, I am.

09:12  6          Q    And did Officer Gendreau say, "If you -- if you

09:12  7     don't calm down, I am going to have to Tase you."

09:12  8               Did Officer Gendreau say words to that effect?

09:12  9          A    He said words to that effect.

09:12 10          Q    Okay.  You have an independent recollection of

09:12 11     him saying words to that effect?

09:12 12          A    Yes, I do.

09:12 13          Q    Okay.  And would it be fair to say that during

09:12 14     this whole time Andy did not say anything?

09:12 15          A    That's correct.

09:12 16          Q    And at approximately this time -- do you recall

09:12 17     being asked by Internal Affairs at that point, "Okay.

09:12 18     Did Gendreau try to help you before that, um, handcuff

09:12 19     him by grabbing the guy?"

09:12 20               Do you recall being asked that question?

09:12 21          A    Yes, I do.

09:12 22          Q    Do you recall your answer?

09:12 23          A    Yes, I do.

09:12 24               MR. SHERMAN:  Objection.  Asked and answered.

09:12 25     ///

331

| | | |
|---|---|---|
| 09:12 | 1 | BY MR. HENNESSEY: |
| 09:12 | 2 | Q    What was your answer? |
| 09:12 | 3 | MR. SHERMAN:   Same objection.   Asked and |
| 09:12 | 4 | answered. |
| 09:12 | 5 | Go ahead. |
| 09:12 | 6 | THE WITNESS:   It was "no." |
| 09:12 | 7 | BY MR. HENNESSEY: |
| 09:12 | 8 | Q    And did you understand that they were asking you |
| 09:12 | 9 | about what Officer Gendreau did before he pulled his |
| 09:13 | 10 | Taser out? |
| 09:13 | 11 | MR. SHERMAN:   Objection.   Speculation, |
| 09:13 | 12 | foundation. |
| 09:13 | 13 | BY MR. HENNESSEY: |
| 09:13 | 14 | Q    Is that what you understood Internal Affairs was |
| 09:13 | 15 | asking you about? |
| 09:13 | 16 | MR. SHERMAN:   Assumes facts not in evidence. |
| 09:13 | 17 | Go ahead. |
| 09:13 | 18 | THE WITNESS:   I believe Internal Affairs was |
| 09:13 | 19 | asking if Officer Gendreau helped in any way by grabbing |
| 09:13 | 20 | him, and I don't -- I didn't recall Officer Gendreau |
| 09:13 | 21 | putting hands on, so that's why I said "no." |
| 09:13 | 22 | BY MR. HENNESSEY: |
| 09:13 | 23 | Q    Okay.   Because at least the recollection that |
| 09:13 | 24 | you had as of September 23rd, 2008, was that you did not |
| 09:13 | 25 | recall Officer Gendreau helping you in any manner by |

332

09:13 1    grabbing Mr. Tran to help in handcuffing him, fair?

09:13 2        A  I got a little confused on what was the question

09:13 3    for that.

09:13 4        Q  The question from me or the question from

09:13 5    Internal Affairs?

09:13 6        A  The question from you.

09:13 7        Q  Okay.  Was your recollection on September 23rd,

09:13 8    when you were talking to Internal Affairs, that you did

09:13 9    not recall Officer Gendreau attempting to help you

09:13 10   handcuff Mr. Tran by grabbing ahold of him in any manner?

09:14 11       A  Yes, that's why I said "no" to that question.

09:14 12       Q  All right.  And then you said, "For" -- now, did

09:14 13   you say, "For about a minute we were just trying to calm

09:14 14   him down.  He still tensed up."

09:14 15       Do you recall saying those words to

09:14 16   Internal Affairs?

09:14 17       A  Yes.

09:14 18       Q  Do you recall telling Internal Affairs, "His

09:14 19   fingers are just tense and I can't break -- break the

09:14 20   hold.  So then, uh, Gendreau said like he is -- he is --

09:14 21   like, 'Hey, Danny, I am just going to -- I am just going

09:14 22   to Tase him'"?  Do you recall saying those words to

09:14 23   Internal Affairs?

09:14 24       A  Is it all right if I review again --

09:14 25       Q  Please.

333

09:15 1      A   Yes, that's correct.

09:15 2      Q   That Officer Gendreau said words to the effect

09:15 3   of, "Hey, Danny, I am just going to -- I am just going to

09:15 4   Tase him," did he say words to that effect?

09:15 5           MR. SHERMAN:  Objection.  Asked and answered.

09:15 6           Go ahead.

09:15 7           THE WITNESS:  Yes, to that effect.

09:15 8   BY MR. HENNESSEY.

09:15 9      Q   And then you said something like, "Um, like,

09:15 10  okay"?

09:15 11     A   Yes, something to that effect.

09:15 12     Q   Now, up until this point in time, were you

09:15 13  trying to be as open and honest with Internal Affairs

09:16 14  about all comments that you heard Officer Gendreau make

09:16 15  to Mr. Tran prior to the Tasering event?

09:16 16          MR. SHERMAN:  Objection.  Vague, ambiguous,

09:16 17  assumes facts not in evidence, lacks foundation, it's

09:16 18  argumentative.

09:16 19          Go ahead, if you understand the question.

09:16 20          THE WITNESS:  Yes.

09:16 21  BY MR. HENNESSEY:

09:16 22     Q   Did you ever hear Officer Gendreau tell Mr. Tran

09:16 23  to put his hands behind his back?

09:16 24     A   I did not hear everything that Officer Gendreau

09:16 25  said, but everything I told Internal Affairs is what I

09:16  1    can recall at that time.

09:16  2         Q    Okay.  Can you describe the manner that you

09:16  3    heard Officer Gendreau speaking?

09:16  4         A    Yes, I can recall.

09:16  5         Q    Can you please do so for the record?

09:16  6         A    Officer Gendreau was talking as if in my tone of

09:16  7    voice and the way I explained how I was talking to

09:16  8    Mr. Tran yesterday.

09:16  9         Q    And during this conversation, how far away was

09:16 10    Officer Gendreau from you during the time that he was

09:16 11    communicating -- or apparently communicating with

09:16 12    Mr. Tran?

09:17 13         MR. SHERMAN:  Let me object to the following

09:17 14    question as possibly calls for speculation, lacks

09:17 15    foundation.

09:17 16         Go ahead.

09:17 17         THE WITNESS:  Officer Gendreau was in between --

09:17 18    or on the other side of Mr. Tran, so he might have been

09:17 19    between one foot to three feet away.

09:17 20    BY MR. HENNESSEY:

09:17 21         Q    Okay.  The words that you told to

09:17 22    Internal Affairs, were those words that you heard coming

09:17 23    out of Officer Gendreau's mouth?

09:17 24         A    Those were the words that I could understand

09:17 25    from Officer Gendreau.

336

09:17 1    Q   Okay.  Did you ever hear Officer Gendreau direct

09:17 2  Mr. Tran to put his hands behind his back?

09:17 3         MR. SHERMAN:  Objection.  Asked and answered.

09:17 4         THE WITNESS:  At the time of that incident, I --

09:17 5  BY MR. HENNESSEY:

09:17 6    Q   Calls for a "yes" or "no," sir.

09:17 7         Did you hear it or not?

09:17 8    A   At that time when I talked to Internal Affairs I

09:17 9  did not.

09:17 10    Q   Okay.  Do you recall Officer Gendreau ever

09:17 11  telling Mr. Tran to put his hands behind his back prior

09:17 12  to the time he Tasered him?

09:17 13         MR. SHERMAN:  Objection.  Asked and answered.

09:17 14         Go ahead.

09:18 15         THE WITNESS:  I did not recall when asked by

09:18 16  Internal Affairs.

09:18 17  BY MR. HENNESSEY:

09:18 18    Q   Have you been trained, in your training at any

09:18 19  time in the Garden Grove Police Department up until

09:18 20  September 3rd, 2008, that "Hey, dude, just calm down" is

09:18 21  a lawful order?  Have you ever been trained in that -- to

09:18 22  that effect?

09:18 23         MR. SHERMAN:  Objection.  Argumentative.

09:18 24         Go ahead.

09:18 25         THE WITNESS:  I believe it's a reasonable order

337

| | | |
|---|---|---|
| 09:18 | 1 | when trying to talk to someone. |
| 09:18 | 2 | BY MR. HENNESSEY: |
| 09:18 | 3 | Q   Who in the Garden Grove Police Department has |
| 09:18 | 4 | told you that "Hey, dude just calm down" is a lawful |
| 09:18 | 5 | order?  Can you think of a name of any officer who told |
| 09:18 | 6 | you that "Hey, dude, just calm down" is a lawful order? |
| 09:18 | 7 | A   It's just a way of talking to people. |
| 09:18 | 8 | Q   As you sit here today, can you think of any |
| 09:18 | 9 | officer who told you that "Hey, dude, just calm down" is |
| 09:18 | 10 | a lawful order prior to September 3rd of 2008?  Can you |
| 09:18 | 11 | think of a name of any training officer who told you |
| 09:18 | 12 | that? |
| 09:18 | 13 | A   No, I cannot. |
| 09:18 | 14 | Q   Did you learn that at the Garden West Academy |
| 09:18 | 15 | that "Hey, dude, just calm down" is a lawful order? |
| 09:18 | 16 | MR. SHERMAN:  Golden West Academy. |
| 09:18 | 17 | MR. HENNESSEY:  Golden West Academy. |
| 09:18 | 18 | MR. SHERMAN:  And it's argumentative and |
| 09:19 | 19 | irrelevant. |
| 09:19 | 20 | Go ahead. |
| 09:19 | 21 | THE WITNESS:  Not that I can recall. |
| 09:19 | 22 | BY MR. HENNESSEY: |
| 09:19 | 23 | Q   Okay.  Did you ever -- were you ever trained |
| 09:19 | 24 | that "Just calm down, just calm down" are lawful orders? |
| 09:19 | 25 | MR. SHERMAN:  It's probably been asked and |

338

09:19  1     answered.
09:19  2            Go ahead.
09:19  3            MR. HENNESSEY:  I am just going down the
09:19  4     transcript.
09:19  5            MR. SHERMAN:  Yes, but it's still been asked and
09:19  6     answered whether you are going through the transcript or
09:19  7     not.
09:19  8            Go ahead.
09:19  9            THE WITNESS:  I felt that was a way of talking
09:19 10     to Mr. Tran.
09:19 11     BY MR. HENNESSEY:
09:19 12        Q    The question is, have you been trained that
09:19 13     that's a lawful order?
09:19 14        A    Not that I can recall.
09:19 15        Q    Have you been trained that lawful orders are,
09:19 16     "Put your hands behind your back"?  Have you been trained
09:19 17     in that?
09:19 18        A    Yes, I have.
09:19 19        Q    Okay.  Did you ever hear Officer -- did you ever
09:19 20     say that to Mr. Tran at any time prior to when he was
09:19 21     Tased -- to the time he was Tasered?  Did you ever say,
09:19 22     "Andy, can you please put your hands behind your back"?
09:19 23            MR. SHERMAN:  Well, it's compound, it's been
09:19 24     asked and answered.
09:19 25            Go ahead.

339

| | | |
|---|---|---|
| 09:19 | 1 | THE WITNESS:  No, I didn't. |
| 09:19 | 2 | BY MR. HENNESSEY: |
| 09:19 | 3 | Q   And do you recall Officer Gendreau ever saying |
| 09:19 | 4 | any words to the effect of what Mr. Tran was or wasn't |
| 09:20 | 5 | doing with his hands?  Anything about his hands, "Don't |
| 09:20 | 6 | clench your hands.  Unclench your hands"?  Do you recall |
| 09:20 | 7 | Officer Gendreau saying anything about his hands at all? |
| 09:20 | 8 | A   I did not hear Officer Gendreau say anything |
| 09:20 | 9 | about his hands. |
| 09:20 | 10 | Q   Okay.  So would it be fair to say that up until |
| 09:20 | 11 | the time that Officer Gendreau Tasered Mr. Tran, no |
| 09:20 | 12 | police officer, in your presence, had ever told Mr. Tran |
| 09:20 | 13 | to put his hands behind his back? |
| 09:20 | 14 | MR. SHERMAN:  Objection.  Misstates prior |
| 09:20 | 15 | testimony, it's argumentative. |
| 09:20 | 16 | Go ahead.  It's compound. |
| 09:20 | 17 | THE WITNESS:  From what I said and what I heard |
| 09:20 | 18 | from Officer Gendreau, I did not hear anyone say to |
| 09:20 | 19 | Mr. Tran to put his hands behind his back. |
| 09:20 | 20 | MR. SHERMAN:  Are you going to let him finish |
| 09:20 | 21 | answering before you cut him off? |
| 09:20 | 22 | MR. HENNESSEY:  I'm sorry.  I thought he was. |
| 09:20 | 23 | MR. SHERMAN:  No, he wasn't. |
| 09:20 | 24 | MR. HENNESSEY:  Sorry.  I thought he was. |
| 09:20 | 25 | MR. SHERMAN:  Go ahead. |

340

| | | |
|---|---|---|
| 09:20 | 1 | BY MR. HENNESSEY: |
| 09:20 | 2 | Q   Officer, do you remember telling Andy anything |
| 09:20 | 3 | about, "Andy, calm down.  I am just trying to place |
| 09:20 | 4 | handcuffs on you"?  Do you ever remember words to that |
| 09:20 | 5 | effect? |
| 09:20 | 6 | A   I did not say any words to those effects. |
| 09:21 | 7 | Q   Do you remember Officer Gendreau saying any |
| 09:21 | 8 | words to the effect of, "Hey, dude, I am -- we are just |
| 09:21 | 9 | trying to put handcuffs on you"?  Do you remember him |
| 09:21 | 10 | saying anything like that? |
| 09:21 | 11 | A   I do not recall hearing Officer Gendreau say |
| 09:21 | 12 | anything to that effect. |
| 09:21 | 13 | Q   Do you recall Officer Gendreau saying anything |
| 09:21 | 14 | about handcuffs at all? |
| 09:21 | 15 | A   I did not hear Officer Gendreau say anything |
| 09:21 | 16 | about handcuffs. |
| 09:21 | 17 | Q   And, again, this communication was all happening |
| 09:21 | 18 | from a distance of one or two feet away, correct? |
| 09:21 | 19 | MR. SHERMAN:  Objection.  Misstates. |
| 09:21 | 20 | THE WITNESS:  I said one to three feet away. |
| 09:21 | 21 | BY MR. HENNESSEY: |
| 09:21 | 22 | Q   Okay.  One to three feet away, correct? |
| 09:21 | 23 | A   That's correct. |
| 09:21 | 24 | Q   Okay.  Now, did the -- Officer Gendreau's manner |
| 09:21 | 25 | in speaking change at any point in time prior to the time |

341

| | | |
|---|---|---|
| 09:24 | 1 | BY MR. HENNESSEY: |
| 09:24 | 2 | Q   Any words to the effect about his hands, |
| 09:24 | 3 | anything he was doing with his hands. |
| 09:24 | 4 | MR. SHERMAN:   Compound. |
| 09:24 | 5 | Go ahead. |
| 09:24 | 6 | THE WITNESS:   No words -- |
| 09:24 | 7 | MR. SHERMAN:   I think it's asked and answered, |
| 09:24 | 8 | but go ahead. |
| 09:24 | 9 | THE WITNESS:   No words directed to his hands. |
| 09:24 | 10 | BY MR. HENNESSEY: |
| 09:24 | 11 | Q   But just so I am clear, do you recall telling |
| 09:24 | 12 | Mr. Tran -- during the time that you saw Officer Gendreau |
| 09:24 | 13 | on scene, do you remember directing any comments to |
| 09:24 | 14 | Mr. Tran to do anything with his hands -- anything with |
| 09:24 | 15 | his hands other than what you have already testified to, |
| 09:24 | 16 | interlock his fingers? |
| 09:25 | 17 | A   Other than interlock his fingers, I did not tell |
| 09:25 | 18 | him to do anything else with his hands. |
| 09:25 | 19 | Q   When Officer Gendreau told you, "Hey, Danny, I |
| 09:25 | 20 | am just going to Tase him," is the only thing you said |
| 09:25 | 21 | "Okay," or was there any communication about that between |
| 09:25 | 22 | you and Officer Gendreau that you recall? |
| 09:25 | 23 | MR. SHERMAN:   Objection.   Compound, foundation. |
| 09:25 | 24 | Go ahead. |
| 09:25 | 25 | THE WITNESS:   From what I can recall, the only |

345

09:26 1          THE WITNESS:  I cannot recall which training

09:26 2    officer said it, but most likely each training officer

09:26 3    said, if need be, interfere with another officer if you

09:26 4    believe a criminal act or injustice is occurring.

09:26 5    BY MR. HENNESSEY:

09:26 6        Q    During this time that you are describing about

09:26 7    the communication between Mr. Tran and Officer Gendreau,

09:26 8    you were behind Mr. Tran during that time, correct?

09:26 9        A    That is correct.

09:26 10        Q    Officer Gendreau was in front of him during this

09:26 11    time; is that true?

09:26 12        A    That's correct.

09:26 13        Q    Okay.  When he took his Taser out, did you move

09:26 14    in any manner?

09:26 15          MR. SHERMAN:  Objection.  Vague, ambiguous.

09:27 16          THE WITNESS:  Not until -- not until

09:27 17    Officer Gendreau said he was going to Tase, and then I

09:27 18    took a step -- a small step to my left.

09:27 19    BY MR. HENNESSEY:

09:27 20        Q    And what, if anything, did you do with your

09:27 21    hands?

09:27 22        A    I kept my hands on the handcuff and on his left

09:27 23    wrist.

09:27 24        Q    Okay.  In the manner that you have previously

09:27 25    described?

347

| | | |
|---|---|---|
| 09:33 | 1 | remembrance? |
| 09:33 | 2 | A   Prior to the Tasering? |
| 09:33 | 3 | Q   Yes. |
| 09:33 | 4 | A   No, it didn't. |
| 09:33 | 5 | Q   So what's the rush?  Why not -- |
| 09:33 | 6 | MR. SHERMAN:  What's what rush? |
| 09:33 | 7 | BY MR. HENNESSEY: |
| 09:33 | 8 | Q   What's the rush to Taser him?  Why was there a |
| 09:33 | 9 | need to Taser this guy so quickly based upon what you |
| 09:33 | 10 | heard? |
| 09:33 | 11 | MR. SHERMAN:  You know what, it's irrelevant, |
| 09:33 | 12 | it's been asked and answered, it's argumentative, it's |
| 09:34 | 13 | vague and ambiguous. |
| 09:34 | 14 | You can answer.  It also possibly calls for |
| 09:34 | 15 | speculation, foundation.  Go ahead. |
| 09:34 | 16 | THE WITNESS:  At the time I could not control |
| 09:34 | 17 | Mr. Tran and get him into a handcuffing technique. |
| 09:34 | 18 | Officer Gendreau was in front of Mr. Tran and could see |
| 09:34 | 19 | something and advised that he was going to Tase. |
| 09:34 | 20 | BY MR. HENNESSEY: |
| 09:34 | 21 | Q   What did he say that he could see?  What did |
| 09:34 | 22 | Officer Gendreau tell you, "Hey, dude, this is what I am |
| 09:34 | 23 | seeing"? |
| 09:34 | 24 | A   I don't recall him saying anything. |
| 09:34 | 25 | Q   Okay.  So you don't know why Officer Gendreau |

355

| | | |
|---|---|---|
| 09:35 | 1 | THE WITNESS:  Yes, I have. |
| 09:35 | 2 | BY MR. HENNESSEY: |
| 09:35 | 3 | Q    Then why didn't you ask Officer Gendreau, "What |
| 09:35 | 4 | do you see that requires him to be Tasered?"  Why didn't |
| 09:35 | 5 | you ask him that? |
| 09:35 | 6 | MR. SHERMAN:  It's argumentative, it's compound, |
| 09:35 | 7 | it's irrelevant. |
| 09:35 | 8 | Go ahead. |
| 09:35 | 9 | THE WITNESS:  Because of the situation I was in |
| 09:35 | 10 | and I trusted Officer Gendreau. |
| 09:35 | 11 | BY MR. HENNESSEY: |
| 09:35 | 12 | Q    You have never worked with Officer Gendreau, to |
| 09:35 | 13 | your knowledge, prior to September 3rd of 2008, had you? |
| 09:35 | 14 | A    No, I haven't. |
| 09:35 | 15 | Q    So what did you know about him that was so |
| 09:35 | 16 | trustworthy? |
| 09:35 | 17 | MR. SHERMAN:  Objection.  Argumentative. |
| 09:35 | 18 | THE WITNESS:  He's a police officer. |
| 09:35 | 19 | BY MR. HENNESSEY: |
| 09:35 | 20 | Q    So just the mere fact that he was a police |
| 09:35 | 21 | officer made him trustworthy to you? |
| 09:35 | 22 | A    Yes, it does. |
| 09:35 | 23 | Q    And you are testifying consistently with the |
| 09:35 | 24 | nature of trust that you have for fellow police officers |
| 09:35 | 25 | here in this deposition, aren't you? |

357

| | |
|---|---|
| 09:37 | 1 |
| 09:37 | 2 |
| 09:37 | 3 |
| 09:37 | 4 |
| 09:37 | 5 |
| 09:37 | 6 |
| 09:37 | 7 |
| 09:37 | 8 |
| 09:37 | 9 |
| 09:37 | 10 |
| 09:37 | 11 |
| 09:37 | 12 |
| 09:37 | 13 |
| 09:37 | 14 |
| 09:37 | 15 |
| 09:37 | 16 |
| 09:38 | 17 |
| 09:38 | 18 |
| 09:38 | 19 |
| 09:38 | 20 |
| 09:38 | 21 |
| 09:38 | 22 |
| 09:38 | 23 |
| 09:38 | 24 |
| 09:38 | 25 |

to Taser this gentleman for?"  Was there anything

prohibiting you from asking Officer Gendreau that type of

question?

        MR. SHERMAN:  Objection.  It's irrelevant, it's

been asked and answered, it's argumentative.

        Go ahead.

        THE WITNESS:  No, there wasn't.

BY MR. HENNESSEY:

    Q  Have you been trained that you must exhaust all

reasonable means of force prior to the escalation of

force?  Have you been trained in that regard?

        MR. SHERMAN:  That's definitely been asked and

answered, it's argumentative, it's compound.

        Go ahead.

        THE WITNESS:  We have been trained to use

reasonable force, to exercise whatever is necessary to

detain or arrest a subject.

BY MR. HENNESSEY:

    Q  Are you done?

    A  Yes.

    Q  You indicated before that you were aware of the

concept of continuum of force, correct?

    A  That's correct.

    Q  Before September 3rd, correct?

    A  That's correct.

360

09:41 1    the transcript, and you feel that you have come to a part

09:41 2    in the transcript where you told Internal Affairs about

09:41 3    Mr. Tran resisting or actively resisting; is that fair?

09:41 4        A    That's fair.

09:41 5        Q    Is it the portion where you told

09:41 6    Internal Affairs, "Officer Gendreau arrived, and I --

09:41 7    uh -- uh -- I -- I informed him, 'Hey, I got one handcuff

09:41 8    on and he started resist or ? resistance, just not obey

09:41 9    or coughs or saying anything.'"

09:41 10        Is that what you feel was the part of your

09:41 11    Internal Affairs interview where you told them that he

09:41 12    was actively resisting or resisting in any fashion?

09:41 13        A    As in resisting in any fashion, yes, that is the

09:41 14    part.

09:41 15        Q    Okay.  Do you want to review the remainder of

09:41 16    the transcript to determine whether you made any other

09:41 17    statement to Internal Affairs about resistance, active

09:41 18    resistance, or any words of resistance prior to the

09:42 19    Tasering event?

09:42 20        MR. SHERMAN:  Once again, the document is going

09:42 21    to speak for itself.

09:42 22    BY MR. HENNESSEY:

09:42 23        Q    Your independent recollection.

09:42 24        A    I don't recall saying the exact words of

09:42 25    "actively resisting," but I do recall saying resisting.

364

09:42 1      Q   And what you read there -- and you heard your

09:42 2  tape, too, correct?

09:42 3      A   That's correct.

09:42 4      Q   Okay.  And that transcript, although it may not

09:42 5  be, you know, every letter of every word, it's very close

09:42 6  to what you did say, fair?

09:42 7      A   That's fair.

09:42 8      Q   Okay.  And --

09:42 9          MR. SHERMAN:  Just for the record -- and, again,

09:42 10  the document speaks for itself -- there's another place

09:42 11  below again on page 6 where the answer is, "I am feeling

09:42 12  at that point probably he is just going to be resisting,"

09:42 13  so there's another one, but I will continue to puruse.

09:42 14          MR. HENNESSEY:  That's fine.

09:42 15      Q   So when you said you felt that he was going to

09:42 16  be resisting, was that your way of communicating to

09:42 17  Internal Affairs that Mr. Tran was, in fact, resisting?

09:42 18      A   Yes.

09:42 19      Q   Or was it your state of mind when you said, "I

09:43 20  am feeling, uh, at this point probably that he is going

09:43 21  to be resisting"?  When you made that statement to

09:43 22  Internal Affairs, was that your attempt to tell them that

09:43 23  he was, in fact, resisting or you thought he was going to

09:43 24  resist?

09:43 25          MR. SHERMAN:  Objection.  Argumentative,

365

| | | |
|---|---|---|
| 09:43 | 1 | compound. |
| 09:43 | 2 | THE WITNESS:  I thought he was going to resist. |
| 09:43 | 3 | BY MR. HENNESSEY: |
| 09:43 | 4 | Q   Okay.  So he wasn't resisting at that point? |
| 09:43 | 5 | You thought he was, but he wasn't actually resisting, |
| 09:43 | 6 | fair? |
| 09:43 | 7 | MR. SHERMAN:  Objection.  Argumentative, |
| 09:43 | 8 | misstates. |
| 09:43 | 9 | Go ahead. |
| 09:43 | 10 | THE WITNESS:  I think at that time I was trying |
| 09:43 | 11 | to illustrate that he was -- it was going to be more of a |
| 09:43 | 12 | resistance than just a slight resistance. |
| 09:43 | 13 | BY MR. HENNESSEY: |
| 09:43 | 14 | Q   Okay.  And you said, "That it might -- it might |
| 09:43 | 15 | turn violent, just by the way of how his body just |
| 09:43 | 16 | reacted once I got one handcuff on." |
| 09:43 | 17 | So, again, that's your state of mind, that you |
| 09:43 | 18 | thought it might turn violent, correct? |
| 09:43 | 19 | A   That's correct. |
| 09:43 | 20 | Q   It hadn't turned violent at the point that |
| 09:43 | 21 | Mr. Tran had been Tasered, had it? |
| 09:43 | 22 | MR. SHERMAN:  Objection.  Argumentative, I |
| 09:43 | 23 | believe it's asked and answered. |
| 09:44 | 24 | Go ahead. |
| 09:44 | 25 | THE WITNESS:  No. |

366

| | | |
|---|---|---|
| 10:00 | 1 | my leg to prop and lock his left -- his left arm in |
| 10:00 | 2 | place.  At that time I was pulling -- or I used the |
| 10:00 | 3 | handcuff to turn his right hand away from his head |
| 10:01 | 4 | towards his body, and that's when the five-second cycle |
| 10:01 | 5 | ended, and that's when he stiffened up his right elbow. |
| 10:01 | 6 | And then I used -- having control of his left hand with |
| 10:01 | 7 | my legs, I was able to bend his elbow at the joint and |
| 10:01 | 8 | able to handcuff him at that time. |
| 10:01 | 9 | BY MR. HENNESSEY: |
| 10:01 | 10 | Q   Would it be fair to say that the only order that |
| 10:01 | 11 | Mr. Tran had disobeyed by both you and Officer Gendreau |
| 10:01 | 12 | was to relax or to calm down? |
| 10:01 | 13 | MR. SHERMAN:  Objection.  Argumentative, asked |
| 10:01 | 14 | and answered. |
| 10:01 | 15 | Go ahead. |
| 10:01 | 16 | THE WITNESS:  From what I heard, yes. |
| 10:01 | 17 | BY MR. HENNESSEY: |
| 10:01 | 18 | Q   Did you have an opportunity to look at |
| 10:01 | 19 | Mr. Tran's face during this handcuffing process that you |
| 10:01 | 20 | have just described? |
| 10:01 | 21 | MR. SHERMAN:  As he is going down? |
| 10:01 | 22 | BY MR. HENNESSEY: |
| 10:01 | 23 | Q   Well, at any point in time, while he was going |
| 10:02 | 24 | down or during this handcuffing process that you have |
| 10:02 | 25 | just described. |

383

| | | |
|---|---|---|
| 10:02 | 1 | A   No, I didn't. |
| 10:02 | 2 | Q   How about at any time after the handcuffs were |
| 10:02 | 3 | in place? |
| 10:02 | 4 | A   Yes, I did. |
| 10:02 | 5 | Q   And did Mr. Tran still seem to have that |
| 10:02 | 6 | confused face? |
| 10:02 | 7 | A   I cannot recall. |
| 10:02 | 8 | Q   Did he appear to still need help, as you |
| 10:02 | 9 | described, of the type that he needed before he was |
| 10:02 | 10 | Tasered? |
| 10:02 | 11 | MR. SHERMAN:  Objection.  Vague, foundation, |
| 10:02 | 12 | speculation. |
| 10:02 | 13 | Go ahead. |
| 10:02 | 14 | THE WITNESS:  I cannot recall. |
| 10:02 | 15 | BY MR. HENNESSEY: |
| 10:02 | 16 | Q   Prior to the time he was Tasered, did you ever |
| 10:02 | 17 | hear Mr. Tran growling? |
| 10:02 | 18 | A   I did not hear Mr. Tran growling. |
| 10:02 | 19 | Q   When you personally observed his face while you |
| 10:02 | 20 | were approaching him, before you asked him to turn |
| 10:02 | 21 | around, could you actually see his face? |
| 10:02 | 22 | A   Yes. |
| 10:02 | 23 | MR. SHERMAN:  Objection.  Vague. |
| 10:02 | 24 | THE WITNESS:  Yes, I did see his face. |
| 10:02 | 25 | /// |

384

| | | |
|---|---|---|
| 10:02 | 1 | BY MR. HENNESSEY: |
| 10:02 | 2 | Q   Did you see drool and/or saliva running down his |
| 10:02 | 3 | face? |
| 10:02 | 4 | MR. SHERMAN:  Foundation, speculation, vague. |
| 10:03 | 5 | THE WITNESS:  I did not notice any. |
| 10:03 | 6 | BY MR. HENNESSEY: |
| 10:03 | 7 | Q   Did he seem to be frothing at the mouth in any |
| 10:03 | 8 | manner that you personally observed? |
| 10:03 | 9 | A   I did not notice any. |
| 10:03 | 10 | Q   Do you remember him making any noises of any |
| 10:03 | 11 | type prior to the time the Taser was deployed? |
| 10:03 | 12 | MR. SHERMAN:  Objection.  Vague. |
| 10:03 | 13 | Go ahead. |
| 10:03 | 14 | THE WITNESS:  I do not recall hearing any |
| 10:03 | 15 | noises from Mr. Tran. |
| 10:03 | 16 | BY MR. HENNESSEY: |
| 10:03 | 17 | Q   Would it be fair to say that Mr. Tran never |
| 10:03 | 18 | spoke a word prior to the time he was Tasered that you |
| 10:03 | 19 | heard? |
| 10:03 | 20 | A   I did not hear Mr. Tran speak a word. |
| 10:03 | 21 | Q   Prior to the time he was Tasered? |
| 10:03 | 22 | A   That's correct. |
| 10:03 | 23 | Q   And after the time he was Tasered, you never |
| 10:03 | 24 | heard him speak a word, did you? |
| 10:03 | 25 | A   That's correct. |

385

| | | |
|---|---|---|
| 10:15 | 1 | BY MR. HENNESSEY: |
| 10:15 | 2 |     Q  -- from your training and experience as a police |
| 10:15 | 3 | officer -- |
| 10:15 | 4 |     A  It doesn't -- |
| 10:15 | 5 |     Q  -- or as a marine? |
| 10:15 | 6 |     A  It doesn't -- I can't recall. |
| 10:15 | 7 |     Q  All right.  Was Mr. Tran breathing at the time |
| 10:15 | 8 | that you saw Officer Gendreau open his eyelids? |
| 10:16 | 9 |     A  I cannot recall. |
| 10:16 | 10 |     Q  At some point in time did you exit the house and |
| 10:16 | 11 | see the paramedics doing anything with Mr. Tran? |
| 10:16 | 12 |     A  I did not exit the house, but I can see the |
| 10:16 | 13 | paramedics doing CPR. |
| 10:16 | 14 |     Q  Why didn't you exit the house when you saw |
| 10:16 | 15 | paramedics performing CPR on Mr. Tran? |
| 10:16 | 16 |     MR. SHERMAN:  Objection.  Relevancy, |
| 10:16 | 17 | materiality. |
| 10:16 | 18 |     Go ahead. |
| 10:16 | 19 |     THE WITNESS:  Officer Gendreau went outside and |
| 10:16 | 20 | the family was still inside, so I wanted to speak with |
| 10:16 | 21 | the family and talk with them and prevent them from |
| 10:16 | 22 | interfering with the paramedics working on Mr. Tran. |
| 10:16 | 23 | BY MR. HENNESSEY: |
| 10:16 | 24 |     Q  Is it true -- did you order the family to go |
| 10:16 | 25 | into the house after Mr. Tran was Tasered?  Did you or -- |

397

```
 1                    CERTIFICATION

 2                          OF

 3            CERTIFIED SHORTHAND REPORTER

 4

 5           I, the undersigned, a Certified Shorthand

 6      Reporter of the State of California do hereby certify:

 7           That the foregoing proceedings were taken

 8      before me at the time and place herein set forth; that

 9      any witnesses in the foregoing proceedings, prior to

10      testifying, were placed under oath; that a verbatim

11      record of the proceedings was made by me using machine

12      shorthand which was thereafter transcribed under my

13      direction; further, that the foregoing is an accurate

14      transcription thereof.

15           I further certify that I am neither

16      financially interested in the action nor a relative or

17      employee of any attorney of any of the parties.

18           IN WITNESS WHEREOF, I have this date

19

20      subscribed my name      Amber N Jensen

21

22                      Dated: _____

23

24

25
```

                                                          306

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

| | |
|---|---|
| 10:46 | 1 |
| 10:46 | 2 |
| 10:46 | 3 |
| 10:46 | 4 |
| 10:46 | 5 |
| 10:46 | 6 |
| 10:46 | 7 |
| 10:46 | 8 |
| 10:46 | 9 |
| 10:46 | 10 |
| 10:46 | 11 |
| 10:46 | 12 |
| 10:46 | 13 |
| 10:46 | 14 |
| 10:46 | 15 |
| 10:46 | 16 |
| 10:46 | 17 |
| 10:46 | 18 |
| 10:46 | 19 |
| 10:46 | 20 |
| 10:46 | 21 |
| 10:46 | 22 |
| 10:46 | 23 |
| | 24 |
| | 25 |

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER

I, the undersigned, a Certified Shorthand Reporter of the State of California do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: _____

Certificate Number _____

413

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**