**EXHIBIT C**

12:53:21

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE, WEST JUSTICE CENTER

QUYEN KIM DANG, INDIVIDUALLY )
AND AS GUARDIAN AD LITEM FOR )
KENNY MINH CAO TRAN, A MINOR, )
AND PERSONAL REPRESENTATIVE )
OF ANDY TRAN, DECEASED; KENNY )
MINH CAO TRAN, A MINOR BY AND )
THROUGH HIS GUARDIAN AD LITEM )
QUYEN KIM DANG NAM TRAN, )
BIOLOGICAL FATHER OF ANDY TRAN)
DECEASED; BUA THI PHAN, )
MOTHER OF ANDY TRAN, DECEASED,)
                              )
            Plaintiff,        )
                              )
vs.                           )   No. 30-2009 00325347
                              )
CITY OF GARDEN GROVE; GARDEN  )
GROVE CHIEF OF POLICE, JOSEPH )
M. POLISAR; GARDEN GROVE      )
POLICE OFFICER GENDREAU;      )
GARDEN GROVE POLICE OFFICER   )
KARSCHAMROOM; TASER           )
INTERNATIONAL, INC., AND      )
DOES 1 TO 10, INDIVIDUAL; AND )
DOES 1 TO 10, ENTITIES,       )
INCLUSIVE,                    )
                              )
            Defendants.       )
_____)

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF RICHARD GENDREAU

Westminster, California

Monday, March 21, 2011

Reported by:
STEPHANIE WILLIAMS
CSR No. 13482

1

1               SUPERIOR COURT OF THE STATE OF CALIFORNIA

2             FOR THE COUNTY OF ORANGE, WEST JUSTICE CENTER

3

4       QUYEN KIM DANG, INDIVIDUALLY  )
        AND AS GUARDIAN AD LITEM FOR  )
5       KENNY MINH CAO TRAN, A MINOR, )
        AND PERSONAL REPRESENTATIVE   )
6       OF ANDY TRAN, DECEASED; KENNY )
        MINH CAO TRAN, A MINOR BY AND )
7       THROUGH HIS GUARDIAN AD LITEM )
        QUYEN KIM DANG NAM TRAN,      )
8       BIOLOGICAL FATHER OF ANDY TRAN)
        DECEASED; BUA THI PHAN,       )
9       MOTHER OF ANDY TRAN, DECEASED,)
                                      )
10                   Plaintiff,       )
                                      )
11      vs.                           )  No. 30-2009 00325347
                                      )
12      CITY OF GARDEN GROVE; GARDEN  )
        GROVE CHIEF OF POLICE, JOSEPH )
13      M. POLISAR; GARDEN GROVE      )
        POLICE OFFICER GENDREAU;      )
14      GARDEN GROVE POLICE OFFICER   )
        KARSCHAMROOM; TASER           )
15      INTERNATIONAL, INC., AND      )
        DOES 1 TO 10, INDIVIDUAL; AND )
16      DOES 1 TO 10, ENTITIES,       )
        INCLUSIVE,                    )
17                                    )
                     Defendants.      )
18      _____)

19              Videotaped deposition of RICHARD GENDREAU,

20      taken before Stephanie Williams, a Certified Shorthand

21      Reporter for the State of California, with principal

22      office in the County of Orange, commencing at 1:15 p.m.,

23      Monday, March 21, 2011, at the Law Offices of

24      Sean Hennessey, 8231 Westminster Boulevard, Westminster,

25      California.

2

```
 1        APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFFS, Quyen Kim Dang, et al.:

 3                        LAW OFFICES OF SEAN HENNESSEY
                          BY:  Sean Hennessey, ESQ.
 4                        8231 Westminster Boulevard
                          Westminster, California  92683
 5                        (949) 280-1257
                          (714) 898-7449
 6                        seanhennesseyesq@gmail.com

 7                        LAW OFFICES OF LIEM DO & ASSOCIATES
                          BY:  Paul Minhthu Pham
 8                        8231 Westminster Boulevard
                          Westminster, California  92683
 9                        (714) 898-7579
                          liemhdoesq@yahoo.com

10

11        FOR THE DEFENDANT, City of Garden Grove:

12                        FERGUSON, PRAET & SHERMAN
                          BY:  Steven A. Sherman, ESQ.
13                        1631 East 18th Street
                          Santa Ana, California  92705
14                        (714) 953-5300
                          (714) 953-1143
15

16        ALSO PRESENT:
                          Quyen Kim Dang
17                        Daniel Karschamroon

18

19

20

21

22

23

24

25
```

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

```
1                          I N D E X

2      WITNESS

3      RICHARD GENDREAU

4                                                        PAGE

5                  Examination by Mr. Hennessey:          6

6

7

8                        E X H I B I T S

9                                            Page        Page
                   Description          Introduced      Marked
10
       Exhibit A    Supplemental Report
11                  by Officer Avalos        64          64

12     Exhibit B    Dispatch Printouts       67          67

13     Exhibit C    Dispatch Log Printouts   69          69

14     Exhibit D    Diagram of the Scene     85          86

15

16

17                  INFORMATION REQUESTED

18                  PAGE            LINE

19                        (NONE)

20

21

22

23

24

25
```

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

| | | |
|---|---|---|
| 13:35:42 | 1 | with Dr. Blum, have you sought out any other type of |
| 13:35:47 | 2 | medical care, treatment of any type, therapy, |
| 13:35:49 | 3 | counseling, since that date, other than this session |
| 13:35:52 | 4 | that you talk about with Dr. Blum? |
| 13:35:55 | 5 | A    No. |
| 13:35:55 | 6 | Q    In -- prior to September 3rd, 2008, had you |
| 13:36:02 | 7 | ever been involved in any type of physical sporting |
| 13:36:07 | 8 | activity such as football, wrestling, Ultimate Fighting, |
| 13:36:12 | 9 | martial arts, anything of that type? |
| 13:36:13 | 10 | MR. SHERMAN:  Let me object to the form of the |
| 13:36:15 | 11 | question as it's compound; it's overbroad in both scope |
| 13:36:19 | 12 | and time; it's irrelevant; it's not necessarily likely |
| 13:36:22 | 13 | to lead to the discovery of admissible evidence. |
| 13:36:29 | 14 | In his adult life at least? |
| 13:36:29 | 15 | BY MR. HENNESSEY: |
| 13:36:32 | 16 | Q    Yeah.  Since high school.  Eighteen on.  I |
| 13:36:34 | 17 | don't care what you did when you were below the age of |
| 13:36:36 | 18 | 18. |
| 13:36:37 | 19 | MR. SHERMAN:  Same objections. |
| 13:36:38 | 20 | However, you may answer. |
| 13:36:39 | 21 | THE WITNESS:  Yes, I took martial arts |
| 13:36:42 | 22 | instruction. |
| 13:36:42 | 23 | BY MR. HENNESSEY: |
| 13:36:42 | 24 | Q    And what -- and I'm talking before |
| 13:36:44 | 25 | September 3rd of 2008.  What type of martial arts |

27

| | | |
|---|---|---|
| 13:36:47 | 1 | instruction did you receive? |
| 13:36:48 | 2 | A    I took Kenpo. |
| 13:36:49 | 3 | Q    Okay.  And is that a form of karate? |
| 13:36:53 | 4 | A    Yes. |
| 13:36:53 | 5 | Q    Okay.  And approximately how old were you when |
| 13:36:56 | 6 | you began that training? |
| 13:36:57 | 7 | A    Approximately 21. |
| 13:36:58 | 8 | Q    Okay.  And so what year would that have been? |
| 13:37:05 | 9 | What year would it have been when you were 21? |
| 13:37:06 | 10 | A    It was right when I had moved out here in 2003. |
| 13:37:10 | 11 | Q    Okay.  So about 2003 you began.  And where did |
| 13:37:13 | 12 | you receive -- start taking those lessons? |
| 13:37:16 | 13 | A    At United Studios of Self-Defense. |
| 13:37:19 | 14 | Q    And where is that? |
| 13:37:19 | 15 | A    Newport Beach. |
| 13:37:21 | 16 | Q    Is that the one right off of Peninsula? |
| 13:37:24 | 17 | A    No. |
| 13:37:24 | 18 | Q    Okay.  And how long did you continue on with |
| 13:37:31 | 19 | that particular type of martial art? |
| 13:37:35 | 20 | A    I stopped about two months before I went to the |
| 13:37:39 | 21 | academy, so approximately two-and-a-half years. |
| 13:37:41 | 22 | Q    Okay.  And what belt -- do they rise in that |
| 13:37:46 | 23 | particular martial art by the -- by acquiring different |
| 13:37:49 | 24 | types of belts? |
| 13:37:51 | 25 | A    Yes. |

28

13:37:51  1        Q    Do you know what belt -- what the highest level

13:37:54  2    of martial arts belt you received from that particular

13:37:57  3    institute?

13:37:57  4        A    I honestly don't recall.

13:37:59  5        Q    Do you recall testing for any type of purple

13:38:02  6    belt, brown belt, black belt, do you remember going

13:38:06  7    through any type of testing?

13:38:06  8        A    The last I remember testing for, I believe was

13:38:09  9    my brown belt.  My first degree.

13:38:11 10        Q    Okay.  And can you just explain the levels of

13:38:21 11    belts at that particular martial arts studio.

13:38:21 12             MR. SHERMAN:  I'm going to object to the form

13:38:21 13    of the question as being irrelevant; calls for a

13:38:21 14    narrative; may cause and call for speculation.

13:38:25 15             You may answer, of course.

13:38:26 16             THE WITNESS:  There's numerous levels, starting

13:38:31 17    with white belt, which is the -- which is for a

13:38:35 18    brand-new student.  And then rises from there.  I don't

13:38:39 19    recall the actual order, but I believe there was

13:38:42 20    approximately five or six levels, prior to when I had

13:38:44 21    finished, that I had completed.

13:38:46 22    BY MR. HENNESSEY:

13:38:46 23        Q    Do you recall it going white, yellow, green,

13:38:49 24    blue, brown and then black; does that sound familiar?

13:38:53 25        A    No, I believe -- if memory serves me right, I

29

13:47:37    1          A     Yes.

13:47:38    2          Q     Okay.  So there was live -- there was live

13:47:42    3    training in various different scenarios to attempt to

13:47:46    4    handcuff people in various situations standing up,

13:47:49    5    correct?

13:47:50    6          A     Yes.

13:47:50    7          Q     Did your training in relation to -- after you

13:47:57    8    completed Golden West College, when was that, if you

13:48:00    9    recall, of your approximate graduation date?

13:48:03   10          A     September 9th of 2005.

13:48:05   11          Q     9/9/05.  And where did you go after that?  Did

13:48:09   12    you go to any particular law enforcement agency or what

13:48:12   13    did you do after that?

13:48:13   14          A     I got sworn in as an officer with the

13:48:17   15    Garden Grove P.D.

13:48:17   16          Q     Okay.  Would it be fair to say that your entire

13:48:19   17    time as a law enforcement officer has been spent at the

13:48:23   18    Garden Grove Police Department?

13:48:24   19          A     Yes.

13:48:24   20          Q     Does the Garden Grove Police Department since

13:48:27   21    September -- did you -- were you sworn in as a police

13:48:31   22    officer in September 9th of 2005 at Garden Grove?

13:48:31   23                THE REPORTER:  September 9th?

13:48:31   24    BY MR. HENNESSEY:

13:48:31   25          Q     September 9th -- is that -- September 9th,

                                                                          38

| | | |
|---|---|---|
| 14:04:04 | 1 | Q    Okay.  What is your understanding as to what |
| 14:04:13 | 2 | the Fourth Amendment is? |
| 14:04:15 | 3 | A    The Fourth Amendment provides -- |
| 14:04:18 | 4 | MR. SHERMAN:  Let me -- let me make an |
| 14:04:21 | 5 | objection as to calls for possible legal opinion, |
| 14:04:24 | 6 | interpretation analysis. |
| 14:04:26 | 7 | I've been an attorney for 27 years and I don't |
| 14:04:30 | 8 | know if I understand what the Fourth Amendment is. |
| 14:04:30 | 9 | But go ahead. |
| 14:04:30 | 10 | BY MR. HENNESSEY: |
| 14:04:33 | 11 | Q    I'm just asking what you've been trained as to |
| 14:04:36 | 12 | what it is.  It may not be right, but just whatever you |
| 14:04:38 | 13 | can recall you being trained in relation to complying |
| 14:04:42 | 14 | with the Fourth Amendment as a police officer. |
| 14:04:45 | 15 | A    My training has given me the understanding that |
| 14:04:47 | 16 | the Fourth Amendment safeguards citizens against |
| 14:04:50 | 17 | unlawful searches and seizures of both themselves and |
| 14:04:52 | 18 | their property. |
| 14:04:54 | 19 | Q    Is it your understanding that that amendment is |
| 14:04:58 | 20 | supposed to protect individual citizens from |
| 14:05:01 | 21 | unreasonable police searches and seizures? |
| 14:05:04 | 22 | A    Yes. |
| 14:05:04 | 23 | Q    How much time have you spent dedicated to |
| 14:05:11 | 24 | applying the standard of -- well, you indicated earlier |
| 14:05:17 | 25 | that you would go on -- or you would have certain |

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

| | |
|---|---|
| 14:42:52 | 1 |
| 14:42:53 | 2 |
| 14:42:54 | 3 |
| 14:42:55 | 4 |
| 14:42:59 | 5 |
| 14:43:03 | 6 |
| 14:43:06 | 7 |
| 14:43:11 | 8 |
| 14:43:16 | 9 |
| 14:43:17 | 10 |
| 14:43:20 | 11 |
| 14:43:27 | 12 |
| 14:43:29 | 13 |
| 14:43:33 | 14 |
| 14:43:34 | 15 |
| 14:43:36 | 16 |
| 14:43:39 | 17 |
| 14:43:42 | 18 |
| 14:43:42 | 19 |
| 14:43:43 | 20 |
| 14:43:45 | 21 |
| 14:43:47 | 22 |
| 14:43:50 | 23 |
| 14:43:51 | 24 |
| 14:43:54 | 25 |

to September 3rd of 2008?

BY MR. HENNESSEY:

    Q    Yeah, absolutely.

    A    Okay.  I recall being told that it had to be used or -- it was suggested to be used whenever you believed that you were going to be detaining somebody and you felt that a recording would be useful as far as evidence or to capture the actions of someone who was uncooperative.

    Q    Okay.  And to your knowledge, from the time that you had become a patrol officer in -- well, let's just talk about the year 2008.  Did you have a specific unit that you went to every day or were they randomly assigned?

    A    Randomly assigned.

    Q    Did you have a specific call name back on September 3rd of 2008?  Call number or name or combination of the two?

    A    Yes.

    Q    And what was your call sign?

    A    I was 253 bravo, B.

    Q    253 B, as in bravo?

    A    Yes.

    Q    Okay.  And have you -- back in September 3rd of 2008, did you use any other designations to identify

81

| | | |
|---|---|---|
| 14:56:06 | 1 | THE WITNESS:  At the time I did not know the |
| 14:56:08 | 2 | severity of the situation.  It didn't occur to me to |
| 14:56:13 | 3 | turn it on when I exited my vehicle. |
| 14:56:16 | 4 | BY MR. HENNESSEY: |
| 14:56:16 | 5 | Q    Earlier you indicated that in relation to the |
| 14:56:18 | 6 | type of call this was that this was a -- not a |
| 14:56:29 | 7 | high-priority call but a priority call, do you recall |
| 14:56:34 | 8 | testifying to words to that effect? |
| 14:56:35 | 9 | A    Yes. |
| 14:56:36 | 10 | Q    How did you describe the call earlier, the type |
| 14:56:38 | 11 | of call that you were responding to? |
| 14:56:40 | 12 | MR. SHERMAN:  Objection.  Asked and answered. |
| 14:56:41 | 13 | You may answer it. |
| 14:56:43 | 14 | THE WITNESS:  It was a -- you know, initially a |
| 14:56:48 | 15 | possible violent mental case that was possibly armed. |
| 14:56:51 | 16 | BY MR. HENNESSEY: |
| 14:56:52 | 17 | Q    Okay.  So you described it earlier as a |
| 14:56:54 | 18 | high-primary call, correct? |
| 14:56:57 | 19 | MR. SHERMAN:  Objection.  Misstates his |
| 14:56:59 | 20 | testimony. |
| 14:56:59 | 21 | BY MR. HENNESSEY: |
| 14:57:00 | 22 | Q    Do you recall referring to this incident as a |
| 14:57:02 | 23 | high-priority call? |
| 14:57:03 | 24 | A    I remember calling it a priority call, yes. |
| 14:57:06 | 25 | Q    Well, how would you describe it today?  With |

93

| | | |
|---|---|---|
| 14:57:10 | 1 | what you knew from this, you know, armed mental |
| 14:57:13 | 2 | patient -- |
| 14:57:13 | 3 | A    That's -- |
| 14:57:13 | 4 | Q    -- with a history of violence, where would that |
| 14:57:15 | 5 | fall on the scale of priorities? |
| 14:57:19 | 6 | A    That's a higher priority -- |
| 14:57:19 | 7 | MR. SHERMAN:  Objection.  Asked and answered. |
| 14:57:21 | 8 | Go ahead. |
| 14:57:21 | 9 | BY MR. HENNESSEY: |
| 14:57:22 | 10 | Q    It would be called a higher priority, correct? |
| 14:57:26 | 11 | A    Yes. |
| 14:57:26 | 12 | Q    So why wouldn't your video unit be turned on? |
| 14:57:31 | 13 | MR. SHERMAN:  Objection.  Argumentative. |
| 14:57:31 | 14 | Go ahead. |
| 14:57:32 | 15 | THE WITNESS:  It didn't occur to me to turn it |
| 14:57:32 | 16 | on. |
| 14:57:32 | 17 | BY MR. HENNESSEY: |
| 14:57:33 | 18 | Q    You indicated that you use your videos or you |
| 14:57:34 | 19 | have been trained to use your videos to capture -- when |
| 14:57:41 | 20 | you believed you would be detain- -- you would be |
| 14:57:45 | 21 | detaining or capturing somebody and there may be |
| 14:57:49 | 22 | violence, words to that effect.  Do you remember saying |
| 14:57:51 | 23 | that? |
| 14:57:51 | 24 | MR. SHERMAN:  Objection.  Misstates. |
| 14:57:53 | 25 | Go ahead. |

94

| | | |
|---|---|---|
| 14:57:53 | 1 | THE WITNESS:  Yes. |
| 14:57:54 | 2 | BY MR. HENNESSEY: |
| 14:57:54 | 3 | Q    Did you believe that you were responding to |
| 14:57:56 | 4 | that type of situation on September 3rd, 2008, based |
| 14:58:01 | 5 | primarily on the 911 call or dispatch information you |
| 14:58:05 | 6 | had before you pulled up to the area of 13252 Barnett |
| 14:58:10 | 7 | Way? |
| 14:58:11 | 8 | MR. SHERMAN:  Compound. |
| 14:58:12 | 9 | You may answer. |
| 14:58:13 | 10 | THE WITNESS:  Yes. |
| 14:58:13 | 11 | BY MR. HENNESSEY: |
| 14:58:14 | 12 | Q    Then why didn't you turn your video camera on? |
| 14:58:17 | 13 | MR. SHERMAN:  Objection.  Asked and answered; |
| 14:58:18 | 14 | argumentative. |
| 14:58:19 | 15 | You can answer it one last time. |
| 14:58:21 | 16 | THE WITNESS:  Again, it didn't occur to me at |
| 14:58:23 | 17 | the time. |
| 14:58:23 | 18 | BY MR. HENNESSEY: |
| 14:58:23 | 19 | Q    Well, it did occur to you to turn on your audio |
| 14:58:27 | 20 | recording device, didn't it?  It occurred to you, true? |
| 14:58:31 | 21 | MR. SHERMAN:  Objection.  Vague. |
| 14:58:32 | 22 | THE WITNESS:  At what point? |
| 14:58:33 | 23 | BY MR. HENNESSEY: |
| 14:58:34 | 24 | Q    At any point in time.  From the time that you |
| 14:58:36 | 25 | got out of your car on September 3rd, 2008, until the |

95

| | |
|---|---|
| 14:58:39 | 1 |
| 14:58:43 | 2 |
| 14:58:44 | 3 |
| 14:58:48 | 4 |
| 14:58:50 | 5 |
| 14:58:54 | 6 |
| 14:58:56 | 7 |
| 14:58:58 | 8 |
| 14:59:00 | 9 |
| 14:59:02 | 10 |
| 14:59:07 | 11 |
| 14:59:11 | 12 |
| 14:59:12 | 13 |
| 14:59:14 | 14 |
| 14:59:15 | 15 |
| 14:59:16 | 16 |
| 14:59:16 | 17 |
| 14:59:24 | 18 |
| 14:59:27 | 19 |
| 14:59:27 | 20 |
| 14:59:28 | 21 |
| 14:59:31 | 22 |
| 14:59:32 | 23 |
| 14:59:33 | 24 |
| 14:59:33 | 25 |

time that you deployed a taser device?

     A    Yes.

     Q    When did it occur to you to turn on your
microphone on your holster?

     A    When we were having difficulty subduing
Mr. Tran and I believed that I was going to have to
deploy my taser.

     Q    Okay.  So what did you do to turn on your
microphone on your holster?

     A    I pressed the switch that was on the recorder
that was on my belt, but it did not activate the camera.

     Q    How do you know?

     A    Because there was no vibration and there was no
recording later on.

     Q    Did you check?

     A    Yes.

     Q    Okay.  Has that ever happened to you before
where you attempted to turn your microphone on and it
just didn't work?

     A    Yes.

     Q    How many times, prior to September 3rd of 2008,
had that happened?

          MR. SHERMAN:  Objection.  Relevancy;
materiality; you may -- it's overbroad; vague and
ambiguous.

96

| | | |
|---|---|---|
| 14:59:36 | 1 | You may answer, of course. |
| 14:59:37 | 2 | THE WITNESS:  Numerous times. |
| 14:59:38 | 3 | BY MR. HENNESSEY: |
| 14:59:39 | 4 | Q    Had you ever brought it to the attention of |
| 14:59:41 | 5 | anybody in a supervisorial role that your microphone did |
| 14:59:43 | 6 | not appear to be functioning properly? |
| 14:59:45 | 7 | A    I wouldn't know if it was a problem with the |
| 14:59:48 | 8 | microphone or if it was a problem with the system. |
| 14:59:50 | 9 | Q    Did you ever bring it to anybody's attention |
| 14:59:52 | 10 | that you were having a problem with your system |
| 14:59:55 | 11 | activating your video and/or audio recording devices? |
| 14:59:57 | 12 | MR. SHERMAN:  Objection.  Relevancy; |
| 14:59:59 | 13 | materiality. |
| 15:00:01 | 14 | You may answer. |
| 15:00:01 | 15 | THE WITNESS:  Yes. |
| 15:00:02 | 16 | BY MR. HENNESSEY: |
| 15:00:02 | 17 | Q    Prior to September 3rd, how did you do that? |
| 15:00:02 | 18 | THE REPORTER:  Can you guys slow down. |
| 15:00:02 | 19 | THE WITNESS:  Sorry. |
| 15:00:02 | 20 | MR. HENNESSEY:  I'm sorry. |
| 15:00:02 | 21 | BY MR. HENNESSEY: |
| 15:00:04 | 22 | Q    How did you bring it to anybody's attention |
| 15:00:06 | 23 | prior to September 3rd of 2008, that you appeared to |
| 15:00:08 | 24 | have some difficulties with your recording devices? |
| 15:00:11 | 25 | A    It was an issue that was common with other |

97

| | |
|---|---|
| 15:00:13 | 1 |
| 15:00:18 | 2 |
| 15:00:21 | 3 |
| 15:00:24 | 4 |
| 15:00:26 | 5 |
| 15:00:28 | 6 |
| 15:00:31 | 7 |
| 15:00:31 | 8 |
| 15:00:33 | 9 |
| 15:00:35 | 10 |
| 15:00:35 | 11 |
| 15:00:36 | 12 |
| 15:00:39 | 13 |
| 15:00:43 | 14 |
| 15:00:44 | 15 |
| 15:00:47 | 16 |
| 15:00:49 | 17 |
| 15:00:50 | 18 |
| 15:00:51 | 19 |
| 15:00:52 | 20 |
| 15:00:56 | 21 |
| 15:01:04 | 22 |
| 15:01:09 | 23 |
| 15:01:19 | 24 |
| 15:01:19 | 25 |

officers who had talked to their supervisors.  I, in

turn, had talked to mine on several occasions, depending

on who the supervisor was at the time, that I was having

issues with the microphones activating the cameras

depending on how far away you were.

    Q    Did you ever put this in writing to anybody?

        MR. SHERMAN:  Objection.  Materiality;

relevancy.

        You may answer.

        THE WITNESS:  Not that I can recall.

BY MR. HENNESSEY:

    Q    Do you remember sending an e-mail, a text

message, a twitter, a -- any form of communication in

writing to anybody in the Garden Grove Police Department

saying that you were having problems with your recording

devices, prior to September 3rd of 2008?

        MR. SHERMAN:  Same objections.

        You may answer.

        THE WITNESS:  Not that I can recall, no.

BY MR. HENNESSEY:

    Q    So you attempted to turn your belt microphone

on at some point in time while you were in the yard at

13252 Barnett Way, true?

    A    Yes.

    Q    Okay.  And the specific actions you made were,

98

| | | |
|---|---|---|
| 15:06:44 | 1 | Go ahead. |
| 15:06:45 | 2 | THE WITNESS:  I didn't know. |
| 15:06:46 | 3 | BY MR. HENNESSEY: |
| 15:06:46 | 4 | Q    Okay.  Were you communicating with |
| 15:06:49 | 5 | Officer Karschamroon, who was at the scene, while you |
| 15:06:51 | 6 | were pulling up? |
| 15:06:53 | 7 | MR. SHERMAN:  Objection.  Vague and ambiguous |
| 15:06:54 | 8 | as to the word "communicating." |
| 15:06:54 | 9 | BY MR. HENNESSEY: |
| 15:06:56 | 10 | Q    Prior to the time you tasered him.  Were you |
| 15:06:59 | 11 | communicating with Officer Karschamroon while you pulled |
| 15:07:01 | 12 | up to the house? |
| 15:07:03 | 13 | A    From the point that I pulled up until the point |
| 15:07:05 | 14 | that I tased him? |
| 15:07:07 | 15 | Q    Yes. |
| 15:07:07 | 16 | A    Yes. |
| 15:07:08 | 17 | Q    Okay.  Was any of those conversations picked up |
| 15:07:11 | 18 | on any recording device that you're aware of? |
| 15:07:13 | 19 | A    No. |
| 15:07:14 | 20 | Q    So you came into a situation -- when you left |
| 15:07:22 | 21 | your police car, you were concerned of potential having |
| 15:07:26 | 22 | gunfire open up, true? |
| 15:07:28 | 23 | A    Yes. |
| 15:07:28 | 24 | Q    Okay.  So this would be the highest priority |
| 15:07:33 | 25 | call that you would be responding to, true? |

107

| | | |
|---|---|---|
| 15:07:35 | 1 | MR. SHERMAN:  Objection.  Argumentative; vague |
| 15:07:38 | 2 | and ambiguous. |
| 15:07:38 | 3 | THE WITNESS:  Yes. |
| 15:07:38 | 4 | BY MR. HENNESSEY: |
| 15:07:41 | 5 | Q    Exactly the type of call that you've been |
| 15:07:43 | 6 | trained to activate your video device for, true? |
| 15:07:47 | 7 | A    Yes. |
| 15:07:47 | 8 | Q    Okay.  And what efforts, if any, did you make |
| 15:07:52 | 9 | to activate your video recording device as you pulled up |
| 15:07:56 | 10 | to 13252 Barnett Way? |
| 15:07:59 | 11 | MR. SHERMAN:  Objection.  Relevancy; |
| 15:08:01 | 12 | materiality. |
| 15:08:01 | 13 | Go ahead. |
| 15:08:02 | 14 | THE WITNESS:  From my car, I made none. |
| 15:08:04 | 15 | BY MR. HENNESSEY: |
| 15:08:07 | 16 | Q    Okay.  Do you have the ability to erase a |
| 15:08:09 | 17 | video? |
| 15:08:10 | 18 | A    No. |
| 15:08:10 | 19 | Q    Are you sure? |
| 15:08:13 | 20 | A    Not that I'm aware of. |
| 15:08:14 | 21 | MR. SHERMAN:  Objection.  Argumentative. |
| 15:08:16 | 22 | You can answer. |
| 15:08:17 | 23 | BY MR. HENNESSEY: |
| 15:08:18 | 24 | Q    What happens with the hard drives once the -- |
| 15:08:20 | 25 | what happens with the hard drives, to your knowledge, at |

108

| | | |
|---|---|---|
| 15:08:22 | 1 | the end of the day, how is the information stored? |
| 15:08:26 | 2 | MR. SHERMAN:  Objection.  Calls for possible |
| 15:08:28 | 3 | speculation -- |
| 15:08:28 | 4 | BY MR. HENNESSEY: |
| 15:08:28 | 5 | Q    If you know. |
| 15:08:29 | 6 | MR. SHERMAN:  Hang on.  Assumes facts not in |
| 15:08:32 | 7 | evidence; lacks foundation. |
| 15:08:32 | 8 | You may answer. |
| 15:08:33 | 9 | THE WITNESS:  I don't know. |
| 15:08:34 | 10 | BY MR. HENNESSEY: |
| 15:08:35 | 11 | Q    Have you ever had an occasion yourself to |
| 15:08:37 | 12 | download information from your unit's video? |
| 15:08:40 | 13 | A    No. |
| 15:08:41 | 14 | MR. SHERMAN:  Has he ever downloaded the -- |
| 15:08:41 | 15 | okay. |
| 15:08:45 | 16 | MR. HENNESSEY:  Has he ever personally had an |
| 15:08:47 | 17 | occasion to download information. |
| 15:08:54 | 18 | THE WITNESS:  No. |
| 15:08:54 | 19 | BY MR. HENNESSEY: |
| 15:08:55 | 20 | Q    After this incident, did you ultimately have |
| 15:08:57 | 21 | your microphone replaced or serviced to correct whatever |
| 15:09:03 | 22 | error existed on 9/3/08? |
| 15:09:03 | 23 | A    I don't recall. |
| 15:09:04 | 24 | Q    Would that have been through -- if it had been |
| 15:09:08 | 25 | done, would that have been through a written request? |

109

| | |
|---|---|
| 15:11:23 | 1 |
| 15:11:24 | 2 |
| 15:11:26 | 3 |
| 15:11:30 | 4 |
| 15:11:31 | 5 |
| 15:11:35 | 6 |
| 15:11:39 | 7 |
| 15:11:40 | 8 |
| 15:11:43 | 9 |
| 15:11:49 | 10 |
| 15:11:54 | 11 |
| 15:12:04 | 12 |
| 15:12:04 | 13 |
| 15:12:04 | 14 |
| 15:12:04 | 15 |
| 15:12:04 | 16 |
| 15:12:04 | 17 |
| 15:12:06 | 18 |
| 15:12:07 | 19 |
| 15:12:07 | 20 |
| 15:12:10 | 21 |
| 15:12:11 | 22 |
| 15:12:14 | 23 |
| 15:12:18 | 24 |
| 15:12:22 | 25 |

BY MR. HENNESSEY:

     Q     What did you understand was the nature of the
911 call that caused you to be dispatched to
13252 Barnett Way?

     A     The nature of the call was a possible mental
case where the subject in question was described as,
quote, crazy.

     Q     Okay.  And as a law enforcement officer -- or
what was your state of mind on September 3rd, 2008, as
to what that meant?  What was in your mind, what was
your state of mind as to what "potential mental case,"
"crazy"?

          MR. SHERMAN:  Objection.  Vague and ambiguous.

          What are you asking him?  What does "crazy"
mean to him?

BY MR. HENNESSEY:

     Q     Well, have you ever heard of Welfare and
Institutions Code 5150?  Are you aware of what that it?

     A     Yes.

     Q     What do you understand Welfare and Institutions
Code 5150 to mean?

     A     It deals with subjects that are gravely
disabled, a danger to themselves, a danger to others,
normally as a result of a mental condition.

     Q     Did you hear a call going out for a possible

112

| | | |
|---|---|---|
| 15:18:49 | 1 | if 20 hours was dedicated to CPR, what was the other |
| 15:18:53 | 2 | 20 hours dedicated to? |
| 15:18:54 | 3 | A    To the application of general first aid. |
| 15:18:57 | 4 | Q    Did that include defibrillators?  Do you know |
| 15:19:01 | 5 | what a defibrillator is? |
| 15:19:03 | 6 | A    I do. |
| 15:19:03 | 7 | Q    Do you carry -- and back in February of 2008, |
| 15:19:07 | 8 | did you carry a defibrillator in your unit? |
| 15:19:10 | 9 | A    No. |
| 15:19:10 | 10 | Q    Do you know whether any responding officer, |
| 15:19:13 | 11 | El-Farra, Karschamroon, had a defibrillator with them |
| 15:19:17 | 12 | when they responded?  If you personally know. |
| 15:19:19 | 13 | A    I personally know that none of the units had |
| 15:19:24 | 14 | them. |
| 15:19:24 | 15 | Q    Okay.  In relation to any specific education |
| 15:19:34 | 16 | that you received in the Americans -- compliance with |
| 15:19:36 | 17 | the Americans with Disabilities Act, in relation to the |
| 15:19:39 | 18 | mentally ill, what have you been trained? |
| 15:19:42 | 19 | A    I have been trained that in dealing with |
| 15:19:45 | 20 | subjects with mental impairments, that they can be prone |
| 15:19:49 | 21 | to violence.  And that our role as responders in dealing |
| 15:19:53 | 22 | with such persons is to attempt to deescalate the |
| 15:19:58 | 23 | situation.  Try and keep them as calm as possible using |
| 15:20:01 | 24 | a calm and soft demeanor. |
| 15:20:07 | 25 | Q    Okay.  Prior to the time that you deployed your |

119

| | | |
|---|---|---|
| 15:21:17 | 1 | him, were you told that Mr. Tran complied with anything? |
| 15:21:20 | 2 | A    No. |
| 15:21:20 | 3 | Q    Okay.  Did you ask? |
| 15:21:21 | 4 | A    No. |
| 15:21:22 | 5 | Q    Why not? |
| 15:21:24 | 6 | MR. SHERMAN:  Objection.  Argumentative; |
| 15:21:25 | 7 | irrelevant. |
| 15:21:26 | 8 | You may answer. |
| 15:21:27 | 9 | THE WITNESS:  Because at the time I was |
| 15:21:28 | 10 | concerned with the fact that he was not compliant at |
| 15:21:31 | 11 | that second that I arrived. |
| 15:21:33 | 12 | BY MR. HENNESSEY: |
| 15:21:34 | 13 | Q    And you went hands-on with Mr. Tran, correct? |
| 15:21:36 | 14 | MR. SHERMAN:  Objection.  Vague and ambiguous; |
| 15:21:39 | 15 | scope and time. |
| 15:21:40 | 16 | You may answer. |
| 15:21:40 | 17 | BY MR. HENNESSEY: |
| 15:21:41 | 18 | Q    Prior to the time you deployed your taser. |
| 15:21:43 | 19 | A    Yes. |
| 15:21:43 | 20 | Q    Okay.  How did you go hands-on with him? |
| 15:21:45 | 21 | A    I had grabbed his left wrist and tried to bring |
| 15:21:51 | 22 | it down to the lower portion of his back so that we |
| 15:21:54 | 23 | could try and handcuff him.  When I was initially unable |
| 15:21:58 | 24 | to pull it away from his right hand, I applied pressure |
| 15:22:02 | 25 | on his left wrist, trying to find a pressure point to |

121

| | |
|---|---|
| 15:22:06 | 1 |
| 15:22:11 | 2 |
| 15:22:13 | 3 |
| 15:22:15 | 4 |
| 15:22:19 | 5 |
| 15:22:20 | 6 |
| 15:22:22 | 7 |
| 15:22:23 | 8 |
| 15:22:23 | 9 |
| 15:22:25 | 10 |
| 15:22:27 | 11 |
| 15:22:30 | 12 |
| 15:22:34 | 13 |
| 15:22:37 | 14 |
| 15:22:40 | 15 |
| 15:22:50 | 16 |
| 15:22:50 | 17 |
| 15:22:50 | 18 |
| 15:22:50 | 19 |
| 15:22:50 | 20 |
| 15:22:50 | 21 |
| 15:22:50 | 22 |
| 15:22:52 | 23 |
| 15:22:52 | 24 |
| 15:22:55 | 25 |

use as a pain compliance hold to try and get him to move

his arm.

     Q    Okay.  Describe the pain compliance hold that

you had been trained on, prior to September 3rd of 2008.

          MR. SHERMAN:  Objection.  Vague.

          You want him to describe what he did or what he

was trained?

          MR. HENNESSEY:  Trained.

BY MR. HENNESSEY:

     Q    What type of pain-compliance maneuvers had you

been trained on prior to September 3rd of 2008?

     A    I had been trained on several.  Many of them

involved bending the hand or wrist in a particular

direction.  Others involved applying pressure to

pressure points to gain compliance in that fashion.

     Q    Okay.

          THE VIDEOGRAPHER:  Counsel, we have less than a

minute.

          MR. HENNESSEY:  Okay.  If you want to change

the tape, that's fine.

          MR. SHERMAN:  What, we're running out of tape?

          MR. HENNESSEY:  I believe he said we have one

minute left.

          THE VIDEOGRAPHER:  This now marks the end of

tape one of the deposition of Officer Richard Gendreau.

122

| | | |
|---|---|---|
| 16:04:22 | 1 | taught you how to use the taser? |
| 16:04:24 | 2 | MR. SHERMAN:  This would be -- |
| 16:04:25 | 3 | MR. HENNESSEY:  Prior to September 3rd, 2008. |
| 16:04:27 | 4 | MR. SHERMAN:  Thank you. |
| 16:04:28 | 5 | THE WITNESS:  Prior to, I recall receiving |
| 16:04:30 | 6 | training from Sergeant Bowers. |
| 16:04:33 | 7 | BY MR. HENNESSEY: |
| 16:04:33 | 8 | Q    And how do you spell that? |
| 16:04:35 | 9 | A    B-O-W-E-R-S. |
| 16:04:37 | 10 | Q    Okay.  Do you recall receiving training from |
| 16:04:39 | 11 | any other officer of the Garden Grove Police Department, |
| 16:04:42 | 12 | prior to September 3rd, 2008, on deployment of a taser? |
| 16:04:45 | 13 | A    Yes. |
| 16:04:45 | 14 | Q    And who was that? |
| 16:04:47 | 15 | A    That was Sergeant Lux, L-U-X. |
| 16:04:50 | 16 | Q    Okay.  And anybody else, prior to September 3rd |
| 16:04:53 | 17 | of 2008, if you recall? |
| 16:04:55 | 18 | A    I don't know if it was before, but I've also |
| 16:04:58 | 19 | received instruction from Lieutenant Boddy, B-O-D-D-Y. |
| 16:05:03 | 20 | Q    Okay.  When you say you don't recall whether it |
| 16:05:06 | 21 | was before, are you talking about before September 3rd |
| 16:05:07 | 22 | of 2008 or after, in relation to Lieutenant Boddy? |
| 16:05:11 | 23 | A    I don't recall if it was before or after the |
| 16:05:14 | 24 | date of Mr. Tran's incident. |
| 16:05:16 | 25 | Q    Okay.  Why don't we -- and that's fine, but I'm |

151

| | | |
|---|---|---|
| 16:13:11 | 1 | people who may be under the influence of certain drugs? |
| 16:13:14 | 2 | A    Yes. |
| 16:13:15 | 3 | Q    Was -- were you taught that it was also a |
| 16:13:20 | 4 | potential for people who are suffering from mental |
| 16:13:23 | 5 | illness?  Was that also brought to your attention? |
| 16:13:26 | 6 | MR. SHERMAN:  Objection.  Vague. |
| 16:13:27 | 7 | You may answer. |
| 16:13:28 | 8 | THE WITNESS:  I don't recall if it was or not. |
| 16:13:30 | 9 | BY MR. HENNESSEY: |
| 16:13:38 | 10 | Q    Okay.  Did you receive any type of a |
| 16:13:41 | 11 | certification in the use of an X26 TASER, prior to |
| 16:13:44 | 12 | September 3rd of 2008? |
| 16:13:46 | 13 | A    No, I don't believe so. |
| 16:13:48 | 14 | Q    Okay.  Meaning, is there a completion of any |
| 16:13:53 | 15 | course that results in you receiving any type of |
| 16:13:58 | 16 | paperwork indicating proficiency in the X26, is there |
| 16:14:00 | 17 | any type of -- does that exist at the Garden Grove |
| 16:14:03 | 18 | Police Department, to your knowledge? |
| 16:14:04 | 19 | A    Not to my knowledge. |
| 16:14:05 | 20 | Q    Is there any type of continuing training |
| 16:14:11 | 21 | requirements since June 2007 on the X- -- between |
| 16:14:16 | 22 | June 2007 and September 2008, do you remember any |
| 16:14:19 | 23 | continuing training on the X- -- on the deployment of |
| 16:14:24 | 24 | the X26 model? |
| 16:14:26 | 25 | MR. SHERMAN:  Objection.  Vague. |

160

16:14:27  1             You may answer.

16:14:28  2             THE WITNESS:  Not that I can -- pardon me.  Not

16:14:31  3  that I can recall, no.

16:14:32  4  BY MR. HENNESSEY:

16:14:34  5      Q    Do you ever remember receiving any written

16:14:35  6  materials during any of Sergeant Bowers' or

16:14:37  7  Sergeant Lux's training on the X26?

16:14:41  8      A    Not that I can recall, no.

16:14:42  9      Q    Have you looked for any since this case began?

16:14:46  10     A    No.

16:14:47  11     Q    Okay.  Do you remember seeing (sic) any

16:15:08  12  training from anybody from TASER International at any

16:15:12  13  time prior to September of 2008?

16:15:16  14            MR. SHERMAN:  Objection.  Vague.

16:15:16  15  BY MR. HENNESSEY:

16:15:18  16     Q    Any trainers from outside the Garden Grove

16:15:22  17  Police Department?

16:15:22  18     A    None that I can recall, no.

16:15:24  19     Q    Okay.  Did you go to any conferences or

16:15:29  20  anything in Arizona or any other locations that

16:15:31  21  specifically address the X26 model TASER?

16:15:35  22     A    No.

16:15:35  23     Q     Is it your testimony that the only formal

16:15:40  24  training you received on the X26 TASER came from -- I'm

16:15:46  25  sorry, prior to September 3rd of 2008, came from

161

**HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398**
**151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626**

16:37:01   1          Q    And that certain clothing would also indicate

16:37:04   2     that somebody's not armed, correct?

16:37:08   3          A    Yes.

16:37:08   4          Q    And in this case you just don't have any idea

16:37:10   5     one way or the other?

16:37:11   6               MR. SHERMAN:   Objection.   Vague.   One way or

16:37:14   7     the other about what?

16:37:15   8               MR. HENNESSEY:   About how he was dressed,

16:37:16   9     whether it was consistent with concealing weapons or

16:37:17  10     anything like that.

16:37:17  11     BY MR. HENNESSEY:

16:37:17  12          Q    True?

16:37:20  13          A    I'm sorry, I --

16:37:21  14          Q    Do you recall anything about the manner in

16:37:23  15     which he was dressed that caused you to have concerns

16:37:26  16     that he may be concealing a weapon under his clothing?

16:37:29  17          A    Not that I can recall.

16:37:32  18          Q    Do you recall ever having a conversation with

16:37:35  19     Officer Karschamroon (pronouncing) -- Karschamroon

16:37:37  20     (pronouncing) as to whether he had patted down Mr. Tran,

16:37:39  21     prior to the time you deployed a taser on him?

16:37:44  22          A    No.

16:37:44  23          Q    When you say "no," are you saying that you did

16:37:47  24     not have that conversation or do not recall having that

16:37:50  25     conversation?

174

| | |
|---|---|
| 16:37:50 | 1 |
| 16:37:51 | 2 |
| 16:37:54 | 3 |
| 16:37:58 | 4 |
| 16:37:59 | 5 |
| 16:37:59 | 6 |
| 16:38:00 | 7 |
| 16:38:04 | 8 |
| 16:38:06 | 9 |
| 16:38:09 | 10 |
| 16:38:13 | 11 |
| 16:38:13 | 12 |
| 16:38:14 | 13 |
| 16:38:15 | 14 |
| 16:38:16 | 15 |
| 16:38:16 | 16 |
| 16:38:20 | 17 |
| 16:38:23 | 18 |
| 16:38:27 | 19 |
| 16:38:29 | 20 |
| 16:38:33 | 21 |
| 16:38:35 | 22 |
| 16:38:36 | 23 |
| 16:38:39 | 24 |
| 16:38:42 | 25 |

1    A    I do not recall having that conversation.

2    Q    Would that be something that you would

3    ordinarily ask a partner, whether this person's been

4    patted down for weapons?

5    A    Yes.

6    Q    Okay.  Is there any reason that you can think

7    of why you wouldn't ask Officer Karschamroon that type

8    of question in this particular type of situation where

9    there had been an indication of weapons in the call?

10         MR. SHERMAN:  Objection.  Argumentative;

11    assumes facts not in evidence; calls for possible

12    speculation; compound.

13         You may answer.

14         THE WITNESS:  Yes.

15    BY MR. HENNESSEY:

16    Q    What was the reason why you may not ask

17    Officer Kar- -- why wouldn't you ask

18    Officer Karschamroon whether Mr. Tran had been patted

19    down, prior to deploying a taser on him?

20    A    When I arrived on scene, I saw that

21    Officer Karschamroon had both hands engaged on the

22    subject's arms and he told me that he tensed up -- that

23    he was tensed up and that he couldn't get Mr. Tran's

24    hands behind his back into a handcuffing position.

25         At that point that became my sole focus was to

175

| | | |
|---|---|---|
| 16:38:45 | 1 | gain control of -- further control of Mr. Tran's hands |
| 16:38:50 | 2 | and not necessarily whether or not he had been patted |
| 16:38:53 | 3 | down yet. |
| 16:38:54 | 4 | Q    Were you concerned about weapons? |
| 16:38:54 | 5 | A    Yes. |
| 16:38:55 | 6 | Q    Okay.  Did you ask Officer Karschamroon whether |
| 16:38:55 | 7 | he had done anything to determine whether Mr. Tran had |
| 16:38:58 | 8 | any weapons? |
| 16:38:59 | 9 | A    No. |
| 16:38:59 | 10 | Q    Why not? |
| 16:39:00 | 11 | MR. SHERMAN:  Objection.  Argumentative; |
| 16:39:02 | 12 | irrelevant. |
| 16:39:03 | 13 | You may answer. |
| 16:39:04 | 14 | THE WITNESS:  Again, my focus became gaining |
| 16:39:07 | 15 | control of his hands so that he would not be able to |
| 16:39:16 | 16 | reach for any potential weapons. |
| 16:39:16 | 17 | BY MR. HENNESSEY: |
| 16:39:16 | 18 | Q    Okay.  And you did gain control of his hands, |
| 16:39:16 | 19 | correct? |
| 16:39:16 | 20 | MR. SHERMAN:  Objection.  Vague and ambiguous; |
| 16:39:17 | 21 | overbroad in both scope and time. |
| 16:39:17 | 22 | BY MR. HENNESSEY: |
| 16:39:18 | 23 | Q    Prior to the time you tasered him, you did gain |
| 16:39:21 | 24 | control over his hands, correct? |
| 16:39:23 | 25 | MR. SHERMAN:  Same objections. |

176

| | | |
|---|---|---|
| 16:39:23 | 1 | THE WITNESS:  We had some control. |
| 16:39:25 | 2 | BY MR. HENNESSEY: |
| 16:39:25 | 3 | Q    Okay.  What does that mean? |
| 16:39:26 | 4 | A    It meant that Officer Karschamroon was holding |
| 16:39:26 | 5 | his wrists, but that doesn't diminish the possibility to |
| 16:39:31 | 6 | being able to break away and swing his arms. |
| 16:39:33 | 7 | Q    Okay.  Had Officer Karschamroon indicated that |
| 16:39:37 | 8 | -- that anything like that had ever happened yet? |
| 16:39:39 | 9 | A    No. |
| 16:39:39 | 10 | Q    Okay.  Did you see Mr. Tran make any movements |
| 16:39:42 | 11 | as if he was going to hit Officer Karschamroon? |
| 16:39:46 | 12 | MR. SHERMAN:  Vague. |
| 16:39:47 | 13 | You may answer. |
| 16:39:47 | 14 | THE WITNESS:  No. |
| 16:39:48 | 15 | BY MR. HENNESSEY: |
| 16:39:48 | 16 | Q    Did he move his body in any fashion that led |
| 16:39:51 | 17 | you to believe that he was about to run? |
| 16:39:53 | 18 | MR. SHERMAN:  Objection.  Vague and ambiguous. |
| 16:39:54 | 19 | BY MR. HENNESSEY: |
| 16:39:55 | 20 | Q    Prior to the time you tasered him. |
| 16:39:57 | 21 | MR. SHERMAN:  It's overbroad. |
| 16:39:58 | 22 | You may answer. |
| 16:40:00 | 23 | THE WITNESS:  No. |
| 16:40:00 | 24 | BY MR. HENNESSEY: |
| 16:40:01 | 25 | Q    Okay.  Do you remember Mr. Tran doing anything |

177

| | | |
|---|---|---|
| 16:43:12 | 1 | BY MR. HENNESSEY: |
| 16:43:12 | 2 | Q    Was -- did Mr. Tran push you at all? |
| 16:43:16 | 3 | THE WITNESS:  No. |
| 16:43:15 | 4 | MR. SHERMAN:  Objection.  Vague. |
| 16:43:17 | 5 | BY MR. HENNESSEY: |
| 16:43:17 | 6 | Q    Okay.  Did he try to kick you? |
| 16:43:18 | 7 | A    No. |
| 16:43:19 | 8 | Q    Did he try to hit you? |
| 16:43:21 | 9 | A    No. |
| 16:43:22 | 10 | Q    Okay.  His appearance was that of somebody who |
| 16:43:25 | 11 | appeared to be sick, correct? |
| 16:43:26 | 12 | MR. SHERMAN:  Objection.  Vague. |
| 16:43:28 | 13 | BY MR. HENNESSEY: |
| 16:43:29 | 14 | Q    I mean, you're saying that he was growling, |
| 16:43:31 | 15 | drooling from the mouth, fists balled up behind his |
| 16:43:36 | 16 | head; he had a very blank stare on his face, didn't he? |
| 16:43:40 | 17 | A    Yes. |
| 16:43:41 | 18 | Q    He didn't seem to understand what you were |
| 16:43:43 | 19 | saying to him, did he? |
| 16:43:44 | 20 | MR. SHERMAN:  Objection.  Compound; |
| 16:43:45 | 21 | argumentative; vague and ambiguous. |
| 16:43:46 | 22 | THE WITNESS:  I don't know if he was |
| 16:43:46 | 23 | understanding. |
| 16:43:48 | 24 | BY MR. HENNESSEY: |
| 16:43:48 | 25 | Q    Did he appear to you to understand the |

182

| | | |
|---|---|---|
| 16:43:50 | 1 | directions that you were giving him? |
| 16:43:51 | 2 | A   He didn't appear that he wasn't understanding |
| 16:43:54 | 3 | them.  It didn't go either way. |
| 16:43:57 | 4 | Q   Did you say during your Internal Affairs |
| 16:43:57 | 5 | interview that Mr. Tran did not appear to understand |
| 16:44:02 | 6 | anything that you were saying, did you say that? |
| 16:44:03 | 7 | A   I did.  And I also stated that he didn't give |
| 16:44:06 | 8 | any indication that he did not understand. |
| 16:44:14 | 9 | Q   Okay.  So you acknowledge that you did say that |
| 16:44:14 | 10 | on the Internal Affairs, that he did not appear to |
| 16:44:15 | 11 | understand anything you were saying, you did say those |
| 16:44:18 | 12 | words, correct? |
| 16:44:18 | 13 | MR. SHERMAN:  Objection.  Argumentative.  The |
| 16:44:19 | 14 | document speaks for itself.  Or at least the audio does. |
| 16:44:21 | 15 | I don't know how accurate the document is, but I'm sure |
| 16:44:24 | 16 | it's fairly accurate. |
| 16:44:24 | 17 | BY MR. HENNESSEY: |
| 16:44:25 | 18 | Q   Do you recall saying words to that effect? |
| 16:44:27 | 19 | MR. SHERMAN:  Objection.  Asked and answered; |
| 16:44:27 | 20 | argumentative. |
| 16:44:28 | 21 | Go ahead.  You can answer. |
| 16:44:30 | 22 | THE WITNESS:  Again, I recall saying that.  And |
| 16:44:32 | 23 | I also recall stating that he also gave no indication |
| 16:44:34 | 24 | that he did not understand what I was saying. |
| 16:44:34 | 25 | /// |

183

| | | |
|---|---|---|
| 16:44:35 | 1 | BY MR. HENNESSEY: |
| 16:44:35 | 2 | Q   What about his actions led you to believe that |
| 16:44:37 | 3 | he did understand what you were saying?  What did he do |
| 16:44:41 | 4 | that led you to believe he did understand what you were |
| 16:44:45 | 5 | saying? |
| 16:44:45 | 6 | A   Nothing.  He wasn't complying with anything we |
| 16:44:47 | 7 | were telling him. |
| 16:44:47 | 8 | Q   How do you know what he did -- do you know |
| 16:44:49 | 9 | whether he complied with one order Officer Karschamroon |
| 16:44:50 | 10 | gave him before you came there? |
| 16:44:52 | 11 | MR. SHERMAN:  Objection.  Asked and answered. |
| 16:44:54 | 12 | THE WITNESS:  No. |
| 16:44:55 | 13 | BY MR. HENNESSEY: |
| 16:44:55 | 14 | Q   Because you never asked. |
| 16:44:57 | 15 | MR. SHERMAN:  Objection.  Argumentative; asked |
| 16:45:00 | 16 | and answered. |
| 16:45:00 | 17 | BY MR. HENNESSEY: |
| 16:45:02 | 18 | Q   What observation did you make that led you to |
| 16:45:05 | 19 | believe that Mr. Tran did understand your orders? |
| 16:45:09 | 20 | MR. SHERMAN:  Objection.  Asked and answered. |
| 16:45:12 | 21 | Go ahead. |
| 16:45:13 | 22 | THE WITNESS:  None. |
| 16:45:16 | 23 | BY MR. HENNESSEY: |
| 16:45:16 | 24 | Q   Was there anything about his demeanor or |
| 16:45:18 | 25 | behavior that led you to believe he did not understand |

184

| | |
|---|---|
| 16:46:36 | 1 |
| 16:46:36 | 2 |
| 16:46:44 | 3 |
| 16:46:49 | 4 |
| 16:46:51 | 5 |
| 16:46:54 | 6 |
| 16:46:54 | 7 |
| 16:46:57 | 8 |
| 16:46:57 | 9 |
| 16:46:57 | 10 |
| 16:47:00 | 11 |
| 16:47:03 | 12 |
| 16:47:08 | 13 |
| 16:47:10 | 14 |
| 16:47:10 | 15 |
| 16:47:11 | 16 |
| 16:47:12 | 17 |
| 16:47:13 | 18 |
| 16:47:15 | 19 |
| 16:47:18 | 20 |
| 16:47:22 | 21 |
| 16:47:25 | 22 |
| 16:47:30 | 23 |
| 16:47:30 | 24 |
| 16:47:30 | 25 |

BY MR. HENNESSEY:

Q    Okay.  Did you go behind Mr. Tran and place both your hands on his arms to try to control his left arm as you've previously described?

MR. SHERMAN:  Objection.  Vague as to "behind."

Go ahead.

THE WITNESS:  Not fully behind, I was more to the side.

BY MR. HENNESSEY:

Q    Okay.  So you were in front of -- you stood directly in front of him, you made the observations of his hands being balled up into fists, and then you moved to his side in order to grab both of his hands?

A    Yes.

MR. SHERMAN:  Objection.  Misstates.

BY MR. HENNESSEY:

Q    Is that the order that it happened in?

A    I'm sorry, can you repeat that.

Q    You indicated that you were standing directly in front of Mr. Tran when you observed that his hands -- his fingers were not interlaced and that his fists (sic) were bundled up into fists; those observations were made standing directly in front of him, correct?

MR. SHERMAN:  Objection.  Asked and answered.

You may answer it again.

187

| 16:53:54 | 1 | A     Maybe 30 to 60 seconds. |
| 16:53:57 | 2 | Q     Could it have been less than that? |
| 16:54:00 | 3 | MR. SHERMAN:  Objection.  Argumentative. |
| 16:54:02 | 4 | BY MR. HENNESSEY: |
| 16:54:02 | 5 | Q     When you say "30 to 60 seconds," where are you |
| 16:54:05 | 6 | coming up with that number? |
| 16:54:06 | 7 | A     With looking at all of my time to be able to |
| 16:54:11 | 8 | observe all of the symptoms that I had seen in Mr. Tran, |
| 16:54:14 | 9 | trying to talk to him to get him to comply, in addition |
| 16:54:26 | 10 | to -- with -- my time from exiting my car to get up to |
| 16:54:26 | 11 | Mr. Tran and Officer Karschamroon.  My attempt to get |
| 16:54:26 | 12 | his hands behind his back, physically, and then another |
| 16:54:29 | 13 | attempt, after that, to go back in front of him and try |
| 16:54:32 | 14 | to talk to him again. |
| 16:54:33 | 15 | Q     From your observations of Officer Karschamroon, |
| 16:54:35 | 16 | did he seem to be in a position to observe you placing |
| 16:54:38 | 17 | your hands on Mr. Tran? |
| 16:54:40 | 18 | MR. SHERMAN:  Objection. |
| 16:54:40 | 19 | BY MR. HENNESSEY: |
| 16:54:41 | 20 | Q     From where you observed him to be, did he seem |
| 16:54:43 | 21 | to be in a position to be able to see you placing your |
| 16:54:47 | 22 | hands on Mr. Tran? |
| 16:54:48 | 23 | MR. SHERMAN:  Objection.  Asked and answered; |
| 16:54:49 | 24 | calls for possible speculation; assumes facts not in |
| 16:54:52 | 25 | evidence; lacks foundation. |

197

| | | |
|---|---|---|
| 17:03:07 | 1 | jogged over to his location. |
| 17:03:09 | 2 | Q    Okay. |
| 17:03:15 | 3 | A    But I wasn't more than a few steps from my car |
| 17:03:19 | 4 | when I started jogging. |
| 17:03:21 | 5 | Q    Okay.  Did you see an elderly man and woman |
| 17:03:23 | 6 | come out of the house, prior to the time you tasered |
| 17:03:26 | 7 | Mr. Tran? |
| 17:03:27 | 8 | A    I could see that they were near the front door. |
| 17:03:29 | 9 | Q    Did you also see a small child near the front |
| 17:03:33 | 10 | door, prior to the time that you tasered Mr. Tran? |
| 17:03:35 | 11 | A    I could see that he was also by the front door. |
| 17:03:38 | 12 | Q    Okay.  Did you make any efforts whatsoever to |
| 17:03:40 | 13 | attempt to get his mother or father over to try to calm |
| 17:03:43 | 14 | Mr. Tran down? |
| 17:03:44 | 15 | A    No. |
| 17:03:44 | 16 | MR. SHERMAN:  Objection.  Relevancy; |
| 17:03:47 | 17 | materiality. |
| 17:03:47 | 18 | BY MR. HENNESSEY: |
| 17:03:48 | 19 | Q    Okay.  Why not? |
| 17:03:49 | 20 | MR. SHERMAN:  Argumentative now. |
| 17:03:50 | 21 | Go ahead. |
| 17:03:50 | 22 | THE WITNESS:  Again, because I did not know |
| 17:03:53 | 23 | whether or not he had any weapons on him.  Also, I |
| 17:03:57 | 24 | didn't want to put them in any potential undue danger. |
| 17:04:00 | 25 | /// |

207

| | | |
|---|---|---|
| 17:05:42 | 1 | A    Yes. |
| 17:05:43 | 2 | Q    Okay.  How long did that go on for? |
| 17:05:45 | 3 | MR. SHERMAN:  Objection.  Asked and answered. |
| 17:05:45 | 4 | Go ahead. |
| 17:05:47 | 5 | THE WITNESS:  Approximately five to ten |
| 17:05:48 | 6 | seconds. |
| 17:05:48 | 7 | BY MR. HENNESSEY: |
| 17:05:49 | 8 | Q    Okay.  How long did you have your hands on |
| 17:05:53 | 9 | Mr. Tran's body, total, prior to the time you tasered |
| 17:06:00 | 10 | him? |
| 17:06:00 | 11 | A    Again, approximately five to ten seconds. |
| 17:06:00 | 12 | Q    Okay.  And what was happening during that five |
| 17:06:02 | 13 | to ten seconds?  Describe everything you did with your |
| 17:06:05 | 14 | hands, or any other part of your body, to Mr. Tran |
| 17:06:08 | 15 | during that five to ten seconds. |
| 17:06:10 | 16 | MR. SHERMAN:  Objection.  Compound; vague. |
| 17:06:12 | 17 | Go ahead. |
| 17:06:13 | 18 | THE WITNESS:  I, again, moved to his left side, |
| 17:06:15 | 19 | placed both my hands around his left wrist, I attempted |
| 17:06:18 | 20 | to apply pressure to the interior of his wrist, hoping |
| 17:06:22 | 21 | that that pain would cause him to loosen his arm and |
| 17:06:25 | 22 | move it in the direction that I want -- that I was |
| 17:06:26 | 23 | pulling. |
| 17:06:27 | 24 | BY MR. HENNESSEY: |
| 17:06:27 | 25 | Q    Okay.  Were you able to get any movement? |

210

| | |
|---|---|
| 17:13:29 | 1 |
| 17:13:29 | 2 |
| 17:13:33 | 3 |
| 17:13:34 | 4 |
| 17:13:34 | 5 |
| 17:13:37 | 6 |
| 17:13:39 | 7 |
| 17:13:40 | 8 |
| 17:13:42 | 9 |
| 17:13:43 | 10 |
| 17:13:44 | 11 |
| 17:13:44 | 12 |
| 17:13:44 | 13 |
| 17:13:47 | 14 |
| 17:13:50 | 15 |
| 17:13:53 | 16 |
| 17:13:53 | 17 |
| 17:13:54 | 18 |
| 17:13:55 | 19 |
| 17:13:55 | 20 |
| 17:13:57 | 21 |
| 17:14:00 | 22 |
| 17:14:04 | 23 |
| 17:14:05 | 24 |
| 17:14:06 | 25 |

A      Correct.

Q      He never advanced on you in an aggressive

fashion, correct?

A      Correct.

Q      He never attempted to do anything that in your

mind appeared to be aggressive towards

Officer Karschamroon, correct?

        MR. SHERMAN:  Objection.  Vague; misstates

prior testimony.

        Go ahead.

        THE WITNESS:  No.

BY MR. HENNESSEY:

Q      Okay.  He didn't appear to make any motions as

if he was going to try to flee while you were standing

in front of him warning of him about using the taser,

correct?

        MR. SHERMAN:  Objection.  Asked and answered.

        Go ahead.

        THE WITNESS:  No.

BY MR. HENNESSEY:

Q      So that was the only available way of subduing

him, in your mind, was to taser him at that point,

correct?

A      Yes.

Q      Why did you choose the leg?

220

| | | |
|---|---|---|
| 17:17:00 | 1 | BY MR. HENNESSEY: |
| 17:17:01 | 2 | Q    Iraq, Afghanistan, both? |
| 17:17:04 | 3 | A    I don't know. |
| 17:17:05 | 4 | Q    Okay.  Why didn't you back off and wait for |
| 17:17:11 | 5 | other officers to arrive? |
| 17:17:13 | 6 | MR. SHERMAN:  Objection.  Relevancy; |
| 17:17:14 | 7 | argumentative; materiality. |
| 17:17:16 | 8 | Go ahead. |
| 17:17:16 | 9 | THE WITNESS:  Because if we let go of his |
| 17:17:18 | 10 | hand -- |
| 17:17:18 | 11 | MR. SHERMAN:  Did I say irrelevant? |
| 17:17:18 | 12 | Go ahead.  No, you can answer. |
| 17:17:20 | 13 | THE WITNESS:  If we let go of his hands, then |
| 17:17:23 | 14 | he had one handcuff with a free-swinging metal object on |
| 17:17:26 | 15 | his wrist. |
| 17:17:26 | 16 | BY MR. HENNESSEY: |
| 17:17:27 | 17 | Q    But he had never swung or made any aggressive |
| 17:17:30 | 18 | moves towards either one of you up to that point in |
| 17:17:33 | 19 | time, had he? |
| 17:17:33 | 20 | MR. SHERMAN:  Objection.  Argumentative; asked |
| 17:17:34 | 21 | and answered; irrelevant; materiality. |
| 17:17:35 | 22 | Go ahead. |
| 17:17:36 | 23 | THE WITNESS:  No, but essentially we would be |
| 17:17:38 | 24 | arming him to do so. |
| 17:17:39 | 25 | /// |

225

| | |
|---|---|
| 18:13:27 | 1 |
| 18:13:28 | 2 |
| 18:13:28 | 3 |
| 18:13:31 | 4 |
| 18:13:32 | 5 |
| 18:13:32 | 6 |
| 18:13:33 | 7 |
| 18:13:34 | 8 |
| 18:13:36 | 9 |
| 18:13:39 | 10 |
| 18:13:43 | 11 |
| 18:13:47 | 12 |
| 18:13:48 | 13 |
| 18:13:48 | 14 |
| 18:13:51 | 15 |
| 18:13:54 | 16 |
| 18:13:58 | 17 |
| 18:13:59 | 18 |
| 18:14:00 | 19 |
| 18:14:03 | 20 |
| 18:14:07 | 21 |
| 18:14:09 | 22 |
| 18:14:11 | 23 |
| 18:14:14 | 24 |
| 18:14:15 | 25 |

1 argumentative.

2          Go ahead.

3          THE WITNESS:  No, I've heard it explained as

4 using the reasonable -- you know, a reasonable amount of

5 force to --

6 BY MR. HENNESSEY:

7     Q    Have you -- I'm sorry, go ahead.

8     A    -- to gain control.

9     Q    Have you been trained that you should use the

10 least amount of force necessary consistent with the

11 factual situation that you are faced with?

12          MR. SHERMAN:  Objection.  Asked and answered.

13          You may answer it.

14          THE WITNESS:  Again, when you have several

15 options that are perceived to be the same level of

16 force, any one of them, you know, is considered a

17 reasonable and is an available option to you.

18 BY MR. HENNESSEY:

19     Q    At the time that you deployed your taser

20 against Mr. Tran, he was not actively resisting in any

21 fashion at that moment, was he?

22          MR. SHERMAN:  Objection.  Argumentative;

23 incomplete hypothetical; assumes facts not in evidence;

24 misstates prior testimony.

25          You may answer.

264

| | |
|---|---|
| 18:15:02 | 1 |
| 18:15:06 | 2 |
| 18:15:08 | 3 |
| 18:15:10 | 4 |
| 18:15:12 | 5 |
| 18:15:13 | 6 |
| 18:15:15 | 7 |
| 18:15:16 | 8 |
| 18:15:16 | 9 |
| 18:15:19 | 10 |
| 18:15:23 | 11 |
| 18:15:23 | 12 |
| 18:15:25 | 13 |
| 18:15:26 | 14 |
| 18:15:27 | 15 |
| 18:15:28 | 16 |
| 18:15:28 | 17 |
| 18:15:31 | 18 |
| 18:15:35 | 19 |
| 18:15:36 | 20 |
| 18:15:37 | 21 |
| 18:15:39 | 22 |
| 18:15:40 | 23 |
| 18:15:42 | 24 |
| 18:15:47 | 25 |

BY MR. HENNESSEY:

    Q    Okay.  You did not see him do anything aggressive towards Officer Karschamroon at the moment you deployed the taser against him, correct?

        MR. SHERMAN:  Vague.

        You may answer.

        THE WITNESS:  Correct.

BY MR. HENNESSEY:

    Q    You did not see him do anything aggressive towards you at the moment you deployed the taser, correct?

        MR. SHERMAN:  For some reason I want to say these are asked and answered.

        But go ahead.

        THE WITNESS:  No, sir.

BY MR. HENNESSEY:

    Q    Okay.  Have you been trained to let a situation play itself out without the use of force, if possible?

        MR. SHERMAN:  Objection.  Vague and ambiguous.

BY MR. HENNESSEY:

    Q    Have you ever been trained in that role as a police officer by anybody?

        MR. SHERMAN:  Objection.  Vague and ambiguous; incomplete hypothetical; irrelevant; argumentative; immaterial.

266

| | |
|---|---|
| 18:27:20 | 1 |
| 18:27:23 | 2 |
| 18:27:23 | 3 |
| 18:27:25 | 4 |
| 18:27:29 | 5 |
| 18:27:32 | 6 |
| 18:27:33 | 7 |
| 18:27:34 | 8 |
| 18:27:38 | 9 |
| 18:27:42 | 10 |
| 18:27:45 | 11 |
| 18:27:47 | 12 |
| 18:27:50 | 13 |
| 18:27:52 | 14 |
| 18:27:52 | 15 |
| 18:27:55 | 16 |
| 18:27:58 | 17 |
| 18:28:00 | 18 |
| 18:28:01 | 19 |
| 18:28:12 | 20 |
| 18:28:17 | 21 |
| 18:28:20 | 22 |
| 18:28:22 | 23 |
| 18:28:28 | 24 |
| 18:28:29 | 25 |

one to two minutes after I had gone on scene.

BY MR. HENNESSEY:

Q    If you had told Officer -- Sergeant Wagner that you arrived on scene at 1136 and called the fire department at 1138, is that consistent with the timing as you recall it?

A    Yes.

Q    And if Officer Wagner had indicated you requested a supervisor to respond at 1146, is that consistent or inconsistent with your recollection of the events?

A    My recollection -- that would be inconsistent. My recollection is that I asked for them at the same time.

Q    Okay.  So if in fact you called for a supervisor eight minutes later after the tasering incident, that's different than you remember, correct?

A    Correct.

Q    Okay.  Do you remember approximately how much time passed from the time that you tasered Mr. Tran until the time that you first noticed a medical personnel was on scene?

A    I would estimate it at maybe a minute to a minute and 15.

Q    So you believe from the time of the tasering

280

| | | |
|---|---|---|
| 18:41:26 | 1 | MR. SHERMAN:  Context. |
| 18:41:26 | 2 | THE REPORTER:  What was that? |
| 18:41:29 | 3 | MR. SHERMAN:  Context. |
| 18:41:29 | 4 | BY MR. HENNESSEY: |
| 18:41:31 | 5 | Q    Did you tell Sergeant Bailey that he was not |
| 18:41:34 | 6 | pulling away from you? |
| 18:41:36 | 7 | MR. SHERMAN:  Same objections. |
| 18:41:38 | 8 | THE WITNESS:  Correct. |
| 18:41:39 | 9 | BY MR. HENNESSEY: |
| 18:42:01 | 10 | Q    Did you ever hold your taser up in front of |
| 18:42:05 | 11 | Andy Tran's face to notify him that you had a weapon in |
| 18:42:08 | 12 | your hand? |
| 18:42:09 | 13 | MR. SHERMAN:  Objection.  Vague. |
| 18:42:11 | 14 | BY MR. HENNESSEY: |
| 18:42:11 | 15 | Q    Did you ever display the weapon to him so that |
| 18:42:14 | 16 | he could see it? |
| 18:42:15 | 17 | A    No. |
| 18:42:16 | 18 | Q    Why not? |
| 18:42:17 | 19 | A    I didn't feel it was necessary. |
| 18:42:20 | 20 | Q    Why not? |
| 18:42:21 | 21 | MR. SHERMAN:  Objection.  Argumentative. |
| 18:42:23 | 22 | THE WITNESS:  Because I was telling him that if |
| 18:42:26 | 23 | he didn't comply, I was going to have to tase him. |
| 18:42:28 | 24 | BY MR. HENNESSEY: |
| 18:42:29 | 25 | Q    Okay.  But you're not sure whether Andy Tran |

296

| 18:44:07 | 1 | understand the warning that you had given him?  Were you |
| 18:44:11 | 2 | concerned at all that he may not have understood the |
| 18:44:14 | 3 | warning that you were attempting to give him by saying, |
| 18:44:19 | 4 | I'm going to taser you? |
| 18:44:20 | 5 | MR. SHERMAN:  Relevancy; materiality. |
| 18:44:21 | 6 | Go ahead. |
| 18:44:21 | 7 | THE WITNESS:  That was a consideration. |
| 18:44:21 | 8 | BY MR. HENNESSEY: |
| 18:44:23 | 9 | Q    Okay.  So if it was a consideration, what, if |
| 18:44:23 | 10 | anything, did you do to make sure that he understood the |
| 18:44:26 | 11 | nature of the threat that you were making to him? |
| 18:44:29 | 12 | MR. SHERMAN:  Objection.  Calls for -- well, |
| 18:44:34 | 13 | assumes facts not in evidence; calls for speculation; |
| 18:44:35 | 14 | lacks foundation as to how he could be -- how he can |
| 18:44:38 | 15 | ensure that someone understood something. |
| 18:44:41 | 16 | You may answer it if you can. |
| 18:44:44 | 17 | Speculation. |
| 18:44:45 | 18 | Go ahead. |
| 18:44:45 | 19 | THE WITNESS:  I had made my decision based on |
| 18:44:45 | 20 | the fact that he hadn't responded to anything that we |
| 18:44:48 | 21 | had said to him, but still displayed the behavior that |
| 18:44:52 | 22 | he did display.  I didn't feel that it would be prudent |
| 18:44:56 | 23 | to spend time trying to make sure that he understood it |
| 18:45:09 | 24 | after I had given the warning several times. |
| 18:45:09 | 25 | /// |

299

| | |
|---|---|
| 18:46:38 | 1 |
| 18:46:42 | 2 |
| 18:46:44 | 3 |
| 18:46:46 | 4 |
| 18:46:49 | 5 |
| 18:46:52 | 6 |
| 18:46:55 | 7 |
| 18:46:57 | 8 |
| 18:46:59 | 9 |
| 18:46:59 | 10 |
| 18:47:01 | 11 |
| 18:47:02 | 12 |
| 18:47:03 | 13 |
| 18:47:05 | 14 |
| 18:47:05 | 15 |
| 18:47:06 | 16 |
| 18:47:08 | 17 |
| 18:47:08 | 18 |
| 18:47:11 | 19 |
| 18:47:16 | 20 |
| 18:47:17 | 21 |
| 18:47:19 | 22 |
| 18:47:19 | 23 |
| 18:47:21 | 24 |
| 18:47:21 | 25 |

       Q    Okay.  So he's on his back, his eyes were
closed, he has a rapid pulse, but you didn't see any
need for medical attention at that point in time?
            MR. SHERMAN:  Objection.  Vague and ambiguous;
irrelevant; argumentative.
            THE WITNESS:  I didn't believe there was any
help I could provide to him, other than trying to make
him more comfortable.
BY MR. HENNESSEY:
       Q    Okay.  And how did you try to make him more
comfortable?
       A    We sat him up.
       Q    Okay.  You felt that made him more comfortable?
            MR. SHERMAN:  Objection.  Argumentative.
            You may answer.
            THE WITNESS:  I believed it could have, yes.
BY MR. HENNESSEY:
       Q    Did you tell the Internal Affairs officer that
Mr. Tran never seemed to understand what was being told
to him?  Ever.
            MR. SHERMAN:  Objection.  The document speaks
for itself; foundation; speculation; vague and
ambiguous.
            Go ahead.
            THE WITNESS:  I said that he never gave any

                                                                        302

1     indication that he understood --
2                 THE REPORTER:  I'm sorry --
3                 THE WITNESS:  -- whether or not -- I'm sorry.
4                 THE REPORTER:  Say that again.  No, you.
5                 THE WITNESS:  Oh, I'm sorry.  I said that he
18:47:32  6     never gave any indication that he understood.  Whether
18:47:34  7     he understood or not, I don't know.
18:47:35  8     BY MR. HENNESSEY:
18:47:35  9          Q     There was nothing about what you observed that
18:47:37  10    led you to believe that he understood anything that you
18:47:39  11    told him, correct?
18:47:40  12         A     Correct.
18:47:41  13         Q     Did you tell -- did you place Mr. Tran against
18:47:51  14    Officer El-Farra's leg because you thought it may help
18:47:55  15    him breathe?
18:47:55  16         A     Yes.
18:47:56  17         Q     What about his breathing concerned you to the
18:47:58  18    point of trying -- of him needing help?  What was it
18:48:02  19    about the way that he was breathing that made you think
18:48:05  20    he needed help?
18:48:07  21         A     Well, again, he had very rapid breathing.  You
18:48:11  22    know, it was very heavy, very rapid, and we thought that
18:48:15  23    if we had put him up in a seated position that would
18:48:19  24    help him to relax and help him to calm down because he
18:48:22  25    would be a little more comfortable than laying on his

303

| | | |
|---|---|---|
| 18:49:11 | 1 | assumes facts not in evidence; it's compound. |
| 18:49:12 | 2 | Go ahead. |
| 18:49:13 | 3 | THE WITNESS:  Correct. |
| 18:49:14 | 4 | BY MR. HENNESSEY: |
| 18:49:14 | 5 | Q    Okay.  And you advised Internal Affairs on |
| 18:49:18 | 6 | September 23rd, 2008, that you had been advised of |
| 18:49:21 | 7 | Mr. Tran's prior history of mental health problems |
| 18:49:21 | 8 | before you arrived on scene, correct? |
| 18:49:26 | 9 | A    I don't recall -- |
| 18:49:26 | 10 | MR. SHERMAN:  Same objections. |
| 18:49:26 | 11 | THE WITNESS:  -- stating that. |
| 18:49:26 | 12 | BY MR. HENNESSEY: |
| 18:49:30 | 13 | Q    Okay.  You don't recall stating that? |
| 18:49:31 | 14 | A    I don't. |
| 18:49:35 | 15 | MR. SHERMAN:  I think he's going to show you |
| 18:49:37 | 16 | the statement.  Go to page 19. |
| 18:49:37 | 17 | BY MR. HENNESSEY: |
| 18:49:42 | 18 | Q    Nineteen. |
| 18:49:42 | 19 | A    Okay. |
| 18:49:44 | 20 | Q    When you were asked, Did you have any |
| 18:49:47 | 21 | indication there might have been any other serious |
| 18:49:48 | 22 | problems with him, Tran, at this point -- |
| 18:49:51 | 23 | MR. SHERMAN:  Where are you at, Counsel? |
| 18:49:53 | 24 | MR. HENNESSEY:  Yeah, I'm on -- they're not |
| 18:49:53 | 25 | numbered, but I'm about four lines -- |

305

| | |
|---|---|
| 18:50:51 | 1 |
| 18:50:51 | 2 |
| 18:50:51 | 3 |
| 18:50:52 | 4 |
| 18:50:53 | 5 |
| 18:50:56 | 6 |
| 18:50:57 | 7 |
| 18:50:58 | 8 |
| 18:51:00 | 9 |
| 18:51:01 | 10 |
| 18:51:03 | 11 |
| 18:51:03 | 12 |
| 18:51:05 | 13 |
| 18:51:05 | 14 |
| 18:51:08 | 15 |
| 18:51:10 | 16 |
| 18:51:11 | 17 |
| 18:51:11 | 18 |
| 18:51:11 | 19 |
| 18:51:13 | 20 |
| 18:51:14 | 21 |
| 18:51:18 | 22 |
| 18:51:18 | 23 |
| 18:51:22 | 24 |
| 18:51:25 | 25 |

              MR. SHERMAN:  -- so whether or not he has all
the pages would possibly -- assumes facts not in
evidence.
              MR. HENNESSEY:  Yeah, that's true.
              MR. SHERMAN:  Calls for speculation.
              MR. HENNESSEY:  Okay.
              MR. SHERMAN:  Okay.  What he was reading for
you, even though it's on his page 19, is apparently on
this page 18?
              THE WITNESS:  Yes.
              MR. SHERMAN:  Okay.  Now, where were we, where
did it start, "um"?
              THE WITNESS:  Yes.  Right here (indicating).
              MR. SHERMAN:  Okay.  Go ahead.  I'm with you.
You know where he's picking up from?
              THE WITNESS:  Yes.
              MR. SHERMAN:  Go ahead.
              THE WITNESS:  I'm sorry, could you restate --
BY MR. HENNESSEY:
      Q    Do you recall having received some information
of a prior mental health history for Mr. Tran before
arrival?
      A    Just that he was described as "crazy" and that
it was -- I inferred that off of the fact that it was a
5150 type call.

307

18:53:32  1    to be a painful situation.  No.  I mean, I'm basing this
18:53:36  2    off of personal experiences.
18:53:37  3    BY MR. HENNESSEY:
18:53:37  4         Q    Your only personal experience and everything
18:53:40  5    you've been trained leads you to have the opinion that a
18:53:44  6    taser device is not painful?
18:53:46  7              MR. SHERMAN:  Objection.  Vague and ambiguous.
18:53:47  8    BY MR. HENNESSEY:
18:53:47  9         Q    Is that true?
18:53:48  10        A    Yes.
18:53:48  11        Q    You don't believe the taser device to be a
18:53:51  12   painful tool?
18:53:52  13             MR. SHERMAN:  Objection.  Argumentative; asked
18:53:54  14   and answered; irrelevant.
18:53:55  15             Go ahead.
18:53:55  16             THE WITNESS:  No, I do not.
18:53:57  17   BY MR. HENNESSEY:
18:54:00  18        Q    Okay.  And you didn't think, based upon
18:54:05  19   anything that you saw from Mr. Tran immediately after
18:54:08  20   the tasering event, that he was in any immediate need
18:54:11  21   for medical attention, correct?
18:54:13  22        A    Correct.
18:54:13  23             MR. SHERMAN:  Objection.  Vague.
18:54:14  24             Go ahead.
18:54:15  25   ///

310

| | | |
|---|---|---|
| 18:58:22 | 1 | A    I did not write one. |
| 18:58:24 | 2 | Q    Is that -- does that violate policies of the |
| 18:58:28 | 3 | Garden Grove Police Department about writing a police |
| 18:58:30 | 4 | report to document a tasering event? |
| 18:58:32 | 5 | MR. SHERMAN:  Objection.  Argumentative; |
| 18:58:34 | 6 | irrelevant; immaterial. |
| 18:58:36 | 7 | Go ahead. |
| 18:58:36 | 8 | THE WITNESS:  No, it does not. |
| 18:58:37 | 9 | BY MR. HENNESSEY: |
| 18:58:38 | 10 | Q    Why not? |
| 18:58:39 | 11 | MR. SHERMAN:  Objection.  Argumentative. |
| 18:58:41 | 12 | Go ahead. |
| 18:58:41 | 13 | THE WITNESS:  Because this is an instance in |
| 18:58:43 | 14 | which the Orange County D.A. investigative team was |
| 18:58:45 | 15 | responding to the scene and, per our policy, we do not |
| 18:58:50 | 16 | write reports in that instance, in that our statement to |
| 18:58:53 | 17 | the District Attorney's Office, if provided, would |
| 18:58:55 | 18 | suffice. |
| 18:58:56 | 19 | BY MR. HENNESSEY: |
| 18:58:57 | 20 | Q    Okay.  But in this case you didn't provide a |
| 18:58:59 | 21 | statement to the Orange County District Attorney's |
| 18:59:01 | 22 | Office, correct? |
| 18:59:02 | 23 | MR. SHERMAN:  Objection.  Relevancy; |
| 18:59:02 | 24 | materiality. |
| 18:59:05 | 25 | Go ahead. |

316

| | | |
|---|---|---|
| 18:59:05 | 1 | THE WITNESS:  No, I refused to. |
| 18:59:05 | 2 | BY MR. HENNESSEY: |
| 18:59:07 | 3 | Q    Okay.  And why did you refuse to provide a |
| 18:59:10 | 4 | statement to the Orange County District Attorney's |
| 18:59:10 | 5 | Office? |
| 18:59:10 | 6 | MR. SHERMAN:  Objection.  Irrelevant; |
| 18:59:12 | 7 | immaterial; possible Fifth Amendment violations; |
| 18:59:13 | 8 | possible attorney-client communications. |
| 18:59:16 | 9 | Go ahead. |
| 18:59:17 | 10 | THE WITNESS:  I was advised so by my attorney, |
| 18:59:20 | 11 | Saku Ethir. |
| 18:59:20 | 12 | BY MR. HENNESSEY: |
| 18:59:21 | 13 | Q    Okay.  If the policy is that you don't have to |
| 18:59:23 | 14 | write a police report in situations where the Orange |
| 18:59:27 | 15 | County District Attorney's Office is conducting their |
| 18:59:29 | 16 | own investigation, and you refuse to cooperate with |
| 18:59:32 | 17 | their investigation, wouldn't that make you required to |
| 18:59:35 | 18 | write your own report about the incident? |
| 18:59:37 | 19 | MR. SHERMAN:  Objection.  Argumentative; |
| 18:59:39 | 20 | foundation; assumes facts not in evidence; incomplete |
| 18:59:44 | 21 | hypothetical. |
| 18:59:44 | 22 | Go ahead. |
| 18:59:45 | 23 | THE WITNESS:  I was advised by Garden Grove |
| 18:59:49 | 24 | sergeants, as well as the investigators assisting the |
| 18:59:52 | 25 | Orange County District Attorney's Investigations Team |

317

| | | |
|---|---|---|
| 19:01:12 | 1 | argumentative; foundation. |
| 19:01:15 | 2 | Go ahead. |
| 19:01:15 | 3 | THE WITNESS:  No. |
| 19:01:16 | 4 | BY MR. HENNESSEY: |
| 19:01:16 | 5 | Q    Did Sergeant Wagner tell you not to write a |
| 19:01:19 | 6 | police report? |
| 19:01:19 | 7 | A    I don't recall if he did or not. |
| 19:01:21 | 8 | Q    Do you recall speaking to any other sergeants, |
| 19:01:23 | 9 | other than Sergeant Bailey and Sergeant Wagner, about |
| 19:01:25 | 10 | the incidents of September 3rd, 2008? |
| 19:01:36 | 11 | A    I do recall briefly running into the Crimes |
| 19:01:45 | 12 | Against Persons sergeant -- |
| 19:01:45 | 13 | THE REPORTER:  The who? |
| 19:01:46 | 14 | THE WITNESS:  Crimes Against Persons.  I can't |
| 19:01:47 | 15 | recall who the sergeant of that unit was at that time. |
| 19:01:48 | 16 | BY MR. HENNESSEY: |
| 19:01:48 | 17 | Q    What is the Crimes Against Persons Unit? |
| 19:01:51 | 18 | A    It is the investigations unit that investigates |
| 19:02:00 | 19 | all violent -- or all crimes committed against a person, |
| 19:02:03 | 20 | not involving solely property and property loss and |
| 19:02:08 | 21 | damage. |
| 19:02:08 | 22 | Q    You're talking about assaults with a deadly |
| 19:02:09 | 23 | weapon, homicides, things like that? |
| 19:02:11 | 24 | A    Yes. |
| 19:02:11 | 25 | Q    Do you believe that somebody from the -- a |

320

| | | |
|---|---|---|
| 19:03:44 | 1 | MR. SHERMAN:  So when was he told he shouldn't |
| 19:03:46 | 2 | write a report? |
| 19:03:47 | 3 | MR. HENNESSEY:  Yes. |
| 19:03:47 | 4 | THE WITNESS:  I believe it was later that day |
| 19:03:49 | 5 | after I had stated that I was not going to be providing |
| 19:03:53 | 6 | a statement to the District Attorney's Investigation |
| 19:03:56 | 7 | Team. |
| 19:03:56 | 8 | BY MR. HENNESSEY: |
| 19:03:56 | 9 | Q    Okay.  So this incident happens on |
| 19:04:00 | 10 | September 3rd, the district attorneys come and ask you |
| 19:04:04 | 11 | to provide a statement, you refuse.  And then after that |
| 19:04:07 | 12 | refusal, you speak to, potentially, Sergeant Peaslee, |
| 19:04:10 | 13 | who tells you not to write a police report about the |
| 19:04:15 | 14 | death of Andy Tran; is that the sequence of events? |
| 19:04:17 | 15 | MR. SHERMAN:  Objection.  Misstates testimony. |
| 19:04:19 | 16 | Go ahead. |
| 19:04:19 | 17 | THE WITNESS:  Yes, I believe so. |
| 19:04:21 | 18 | BY MR. HENNESSEY: |
| 19:04:21 | 19 | Q    Okay.  Did you ask why you shouldn't write a |
| 19:04:24 | 20 | police report about it?  Was there any -- was there any |
| 19:04:27 | 21 | back-and-forth communication with, potentially, |
| 19:04:29 | 22 | Sergeant Peaslee or this other -- or somebody else as to |
| 19:04:33 | 23 | why or why not -- why a report should be written or why |
| 19:04:38 | 24 | a report shouldn't be written? |
| 19:04:38 | 25 | MR. SHERMAN:  Relevancy; materiality; asked and |

323

| | | |
|---|---|---|
| 19:13:49 | 1 | MR. HENNESSEY:  I know I haven't. |
| 19:13:49 | 2 | MR. SHERMAN:  No, that's why I said "go ahead." |
| 19:13:50 | 3 | It doesn't matter, even if you had, I was going to let |
| 19:13:53 | 4 | him answer it anyway. |
| 19:13:53 | 5 | MR. HENNESSEY:  I'm looking at this and I'm |
| 19:13:56 | 6 | thinking, How haven't I asked that? |
| 19:13:57 | 7 | THE WITNESS:  Yes, I have. |
| 19:13:58 | 8 | BY MR. HENNESSEY: |
| 19:13:58 | 9 | Q    Okay.  And specifically in relation to -- what |
| 19:14:01 | 10 | had you been trained, prior to September 3rd, as to -- |
| 19:14:03 | 11 | are symptoms of somebody -- well, was there anything |
| 19:14:05 | 12 | about the way Andy Tran was acting that led you to |
| 19:14:10 | 13 | believe that he was under the influence of anything? |
| 19:14:12 | 14 | A    Yes. |
| 19:14:14 | 15 | Q    What did you believe he may be under the |
| 19:14:16 | 16 | influence of? |
| 19:14:17 | 17 | A    I believed that it could have been some type of |
| 19:14:22 | 18 | controlled substance, particularly a stimulant.  And I |
| 19:14:25 | 19 | based that based off of, you know, his shaking, the foam |
| 19:14:33 | 20 | that was forming at the corner of his mouth.  And |
| 19:14:34 | 21 | particularly the dilatation of his pupils, given the |
| 19:14:41 | 22 | lighting conditions. |
| 19:14:41 | 23 | Q    So it was the shaking, the foaming at the |
| 19:14:44 | 24 | mouth, the dilation of the pupils that led you to |
| 19:14:47 | 25 | believe that he may be under the influence of a central |

327

| | | |
|---|---|---|
| 19:14:47 | 1 | nervous system stimulant? |
| 19:14:50 | 2 | A   Yes. |
| 19:14:51 | 3 | Q   And when you say central nervous system |
| 19:14:53 | 4 | stimulant, are you talking about substances such as |
| 19:14:54 | 5 | methamphetamine? |
| 19:14:55 | 6 | A   Yes. |
| 19:14:55 | 7 | Q   Cocaine? |
| 19:14:56 | 8 | A   Yes. |
| 19:14:57 | 9 | Q   And all derivatives of cocaine? |
| 19:15:00 | 10 | A   Yes. |
| 19:15:00 | 11 | Q   Okay. |
| 19:15:00 | 12 | MR. SHERMAN:  Like crack? |
| 19:15:01 | 13 | MR. HENNESSEY:  Crack, exactly.  Smoking, |
| 19:15:04 | 14 | whatever. |
| 19:15:04 | 15 | BY MR. HENNESSEY: |
| 19:15:04 | 16 | Q   As opposed to central nervous system |
| 19:15:08 | 17 | depressants such as heroin or opiates; is that what you |
| 19:15:12 | 18 | saw? |
| 19:15:12 | 19 | A   Yes. |
| 19:15:12 | 20 | Q   And is it your training that people who appear |
| 19:15:16 | 21 | to be under the influence of a central nervous system |
| 19:15:19 | 22 | stimulant are at a higher risk of sudden death from |
| 19:15:23 | 23 | excited delirium, is that one of the factors that you've |
| 19:15:26 | 24 | been trained to look for? |
| 19:15:27 | 25 | A   Yes. |

328

| | | |
|---|---|---|
| 19:15:27 | 1 | Q    Okay.  And you did see symptoms from Mr. Tran |
| 19:15:30 | 2 | that was consistent with central nervous system |
| 19:15:34 | 3 | stimulant usage and you still determined that deploying |
| 19:15:38 | 4 | a taser against him was appropriate? |
| 19:15:40 | 5 | MR. SHERMAN:  Objection.  Argumentative; |
| 19:15:42 | 6 | irrelevant. |
| 19:15:42 | 7 | Go ahead. |
| 19:15:43 | 8 | THE WITNESS:  Yes. |
| 19:15:43 | 9 | BY MR. HENNESSEY: |
| 19:15:44 | 10 | Q    Even though you understood that with subjects |
| 19:15:47 | 11 | such as him, based upon your training, there was a |
| 19:15:51 | 12 | chance of sudden death from the use of the taser, |
| 19:15:53 | 13 | correct? |
| 19:15:53 | 14 | MR. SHERMAN:  Objection.  Compound; it assumes |
| 19:15:55 | 15 | facts not in evidence; lacks foundation; incomplete |
| 19:15:57 | 16 | hypothetical. |
| 19:15:58 | 17 | Go ahead. |
| 19:15:58 | 18 | THE WITNESS:  Yes. |
| 19:15:59 | 19 | MR. HENNESSEY:  Okay.  I don't have anything |
| 19:16:01 | 20 | further. |
| 19:16:01 | 21 | MR. SHERMAN:  Nothing further.  Stipulation? |
| 19:16:03 | 22 | MR. HENNESSEY:  Can you make the stipulation? |
| 19:16:05 | 23 | MR. SHERMAN:  Sure. |
| 19:16:07 | 24 | THE REPORTER:  Slowly. |
| 19:16:11 | 25 | MR. SHERMAN:  I propose that we relieve the |

329

1                          CERTIFICATION

2                                OF

3                  CERTIFIED SHORTHAND REPORTER

4

5          I, STEPHANIE WILLIAMS, a Certified Shorthand

6     Reporter of the State of California, do hereby certify:

7          That the foregoing proceedings were taken before me

8     at the time and place herein set forth; that the witness

9     in the foregoing proceedings, prior to testifying, was

10    placed under oath; that a verbatim record of the

11    proceedings was made by me using machine shorthand which

12    was thereafter transcribed under my direction; further,

13    that the foregoing is an accurate transcription thereof.

14         I further declare that I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney of any of the parties.

17         In witness whereof, I have this date subscribed my

18    name _Stephanie Williams_____.

19

20              Dated:  March 28, 2011

21              Certificate Number 13482

22

23

24

25

                                                              336

**EXHIBIT D**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


QUYEN KIM DANG, et al.,      )   CASE NO. SACV10-03388DOC
                             )             (MLGx)
              Plaintiffs,    )
                             )
      vs.                    )
                             )
CITY OF GARDEN GROVE, et     )
al.,                         )
                             )
              Defendants.    )
_____  )




VIDEOTAPED DEPOSITION OF

RICHARD I. FUKUMOTO, M.D.

Anaheim, California

Wednesday, May 25, 2011




REPORTED BY:  Jennifer K. Abe, CSR No. 10753
              Registered Professional Reporter


1

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4    QUYEN KIM DANG, et al.,    )  CASE NO. SACV10-03388DOC
                                 )              (MLGx)
 5              Plaintiffs,      )
                                 )
 6         vs.                   )
                                 )
 7    CITY OF GARDEN GROVE, et   )
      al.,                       )
 8                               )
                Defendants.      )
 9    _____)

10

11

12              Videotaped Deposition of RICHARD I. FUKUMOTO,

13    M.D., taken before Jennifer K. Abe, a Certified Shorthand

14    Reporter for the State of California, beginning at

15    10:25 a.m. and ending at 1:37 p.m., on Wednesday, May 25,

16    2011, at Richards, Fischer, Fukumoto Medical Group, Inc.,

17    1240 South State College Boulevard, Suite 135, Anaheim,

18    California.

19

20

21

22

23

24

25
```

2

```
1       APPEARANCES OF COUNSEL:

2       FOR PLAINTIFF:

3               LAW OFFICES OF SEAN HENNESSEY
                BY:  SEAN HENNESSEY, ESQ.
4               8231Westminster Boulevard
                Westminster, California  92683
5               TEL:  (949) 280-1257  FAX:  (714) 898-7449

6                       - and -

7               LAW OFFICES OF LIEM H. DO & ASSOCIATES
                BY:  PAUL MINHTHU PHAM, ESQ.
8               8231 Westminster Boulevard
                Westminster, California  92683
9               TEL:  (714) 898-7579

10

11      FOR DEFENDANT CITY OF GARDEN GROVE, ET AL.:

12              LAW OFFICES OF FERGUSON, PRAET &SHERMAN
                BY:  STEVEN SHERMAN, ESQ.
13              1631 East 18th Street
                Santa Ana, California  92705
14              TEL:  (714) 953-5300

15      ALSO PRESENT:

16              TIM NOLAN, LEGAL VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

3

1    been busy.

2              MR. HENNESSEY:  Very unfortunately.

3    BY MR. HENNESSEY:

4        Q    Okay.  And since 1965, it appears that most,

10:39:52  5   if not all, of your professional experiences appeared

6    to be in the field of pathology?

7              Would that be accurate?

8        A    Yes, exclusively in pathology.

9        Q    Have you ever practiced in any other

10:40:06 10   capacity, other than a pathologist, such as a family

11   physician, a -- any other field, you know, oncology

12   or, you know, any other field of medicine other than

13   pathology?

14       A    No.  Since I became board certified, no,

10:40:27 15   I've been exclusively doing anatomical, clinical, and

16   forensic pathology.

17       Q    How would you describe anatomical pathology?

18       A    Anatomical pathology is that sub-specialty

19   in pathology where the pathologist examines tissues,

10:40:52 20   biopsies, and specimen taken from hospitals.

21             He's also in charge of running the hospital

22   pathology laboratory, and basically that's what the

23   analytical pathologist does.

24       Q    Okay.  So in order to be an anatomical

10:41:14 25   pathologist, I'm assuming that you have to have

17

1    Q    -- just things that would commonly -- more

2    common things that -- well, can you think of any

3    other type of accidental deaths?

4            MR. SHERMAN:   Objection; vague and

10:51:58   5    ambiguous; overbroad.

6    BY MR. HENNESSEY:

7    Q    Anything that you've described as an

8    accidental death.

9            How many autopsies have you performed, do

10:52:04   10   you think, over the course of your career?

11   A    You really don't want to know.

12   Q    I know I probably would be shocked and awed

13   by it, but --

14   A    At least 15,000.

10:52:14   15   Q    15,000.  Okay.

16           And that, I'm assuming, began in

17   approximately 1965?

18   A    Well, I was doing it even before that in the

19   service and also during my training, I was doing

10:52:28   20   autopsies.

21   Q    Okay.  When you say "15,000," are you

22   talking 15,000 where you were the primary pathologist

23   as opposed to, you know, being the secondary doctor

24   there watching or observing?

10:52:43   25           Are you talking about being the primary at

26

1    somebody fired a gun into the ground and it

2    ricocheted and went into the garage across the street

3    and killed the person.

4         A    That is correct.

10:56:40  5         Q    Is that what you're talking about; that

6    there is not just merely the medical evaluation, but

7    there is also a secondary report, reviewing, and

8    discussions with investigating law enforcement

9    agencies or witnesses?  Is that --

10:56:53  10         A    That is how I was trained.  But in this

11   County, you know, with the manner of death, usually

12   it's not just the pathologist's job.  It is the

13   job -- and the coroner is actually the one who

14   designates the manner of death, not the pathologist.

10:57:13  15         Q    And where would you fall, as the coroner or

16   the pathologist, in the incident of Andy -- the

17   September 4th, 2008, autopsy that you performed on

18   Andy Tran, were you acting in the capacity as a

19   coroner, pathologist, a combination of the two?

10:57:31  20         A    Pathologist.

21         Q    Pathologist.  Okay.

22              And who would have been the coroner on

23   Mr. Tran's autopsy?

24         A    The coroner is Sheriff Hutchens.

10:57:48  25         Q    When you say "Sheriff Hutchens," would it be

30

```
 1          Q     Okay.

 2          A     I can't remember.

 3          Q     Have you dealt with many cases involving

 4    in-custody deaths of individuals following a

 5    deployment of a Taser device?

 6          A     My recollection, I've had at least three.

 7          Q     Okay.  And what time frame would you say

 8    these three investigations that you've done in

 9    relation to deaths following in close proximity to

10    the application of a Taser to a human?

11          A     At least two.

12          Q     Okay.  When you originally said "at least

13    three," now saying "two," as you sit here, are you

14    remembering the circumstances of the particular

15    cases?

16          Is your memory being refreshed as you kind

17    of sit here and think of --

18          A     Well, one in particular.

19          Q     Okay.  And which -- what one in -- what case

20    in particular can you remember involving a death

21    closely following a deployment of a Taser?

22          MR. SHERMAN:  Relevancy; immateriality.

23          THE WITNESS:  It's a San Bernardino case

24    that I was kind of asked to do by the sheriff as a

25    courtesy to San Bernardino since their pathologist
```

11:30:28  5
11:30:55 10
11:31:19 15
11:31:29 20
11:31:51 25

58

1    was not available.  I will always remember the case.

2    BY MR. HENNESSEY:

3        Q    Why will you always remember the case?

4        A    Because I got deposed by an attorney who

11:32:07  5    actually works with Taser.

6        Q    Would it be fair that it wasn't a pleasant

7    experience being questioned by the attorney from

8    Taser International?

9            MR. SHERMAN:  Objection; vague.

11:32:22  10           THE WITNESS:  I wouldn't say it's

11   unpleasant.  It just surprised me that the attorney

12   was from Taser, not from San Bernardino Sheriff's

13   Department.

14           MR. SHERMAN:  We probably should have a

11:32:35  15   Taser attorney here.

16           MR. HENNESSEY:  No need.

17   BY MR. HENNESSEY:

18       Q    Is there -- do you remember the name of that

19   attorney?

11:32:40  20       A    No, no.  I don't remember.

21       Q    If I were to tell you a name, do you think

22   that it may refresh your recollection?

23       A    I don't think so.

24       Q    Let me just try.

11:32:57  25       A    Because of some of the things he said, that

59

1    is why I remembered him.

2         Q    Did you have disagreements with that

3    attorney about his opinions -- your opinions on that

4    particular case?

11:33:14  5              MR. SHERMAN:  Objection; vague.

6              THE WITNESS:  I don't know, but his very

7    last question really upset me.

8    BY MR. HENNESSEY:

9         Q    And what was the -- what question was asked

11:33:27 10   that upset you?

11        A    He says, "Are you planning to represent

12   other clients against Taser?"

13             I said, "No.  I only get involved if I did

14   the autopsy."

11:33:44 15        Q    Why did that question upset you?

16        A    Why?

17        Q    I mean, given the number of times that

18   you've been questioned in court and proceedings, why

19   did that particular question upset you?

11:33:57 20             MR. SHERMAN:  Vague; irrelevant.

21             THE WITNESS:  It's the implication that I'm

22   paid to give opinion favorable to the person that --

23   BY MR. HENNESSEY:

24        Q    Did you give an opinion in that particular

11:34:11 25   case that was favorable or nonfavorable to Taser?

60

```
 1          A    Very unfavorable.

 2          Q    Okay.  Can you describe when that case

 3   occurred?

 4               MR. SHERMAN:  Relevancy; immateriality.

 5   BY MR. HENNESSEY:

 6          Q    The year of that case?

 7          A    All I know is Mike Carona was still sheriff.

 8   That's all I can say.  It's before Sheriff Hutchens.

 9          Q    Was it a case that went to a jury trial?

10          A    I have no idea what happened.

11          Q    Okay.  You were just deposed in an informal

12   environment such as this?

13          A    Yes.

14          Q    And do you remember approximately the year

15   that that occurred?

16          A    Well, when did -- it's during -- I believe

17   it was during Mike Carona's first year, so --

18          Q    So do you have any idea what year that may

19   be?

20          A    No, Hutchens.

21          Q    Do you know the name of the San Bernardino

22   coroner who's been working out there for about

23   25 years?  What his name is?

24          A    Yes.

25          Q    An Irish guy.
```

Timestamps (left margin):
- 11:34:28 — line 5
- 11:34:44 — line 10
- 11:34:51 — line 15
- 11:35:10 — line 20
- 11:35:21 — line 25

61

1        A     The attributable cause of death, he died as

2   a result while Tasered.

3        Q     While Tasered?

4        A     Yes.

11:36:49  5      Q     That the Taser -- that the Taser device

6   played some role in that person's death, at least

7   according to your opinion?

8        A     He went into cardiac arrest.

9        Q     How soon -- I'm sorry.

11:37:01 10      A     He died.  He went into cardiac respiratory

11   arrest while being Tasered.

12       Q     Do you know how long after in that

13   particular case -- do you remember the name of that

14   case?

11:37:13 15      A     One thing I don't like to do is to remember

16   names.

17       Q     Okay.  Probably in your profession, that's a

18   good one.

19              You just remember it was -- what

11:37:25 20   jurisdiction was it out of?  Meaning --

21       A     San Bernardino.

22       Q     San Bernardino.

23              And you believe it was during the first --

24   do you remember the name of the attorney for the

11:37:34 25   plaintiff in that case, maybe not the attorney for

63

1      Q    Okay.

2      A    All I've done is look at some -- whenever

3  they have a video, you know, to show to the -- in the

4  sheriff's department, I may have attended them.

11:40:22  5  That's about it.

6      Q    Have you given any lectures to members of

7  the Orange County District Attorney's Office, any law

8  enforcement agency on the effects of Tasers on the

9  human body?

11:40:36 10      A    No.

11      Q    Have you ever been asked to?

12      A    No.

13      Q    I'm assuming if you put in your findings in

14  that particular case that at least one of the

11:40:56 15  contributory causes of that person's death was the

16  use of a Taser against him, you must have had some

17  information about Tasers; is that true?

18      A    Well, the report for the autopsy said that

19  he was Tasered.

11:41:06 20      Q    Okay.

21      A    And he had cardiac arrest immediately after

22  the Taser.

23      Q    Did you consider the proximity between

24  cardiac arrest and Taser, meaning the time frame

11:41:30 25  between cardiac arrest and Taser, to have some

66

1    influence on your opinion as to the Taser having

2    some -- having contributed in some manner to that

3    person's death?

4         A    Well, yes, because he never gained

11:41:46  5    consciousness after the Tasering.

6         Q    Okay.  Do you know where you received the

7    facts on this particular case?  Who provided you the

8    facts in this particular case of what happened?

9         A    It would be from Mr. Gomez.

11:42:11  10        Q    Okay.  And do you know -- as you sit here

11   today, do you know or do you remember what Mr. Gomez

12   told you happened prior to the time Mr. Tran -- when

13   I say "Mr. Tran," do you know who I'm talking about?

14        A    Yes.

11:42:28  15        Q    Okay.  How did Mr. Gomez describe to you

16   what happened prior to the deployment of a Taser, if

17   you recall?

18             MR. SHERMAN:  Objection; vague; overbroad in

19   scope and time; speculation, also.

11:42:43  20             THE WITNESS:  I really have a very vague

21   memory.  Without reading a report, I probably will

22   not be able.

23   BY MR. HENNESSEY:

24        Q    If I was able to provide you a report

11:42:52  25   prepared by Mr. Ernie Gomez that summarized his

67

1     A    It means that he's in cardiorespiratory

2     arrest.

3     Q    Is there any indication from the -- from the

4     paramedic records that you've seen there that

12:42:26  5     indicate that Mr. Tran was demonstrating labored

6     breathing?

7     A    No.

8     Q    Is there anything in the paramedic report

9     that indicates that Mr. Tran was not breathing at all

12:42:45  10    when the paramedics initially arrived?

11    A    Yes.  It means that he was not breathing at

12    all.

13    Q    And according to -- if I can just look at

14    it, according to the call incident history, it

12:42:59  15    appears that the paramedics were dispatched at 1139

16    and 38 seconds and arrived at 1143 and 12 seconds.

17          And is it your understanding that when they

18    arrived at the 1143 and 12 seconds, it was at or near

19    that time that they came across a lifeless Mr. Tran?

12:43:27  20          MR. SHERMAN:  Objection; speculation;

21    foundation; assumes facts not in evidence.

22          THE WITNESS:  Yes.  They arrived and the

23    individual, it says, was full cardiopulmonary arrest.

24    BY MR. HENNESSEY:

12:43:39  25    Q    What, if anything, does that potentially

90

1    death of the subject.

2            From reading the reports from the

3    paramedics, do you feel, based upon the time of the

4    Tasering event until the time of death, that the

12:45:44  5    Taser had something to do with the death of Andy

6    Tran?

7            MR. SHERMAN:  Objection; vague and

8    ambiguous; assumes facts not in evidence; calls for

9    speculation; lacks foundation.  It's compound.

12:46:04  10           THE WITNESS:  I would -- I would say that

11    the Tasering did not help the situation.

12    BY MR. HENNESSEY:

13        Q    Would you say that it likely contributed to

14    his death?

12:46:18  15           MR. SHERMAN:  Same objections.

16           THE WITNESS:  I would say it probably

17    contributed to the cardiac arrest.

18    BY MR. HENNESSEY:

19        Q    Would you say that it's more likely than not

12:46:28  20    that the Tasering event contributed to his death?

21           MR. SHERMAN:  Objection; assumes facts not

22    in evidence; lacks foundation; calls for speculation;

23    vague and ambiguous.

24           THE WITNESS:  Since the patient did not --

12:46:52  25    did not overcome the cardiac arrest according to the

92

```
 1    reports that I have read so far, I would say, yes.
 2    BY MR. HENNESSEY:
 3         Q    That it's more likely than not that the
 4    Tasering event caused the death of Mr. Tran --
 5              MR. SHERMAN:  Objection; assumes facts not
 6    in evidence.
 7    BY MR. HENNESSEY:
 8         Q    -- at least, in part?
 9         A    Yes.  I would say it may have contributed to
10    his cause of death.
11         Q    Would you say that it is more likely than
12    not that the Tasering event contributed to Mr. Tran's
13    death at the time that he ultimately did pass away?
14              MR. SHERMAN:  Same objections; vague and
15    ambiguous; assumes facts not in evidence; lacks
16    foundation; asked and answered.
17              THE WITNESS:  I still would like to see the
18    medical records.
19              MR. HENNESSEY:  Okay.  You know, given that
20    statement, I think this is probably a good point to
21    stop.
22              THE WITNESS:  Uh-huh.
23              MR. HENNESSEY:  And we'll get you those
24    medical records.
25              MR. SHERMAN:  Let me ask you one real quick
```

12:47:17 (line 5)
12:47:29 (line 10)
12:47:46 (line 15)
12:47:57 (line 20)
12:48:03 (line 25)

93

1    an enlarged heart?

2         A    Quite a bit.

3         Q    Which made him more susceptible to potential

4    cardiac events --

12:49:58  5         A    That is correct.

6         Q    -- than a normal person?

7         A    That is correct.

8         Q    Would you also agree that people with

9    enlarged hearts can die suddenly or they can also

12:50:09  10   live long and -- long lives?

11        A    That is correct.

12        Q    It's impossible to determine whether one

13   person who has the heart the size of Mr. Tran would

14   be a candidate for immediate death or whether he

12:50:23  15   could live into his 80s or 90s?  Fair?

16        A    That is correct.

17        Q    Okay.  And you are -- the cause of death in

18   this particular situation, when you use the term

19   "struggle," were you using the term "struggle" to

12:50:43  20   define the deployment of a Taser or was it your

21   understanding that there was more physical contact

22   between Mr. Tran and members of law enforcement or

23   was it simply the deployment of the Taser?

24        A    I would say it's everything.  In other

12:51:02  25   words, it was a confrontation, the Tasering, and

96

1    whatever happened.

2         Q     Okay.

3         A     This is why it's important that I look at

4    the whole chart.

12:51:09  5    Q     And fair enough.

6               But I just -- I just want to know, just

7    procedurally, do you believe that Mr. Tran died as a

8    result of a Diphenhydramine overdose?

9         A     No.

12:51:27 10    Q     Do you believe that the cause of his death

11   was caused by a Trihexyphenidyl overdose?

12        A     By themselves, the two medications of drugs

13   that you mentioned did not cause his death by

14   themselves.

12:51:46 15    Q     Okay.  Meaning if everything else was

16   normal, the level of Diphenhydramine in his system

17   would not have caused an overdose in and of itself?

18        A     That is correct.  He would not have died

19   from the combination effects of those drugs.

12:52:03 20    Q     Okay.

21              MR. SHERMAN:  Sorry.  Go ahead.

22   BY MR. HENNESSEY:

23        Q     So you do not -- your opinion is not that

24   the hypertrophic cardiomyopathy was a result of the

12:52:19 25   interaction of those two substances found in his

97

```
 1    system?

 2        A    No.  I think the two drugs that are

 3    mentioned in this report did not cause the enlarged

 4    heart.

 5        Q    Okay.  And it was not merely the enlarged

 6    heart that caused his death at the time that he died

 7    on 9/03/08 alone; correct?

 8        A    I would say no.  It is the circumstance, the

 9    events that occurred, causing his heart to become

10    overloaded.

11        Q    Meaning it wasn't a coincidence that here is

12    a guy with an enlarged heart who then got involved in

13    some type of alleged struggle with law enforcement

14    that resulted in a deployment of Taser, and he just

15    coincidently died of an enlarged heart, and the

16    police involvement had nothing to do with it?  Fair?

17            MR. SHERMAN:  Objection; compound; vague;

18    assumes facts not in evidence; lacks foundation.

19    BY MR. HENNESSEY:

20        Q    I mean, it just wasn't coincidental.

21            MR. SHERMAN:  Objection -- same objections.

22            THE WITNESS:  I don't think so.

23    BY MR. HENNESSEY:

24        Q    Okay.  And you don't think so because of the

25    fact that you were told that there was some type of
```

12:52:31 — 5
12:52:57 — 10
12:53:13 — 15
12:53:24 — 20
12:53:36 — 25

98

1   reports are on this disk.

2          Because I believe on Wednesday you also

3   indicated that normally during the autopsy process,

4   you do have access to police reports.  So I provided

09:18:09   5   this disk, which I believe contain all of the police

6   reports.

7          And just so to show you, Steve, this is the

8   disk I think we've all been working off of.

9          MR. SHERMAN:  It could be.

09:18:23   10          MR. HENNESSEY:  I'll be more than happy to

11   let you look at it on my computer if there is any

12   issues in that regard.

13          MR. SHERMAN:  Okay.  I appreciate that.

14   Thank you.

09:18:30   15   BY MR. HENNESSEY:

16      Q    In relation to these documents, Doctor, have

17   you had an opportunity to review any or all of the

18   documents that were provided?

19      A    I have reviewed all of the documents you

09:18:43   20   have provided.

21      Q    And when you say "all of the documents,"

22   would that include the dispatch printout?

23      A    Yes.

24      Q    Would that include the Ernesto Gomez's

09:18:51   25   Investigative -- I guess it would be Investigative

141

1    Summary?

2        A    Yes.

3        Q    Would that include the --

4        A    That's the coroner's file.

09:19:01  5   Q    -- the coroner's file?

6            Is this the entire coroner's file to your

7    knowledge or does this appear to be the entire

8    coroner's file?

9        A    It's -- I believe it's close to being

09:19:14  10  complete.

11       Q    Is there anything in the coroner's file from

12   this file that I'm holding up that you would expect

13   to see that wasn't in the file?

14           Is there anything that like kind of sticks

09:19:26  15  out?

16       A    The only thing I did not see is the final --

17   a copy of the final Death Certificate.

18       Q    Okay.  Okay.  And I think we can accommodate

19   that.

09:19:39  20          Did you have an opportunity to read the

21   interview of John David Herrera, captain/paramedic,

22   Garden Grove City Fire Department?

23       A    Yes, I did.

24       Q    Did you have an opportunity to review what

09:19:57  25  appears to be the paramedics reports?

142

1     It's taken a lot of effort to try to figure out

2     exactly what caused the person's death.

3          A    Yes.

4          Q    At the end of the first part of the

09:52:23  5  deposition that we had on Wednesday, one of the

6     things that you said near the end was that this is

7     not a very complicated case.

8               What did you mean by that?

9          A    By that I mean, as from the -- based on

09:52:41 10  pathological autopsy findings and the -- along with

11    the chem- -- the toxicological and chemical analyses

12    of the various specimen, to me, it is not a very

13    complicated case compared to many other things I've

14    done.

09:53:11 15       Q    Why wasn't it complicated compared to other

16    cases that you've done?

17               MR. SHERMAN:  Objection; vague;

18    argumentative.

19               THE WITNESS:  I would say --

09:53:22 20       MR. HENNESSEY:  I'm certainly not trying to

21    be argumentative.

22               THE WITNESS:  Yes.  It's not that

23    complicated.  Because in this case, I have more facts

24    than some of the cases I've worked with.

09:53:33 25  BY MR. HENNESSEY:

161

1    BY MR. HENNESSEY:

2        Q     Other than that occasion where you worked

3    for San Bernardino in that case that apparently

4    involved some type of Tasering activity and a

11:16:58  5    subsequent death, do you recall any other cases that

6    you worked on that involved a death following

7    application of a Taser from a police officer, from a

8    private citizen, from anyone, meaning like, you know,

9    a husband Tasering their wife or somebody using it as

11:17:16 10    a weapon on a street?

11        Do you know any -- can you think of any

12    other cases, other than this and the one you talked

13    about from San Bernardino?

14        MR. SHERMAN:   Overbroad and compound.

11:17:26 15        THE WITNESS:   No.   I think death due to

16    Tasering, I think I've done maybe -- I know of at

17    least maybe about three or four cases.   That's all

18    I've done, and every one of them has involved police

19    officers.

11:17:48 20    BY MR. HENNESSEY:

21        Q     Okay.   So you've personally been the chief

22    pathologist on three or four different cases

23    involving police Tasering an individual who at some

24    later point died; is that fair?

11:18:05 25        A     That is correct.   The death -- I mean, did

215

1    not die as a result of the Tasering.  One or two of

2    them did not die as a result of the Tasering.  That

3    is something else.

4         Q    Okay.  All right.  A Taser may have been

11:18:19  5    involved, but you did not determine that had anything

6    to do with the resultant death?

7         A    No.  Yes.  They've been Tasered, but then

8    survived and then died from something else, like a

9    gunshot wound or --

11:18:31 10         Q    Okay.  Okay.  How many cases have you

11   determined that a subject died following a police

12   encounter as a result of a Taser?

13              MR. SHERMAN:  Objection; asked and answered;

14   vague and ambiguous.

11:18:48 15              THE WITNESS:  I think cases I've done would

16   be that I say -- I would say the Tasering may have

17   something to do with the death, it would be two

18   cases, the San Bernardino case and this one.

19   BY MR. HENNESSEY:

11:19:03 20         Q    And I know we talked about the San

21   Bernardino case yesterday and this case.

22              Other than these two cases, are these the

23   only two cases that you can recall where you

24   attributed as at least a part of the death the

11:19:34 25   deployment of a Taser by a law enforcement officer

216

|        |    |   |                                                      |
|--------|----|---|------------------------------------------------------|
|        | 1  | Q | -- by 10:00 o'clock?                                 |
|        | 2  | A | That is correct.                                     |
|        | 3  | Q | Do you have any reason to believe that any           |
|        | 4  |   | blood was drawn by anyone from the coroner's office  |
| 11:38:07 | 5 |   | prior to September 4th, 2008?                        |
|        | 6  | A | No, not at the coroner's office, I mean,             |
|        | 7  |   | blood would not have been drawn.                     |
|        | 8  | Q | It wouldn't be something that Ms. Williams           |
|        | 9  |   | would do at the hospital or anything like that when  |
| 11:38:20 | 10 |  | she goes down after she's notified of a death?       |
|        | 11 | A | When she goes to the hospital, she will try          |
|        | 12 |   | and collect whatever blood sample has been obtained. |
|        | 13 | Q | Okay.  Okay.  Would it be fair to say                |
|        | 14 |   | that -- you're familiar with -- have you ever been   |
| 11:38:36 | 15 |  | qualified as an expert in toxicology in courtrooms?  |
|        | 16 | A | On just an analysis of the result, not              |
|        | 17 |   | the -- how the test is run.                          |
|        | 18 | Q | Okay.                                                |
|        | 19 | A | Just interpretation of results.                      |
| 11:38:51 | 20 | Q | I'm assuming you're familiar with how --            |
|        | 21 |   | absorption and burn-off of alcohol?                  |
|        | 22 | A | Yes.                                                 |
|        | 23 | Q | You're familiar with those terms --                  |
|        | 24 | A | Yes.                                                 |
| 11:39:04 | 25 | Q | -- when I say them?                                  |

228

1          Would it be fair to say that once a person

2    dies, that any -- that the breakdown or the burn-off

3    of alcohol stops?

4          MR. SHERMAN:  Vague and ambiguous.

11:39:20  5          THE WITNESS:  There is some what we call a

6    degradation decomposition change; but, basically, if

7    it's done within -- you know, I would say 24 hours,

8    it probably will be pretty well -- it's okay, the

9    results.

11:39:39 10   BY MR. HENNESSEY:

11         Q    Meaning that the blood drawn at

12   approximately give or take 10:00 o'clock on 9/04/03

13   (sic) would accurately show the -- whatever

14   substances were tested for at the time of Mr. Tran's

11:39:57 15   death?

16         MR. SHERMAN:  Objection; vague and

17   ambiguous; assumes facts not in evidence; lacks

18   foundation; calls for speculation.

19         THE WITNESS:  And this would indicate that

11:40:07 20   the level that is present is below the minimum

21   standard that the analytical laboratory has.  It

22   doesn't mean it's completely zero.

23         MR. HENNESSEY:  Okay.

24         THE WITNESS:  It may be slightly elevated.

11:40:27 25   I mean, it may be a level; but it's below the

229

1    two prongs sticking out of his leg, but he's got at

2    least the puncture sites anyway; and I've taken

3    specimen for toxicology to rule out any chemicals

4    that may or may not be present in him.

11:54:46   5         Q    And the ultimate -- did the toxicology

6    results that you ultimately obtained, did they in any

7    way, shape, or form affect your cause of Mr. Tran's

8    death?

9              MR. SHERMAN:   Vague.

11:55:02  10              THE WITNESS:   Yes.   I think it's

11   important -- he has a level of Diphenhydramine, which

12   is somewhat elevated; but, to me, it's not fatal.   So

13   he is under the influence of certain medication.

14   BY MR. HENNESSEY:

11:55:24  15         Q    And in this case, it would be like under the

16   influence of the active ingredient of Benadryl?

17        A    Yes.

18        Q    Okay.

19        A    And that he's been taking his medication

11:55:42  20   because he had the other medication, Valproic Acid,

21   which is the metabolite of Depakote.

22        Q    Okay.

23        A    So I know he's taking -- he was given his

24   medication sometime within the last 24 hours.

11:55:52  25         Q    The three medications that were listed on

239

1    Page 3 of Investigator Gomez's report, do you see

2    presence in the toxicology results that Mr. Tran had

3    appeared to have been taking his medications?

4         A    Yes.  Because the Triphenyl- -- I have my

11:56:18  5    own report here.

6         Q    Trihexyphenidyl?

7         A    Trihexyphenidyl is present.

8         Q    Okay.

9         A    So it means he's taking it and the Valproic

11:56:27  10    Acid.

11         Q    And the Valproic Acid is --

12         A    Depakote.

13         Q    -- Depakote?

14         A    Yes.

11:56:33  15         Q    This is mine so I can write on this.

16         A    Yes.  They did not mention anything about

17    Risperidone, but that does not mean a thing because

18    it may be at a level below their minimum standard.

19         Q    Okay.  So the fact that it's not -- the

11:56:56  20    Risperidone is not listed does not -- is not an

21    indication, at least from the toxicology results,

22    that he wasn't taking that medication?

23         A    That is correct.

24         Q    Can you tell -- they say that the results

11:57:08  25    and interpretations were that Depakote and

240

1        they have the level of 7.9 milligrams per liter.

2                In the literature, the toxic range is

3        around -- some report as low as 8 up to about 31

4        milligrams per liter.  The mean range usually, the

12:00:23  5      toxic level, is about 16.

6                Since it is approaching, you know, very

7        close to the minimum level so -- and since there is

8        usually a redistribution of a drug in the blood after

9        death, they redid it.

12:00:41  10             And in this case during the autopsy, we not

11       only take postmortem blood from the heart, but we

12       take some from the peripheral blood, in other words,

13       away from the heart.

14               And the peripheral blood level was 6.2

12:00:56  15     milligrams per liter.  So probably the level is

16       closer to 6.2 than 7.9.

17           Q    Is that high?  Low?  How would you describe

18       that?

19           A    6.2 is -- it's therapeutic level, but below

12:01:14  20     the known levels of fatal cases.  And just to check

21       on that to make sure this was fairly accurate, they

22       did the liver sample, which was somewhat elevated.

23               And to me the reason it's elevated, because

24       the liver is not really metabolizing the drug.

12:01:44  25     Because I told you the liver is bad.  It's

243

1    probably he's got liver failure.

2         That's the reason why it's a little higher

3    than what you should normally find in a normal liver.

4    Normal liver would be approximately around 35, 36

12:02:04   5    milligrams; but since it's a failing liver, it's

6    somewhat retained.  It does not metabolize it as

7    fast.

8         Q    Got you.

9              So would that level be considered high?

12:02:18  10   Low?

11        A    Yes.  The liver level is normally high --

12   I'm sorry, abnormally high then.  Normally, I would

13   say it would probably go way up to 50, you know.

14   We've done some fatal cases where they have

12:02:38  15   50 milligrams.

16              And the stomach contents, to find out how

17   much is found in the stomach residue, and 7.1

18   milligrams is not too much.  I think the normal

19   dosage is about 25 milligrams.

12:03:00  20        Q    Okay.  So at least as far as the postmortem,

21   the peripheral and the stomach content levels of the

22   Diphenhydramine, they were all well within

23   therapeutic levels?

24        A    Right.  He's under the influence.

12:03:13  25             MR. SHERMAN:  Objection; misstates.

244

```
 1              THE WITNESS:  He's still under the influence
 2     of the Diphenhydramine.  So if you got arrested for
 3     DUI, no alcohol, but high level, he'd probably get a
 4     warning saying, don't take it before you drive.
12:03:28  5          MR. HENNESSEY:  Okay.  Okay.  I've done a
 6     lot of criminal law.  I've never seen a driving under
 7     the influence of a Benadryl case yet.
 8              THE WITNESS:  It's usually probably they
 9     have alcohol in them.
12:03:43 10          MR. HENNESSEY:  Yes.  I'm assuming there
11     probably is.  I'm assuming they're not just limiting
12     it to that.
13     BY MR. HENNESSEY:
14          Q    So none of these levels at least appear to
12:03:50 15     be toxic to you; is that true?
16              MR. SHERMAN:  Objection; misstates; vague.
17              THE WITNESS:  Let's put it this way, it's
18     toxic but not -- to me, not fatal.
19     BY MR. HENNESSEY:
12:03:58 20          Q    Okay.  Meaning he did not die from a
21     Diphenhydramine overdose?
22          A    No.  In my opinion, no.
23          Q    Nor did he die from a Trihexyphenidyl
24     overdose?
12:04:16 25          A    In my opinion, no.
```

245

BY MR. HENNESSEY:

    Q    All right.  Now, Officer Karschamroon gave
some deposition testimony that, you know, he believed
Mr. Tran, although was exhibiting signs of labored
breathing, was still alive.

       If you were to receive information from
other sources that Mr. Tran did not appear to be
breathing or moving in any fashion from the moment he
went down from the Tasering, would that in any way,
shape, or form change any opinions that you have in
this case?

       MR. SHERMAN:  Objection; vague and
ambiguous; assumes facts not in evidence; incomplete
hypothetical.

       THE WITNESS:  Probably not.  Because the
reason I say that probably the cardiac arrythmia
occurred after he was Tasered, the fact that he said
that labored breathing, that labored breathing could
indicate that he was going into some kind of cardiac
arrythmia, which means he was still alive after he
was Tasered but having cardiac arrhythmia.

BY MR. HENNESSEY:

    Q    If you believe the statement from Officer
Karschamroon on that point.

    A    Yes.

259

1        Q    Okay.  So the Taser -- if you believe

2    Officer Karschamroon and his observations, it appears

3    that the Taser appeared to result in almost immediate

4    cardiac arrhythmia?

12:26:56  5        MR. SHERMAN:  Objection; misstates;

6    incomplete hypothetical; vague and ambiguous;

7    overbroad; assumes facts not in evidence; lacks

8    foundation.

9        THE WITNESS:  Yes, that cardiac arrhythmia

12:27:06  10   occurred after the Tasering.

11   BY MR. HENNESSEY:

12        Q    And based upon the description from Officer

13   Karschamroon, the cardiac arrhythmia appeared to have

14   occurred almost immediately following the Tasering

12:27:20  15   based upon his observations of labored breathing?

16        MR. SHERMAN:  Objection; vague; misstates

17   testimony.

18        THE WITNESS:  I don't know the time

19   interval.  I don't know if he gave in his deposition

12:27:30  20   whether he gave a time interval from the actual

21   incident to the actual first noticing the labored

22   breathing.

23        MR. HENNESSEY:  I'd hate to go through the

24   deposition.  I'm not too sure if he did.  I don't

12:28:22  25   want you to go through that because I have it

260

```
 1      somewhere.  Excuse me.
 2              THE WITNESS:  Uh-huh.
 3      BY MR. HENNESSEY:
 4          Q    I don't know.  We can waste all day if we're
 5      doing this.
 6              But given the timing of the 11:38 call of a
 7      Tasering event until the 11:43 time arrival by the
 8      paramedics, what did Officer Karschamroon testify
 9      that leads you to believe that Mr. Tran was
10      exhibiting potential symptoms of cardiac arrhythmia?
11              MR. SHERMAN:  Objection; vague and
12      ambiguous; overbroad in scope and time.
13              THE WITNESS:  The fact that he started
14      having difficulty breathing.  Whether it's Officer --
15      whatever his name is --
16              MR. HENNESSEY:  Karschamroon.
17              THE WITNESS:  -- Karschamroon's testimony or
18      somebody else, I read that there was evidence that he
19      appears to be having trouble breathing.  Because a
20      person who goes into cardiac arrhythmia will have
21      some problems with breathing.
22      BY MR. HENNESSEY:
23          Q    Was there anything -- was there anything
24      that could have been done when the officers began
25      noticing this labored breathing that could have
```

Timestamps (left margin):
12:29:47 — line 5
12:30:18 — line 10
12:30:40 — line 15
12:30:59 — line 20
12:31:17 — line 25

261

1        THE WITNESS:  I know he was handcuffed from

2    behind.

3    BY MR. HENNESSEY:

4        Q    Do you recall Officer Karschamroon saying

12:34:11    5    that he was on his chest with a knee on his back

6    handcuffed and then -- then Officer Karschamroon

7    noticed that he was having labored breathing and as a

8    result, ultimately, he was placed against the legs of

9    an officer who responded and put into some type of

12:34:33   10    seated position?

11        A    I remember that.  Correct.  Yes.

12        Q    Okay.  During that time frame, from the time

13    that Officer Karschamroon noticed the labored

14    breathing while Mr. Tran was in -- was on his chest,

12:34:52   15    would that be the likely beginning point of the

16    cardiac arrhythmia?

17        MR. SHERMAN:  Objection; calls for

18    speculation; lacks foundation; assumes facts not in

19    evidence; vague and ambiguous; incomplete

12:35:02   20    hypothetical.

21        THE WITNESS:  The minute he was noted to

22    having shortness of breath to me would be the

23    likelihood of the start of his cardiac arrhythmia.

24    BY MR. HENNESSEY:

12:35:13   25        Q    Okay.  After the recognition of the

264

```
 1              MR. SHERMAN:  Same objections.

 2              THE WITNESS:  Um, if he's unable to really

 3      take a deep breath, yes, then it would affect it.

 4      BY MR. HENNESSEY:

 5         Q    What effect would it have on him?

 6              MR. SHERMAN:  Same objections.

 7              THE WITNESS:  If you don't breathe properly,

 8      you're going to have less oxygen to your system.

 9      BY MR. HENNESSEY:

10         Q    How would the positions of the hands behind

11      Mr. Tran's back -- Mr. Tran's back exacerbate or

12      potentially exacerbate his breathing?

13         A    He won't be able to take a complete -- a

14      full expansion of his chest.  It's a little more

15      difficult.

16         Q    Okay.  And does that also -- does the size

17      of -- is his make-up, his build, also a factor in

18      that situation?

19         A    I would say yes.  His weight has probably a

20      lot to do with it.

21         Q    And do you recall Mr. Tran's size, weight,

22      height, things like that?

23         A    Well, yes, he was 67 inches, five-seven, and

24      he weighed 203 pounds.  He's bigger than you.

25              MR. SHERMAN:  No.  He's not bigger than me.
```

Timestamps (left margin):
12:36:36 — line 5
12:36:46 — line 10
12:37:11 — line 15
12:37:26 — line 20
12:37:44 — line 25

266

1    exacerbate his already noticed labored breathing?

2              MR. SHERMAN:  Objection; vague and

3    ambiguous; incomplete hypothetical; calls for

4    speculation; lacks foundation; assumes facts not in

12:39:38  5    evidence.

6              THE WITNESS:  I would say it would -- has a

7    negative influence.

8    BY MR. HENNESSEY:

9         Q    The handcuffing would have a negative

12:39:45  10   influence --

11        A    To his back.

12        Q    -- because of the nature of his build?

13        A    That is correct.

14        Q    And what would the negative impact of the

12:39:54  15   handcuffing be based upon a person of his dimensions

16   and the recognized labored breathing?

17             MR. SHERMAN:  Asked and answered; vague and

18   ambiguous.

19             THE WITNESS:  Well, probably most likely,

12:40:10  20   there would be a less expansion of his chest cavity.

21   So the total volume probably would be a little

22   diminished.  Air to his lungs would be diminished.

23   BY MR. HENNESSEY:

24        Q    And you noticed that as soon as the

12:40:28  25   paramedics arrived, they removed the handcuffs?

268

1    would be more consistent with somebody having

2    symptomatology of excited delirium?

3         A    Yes.  They would be sweaty.  So the

4    clothing, if there is still clothing present, would

12:54:12  5    be kind of wet.

6         Q    So --

7         A    Diaphoretic and then "wet" would be marked.

8         Q    Diaphoretic is --

9         A    Sweating.

12:54:21  10        Q    Sweating.  Okay.

11             And then, you know, wet is I guess kind of

12    like a higher level of sweating.

13             Again, the "moist" -- the box appears to be

14    marked either normal or dry.

12:54:47  15             Again, would that be consistent or

16    inconsistent with somebody exhibiting symptomatology

17    of excited delirium?

18        A    It would be inconsistent.

19        Q    Okay.  Under the pupils section, the left

12:55:10  20    and the right are both marked as fixed and dilated.

21             What, if anything, does that signify to you?

22        A    It means probably that the brain activity is

23    diminishing.

24        Q    Is diminishing?

12:55:26  25        A    Yes.

280

```
 1        Q    Is it also consistent with brain activity
 2   having already ceased?
 3             MR. SHERMAN:  Objection; speculation;
 4   foundation; assumes facts not in evidence; lacks
 5   foundation.
 6             THE WITNESS:  It didn't say reaction to it.
 7   Whether it reacted or not, I can't tell you.  All it
 8   means it's already dilating.
 9   BY MR. HENNESSEY:
10        Q    What in the -- are we on any time?  No?
11             What does fixed mean in relation to eye
12   appearance?
13        A    There is no reaction when they open them and
14   extend it.
15        Q    When they what?
16        A    When they open the eyelid.
17        Q    Is that something that medical professionals
18   do?  They open the eyelid?
19        A    Yes.  If it's fixed, there is no reaction to
20   light.
21        Q    Okay.  So a fixed pupil would be a pupil
22   showing no reaction to light?
23        A    Yes.
24        Q    Because when you open an eye up, if it's a
25   sunny day, it's going to be exposed to light?
```

Time stamps: 12:55:36 (5), 12:55:45 (10), 12:56:05 (15), 12:56:16 (20), 12:56:30 (25)

281

```
 1          A      That is correct.

 2          Q      And, again, I know this is going to be a

 3    dumb one, but I'm sure you're used to it from me so

 4    far.

 5                 Dilated, what does that term connote in

 6    relation to the pupils?

 7          A      It's bigger than normal.  It's wider than

 8    normal is what it means.  So when the paramedic

 9    opened the eyelid -- separated the eyelid, there is

10    no constriction of the pupils, which means brain

11    activity is going down.

12          Q      Or has already stopped?

13          A      Already stopped.

14          Q      So from the evaluation of the pupils, would

15    it be a reasonable assumption or would one reasonable

16    interpretation of the observations the paramedics

17    made of the left and right pupil, both being fixed

18    and dilated, would one reasonable interpretation of

19    that evidence be that brain function had already

20    stopped entirely?

21                 MR. SHERMAN:  Objection; speculation;

22    assumes facts not in evidence; lacks foundation.

23    BY MR. HENNESSEY:

24          Q      Would that be one reasonable interpretation?

25                 MR. SHERMAN:  Incomplete hypothetical; vague
```

Time stamps:
12:56:46 — line 5
12:57:03 — line 10
12:57:21 — line 15
12:57:43 — line 20
12:57:51 — line 25

282

```
 1    and ambiguous.
 2              THE WITNESS:  It cannot be ruled out.
 3    BY MR. HENNESSEY:
 4         Q    Would it -- would it be considered a
 5    reasonable interpretation -- I'm not saying the only
 6    interpretation.
 7              I'm just saying, would the fact that both
 8    the left and the right pupil are both checked as
 9    fixed and dilated, would one reasonable
10    interpretation of those findings be that brain
11    activity had already come to a complete stop?
12              MR. SHERMAN:  Same objection except now it's
13    argumentative and asked and answered.
14              MR. HENNESSEY:  I'm certainly not trying to
15    argue.
16              THE WITNESS:  I would say yes.  Yes.
17    BY MR. HENNESSEY:
18         Q    Not the only potential explanation, but a
19    reasonable explanation?
20         A    Yes.
21         Q    How long does it normally take for brain
22    function to stop after a cardiac arrhythmia?
23         A    I would say six to eight minutes.
24         Q    Is there a range, an accepted --
25         A    That's not cardiac arrhythmia, stopped,
```

Timestamps in left margin:
12:57:59 (line 5)
12:58:14 (line 10)
12:58:27 (line 15)
12:58:37 (line 20)
12:59:01 (line 25)

283

1    an accident" is because there was no -- he did not

2    die of -- he died of a natural process, but the way

3    he died is because something accidental happened.

4         In other words, there was a struggle,

02:12:55  5    confrontation, along with the Tasering.  There was no

6    intentional intent to kill a person during that

7    confrontation.

8         Q    You don't know, as you sit here today, the

9    legality of the deployment of that Taser; is that

02:13:17  10   fair?

11             MR. SHERMAN:  Objection; speculation.

12             THE WITNESS:  That's correct.  In other

13   words, we have no -- legal things, we're not involved

14   with.

02:13:24  15  BY MR. HENNESSEY:

16        Q    Okay.  All right.  My question is --

17             MR. SHERMAN:  Well, you're not involved in

18   legal things?

19             THE WITNESS:  That's right.

02:13:30  20             MR. SHERMAN:  The Sheriff's Department and

21   the DA are; correct?

22             THE WITNESS:  The DA is, but not the -- the

23   coroner has nothing to do with legal things.

24   BY MR. HENNESSEY:

02:13:39  25        Q    Okay.  So when you say "accident," the --

296

1    cause -- you send a high amount of electricity

2    through the body system causing contraction of the

3    muscle.

4         Q    And where did you learn this intended

02:22:03   5    purpose of a Taser?

6         A    Intended purpose of a Taser?

7         Q    No, no.  Where did -- what you just said,

8    where did you -- where did you obtain that knowledge?

9         A    Just from reading the articles.

02:22:14 10        Q    Okay.  Do you stay current -- I'm sorry.

11             You do read articles.  Obviously, you've

12    read articles on Tasers because you provided one.

13             Have you read articles on Tasers other than

14    the one that you've provided?

02:22:29 15             MR. SHERMAN:  Objection; asked and answered.

16             THE WITNESS:  Yes.  At one time, I had a

17    whole notebook of it; but I said while I was --

18    because of that San Bernardino case.

19    BY MR. HENNESSEY:

02:22:42 20        Q    In relation to that San Bernardino case,

21    what, if anything, did you do to familiarize yourself

22    with the effects of a Taser on a human body?

23             MR. SHERMAN:  Objection; relevancy;

24    immateriality.

02:22:56 25             THE WITNESS:  You mean experimentally?

304

1    You're not just asking --

2    BY MR. HENNESSEY:

3        Q    I'm not asking whether you personally

4    Tasered anybody or did anything like that.

02:23:02  5        I'm just asking, you know, you said you had

6    a whole notebook on the subject.

7            What was in that notebook?

8        A    Essentially what happens when a person is

9    Tased, you know.  I viewed a video of a subject being

02:23:25 10   Tased.  And per the articles that I've read, I find

11   that there is more than just an electrical component

12   of it; that there are some biochemical changes that

13   also occur with the body in addition to the

14   electrical disruption of the rhythm in the heart.

02:23:54 15       Q    What are the biochemical changes that your

16   research has -- the research that you conducted, what

17   are some of the biological changes that you have

18   learned that the Taser has the potential for?

19           What biological -- what biochemical changes

02:24:17 20   did you determine the deployment of Tasers could

21   have?

22       A    Basically what happens is, that it's all

23   related to the cardiovascular disturbance, you know,

24   especially with repeated application of the Taser and

02:24:36 25   also the prolonged application of the Taser in that

305

1    there are biochemical changes that occur related to

2    the acid-base balance in the body.

3        Q    And would those biochemical changes be

4    different for -- if you know, for a healthy person

02:25:02  5    versus, say, somebody who may have an enlarged heart

6    and a liver that is not properly functioning?

7            MR. SHERMAN:  Objection; foundation;

8    speculation.  It assumes facts not in evidence;

9    incomplete hypothetical.

02:25:15  10           THE WITNESS:  I don't know.  Well, most of

11   these studies are done on animals.  Because you can't

12   do it on humans, unless you've got volunteers, and

13   the volunteers they usually get are healthy people.

14   BY MR. HENNESSEY:

02:25:27  15       Q    Police officers and the like?

16       A    And whoever and probably then some volunteer

17   prisoners.

18           MR. SHERMAN:  I've been Tasered.  I'm not a

19   police officer.

02:25:37  20           MR. HENNESSEY:  But you probably deserved

21   it.

22           MR. SHERMAN:  Just for the record, I

23   probably did.

24           THE WITNESS:  And, you know, and they do

02:25:42  25   some -- but these volunteers are not repeatedly

306

1    Tasered or Tasered for a long time.

2         So most of the studies are done on animals,

3    and but they find that certain animals produce the

4    same similar changes in their system as humans and so

02:26:08    5    they use these animals.

6    BY MR. HENNESSEY:

7         Q    Are you talking about pigs?

8         A    Pigs, yes.

9         Q    And is that because of their -- because of

02:26:13   10    their skin and because of their genetic make-up that

11    they have been the subject of testing to your

12    knowledge?

13         A    Yes.  Probably because the human rights

14    people don't object, I mean.

02:26:28   15         MR. SHERMAN:  Who cares about a pig.

16         THE WITNESS:  It's a pig.

17         MR. HENNESSEY:  I'm sure PETA cares.

18    BY MR. HENNESSEY:

19         Q    The biochemical changes that have been

02:26:37   20    determined, can you describe some of them with more

21    specificity?

22         A    Well, we have changes.  Because of the

23    muscle irritation, you've got muscle enzyme changes

24    like the, you know, lactic acid, dehydrogenase.  The

02:27:00   25    heart muscle --

307

1     Q     I'm sorry.  You said like lactic acid.   And

2  then what did you say?

3     A     Dehydrogenase.

4     Q     Dehydrogenase?

02:27:07  5     A     Yes.  The heart muscle, the enzyme Troponin

6  has been elevated in these people along with a --

7  the --

8     Q     I'm sorry.  The enzyme Tro- --

9     A     Troponin.

02:27:26  10     Q     Can you spell that, please?

11     A     T-r-y-p-o-n-i-n (sic), Troponin, yes.   And

12  that's the most sensitive change associated with

13  heart muscle.  With elevated Troponin, you have a

14  heart attack.

02:27:44  15     Q     And what are the changes that have been

16  found in that enzyme that you just described?

17     A     They find that the levels increase.

18     Q     And what are the dangers, if any, of the

19  increase in changes in that particular enzyme.

02:28:01  20     A     If there is an increase, that means there is

21  some damage to that muscle and that organ or that

22  organ.  So this is -- so there is some damage, but

23  it's microscopic.  There is some damage to those

24  muscles, and also there is a derangement in what we

02:28:19  25  call the acid-base balance in the body.

308

1       The pH, which is normally around 7.3,

2   sometimes becomes acid.  And when the body becomes

3   acid, especially to the heart muscle, it becomes very

4   sensitive.  So it becomes irritated and very inducive

02:28:47  5   to cardiac arrhythmia.

6       Q    How is the pH levels affected by the

7   application of a Taser?

8       A    Because with the contraction, you've got

9   changes in the chemical component.  And when you're

02:29:13  10  Tased, you stop breathing while you're being Tased.

11  While the electrical component is going through you,

12  you're not breathing.

13       So a normal person could overcome that

14  probably because the body will try to compensate.

02:29:33  15       If you do not compensate properly, you

16  either have respiratory acidosis.  And if you've got

17  enough tissue damage, depending the organ that is

18  damaged, you could have what they call metabolic

19  damage.

02:29:50  20       And because of that, it changes.  The pH

21  will change.  The heart muscle becomes very

22  sensitized through irritation.

23       Q    When you say that the person stops breathing

24  during the Taser cycle, does that have anything to do

02:30:14  25  with the -- with the disabling of muscle functioning

309

1    really tell whether the heart is really beating or

2    not because it disrupts the EKG pattern.

3         Q    So the animals were hooked up to EKG

4    machines and things like that during the -- during

02:32:09  5    those tests?

6         A    Yes, during the actual Tasering.

7         Q    And do you know if there have been any

8    similar human testing done on members of law

9    enforcement or anybody else where EKGs were hooked up

02:32:25  10   to them --

11        A    No.

12        Q    -- during the Tasering process?

13             MR. SHERMAN:  Objection; speculation;

14   foundation.

02:32:30  15             THE WITNESS:  I don't know.

16   BY MR. HENNESSEY:

17        Q    From the different effects that you have

18   described that a Taser is capable of doing, do you

19   have an opinion as to what the Taser did to Mr. Tran?

02:33:02  20             MR. SHERMAN:  Objection; assumes facts not

21   in evidence; calls for speculation; lacks foundation.

22             THE WITNESS:  I can't say for sure; in other

23   words, all I know is cardiac arrhythmia occurred.

24   BY MR. HENNESSEY:

02:33:18  25        Q    And is that consistent with all of the

311

BY MR. HENNESSEY:

    Q    And there was nothing that in the description that was given by Officer Karschamroon, who described the visual appearance of Mr. Tran as looking confused and like he needed help, he did not describe any symptoms that to you as a medical doctor indicate that he was in cardiac -- suffering from a cardiac arrhythmia at that moment, was there?

    MR. SHERMAN:  Objection; incomplete hypothetical; vague and ambiguous.

    THE WITNESS:  When he first saw him, there was no -- there was no evidence of cardiac arrhythmia.

BY MR. HENNESSEY:

    Q    There was no -- and he did not describe ever during the time of his contact prior to the Tasering of Mr. Tran suffering from labored breathing prior to that time; correct?

    MR. SHERMAN:  Objection; misstates testimony; assumes facts not evidence.

    THE WITNESS:  That's correct.

BY MR. HENNESSEY:

    Q    He did not -- Officer Karschamroon did not say anything that Mr. Tran was doing that led him to believe that he was suffering -- you know, that he

317

        1    had -- was breathing very heavily until after the

        2    Tasering event?

        3            That was the first time the labored

        4    breathing issue ever came up; isn't that true?

02:41:39 5            MR. SHERMAN:  Misstates; assumes facts not

        6    in evidence; lacks foundation; calls for speculation.

        7            MR. HENNESSEY:  At least from what he

        8    testified to?

        9            THE WITNESS:  That is correct.

02:41:45 10   BY MR. HENNESSEY:

       11       Q    And is that consistent with the fact that he

       12    did not at least outwardly appear to be suffering

       13    from a cardiac arrhythmia until after the Tasering

       14    event?

02:41:58 15           MR. SHERMAN:  Same objections.

       16            THE WITNESS:  That is correct.

       17            MR. SHERMAN:  That's a train.

       18    BY MR. HENNESSEY:

       19       Q    This section, I guess, authored by -- well,

02:42:50 20   is this part -- and I know it's part of Exhibit C,

       21    also; but every time I look through that, I can't

       22    ever find it.  This section here about the follow --

       23    the follow requests --

       24       A    Yes.

02:43:05 25      Q    -- and actions taken, is that the area that

                                                                    318

1    A    In other words, any drug, if you read the
2    PDR, it says it's bad for your heart, liver.  So I
3    would say the levels he has is not in the fatal
4    range.

03:11:10  5    Q    Well, we have it written down somewhere.
6         They're real high; correct?
7    A    The blood levels, the book that I use are
8    written by Bassell (phonetic).  Bassell used to be
9    the -- one of the toxicologists.  Now he wrote the
03:11:30  10   book.  It's a well-known book.
11        The fatal range of postmortem
12   Diphenhydramine, the range is usually 8 to 31
13   milligrams per liter.  That's in the postmortem
14   blood.  But in his peripheral blood, there is usually
03:11:49  15   a redistribution after death.  It's 6.2 in the
16   peripheral blood.  So it's even lower than the
17   peripheral blood.
18        So I would say in the blood, the
19   Diphenhydramine level is not in the fatal range.
03:12:08  20   Q    Okay.
21   A    It's in the toxic range, but not fatal.
22   Q    And what does the fatty liver mean, if
23   anything, to you?
24   A    Fatty liver means the liver is failing and
03:12:26  25   that would account in my opinion why he has high

347

BY MR. HENNESSEY:

Q    You indicated when Mr. Sherman asked you the question what kind of events would cause -- what types of events could cause Mr. Tran to have a cardiac event, would the application of a Taser be a stressful event that could cause him to have a cardiac event?

MR. SHERMAN:  Objection; asked and answered.

THE WITNESS:  It could.

BY MR. HENNESSEY:

Q    And that's what you opined in this autopsy; correct?

A    Yes, yes.

Q    Is it my understanding that -- that the symptoms of a cardiac arrythmia would be problems breathing, shortness of breath, or labored breathing?

A    Yes.

Q    That would be one of them?

A    Yes, one of them.

Q    And also you indicated an irregular heartbeat.

Would -- if somebody had been trained in how to take somebody's pulse, either their carotid pulse or their pulse in their wrist, would the irregular heartbeat be present?

355

1    police caused Mr. Tran's death, your answer was

2    "yes"; correct?

3              MR. SHERMAN:  Objection; misstates.

4              THE WITNESS:  The confrontation contributed

03:35:47  5    to his death.  Yes.

6    BY MR. HENNESSEY:

7         Q    The confrontation that Mr. Tran had with

8    members of law enforcement contributed to his death?

9              MR. SHERMAN:  Same objection; foundation;

03:35:56 10   assumes facts not in evidence; speculation.

11             THE WITNESS:  I don't know who else he had a

12   confrontation with, so --

13             MR. HENNESSEY:  I'm just -- I mean, frankly,

14   I'm not --

03:36:08 15             THE WITNESS:  Yes.

16             MR. HENNESSEY:  -- I'm not meaning to be

17   disrespectful in any way, shape, or form.

18   BY MR. HENNESSEY:

19        Q    The only -- I mean, you read the information

03:36:14 20   from the first responding police officer who

21   described in detail what happened out there.

22             And you're not aware of Mr. Tran being

23   involved in any other type of confrontation within

24   minutes before he passed away, other than the police;

03:36:35 25   is that true?

367

```
1        A     That's what I have in my report.  That's

2   what I put as cause of death.

3             MR. HENNESSEY:  And I just was responding to

4   that -- to a question, and I am done; and I thank you
03:36:46
5   for your time.

6             MR. SHERMAN:  I have one more.

7             MR. HENNESSEY:  Sorry.

8

9                     FURTHER EXAMINATION
03:36:48
10  BY MR. SHERMAN:

11       Q     Since you don't have a lot of history before

12  the officers get there, hypothetically speaking --

13  purely hypothetically speaking -- if Mr. Tran was

14  running up and down the street hypothetically
03:36:59
15  speaking and within a short period of time of the

16  officers' arrival, within minutes, and then the

17  officers came along and had a brief interaction with

18  him with whatever struggle there was and with the

19  Tasering event, could he have died from the exercise
03:37:15
20  that he had done beforehand, hypothetically speaking?

21       A     Yes.  Hypothetically, if he was short of

22  breath already, yes, you can't rule that out, but he

23  has to be short of breath.

24       Q     Huffing and puffing?
03:37:30
25       A     Huffing and puffing.  You know, you know if
```

368

1    until the point that following the Tasering where he

2    noticed labored breathing, he was not describing any

3    symptoms that were consistent with Mr. Tran

4    exhibiting a cardiac arrythmia, did he?

03:38:41   5              MR. SHERMAN:  Vague and ambiguous.

6              THE WITNESS:  There was no indication from

7    any observations that he was suffering cardiac

8    arrythmia.

9    BY MR. HENNESSEY:

03:38:50   10        Q     In fact, he said that he was responsive,

11   cooperative.  He did not describe any types of

12   breathing disorders at any time before this Tasering.

13             So would that be -- would it be reasonable

14   to believe that whatever exercise he may have done

03:39:10   15   before the police arrived caused his death versus

16   what you say in your report caused his death?

17        A     No.  He was not -- most likely he did not

18   have cardiac arrythmia.

19        Q     And that is consistent with the observations

03:39:23   20   that Officer Karschamroon very specifically described

21   that he saw?

22        A     Yeah.

23        Q     What he described is inconsistent with

24   somebody who is suffering a cardiac arrythmia; is

03:39:36   25   that true?

                        FURTHER EXAMINATION

1  BY MR. HENNESSEY:

2      Q    In response to that one question, whatever

3  hypothetically happened earlier in the day, the

4  observations made by Officer Karschamroon do not in

03:40:30  5  any way, shape, or form indicate that Mr. Tran was

6  experiencing signs of cardiac arrhythmia until after

7  the Tasering; isn't that true?

8           MR. SHERMAN:  Objection; asked and answered;

03:40:47 10  cumulative.

11          THE WITNESS:  That is correct, according to

12  his descriptions.

13          MR. HENNESSEY:  Thank you.  I don't have

14  anything further.

03:40:54 15          MR. SHERMAN:  Stipulation?

16          MR. HENNESSEY:  Yes.

17          MR. SHERMAN:  Hi.  Can you call the doctor

18  and tell him I'm going to be a few minutes late, but

19  I'm on my way?  Thanks.

03:41:02 20          I would propose that -- do you want me to do

21  it or do you want to do it?

22          MR. HENNESSEY:  I don't even know how to do

23  it.

24          MR. SHERMAN:  That's right.

03:41:07 25          I propose the following stipulation:  That

                                                      372

1              CERTIFICATION

2                    OF

3        CERTIFIED SHORTHAND REPORTER

4

5

6              I, the undersigned, a Certified Shorthand

7    Reporter of the State of California do hereby certify:

8              That the foregoing proceedings were taken

9    before me at the time and place herein set forth; that

10   any witnesses in the foregoing proceedings, prior to

11   testifying, were placed under oath; that a verbatim

12   record of the proceedings was made by me using machine

13   shorthand which was thereafter transcribed under my

14   direction; further, that the foregoing is an accurate

15   transcription thereof.

16             I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney of any of the parties.

19             IN WITNESS WHEREOF, I have this date

20   subscribed my name     *Jennifer K. Abe*                .

21

22

23        Dated:  _____

24

25

377