**EXHIBIT E**



BEACH
COURT
REPORTING

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

QUYEN KIM DANG, INDIVIDUALLY AND )
AS GUARDIAN AD LITEM FOR KENNY   )
MINH CAO TRAN, A MINOR, AND      )
PERSONAL REPRESENTATIVE OF ANDY  )
TRAN, DECEASED; KENNY MINH CAO   )
TRAN, A MINOR BY AND THROUGH HIS )
GUARDIAN AD LITEM, QUYEN KIM     )
DANG; NAM VAN TRAN, BIOLOGICAL   )
FATHER OF ANDY TRAN, DECEASED;   )
BUA THI PHAN, BIOLOGICAL MOTHER  )
OF ANDY TRAN, DECEASED,          )
                                 )
              Plaintiffs,        )
                                 )
        vs.                      )   CASE NO.   SACV10-00338
                                 )              DOC(MLGx)
CITY OF GARDEN GROVE; GARDEN     )
GROVE CHIEF OF POLICE JOSEPH     )   VOLUME II
M. POLISAR; GARDEN GROVE POLICE  )   (Pages 195 - 313)
OFFICER GENDREAU; GARDEN GROVE   )
POLICE OFFICER KARSCHAMROOM;     )
TASER INTERNATIONAL, INC., AND   )
DOES 1 TO 10, INDIVIDUALS; AND   )
ROES 1 TO 10, ENTITIES,          )
INCLUSIVE,                       )
                                 )
              Defendants.        )
                                 )

ORIGINAL

VIDEOTAPED DEPOSITION OF

BUA THI PHAN

WEDNESDAY, MAY 4, 2011; 10:09 A.M.

SANTA ANA, CALIFORNIA

REPORTED BY:  CHRISTINA L. MAGALLANES, CSR NO. 11192

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   QUYEN KIM DANG, INDIVIDUALLY AND )
     AS GUARDIAN AD LITEM FOR KENNY   )
 5   MINH CAO TRAN, A MINOR, AND      )
     PERSONAL REPRESENTATIVE OF ANDY  )
 6   TRAN, DECEASED; KENNY MINH CAO   )
     TRAN, A MINOR BY AND THROUGH HIS )
 7   GUARDIAN AD LITEM, QUYEN KIM     )    .
     DANG; NAM VAN TRAN, BIOLOGICAL   )
 8   FATHER OF ANDY TRAN, DECEASED;   )
     BUA THI PHAN, BIOLOGICAL MOTHER  )
 9   OF ANDY TRAN, DECEASED,          )
                                      )
10              Plaintiffs,           )
                                      )
11          vs.                       )  CASE NO.  SACV10-00338
                                      )            DOC(MLGx)
12   CITY OF GARDEN GROVE; GARDEN     )
     GROVE CHIEF OF POLICE JOSEPH     )  VOLUME II
13   M. POLISAR; GARDEN GROVE POLICE  )  (Pages 195 - 313)
     OFFICER GENDREAU; GARDEN GROVE   )
14   POLICE OFFICER KARSCHAMROOM;     )
     TASER INTERNATIONAL, INC., AND   )
15   DOES 1 TO 10, INDIVIDUALS; AND   )
     ROES 1 TO 10, ENTITIES,          )
16   INCLUSIVE,                       )
                                      )
17              Defendants.           )
     _____)

18

19

20         The Deposition of BUA THI PHAN, taken on behalf

21   of the Defendants, before Christina Lynn Magallanes,

22   Certified Shorthand Reporter 11192 for the State of

23   California, commencing at 10:09 A.M., Wednesday, May 4,

24   2011, at 1631 East 18th Street, Santa Ana,

25   California 92705-7101.
```

196

May 4, 2011

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFFS:

 4
              LAW OFFICES OF SEAN HENNESSEY
 5            BY:  SEAN HENNESSEY, ESQUIRE
              8231 Westminster Boulevard
 6            Westminster, California 92683
              (949) 280-1257
 7
              -and-
 8
              LIEM H. DO & ASSOCIATES
 9            BY:  PAUL MINHTHU PHAM, ESQUIRE
              8231 Westminster Boulevard
10            Westminster, California 92683
              (714) 898-7579
11

12    FOR THE CITY OF GARDEN GROVE DEFENDANTS:

13            FERGUSON, PRAET & SHERMAN
              BY:  STEVEN A. SHERMAN, ESQUIRE
14            1631 East 18th Street
              Santa Ana, California 92705-7101
15            (714) 953-5300

16

17    ALSO PRESENT:  NAM VAN TRAN, PLAINTIFF

18            QUYEN KIM DANG, PLAINTIFF

19            THOMAS VU, VIETNAMESE INTERPRETER
              CERTIFICATE NO. 300113
20
              MARK HOWARD, VIDEO TECHNICIAN
21
              RICHARD GENDREAU, OFFICER
22
              DANIEL KARSCHAMROON, OFFICER
23
              DOUGLAS DO, LAW CLERK
24

25
```

197

Bua Thi Phan, VOL. I                                                    May 3, 2011

1       A    Raising it up like this (indicating).

2       Q    Right.  Just like you are showing us now.

3       A    And then he was asked to turn around.  And he

4    was asked -- I saw him placing his hand like this

01:21  5    (indicating).

6       Q    On his head?

7       A    Yeah, on his head.  And then he was handcuffed

8    on one hand.  And then there was another person coming

9    from that side, approaching (indicating).

01:21  10         And then he -- he was shot.  He was shot by the

11   sound, tek, tek, tek, tek, right here (indicating).  And

12   then I saw him.  I heard the sound, tek, tek, tek, and

13   then he -- and then he fell to the front on the grass,

14   like this (indicating).

01:22  15        Q    Face first?

16      A    And then I saw his face turn purple.  And then

17   there was one police officer that twist his arm --

18   twisted his arm back like this (indicating) to -- to the

19   back and then handcuff him.  And then the police officer

01:22  20   put a knee on his back and then handcuffed him.

21            At that time, he had already been dead.  At that

22   time, I -- he was -- there was no moving on him at all.

23   He already flat dead.  My son had already flat dead.  Two

24   police officer killed my son.

01:23  25            And then a third person came, and grab -- and

Bua Thi Phan, VOL. II

May 4, 2011

1          You don't have to get up again.  I just want to
2    confirm that what you were doing with the interpreter is
3    what you saw.
4          A   Yes.  I saw it very clearly.
10:49  5   Q   Right.
6          A   I stood there and I saw it.
7          Q   Right.  And it was about two or three inches
8    away, about this far, Mrs. Bua?  About this far
9    (indicating)?
10:49  10  A   No, no, no.  About this distance (indicating).
11         Q   About that far (indicating), as you are holding
12   your fingers up now?
13         A   Yes.
14         Q   Excellent, perfect.
10:49  15  A   And he stood closely and pointed.
16         Q   No.  That's fine.
17         A   Like this, like this distance here (indicating).
18         Q   About that distance?
19         A   Yes.
10:50  20  Q   Excellent.  That is more than two or three
21   inches.  That is probably like eight inches.  Thank you
22   very much.
23             MR. SHERMAN:  I will tell you what.  Your
24   attorney thinks we should take a break right now, and I
10:50  25  agree 100 percent.

Bua Thi Phan, VOL. II

May 4, 2011

1    there was a third officer.  He pulled him up.  He

2    couldn't be able -- he was -- he couldn't stand up, and

3    he -- he was drooping down like this (indicating).  He

4    was drooping.

11:35  5          And then the -- one of the officers used his

6    legs to -- to hold -- hold him straight up, and then at

7    that time, his hand was like in this position

8    (indicating).

9          Q    Handcuffed behind his back?

11:35  10          A    Yes, yes, they were still being handcuffed.

11          Q    Right.

12          A    He already died.

13          Q    Okay.

14          A    He already flatly died.

11:35  15          Q    Okay.  What makes you say that, ma'am?

16          A    He had already flatly died.  He -- because --

17    and because -- and the officer didn't know that he

18    already died, and that's why they -- they did that.

19          Q    The officers did not know he had died?

11:35  20          A    No.  He was drooping down like this

21    (indicating).  He was not doing at all anything else.  He

22    already died.  He already died.

23          Q    How do you know that Andy had already died?

24          A    No moving.  There was -- there was no sign of

11:36  25    blood on his face.

240

Bua Thi Phan, VOL. II                                    May 4, 2011

1       A    Nothing, nothing.

2       Q    Right.  There was no sign of color, and you

3    didn't see Andy moving, and that's --

4       A    Nothing.  I didn't see anything at all.

11:39   5       Q    And that's what makes you believe he was dead,

6    correct?

7       A    He fell to the ground, and he died after I heard

8    tat, tat, tat.

9       Q    Right.  Based on what she has told us, correct?

11:39  10       A    Yes.

11       Q    Are you --

12       A    He already died already.

13       Q    Yes.  Is there anything else that you observed,

14    or saw, or heard that makes you believe that Andy died

11:40  15    already, other than what you have already told us?

16       A    He already died.  Nothing else.  He -- he fell

17    down and he flatly died in front of me.  What else can I

18    say?  What else can I say?

19       Q    Yes.  Thank you.  But what you saw is what made

11:40  20    you believe he was dead already, correct?

21       A    Yes.  Yeah, I saw him die already, yes.  He

22    already flatly died.  Nothing else.

23       Q    Okay.  Let's talk about the purple, if we could,

24    please.

11:40  25       A    What purple?

243

Bua Thi Phan, VOL. II                                    May 4, 2011

```
        1        Q    Yes.

        2        A    And then after he was shot, tat, tat, tat, and

        3   he fell down, and then his face -- he -- he died.

        4        Q    Okay.

11:45   5        A    Right away.

        6        Q    As soon as he was on the ground, his face turned

        7   very purple?

        8        A    Yes.

        9        Q    Did it ever get more purple than the very purple

11:45  10   you just told us about, or did it stay that color?

       11        A    It stayed that way.  And he died, nothing else.

       12   He flatly fell down, and he lied there, and he died.

       13        Q    Did the very purple ever change any other color?

       14        A    I don't know.  I don't know.  He died, and his

11:46  15   skin -- his face, skin complexion, was purple.

       16        Q    Okay.  Thank you.  You said a third officer

       17   arrived?

       18        A    Yes.

       19        Q    Was this before or after Andy's face turned very

11:46  20   purple?

       21        A    No.  He came after.  His face already turned

       22   purple before the third officer came.

       23        Q    Okay.  Before the third officer came -- strike

       24   that.

11:46  25             What made you see the third officer?  What
```

246

Beach Court Reporting
714-368-1010

Bua Thi Phan, VOL. II

May 4, 2011

 1      A    Yeah, they transport him away.  He already died.

 2      Q    And you knew Andy was dead right -- as soon as

 3  you heard the tat, tat, tat, tat, right?

 4      A    Yes.  He fell down, there was no moving, and

12:02  5  there was no sign of color, blood, and that was it.

 6      Q    Okay.  Thank you.  Do you -- do you remember,

 7  for example, seeing the vehicle that transported Andy

 8  away arrive?

 9      A    Yes.  Yes, I did, yes.

12:03 10      Q    You saw it arrive?

11      A    Yes.

12      Q    When did it arrive?

13      A    About five or seven minutes after he died, then

14  that vehicle arrived.

12:03 15      Q    Okay.  So you saw that vehicle arrive about five

16  or seven minutes after Andy went to the ground?

17           THE INTERPRETER:  After he went to the ground?

18           MR. SHERMAN:  Because that is when he died.

19           THE WITNESS:  Yes.  There was a vehicle that

12:04 20  arrived and transport him away.

21      Q    BY MR. SHERMAN:  What color was that vehicle?

22      A    A red color.

23      Q    Okay.  And did you --

24      A    That was the vehicle that came to take him away.

12:04 25      Q    Did it come --

1                          CERTIFICATE

2                               OF

3                CERTIFIED SHORTHAND REPORTER

4                     *     *     *     *

5

6

7        The undersigned Certified Shorthand Reporter and

8   Deposition Notary Public of the State of California does

9   hereby certify:

10       That the foregoing Deposition was taken before me

11  at the time and place therein set forth, at which time

12  the Witness was duly sworn by me.

13       That the testimony of the Witness and all

14  objections made at the time of the Deposition were

15  recorded stenographically by me and were thereafter

16  transcribed, said transcript being a true and correct

17  copy of the proceedings thereof.

18       In witness whereof, I have subscribed my name, this

19  date: ___5/17/11_____.

20

21

22

        CHRISTINA LYNN MAGALLANES, CSR No. 11192

23

24

25

**EXHIBIT F**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


QUYEN KIM DANG, individually )
and as Guardian ad Litem for )
KENNY MINH CAO TRAN, a minor, )
and personal representative )
of ANDY TRAN, deceased; KENNY )
MINH CAO TRAN, a minor, by and )
through his Guardian ad Litem, )
GUYEN KIM DANG; NAM VAN TRAN, )
biological father of ANDY TRAN,)
deceased; BUA THI PHAN, )
biological mother of ANDY TRAN,)
)
        Plaintiffs, )
)
    vs. )Case No. SACV10-00338
)
CITY OF GARDEN GROVE; GARDEN )
GROVE CHIEF OF POLICE JOSEPH M.)
POLISAR; GARDEN GROVE POLICE )
OFFICER GENDREAU; GARDEN GROVE )
POLICE OFFICER KARSCHAMROOM; )
TASER INTERNATIONAL, INC.; )
and DOES 1 to 10, individuals; )
and ROES 1 to 10 entities, )
inclusive, )
)
        Defendants. )
_____)


VIDEOTAPED DEPOSITION OF BENEDICT LUX

Westminster, California

Tuesday, May 24, 2011


Reported by:
Deborah K. Sylvester
CSR No. 10532

1

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4    QUYEN KIM DANG, individually  )
     and as Guardian ad Litem for  )
5    KENNY MINH CAO TRAN, a minor,  )
     and personal representative   )
6    of ANDY TRAN, deceased; KENNY  )
     MINH CAO TRAN, a minor, by and )
7    through his Guardian ad Litem, )
     GUYEN KIM Dang; NAM VAN TRAN,  )
8    biological father of ANDY TRAN,)
     deceased; BUA THI PHAN,       )
9    biological mother of ANDY TRAN,)
                             )
10               Plaintiffs,       )
                             )
11       vs.                   )Case No. SACV10-00338
                             )
12    CITY OF GARDEN GROVE; GARDEN    )
     GROVE CHIEF OF POLICE JOSEPH M.)
13    POLISAR; GARDEN GROVE POLICE   )
     OFFICER GENDREAU; GARDEN GROVE )
14    POLICE OFFICER KARSCHAMROOM;   )
     TASER INTERNATIONAL, INC.;     )
15    and DOES 1 to 10, individuals; )
     and ROES 1 to 10 entities,    )
16    inclusive,                )
                             )
17               Defendants.      )
     _____)

18

19

20          Videotaped deposition of Benedict Lux,

21   taken on behalf of Plaintiffs, at 8231 Westminster

22   Boulevard, Westminster, California, beginning at

23   10:51 a.m. and ending at 5:51 p.m., on Tuesday,

24   May 24, 2011,  before DEBORAH K. SYLVESTER, Certified

25   Shorthand Reporter No. 10532.

2

```
 1      APPEARANCES:

 2

 3      For Plaintiffs:

 4            LAW OFFICE OF SEAN HENNESSEY
              BY:  SEAN HENNESSEY, ESQ.
 5            8231 Westminster Boulevard
              Westminster, California  92683
 6            (949) 280-1257
              (714) 898-7449 Fax
 7            E-mail:  seanhennesseyesq@gmail.com

 8            -and-

 9            LIEM H. DO & ASSOCIATES
              BY:  PAUL MINHTHU PHAM
10            8231 Westminster Boulevard
              Westminster, California  92683
11            (714) 898-7579
              E-mail:  liemhdoesq@yahoo.com
12
        For Defendants:
13
              FERGUSON, PRAET & SHERMAN
14            BY:  STEVEN A. SHERMAN, ESQ.
              1631 East 18th Street
15            Santa Ana, California  92705
              (714) 953-5300
16            (714) 953-1143 Fax
              E-mail:  ssherman@law4cops.com
17
        Also Present:
18
              BARRY VARANESE, VIDEOGRAPHER
19

20

21

22

23

24

25
```

3

5

```
1                          I N D E X
2    Examination by:                                    Page
3    Mr. Pham                                              6
4    Mr. Hennessey                                        26
5
6
7                        E X H I B I T S
8                                            Page      Page
     Plaintiffs'  Description             Introduced  Marked
9
     Exhibit 1    Garden Grove Police         69        69
10                Department Use of Deadly
                  Force Review Board
11                Report of Findings
12   Exhibit 2    General Order 2.24         104       105
13   Exhibit 3    Notice of Deposition      194       194
                  of Garden Grove Police
14                Officer Ben Lux and
                  Request For Production
15                of Records and Things
16   Exhibit 4    Amended Notice of         194       194
                  Deposition of Garden Grove
17                Police Officer Ben Lux
                  and Request For Production
18                of Records and Things
19
20
21           QUESTIONS NOT ANSWERED BY THE WITNESS
22                    PAGE          LINE
23                    236            12
24
25
```

4

CERTIFICATION

OF

CERTIFIED SHORTHAND REPORTER


I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name. _____.

Dated: _____


Certificate Number 10532

279

1      Q    Did you hold any other concurrent duties in

2    September of 2008 specifically?

3           MR. SHERMAN:  Objection.  Asked and answered.

4           Go ahead.

11:15:25  5      THE WITNESS:  I don't understand the question.

6    BY MR. PHAM:

7      Q    I'll withdraw.

8           Did you review any documents for your

9    deposition today?

11:15:57 10      A    No.  I take it back.  The subpoena that was

11   e-mailed to me, I looked at that.

12     Q    Other than the subpoena, any documents?  Did

13   you review any other documents?

14     A    No.

11:16:15 15      Q    Do you know what the lawsuit, this lawsuit,

16   is about?

17     A    Not really.

18     Q    Do you know that this is -- the plaintiffs

19   have initiated a civil rights and wrongful death

11:17:05 20   lawsuit?

21     A    I understand that, yes.

22     Q    When did you -- do you know the name of the

23   decedent?

24     A    No.

11:17:11 25      Q    When did you first come to know about the

1    Q    How long did you hold the rank of Taser

2    instructor at the Garden Grove Police Department?

3         MR. SHERMAN:  Objection.  Assumes facts not in

4    evidence, misstates prior testimony.

12:35:42  5         Go ahead.

6         THE WITNESS:  Until I retired.

7    BY MR. HENNESSEY:

8    Q    Again, that was in July of 2010?

9    A    Yes.

12:35:56  10    Q    So would it be fair to say that from 19- --

11   from approximately 1992 until July of 2010, you were

12   one of several Taser instructors at the Garden Grove

13   Police Department?

14   A    Yes.  But can I clarify one thing?

12:36:15  15    Q    Sure.

16   A    Because you keep saying 1992.

17   Q    Yes.  If I'm making a mistake, please.

18   A    I wasn't promoted to sergeant until 1998, and

19   I believe this was 2002 --

12:36:25  20    Q    Okay.  Thank you.

21   A    -- when all this occurred, sometime in

22   that --

23   Q    And again, it is -- I will never admonish you

24   for correcting the record.  Okay?  And I certainly am

12:36:40  25   not trying to misrepresent the record.  I guess I'm

65

1    jet-lagged.

2              So 2002 is when you went through the

3    M26 Taser 16-hour program?

4        A    I believe it was in that time period, yes.

12:36:53   5        Q    Give or take.  Okay.  All right.

6              And again, would it be fair to say that at

7    that point in time, other than these Canine officers,

8    no one at the Garden Grove Police Department were

9    using any type of electronic control devices of any

12:37:11   10   type, to your knowledge, prior to 2002?

11       A    Not to my knowledge.

12       Q    And when you are found -- when you are

13   determined to be a Taser instructor by passing this

14   school in Garden Grove, do you receive any type of

12:37:30   15   certificates, awards, trophies, plaques?

16       A    I believe I received a certificate from

17   Taser International.

18       Q    Was -- how long -- from 2002, do you know how

19   long the M26 Taser was used by the Garden Grove

12:38:00   20   Police Department?

21       A    No.

22       Q    Would it be fair to say that at some point in

23   time the M26 TASERS were replaced with the X26 Taser

24   models?  Is that fair?

12:38:17   25       A    They were phasing out the M26's.  They still

HAHN & BOWERSOCK 800-660-3187 FAX 714-662-1398
151 KALMUS DRIVE, SUITE L1 COSTA MESA, CA 92626

1    use-of-force memo through my chain of command.

2         Q    Are you familiar with Sergeant Wagner?

3         A    Yes.

4         Q    Back in -- did you know him back on

**12:56:58** 5    September of 2008?

6         A    Yes.

7         Q    Was his job title the same as your job title

8    in 2008, meaning a field supervisor?

9         A    No.

**12:57:12** 10         Q    Do you know what the difference in your

11    titles was, if you have any personal knowledge?

12         A    In 2008, I was an investigative supervisor.

13         Q    Okay.  What did you understand

14    Sergeant Wagner's role to be in September of 2008, if

**12:57:28** 15    you have any personal knowledge?

16         A    I don't know.

17         Q    If he described himself as a field

18    supervisor, a sergeant field supervisor doing all of

19    the things that you've described -- morning

**12:57:40** 20    briefings, responding to calls, listening to radio

21    broadcasts and things like that -- what job does that

22    sound like to you given the time that you spent in

23    the Garden Grove Police Department?

24         MR. SHERMAN:  Objection.  Speculation, assumes

**12:58:03** 25    facts not in evidence, misstates prior testimony.

81

1        You certainly may answer.

2        THE WITNESS:  It would sound to me like he was

3    a patrol field supervisor.

4    BY MR. HENNESSEY:

12:58:10  5        Q     And you also held the same position, as a

6    patrol field supervisor?

7        A     At that time?

8        Q     No, no, not at that time.  During the time

9    frames that we've already talked about.

12:58:24  10       A     Yes.

11       Q     And was it in your role as a patrol

12   supervisor that you would, as you described, go to

13   the scene of a Tasering, ensure that the subject

14   received the proper medical advice, ensure there was

12:58:46  15   an appropriate investigation, and that a use-of-force

16   memo was prepared?  Was that all done by you?

17       MR. SHERMAN:  Objection.  Misstates prior

18   testimony.

19       Go ahead.

12:58:58  20       THE WITNESS:  Yes.

21   BY MR. HENNESSEY:

22       Q     I mean, did you write the Use of Force Report

23   yourself?

24       A     Yes, I would.

12:59:03  25       Q     Why would you write the Use of Force Report

82

1    as opposed to anybody else, if you know?

2        A    Because the General Order stated that the

3    field supervisor was responsible for doing it.

4        Q    Had you ever been involved, during the time

12:59:29  5    when you were a field supervisor, in a Taser

6    deployment that resulted in death within, let's say,

7    half an hour after deployment?  Had you ever come

8    across that situation in your capacity as a field

9    supervisor?

12:59:48  10            MR. SHERMAN:   Objection.   Irrelevant,

11    immaterial, vague and ambiguous, overbroad.

12            Go ahead.

13            THE WITNESS:   No.

14    BY MR. HENNESSEY:

12:59:54  15    Q    Have you ever heard of that happening since

16    September 3rd, 2008?

17            MR. SHERMAN:   Same objections plus overbroad.

18            Go ahead.

19    BY MR. HENNESSEY:

01:00:02  20    Q    Until the time that you retired.

21        A    Not that I recall.

22        Q    Are you aware of any other sudden in-custody

23    death following the use of a Taser other than

24    Mr. Andy Tran's case?

01:00:18  25            MR. SHERMAN:   I'm going to object to the

1    Is your memory now refreshed in any way?

2        A    Okay.   I don't have any independent

3    recollection of doing that, but if the officer says I

4    did, then I did.

03:21:28  5             MR. SHERMAN:   That's fine.   You've answered the

6    question.   Thank you.

7    BY MR. HENNESSEY:

8        Q    What portions of the Taser videos -- okay.

9    You say that these classes are an hour in length;

03:21:42  10   true?

11       A    Uh-huh, thereabouts, yeah.

12       Q    How much of that time is taken up watching

13   videos from the Taser International video?

14             MR. SHERMAN:   Objection.   Asked and answered,

03:21:53  15   calls for possible speculation, lacks foundation.

16             Go ahead.

17             THE WITNESS:   I'd say the vast majority of it

18   has to do with watching the PowerPoint presentation

19   plus there are video vignettes intermingled with it.

03:22:12  20   BY MR. HENNESSEY:

21       Q    Who selected -- you're teaching by yourself

22   in these classes after these group settings ended

23   back in 2003; right?

24       A    Okay.

03:22:25  25       Q    Is that true?

151

| | |
|---|---|
| 1 | A    Taser made it. |
| 2 | Q    Oh, okay.  So it's all Taser International? |
| 3 | A    Yes. |
| 4 | Q    Okay.  So does Garden Grove Police Department |
| 03:23:24  5 | offer anything, other than what they're told by Taser |
| 6 | International, for the use of these weapons in the |
| 7 | field -- |
| 8 | MR. SHERMAN:  Objection. |
| 9 | BY MR. HENNESSEY: |
| 03:23:32  10 | Q    -- or do you only rely upon Taser |
| 11 | International? |
| 12 | MR. SHERMAN:  Objection.  Vague and ambiguous, |
| 13 | it's overbroad in both scope and time, lacks |
| 14 | foundation, it assumes facts not in evidence. |
| 03:23:43  15 | BY MR. HENNESSEY: |
| 16 | Q    From the classes that you've taught. |
| 17 | MR. SHERMAN:  It's compound. |
| 18 | THE WITNESS:  The information on the use of the |
| 19 | X26 is right from the Taser DVD. |
| 03:23:51  20 | BY MR. HENNESSEY: |
| 21 | Q    Okay.  The DVD that you've acknowledged is |
| 22 | hours and hours in length. |
| 23 | A    Uh-huh. |
| 24 | Q    Yes? |
| 03:23:57  25 | A    Yes. |

153

```
      1    in -- let's say before 2007 since you don't remember

      2    that -- about the possible consequences of Tasering

      3    somebody who may suffer from a mental illness, if

      4    any?

03:45:29  5           MR. SHERMAN:  Vague.

      6    BY MR. HENNESSEY:

      7        Q    Other than they may not be violent and there

      8    may be no reason whatsoever to Taser them, did

      9    anything else come up other than that?

03:45:39 10           MR. SHERMAN:  Objection.  Misstates prior

     11    testimony.

     12           Go ahead.

     13           THE WITNESS:  Not that I recall.

     14    BY MR. HENNESSEY:

03:45:48 15        Q    Would it be appropriate to Taser -- do you

     16    teach in your classes -- well, are you aware of the

     17    term "noncombative resistance"?

     18        A    Yes.

     19        Q    How did you become aware of the term

03:46:03 20    "noncombative resistance"?

     21        A    It's in the Garden Grove Police Department

     22    General Orders.

     23        Q    And can you describe what noncombative

     24    general resistance is or do I need to show you the

03:46:14 25    General Orders?
```

176

```
 1              MR. SHERMAN:  Well, let me object.  It calls

 2      for possible speculation, lacks foundation.

 3              THE WITNESS:  I can describe the scenario that

 4      I was told to define noncombative resistance.

 5      BY MR. HENNESSEY:

 6          Q    If you can do that and then, you know --

 7          A    That would be somebody who is relatively in

 8      control or under control by the police officers.

 9      They're not offering active resistance.

10              The example was somebody laying on their

11      stomach with their hands, like, under their chest

12      resisting arrest, resisting handcuffing by not

13      allowing the officers to pull their hands behind

14      their back and handcuff them, but not actively

15      resistant, not fighting or struggling.

16          Q    In those situations do you teach your

17      students it's okay to Taser those people?

18          A    No.

19          Q    Why not?

20          A    Because it's noncombative resistance.

21          Q    So what?  They're not allowing themselves to

22      be handcuffed.

23              MR. SHERMAN:  Objection.  Argumentative.

24      BY MR. HENNESSEY:

25          Q    I mean, these people are actively frustrating
```

03:46:29   5
03:46:45  10
03:47:04  15
03:47:12  20
03:47:21  25

177

1    the handcuffing process of a law enforcement agent;

2    correct?

3         MR. SHERMAN:   Incomplete hypothetical, vague.

4    BY MR. HENNESSEY:

03:47:31  5    Q    What you just described --

6    A    Right.

7    Q    -- the situation that you just described

8    where somebody is laying on their stomach with their

9    hands under their stomach making it difficult for law

03:47:39 10    enforcement to gain control of their hands and get

11    them behind their back, why can't you Taser them?

12         MR. SHERMAN:   Objection.  Argumentative, vague.

13         THE WITNESS:   Because they aren't being

14    combative.

03:47:52 15    BY MR. HENNESSEY:

16    Q    They are being combative.  They are

17    resisting.  They are actively resisting by not

18    allowing their hands to be handcuffed.

19         MR. SHERMAN:   Objection.  Asked and answered

03:48:01 20    and argumentative.

21         THE WITNESS:   Then I think we should define

22    what "combative" is first.

23    BY MR. HENNESSEY:

24    Q    I'm asking you.

03:48:07 25    A    I don't --

178

```
 1        Q    So somebody can resist, and it's not right to

 2   Taser them.  Would you agree with that statement?

 3             MR. SHERMAN:  Objection.  Vague.

 4   BY MR. HENNESSEY:

 5        Q    Would you agree with the statement that

 6   somebody could resist law enforcement, yet it would

 7   be inappropriate to Taser them?

 8             MR. SHERMAN:  Objection.  Vague, incomplete

 9   hypothetical, lacks foundation, assumes facts not in

10   evidence.

11             THE WITNESS:  I'd say yes, that's possible,

12   yes.

13             MR. SHERMAN:  Vague and ambiguous.

14   BY MR. HENNESSEY:

15        Q    And that's what you teach to your students?

16        A    Uh-huh.

17        Q    Correct?

18        A    Yes.

19        Q    That these are a dangerous weapon.  You do

20   teach that to your students, that TASERS are a

21   dangerous weapon; correct?

22             MR. SHERMAN:  Objection.  Assumes facts not in

23   evidence, lacks foundation.

24             THE WITNESS:  I don't know if you'd classify it

25   as a weapon.
```

03:48:15   5
03:48:27   10
03:48:33   15
03:48:41   20
03:48:52   25

179

BY MR. HENNESSEY:

    Q    Looking at what we've previously marked as
No. 2, I just want to go over when you put on your
classes, do you go over General Order 2.24 with your
students?

    A    Yes.

    Q    Is it -- I mean, how is it explained to them?
I mean, is it -- do you give them a copy of them and
have them read it all or do you discuss different
aspects of it?  Is it a question-and-answer session?
How would you describe it?

    MR. SHERMAN:  I'll object as compound.  Are you
talking about what is the class or what is the class on
the 2.24?  It's compound.

    Go ahead.

    MR. HENNESSEY:  The class as it relates to
dealing with Garden Grove General Order 2.24.

    THE WITNESS:  Okay.  I give every member of the
class a copy of the General Order, and then I read it
aloud to them word for word and ask them if they have
any questions along the line.

BY MR. HENNESSEY:

    Q    Okay.  And so you're reading it word for
word?

    A    Yes.

199

```
 1                Is that your representation?

 2                MR. HENNESSEY:  Absolutely it is.  This is not

 3       how it looks.  It's General Order 2.6, "Use of Physical

 4       Force," and then they go through some definitions.  And

 5       then on the next page down --

 6                MR. SHERMAN:  Maybe.

 7       BY MR. HENNESSEY:

 8          Q    On the next page down, it then discusses or

 9       defines -- it says "Noncombative resistance defined"

10       and lists three different areas, one of which you --

11       I believe you were referencing earlier.

12                But starting with No. 1, "An individual does

13       not respond to an officer's requests or commands and

14       may be argumentative," is that your understanding,

15       while a Garden Grove police officer, of an act of

16       noncombative resistance?

17          A    Yes.

18          Q    As a Taser instructor for ten years, would it

19       be appropriate to Taser somebody whose actions are

20       noncombative as described in definition No. 1?

21                MR. SHERMAN:  Let me object to the form of the

22       question in that it misstates prior testimony and is an

23       incomplete hypothetical, it's vague and ambiguous.

24       BY MR. HENNESSEY:

25          Q    I just want you to assume that you have an
```

04:28:58   5
04:29:16  10
04:29:40  15
04:29:59  20
04:30:11  25

204

```
 1    individual who, as defined here, "an individual does
 2    not respond to an officer's requests or commands and
 3    may be argumentative."
 4             If that is what the person is doing, as a
 5    Taser instructor, would you school your students that
 6    this is an appropriate situation where the deployment
 7    of a Taser would be okay?
 8             MR. SHERMAN:  Same objections.
 9             THE WITNESS:  I would say --
10             MR. SHERMAN:  Incomplete hypothetical, vague
11    and ambiguous.
12             Go ahead.
13             THE WITNESS:  I would say that this would not
14    be an appropriate time to use the Taser.
15    BY MR. HENNESSEY:
16        Q    This would not be an appropriate time to use
17    the Taser?
18        A    Yes.
19        Q    What about what is described in noncombative
20    resistance No. 1, as I've already read -- why isn't
21    that a situation where you would say a Taser
22    deployment would be appropriate or inappropriate?
23             MR. SHERMAN:  Objection.  Argumentative, it's
24    vague and ambiguous, it possibly calls for an expert
25    opinion from a lay witness.
```

04:30:29   5
04:30:47  10
04:30:53  15
04:31:01  20
04:31:27  25

205

1          THE WITNESS:  I'm confused now.  Can I just ask

2     a clarifying question?

3     BY MR. HENNESSEY:

4          Q     Sure.

04:31:38    5          A     Are you asking that under No. 1,  would that

6     be an appropriate time to deploy the Taser?

7          Q     Right.

8          A     Is that what you're asking me?

9          Q     Yes, yes.  You're going through a classroom

04:31:50   10     type of discussion and then you come up with a

11     situation like this.  You know, as a police officer

12     you come across jerks every single day who are going

13     to mouth off and they're going to be basic idiots.  I

14     mean, that's part of the job, coming across people

04:32:05   15     like that.  Okay?

16          A     Uh-huh.

17          Q     But they're not fistfighting, they're not

18     pushing, shoving, kicking, hurting, stuff like that.

19     The individual does not respond to an officer's

04:32:16   20     requests or commands and may be argumentative.

21          A     I would say you should not use -- deploy the

22     Taser at that point.

23          Q     Why not?

24          MR. SHERMAN:  Same objections as before.

04:32:31   25     ///

206

BY MR. HENNESSEY:

Q    No. 2, "An individual's verbal or nonverbal

actions indicates he is not complying with the

officer's requests or demands."  In that situation,

would that -- in that situation, would you -- would

you recommend Taser deployment as an appropriate

option in that situation?

MR. SHERMAN:  Objection.  Vague and ambiguous,

incomplete hypothetical.

Go ahead.

THE WITNESS:  Again, I would not recommend that

the Taser be deployed in that -- in the situation

described in No. 2.

BY MR. HENNESSEY:

Q    And why not?

A    Because --

MR. SHERMAN:  Calls for possible expert

opinion.

Go ahead.

THE WITNESS:  Oh, because just because

somebody's nonverbal actions indicate that he's not

complying with the officer's requests or demands --

maybe the person is deaf.

BY MR. HENNESSEY:

Q    Or just being a jerk or something like that?

209

1    A    Or just being a jerk.  There's no law against

2    just being a jerk.

3         MR. SHERMAN:  Thank goodness.  I would have

4    been arrested years and years ago.

04:35:43  5         MR. HENNESSEY:  I think many people in this

6    room probably would have.

7    BY MR. HENNESSEY:

8    Q    But the third one, "An individual is actively

9    resisting handcuffing techniques but is reasonably

04:35:53 10   under control by the officers," in that situation, do

11   you believe or would you recommend to your students

12   faced with this particular situation that a Taser

13   deployment is warranted?

14        MR. SHERMAN:  Objection.  Vague and ambiguous,

04:36:14 15   incomplete hypothetical.

16        Go ahead.

17        THE WITNESS:  Again, under those circumstances,

18   I would not recommend that they deploy the Taser.

19   BY MR. HENNESSEY:

04:36:24 20   Q    And why not in this situation?  Because

21   clearly the guy is being handcuffed.

22   A    Okay.

23   Q    I mean, there's something going on that's

24   resulting in this guy being handcuffed.  Okay?

04:36:33 25   However, it does also say that he's otherwise

210

1    reasonably under control by the officers.

2            Why, in situation No. 3, would you advise

3    against deployment of a Taser in that particular

4    situation?

04:36:50  5            MR. SHERMAN:  Objection.  Relevance, incomplete

6    hypothetical, vague and ambiguous, calls for possible

7    expert opinion.

8            Go ahead.

9            THE WITNESS:  Because in No. 3, even though the

04:37:02  10   subject is actively resisting, he's reasonably under

11   control by the officers.

12   BY MR. HENNESSEY:

13       Q    And when you say "reasonably under control by

14   the officers," what types of situations could that

04:37:20  15   mean to you as a 30-year police officer?

16           MR. SHERMAN:  Objection.  Vague and ambiguous.

17   BY MR. HENNESSEY:

18       Q    In 1982 to -- 28-year police officer.

19       A    29 years, two months.

04:37:38  20       Q    29 years, two months.  Thank you.

21           MR. SHERMAN:  That's not what my objection was

22   based on.  My objection was based on --

23           MR. HENNESSEY:  It makes a big difference as

24   far as the 2.7 percent retirement.

04:37:46  25           MR. SHERMAN:  It does.

211

1          MR. SHERMAN:  That's fine.  I'm doing it.

2          The code requires that we meet and confer,

3     so --

4          MR. HENNESSEY:  You're not saying anything that

05:17:34  5     surprises me.

6          MR. SHERMAN:  And I appreciate that, and I know

7     you expected it, and I know we talked about it when we

8     did the Rule 26 originally.  However --

9          MR. HENNESSEY:  I'll tell you, I am the least

05:17:46 10     concerned about a motion for summary judgment in this

11     particular case.

12          MR. SHERMAN:  I'm just bringing it up, that's

13     all.

14     BY MR. HENNESSEY:

05:17:53 15     Q    Are you saying, if there's time permitting,

16     that the first officer should make an inquiry as to

17     why things are being done?

18          MR. SHERMAN:  Objection.  Irrelevant,

19     immaterial, incomplete hypothetical, vague and

05:18:03 20     ambiguous, speculation, assumes facts not in evidence.

21          THE WITNESS:  I would say that it would appear

22     reasonable for an officer to make an inquiry, if

23     practical, as to what the second officer is doing,

24     especially if the first officer is the one required to

05:18:18 25     write reports and document everything.

247

1    times.  I'm just wondering if you are aware of

2    Officer Gendreau deploying his Taser against suspects

3    in the field other than on September 3, 2008.

4              MR. SHERMAN:  Same objections.  Go ahead.

05:20:03  5              THE WITNESS:  No, I'm not aware.

6    BY MR. HENNESSEY:

7         Q    Is it your indication that upon encountering

8    a situation that may require the use of a Taser, the

9    officer shall request the response of a backup

05:20:19 10    officer and a supervisor, is no longer applicable?

11              MR. SHERMAN:  Objection.  Vague and ambiguous.

12              You can answer the question if you understand

13    it.

14              THE WITNESS:  I don't understand "no longer

05:20:30 15    applicable."

16    BY MR. HENNESSEY:

17         Q    Is that still the General Order of the Garden

18    Grove Police Department, that upon encountering a

19    situation that may require the use of a Taser, the

05:20:44 20    officer shall request the response of a backup

21    officer and a supervisor?  Is that still in force and

22    effect today?

23              MR. SHERMAN:  Let me object to the form of the

24    question as calls for possible speculation, lacks

05:20:56 25    foundation.

249

1          Go ahead.

2          THE WITNESS:  I would say yes.

3     BY MR. HENNESSEY:

4      Q    At what point is -- when an officer comes

05:21:04   5     upon a situation where they realize they're going to

6     deploy a Taser, at what point are they required to

7     notify the supervisor?  Before the Tasering event or

8     after the Tasering event?

9      A    If they have the time, before a Tasering

05:21:23   10    event.

11     Q    All right.  So if the officer has time to,

12    say, to attempt to turn on his IVS unit on his belt,

13    what else -- what would be different than notifying a

14    supervisor than trying to turn on your IVS unit on

05:21:44   15    your belt?

16          MR. SHERMAN:  Objection.  Vague and ambiguous.

17    BY MR. HENNESSEY:

18     Q    Is one much more time-consuming than the

19    other?

05:21:48   20     A    Yes.

21     Q    Which is more time-consuming?

22     A    Calling for a supervisor.

23     Q    Well, how is that more time-consuming?

24     A    Well, when you turn on the IVS unit from your

05:21:58   25    belt, it's a button you press.  That's all you do.

250

1    Q    In your 29.2 years as a police officer, have

2    you ever come across the term "crisis-intervention

3    training" in relation to law enforcement?

4         MR. SHERMAN:  Objection.  Irrelevant, overbroad

05:23:26  5    in scope and time, vague and ambiguous, probably

6    compound too.

7         Go ahead.

8         THE WITNESS:  I don't recall specifically

9    anything about crisis-intervention training.

05:23:50  10   BY MR. HENNESSEY:

11        Q    Have you trained your students in Taser

12   deployment to use extra caution when deploying a

13   Taser against somebody who may be under the influence

14   of a central-nervous stimulant?

05:24:11  15        MR. SHERMAN:  Objection.  Asked and answered.

16        Go ahead.

17        THE WITNESS:  This is a general question?

18   BY MR. HENNESSEY:

19        Q    A general question, yes.

05:24:19  20        A    Have I cautioned them, is that the question?

21        Q    Have you ever explained to your students that

22   people who may be under the influence of

23   central-nervous-system stimulants may be at a greater

24   increased risk for sudden death following Taser

05:24:36  25   deployment?

252

```
 1              MR. SHERMAN:  Compound.  Same objection.  Also,
 2    asked and answered.  Sorry.
 3              THE WITNESS:  Yes.
 4    BY MR. HENNESSEY:
 5       Q    Where have -- do you train that -- do you
 6    teach that in each of your classes, that people --
 7    that extra caution should be utilized when deploying
 8    a Taser against a potential suspect who may be under
 9    the influence of a central nervous system because
10    they may be at increased risk of death from Taser
11    deployment, in all of your classes?
12       A    Yes.
13              MR. SHERMAN:  Compound, vague and ambiguous.
14              THE WITNESS:  Sorry.
15              MR. SHERMAN:  That's all right.
16              Also, it's asked and answered.
17    BY MR. HENNESSEY:
18       Q    And what specifically do you tell your
19    students about why those people may be at increased
20    risk of sudden death following Taser deployment --
21              MR. SHERMAN:  Same objections.
22    BY MR. HENNESSEY:
23       Q    -- those who may be under the influence of
24    CNS's?
25       A    I --
```

05:24:42   5
05:25:00  10
05:25:09  15
05:25:19  20
05:25:28  25

253

1          MR. SHERMAN:  Same objections again.

2          THE WITNESS:  Sorry.

3          MR. SHERMAN:  Same objections plus it calls for

4     a possible medical opinion.

05:25:33  5          Go ahead.

6          THE WITNESS:  I tell them what is on the Taser

7     DVD, which includes a PowerPoint and various vignette

8     videos.

9     BY MR. HENNESSEY:

05:25:53 10     Q     Okay.

11     A     Okay?  That's what I tell them, what Taser

12     instructs us to tell them.

13     Q     What specifically can you recall as you sit

14     here today about what Taser instructs law-office

05:26:09 15     personnel about deploying TASERS against those who

16     may appear to be under the central-nervous-system

17     stimulant, because of potential sudden death from

18     Taser deployments?

19          MR. SHERMAN:  Compound, vague and ambiguous.

05:26:23 20     BY MR. HENNESSEY:

21     Q     I mean, what can you remember them saying in

22     that regard?

23     A     Specifically, I don't remember exactly what

24     they say.

05:26:31 25     Q     Can you state in general?

254

1          A     But in general, because they have -- usually

2     central-nervous-system stimulants, they have elevated

3     pulses, elevated blood pressure, things like that

4     that you need to be aware of.

05:26:45  5          Q     And what, if anything, do you tell your

6     students about decision making about deploying TASERS

7     against people they believe are under the influence

8     of a central-nervous-system stimulant?

9                MR. SHERMAN:   Objection.  Vague, ambiguous,

05:27:06 10     incomplete hypothetical, possibly even asked and

11     answered.

12                THE WITNESS:   That they need to be aware of

13     these conditions that these people are subject to.

14     They could have a heart attack, you know, so you need

05:27:19 15     to be aware of that.

16     BY MR. HENNESSEY:

17          Q     Because of the deployment of the Taser

18     coupled with the central-nervous-system stimulants --

19                MR. SHERMAN:   Objection.

05:27:26 20     BY MR. HENNESSEY:

21          Q     -- is that what you tell them?

22                MR. SHERMAN:   Objection.

23                Incomplete hypothetical, calls for a

24     possible --

05:27:32 25                THE WITNESS:   No.

255

```
 1          Q     In what way?

 2          A     You don't Tase somebody just because they're

 3     mentally ill.

 4          Q     What are your -- what do you teach -- I mean,

 5     you say that not only do you show the portions of the

 6     Taser video to your students, you also read verbatim

 7     General Order 2.24; is that true?

 8          A     Yes.

 9                MR. SHERMAN:  Objection.  Asked and answered.

10                Go ahead.

11                THE WITNESS:  Oh, sorry.

12     BY MR. HENNESSEY:

13          Q     And you indicated that while you read this

14     General Order 2.24, you also emphasize certain areas

15     during your reading; true?

16                MR. SHERMAN:  Objection.  Misstates.

17     BY MR. HENNESSEY:

18          Q     Well, is that true?

19          A     Yes.

20          Q     In relation to medical treatment, do you

21     agree with this statement:  "Before the use of the

22     Taser, if practical, request that fire department

23     paramedics respond to the scene"?  Do you agree with

24     that?

25          A     Yes.
```

05:32:20  5
05:32:36  10
05:32:45  15
05:32:54  20
05:33:09  25

260

```
 1              THE WITNESS:  The information that I recall
 2    receiving from Taser from training, they don't talk
 3    about Taser exacerbating injuries.
 4    BY MR. HENNESSEY:
 5         Q    But this document was not written by Taser.
 6         A    Right.
 7         Q    This was written by the Garden Grove Police
 8    Department personnel; is that true?
 9              MR. SHERMAN:  Well, I'll object to the question
10    as calls for speculation, assumes facts not evidence,
11    lacks foundation.
12    BY MR. HENNESSEY:
13         Q    Well, you already explained who in your
14    department was partially responsible for authoring
15    this document; true?
16         A    Yes.
17         Q    And are you aware that this document was
18    prepared by members of the Garden Grove Police
19    Department as opposed to Taser International?
20         A    Yes.
21         Q    So although Taser may not acknowledge their
22    products can harm anybody except for situations where
23    they may fall and hurt themselves, the Garden Grove
24    Police Department has recognized it prudent to call
25    for paramedics, if practical, prior to the time a
```

Timestamps:
05:34:29 — line 5
05:34:39 — line 10
05:34:48 — line 15
05:35:01 — line 20
05:35:19 — line 25

262

1    Taser is deployed, and you agree with that policy;

2    true?

3         A    True.

4         Q    And that's what you teach to your students in

05:35:32  5    your class; is that right?

6         A    Yes.

7         Q    And again, as far as responding to a -- as

8    far as summoning a paramedic, we are talking about

9    somebody activating their radio and putting out

05:35:53  10   either a coded message or a request for a paramedic

11   to arrive at a scene; is that true?

12        MR. SHERMAN:  Objection.  Speculation,

13   foundation, assumes facts not in evidence.

14        Go ahead.

05:36:06  15        THE WITNESS:  That's true.

16   BY MR. HENNESSEY:

17        Q    In your past, as a 29.2-year police officer,

18   have you ever had occasion to call for the paramedics

19   to come to a scene?

05:36:18  20        MR. SHERMAN:  Objection.  Vague and ambiguous,

21   overbroad in both scope and time.

22        THE REPORTER:  I'm sorry.  One more time.

23   "Vague and ambiguous, overbroad" --

24        MR. SHERMAN:  In both scope and time.  It's

05:36:25  25   irrelevant, too.  I forgot it.

263

1           Go ahead.

2           THE WITNESS:  Yes.

3    BY MR. HENNESSEY:

4        Q   How much time does it take for you to place a

**05:36:33** 5    call to the paramedics requesting them to respond to

6    a scene, normally?

7           MR. SHERMAN:  Same objections.

8           Go ahead.

9           THE WITNESS:  A couple seconds.  A couple,

**05:36:47** 10   three seconds, generally.  It's just like when I talked

11   about earlier requesting for a supervisor.

12   BY MR. HENNESSEY:

13       Q   So it would generally take two to three

14   seconds to request either a paramedic to respond

**05:37:00** 15   and/or a supervisor to respond if time permits?

16       A   If the radio is not busy, if there are not

17   other people talking.  It could be more, it could be

18   less.

19       Q   And on a three-person call, you're aware that

**05:37:15** 20  the channels are kept to a minimum during three-car

21   calls; true?

22           MR. SHERMAN:  Objection.  Vague.

23   BY MR. HENNESSEY:

24       Q   A Garden Grove Police Department three-car

**05:37:26** 25  call, radio traffic for those calls are kept to a

264

1      Taser is deployed, and you agree with that policy;

2      true?

3          A    True.

4          Q    And that's what you teach to your students in

05:35:32  5    your class; is that right?

6          A    Yes.

7          Q    And again, as far as responding to a -- as

8      far as summoning a paramedic, we are talking about

9      somebody activating their radio and putting out

05:35:53 10    either a coded message or a request for a paramedic

11     to arrive at a scene; is that true?

12              MR. SHERMAN:  Objection.  Speculation,

13     foundation, assumes facts not in evidence.

14              Go ahead.

05:36:06 15             THE WITNESS:  That's true.

16     BY MR. HENNESSEY:

17         Q    In your past, as a 29.2-year police officer,

18     have you ever had occasion to call for the paramedics

19     to come to a scene?

05:36:18 20             MR. SHERMAN:  Objection.  Vague and ambiguous,

21     overbroad in both scope and time.

22              THE REPORTER:  I'm sorry.  One more time.

23     "Vague and ambiguous, overbroad" --

24              MR. SHERMAN:  In both scope and time.  It's

05:36:25 25    irrelevant, too.  I forgot it.

263

1            Go ahead.

2            THE WITNESS:  Yes.

3      BY MR. HENNESSEY:

4            Q    How much time does it take for you to place a

05:36:33  5      call to the paramedics requesting them to respond to

6      a scene, normally?

7            MR. SHERMAN:  Same objections.

8            Go ahead.

9            THE WITNESS:  A couple seconds.  A couple,

05:36:47 10      three seconds, generally.  It's just like when I talked

11      about earlier requesting for a supervisor.

12      BY MR. HENNESSEY:

13            Q    So it would generally take two to three

14      seconds to request either a paramedic to respond

05:37:00 15      and/or a supervisor to respond if time permits?

16            A    If the radio is not busy, if there are not

17      other people talking.  It could be more, it could be

18      less.

19            Q    And on a three-person call, you're aware that

05:37:15 20      the channels are kept to a minimum during three-car

21      calls; true?

22            MR. SHERMAN:  Objection.  Vague.

23      BY MR. HENNESSEY:

24            Q    A Garden Grove Police Department three-car

05:37:26 25      call, radio traffic for those calls are kept to a

264

266

1    Taser is deployed, and you agree with that policy;

2    true?

3        A    True.

4        Q    And that's what you teach to your students in

05:35:32  5    your class; is that right?

6        A    Yes.

7        Q    And again, as far as responding to a -- as

8    far as summoning a paramedic, we are talking about

9    somebody activating their radio and putting out

05:35:53  10    either a coded message or a request for a paramedic

11    to arrive at a scene; is that true?

12            MR. SHERMAN:  Objection.  Speculation,

13    foundation, assumes facts not in evidence.

14            Go ahead.

05:36:06  15            THE WITNESS:  That's true.

16    BY MR. HENNESSEY:

17        Q    In your past, as a 29.2-year police officer,

18    have you ever had occasion to call for the paramedics

19    to come to a scene?

05:36:18  20            MR. SHERMAN:  Objection.  Vague and ambiguous,

21    overbroad in both scope and time.

22            THE REPORTER:  I'm sorry.  One more time.

23    "Vague and ambiguous, overbroad" --

24            MR. SHERMAN:  In both scope and time.  It's

05:36:25  25    irrelevant, too.  I forgot it.

263

1              Go ahead.

2              THE WITNESS:  Yes.

3    BY MR. HENNESSEY:

4        Q    How much time does it take for you to place a

05:36:33  5    call to the paramedics requesting them to respond to

6    a scene, normally?

7              MR. SHERMAN:  Same objections.

8              Go ahead.

9              THE WITNESS:  A couple seconds.  A couple,

05:36:47  10    three seconds, generally.  It's just like when I talked

11    about earlier requesting for a supervisor.

12    BY MR. HENNESSEY:

13        Q    So it would generally take two to three

14    seconds to request either a paramedic to respond

05:37:00  15    and/or a supervisor to respond if time permits?

16        A    If the radio is not busy, if there are not

17    other people talking.  It could be more, it could be

18    less.

19        Q    And on a three-person call, you're aware that

05:37:15  20    the channels are kept to a minimum during three-car

21    calls; true?

22              MR. SHERMAN:  Objection.  Vague.

23    BY MR. HENNESSEY:

24        Q    A Garden Grove Police Department three-car

05:37:26  25    call, radio traffic for those calls are kept to a

264

```
          1        A    Yes, there was no IVS unit.

          2             MR. SHERMAN:  It's coming up on 6:00.

          3             MR. HENNESSEY:  I'm not that much done -- I'm

          4   not that much further.

05:38:48  5             MR. SHERMAN:  You just scared the reporter.

          6             THE REPORTER:  I just need a minute to change

          7   my paper.

          8             (A recess is taken.)

          9             THE REPORTER:  Whenever you're ready.

05:39:28 10             MR. HENNESSEY:  I'm ready.

         11   BY MR. HENNESSEY:

         12        Q    When you were a field supervisor, a sergeant

         13   field supervisor, you indicated that you did respond

         14   to scenes where TASERS were deployed and that you

05:39:39 15   were the one who personally wrote the General

         16   Order 2.6 Use of Physical Force Report.  Is that

         17   true?

         18        A    I wrote a Use of Force Memo, yes.

         19        Q    The Use of Force Memorandum that's directed

05:39:50 20   to the chief of police that's required under both

         21   General Order 2.24 and General Order 2.6?

         22        A    Yes.

         23        Q    Was there ever a time where you were advised

         24   to not write such a report?

05:40:07 25             MR. SHERMAN:  Objection.  Vague and ambiguous,
```

266

1    A    No.

2    Q    So let's just stick to the parts where the

3    Taser actually impacts the skin and the corresponding

4    neuromuscular responses -- you know, it worked.

05:41:36  5    A    Okay.

6    Q    Okay?

7         Did you write a report, a Use of Force

8    Memorandum, directed to the chief of police on every

9    single occasion that a Taser was effectively deployed

05:41:52  10   in the field?

11        MR. SHERMAN:  Objection.  Irrelevant,

12   immaterial.

13        Go ahead.

14        THE WITNESS:  Where I was the field supervisor?

05:41:55  15   BY MR. HENNESSEY:

16   Q    When you were the field supervisor, yes, when

17   it was your responsibility to do so.

18   A    Yes.

19   Q    Did you understand that the responsibility to

05:42:04  20   write a Use of Force Memorandum was mandatory,

21   meaning shall?  It wasn't discretionary in nature?

22        MR. SHERMAN:  Objection.  Argumentative

23   irrelevant, vague and ambiguous.

24        Go ahead.

05:42:16  25   THE WITNESS:  Yes.

268

**EXHIBIT G**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

QUYEN KIM DANG, Et Al.    )
                              )
           Plaintiffs,   )
                              )
    vs.                  )    Case No. SACV10-0338 DOC
                              )           (MLGx)
                              )
CITY OF GARDEN GROVE,   )
Et Al.                  )
                              )
          Defendants.   )
_____)

VIDEOTAPED DEPOSITION OF TED PEASLEE

Westminster, California

Thursday, May 5, 2011

REPORTED BY:  Tanya Leonard
               CSR No. 13553

1

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

    QUYEN KIM DANG, Et Al.    )

5                       )

6           Plaintiffs,   )

                       )

7       vs.             )    Case No. SACV10-0338 DOC

                       )       (MLGx)

8    CITY OF GARDEN GROVE,    )

    Et Al.                )

9                       )

           Defendants.   )

10  _____)

11

12

13

14

15       Deposition of TED PEASLEE, taken before

16  Tanya Leonard, a Certified Shorthand Reporter for the

17  State of California, with principal office in the County

18  of Orange, commencing at 9:43 a.m. Thursday, May 5, 2011,

19  in the Law Offices of Liem H. Do, 8231 Westminster

20  Boulevard, Westminster, California.

21

22

23

24

25

```
 1      APPEARANCES OF COUNSEL:

 2

 3      FOR PLAINTIFF:

 4              LAW OFFICE OF SEAN HENNESSEY
                BY:  SEAN HENNESSEY, ESQ.
 5              8231 Westminster Boulevard
                Westminster, California 92683
 6              TEL:  (949) 280-1257
                FAX:  (714) 898-7449
 7              E-MAIL:  seanhennesseyesq@gmail.com

 8

 9              LIEM H. DO & ASSOCIATES
                BY:  PAUL MINHTHU PHAM, ESQ.
10              8231 Westminster Boulevard
                Westminster, California 92683
11              TEL:  (714) 898-7579
                E-MAIL:  liemhdoesq@yahoo.com
12

13      FOR DEFENDANTS:

14              LAW OFFICES OF FERGUSON, PRAET & SHERMAN
                BY:  STEVEN A. SHERMAN, ESQ.
15              1631 East 18th Street
                Santa Ana, California 92705
16              TEL:  (714) 953-5300
                FAX:  (714) 953-1143
17              E-MAIL:  ssherman@law4cops.com

18

19

20      Also Present:

21              Douglas Do- Liem H. Do Law Clerk

22              Daniel Karschamroon- Garden Grove Police Officer

23              Richard Gendreau- Garden Grove Police Officer

24              Courtney Bates- Videographer

25
```

3

1   opportunity to review that prior to your testimony here

2   today in anticipation of your testimony.

3       A    Yes.

4       Q    And what was the purpose of reviewing that

5   particular document?

6       A    This is a summary by Sergeant Wagner and I

7   glanced at it in preparation for this. He was a

8   supervisor at the scene.

9       Q    Okay.  And there's several statements in there

10  from several of the officers who are here in the office

11  today.  Officer Karschamroon and Officer Gendreau appear

12  to have made certain statements to Officer Wagner.  Did

13  you have an opportunity to review those statements in any

14  length -- at any length?

15          MR. SHERMAN:  Let me object that you're

16  misstating the report.

17          MR. HENNESSEY:  Can I --

18          MR. SHERMAN:  I don't want him to be confused.

19  In your review, did you see any statements of officers?

20          THE WITNESS:  No.

21  BY MR. HENNESSEY:

22      Q    Sorry.  Your mention in this report, did you

23  look at that report in any way to refresh your

24  recollection of any role that you may have played?

25      A    I don't remember that I was mentioned in this.

16

1    Q    And what, if anything, were you told as the

2    reason that you were being requested to respond?  Why

3    were you asked to respond?

4    A    The Crimes Against Persons Unit responds to

5    incidents such as this.

6    Q    What did you understand this incident to be?

7    A    It was that -- this was a subject and he went

8    into full arrest was taken to the hospital and it did not

9    appear he was going to live.

10   Q    What, if any, information were you given prior

11   to the time you arrived?

12   A    I don't recall any information prior to that.

13   Q    Do you recall asking for any information while

14   speaking to Sergeant -- well, how did Sergeant Wagner

15   contact you?

16   A    He contacted me by telephone.

17   Q    How long was the conversation?

18   A    Very short.

19   Q    When you say very short, can you give an

20   estimate as to how long?

21   A    A minute.

22   Q    And what was the subject -- what was told to you

23   during that minute?

24   A    That there was a subject here who was being

25   arrested, he'd gone into full arrest, he was going to the

43

1    hospital.   They did not think he was going to live and

2    they wanted the Crimes Against Persons Unit to respond to

3    the location.

4         Q    Sergeant Wagner specifically told you the

5    subject was being arrested?

6         A    No.

7         Q    When you used the term subject being arrested,

8    was that what you were told or was that -- what was that?

9    Why did you use that word arrested, subject being

10   arrested?

11        A    I thought that he was -- arrest is probably not

12   the correct term, if it was -- I don't specifically

13   recall what he told me on that.

14        Q    Again, I'm just asking --

15        A    When we respond -- the officers were dealing

16   with the subject there and I believe he was being

17   handcuffed or taken into custody in some way and he

18   had -- went into full arrest and was being transported to

19   the hospital.

20        Q    Did you ask any questions, such as why the

21   subject was being contacted by the police at all?

22        A    No.

23        Q    Why -- anything that happened prior to the time

24   he went into full arrest?

25             MR. SHERMAN:  Objection, vague.  Did you ask --

44

1      District Attorney's Office.

2              If they needed a place to do an interview, I

3      would try and get them an office where they could do

4      that, I facilitated them so they could perceive their

5      investigation.  I did not interview anybody if that's

6      what you're asking.

7      BY MR. HENNESSEY:

8          Q    Well, you spoke to Officer Gendreau, correct?

9          A    Yes.

10         Q    You instructed him to do certain things or not

11     do certain things, correct?

12             MR. SHERMAN:  Objection, misstates the

13     testimony, assumes facts not in evidence, lacks

14     foundation but I think you answered the question.

15     BY MR. HENNESSEY:

16         Q    What did you instruct him not to do?

17         A    Not to write a police report.

18         Q    Why did you instruct Officer Gendreau not to

19     write a police report?

20         A    Because our general orders state that an officer

21     involved in an incident where there is great bodily

22     injury or death will be interviewed by the

23     District Attorney's Office and that interview or the

24     interview by the Internal Affairs section would be

25     considered his report or accepted as his report.

90

BY MR. HENNESSEY:

1   BY MR. HENNESSEY:

2       Q    Did Officer Gendreau tell you that at the time

3   he was talking to you he had already refused to give a

4   statement to the

5   Orange County District Attorney's Office?

6           MR. SHERMAN:   Same objection.

7   BY MR. HENNESSEY:

8       Q    Did he tell you that?  Do you remember that

9   coming up?

10      A    I do not remember that.

11      Q    Do you remember the area of him communicating

12  with the District Attorney's Office at all coming up

13  during this conversation?

14          MR. SHERMAN:   Let me object, you said the

15  area -- are you talking about the subject matter or the

16  area where the investigations are occurring?

17  BY MR. HENNESSEY:

18      Q    Do you remember the subject being brought up by

19  either Officer Gendreau to you or you to him that there

20  would be some type of interview conducted by the

21  District Attorney's Office, that he would be interviewed

22  by the District Attorney's Office?  Do you remember that

23  subject coming up during this conversation on

24  September 3rd?

25      A    No, I don't remember that.

94

1    deposition about your being the investigation unit on

2    this, that would be inconsistent with what your view of

3    your role was; true?

4        A    True.

5        Q    Did you become aware on September 3rd, 2008 at

6    any time during that day that Officer Gendreau refused to

7    give a statement to the District Attorney's Office?

8            MR. SHERMAN:  Objection, speculation,

9    foundation, vague and ambiguous.

10           Go ahead.

11           THE WITNESS:  Yes, I believe I knew by the end

12   of the day he hadn't.

13   BY MR. HENNESSEY:

14       Q    And what, if anything, did you instruct anybody

15   to do as a result of learning that information?  Did you

16   instruct anybody to do anything once you learned that

17   Officer Gendreau refused to provide a statement to the

18   D.A.'s Office?

19       A    No, I don't believe I did anything.

20       Q    Did you instruct Sergeant Wagner to write a

21   police report, memorizing his conversations with

22   Officer Gendreau?

23       A    That sounds correct.  I believe -- now that you

24   refreshed my memory -- that we at the end of the day

25   needed to put something in the documentation and we asked

                                                          212

1     A     Yes, they weren't in quotes, but yes, I had a

2   description of the events summarized by Sergeant Wagner

3   is probably the best way for me to describe it.

4     Q     And did you have an opportunity at some point in

5   time after Sergeant Wagner wrote his report to review his

6   report, prior to testifying here, meaning, at or near

7   September 3rd?

8           MR. SHERMAN:  What's the question, did he ask

9   Wagner to review it?

10  BY MR. HENNESSEY:

11    Q     No.  No.  Did you, Lieutenant Peaslee, have an

12  opportunity to review Sergeant Wagner's report that --

13  where he -- the one you told him to write.  Did you

14  review that at any point in time at or near

15  September 3rd?

16    A     Not at or near September 3rd, it was probably a

17  week later when Investigator Noce had compiled all of the

18  documentation that we were putting together in here and

19  when she completed everything, compiled it together, I

20  looked through that DR at that time.

21    Q     And was the police report that you read, which

22  was prepared by Sergeant Wagner, consistent with the

23  statements that he told you upon arrival at the scene?

24          MR. SHERMAN:  Objection, assumes facts not in

25  evidence, calls for speculation, lacks foundation.

221

```
 1              THE WITNESS:  I believe so.
 2    BY MR. HENNESSEY:
 3         Q    Was there anything about the report when you
 4    read it that said this is consistent or inconsistent with
 5    what I was told?  Do you remember seeing anything in
 6    there that you hadn't heard before?
 7         A    I don't remember anything jumping out at me, no.
 8         Q    Did you request Sergeant Wagner to write his
 9    report that Mr. Tran resisted?
10         A    I don't remember telling him to write anything
11    specifically in the report, just to write a brief summary
12    of what happened.
13         Q    Did you ever see Sergeant Wagner appear to be
14    reading from any handwritten notes when he communicated
15    any statements by Officer Gendreau to you when you first
16    arrived?
17         A    I don't remember him having any notes, no.
18         Q    Do you remember him having any notes later
19    during this District Attorney briefing that happened an
20    hour to an hour and a half after your arrival?
21         MR. SHERMAN:  Objection, vague.
22         Go ahead.
23         THE WITNESS:  No, I don't know that he had any
24    notes because I remember he couldn't spell someone's
25    name, so I don't think he had any notes or anything
```

222

25

333

1       THE WITNESS:  I believe so.

2    BY MR. HENNESSEY:

3       Q    Was there anything about the report when you

4    read it that said this is consistent or inconsistent with

5    what I was told?  Do you remember seeing anything in

6    there that you hadn't heard before?

7       A    I don't remember anything jumping out at me, no.

8       Q    Did you request Sergeant Wagner to write his

9    report that Mr. Tran resisted?

10      A    I don't remember telling him to write anything

11   specifically in the report, just to write a brief summary

12   of what happened.

13      Q    Did you ever see Sergeant Wagner appear to be

14   reading from any handwritten notes when he communicated

15   any statements by Officer Gendreau to you when you first

16   arrived?

17      A    I don't remember him having any notes, no.

18      Q    Do you remember him having any notes later

19   during this District Attorney briefing that happened an

20   hour to an hour and a half after your arrival?

21      MR. SHERMAN:  Objection, vague.

22      Go ahead.

23      THE WITNESS:  No, I don't know that he had any

24   notes because I remember he couldn't spell someone's

25   name, so I don't think he had any notes or anything

222

333

1       THE WITNESS:  I believe so.

2   BY MR. HENNESSEY:

3       Q    Was there anything about the report when you

4   read it that said this is consistent or inconsistent with

5   what I was told?  Do you remember seeing anything in

6   there that you hadn't heard before?

7       A    I don't remember anything jumping out at me, no.

8       Q    Did you request Sergeant Wagner to write his

9   report that Mr. Tran resisted?

10      A    I don't remember telling him to write anything

11  specifically in the report, just to write a brief summary

12  of what happened.

13      Q    Did you ever see Sergeant Wagner appear to be

14  reading from any handwritten notes when he communicated

15  any statements by Officer Gendreau to you when you first

16  arrived?

17      A    I don't remember him having any notes, no.

18      Q    Do you remember him having any notes later

19  during this District Attorney briefing that happened an

20  hour to an hour and a half after your arrival?

21      MR. SHERMAN:  Objection, vague.

22      Go ahead.

23      THE WITNESS:  No, I don't know that he had any

24  notes because I remember he couldn't spell someone's

25  name, so I don't think he had any notes or anything

                                                        222

```
 1                      CERTIFICATE

 2                          OF

 3            CERTIFIED SHORTHAND REPORTER

 4

 5

 6           I, the undersigned, a Certified Shorthand

 7     Reporter of the State of California do hereby certify:

 8           That the foregoing proceedings were taken before

 9     me at the time and place herein set forth; that any

10     witnesses in the foregoing proceedings, prior to

11     testifying, were placed under oath; that a verbatim

12     record of the proceedings was made by me using machine

13     shorthand which was thereafter transcribed under my

14     direction; further, that the foregoing is an accurate

15     transcription thereof.

16           I further certify that I am neither

17     financially interested in the action nor a relative or

18     employee of any attorney of any of the parties.

19           IN WITNESS WHEREOF, I have this date

20     subscribed my name _____ Tanya Leonard _____.

21

22                   Dated: _____5-19-11_____

23

24                   Certificate Number __13553_____

25
```

                                                              333

# EXHIBIT H

**GARDEN GROVE POLICE DEPARTMENT**

**GENERAL ORDER 2.6**

Effective Date: January 1, 1988
Last Amended: December 28, 2006

Index as:

---

## USE OF PHYSICAL FORCE

---

### PURPOSE

The purpose of this General Order is to establish department policy and procedures for the use of physical force and to govern the use of less-lethal department-authorized weapons.

### PHYSICAL FORCE DEFINED

PHYSICAL FORCE IS THAT FORCE NECESSARY TO OVERCOME RESISTANCE, ACHIEVE COMPLIANCE, OR ANY USE OF DEPARTMENT ISSUED AND/OR APPROVED LETHAL OR LESS-LETHAL WEAPONS.

### AUTHORITY FOR THE USE OF FORCE

Section 835a of the California Penal Code states:

"Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

A peace officer who makes or attempts to make, an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance."

## POLICY

It is the policy of this department that each incident involving the application of any degree of physical force upon the person of another must be evaluated upon the facts of the particular incident.

Whenever any officer of this department, while in the performance of his official law enforcement duties, deems it necessary to utilize any degree of physical force upon the person of another, the degree of physical force shall only be that which the officer believes reasonable and necessary to effect the arrest, prevent escape or overcome resistance.

An officer of this department will use only the force necessary to accomplish lawful objectives.

A punch is not a recommended substitute for a control hold or a pain compliance technique, when dealing with non-combative resistance.  Non-combative resistance is defined as:

1. An individual does not respond to an officer's requests or commands and may be argumentative, or
2. An individual's verbal or non-verbal actions indicate he is not complying with the officer's requests or demands, or
3. An individual is actively resisting handcuffing techniques, but is reasonably under control by the officer(s).

## USE OF LESS-LETHAL WEAPONS

Officers are authorized to carry only the following less-lethal weapons:

1.    Approved baton
2.    Approved Chemical Agent
3.    Approved "Less Lethal" Shotgun
4.    M-26 Advanced Taser (Refer to General Order 2.24)

Community Service Officers assigned as Field Report Writers are authorized to carry only the following less-lethal weapon:

1. Approved Chemical Agent

Employees are encouraged to suggest use of alternate less-lethal weapons. All such suggestions should be contained in a memorandum to the Chief of Police.

Officers will be trained in and will demonstrate proficiency in the use of these weapons at a POST certified recruit academy and through an in-house retraining program.   A certified Department instructor will train the Community Service Officers in the use of the approved chemical agent who must demonstrate proficiency in its use.

Any employee who doesn't demonstrate proficiency will be provided remedial training until they are able to do so.  In-service training in the use of less-lethal weapons will occur at least biennially, except for the carotid control hold, which will be done annually.

As with any use of force, the force must be reasonable to the situation applied. Taking into consideration the facts confronting the officer, approved less-lethal weapons may be used in a variety of situations, including but not limited to the following:

1. To de-escalate a dangerous or potentially dangerous situation.
2. When there is a potential threat of public or officer safety, including situations in which self-inflicted injury by a suspect may occur.
3. When immediate control is needed due to tactical considerations, such as safety and/or the potential for harm.

CARE SHOULD ALWAYS BE EXERCISED DURING THEIR USE. THE USE OF A LESS-LETHAL WEAPON(S) MUST BE DOCUMENTED IN THE FORMAT DESCRIBED BELOW.

## **REPORTING THE USE OF FORCE**

Whenever an officer applies any degree of physical or non-lethal force upon a person while in the performance of his official duties, the officer will articulate the use of force in his arrest report.

The report will detail:

1. Justification for the use of physical force
2. The type of force applied (specify less-lethal weapon, if applicable)
3. The effect of the force upon the person
4. The subsequent actions taken by the officer

Note:  If the District Attorney's Office is requested to investigate the matter, the involved officer(s) interview with the District Attorney's Investigator will suffice for the official report.  Any necessary arrest and crime incident face page reports will be completed by the officer(s) involved.  If the officer(s) elects not to give a voluntary statement to the District Attorney's Investigator, and the suspects remain outstanding or are subject to prosecution for related offenses, the Department shall retain the authority to require involved officers to provide sufficient information in related criminal reports to facilitate the apprehension and prosecution of those individuals.

The officer will notify a field supervisor as soon as possible, but no later than the end of shift, if the application of physical force results in one of the following injuries:

1. Unconsciousness
2. Temporary vision impairment caused by a chemical agent
3. Any other injury requiring medical treatment

*G.O. 2.6 page 3 of 7*

In the case where a baton, less-lethal shotgun, M-26 Advanced Taser or other instrument/object is used, a field supervisor will be notified as soon as possible.

In the case of a dog bite, the canine handler will complete a Garden Grove Police Department K-9 Incident Report in addition to the above notification.

The on duty division Sergeant will review arrest reports that involve the use of physical force.

## DEADLY FORCE OR SERIOUS INJURY

When an incident involving the discharge of deadly force occurs, the reporting and investigative procedures established in General Order 2.8 - Discharge of Deadly Force will be followed.

Any other use of force that results in a death or serious injury shall also follow the reporting and investigative procedures established in General Order 2.8 - Discharge of Deadly Force.

## MEDICAL TREATMENT

When an arrestee requires medical treatment as a result of physical force being applied, the procedures established in General Order 10.9 - Arrestee Transportation are to be followed.

## REVIEW OF THE USE OF FORCE

A field supervisor must submit a Use of Force Review memorandum, directed to the Chief of Police, when the use of force is applied by use of a baton, less-lethal shotgun, M-26 Advanced Taser, or other less-lethal instrument/object; or any other use of force that results in death or serious injury.  A field supervisor may submit a Use of Force memorandum after any use of physical force incident in which the supervisor feels it is necessary to report the incident in writing up the chain of command.

The memorandum will accompany all relevant reports and documents that pertain to the incident. The employee's Division Commander and Bureau Commander will review the package. The Bureau Commander may request that the Use of Deadly Force Review Board convene to review the circumstances of the incident. If a Use of Force incident is referred to the Use of Force Review Board, the employee (s), involved in the incident will be interviewed by the Internal Affairs Sergeant prior to the Board's review of the incident. The completed internal investigation, along with all reports, and any other necessary information requested by the board, will be provided to them. Refer to General Order 2.9 - Use of Deadly Force Review Board.

If a formal investigation is initiated, it will be conducted in compliance with the procedures established in General Order 1.2 - Disciplinary Procedures.

If the use of force involves death or traumatic/serious injury to a person, the involved employee(s) will be placed on administrative leave with pay pending a mandatory interview with a department-recognized psychologist.  If the psychologist is not called out or is unavailable at the time of the incident, the involved employee(s) Unit or Division Commander will request that the Training Manager arrange an appointment with the psychologist.  The employee(s) Unit or Division Commander will insure that a City of Garden Grove Personnel Action Form is completed to document the administrative leave with pay.  After consultation with the department psychologist, and a preliminary review of the incident, the employee(s) may be returned to full duty or modified duty based on what is in the best interest of the employee(s) and the department.

## CRIMINAL AND CIVIL LIABILITY

The following state and federal code sections are relevant to the use of force and treatment of arrestees. All employees should be familiar with them.

147 PC - Inhumanity to Prisoners
148 PC - Resisting Public or Peace Officers
149 PC - Assault by Officers Under the Color of Authority
673 PC - Cruel and Unusual Punishments
692 PC - Lawful Resistance
694 PC - Lawful Resistance
835 PC - Method of Effecting Arrests/Resistance
843 PC - Force that May Be Used to Arrest Under a Warrant
43 Civil Code - Personal Rights
820a Government Code - Peace Officer Liability Same As a Citizen
Title 18, Section 241, 245 of the U.S. Code - Civil Rights Act

**GARDEN GROVE POLICE DEPARTMENT**
**INTRA-DEPARTMENT MEMORANDUM**

**To:**

**From:**                                              **Date:**

**Subject:  USE OF FORCE REVIEW**

This review is to be completed by an on-duty or on-scene supervisor when the use of force is applied by use of a baton, less-lethal shotgun, M-26 Advanced Taser, or other less-lethal instrument/object; or any other use of force that results in death or serious injury. Or when an employee discharges a firearm, on or off duty, intentionally or accidentally.

DR # _____

DATE OF INCIDENT _____

TIME OF INCIDENT _____

LOCATION OF THE INCIDENT _____

OFFICER(S) INVOLVED _____

NATURE OF THE CALL OR INCIDENT _____

_____

_____

_____

_____

TYPE OF FORCE USED  ☐ PHYSICAL  ☐ LESS-LETHAL WEAPON   ☐ FIREARM

NATURE OF THE INJURIES AND MEDICAL TREATMENT REQUIRED _____

_____

_____

SUMMARY OF THE ACTIONS OF THE OFFICER(S) INVOLVED _____

_____

_____

_____

_____

_____

WAS AN OFFICER, POLICE EMPLOYEE, OR CITIZEN INJURED? ☐ YES  ☐ NO

*G.O. 2.6 page 6 of 7*

**USE OF FORCE REVIEW**
Page 2

IF YES, NATURE OF THE INJURIES AND MEDICAL TREATMENT REQUIRED

_____

_____

_____

WAS AN ACCIDENT REPORTING FORM COMPLETED? ☐ YES      ☐ NO

IF YES, ATTACH A COPY

INVESTIGATOR(S) AND IDENTIFICATION TECHNICIAN(S) WHO RESPONDED, IF CALLED _____

_____

_____

_____

SUPERVISOR'S COMMENTS _____

_____

_____

_____

_____

_____

_____

_____

_____

SUPERVISOR'S SIGNATURE _____

## GARDEN GROVE POLICE DEPARTMENT

**GENERAL ORDER 2.24**

Effective Date: April 1, 2002
Last Amended: May 28, 2008

Index as: TASER

### TASER

### PURPOSE

The purpose of this general order is to establish department policy and procedures for the deployment and use of the TASER.

### POLICY

TASERS are Conducted Energy Weapons deployed as an additional less-lethal police tool and is not intended to replace firearms or self-defense techniques. The TASER may be used to control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective in the situation. The TASER may also be used in situations where there is a reasonable expectation that it will be unsafe for officers to approach a person and take him or her into custody without the probability of injury to the officers or suspect.

### PROCEDURES

Only sworn personnel who have completed the Department's TASER training program shall be authorized to use the TASER. Only supervisory personnel who have completed an instructor course are authorized to provide training in the deployment and use of the TASER. X-26 TASERS and an approved holster will be issued to uniformed officers assigned to Patrol, the Neighborhood Traffic Unit, the Gang Suppression Unit, and as School Resource Officers from Property and Evidence. Officers assigned an X-26 TASER shall take the TASER with them during their assigned field duties. The Taser will not be worn on the same side as a duty weapon. Spare X-26 TASERS will be stored in the TASER firearms safe for issue or use as needed by the Watch Commander.

M-26 TASERS will be stored in the TASER firearms safe where they will be connected to there charging units or assigned to specialty units. TASERS should only be transported in a department approved TASER holster. They should not

be carried or stored in any other manner to prevent unnecessary damage or an accidental discharge.

TASERS are assigned to first responders for deployment in field situations and for cell extractions. Only properly functioning and charged TASERS shall be deployed. Before each shift deployment, or at the beginning of each shift, the TASER should be inspected for damage and tested for a proper pulse. Any damage or improper functioning must immediately be reported to the Chief of Police or his designee via intra-departmental memorandum. The memorandum must include the TASER serial number, the damage or malfunction and the circumstances under which the damage or malfunction occurred. It is the Watch Commander's responsibility to ensure the pool of X-26 and M-26 TASERS and TASER cartridges are in proper working order and accounted for during each shift.

## DEPLOYMENT AND USE

Upon encountering a situation that may require the use of a TASER, the officer shall request the response of a back up officer and a supervisor. For situations in which a suspect is within hearing distance of the requesting officer, or to maintain the confidentiality of deployment from the public or bystanders, the officer may broadcast a "**Code Zebra.**" Communications personnel will interpret the broadcast of a "**Code Zebra**" as a request for TASER equipped supervisor or officer and assigned field units to respond to the location immediately. If the field situation changes and a TASER is no longer needed at the scene, a cancellation of the "Code Zebra" shall be broadcast.

Officers should be aware of the suspect's location and surroundings prior to discharging the TASER to reduce the chance of collateral injury to the suspect from falling. The TASER should not be used in situations where the suspect is in proximity to, known to be in possession of or is contaminated with flammable liquids, gases, blasting or explosive materials, or any other highly combustible material that may be ignited by the device. The TASER shall only be used in accordance with the proper guidelines and instructions identified in the Department's training program. Nothing in this policy shall prohibit or discourage the use of other less-lethal weapons in conjunction with or prior to the deployment of the TASER.

## MULTIPLE APPLICATIONS OF THE TASER

If, after a single application of the TASER, an officer is still unable to gain control of an individual and circumstances allow, the officer should consider whether or not the TASER device is making proper contact, the use of the TASER is limiting the ability of the individual to comply or if other options or tactics may be more appropriate. However, this shall not preclude any officer from multiple, reasonable applications of the TASER on an individual.

## MEDICAL TREATMENT

Before the use of the TASER, if practical, request the Fire Department Paramedics respond to the scene. Once in custody, the arresting officer shall advise Paramedics or the Emergency Room staff that the person has been subjected to the TASER and relate the approximate time the action occurred. If the probes penetrate the skin, the puncture sites shall be brought to the attention of the on-duty supervisor, Paramedics and Emergency Room Staff. Only Emergency Room Staff may remove TASER probes that are embedded in the skin of the suspect. All subjects exposed to a TASER deployment must be cleared by emergency room personnel as soon as possible and prior to release from police custody.

After examining the affected person, the Paramedics will determine how the suspect will be transported to the hospital. Transportation to a medical facility will be by police transport unless otherwise directed by the Fire Department Paramedics. Photographs shall be taken of probe impact sites and any other related injuries. Probes that have penetrated the body should be treated as Biohazard "Sharps". Proper handling and disposal of the probes is essential to avoid exposure to injury or the transmission of blood born pathogens. Based on the totality of the circumstances, the on-scene supervisor has the discretion to direct the probes and cartridge booked into evidence or destroyed.

## REPORTING

All uses of the TASER in which the probes impact the suspect or when the TASER is used in a Touch Stun mode shall be reported in the appropriate police report and a Use of Force memorandum to the Chief of Police or his designee in accordance with the guidelines set forth in General Order 2.6 – Use of Physical Force. During the post Taser investigation the deploying officer should obtain a statement from the involved suspect(s) addressing the use of force. Each officer deploying the TASER, whether single or multiple applications are used, or using the TASER in the touch stun mode, shall document their actions with the TASER in the appropriate narrative for that incident. Officers will specifically articulate reasons for each application of the TASER.

**GARDEN GROVE POLICE DEPARTMENT**

**GENERAL ORDER 5.9**

Effective Date:  September 1, 1987
Last Amended:  December 28, 2006

Index as:    5150 WIC Bookings
              Mental Health Bookings
              Mentally Ill Persons

---

## MENTAL ILLNESS & 5150 WIC BOOKINGS

---

### PURPOSE

The purpose of this General Order is to establish a procedure for the handling of persons listed under the provisions of 5150 of the Welfare and Institutions Code and for the Confiscation and Disposal of Firearms and other deadly weapons.  This order complies with the Orange County Chief's of Police and Sheriff's Association Operation and Procedural Protocol #127. This order makes available alternative psychiatric services to field officers.

### MENTAL ILLNESS RECOGNITION

Mental illness affects people of all ages, all levels of society, and all ethnic groups.  It is a medical illness caused by abnormalities in the brain's chemistry or structure or both.

Mental illness creates problems with feeling, thinking, and perception.  The illness may cause bizarre behavior and/or inappropriate behavior.  It may be cyclic, varying in severity from one episode to the next and the duration of an episode can vary.  Some persons are affected for a few weeks or months, while, for others, the disorder may last many years or a lifetime.

Symptoms can vary and the effect of the mental disorder on each person is different.  Some of the signs of mental illness are:

1.   Abnormalities In Mood
     a. Reduced emotional response or emotional flatness
     b. Extremes in emotion
     c. Inappropriate emotions
     d. Mood swings
2.   Abnormalities In Thought
     a. Delusions
     b. Paranoia
     c. Hallucinations

The categories of mental illness are:

1.  Major depression
2.  Bipolar Disorder (Manic-Depressive Illness)
3.  Schizophrenia
4.  Obsessive Compulsive Disorder
5.  Personality disorders

## INTERVENTION STRATEGIES

When responding to a call that involves a person who is mentally ill, officers should obtain as much information as possible to assess and stabilize the scene. Information such as dispatch history and recent calls for service may be helpful.

Tactical Communication

As with all calls-for-service, safety is always a top priority. Tactical communication techniques are designed to de-escalate potentially violent situations. Intervention techniques vary depending upon the level of danger. In a low risk situation, an officer has time to process the scene, assess the situation, and respond accordingly. In a high-risk incident, when the threat of danger is immediate, there is little time to process information and officers are expected to make split second decisions to control the situation.

Tactical communication techniques that may be used while completing calls for service, or while conducting interviews, include:

1.  Tone – It's not only what you say, but also how you say it.
    a. Present a calm and firm demeanor
    b. Maintain respect and dignity
2.  Atmosphere – Reduce distractions/evaluate distance
    a. Common distractions
        - Upsetting influences
        - Disruptive people
        - Shouting by others on the scene
        - Radios
        - Sirens
        - Bright colors and flashing lights
    b. Respect personal space
3.  Communication – It's better to spend 15 minutes talking than 5 minutes fighting.
    a. Establish contact
    b. Develop rapport
4.  Time – Time is on your side.
    a. Slow down
    b. Reassess

If the individual is violent as a result of a mental illness, it may be necessary to employ a use of force option to take the person into protective custody pursuant to 5150 WIC. General Order 2.6 – Use of Physical Force, addresses authorized use of physical force methods.

## ADVISEMENT

Per 5157(A) WIC, the following oral advisement must be given to all persons being detained under 5150 WIC:

My name is Officer _____.  I am a Police Officer with the City of Garden Grove.  You are not under criminal arrest, but I am taking you to (name of facility) for an examination by mental health staff.  (If the person(s) is taken into custody at his/her home, he shall be told the following information in substantially the following form.)  You may bring a few personal items with you, which I will have to approve.  You can make a phone call and/or leave a note telling your friends and/or family where you have been taken.

## PROCEDURE

Depending on the observations of the individual, the Options listed below will be used for handling adult subjects who are not injured, not suspected of alcohol and/or drug intoxication, and do not have other medical problems.

Option #1. Contact the in-house Mental Health Clinician and have them respond if he/she is on duty. The clinician works a flexible schedule and is generally at our facility five days a week. If the Clinician is not available, go to option #2.

Option #2. Contact a Centralized Assessment Team (CAT) and have them respond to the scene. The Countywide CAT phone number is 1-866-830-6011. CAT should be used when clinical intervention may lead to a hospital diversion. CAT's preferred response is to the scene. However, the officer must remain at the scene until it is determined the officer's presence is no longer necessary, and that it is safe for CAT personnel to leave, with or without the subject.

CAT personnel may not go into a medical facility, however, they may enter an emergency room in both designated and non-designated facilities. CAT personnel will not physically handle a combative subject and rely on law enforcement for this.

It is preferred that the CAT team responds to assist the officer in the field. If CAT is unavailable, call the clinic and they will accommodate the officer by locating a clinician to respond to the field or they will have the officer bring the patient to the clinic. If the patient is determined to be 5150 the clinic will assist with arranging transportation if needed.

A County Mental Health clinic is located at 2035 E. Ball Road Suite # 200, telephone number 714-517-6300. The operating hours are Monday – Thursday 0800-1900 and Friday 0800-1700.

Option #3. Another option is to bring the subject to one of the six OC/HCA clinics throughout the County. This is a separate service from the CAT teams.

Option #4. If CAT is unavailable due to closure, contact Emergency Treatment Services (ETS), which is a part of the Orange County Health Care Agency. They are located at 1030 West Warner Avenue, Santa Ana. Their phone number is 714-834-6913/6900. ETS is not licensed or capable of housing patients for 72 hours, and they are not a medical facility. The facility is open 24 hours a day seven days a week. They accept adult mental health patients absent any apparent medical or intoxicated condition(s). The officer shall call ETS prior to any transport and explain the circumstances. ETS will determine if the patient needs to go to a designated medical facility or directly to ETS.

If ETS refuses to accept the person due to a medical condition follow the listed steps:

Conduct an independent assessment to determine if emergency medical personnel should be summoned to the location. This assessment should include consideration of information received from ETS personnel, statements made by the person being held, the officers own observation of the person's condition and any additional information known to the officer that would help him/her to determine whether response by emergency medical assistance is reasonably necessary.

Notify the Watch Commander or designee and advise of the circumstances of the refusal of ETS to accept the person.

The transporting agency Watch Commander or designee should attempt to contact staff at ETS and make appropriate arrangements for transportation of the person to a medical facility for medical treatment or to another designated mental health facility for admittance for a 5150 hold.

If the person being refused at ETS is transported to a designated facility, the peace officer will advise the emergency room staff that a hold has already been placed on the person and request acceptance of the person as soon as possible for the orderly transfer of custody.

*Combative:* Pursuant to section 1257 of the Health and Safety Code, if the subject is violent or potentially violent, the officer will have the hospital staff notified prior to his/her arrival. It is the responsibility of a *designated* facility to have sufficient security personnel and equipment to handle the violent or uncooperative patient, absent the assistance of the officer. The peace officer will remain at the facility and assist the facility security and/or medical staff in the initial restraint of the patient.

Option #5. College Hospital in Costa Mesa is a Designated Mental Health Facility. This hospital has a **P**sychiatric **E**valuation **T**eam (PET) called the Crisis Response Team (CRT), and it is available 24 hours a day seven days a week. They accept adult mental health patients absent any attendant medical or intoxicated condition(s). They are authorized and designated by the County to complete 5150 evaluations in emergency departments, police departments, and at College Hospital in Costa Mesa. As with CAT, the officer is responsible to stay with the patient who is combative or as long as it is necessary. Their phone number is 800-773-8001.

It is mandatory that the handling officers, prior to transporting a patient to any of the Designated Mental Health Facilities, contact the facility by telephone. The Officer will report the mentally ill person's identity, behavior and medical status. If the officer does not have access to a telephone, a field supervisor will respond with a cellular phone. Upon approval of the mental health personnel, the subject should be transported to the facility. Restraints will be used, if needed, to protect the subject, officer or mental health personnel.

The 5150 WIC applications for detention will be completed by the officer and turned over to the mental health staff. The officer will retain a copy and it will serve as the narrative of his report.

If an officer contacts one of the **Psychiatric Assessment Teams** (PAT) they will provide PAT with the individual's identity and a brief explanation of the problem

The PAT will evaluate the individual and will complete the application for detention. They will also arrange for transportation to an appropriate facility. The officer will complete a Crime/Incident Report indicating 5150 WIC as the primary section. The narrative will specify which PAT team completed the 5150 WIC application for detention.

If after an evaluation the PAT team concludes that the subject no longer meets the requirements of 5150 WIC, the subject may be released. The officer will complete an Officers Report specifying the PAT team that evaluated and released the individual. A SUPERVISOR SHALL BE NOTIFIED BEFORE THE SUBJECT IS RELEASED.

**The following procedure will be used for handling individuals who are injured, suspected of alcohol and/or drug intoxication/overdose, or have other medical problems.**

The subject will be transported to the nearest hospital emergency room, or the hospital emergency room as directed by the attending paramedic team. The officer will call one of the PAT teams to respond to that hospital. The officer will stay with the subject until the PAT team assumes custody of the subject or if the subject is combative. The officer will complete a 5150 WIC Crime/Incident Report with the

narrative indicating which PAT team completed the 5150 WIC application for detention.

If the subject is taken to UCIMC emergency room, the officer can complete the 5150 placement there. The Officer will stay with the patient until the transfer of custody has taken place.

If the individual is not going to be released from the hospital due to medical reasons, the officer shall complete an Officers Report.  Prior to leaving, the officer shall notify the attending physician of his/her observation of the individual's mental condition and the facts of the incident.  The doctor may then determine if he needs to notify a PAT team prior to the individual being released at a later time.

If the individual does not meet the criteria for a detention, but still requests assistance, or if the individual suffers a psychological or substance abuse problem that requires immediate intervention, any of the private psychiatric response units can be contacted and arrangements made for assistance.  This category is intended only for passive individuals who pose no threat to themselves or others.  The method selected for this voluntary intervention should best serve the need of the individual and is most expeditious to the officer. The Officer shall also advise the in-house Mental Health Clinician about the individual. At the conclusion, a Miscellaneous Service Report should be completed.

## Juveniles

Non-Injury
When an officer contacts a juvenile, and the officer feels the juvenile falls under 5150 W&I, the officer should use one of the following options:

Option #1: The officer should speak to the family members and see if a physician is currently treating the juvenile. During normal business hours, the family should call the treating physician and determine where to take the juvenile for treatment. If the family is insured, they can also call their insurance carrier to determine where the juvenile should be treated.

Option #2: When there is no treating physician, or the officer is unable to reach a treating physician, the officer should call the Orange County Children and Youth Services at (714) 896-7556 during normal business hours (Monday – Friday 0800-1700). There is an office in Westminster and they will respond to the field. As with all field responses, the officer shall remain at the call until the mental health clinician feels the officer's presence is no longer needed. Children and Youth Services will arrange for transportation. After business hours, the officer shall call ETS (834-6913), tell them they are dealing with a juvenile, and ETS will send an on-call clinician to the field to assist.

Option #3: College Hospital has juvenile facilities in Cerritos (800-352-3301) and Costa Mesa (800-773-8001). If the juvenile is insured, the officer can contact College Hospital and they may accept the juvenile at their facility. The Costa Mesa facility will take children 12 years and older, and the Cerritos facility will take

children 5 years and older. The Officer can also use one of the listed designated mental health facilities that accept juveniles.

**Injury**

If the juvenile has an obvious medical condition, Garden Grove Paramedics shall respond to assess the patient's physical medical condition. The juvenile's physical medical condition shall be stabilized prior to any mental health evaluation. Garden Grove Paramedics shall determine if the patient needs to be transported by ambulance and what facility the patient will be transported to; irrespective of the facilities designated or non-designated status. In most cases, the hospital staff will notify a mental health response team and allow the officer to leave the facility. It is the officer's responsibility to ensure that the appropriate paperwork is completed, and that the hospital staff is going to notify a mental health professional to conduct the evaluation. If the hospital staff is not going to facilitate the mental health evaluation, the officer should follow option #2 under non-injury.

## CONFISCATION AND BOOKING OF FIREARMS
## AND OTHER DEADLY WEAPONS

Whenever a person is detained for examination of his or her mental condition (pursuant to 5150 WIC) and is found to own, have in his or her possession or control any firearm or other deadly weapon, the officer detaining the person shall confiscate any such firearm or deadly weapon. Any firearm or deadly weapon confiscated shall be booked as evidence.

Upon confiscation of any firearm or other deadly weapon the officer shall complete and provide the person detained with a copy of the Notice of Firearm or Other Deadly Weapon Confiscation (form #515). The original will be submitted with the crime/incident report. A copy of the Notice of Firearm or Other Deadly Weapon Confiscation form is attached to this general order.

The crime/incident reports will be forwarded to the Crimes Against Persons Sergeant for review. The sergeant will have 30 days from the time of commitment to initiate a petition in superior court for a hearing to determine whether the release of the firearm or deadly weapon would likely endanger the detained person or others. If a petition is filed a notice will be sent to the detained person (at the address provided when the person was detained) advising the person of his or her right to a hearing.

If no petition proceeding is initiated within 30 days, the confiscated firearm or deadly weapon will be made available for release only upon approval of DOJ.

Individuals seeking the return of their firearm(s) must submit a LEGR, Law Enforcement Gun Release Program, Application along with the appropriate fees to the Department of Justice (DOJ)

If no petition is filed and the detained person does not retrieve the firearm or deadly
weapon within 6 months, the firearm or deadly weapon will be disposed of pursuant
to General Order 11.1.

## **TRAINING**

All entry-level personnel, who have not received specific documented training on
dealing with persons with mental disabilities, will receive training during their
orientation. This will be documented on the Mental Illness Awareness form.

Updated training for all personnel will occur every three years. As to this General
Order, "all personnel" is defined as agency personnel who may come in contact with
the mentally ill, i.e. sworn officers, CSO's, Front Counter personnel etc. This training
may be held during the monthly training, use of force training or at briefing training.
This training will be developed in collaboration with our mental health partners.

**GARDEN GROVE POLICE DEPARTMENT**

**GENERAL ORDER 5.31**

Effective Date: September 23, 2004
Operational Date: October 1, 2005
Last Amended: March 31, 2011

Index as:    In-Car Video System

---

## IN-CAR VIDEO SYSTEM

---

### PURPOSE

The purpose of the In-car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.

### POLICY

It is the policy of this Department to install, use, and maintain an In-car Video System (IVS) in designated enforcement vehicles. Use of the IVS equipment is mandatory as outlined in this policy. However, with the exception of covertly recording other Department personnel or the unauthorized review of a recorded incident, it is the specific intent of this policy to be non-punitive in nature. No disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure, to use the IVS. It is recognized that it may not always be practical to activate the IVS, however those occurrences should be the exception rather than the rule.

### PROCEDURE

**Training**

Department personnel will not use the IVS until they have completed training in the proper use of the system. The training will be provided by the Professional Standards Division and will consist of the following:

1. A review of the Department policy on the use of the IVS equipment.

2. A video review of the IVS, its functions and recommended activations.

3. An orientation and hands-on review of the IVS and its associated components.

*G.O. 5.31 Page 1 of 7*

4. An in-field presentation followed by practical application by the trainee to demonstrate competency of use. A written record of the training provided will be completed by the trainer and maintained in the employee's training file.

## Components of the In-car Video System

The in-car video systems consists of:
1. Camera, front and rear
2. Monitor
3. Control panel
4. Video recorder
5. GPS sensor
6. Wireless recording system
7. Wireless microphone
8. Personal USB key

All personnel assigned to a patrol function will be issued a wireless microphone and a charging unit.  All sworn personnel will be issued an access control USB key used to log in to the in-car video system.

## In Car Video System Personnel Responsibilities

1. To update and keep current the list of users stored in the individual units system.

2. Ensure there is a sufficient supply of spare wireless microphones and access control USB keys.

3. Account for all DVD-RAM disks currently in inventory by the corresponding serial/barcode number, date returned, and Department member's name. The DVD-RAM disks and recorded incidents will be retained for a two-year period, or as required by policy and/or statute.

4. Process all requests for copies of recorded incidents.

5. Maintain all wirelessly uploaded files in the manner and for a period of time as prescribed by this policy. Update file incident types/file preservation times as necessary (see the table on page 5 of this policy).

## Department Personnel Responsibilities

1. Department personnel using the wireless/IVS should start the unit normally and press the power button on the camera system. Once the camera system boots up, employees shall place their access control USB key into the USB port of the video recording unit and place their microphone into the charging base in the unit to synchronize the microphone to that unit's system. The employee shall then follow the log on procedure for the unit. Once logged on, the employee may remove and store their USB key.

2. The power to the system shall be left on during the entire shift to ensure proper temperature control for the system's components.

3. At the conclusion of the Department member's duty shift, the employee will log off the unit and verify that the officer name display on the screen now shows, "No Name.". The employee should then shut off the unit by pressing the power button on the console. <u>The camera will not turn off until all files are transferred to the server over the wireless connection.</u>

4. If any member of the Department determines that a recorded incident should be retained beyond the required three-year period, the IVS Custodian shall be notified via Department memorandum. The recorded incident shall be retained for the period of time requested, or until the Department member notifies the custodian, via memorandum, that the recorded incident can be purged. The Chief of Police or his designee can also authorize the purging of a retained incident.

5. Department personnel **shall** activate the IVS, audio and video, during all pursuits, all vehicle stops and all detentions. Recording is mandatory whenever driving "Code 3."

6. Any and all conversation with the subject of a detention shall be recorded by using the in-car microphone or the remote transmitter; whichever is necessary to capture the conversation.

7. Department personnel should record any other activities when, in their judgment, it would be beneficial to do so. This includes probable cause for stops and detentions, or any situation, condition or event having a potential for loss of life, injury or damage to property.

8. Department personnel shall not knowingly use the IVS system to covertly record police personnel.

9. Unless impracticable, department personnel should indicate the nature of the recording by pressing the stop button the number of times necessary to scroll to the proper incident type. The first press of the stop button will result in the incident being classified as a "Non-Event." Subsequent presses of the stop button will allow the employee to cycle through the following list of event types from the table on page 6 of this policy:

   a. Non-Event (Default)
   b. Non-Arrest Report
   c. Arrest Report
   d. Pursuit
   e. Unit-Involved Traffic Collision.

**Activation of the In-car Video System (IVS)**

1. The IVS is automatically activated when the overhead lights are turned on, when the crash sensor senses G forces over a certain threshold and when the vehicle exceeds 80 miles per hour. Officers may manually activate the system by pressing the "record" button on either the console or the wireless microphone.

2. Once the IVS is activated, it shall remain on until the incident has reached a conclusion or the Department member leaves the scene.

   a. Once an event has been stabilized, if it is necessary to discuss issues surrounding the investigation with a supervisor or another officer in private, officers may mute their remote transmitter thereby preventing their private audio conversation from being recorded. The video recording shall not be stopped until the incident has reached a conclusion or the Department member leaves the scene.

3. Department personnel shall not in any manner attempt to modify, alter, erase, or tamper with any portion of the system or any recorded incident.

4. The IVS is equipped with a "pre-event record feature," which will allow for sixty seconds of video to be captured prior to the system being activated by the Department member. This portion of the video will have video, but no audio recording. This allows the Department member to record information that may be pertinent to an enforcement incident in which they subsequently become involved.

5. The IVS is equipped with a "crash record activation kit," which will activate the IVS system in the event of a traffic collision. If an IVS equipped unit is involved in a traffic collision and is disabled, the scene supervisor will request the in-car video system personnel download the video manually from the unit as soon as practicable and process it as described above. If the vehicle is drivable, the scene supervisor should return the car to the PD to allow the video to download over the wireless system, prior to the car being sent for service.

6. The IVS is equipped with a GPS sensor which reports the vehicle's identity, speed and location to the video recorder and over the air back to the PD network. The speed indications will cause the IVS system to activate whenever the vehicle's speed exceeds 80 miles per hour. The unit identifier and GPS coordinates will also be wirelessly transmitted real-time to the PD network and will be utilized to show GGPD Dispatch, the Watch Commander and any authorized supervisor logged into the system a live representation of where all police units are at any given time. This feature is known as an Automatic Vehicle Locator (AVL). The AVL will also interface with our CAD system to recommend the closest unit available for a particular call for service. This functionality, like all others of the IVS, is not intended to be used as a disciplinary tool. It is intended to be used to improve officer safety, response time to calls and to allow dispatch to send the closest units to a call for service or request for help, as required by this manual. Minor policy violations inadvertently observed on the AVL should first be handled by advising

personnel to correct the violation. Repeated or persistent violations observed on the AVL may result in disciplinary action.

**Recorded Incident Review**

1. IVS recordings **shall not** be randomly reviewed to monitor officer performance. The exception is for an officer who has been placed on a Personal Improvement Plan in order to address identified behavior. An investigator participating in an official Department investigation, such as a personnel complaint, claims investigation, administrative inquiry or criminal investigation may review a specific incident either on the car console or on the video system after it has been downloaded. Any other review will require the express approval of the Chief of Police.

2. Department personnel may review their own incidents for training and/or report writing purposes. A supervisor may review a specific recorded incident for the purpose of training, critique or addressing a personnel complaint.

3. In no event shall any recorded incident be used or shown for the purpose of officer ridicule or embarrassment.

4. No video or portion of a video recording from this system may be released to a media organization, unless previously authorized by the Chief of Police or his/her designee.

5. Department personnel shall be notified as soon as practicable whenever one of their video recorded incidents is being reviewed. This notification may occur after review of the incident. This notification shall be documented on the Garden Grove Police Department **IVS WORK REQUEST** form. The only exception to this notification requirement is if it would compromise an official investigation and the Chief of Police has approved such action.

6. All reviews shall be logged unless the review is done with the Department member's knowledge during or immediately following their shift during which the recording occurred. The only exceptions to this requirement are described in sections 2 and 5 above.

**Recorded Incidents Integrity**

1. **Recorded Incidents** shall be retained in a format that is readily accessible on the Department network for a minimum of 30 days and in an archived format for a minimum of three years unless a specific request is made to store them for a longer period. The table below lists the periods of time recordings will be retained in an archived format (DVD discs) based upon their classification by the employee, the investigating officer, the IVS Custodian or a supervisor. Only the first five settings can be made at the time of recording. Therefore, classification as one of the other four settings will require the employee, investigating officer or a supervisor to notify the IVS Custodian to change the incident type of the video recording in question.

| Type of Incident | Retention Period |
|---|---|
| Non-Event (Default) | 3 Years |
| Non-Arrest Report | 3 Years |
| Arrest Report | 3 Years |
| Pursuit | 3 Years |
| Unit-Involved Traffic Collision | 3 Years |
| Employee Request | 3 Years (or as requested) |
| Administrative Investigation | 3 Years (or as requested) |
| Training Video | Permanent (or as requested) |
| Homicide or Kidnapping | Permanent (or as requested) |

2. Only a copy of a specific incident may be released. The original DVD-RAM/DVD disk shall not be released unless ordered to do so by a valid court order and only after review of that order by the Chief of Police or his/her designee. In such a case, a copy of the original DVD-RAM/DVD disk shall be made and retained until the original is returned.

3. If a member of the Department needs a copy of a specific incident the request shall be made using the **IVS WORK REQUEST.** The request should include as much pertinent information as possible to assist the IVS Custodian in locating the incident. Absent extenuating circumstances, the request shall be made at least three court days in advance. A Lieutenant or above may authorize the immediate duplication of an incident, if circumstances require. If this is authorized, the work request shall be completed and the immediate duplication need shall be noted in the additional information portion of the work request. The request will then be turned into the IVS room. If during the duplication process, the incident was temporarily placed onto the hard drive of a computer or any other digital storage device, that copy will be deleted after it is transferred to a DVD. The above describes the only authorized manner in which a copy of a recorded incident or DVD can be made.

4. It is the responsibility of the Department member obtaining a copy of a recorded incident, to ensure it is not copied and to return that copy as soon as practicable to the IVS Custodian. The IVS Custodian shall erase/destroy the copy immediately.

5. All DVD-RAM/DVD disks and recorded incidents are the property of the City of Garden Grove and shall be stored in a secure location with limited access.

**EXHIBIT I**

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CD TRANSCRIPTION
### CASE # SACV10-0338 DOC

| CD No.: | 002-11 |
|---|---|

| TOTAL TIME: | 27:16 MIN/SEC |
|---|---|

| | |
|---|---|

| DATE OF INCIDENT: | 9-23-08 |
|---|---|

| DATE TRANSCRIBED: | 3-19-11 |
|---|---|

| LEGEND: | TRACK 2 |
|---|---|

| Q: | Sergeant Bailey, Garden Grove Police Department [?] |
|---|---|
| A1: | Saku Ethir, Esq. |
| A2: | Officer Rick Gendreau, Garden Grove Police Department |
| UNK: | Unidentifiable Parties |
| | |
| | |

| NOTE: | (..?) | = | Non-intelligible or non-distinguishable words or phrases. |
|---|---|---|---|
| | -- | = | Change / Interruption in thought. |
| | ... | = | Incomplete thought / Pause in thought. |
| | [ ] | = | Transcriber's comment(s). |
| | Uh huh | = | Affirmative response. |

**NOTE:**    (..?)   =   Non-intelligible or non-distinguishable words or phrases.
        --   =   Change / Interruption in thought.
       ...   =   Incomplete thought / Pause in thought.
       [ ]   =   Transcriber's comment(s).
    Uh huh   =   Affirmative response.

## QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
### CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD | 1 |
| INTERVIEW DATE: | 9-23-08 | CD NO: 002-2-11 |

CD NO. E-002, TRACK 2, BEGINS AT 0:00 MIN/SEC

UNK: (..?) (..?).

Q:  Okay --[break in recording]--all right.  The date of this interview is, uh, 9-23-08.  The time is approximately 0905 hours...uh, present in the room is Officer Rick Gendreau and his attorney, Saku Ethir?

A1:  You got it.

Q:  Okay.

A1:  Mm.

Q:  And myself, Sergeant Bailey [phonetic spelling].  This interview is being conducted, uh...uh...to get Officer Gendreau's statement under the C(..?) Report of 08-13270...uh, at this time, Rick, I'll advise you of your...AB-3-0 -- your right (..?) AB-301.  Uh, you have the right to a representative of your choice present during this interview and you've chosen your attorney Saku Ethir, is that correct?

A2:  Yes.

Q:  Okay.  You can, also, have an association member, uh, or anyone else not connected with this investigation.  You have the right to make your own tape recording of this interview...at the end of the investigation, you will be furnished with a copy of all documents concerning this investigation and of all taped records, if you desire.  Uh -- do you understand these rights?

A2:  Yes.

Q:  Okay...[clears throat]...okay.  I need to read you your Miranda rights...okay?

A2:  [no audible response-may be nodding]

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

**2**

**INTERVIEWEE(s):**       **OFFICER GENDREAU, GARDEN GROVE PD**
**INTERVIEW DATE:**       9-23-08                    **CD NO: 002-2-11**

Q:   You have the right to remain silent.  Anything you say may be used against you in court. You have the right to an attorney before any -- and during questioning.  If you cannot afford an attorney, one will be afforded -- one will be appointed for you before questioning, if you wish. Do you understand each of the rights I've explained to you?

A2:   Yes.

Q:   And are you willing to waive these rights now?

A2:   No.

Q:   Okay. Let me give you the Lybarger Warning...okay?

A2:   [no audible response-may be nodding]

Q:   While you--...[clears throat]--excuse me.  While you have the right to remain silent with regard to any criminal investigation...you do not have the right to refuse to answer my administrative questions.  This is strictly an administrative investigation.  I am, therefore, now, ordering you to discuss this matter with me and answer the questions in a truthful and accurate manner.  If you refuse to discuss this matter, your silence can be deemed insubordination and result in administrative discipline, up to and including termination. Any statement you make under the compulsion of the threat of such discipline cannot be used against you in a later criminal proceeding.  Do you understand this order?

A2:   Yes.

Q:   Okay, Rick, did you have a opportunity to review the report on this...case?

A2:   No, I did not.

Q:   Okay....uh, would you like to?

A2:   Uh...if one's available.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

**3**

| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD |
|---|---|
| INTERVIEW DATE: | 9-23-08 |

CD NO: 002-2-11

Q:    Yeah.   I'm sure I have it...[pause w/papers shuffling]...hm, hm, hm, hm...[papers shuffling]...that's the little [unclear] report, if you haven't looked at it...take some time to do that...[pause]...now, Officer -- I mean, um, Sergeant Wagner did two supplements. And, basically, one has...what you guys told him at the scene...that's (..?).

[≈ 20-second pause]

A1:    (..?) (..?)...(..?) not here [unclear-whispering].

[≈ 5-minute pause]

A2:    I'd say, as far as, uh, statements are concerned...

A1:    Uh huh.

A2:    ...(..?) (..?)...

A1:    Uh huh.

A2:    ...and, uh, it says, uh, past report.

A1:    Oh, okay.

A2:    Okay...so, yeah, it looks like that's...it for...(..?) statements.

Q:    You got, um...this one, right?  The one by, uh, Wagner?

A2:    No, sir.

Q:    No, no, no.  That -- you did.

A2:    [talk-over-inaudible]...

UNK:   Unofficial [unclear who].

A2:    Yes.

Q:    Yeah, I just cut that out...

A1:    Uh huh.

## QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
### CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | **4** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-2-11** |

Q:      ...for...

A2:     Okay.

Q:      ...notes.

UNK: Okay.

Q:      Good [unclear]...[pause]...okay, um...Rick, can you, uh, just...

A2:     Uh huh [unclear].

Q:      ...go ahead and, basically, tell me what the call was all about?

A2:     Uh...the call would've gone out as a, uh...as a 51-50 call...

Q:      Uh huh [unclear].

A2:     ...a violent mental case.

Q:      Uh huh.

A2:     Um...dispatch had advised that, uh...the subject was, uh...possibly, in possession of weapons...um, and that...uh, they were informed by the calling party, uh...that, uh...he was, possibly, uh...assaulted by...uh, the subject, who was, uh, identified over the radio as Andy Tran.

Q:      Okay.  The calling party said he'd been assaulted?

A2:     Yes.

Q:      And who was that calling party?

A2:     Uh...I believe the calling party was Trinh Tran.  I'm not sure if that was the mother or the father of -- I was unable to get any other info.

Q:      Okay...okay.  And who arrived first?

A2:     Uh, Officer Karschamroon arrived first.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | **5** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-2-11** |

Q:     Okay.  And how-how af -- how soon after that did you arrive?

A2:     Um…I'd say, approximately…two minutes…um, but I'm not positive.

[short pause]

Q:     About…two minutes?

A2:     Roughly.

Q:     (..?) -- that's okay.

A2:     It's roughly two minutes.

Q:     Okay.  Um…when you arrived, where'd you park?

A2:     I parked, uh…right behind Officer Karschamroon's unit.  It was on the…south curb line [unclear] of Paloma, just, uh…just west of Barnett.

Q:     Okay.  And, uh…what-what were your observations?

A2:     Uh, when I got out of my unit, I could see that Officer Karschamroon had, uh, a subject…uh…he was trying to detain the subject out on the, uh, out on the front lawn…uh, both Officer Karschamroon and…uh, An -- uh, later turned out to be, uh, Andy Tran, were facing, uh, eastbound…um…I could see Officer Karschamroon looking to his left and looking to his right…uh…and I could see that he was struggling, trying to get, uh, Tran's arms behind his back…uh, at…that point, I, uh…I ran to where Officer Karschamroon was.

Q:     Uh huh.

A2:     Officer Karschamroon say that, uh, the subject was resisting.  He was…tensed up and flexing his muscles and…uh, he couldn't get his hands behind his back.

Q:     Karschamroon said that?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | **6** |
| **INTERVIEW DATE:** | 9-23-08 | **CD NO: 002-2-11** |

A2:     Yes.

Q:      Okay, and...what were your observations of...uh -- the subject [unclear] is Andy Tran, correct?

A2:     Yes.

Q:      What were your observations of Tran at that point?

A2:     Uh...Tran had his-had his hands up behind his head...but his fingers were not interlaced, uh, he had bundled them up in a fist...uh, he was shaking.  Uh, I-I stood directly in front of him.  So, Tran was, now, in between Officer Karschamroon and myself...um...I tried to cut off an avenue of escape in case he tried to run...um...I could see that he was...he was shaking.  He was, actually, growling...at me.  Um...he wasn't blinking...uh, his-his pupils, even with the sun shining in his face, uh, appeared to be very dilated....um, he had saliva coming in -- coming out of the corner of his mouth, um, almost like he was frothing at the mouth...um...and he just appeared to be looking right through me...

Q:      Uh huh.

A2:     ...uh, as if I wasn't even there.

Q:      How close were you?

A2:     Uh...m--...maybe, about two feet away.

Q:      Okay, was he struggling with, uh...Karschamroon?

A2:     He was, still, just keeping his arms flexed.

Q:      Uh huh.

A2:     Um...behind his head...um, I could see Officer Karschamroon trying to separate his hands...

## QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
### CASE # SACV10-0338 DOC

INTERVIEWEE(s):      **OFFICER GENDREAU, GARDEN GROVE PD**      7
INTERVIEW DATE:      9-23-08                        CD NO: 002-2-11

Q:   Uh huh.

A2:  ...uh, even though they (..?), he was tryin' to...uh, bring 'em down below his back.  I could see that...um, Officer Karschamroon had already gotten a handcuff on...Tran's right hand...um, and he still had just a dangling cuff.

Q:   Uh huh.

A2:  Um...I told...I told Tran to relax...put his hands behind his back and that we weren't there to hurt him...um...and he still stared through me like I wasn't even there, just...no verbal recognition of-of what I was telling him.

Q:   Uh huh.

A2:  Uh, no physical recognition.  Uh, no compliance.  Um...and I could see that he was still shaking and...

Q:   Uh huh.

A2:  ...uh...Officer Karschamroon was-was still...just trying to separate his hands and he couldn't' get 'em apart.  Um...so, Officer Karschamroon still had...uh, his left hand on Tran's left hand.  I grabbed Tran's left hand with both of my wrists and, now, we had three hands on his left wrist...um...and we tried pulling his arm down...behind his back and, even with Officer Karschamroon and myself combined...we couldn't get his hand down from the-the flexed position.

Q:   Uh huh.

A2:  Um...so, I stood back in front of Tran...and I told him..."Put your hands behind your back...uh...we're not here to hurt you.  We just...we need to talk to you.  Put your hands behind your back."   And, uh, he still...same condition; still snarling...uh...drooling,

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

**8**

| | |
|---|---|
| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD |
| INTERVIEW DATE: | 9-23-08                       CD NO: 002-2-11 |

um...still hadn't -- I still hadn't seen him blink.  Uh, he still had that blank stare like he was looking right through me.

Q:      Okay, you...

A2:     Um--

Q:      ...show -- you went around back in front of him [A2 talking-both inaudible]...

A2:     [talk-over-inaudible]...I went around back in front of him after...

Q:      So [unclear], he-he had his--

A2:     ...he tried-- he still had his hands behind his head and still shaking.

Q:      Okay.

A2:     Um...

Q:      Shaking, as in...like...do you think it was being tense or...like...

A2:     [heavy exhale]...

Q:      ...like...-- or what do you--...

A2:     It...it was tough to tell.  It-it -- at first, I thought he was just being tense, but then he started...-- the shaking started getting a little more violent...um...as though he was trying to break away from Officer Karschamroon.

Q:      Oh, I see.  Okay.

A2:     Um...but, you know, at-at first...when we tried to separate his arms, um....you know, he was just shaking a little bit...only when we-when-when we tugged on his arms, like, he was pulling back...

Q:      Uh huh.

A2:     ...um...but not like he was pulling away.  Uh, when I went back in front of him the

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

**9**

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** |
| **INTERVIEW DATE:** | **9-23-08**       **CD NO: 002-2-11** |

second time...

Q:   Uh huh.

A2:   ...after I tried to get his left hand behind his back...um, he was shaking pretty violently. Um...and I thought...I thought he was gonna fight. Um, it-it looked like he was-he was trying to pull away...um, and I knew...given the strength he had already exhibited...um...even with Officer Karschamroon and I trying to pull down on his, uh...on his left hand...

Q:   Uh huh.

A2:   ...um...that, if it did go to a fight, it was-it was gonna be a bad one...and...you know, he...didn't seem like he was just (..?)ing to be in compliance at all...um, even when we tried to move his-his wrist behind his back.

Q:   Okay.  So...so, you ne[ver] -- you guys never did get his wrist behind his back?

A2:   No.

Q:   Okay.

A2:   Not at all.

Q:   Okay.  What were your actions at that point?

A2:   Uh, at that point, I took my Taser out.

Q:   Uh huh.

A2:   Um...and I held it in my right hand.  I took off the safety...

Q:   Uh huh.

A2:   ...so I can see, um...the-the red laser sight in his thigh...um...and I told Officer Karschamroon...um...to be prepared for a Taser deployment.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

| | | 10 |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-2-11** |

Q:     Uh huh.

A2:    And I, then, told Tran one last time, "Get your hands behind your back or you're gonna be Tased"...uh...Tran still...stood there shaking, um...didn't comply.     Didn't acknowledge...that I had even said anything.   Um...hadn't said a -- an entire word the entire time I dealt with him.   Uh...I then advised Officer Karschamroon I was gonna deploy the Taser.   Um, I told Officer Karschamroon to...(..?) (..?) under Tran's hands, take...you know, a couple steps to his left...so -- to avoid the darts hitting him...and...

Q:     Uh huh.

A2:    ...uh, I deployed the Taser into his thigh.

Q:     Okay.   Now, why into his thigh?

A2:    Uh...it's been, uh, part of our training, um...that one of the best ways to get a subject down to the ground...is to, uh...is to Tas him in the leg.

Q:     Okay.

A2:    Um...and that-that, usually, uh, gives it a...a better chance of getting the subject to the ground.

Q:     Okay.   And what was your, um.....um...state of mind?   What were you...what were you trying to accomplish?   Just getting him--

A2:    Uh, I was trying to accomplish getting him into custody without...without any further risk of injury to Officer Karschamroon, nor to Tran or to myself.

Q:     Okay...after, uh...he Tased, what happens at that point?

A2:    Uh...I could hear the Taser firing...

Q:     Uh huh.

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
CASE # SACV10-0338 DOC

INTERVIEWEE(s):     **OFFICER GENDREAU, GARDEN GROVE PD**          **11**
INTERVIEW DATE:     **9-23-08**                         **CD NO: 002-2-11**

A2:    ...and I started telling him, "Get down on the ground, get down on the ground"...

Q:     Uh huh.

A2:    ...um, and then I could see him...start going to the ground, but it looked as though Officer Karschamroon was...lightly -- gent[ly] -- he gently laying him on the ground...um...

Q:     Okay.

A2:    ...I couldn't tell if it was...just because of the Taser reaction and Officer Karschamroon was just laying him down so he didn't hurt himself...

Q:     Uh huh.

A2:    ...uh, or if he was going down voluntarily.

Q:     Okay. How many cycles did you do?

A2:    Just one.

Q:     Okay.  And, uh, what happened after Tran was down on the ground after he'd been...Tasered?

A2:    Uh, Officer Karschamroon, um...took control of his left hand.  I took control of his, uh, of his right hand.

Q:     Uh huh.

A2:    We got his hands behind his back...and, uh...um, handcuffed him.

Q:     Okay.  What...what did Tran do after being handcuffed?

A2:    Uh, after Tran, uh, was handcuffed, he was on the ground and he...he was looking up -- he was looking to his left, looking to his right...and I kept telling him, "Relax, relax"...um, "We're gonna get medics for you."   I started asking him if he was

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

12

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** |
| **INTERVIEW DATE:** | **9-23-08**                         **CD NO: 002-2-11** |

     okay...um...he wasn't responding.  He just kept looking around.

Q:     Uh huh.

A2:     Um...and, uh--

Q:     Did he ever...talk?

A2:     He never once talked.

Q:     Okay.

A2:     Um...and, uh...after looking around a couple times, he just put his head on the ground...uh, face down, uh, on his left side...

Q:     Uh huh.

A2:     ...so he was looking to his right.

Q:     Uh huh.

A2:     Um...and, once we had the handcuffs on him...uh, I...advised dispatch over the radio that we were...we were okay...and to...start medics for a Taser deployment.

Q:     Okay.  So...um...say that again, when-when he was lookin' around to when he put his head down on the ground and looked to the right...how long -- what time was that?

A2:     Uh, that's, maybe, 5 or 10 seconds.

Q:     Okay.

A2:     He-he looked to his left, looked to his right...back to his left, back to his right, and then he just put his face down on the ground.

Q:     Okay.  Did he appear to you to be in any kind of distress, physically?

A2:     At that time, no.

Q:     Okay.

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

| | | **13** |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-2-11** |

A2: Um...we, uh--

Q: I'm sorry.

A2: --we had rolled him over. Um...

Q: Uh huh.

A2: ...so that I can -- I could check to make sure that he was okay...

Q: Uh huh.

A2: ...um, at -- once we rolled him over, um...you know, he had very short rapid breaths...um...but he was...you know, he -- his eyes were closed, but he was still breathing.

Q: Uh huh.

A2: Um, I checked his pulse. He had a very rapid pulse...um...and, you know, very labored breathing...um...you know, just...numerous, uh...numerous breaths, um....very, very quick...uh....

Q: Did you time his pulse, by chance?

A2: No, I didn't.

Q: Do you have any training on...on that, any kind -- anything like that?

A2: Uh. as far as pulse (..?), yes.

Q: Okay...[inhale/exhale]...okay...and he didn't talk during...the incident, right?

A2: No.

Q: So, he never complained of any physical problems?

A2: No.

Q: Okay. Were you guys out in the front yard with him alone?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

15

| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD |
|---|---|
| INTERVIEW DATE: | 9-23-08 |

CD NO: 002-2-11

He just…stood there…silent and….

Q: Okay…[papers shuffling]…and, uh, when did El-Farro [sic] get there?

A2: Officer El-Farra got there, uh, after we had already had Tran in handcuffs.

Q: Uh huh.

A2: Um, we had rolled him over. We sat him up…um…

Q: Okay. And, now, why did you set him up -- si-sit him up?

A2: [pause in response]…I --[small chuckle]--I don't know. We-we just did. Um…you know, we-we thought that might help…uh, help him breathe…uh, might help him…kinda snap out of the trance that he seemed to be in.

Q: Okay. Did he appear to have any kind of labored breathing or somethin'?

A2: Uh, he still had-he still had short…rapid breaths.

Q: Okay.

A2: Um, his…--- I-I would…describe that as pre-labored breathing.

Q: Okay. But you had already called medics.

A2: But we had already called -- I called medics, uh, as soon as we had him handcuffed…um, I had-I had called [mumbling-inaudible] to respond [unclear].

Q: Okay. And, uh, was Karschamroon -- uh, I'm sorry, was El-Farro [sic]…was he originally sent the call or did he…come because of…

A2: I don't know.

Q: …the radio traffic (..?)--

A2: I don't know.

Q: The original…to the call was just you and Karschamroon.

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

| | | 16 |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** | |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-2-11** |

A2:   Uh, there were three units, uh....that were...dispatched.  I believe Officer Avalos was the third.

Q:    Okay.

A2:   Or was the other unit.  Um...but when he had come on-scene, um, uh, you know, as -- right as we were handcuffing him...uh, I told...Officer Avalos that...we were okay.

Q:    Uh huh.

A2:   And...you know, we assumed that we were...that we were fine at that point...'cause I had already called...called for medics for the Taser deployment.

Q:    Uh huh.

A2:   Um...so...Officer, uh, Officer Avalos...left, and that's when Officer El-Farra responded to the scene.

Q:    Okay.  Did the family...tell you about any kind of medical issues at that point?

A2:   Uh, I had a hard time communicating with the family.

Q:    Uh huh.

A2:   Um...they-they didn't seem to understand very much English.

Q:    Uh huh.

A2:   Um...we were trying to establish if any of them were hurt...um...because of the call, it initially stated that somebody had...possibly, been ass[aulted] -- been assaulted...um...and it-it...took a little while to even get out of them that...nobody was, actually, assaulted.  We asked 'em if they were on any medications.

Q:    Uh huh.

A2:   Uh, they didn't really seem to understand what we were saying.

QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT

CASE # SACV10-0338 DOC

**17**

INTERVIEWEE(s):          OFFICER GENDREAU, GARDEN GROVE PD
INTERVIEW DATE:          9-23-08                                          CD NO: 002-2-11

Q:      Uh huh.

A2:     Um...I asked 'em if I could go in the house and check for anybody else...um, and they started pointing towards the front door...um...I asked 'em where Tran slept.  They showed me a bedroom...um...after we (..?) our protective suit [unclear] to make sure nobody was hurt...um...

Q?:     We?

A2:     ...I checked...

A1:     Who?

A2:     ...his bedroom to see -- uh, Officer Karschamroon and I...or Officer El-Farra.  We asked Officer El-Farra to stay out on the front lawn with, uh...

Q:      Okay.

A2:     ...with Tran.

Q:      Did (..?)--

A2:     Um--

Q:      --did everything look...fairly...

A2:     Every-everything...

Q:      ...Code 4'd [unclear], and all that?

A2:     ...looked Family [unclear]-Code 4, um...it -- you know, he-he was still having labored breathing, but...you know, we didn't think that he needed any immediate medical attention from us...

Q:      Uh huh.

A2:     ...because he still had a pulse.  He was still breathing.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

**18**

| | |
|---|---|
| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD |
| INTERVIEW DATE: | 9-23-08                           CD NO: 002-2-11 |

Q:     Uh huh.

A2:    Um...we could hear the medics...uh, we could hear the sirens...uh, coming from...what seemed like a relatively short distance...um...so, uh, you know, we had Officer El-Farra stand by...with Tran and...uh, Officer Karschamroon and I went inside to make sure that there were no other injured people.

Q:     Okay.  And you found none, right?

A2:    We found none.

Q:     Okay....uh...did you have any, uh...inclination that there might've been any other serious problems with, uh, Tran at this point?

A2:    Um...just other than what had been advised as far as his past mental history...um...dis-dispatch had advised over the radio that there was a history of mental illness...

Q:     Uh huh.

A2:    ...uh, as reported by the family.

Q:     Okay.

A2:    Um...but, other than that, I mean...you know, I-I...couldn't really tell other than just the fact that his-his...pupils were extremely dilated...um...while even -- like I said, even with the sun shining in his face, and...

Q:     Uh huh.

A2:    ...prior to going on-scene, I had asked dispatch to run him through our...local records...and they had told 'em that he had a...prior arrest for, um...(..?)...drug paraphernalia.

Q:     That's before you got there, you said?

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

**INTERVIEWEE(s):**      **OFFICER GENDREAU, GARDEN GROVE PD**      **19**
**INTERVIEW DATE:**      9-23-08      **CD NO: 002-2-11**

A2:   That was before I had gotten there.  Um, so, when I saw how…dilated his pupils was -- uh, were, how rapid his pulse was and…how resistive he was being, I thought there was a possibility he might be under the influence of something, but…

Q:   Okay.

A2:   …I didn't even get to do a-a-a full evaluation.

Q:   Okay.  Now, when you came out of the house…El-Farro's [sic] got him and he's sitting up, right?

A2:   Uh huh.

Q:   Uh…uh, were the medics there…

A2:   Uh…

Q:   …by that time?

A2:   …(..?) -- the-the medics-the medics were just arriving on the scene.

Q:   Uh huh.

A2:   Um, and when they were checking him out, that's when they…they found that he wasn't…breathing.

Q:   Okay.  But you never saw that he wasn't breathing?

A2:   I never saw that he wasn't breathing.

Q:   Okay…okay.  Did that surprise you?

A2:   It did.

Q:   Okay.

A2:   It did.

Q:   Okay.  Now, at any time, uh, did you use your IVS-Recorder or video on this?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
CASE # SACV10-0338 DOC

20

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** |
| **INTERVIEW DATE:** | **9-23-08**                          **CD NO: 002-2-11** |

A2:   No. I-I tried to, uh…right before we deployed the Taser…

Q:   Uh huh.

A2:   …um, I hit the button on my microphone…

Q:   Yes.

A2:   …and I checked my…uh, recorder at the beginning of the shift…uh, everything was fine and working with it.

Q:   Uh huh.

A2:   Um, I had hit the button on my IVS-Recorder, but it didn't activate.

Q:   Okay. How far away was your car?

A2:   [heavy exhale]…I'd say it was…probably, about 100 feet.

Q:   Okay. All right. Is there a-anything else, um…that…that you can think of that we might've missed here or…that, you know, regarding your train of thought or anything like that?

A2:   [short pause in response]…I don't think so.

Q:   Okay [unclear].

A2:   Do you think there's anything…Saku?

A1:   I can't think of anything.

[pause]

Q:   Okay. So, basically, when you sat him up, it was more for his comfort?

A2:   It was more for his comfort. Yeah [unclear].

Q:   Okay…okay. And (..?) -- and you really couldn't communicate with the family about what-what -- anything else goin' on?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

14

| INTERVIEWEE(s): | OFFICER GENDREAU, GARDEN GROVE PD | |
|---|---|---|
| INTERVIEW DATE: | 9-23-08 | CD NO: 002-2-11 |

A2: Uh…

Q: You and, uh…Karschamroon--

A2: Officer Karschamroon and I were the only two officers out there with him.

Q: Uh huh.

A2: His parents did come out into the front yard.

Q: Uh huh.

A2: Uh, and I did see a small child…that came out into the doorway.

Q: At what point?

A2: Um….it was-it was…when I had first gotten on-scene…and I was trying to calm Tran down. His parents came out to the doorway and…I told 'em to stay on the pa[tio] -- on…to the porch.  Um…and…they -- from what I could hear behind me, they were still out there.

Q: Uh huh.

A2: Um…but…I-I didn't see them until after we had them [sic], uh…handcuffed.  I saw them when I first got there…and then I put all my focus on Tran.  I could hear them in the background, but I couldn't see them.

Q: Uh huh.

A2: Then, after we got Tran handcuffed, that's when (..?) came back out to the porch.

Q: Okay.  Um…during this incident, did Tran appear to understand what you said to him?

A2: No.

Q: Okay.

A2: He-he-he had [unclear] no indications that he…either understood or didn't understand.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

CASE # SACV10-0338 DOC

21

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER GENDREAU, GARDEN GROVE PD** |
| **INTERVIEW DATE:** | **9-23-08**                 **CD NO: 002-2-11** |

A2:   No.

Q:   Okay...Okay. Uh, I think that's about all I have for you. Do you have anything?

A1:   Uh, no, and I -- but I think it's been said, Rick, it's just...my understanding of what you said that you believe the use of the Taser was...the amount of force reasonably necessary to get this individual into, um...handcuffs and into custody.

A2:   Yeah. While-while we were deal-dealing with him, I mean, when-when we tried to overcome his...his....uh, resistance with just being compliance [sic?] and wrist locks, that wasn't working, um...and...it's been my training that when -- typically, when that kinda thing...just doesn't work...uh...baton strikes and pepper spray are gonna be pretty ineffective as well.

Q:   Right. So...

A2:   (..?)--

Q:   ...your progression...

A2:   My-my--

Q:   ...for a Taser was...

A2:   To Taser was...

Q:   ...to--

A2:   ...the only last option left on my...

Q:   Well, sure. And it (..?) -- yeah. I understand what you're-you're sayin', and-and it was, to -- like you said before, it was to make sure that nobody else got...injured further...

A2:   Yes.

Q:   ...including Tran...

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
CASE # SACV10-0338 DOC

**22**

INTERVIEWEE(s):      **OFFICER GENDREAU, GARDEN GROVE PD**
INTERVIEW DATE:      **9-23-08**                        **CD NO: 002-2-11**

A2:      Yes.

Q:      …correct [in unison]?  Okay.

A1:      That was all I have.

Q:      Okay….all right.  That's about all I have…for ya'….and, uh, Rick, I'm gonna order you not to discuss this interview or investigation with anyone other than…your representative or myself.  Do you understand that?

A2:      Yes.

Q:      Okay.  I'm gonna cut off the…(..?).

CD NO. 002, TRACK 2, ENDS AT 27:16 MIN/SEC

TRANSCRIBED ON MARCH 19, 2011

**EXHIBIT J**

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CD TRANSCRIPTION
### CASE # SACV10-0338 DOC

| CD No.: | 002-3-11 |
|---------|----------|

| TOTAL TIME: | 17:32 MIN/SEC |
|-------------|---------------|

|  |  |
|--|--|

| DATE OF INCIDENT: | 9-23-08 |
|-------------------|---------|

| DATE TRANSCRIBEQ: | 3-21-11 |
|-------------------|---------|

| LEGENQ: | TRACK 3 |
|---------|---------|

| Q: | Sergeant Bailey, Garden Grove Police Department [?] |
|----|-----------------------------------------------------|
| A1: | Saku Ethir, Esq. |
| A2: | Officer Karschamroon, Garden Grove Police Department |
|  |  |
|  |  |
|  |  |

| NOTE: | (..?) | = | Non-intelligible or non-distinguishable words or phrases. |
|-------|-------|---|-----------------------------------------------------------|
|  | -- | = | Change / Interruption in thought. |
|  | ... | = | Incomplete thought / Pause in thought. |
|  | [ ] | = | Transcriber's comment(s). |
|  | Uh huh | = | Affirmative response. |

NOTE:    (..?)   =    **Non-intelligible or non-distinguishable words or phrases.**
         --     =    **Change / Interruption in thought.**
         …      =    **Incomplete thought / Pause in thought.**
         [  ]    =    **Transcriber's comment(s).**
         Uh huh  =    **Affirmative response.**

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):**    **OFFICER KARSCHAMROON [GARDEN GROVE PD]**    1
**INTERVIEW DATE:**    **9-23-08**    **CD NO: 002-3-11**

CD NO. 002, TRACK 3, BEGINS AT 0:00 MIN/SEC

Q:    That's what I was tryin' to do, too.   I hope it-I hope it worked...we're re...reverting [unclear] to tape.

A1:    Okay. I'm ready.

Q:    Okay...[pause]...okay.  The date of this interview is 9-23-08.  The time is approximately 0953 hours.  Present in the room is Officer Karschamroon...uh, his attorney, Saku Ethir, and myself, Sergeant Bailey.  This interview is being conducted to, uh, get Officer Karschamroon's statements on the Casualty Report listed under DR 08-13270.  Uh, Daniel, at this time, I'll advise you of your rights per AB-301.  You have the right to a representative of your choice during this interview and you've chosen your attorney, Saku Ethir, is that correct?

A2:    Yes.

Q:    You may, also, have...uh, an association member or anyone else not connected with this investigation.  You have the right to make your own tape recording of this interview.  At the end of the investigation, you will be furnished with a copy of all documents concerning this investigation and of all taped records, if you desire.  Do you understand these rights?

A2:    Yes.

[pause]

Q:    Okay, I'm gonna read your Miranda rights, okay?

A2:    Okay.

Q:    You have the right to remain silent.  Anything you say may be used against you in court.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):      OFFICER KARSCHAMROON [GARDEN GROVE PD]**   2
**INTERVIEW DATE:      9-23-08                                CD NO: 002-3-11**

You have the right to an attorney before and during questioning. If you cannot afford an attorney, one will be appointed for you before questioning, if you wish. Do you understand each of these rights I've explained to you?

A2:    Yes.

Q:     Are you willing to waive these rights now?

A2:    I'm not going…to waive.

Q:     Okay, so…okay…[pause]…okay. I'm gonna read you Lybarger, okay?

A2:    [no audible response-may be nodding]

Q:     While you have the right to remain silent with regard to any criminal investigation, you do not have the right to refuse to answer my administrative questions. This is strictly an administrative investigation. I am, therefore, now, ordering you to discuss this matter with me and answer all the questions in a truthful and accurate manner. If you…if you refuse to discuss this matter, your silence can be deemed insubordination…and result in administrative discipline, up to and including termination. Any statement you make under the compulsion of such -- of the threat of such discipline cannot be used against you in a later criminal proceeding. Do you understand this order?

A2:    Yes.

Q:     Okay. Now, you've just reviewed the report, correct?

A2:    That's correct.

Q:     All right. Is this report true and correct as you remember it?

A2:    Yes.

Q:     Okay…[pause]…all right. Daniel, um…uh…this stems from the Casualty Report…on

## QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
### CASE # SACV10-0338 DOC
**INTERVIEWEE(s):**   **OFFICER KARSCHAMROON [GARDEN GROVE PD]   3**
**INTERVIEW DATE:**   **9-23-08**                        **CD NO: 002-3-11**

September 3rd at (..?) -- 1-3-2-5-2 Barnett.  Do you recall that?

A2:   Yes, I do.

Q:   Okay.  Can you tell me what the call was?

A2:   Um…I believe it was three units, uh, were dispatched to…a violent mental case.

Q:   Uh huh.

A2:   Uh, the call went out that, um…the subject was assaulting someone with, uh, unknown weapons…and, um…that's when I responded…and I clarified -- I tried to clarify with dispatch if there was any description of the weapons…uh, dispatch…told me that they were still -- it's unknown what type of weapons were used.

Q:   Okay…and you arrived first, correct?

A2:   Yes, that's correct.

Q:   Okay.  And, um…what happened when you arrived?  What were your observations?

A2:   I parked on the…the west side of the house, across from Barn…Barnett.

Q:   Uh huh.

A2:   And, uh, I can see directly at the house, uh, there was a male individual that was tryin' to…enter through a window.

Q:   Okay.

A2:   Right next--

Q:   Stop you.  Park on Paloma, right?

A2:   Yes.

Q:   Okay.  So…go back.  I'm sorry, I didn't mean to…

A2:   I was--

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]   4** |
| **INTERVIEW DATE:** | **9-23-08**                          **CD NO: 002-3-11** |

Q:      …break your…

A2:     I parked on Paloma, directly facing, um…the address on Barnett.

Q:      Okay.

A2:     I can see a male individual that was tryin' to -- it-it appeared to me that he was trying to get inside the house.

Q:      Uh huh.

A2:     Um…there was a broken screen window…that was right next to him…and, as I got out of my unit to approach him, I could see him reach in and somewhat grabbing something from inside the window.

Q:      Okay.  So, the screen was broken, not the…

A2:     Yes.

Q:      …window?

A2:     The screen…

Q:      Okay.

A2:     …was.

Q:      Okay.  Was this Andy Tran?

A2:     Yes, it was.

Q:      Okay…and then what happened?

A2:     As I started walking towards him, there was another…male white that was in the center of the street.

Q:      Uh huh.

A2:     And he was yelling over to Andy…"Hey, hey, hey"…just trying to get his

QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]** | **5** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-3-11** |

attention…and, um…dispatch told me that…it…-- the subject was, um…Andy Tran.  So, I just called him by his first name.  I just yelled, "Andy!...Andy!" I think, three or four times…and, um, that's when he stopped what he was doing at the window.  Um…kinda slow…slow movement, turn around…and started facing me.  And then, um…I told him…-- he came down from the porch…and I can see his eyes -- or his-his face and he just had a…pretty much a blank stare…and, um…

Q:     Did you call him off the cou[ch?] -- off the porch?

A2:    Yeah, I told him to approach me.

Q:     Okay.

A2:    And he just slowly…with his hands on his sides…he just slowly approached me…um--

Q:     Hands down to his sides, you mean?

A2:    Yes.

Q:     Okay.

A2:    And it would just -- I mean, he was just -- he had a blank stare on his face that -- it looked like as if he was confused to what was going on…um, he didn't -- he wasn't sure of what was going on…and he -- it seemed like he just needed help.

Q:     Okay.

A2:    From what it-it-it appeared to me.

Q:     Okay.

A2:    And then, uh…he was about 20 feet away from me….I told him to approach me a little more and he came about within 10 feet…and I told him to stop.  He stopped…and he still had that blank stare on his face…so, I told him to put his…his hands on top of his head

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
CASE # SACV10-0338 DOC

| INTERVIEWEE(s): | OFFICER KARSCHAMROON [GARDEN GROVE PD] | 6 |
| INTERVIEW DATE: | 9-23-08 | CD NO: 002-3-11 |

and turn around...he made slow movements.  He complied at that time...and he turned around and that's when I approached him, grabbed both...both hands...and I told him to inter-lock his fingers...and he did that, but that's when I grabbed his hands and I...-- (..?) -- I'm talkin' to him, "Hey...Andy, there's," you know, "there's nothin' wrong"...

Q:     Uh huh.

A2:    ...uh, the -- "We're just out here to help you...just calm down and relax"...and at that -- he was...he was calm at that point...and then, as soon as I placed one handcuff -- I took out one handcuff and I placed it on his right wrist...in my other hand, I was holding his inter-locked fingers...I can feel it just tense up...and (..?)--

Q:     Your hand tensed up or his hand tensed up?

A2:    His hands (..?).

Q:     Okay.

A2:    And, so, his fingers tensed up, and I could just feel it closed, pretty much.

Q:     Okay.

A2:    And, um....that's when I tried to just separate 'em...so I can get both hands behind his back, and that's when, uh, Officer Gendreau arrived...and I-I informed him, "Hey, I got one handcuff on"...and, uh, he started resist -- or...(..?) resistance, just not obeying or...

Q:     [coughs]

A2:    ...or saying anything.

Q:     Okay.  And what are you thinkin' at this point?  What are you feelin'?

A2:    I'm feeling, uh.....at this point, probably, that he's just gonna be resistant.

Q:     Uh huh.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]**   7 |
| **INTERVIEW DATE:** | **9-23-08**                        **CD NO: 002-3-11** |

A2:     That it might-it might turn violent just…by the way of how his body just reacted once I got one handcuff on.

Q:       Okay…okay.  Did he ever say anything…

A2:     No.

Q:       …to you?

A2:     Didn't say anything at all.

Q:       Okay.  Did-did -- he did appear to be understanding what you were telling him, though?

A2:     Yes.

[short pause]

Q:       Okay.  And -- okay.  So, Gendreau gets there, you've got his hand…hand, uh…behind his head, one handcuff on, what-what happens now?

A2:     Uh, when Gendreau arrives, I just told him, "Hey, I got one handcuff on"…he was being quiet now.  He's [unclear] just…-- his, uh, fingers were all tense…and he's just not listening to me.

Q:       Okay…then what happened?

A2:     Uh, Gendreau went to the front of him…and, uh, started talking to Andy, "Hey, dude, just calm down" and at that same time, I'm just…I'm shaking both hands, not to agitate him, just to…'hey, I'm still behind you, uh, you know, just calm down.'  I'm still tellin', "Hey, Andy, just calm down, calm down"…and, um…Gendreau's, as far as [unclear], um, he's tellin' him the same thing; "Hey, dude, you just need to relax…calm down"…and that's when he pulled out his Taser and he's, like, "If you-if you don't calm down, I'm gonna have to Tase you."  The whole time, Andy didn't say anything…and,

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):**     **OFFICER KARSCHAMROON [GARDEN GROVE PD]**   **8**
**INTERVIEW DATE:**     **9-23-08**                   **CD NO: 002-3-11**

um…

Q:     Okay, did-did Gendreau try to help you before that…um…handcuff him by grabbin' the guy?

A2:     No.

Q:     Okay. So, he took out his Taser, then what happened?

A2:     Um…for about a minute, we were just trying to calm him down. He's still tensed up.

Q:     (..?).

A2:     His fingers are just…tense, and I can't break…break the hold….so, then, uh, Gendreau was just, like -- he-he's, like, "Hey, Danny, I'm just gonna…-- I'm gonna Tase him." I'm, like, "Okay." So, he took a step…to….Andy's right…uh, Gendreau's left…and, uh, he's…"Hey, I'm just gonna Tase him in the leg"…I'm, like, "Okay"…so, he Tase's him…um…Andy goes stiff. He starts falling back. He's falling back towards me…I get control of him and I just lay him forward…onto the ground…and, um…he releases his grip…so that I'm able to get his left hand behind his back…and I placed my left knee on his…on his upper shoulder, left shoulder…and my right foot…up against his forearm, which kinda just pinched it and made it…lock so I had it secure.

Q:     Uh huh.

A2:     And then with -- I-I'm still in control of the handcuff…so, I grab it and I'm tryin' to…get it behind his back, but he -- once the…the 5-second cycle end…ended…he, uh, he…pretty much stiffened up his right arm again. So, then, I just reach over and just break the elbow…and just…put it behind his back, and then…

Q:     Breaking elbow, meaning what?

# QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT
## CASE # SACV10-0338 DOC

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]** | **9** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-3-11** |

A2:    Breaking it so….that it -- if…-- it bends the right way.

Q:    Okay, not breaking the bone, but just…

A2:    Not breaking the bone, just breaking--

Q:    …breaking the resistance?

A2:    The resistance.

Q:    Okay.

A2:    And, um…get it behind his back and was able to handcuff him at that time.

Q:    How many Taser cycles?

A2:    Uh, just one cycle.

Q:    Okay.  Did he, uh, struggle after the-after getting handcuffed?

A2:    No, he didn't.  After both handcuffs were placed on?

Q:    Uh huh.

A2:    No.

Q:    He struggled before that?

A2:    Uh…yes, once…I was able to control the left arm…

Q:    Right.

A2:    …he was just struggling with his right arm, just keepin' it stiff and…not allowing me to….bend the joint.

Q:    Okay….okay.  What were you thinking at this point?

A2:    At that point, I…

Q:    Uh huh.

A2:    …felt that we had…every -- the situation under control.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]**   1 |
| **INTERVIEW DATE:** | **9-23-08**                                    **CD NO: 002-3-11** |

Q:      Uh huh.

A2:     And, at that point, he wasn't being resistant at all, once both handcuffs were on.

Q:      Okay.  (..?) -- uh, did he appear injured or distressed to you after the struggle?

A2:     Um…I noticed, probably, about…10, 15 seconds later…once, uh…Gendreau, as soon as we had him handcuffed, he called for medics and, uh, the sergeant for the Taser incident.

Q:      Uh huh, yeah.

A2:     I noticed that he was face down onto the ground and he was breathing heavily, just -- 'cause I can see the dirt just…go on his side…so…I just tilted his head…to his left, so he can have a clear airway 'cause, before, he was just pretty much face down onto the ground.

Q:      Okay.  So, he's lookin' to the right then?

A2:     No, he's looking to the left.

Q:      He's lookin', like, toward the house?  His house?

A2:     Well, his head was facing…facing the house…in a eastbound direction.  So, I tilted his…his head towards left -- in a north….north facing direction.

Q:      Okay.  So, he's laying on the right side of his face or the left side of his face?

A2:     He was laying on the right side of his face.

Q:      Okay…[short pause]…did, uh, did Tran say anything during this whole thing?

A2:     No, he didn't.

Q:      Okay.  Did -- so, he never complained of any physical injuries or anything like that?

A2:     No.

Q:      [clears throat]…okay…um….what happens after you turn his head?  What happens then?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

**CASE # SACV10-0338 DOC**

| | |
|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]** 1 |
| **INTERVIEW DATE:** | **9-23-08**                              **CD NO: 002-3-11** |

A2:    I notice that...-- um, we kept on trying to talk to him.   Still...no response from him...and...he was having -- he was...kinda doing labored breathing.

Q:    Uh huh.

A2:    Or it's just heavy, but...slow, heavy...labored breathing.  So, I went and checked him pulse...and that's when he just started...just kinda just nodded his head, like he didn't wanna be touched.

Q:    Uh huh. Okay.

A2:    And then, uh, from that point, uh, we decided to roll him over on his-on his back so we can...see from the front...and, once we rolled him over, his eyes were just closed.  So, Officer Gendreau opened up his eyes and saw that both of 'em were both...dilated.  So, then, we decided to sit him up...and, um...from that -- from there, he was...-- he's still breathing heavily, and I was (..?) -- you know, just...checking his pulse...probably, like, every minute, just to make sure there was-there was a pulse, 'cause he -- it seemed like he was a little unconscious, but I can still see him breathing.

Q:    Uh huh.

A2:    Just unconscious because he just wouldn't respond to...any...verbal commands or any...any type of (..?).

Q:    Okay.  Now, was he breathing heavy or is he breathing rapidly?

A2:    Heavy.

Q:    Meaning...real deep breaths?

A2:    Yes.

Q:    Okay.  And, uh...the medics had been called, right?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):**        **OFFICER KARSCHAMROON [GARDEN GROVE PD]**    1
**INTERVIEW DATE:**       **9-23-08**                       **CD NO: 002-3-11**

A2:     Yes.

Q:     Okay.  What happens then?

A2:     Um…it was….probably, right smack in the afternoon, high noon.

Q:     Uh huh.

A2:     So, it was pretty hot out there.  So…under the por[ch] -- the…-- where I first saw him, there's a porch that had some shade…so, I told the other officers, "Hey, why don't we just bring him over into the shade 'cause it's kinda hot out here?"…and, um…by that time, I can hear…the…paramedics…the ambulance coming down 'cause they were…-- they had, uh, lights -- or sirens.  I can hear the sirens…

Q:     Okay.

A2:     …coming from, uh, Euclid and Paloma.  And that's when, um….we decide just leave him there 'cause they were just down the street.

Q:     Okay.  When did El-Farro [sic] get there?

A2:     El-Farra got there right when I had both handcuffs on.

Q:     Okay…so, you -- you guys, uh, just rolled him over.  Did anybody set him up?

A2:     [short pause]…yeah, after-after we checked his…his, uh…his pupils.

Q:     Okay.

A2:     Then we sat him up.

Q:     Sat him up.  Okay.  And what -- the reason for sitting him up was?

A2:     Just so that he can breathe a little better, or…-- 'cause I was thinking just to get him into the shade.

Q:     Yeah.

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):        OFFICER KARSCHAMROON [GARDEN GROVE PD]**   1
**INTERVIEW DATE:        9-23-08                                    CD NO: 002-3-11**

A2:     And we can just pull him to the shade, rather than…dragging him on the ground.

Q:      Okay…okay.   And, uh…did -- now, you and…you and Gendreau went inside the house…

A2:     Yes.

Q:      …right?  And you left…left Tran with El-Farro [sic]?

A2:     Uh huh.

Q:      Okay.  Did…did, uh…he appear to be in any kind of a life-threatening stress to you at that point?

A2:     Mm, not that I can see.

Q:      Okay…and you guys went and checked the house, uh, for what?

A2:     Well, the call came out that…um, it was a mental…mental, and this person that…was violent and had (..?) with weapons.  So, we went inside…to make sure there was no one inside that was injured or…possibly, attacked…by Andy.

Q:      Uh huh.

A2:     And, um…the parents were there…and said -- uh, it was a big language barrier and…all the parent's were saying was just that he's got a…a mental…-- or something wrong with, uh, his head.

Q:      Okay.  All right.  You didn't find any medi -- or, uh, people making medical…

A2:     No.

Q:      …um…attention in there?  Now, were you there when the medics got there…outside with Tran?

A2:     No, was inside the house with…

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**
**INTERVIEWEE(s):        OFFICER KARSCHAMROON [GARDEN GROVE PD]   1**
**INTERVIEW DATE:        9-23-08                          CD NO: 002-3-11**

Q:      Okay.

A2:     ...Gendreau.

Q:      And, uh, what happened when you come outside, what did you see then?

A2:     Once we cleared the house...and we didn't find anyone injured...and we weren't able to
        find any medication for Andy...um...we started walking towards the front door and I can
        see...paramedics working on Andy...doing, uh, CPR.

Q:      Uh huh.

A2:     (..?)--

Q:      Did that surprise you?

A2:     It did a little...it did, um, just because it was just -- well, we left him when he was still
        breathing, and then, now...-- I was...I was just kinda shocked on why they were doing
        CPR on him.

Q:      Uh huh.

A2:     And, um...Officer Gendreau went...and talked with him as I...I stayed in the residence
        with, uh...his parents.

Q:      Okay....okay.  Um...[short pause]...did you ever utilize your -- use your IVS-Recorder
        or your video?

A2:     No, I didn't.

Q:      Okay.  And wh-why or what -- why did you not use it?

A2:     Um...it didn't...it just didn't appear to me -- or occur to me to turn it on.

Q:      Okay...okay...[pause]...did Officer El-Farro [sic] say anything to you after that?

A2:     The only thing he told me was just he, uh...he talked to the man...that was in the center

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**
**CASE # SACV10-0338 DOC**

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]** | **1** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-3-11** |

    of the street.

Q:    Uh huh.

A2:    I believe he got a statement from him…and…but that was pretty much it.

Q:    Okay…[pause]…why do you think the, um…the Taser was used on Tran?

A2:    Um…..just I…couldn't tell you what Officer Gendreau saw.

Q:    Uh huh.  He told you he was gonna Tase him, though, right?

A2:    Yeah, he-he told me he was…

Q:    (..?).

A2:    …gonna Tase him.

Q:    But you were-you were pretty much unable to get Tran in the handcuffs, correct?

A2:    That's correct.

Q:    Okay…and it was Tased -- he was Tased after that?

A2:    Yes.

Q:    Okay…[pause]…all right…..so, apparently, uh, Tran was being uncooperative, right?  He was tense.  He was struggling.  Was he trying to break your grasp?

A2:    No, he wasn't.

[short pause]

Q:    Okay…[pause]…but you were unable to get him handcuffed, correct?

A2:    That's correct.

Q:    Okay.  And that was because of his…being not cooperative?

A2:    That's correct.

Q:    And being tense?

**QUYEN DANG v. CITY OF GARDEN GROVE POLICE DEPARTMENT**

**CASE # SACV10-0338 DOC**

| | | |
|---|---|---|
| **INTERVIEWEE(s):** | **OFFICER KARSCHAMROON [GARDEN GROVE PD]** | **1** |
| **INTERVIEW DATE:** | **9-23-08** | **CD NO: 002-3-11** |

A2:     [no audible response-may be nodding]

Q:       Okay....okay...uh, do you have anything?

A1:     [pause in response]...

Q:       Did we miss anything?

A1:     I don't think so...I think they covered everything.

Q:       Okay...do you have anything else you wanna add that we might not of asked?

A2:     [pause in response]...

Q:       Aside from the stuff you're gonna think 10 minutes from now?

A1:     [laughs]...wait...[ Q laughs]...till it happened [Q/A1 laugh].

A2:     Um...[pause]...

A1:     Ahh...

[pause]

A2:     Nope, that's...pretty much it.

Q:       Okay.  I'm gonna go ahead and end the interview, then, and, um....I'm gonna give you an order not to talk, okay?

A2:     Okay.

Q:       So, Daniel, I'm gonna order you not to discuss this interview or investigation with anyone other (..?) -- than your representative or myself.  Do you understand the order?

A2:     Yes, I do.

Q:       Okay.  We're gonna stop the tapes now, then.

CD NO. 002, TRACK 3, ENDS AT 17:32 MIN/SEC

TRANSCRIBED ON MARCH 21, 2011

**EXHIBIT K**

## GARDEN GROVE POLICE DEPARTMENT
### Narrative / Supplemental Report

08-13270
**Casualty Report**
**Page 1 of 2**

| | | |
|---|---|---|
| (O) | Tran, Andy Longphi | 09-17-65 |
| | 13252 Barnett Way, GG 92840 | 714-530-3945 |
| (O) | Officer Karschmroon # 3622, | GGPD |
| (O) | Officer Gendreau # 3282, | GGPD |
| (O) | Officer El-Farra # 3740, | GGPD |
| (O) | Officer Alarcon # 3712, | GGPD |
| (O) | Sgt. Peaslee | GGPD |
| (O) | Inv. Noce #0390, | GGPD |

On September 3, 2008 at 1128 hours communications received a call for service at 13252 Barnett Way, Garden Grove. The calling party had a language barrier but had told communications that his son was crazy with weapons, send someone right now, you come right now, take to hospital. The calling party kept hanging up on communications and was heard to be out of breath, a child crying in the background, would not answer questions and communications advised of a major language barrier.

Officer Karschamroon and Officer Gendreau were dispatched to the 5150 W&I call at 13252 Barnett Way at 1130 hours. Both Officers advised they were on scene at 1136 hours. Officer Gendreau requested GGFD to respond due to a subject being Tased at 1138 hours. Officer Gendreau requested a supervisor respond at 1146 hours. I responded and arrived at approximately 1151 hours. Officer El-Farra was the handling officer of the call at the time of my arrival. I was the supervisor on scene.

Upon my arrival I saw the subject, Andy Tran 9-19-75, on an ambulance gurney and being treated by GGFD personnel. GGFD personnel were starting to move towards the ambulance. The subject was transported to GGMC and I directed Officer Gendreau to follow the ambulance to GGMC. GGFD and Officer Gendreau left the scene at 1153 hours.

I contacted Sgt. Peaslee and informed him of the incident. I requested he and his investigative team respond to the location. Inv. Noce was assigned as the lead Investigator and I briefed her as to what officers were involved in the investigation.

Officer Gendreau informed me at 1217 hours that the doctor at GGMC had pronounced the subject deceased.

SGT. R. D. WAGNER # 9103                                          9/03/08

# GARDEN GROVE POLICE DEPARTMENT
## Narrative / Supplemental Report

08-13270
**Casualty Report**
**Page 2 of 2**

I directed Officer Alarcon to contain the crime scene and maintain a crime scene log.

GGPD Investigators and OCDA Investigators completed the subsequent investigation.

SGT. R. D. WAGNER # 9103                                        9/03/08

# GARDEN GROVE POLICE DEPARTMENT
## Narrative / Supplemental Report

08-13270
**Casualty Report**
Page 1 of 2

| | | |
|---|---|---|
| (O) | Tran, Andy Longphi | 09-17-65 |
| | 13252 Barnett Way, GG 92840 | 714-530-3945 |
| (O) | Officer Karschmroon # 3622, | GGPD |
| (O) | Officer Gendreau # 3282, | GGPD |
| (O) | Officer El-Farra # 3740, | GGPD |
| (O) | Sgt. Peaslee | GGPD |
| (O) | Inv. Noce #0390, | GGPD |

On September 3, 2008 at 1130 hours officers responded to 13252 Barnett Way, Garden Grove. My original supplement details my response, arrival, initial observations, and circumstances for officers being dispatched to the location.

Upon my arrival I spoke to each of the initially involved officers and obtained a public safety statement from them.

Officer Gendreau informed me that Officer Karschamroon was conducting a pat down of the subject and the subject was being uncooperative. The subject had a blank stare on his face and did not acknowledge Officer Gendreau. Officer Gendreau said that the subject was looking right through him like he wasn't there. The subject was uncooperative and Officer Gendreau warned the subject to stop resisting or he would be Tased. The subject continued to resist and Officer Gendreau discharged his department issued Taser in the right leg of the subject. The subject was placed on the ground in a prone position and handcuffed after some resistance. The subject was then placed into a seated position. Officer El-Farra stood by with the subject while Officer Gendreau and Officer Karschamroon checked the residence and family. GGFD personnel arrived and administered first aid. The subject was transported to GGMC and I directed Officer Gendreau to follow the ambulance to GGMC. GGFD and Officer Gendreau left the scene at 1153 hours.

I spoke to Officer El-Farra who said that when he arrived Tran was handcuffed and lying face down on the grass in the front yard. Officer Karschamroon was kneeling next to Tran and Officer Gendreau was holding a Taser. Officer El-Farra suggested that Tran be placed in a seated position, which was completed. Officer Gendreau and Officer Karschamroon checked the residence while Officer El-Farra stood by with Tran. Officer El-Farra saw the subject had labored breathing and was moving. Officer El-Farra had Tran lean against his leg and El-Farra was supporting him in the seated position. Officer El-Farra said that he could see and hear Tran

SGT. R. D. WAGNER # 9103                                                    9/03/08

# GARDEN GROVE POLICE DEPARTMENT
## Narrative / Supplemental Report

08-13270
Casualty Report
Page 2 of 2

breathing. Officer El-Farra also felt Tran breathing against his leg. GGFD personnel arrived and approached Tran. They stated they needed to start CPR and asked Tran be uncuffed. Officer El-Farra uncuffed Tran and GGFD personnel started treating Tran. Officer El-Farra said he was surprised when GGFD started CPR since Tran had been breathing.

I spoke to Officer Karschamroon and he told me the following. He parked on Paloma west of Barnett on the south curb line facing eastbound. As he approached the residence he saw Tran leaning in a window on the front porch of 13252 Barnett. He saw the window screen bent and on the ground. He yelled at Tran several times and it took a while for Tran to recognize and respond to him. Tran finally acknowledged him and followed his orders to step off the porch, put his hands in the air, turn around, and put his hands on his head. A male neighbor was also in the street on Barnett yelling at Tran by name trying to get his attention as he approached Tran.

Officer Karschamroon said he grabbed Trans hands behind his head and Tran was tense, tight, and not calming down. Tran was agitated and did not respond to their requests to calm down. Officer Karschamroon placed a handcuff on the right wrist but did not want to let go of Trans hands due to Trans actions. Officer Gendreau stepped in front of Tran and tried talking to Tran to no avail. Officer Gendreau warned Tran to calm down and comply with their requests or Tran would be Tased. Tran continued to be uncooperative, tense, struggling to break his grasp, and Officer Gendreau deployed his department issued Taser into Tran's right leg. Once the Taser was activated Tran became rigid and he laid Tran onto the ground on Tran's stomach. Officer Karschamroon took control of Tran's left wrist and Tran started to resist and struggle. Officer Karschamroon was able to gain control of the left arm behind Tran's back and then had to struggle against Tran's resistance to get control of the right arm. Once Officer Karschamroon gained control of the right arm he finished handcuffing Tran. Tran was breathing and after leaving him on his stomach a few moments Tran was placed into a seated position. Tran was breathing in the seated position. Officer Gendreau and Officer Karschamroon checked the residence and family while Officer El-Farra stood by with Tran. Officer Karschamroon said that when GGFD personnel arrived they started CPR on Tran.

No further information at this time.

SGT. R. D. WAGNER # 9103                                   9/03/08

**EXHIBIT L**

1  Steven A. Sherman, Esq., Bar No. 113621
   **FERGUSON, PRAET & SHERMAN**
2  A Professional Corporation
   1631 East 18th Street
3  Santa Ana, California  92705-7101
   (714) 953-5300 Telephone
4  (714) 953-1143 Facsimile
   ssherman@law4cops.com
5
   Attorneys for City of Garden Grove Defendants
6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  QUYEN KIM DANG, INDIVIDUALLY )   NO.   SACVIO-0338 DOC (MLGx)
    AND AS GUARDIAN AD LITEM FOR )
12  KENNY MINH CAO TRAN, A MINOR, )   **DEFENDANT OFFICER**
    AND PERSONAL REPRESENTATIVE )     **KARSCHAMROON'S**
13  OF ANDY TRAN, DECEASED;      )    **RESPONSE TO QUYEN KIM**
    KENNY MINH CAO TRAN, A MINOR )    **DANG'S REQUEST FOR**
14  BY AND THROUGH HIS GUARDIAN )     **ADMISSIONS, SET ONE**
    AD LIETM, QUYEN KIM DANG' NAM)
15  VAN TRAN, BIOLOGICAL FATHER )
    OF ANDY TRAN, DECEASED; BUA )
16  THI PHAN, BIOLOGICAL MOTHER )
    OF ANDY TRAN, DECEASED,      )
17                               )
        Plaintiffs,              )
18                               )
    v.                           )
19                               )
    CITY OF GARDEN GROVE; GARDEN )
20  GROVE CHIEF OF POLICE JOSEPH )
    M. POLISAR; GARDEN GROVE     )
21  POLICE OFFICER GENDREAU;     )
    GARDEN GROVE POLICE OFFICER )
22  KARSCHAMROOM; TASER          )
    INTERNATIONAL, INC., AND DOES 1)
23  TO 10, INDIVIDUALS; AND ROES 1 )
    TO 10, ENTITIES, INCLUSIVE,  )
24                               )
                                 )
25      Defendants.              )
                                 )
26

27  ///

28  ///

_____
                              Case No. 30-2009 00325347

1   PROPOUNDING PARTY:        Plaintiff Quyen Kim Dang

2   RESPONDING PARTY:        Defendant, Officer Karschamroon

3   SET NUMBER:              One (1)

4        TO PLAINTIFF AND HER ATTORNEY OF RECORD:

5        Defendant Officer Karschamroon responds as follows to your Requests for

6   Admission, Set One:

7   **REQUEST FOR ADMISSION # 1:**

8        Admit that you do not personally know why GGPD Officer Genreau

9   deployed a Taser against Mr. Andy Tran on September 3, 2008.

10  **RESPONSE TO REQUEST FOR ADMISSION # 1:**

11       Objection.  Defendant objects to this request in that it is burdensome,

12  oppressive and not likely to lead to the discovery of admissible evidence.  Further,

13  it requires improper speculation.

14       Defendant further objects to this request in that it is vague, ambiguous, and

15  overbroad in both scope and time.  Additionally, said request seeks items and

16  material that are irrelevant for purposes of this proceeding and not reasonably

17  calculated to lead to the discovery of admissible evidence.

18       The request is further vague and ambiguous as to the terms " you", "do not

19  personally know", "personally", "know", "why", "deployed" and/or "against" so as

20  to make any response impossible as it calls for guess work, conjecture and/or

21  speculation as to the true meaning of the request.   Further said request has been

22  asked and answered, therefore making it burdensome, oppressive and cumulative.

23       However and without waiving said objections, despite the fact that I heard

24  why it occurred during deposition testimony, one can never know what another

25  person sees, observers and/or is thinking.  Accordingly, Defendant admits that at

26  the time Genreau never told me.

27  ///

28  ///

---

**REQUEST FOR ADMISSION # 35:**

Admit that you were requested to provide an interview to a District Attorney Investigator concerning the force you used against Mr. Andy Tran on September 3, 18 2008.

**RESPONSE TO REQUEST FOR ADMISSION # 35:**

Objection. Defendants object to this request in that it is vague, ambiguous, and overbroad in both scope and time.   Additionally, said request seeks items and material that are irrelevant for purposes of this proceeding and not reasonably calculated to lead to the discovery of admissible evidence.

The request is further vague and ambiguous as to the terms "stated in part", "NOTE", "if", "requested", "investigate", "matter", "involved officer(s)", "interview", "with", "will suffice", "will", "suffice", "for the" and/or "official report" so as to make any response impossible as it calls for guess work, conjecture and/or speculation as to the true meaning of the request.   Additionally, the General Order referenced above, like as is noted at the beginning of the Garden Grove Police Department General Orders, all General Orders are a set of Departmental Guidelines, as opposed to mandates, thereby allowing application and interpretations under the law.

Defendant further objects to said request on the grounds that requested information is irrelevant to the instant matter.  Also, said request is compound. Further the request has been asked and answered and it is therefore cumulative. Additionally, said information is equally available to all, thereby making it burdensome and oppressive to this responding party.

Defendant further objects to this request in that it invades the 'attorney-client' privilege, and may seek items and information in that regard.

Also, this request may seek items and information that are privileged and/or protected under Evidence Code §§ 1043, et seq., Penal Code §§ 832 et seq, the California Constitution and/or the United States Constitution.

1   set of Departmental Guidelines, as opposed to mandates, thereby

2   allowing application and interpretations under the law.

3       Defendant further objects to said request on the grounds that requested

4   information is irrelevant to the instant matter.  Also, said request is compound.

5   Further the request has been asked and answered and it is therefore cumulative.

6       However and without waiving said objections, Defendant admits said

7   request.

8   **REQUEST FOR ADMISSION # 44:**

9       Admit that on September 3, 2008, you checked out a DVD-RAM disk using

10  the DVD-RAM Disk Tracking System.

11  **RESPONSE TO REQUEST FOR ADMISSION # 44:**

12      Objection.  Defendants object to this request in that it is vague, ambiguous,

13  and overbroad in both scope and time.   Additionally, said request seeks items and

14  material that are irrelevant for purposes of this proceeding and not reasonably

15  calculated to lead to the discovery of admissible evidence.

16      The request is further vague and ambiguous as to the terms "checked out",

17  "checked", "out" and/or "using" so as to make any response impossible as it calls

18  for guess work, conjecture and/or speculation as to the true meaning of the request.

19      Defendant further objects to said request on the grounds that requested

20  information is irrelevant to the instant matter.  Also, said request is compound.

21  Further the request has been asked and answered and it is therefore cumulative.

22      However and without waiving said objections, Defendant admits said

23  request.

24  DATED:  May 26, 2011            FERGUSON, PRAET & SHERMAN

25                              A Professional Corporation

26

                 By:

27                         Steven A. Sherman, Attorneys for

                       Defendants

28

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF ORANGE

I, Cathy Sherman, employed in the aforesaid County, State of California; I am over the age of 18 years and not a party to the within action. My business address is 1631 East 18th Street, Santa Ana, California 92705-7101.

On May 26, 2011, served the **DEFENDANT OFFICER KARSCHAMROON'S RESPONSE TO QUYEN KIM DANG'S REQUEST FOR ADMISSIONS, SET ONE** on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Sean Hennessey
LAW OFFICES OF SEAN HENNESSEY
8231 Westminster Blvd.
Westminster, CA 92683

XXX (By Mail)  I placed such envelope for deposit in accordance with office practice, sealed, with postage thereon fully paid and the correspondence to be deposited in the United States mail at Santa Ana, California on the same day.

____ (By Personal Service)  I caused such envelope to be delivered by hand to the office of the addressee.

____ (State)  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

XXX (Federal)  I declare under penalty of perjury that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 26, 2011, at Santa Ana, California.

Cathy Sherman