1   Steven A. Sherman, Esq., Bar No. 113621
    **FERGUSON, PRAET & SHERMAN**
2   A Professional Corporation
    1631 East 18th Street
3   Santa Ana, California  92705-7101
    (714) 953-5300 Telephone
4   (714) 953-1143 Facsimile
    ssherman@law4cops.com
5
    Attorneys for City of Garden Grove Defendants
6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  QUYEN KIM DANG, INDIVIDUALLY  )   NO. SACV10-00338 DOC(MLGx)
    AND AS GUARDIAN AD LITEM FOR  )
12  KENNY MINH CAO TRAN, A MINOR, )   **DEFENDANTS' REPLY TO**
    AND PERSONAL REPRESENTATIVE   )   **PLAINTIFFS' OPPOSITION TO**
13  OF ANDY TRAN, DECEASED;       )   **SEPARATE STATEMENT OF**
    KENNY MINH CAO TRAN, A MINOR  )   **UNDISPUTED FACTS AND**
14  BY AND THROUGH HIS GUARDIAN   )   **CONCLUSIONS OF LAW**
    AD LIETM, QUYEN KIM DANG; NAM )
15  VAN TRAN, BIOLOGICAL FATHER   )   **DATE: July 25, 2011**
    OF ANDY TRAN, DECEASED; BUA   )   **TIME: 8:30 a.m.**
16  THI PHAN, BIOLOGICAL MOTHER   )   **CTRM: 9-D**
    OF ANDY TRAN, DECEASED,       )
17                                )
            Plaintiffs,           )
18                                )
    v.                            )
19                                )
    CITY OF GARDEN GROVE; GARDEN  )
20  GROVE CHIEF OF POLICE JOSEPH  )
    M. POLISAR; GARDEN GROVE      )
21  POLICE OFFICER GENDREAU;      )
    GARDEN GROVE POLICE OFFICER   )
22  KARSCHAMROOM; TASER           )
    INTERNATIONAL, INC., AND DOES 1)
23  TO 10, INDIVIDUALS; AND ROES 1 )
    TO 10, ENTITIES, INCLUSIVE,   )
24                                )
                                  )
25          Defendants.           )
    _____)
26

27

28

                                          Case No. 30-2009 00325347

**ADJUDICATION NUMBER 1**

**THE OFFICERS' USE OF FORCE WAS REASONABLE UNDER THE TOTALITY OF CIRCUMSTANCES, THUS BARRING 42 U.S.C § 1983 CLAIMS**

| *DEFENDANTS' UNDISPUTED FACT & EVIDENCE* | *PLAINTIFFS' OPPOSITION* | *DEFENDANTS' REPLY* |
|---|---|---|
| 1.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved.<br><br>*1.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* | 1.  **Disputed:** Neither the 911 Transcript  nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake.<br><br>*1.  Defense Exhibit 2, Transcript/ Audio of 911; Defense Exhibit 3, Dispatch CAD.  As will be shown throughout Gendreau's and Karschamroon's Declaration are in inconsistent with both their Internal* | 1.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*1.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | *Affairs interviews and Deposition Testimony.* **Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | |
|---|---|---|
| 2.  Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background. The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." <br><br> *2.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/ Audio 911 recording; Exhibit 3, Dispatch CAD.* | 2.  **Disputed**: Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major language barrier between 911 caller and despatch.  The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history.  The CAD clearly states Andy needs to be taken to the hospital. <br> **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal affairs Interview, pp. 17-18. | 2.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of |

|  |  | Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge. In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.

*Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
|--|--|--|

| | | |
|---|---|---|
| 3.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside.<br>*3.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | 3.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51:9-22, 52:1-24. | 3.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 4.       Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his | 4.  **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. | 4.   The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony |

| | | |
|---|---|---|
| attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br>*4.  Karschamroon Decl., ¶¶ 8-10.* | Zimmerman saying it or hearing Andy's name from dispatch.  Karshamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25; 246:1-4. | does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 5.  Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to | 5.  **Disputed**: Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.  Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never | 5.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that |

| | | |
|---|---|---|
| within 10 feet of Officer Karschamroon's location, he was instructed to stop. Andy stopped, but maintained his blank expression.<br><br>*5. Karschamroon Decl., ¶¶ 11, 12* | testified Andy ever stopped before being told to do so and was told to come closer.<br><br>**Supporting Evidence:** Exhibit B, of Daniel 244: 15-25,259: 1-7,257: 15-22,276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | detention. In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location. The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
| 6. Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive. Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did. Andy never spoke, but did appear to understand what was being said.<br><br>*6. Karschamroon Decl., ¶¶ 13, 14* | 6. **Undisputed.** | 6. **Undisputed** |

| | | |
|---|---|---|
| 7.  Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*7.  Karschamroon Decl., ¶¶ 14* | 7.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of  Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with suspicion.<br><br>**Supporting Evidence**: Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | 7.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>Karschamroon Decl., ¶¶ 1-5; Gendreau *Decl., ¶¶ 1-5; Exhibit 2, Transcript/ Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | | |
|---|---|---|
| 8.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists. *8. Karschamroon Decl., ¶ 15* | 8.  **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hand ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists.  Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers.  He also testified Andy was never aggressive. **Supporting Evidence:** Exhibit J, Karshamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261:12-18, 264:17-20, 265:13-18, 268:9-10, 270:10-11, 281:9-25, 284:1-25, 285:1-6. | 8.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
| 9.  Officer Gendreau noticed the struggle to get Andy's arms behind his | 9.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer | 9.  Plaintiffs do not dispute any material fact, argue semantics, and |

back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist.

*9.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuffed and said he told Gendreau Andy was complying butr hands tensed when placed first handcuff on.  Also given Karschamroon and Zimmerman disagree with most of what Gendreau said occurred and both Gendreau and Karschamroon have now filed Declarations which are filled with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C,

mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20

| | Depositio of Richard Gendreau, pp. 175:1-25, 176:1-25, 177:1-5, 2-6:19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285:11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.* |
|---|---|---|
| 10.     Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move. *10.  Karschamroon Decl., ¶ 16 Gendreau Decl., ¶ 9* | 10. **Disputed:** Officer Karschamroon had full control of Andy and there was never a struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on.  Also given Karschamroon and Zimmerman disagree with most of what Gendreau | 10.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively |

| | | |
|---|---|---|
| | said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon , pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."<br><br>Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22.* |
| 11.  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see | 11.  **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never | 11. Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did |

| | | |
|---|---|---|
| that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him.<br><br>*11.  Karschamroon Decl., ¶ 16*<br><br>*Gendreau Decl., ¶¶ 10, 11* | heard Andy growl or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behing him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Depostion of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: 1-10. | not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
| 12.     In a casual manner, Officer Gendreau said words to the effect of, | 12. **Disputed:** Officer Karschamroon testified the only thing he heard | 12.  Plaintiffs do not dispute Defendants' UMF that the officers |

"Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you." Officer Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *12. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13*

Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testified he never said anything to Andy about being handcuffed.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282,345: 1-18,268: 19-23,269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25,337: 10-16,340:8-9,341: 7-16.

attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken. This does not create a genuine issue of material fact precluding summary judgment. Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention. Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19*

| | | |
|---|---|---|
| 13.    Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position. A pain compliance technique performed by Officer Gendreau did nothing. *13.  Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16* | 13.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order?  Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmerman said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's arm behind his back. Karschamroon testified he always hada hold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs and | 13.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders. Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark |

during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11,274,292: 17-23,293: 1, 331: 16-25,332: 18-21,333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20, 80:10-16, 81:4-5, 83:18-25, 85:1-10,87:3-7/16-23, 97:5-6, 100:1-25, 102:4-9/20-24, 150:20-25, 151:9-11, 197:20-25,198: 1-5, 209:23-25, 222:17 -25, 224: 6-12, 276: 10-20, 277:1-4, 278:18-21.

Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the

|  |  | incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle. *Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |

14. Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms. Officer Karschamroon was similarly concerned about officer safety.

*14. Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19*

14. **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon , pp. 273: 8-11,274,292: 17-23,293: 1, 33 1: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmennan, pp. 79:11-20,80: 10-16,81: 4-5, 83: 18-25,85:1-10,87: 3-7116-23,97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151:

14. Plaintiffs' evidence does not dispute any material fact. Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling." Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did

| | 9-11, 197:20-25,198: 1-5,209:23-25, 222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
|---|---|---|
| 15.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, | 15.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful | 15.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn |

he would be tased.  Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.

*15.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23*

orders.  Gendreau testified he did not believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands".  Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroon testified Gendreau never told Andy he was going to be tasered.  Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13122-25,111: 10-17/18-22,112: 25, 121: 6-11/15-24,123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D.,

Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.

*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17*

| | pp.90: 13-16,258: 16-19,259: 2-23, 260: 1-10,261: 13-15,264: 21-24, 266: 13-22, 268:6-22,280: 19-25,281:10-25, 282: 7-15, 283: 4-16121-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243. 1:16-18; 256.1: 2-5. | |
|---|---|---|
| 16.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation.   Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts. <br><br> *16.  Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20* | 16.  **Disputed:** GGPD General Order 5.31states the IVS Unit must be activated when a detention was going to occur.  Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a | 16.  Plaintiffs do not dispute any material fact precluding summary judgment.  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of |

| | supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwork. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24,5.31. | his/her failure.  Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. General Order 2.24, 5.31, General Order, "Statement by the Chief of Police" |
|---|---|---|
| 17.     Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or | 17. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. | 17.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances |

| | | |
|---|---|---|
| himself.<br><br>*17. Gendreau Decl., ¶ 22* | Given theses facts it is difficult to believe Gendreau did not believe to injure Andy. Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy.  Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why | confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.<br><br>*Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.* |

Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have determined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25,252: 1-118,355: 21-24,357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16, 174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8,220: 1-24,225: 17-24,266: 1-10, 327: 17-22,328: 1-14/20-25,329: 1-18; Exhibit F, Deposition of Benedict Lux,pp. 176: 15-22,177:7-20,178: 5-14, 179: 5-12, 204: 1-25,205: 1-15,206:9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12,254,255: 1-5/12-15;

| | Exhibit H, GGPD General Order 2.24,2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 18.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>18.  *Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 18.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13,240: 21-25, 242: 13-25,243: 11-16. | 18.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after |

| | | being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. *Zimmerman Depo. pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| --- | --- | --- |
| 19.    At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased. *19.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | 19.  **Disputed:** GG Fire Department paramedics were not dispached until 11 :39:38. Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11:46. **Supporting Evidence:** Exhibit D, tased. Deposition of Richard Fukumoto, M.D., pp.90: 13-16, 282: 7-15, 283: 4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25,250:9-10,260: 13-25, 262: 15-25, | 19.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. *General Orders, "Statement by the Police Chief"* |

| | 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K, Sergeant Wagner's report. | |
|---|---|---|
| 20.    As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br>*20.  Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | 20.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground.  Zimmerman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted.  Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking", Bua Phan also testified Andy died immediately after the tasering.  Dr. | 20.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned.  In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his |

| | Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered. | belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. |
| --- | --- | --- |
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Ztinmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/5-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246:7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268: 6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 21.    After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over | 21.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and | 21. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.

*21.  Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8*

saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is

immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as

| | consistent with Andy being dead immediately after he saw tasered. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/8-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22,268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | to the time of death. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25* |
|---|---|---|
| 22.    Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a | 22. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and | 22.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual |

controlled substance, but he never had the opportunity to do a full evaluation.

*22.  Gendreau Decl., ¶ 37*

knew and had been trained that tasering Andy could cause his immediate death. Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau

resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

was tasering Andy. Lux testified Karshamroon as the first officer on scene should have determined why Gendreau was going to taser Andy. Gendreau clearly had time to whatever exams and calls necessary before he tasered Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16, 174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: 1-10, 327: 17-22 ,328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22, 177: 7-20, 178: 5-14, 179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18,

| | 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6 ; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 23.     As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.<br><br>*23.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 23.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and | 23.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was |

Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25,  240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19;

breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 24.    Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *24. Karschamroon Decl., ¶¶ 35-36;* | 24. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. | 24.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 123:15-25, 246: 7-19, 251: 4, 264: 18-25 ,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 25.    Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.<br><br>*25.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 25. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival.  There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony.  Again, another example of recreating history by Karschamroon and Gendreau and another reason to | 25.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned.  In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25, 246: 7-19, 251: 4, 264: 18-25, 265: 5-14/18-25, 267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
| --- | --- | --- |
| 26.    An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties. | 26. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an | 26.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of |

| | | |
|---|---|---|
| *26. El-Farra Decl., ¶ 13-17* | officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br> Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br> Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, | approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 27.     After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *27. Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 27. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent | 27.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his |

with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

   Dr. Fukumoto testified the evidence is

eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

consistent with Andy being dead '
immediately after he saw tasered.
 Dr. Fukumoto also testified that if
officers did see labored or heavy
breathing they should have known
Andy was in cardiad distress and taken
off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A,
Deposition of Mark Zimmerman, pp.
108: 1-11118-24, 110: 1-13/22-25,
111:10-17/18-22,112: 25,121: 6-11/15-
24,123: 15-25,240: 21-25,242: 13-25,
243: 11-16,244: 12-15,246: 7-19;
Exhibit B, Deposition of Daniel
Karschamroon, pp. 397: 7-8; Exhibit 0,
Deposition of Richard Fukumoto,
M.D., pp. 90: 13-16,258: 16-19,259: 2-
23, 260: 1-10,261: 13-15,264: 21-
24,266:13-22,268:6-22,280: 19-25,281:
10-25,282: 7-15,283: 4-16/21-23;

| | Exhibit E, Deposition of Bua Thi Phan, pp.243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 28.    Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>**Supporting Evidence:** Exhibit 6, Toxicology Report | 28.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: | 28.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto's opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to |

| | 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
|---|---|---|
| 29.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication." <br><br> 29. *Exhibit 7, Autopsy Report* | 29. **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.  Dr. Fukumoto testified he was provided an incorrect history including being told Andy was breathing when paramedics arrived and was never told exactly what type of | 29.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that |

struggle Andy was alleged to have been involved in with police. After being provided the true facts, including· Dr. Karschamroon's deposition, Dr. Fukumoto concluded Andy died from the tasering. The Defense objected to Dr. Fukumoto reading the Internal Affair transcripts of Officer Gendreau and Karschamroon even though Dr. Fukumoto thought they could define the facts.

**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25, 243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3-16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-

he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25*

| 7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | |

### ADJUDICATION NUMBER 2

### QUALIFIED IMMUNITY BARS PLAINTIFFS CLAIMS AGAINST

### THE INDIVIDUAL OFFICERS, THUS BARRING 42 U.S.C § 1983 CLAIMS

| | | |
|---|---|---|
| 30.    On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved.<br><br>*30.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD* | 30. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. As will be shown throughout Gendreau's and Karschamroon's Declaration are inconsistent with both their Internal Affairs interviews and | 30.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | Deposition Testimony. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | |
|---|---|---|
| 31.     Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." 31.  *Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD* | 31. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispatch. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | 31.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before |

| | | |
|---|---|---|
| | | arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 32.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and | 32.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. | 32.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.  In any event, this does not constitute a genuine issue of material |

| | | |
|---|---|---|
| he appeared to be trying to grab something from inside.<br><br>*32.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD* | 51: 9-22, 52: 1-24. | fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 33.     Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br><br>*33.  Karschamroon Decl., ¶¶ 8-10* | 33. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | 33. The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information. Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances |

| | | confronting the officers during that detention. *Karschamroon Depo., 245:15-25, 246:1-4* |
|---|---|---|
| 34.   Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression. *34.  Karschamroon Decl., ¶¶ 11, 12* | 34.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.  Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | 34.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and |

| | | would be an immaterial variance regardless. |
|---|---|---|
| 35.     Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did. Andy never spoke, but did appear to understand what was being said.<br><br>*35.  Karschamroon Decl., ¶¶ 13, 14* | 35. **Undisputed**. | 35. **Undisputed.** |
| 36.     Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*36.  Karschamroon Decl., ¶¶ 14* | 36. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is | 36.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made |

| | vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
|---|---|---|
| 37.    As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists.<br><br>*37.  Karschamroon Decl., ¶ 15* | 37. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. | 37.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy |

| | He also testified Andy was never aggressive.<br><br>**Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | was "actively resisting" and that he "thought it might turn violent."<br><br>*Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
|---|---|---|
| 38.    Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist.<br>*38.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8* | 38. **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman | 38.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told |

| | | |
|---|---|---|
| | disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.* |
| 39.    Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his | 39. **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is | 39.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer |

fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.

*39.  Karschamroon Decl., ¶ 16*

*Gendreau Decl., ¶ 9*

Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel

Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's

| | Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
|---|---|---|
| 40.     To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him. *40.  Karschamroon Decl., ¶ 16 Gendreau Decl., ¶¶ 10, 11* | 40. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, | 40.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman |

| | | |
|---|---|---|
| | pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
| 41.    In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you." Officer Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *41.  Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | 41. **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed. | 41.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer |

| | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
|---|---|---|
| 42.    Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A pain compliance technique performed by Officer Gendreau did nothing. *42.  Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16* | 42. **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann | 42  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders.  Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy.  Officer Karschamroon also stated in his deposition that Andy was "actively |

behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibility of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,

resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."

Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that

| | | |
|---|---|---|
| | 85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25, 222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle *Karschamroon Depo., 321:22-322:22,* |

| | | |
|---|---|---|
| | | *280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 43.   Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety.<br><br>*43.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 43. **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, | 43.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and |

| | | |
|---|---|---|
| | 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21. | providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20,* |

| | | *162:11-19, 187:3-11, 200:11-24,* |
|---|---|---|
| | | *201:6-12, 209:7-22, 217:3-9, 222:11-* |
| | | *223:13, 276:22-25, 287:25-288:12.* |
| 44.     As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.<br><br>*44.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | 44.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.<br><br>**Supporting Evidence:** Exhibit A, | 44.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.<br><br>*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | | |
|---|---|---|
| | Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 45.    Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and | 45. **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS | 45.  Plaintiffs do not dispute any material fact precluding summary judgment.  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased |

rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts.

*45. Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20*

Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwork.

audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities. The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure. Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"*

| | **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | |
|---|---|---|
| 46.     Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.<br><br>*46.  Gendreau Decl., ¶ 22* | 46. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being | 46.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent |

| | | |
|---|---|---|
| | aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1- | the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case. *Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.* |

| | | |
|---|---|---|
| | 10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 47.    Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to | 47. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. | 47. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no |

| | | |
|---|---|---|
| secure his arms.<br><br>*47. Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence<br><br>*Zimmerman Depo. pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 48.    At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and | 48.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be | 48  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire |

| | | |
|---|---|---|
| he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.   At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased.<br>*48.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46.<br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability.<br>*General Orders, "Statement by the Police Chief"* |
| 49.    As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look | 49.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. | 49.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his |

| | | |
|---|---|---|
| around.<br><br>*49. Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel | eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 50.    After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in. | 50. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an | 50.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of |

| | | |
|---|---|---|
| *50. Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8* | officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br> Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel | approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 51.    Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation.<br><br>*51.   Gendreau Decl., ¶ 37* | 51. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to | 51. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer |

activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon,

Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

| | pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 52.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the | 52. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy | 52.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed |

situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.

*52. Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10*

being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead

fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

| | | |
|---|---|---|
| | immediately after he saw tasered. Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 53.  Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *53. Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 53.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | 53.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 54.  Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua | 54.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of | 54.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department |

Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.

*54.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen*

Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-

Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.

*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25*

| | 25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
|---|---|---|
| 55.  An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR.  This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties.<br><br>55.  *El-Farra Decl., ¶ 13-17* | 55.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br>Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy | 55.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his |

was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25,111:10-17/18-22,112: 25, 121: 6-11/15-24,123: 15-25,240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel

belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259:2-23,260: 1-10,261: 13-15,264:21-24, 266:13-22,268: 6-22,280: 19-25,281: 10-25,282: 7-15, 283: 4-16121-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| --- | --- | --- |
| 56.     After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers.<br><br>*56.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 56. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an | 56.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of |

officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed

Gendreau opened up Andy's eyes and

Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A,

approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | Deposition of Mark Zimmennan, pp. 108: 1-11/18-24,110: 1-13/22-25, 111:10-17/18-22, 112: 25, 121: 6-11115-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246:7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259:2-23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15, 283: 4-16121 -23; Exhibit E, Deposition ofBua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| --- | --- | --- |
| 57.  Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive. Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the | 57.  Disputed: Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after | 57.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances |

| | | |
|---|---|---|
| time of death.<br><br>*57.  Exhibit 6, Toxicology Report* | being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence**: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp.63: 1-8,66: 18-22,67: 4-5,90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228:13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25,245: 17-25, 260:1-10,283: 4-16/21-23,296: 1-7,304: 1-3/16-18,305: 8-25,306: 1-2/10-14,307:1-8/22-25,308: 5-7,309: 1-5/18-22, 347: 1-4,355: 2-9. | confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25* |

***ADJUDICATION NUMBER 3***

**THE INDIVIDUAL OFFICERS ACTED REASONABLY WITH RESPECT TO DECEDENT'S MEDICAL NEEDS, THUS BARRING 42 U.S.C § 1983 CLAIMS**

| | | |
|---|---|---|
| 59.    On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved.<br><br>*59.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* | 59. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony.<br><br>**Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; | 59.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | |
|---|---|---|
| 60.    Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *60.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD* | 60. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispacth. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18.60. | 60.   Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs |

| | | that he acquired such knowledge. In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
|---|---|---|
| 61.     Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab | 61.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived.  **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | 61.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is |

| | | |
|---|---|---|
| something from inside.<br><br>*61.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD* | | immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 62.     Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br><br>*62.  Karschamroon Decl., ¶¶ 8-10* | 62. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | 62  The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the |

| | | totality of the circumstances confronting the officers during that detention. *Karschamroon Depo., 245:15-25, 246:1-4* |
|---|---|---|
| 63.    Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression. *63.  Karschamroon Decl., ¶¶ 11, 12* | 63. **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help. Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs | 63.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a |

| | Interview, pp. 5-6. | question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless |
|---|---|---|
| 64.     Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did.  Andy never spoke, but did appear to understand what was being said.  *64. Karschamroon Decl., ¶¶ 13, 14* | 64. **Undisputed** | 64. **Undisputed.** |
| 65.     Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a | 65. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the | 65.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with |

| | | |
|---|---|---|
| weapon.<br><br>*65.  Karschamroon Decl., ¶¶ 14* | dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 66.    As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists.<br><br>*66. Karschamroon Decl., ¶ 15* | 66.. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did | 66. Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked |

| | not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive.<br><br>**Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | position" and "close up as if the fingers were curling." Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent."<br><br>*Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
|---|---|---|
| 67.    Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.  Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn | 67. **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told | 67.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he |

violent due to Andy's reaction when the first handcuff was placed on his wrist.

*67.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9.

couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.*

| | | |
|---|---|---|
| 68.    Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.<br><br>*68.  Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶ 9* | 68.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with | 68.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist |

| | | |
|---|---|---|
| | suspicion.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. . | after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| 69.    To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was | 69. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau | 69.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position |

| | | |
|---|---|---|
| foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him.<br>*69.  Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.<br>*Karschamroon Depo., 348:9-15,*<br>*355:16-19, Zimmerman Depo., 217:3-*<br>*9, 222:11-223:13, 276:22-25* |
| 70.     In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer | 70. **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never | 70.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of |

| | | |
|---|---|---|
| Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *70. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention.<br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 71.     Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to | 71.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order?  Further, Karschamroon testified that neither | 71.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm |

pry Andy's arms down but could not overcome his flexed/locked position. A pain compliance technique performed by Officer Gendreau did nothing.

*71. Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16*

"relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

down" were not lawful orders. Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21.

seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands

|  |  | from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 72.    Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer | 72. **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. | 72.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy |

| | | |
|---|---|---|
| Karschamroon was similarly concerned about officer safety.<br><br>72. *Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21. | "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep |

| | | more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
|---|---|---|
| 73.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased.  Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds. | 73.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". | 73.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about |

| | | |
|---|---|---|
| *73. Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21- | 20 seconds before stepping to the side to taser him.<br><br>*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | 23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 74.    Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts. *74.  Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20* | 74. **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, | 74.  Plaintiffs do not dispute any material fact precluding summary judgment.  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.   The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.   Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. |

| | | |
|---|---|---|
| | given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"* |
| 75.     Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself. | 75. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to | 75. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that |

| | | |
|---|---|---|
| 75.  *Gendreau Decl., ¶ 22* | believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified | detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case. *Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.* |

Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD

| | Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 76.    Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*76.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 76. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | 76  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not |

| | | observe it, and that his belief that Andy was dead is not based on any actual evidence<br><br>*Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
|---|---|---|
| 77.    At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.   At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased.<br><br>*77.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | 77.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11:46.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; | 77.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability.<br><br>*General Orders, "Statement by the Police Chief"* |

| | Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | |
|---|---|---|
| 78.    As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br><br>*78. Karschamroon Decl., ¶ 30; Genreau Decl., ¶ 27* | 78. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. | 78.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his |

| | | |
|---|---|---|
| | Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 79.    After the tasing, a third officer arrived on scene, Officer Amir El-Farra. | 79.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the | 79.  Plaintiff's evidence does not constitute a genuine issue of material |

The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.

*79.  Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8*

tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on

| | Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered. | the physician's death pronouncement as to the time of death. |
|---|---|---|
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 80.      Given Andy's dilated pupils in bright sunlight and his rapid pulse, | 80.  **Disputed:** Gendreau testified he believed that Andy was under the | 80.  Plaintiff's evidence does not constitute a genuine issue of material |

Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation.

80.  *Gendreau Decl., ¶ 37*

influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau

fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

not taser such subjects.

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209:

| | 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 81.    As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.<br><br>*81.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 81.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly | 81.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements |

not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

 Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-

were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | 11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 82.    Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for | 82.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the | 82  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the |

| | | |
|---|---|---|
| approximately 15 to 20 seconds thereafter prior to medics arriving.<br><br>*82. Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | paramedics arrival.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | paramedics arrived but concedes he lost track of them.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 83.    Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.<br><br>*83.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 83. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a | 83.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy. |

| | complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
|---|---|---|
| 84.    An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to | 84.  Disputed: Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. | 84.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his |

speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties. *84.  El-Farra Decl., ¶ 13-17*

Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

  Dr. Fukumoto also testified that if officers did see labored or heavy

eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 85.    After checking the house, the Officers Gendreau and Karschamroon | 85. **Disputed:** Zimmerman testified all police officers arrived outside until the | 85.  Plaintiff's evidence does not constitute a genuine issue of material |

started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *85.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38*

paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw

fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as

| | | |
|---|---|---|
| | Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br>Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.<br><br>Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, | to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | M.D., pp. 90: 13-16,258: 16-19,259: 2-23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 86.    Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>*86.   Exhibit 6, Toxicology Report* | 86. **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, | 86.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. |

| | | |
|---|---|---|
| | M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
| 87.    The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication." <br> 87. *Exhibit 7, Autopsy Report* | 87. **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser.  Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated.  Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.  Dr. Fukumoto testified he wass provided | 87. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was |

an incorrect history including being told Andy was breathing when paramedicas arrived and was never told exactly what type of struggle Andy was alleged to have been involved in with police. After being provided the true facts, including· Dr. Karschamroon's deposition, Dr. Fukumoto concluded Andy died from the tasering. The Defense objected to Dr. Fukumoto reading the  Internal Affair transcripts of Officer Gendreau and Karschamroon even though Dr. Fukumoto thought they could define the facts.

**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25, 243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23,

a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25*

| 296: 1-7, 304: 1-3-16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | |

### ADJUDICATION NUMBER 4

### PLAINTIFFS CANNOT ESTABLISH A CONSTITUTIONAL VIOLATION AGAINST POLICE CHIEF POLISAR OR THE ENTITY DEFENDANTS – MONELL LIABILITY

| 88. Plaintiffs allege the City of Garden Grove is a municipality, and the Garden Grove Police Department is a public agency. *88. Exhibit 1, Complaint, ¶ 6* | 88. **Undisputed.** **Discovery violation:** Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond | 88. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit. Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired. When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given |

| | the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney | new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
|---|---|---|
| 89.     As Chief of Police, Chief Raney is a policymaker for the Garden Grove Police Department's policies and practices and with regard to all aspects of police administration and conduct. *89.  Declaration of Chief Kevin Raney ¶ 2* | 89. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Objection. This assertion lacks foundation. Defendants have not | 89.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had |

provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if

previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 90.    The written policies of the Department which are valid and constitutional are accessible to the public on the Department's website. The policies on that site and attached to this declaration have never been found to be unconstitutional in any legal forum.<br><br>*90.  Declaration of Chief Kevin Raney ¶ 2* | 90. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br><br>**Objection.**  This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  No information has been provided to Plaintiffs and neither has any evidence been shown to Plaintiffs that Chief Raney knows | 90.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any |

| | | |
|---|---|---|
| | thepolicies of the Garden Grove Police Department or how Chief Raney knows that none of those policies has ever been found to be unconsitutional in any legal forum.  Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion. Objection. Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating the written policies of the Garden Grove Police Department as they existed at the time of the incident or the time of the filing of this lawsuit. Furthermore, without personal knowledge of the written policies of the Garden Grove Police Department as they were during the time periods relevant to this case, the portions of Chief Raney's | further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

declarations regarding those policies amount to speculation about the same. Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.

Objection.  Defendants' assertion calls for a legal conclusion and/or opinion. The constitutionality of the policies, customs, and practices of the Garden Grove Police Department, whether written or unwritten, is not an issue to be determined by Chief Raney.

**Discovery violation**: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary

| | | |
|---|---|---|
| | Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation.  Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 91.     The City of Garden Grove has a General Orders Manual. The General Orders contained within that manual are designed to guide employees of the Police Department in carrying out the duties and responsibilities imposed upon them by law or necessarily in | 91.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Objection.  This assertion lacks | 91.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify |

| | | |
|---|---|---|
| carrying out the department's objectives.<br><br>*91.  Declaration of Chief Kevin Raney ¶ 3* | foundation. Defendants have not provided any foundation whatsoever as to whether, how, or to what extent Chief Raney has any personal knowledge about the General Orders Manual as it existed during the time periods relevant to this case. Objection. Defendants' assertion relies upon Chief Raney's speculation. Without personal knowledge of the General Orders of the Garden Grove Police Department as they were during the time periods relevant to this case, the portions of Chief Raney's declarations regarding the General Orders amount to speculation about the same.<br><br>**Discovery violation:** Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 | as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | | |
|---|---|---|
| | discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation.  Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 92.     It is important to remember that these General Orders are "guidelines." No rules or procedures can be | 92. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the | 92.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. |

established which embrace all situations; some things must be left to the discretion of the individual employee. The intention of these General Orders is clearly set forth in the Statement by the Chief of Police.

*92.  Declaration of Chief Kevin Raney ¶ 4, Exhibit "1" thereto*

lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Having not been in the policy making positino at the time of either the incident or the filing of this lawsuit, Chief Raney had not bearing on the construction or direction of the General Orders or their accompanying Statement by the Chief of Police as they existed when the incident occurred and when this lawsuit was filed. Objection: This assertion lacks foundation.  Defendants have failed to establish that Chief Raney had any personal knowledge as to what the General Orders were at the time of the incident or at the filing of this lawsuit, as to what was and what was not discretionary during that same time, or as to what the intention of the then Chief of Police of the Garden Grove

Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

| | | |
|---|---|---|
| | Police Department was during that time. | *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
| | Objection: Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating the intention of the General Orders and/or the Chief of Police as either existed at the time of the incident or the time of the filing of this lawsuit. Without personal knowledge of the General Orders of the Garden Grove Police Department as they were during the time periods relevant to this case, the portions of Chief Raney's declarations regarding the General Orders amount to speculation about the same. | |
| | Objection: Objection: Defendants are offering hearsay testimony through Chief Raney.  Through Chief Raney, | |

Defendants are trying to introduce statements contained in the Statement of the Chief of Police.

**Discovery violation**: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness,

| | Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 93.     The City of Garden Grove Police Department has never had a policy, practice or custom, written or otherwise, authorizing or condoning of any kind of use of excessive force, unlawful stop, unlawful arrest, unlawful detention, unlawful seizure or unlawful search, pursuant to warrant or otherwise.<br><br>*93.  Declaration of Chief Kevin Raney ¶ 5* | 93. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have shown no indication that Chief Raney was aware of any policy, practice, or custom of the Garden Grove Police Department during the time period | 93. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed |

relevant to this case.  Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.

Objection.  Defendants' assertion calls for a legal conclusion and/or opinion.  The constitutionality of the policies, customs, and practices of the Garden Grove Police Department, whether written or unwritten, is not an issue to be determined by Chief Raney.

**Discovery violation**: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have

former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| --- | --- | --- |
| 94.   The City of Garden Grove does not have a custom, policy and practice that encourages, tolerates, or ratifies the employment, deployment and detention of persons as peace officers who are unsuitable due to bias, prejudice. <br> *94.  Declaration of Chief Kevin Raney ¶ 5* | 94. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Also, the current customs, policies, and practices of the Garden Grove Police Department, with regards | 94.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his |

to hiring biased and/or prejudiced employees, has no bearing on this lawsuit.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have failed to establish whether, how, and to what extent Chief Raney knew or knows about the hiring and employment practices of the Garden Grove Police Department during the time periods relevant to this case. Defendants' assertion relies upon Chief Raney's speculation.  Without personal knowledge of the General Orders of the Garden Grove Police Department as they were during the time periods

declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

relevant to this case, the portions of Chief Raney's declarations regarding the General Orders amount to speculation about the same.

**Discovery violation:** Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were

| | allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 95.     The City has a valid Use of Physical Force policy which includes a review process which is General Order 2.6.<br>*95. Declaration of Chief Kevin Raney ¶ 6, Exhibit 2 thereto* | 95. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Chief Raney's current understanding, if any, of the General Orders as they are today is not relevant to the case at hand.<br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Defendants have | 95.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any |

| | | |
|---|---|---|
| | failed to establish whether, now, and to what extent Chief Raney knew or knows the General Orders of the Garden Grove Police Department as they were during the time periods relevant to this case.  Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a personal qualified to give a legal opinion.<br><br>Objection: Defendants' assertion relies upon Chief Raney's speculation. Without personal knowledge of the General Orders of the Garden Grove Police Department as they were during the time periods relevant to this case, the portions of Chief Raney's declarations regarding the General Orders amount to speculation about the same.<br><br>Objection.  Defendants' assertion calls | further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

for a legal conclusion and/or opinion. The validity of the polices, customs, and practices of the Garden Grove Police Department, whether written or unwritten, is not an issue to be determined by Chief Raney.

**Discovery violation:** Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation.  Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any

| | preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 96.    The City has a valid Citizen Complaint Procedures Policy which is General Order 4.8<br><br>*96.  Declaration of Chief Kevin Raney ¶ 6, Exhibit 3 thereto* | 96.  Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Further, Defendants have failed to show whether, how, and to what extent Chief Raney knew or knows about the City of Garden Grove's Citizen Complaint Procedure Policy as it existed during the time periods relevant to this case. Lastly, Defendants have not provided | 96.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given |

the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.

Objection.  Defendants' assertion relies upon Chief Raney's speculation.  Without personal knowledge of the General Orders of the Garden Grove Police Department as they were during the time periods relevant to this case, the portions of Chief Raney's declarations regarding the General Orders amount to speculation about the same.

Objection.  Defendants' assertion calls for a legal conclusion and/or opinion.  The validity of the polices, customs, and practices of the Garden Grove Police Department, whether written or unwritten, is not an issue to be determined by Chief Raney.

**Discovery violation:** Plaintiffs have

new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation.  Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness.

| | | |
|---|---|---|
| 97.    The City of Garden Grove Police Department is accredited by the Commission on Accreditation for Law Enforcement Agencies ("CALEA") and has been since July 24, 1988.<br><br>97.   *Declaration of Chief Kevin Raney ¶ 7* | 97.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Further, CALEA accreditation is not dispositive or innocence of wrongdoing. Objection.  This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only | 97. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to |

| | brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
|---|---|---|
| 98.    The City was most recently re-accredited in November 2010.  This accreditation shows that the City of Garden Grove Police Department meets the national standards for policies, | 98. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident | 98.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney |

procedures, and training since the CALEA Accreditation requires that the City develop a comprehensive, well thought out, uniform set of written directives with directions to personnel and have a preparedness program in place.

*98.  Declaration of Chief Kevin Raney ¶ 7*

occurred.  CALEA accreditation is not indicative of a lack of wrondoing on the accredited institution.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Further, Defendants fail to provide any foundation as to the standards of the CALEA system, as to Chief Raney's personal knowledge as to the Garden Grove Police Department's accreditation during the time periods relevant to this case.

Objection.  Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating

is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | about the Garden Grove Police Department's qualifications according to CALEA standards. | |
|---|---|---|
| 99.    CALEA accreditation is the primary method for an agency to voluntarily demonstrate their commitment to excellence in law enforcement.<br><br>*99.  Declaration of Chief Kevin Raney ¶ 7* | 99. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. CALEA accreditation has no bearing on the case at hand. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Defendants fail to provide any foundation as to the standards of the CALEA system, as to Chief Raney's personal knowledge of the CALEA system, or as to Chief | 99.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now |

| | | |
|---|---|---|
| | Raney's personal knowledge as to the Garden Grove Police Department's accreditation during the time periods relevant to this case.  Further, Defndants do not give any foundation as to how Chief Raney knows that the CALEA accreditation system is the "primary" method by which a law enforcement agency is judged. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10, 2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation.  Faced | claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 100.   The City of Garden Grove has no policy allowing and does not: a) subject individuals to excessive force;  b) subject individuals to unlawful arrests; c) arrest individuals without probable cause;  d) employ or retain peace officers who are unsuitable due to bias, or prejudice; e) abridge any constitutional right of any citizen including the rights provided by the First, Fourth or Fourteenth | 100. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the | 100.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, |

Amendments;  f) arrest individuals based on race, ethnicity or political views;  g) allow officers to engage in any type of conspiracy to deny any individual of a constitutional right secured by the United States or California Constitution; and h) allow officers to engage in the "code of silence" or fail to report the use of force.

*100.  Declaration of Chief Kevin Raney ¶ 8*

facts and circumstances upon which this lawsuit is based.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the

who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 101.   City of Garden Grove has no policy, written or otherwise, which allows, ratifies or condones the conduct described by the Plaintiffs in their Complaint.  The Plaintiffs' allegations have no support or basis in any formal or informal policy of the City of Garden Grove and the allegations of the Complaint are nothing more than assumptions made by the Plaintiffs in order to bring this lawsuit.<br><br>*101. Declaration of Chief Kevin Raney ¶ 11* | 101.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have laid no foundation showing that Chief Raney had any personal knowledge of the policies of the City of Garden Grove. | 101. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed |

| | | |
|---|---|---|
| | Objection.  Defendants seek to introduce statements that amount speculation.  Without personal knowledge of the policies of the City of Garden Grove, Chief Raney is merely speculating as to the substance of those policies. Further, Defendants have not shown that Chief Raney has any personal knowledge regarding the allegations in Plaintiffs' Complaint and thus any statements from Chief Raney are speculative. | former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
| 102.   Prior to the hiring of a police officer, there is an extensive background investigation of applicants pursuant to the Commission on Peace Officer Standards and Training guidelines [hereinafter "P.O.S.T."], including a psychological examination and evaluation.  The City undertakes recruitment and training pursuant to | 102.  Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have | 102.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had |

| | | |
|---|---|---|
| P.O.S.T. standards.<br><br>*102.  Declaration of Chief Kevin Raney ¶ 12* | inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
| 103.   The City requires extensive and lawful training of police officers at certified academies.  All Garden Grove | 103. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the | 103.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. |

police officers attend only P.O.S.T. certified academies which provide training that complies with the laws of the State of California and the standards set by the Commission on Peace Officer Standards and Training.  The Commission on P.O.S.T. is the entity that establishes the standards that must be met by law enforcement agencies and peace officers in California.

*103. Declaration of Chief Kevin Raney ¶ 13*

lawsuit was filed and was not the Chief of Police on the date the incident occurred.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion

Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

|  |  |  |
|---|---|---|
|  | of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
| 104.   The Department closely monitors arrest procedures and the use of force, and investigations by its officers.  There is a review procedure concerning any alleged misconduct,  and a disciplinary procedure concerning any alleged misconduct.<br><br>*104.  Declaration of Chief Kevin Raney ¶ 14* | 104. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Chief Raney's understanding of the procedures of the Garden Grove Police Department as they are today are not relevant to the issue of how those procedures were during the time | 104.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of |

periods relevant to this case.
Objection. This assertion lacks
foundation. Defendants have not
provided any foundation whatsoever as
to how and to what extent Chief Raney
has any personal knowledge of the
facts and circumstances upon which
this lawsuit is based. Defendants have
failed to show whether, how, and to
what extent Vhief Raney has any
personal knowledge of the policies and
procedures regarding misconduct and
discipline as they were during the time
periods relevant to this case.
Objection.  Defendants are attempting
to introduce Chief Raney's statement
speculating what the policies and
procedures regarding misconduct and
discipline were at the time of the
incident or the time of the filing of this
lawsuit.  Furthermore, without personal

former Police Chief Joseph Polisar,
who had retired.  When a scheduling
conflict necessitated changing the date
set for deposition, Plaintiffs were given
new dates from which to choose.
However, Plaintiffs failed to take any
further action and never deposed
former Chief Polisar.  They cannot now
claim prejudice or surprise from a
declaration from Garden Grove's Police
Chief, when they took no action to
depose retired Chief Polisar, a fact of
which counsel was aware, or his
replacement, Chief Raney.
*Supp. Dec. of Sherman, ¶s 1-13; Supp.
Dec. of Raney, ¶s 1-14.*

knowledge of the polices and procedures regarding misconduct and discipline as they were durign the time periods relevant to this case, the portions of Chief Raney's declarations regarding those policies and procedures amount to speculation about the same. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice,

| | and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 105.   The City of Garden Grove has a lawful procedure for citizen's complaints and a review procedure to monitor and take appropriate action if there is an alleged unlawful arrest, use of force, or other inappropriate action by police officers.<br><br>*105.  Declaration of Chief Kevin Raney ¶ 15* | 105. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br><br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Further, | 105.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date |

| | | |
|---|---|---|
| | Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Further, Defendants have not provided any foundation showing that the procedures for citizen's complaints and review were the same as they were during the time periods relevant to this case.<br><br>Objection.  Defendants are calling for speculation in this assertion.  Defendants are attempting to introduce Chief Raney's statement speculating what the procedures for citizen's complaints and review were during the time periods relevant to this case.  Furthermore, without personal knowledge of these policies and procedure as they were during the time | set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

periods relevant to this case, the portions of Chief Raney's declarations regarding amount to speculation about the same.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were

| | | |
|---|---|---|
| | allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 106.   With regard to the incident addressed in this litigation, Chief Raney nor his predecessor , Joseph Polisar set in motion, a series of acts by others, or knowingly refuse to terminate a series of acts by others, which I knew or reasonably should have known or was plainly obvious, would cause others to inflict constitutional injury.<br><br>*106.  Declaration of Chief Kevin Raney ¶ 16* | 106. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br><br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based. Defendants have failed to lay the foundation for whether, how, or to what extent Chief Raney knew former-Chief Polisar or | 106. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any |

| | | |
|---|---|---|
| | what former-Chief Polisar did while still acting as the Garden Grove Police Department's Chief of Police.  Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.<br><br>Objection.  Defendants are calling for speculation in this assertion.  Defendants are attempting to introduce Chief Raney's statement speculating about what the actions of former-Chief Polisar were during the time periods relevant to this case and whether those actions were constitutional.  Without personal knowledge of former-Chief Polisar's actions during the time periods relevant to this case, the portions of Chief Raney's declarations regarding those actions amount to speculation about the same. | further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

Objection.  Defendants' assertion calls for a legal conclusion and/or opinion. The constitutionality of the actions of Chief Raney or of former Chief of Police Joseph is not an issue to be determined by Chief Raney. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any

| | preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 107.   Chief Raney has ultimate authority to recommend hiring and firing of employees. <br><br> *107.  Declaration of Chief Kevin Raney ¶ 17* | 107.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Chief Raney's current authority over employment matters has no bearing on any issue in the case.  Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which | 107.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given |

this lawsuit is based. Defendants have no shown whether, how, or to what extent Chief Raney had any authority over employment matters during the time periods relevant to this case. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be

new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 108.   Chief Raney and his predecessor, Joseph Polisar, have taken no culpable action or inaction with regard to the hiring, training, supervision, control or discipline of subordinates at the Garden Grove Police Department, nor has he failed to remove an officer known to be unfit for duty.  He has not created, nor does he nurture, an atmosphere in which unlawful or biased arrests by police officers are condoned or encouraged.<br><br>*108.  Declaration of Chief Kevin Raney ¶ 17* | 108.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  As such, the atmosphere Chief Raney has created or nurtured has no bearing on any issue in this case.  Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have | 108.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. |

| | | |
|---|---|---|
| | failed to provide any foundation as to whether, how, or to what extent Chief Raney had any personal knowledge with regards to former-Chief Polisar or Polisar's actions during Polisar's tenure as acting Chief of Police.  Lastly, Defendants have not provided the foundation necessary to categorize ChiefRaney as a person qualified to give a legal opinion.

Objection.  Defendants are calling for speculation in this assertion.  Defendants are attempting to introduce Chief Raney's statement speculating about what the actions of former-Chief Polisar were during the time periods relevant to this case and whether those actions were constitutional.  Without personal knowledge of former-Chief Polisar's actions during the time periods relevant to this case, the | However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

portions of Chief Raney's declarations regarding those actions amount to speculation about the same. Objection.  Defendants' assertion calls for a legal conclusion and/or opinion. The constitutionality of the policies, customs, and practices of the Garden Grove Police Department, whether under Raney's term or under Polisar's term, is not an issue to be determined by Chief Raney.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any

| | notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 109.   Neither Chief Raney nor Joseph Polisar acquiesced to any alleged constitutional deprivation claimed by the Plaintiffs, nor has he condoned, ratified or encouraged unlawful use of force, arrests, detentions, or seizures or searches.<br><br>*109.  Declaration of Chief Kevin Raney ¶ 18* | 109.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as | 109.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had |

| | | |
|---|---|---|
| | to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have failed to provide any foundation as to whether, how, or to what extent Chief Raney had any personal knowledge with regards to former-Chief Polisar or his actions during Polisar's tenure as acting Chief of Police.  Lastly, Defendants have not provided the foundation necessary to foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.<br><br>Objection.  Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating about what the actions of former-Chief Polisar were during the time periods | previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

relevant to this case and whether those actions were constitutional.  Without personal knowledge of former-Chief Polisar's actions during the time periods relevant to this case, the portions of Chief Raney's declarations regarding those actions amount to speculation about the same.

Objection.  Defendants' assertion calls for a legal conclusion and/or opinion. The constitutionality of the actions or inactions of either Raney or Polisar is not an issue to be determined by Chief Raney.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through

| | | |
|---|---|---|
| | Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 110.   When complaints of unlawful use of force, unlawful arrest, or other misconduct come to Chief Raney's attention, even when they are not sustained, corrective actions are often taken.  If he is aware of a deficiency in | 110.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.  Therefore, issues and | 110.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden |

performance, a lack of judgment in a police officer, or of inappropriate action by a police officer, he takes appropriate action to preclude any recurrence.

*110.  Declaration of Chief Kevin Raney ¶ 19*

complaints that are brought to Chief Raney's attention are entirely immaterial to this case.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion

Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

| | of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 111.   Chief Raney has not, pursuant to official policy, custom or practice, intentionally, knowingly, recklessly or with deliberate indifference, failed to instruct, supervise, control and/or discipline on a continuing basis, Officers Gendreau and Karschamroon. *111. Declaration of Chief Kevin Raney ¶ 19* | 111. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Chief Raney's interactions, if any, with Officers Gendreau and Karschamroon after the time periods relevant to this case are immaterial. Chief Raney's interactions with | 111.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4.  Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of |

| | | |
|---|---|---|
| | Officers Gendreau and Karschamroon during the time periods relevant to this care are also immaterial as he was not the Chief of Police at those times. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Further, Defendants have failed to lay the foundation for whether, how, or to what extent Chief Raney knew, interacted with, or influenced Officers Gendreau and Karschamroon during the time periods relevant to this case. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 | former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | | |
|---|---|---|
| | discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 112.   Police Chief Raney is not aware of any practice by himself or the City of Garden Grove that has made it plainly | 112.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the | 112.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. |

obvious that a constitutional violation would occur from this practice.

*112.  Declaration of Chief Kevin Raney ¶ 19*

lawsuit was filed and was not the Chief of Police on the date the incident occurred.  The constitutionality of Chief Raney's practices, as the current acting Chief of Police, is not at question in this case.  Similarly, Chief Raney's awareness of any constitutional violations is not at issue in this case.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Further, Defendants have failed to provide any foundation as to how Chief Raney would be qualified to deetermine whether a constitutional violation has occurred or not.  Lastly, Defendants

Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

| | | |
|---|---|---|
| | have not provided the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion. | *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |
| | Sss | |
| | Objection.  Defendants are calling for speculation in this assertion.  Defendants are attempting to introduce Chief Raney's statement speculating about what the actions of former-Chief Polisar were during the time periods relevant to this case and whether those actions were constitutional.  Without personal knowledge of former-Chief Polisar's actions during the time periods relevant to this case, the portions of Chief Raney's declarations regarding those actions amount to speculation about the same. Objection.  Defendants' assertion calls for a legal conclusion and/or opinion. | |

The constitutionality of the policies, customs, and practices of the Garden Grove Police Department or the City of Garde Grove, whether written or unwritten, is not an issue to be determined by Chief Raney.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any

| | preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 113.   Police Chief Raney has reviewed the personnel files of Officers Gendreau and Karschamroon which contain no information of a sustained citizen complaint or a performance criticism that excessive force was used in an arrest, or that an arrest was made in violation of the constitution.<br><br>113.  *Declaration of Chief Kevin Raney ¶ 19* | 113.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Chief Raney's review of the personnel files of Officers Gendreau and Karschamroon has no bearing on any issue in this case.<br><br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the | 113.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given |

| | | |
|---|---|---|
| | facts and circumstances upon which this lawsuit is based.  Defendants have also failed to establish whether, how, or to what extent Chief Raney is familiar with the practice of reviewing personnel files or with Officers Gendreau and Karschamroon has no bearing on any issue in this case. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have also failed to establish whether, how, or to what extent Chief Raney is familiar with the practice of reviewing personnel files or with Officers Gendreau and Karschamroon. Moreover, there is not foundation as to | new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

the authenticity of the personnel files which Chief Raney is referring to in his statements.

Objection.  Defendants are offering hearsay testimony through Chief Raney. Defendants are trying to introduce statements contained in the personnel files of Officers Gendreau and Karshamroon.

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced

| | with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 114.   Police Chief Raney has reviewed the training of Officers Gendreau and Karschamroon and they are graduates from a P.O.S.T.-certified academy.<br>*114.  Declaration of Chief Kevin Raney ¶ 19* | 114. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Chief Raney's review or knowledge of Officers Gendreau's and Kazrschamroon's training has no bearing on any issue in this case.  Objection. This assertion lacks foundation. Defendants have not | 114.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, |

| | | |
|---|---|---|
| | provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have failed to lay the foundation showing that Chief Raney has personal knowledge of the training and qualifications of Offices Gendreau and Karschamroon.<br><br>Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion | who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| --- | --- | --- |
| 115.   While at the City of Garden Grove, Officers Gendreau and Karschamroon met or exceeded the number of hours of continuing education required by P.O.S.T. <br> *115. Declaration of Chief Kevin Raney ¶ 19* | 115.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Whether Officers Gendreau and Karschamroon met or exceeded the number of hours of continuing education required by P.O.S.T. has no relevance in this case.  Further, Chief | 115.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of |

Raney's knowledge of these educational endeavors is also irrelevant in this case.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have failed to lay the foundation showing that Chief Raney has personal knowledge of Officers Gendreau's and Karschamroon's efforts to meet the education requirements of the P.O.S.T. program.

Objection.  Defendants are calling for speculation in this assertion. Without personal knowledge of whether or not Officers Gendreau and Karschamroon actually completed these programs

former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.*

while meeting or exceeding the
required hours, Chief Raney's
statements amount to speculation about
those same efforts.

Discovery violation: Plaintiffs have
never once seen or heard Chief Raney's
name appear in the course of litigation
on or before the June 10,2011
discovery cutoff date. Chief Raney's
involvement in this case was only
brought to Plaintiffs' attention through
Defendants' Motion for Summary
Judgment. Defendants have
inexplicably failed to provide any
notice or disclosure as to the inclusion
of Chief Raney in this litigation. Faced
with a new witness introduced beyond
the discovery deadline, without notice,
and without allowing for any
preparation, Plaintiffs would be
unfairly prejudiced if Defendants were

| | allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 116.   Officers, in addition to Officers Gendreau and Karschamroon, documented P.O.S.T. certified education, participated in formal and informal department-provided training on a constant and on-going basis. *116.  Declaration of Chief Kevin Raney ¶ 19* | 116.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. The officers' completion of the P.O.S.T. program is not at issue in this case.  What is aty issue is the adequacy of that and similar programs as well as the adequacy of enforcement and implementation of these training programs. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney | 116.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any |

| | | |
|---|---|---|
| | has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  There is no foundation to speak of showing that Chief Raney had personal knowledge of officers Gendreau and Karschamroon or any other officer completing the P.O.S.T or any other training program.<br><br>Objection.  Defendants are calling for speculation in this assertion.  Without personal knowledge of any of the officers completing the P.O.S.T. or any other training program, Chief Raney is essentially speculating about the completion by these officers of those programs.<br><br>Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 | further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
|---|---|---|
| 117.   The City of Garden Grove has not directly or indirectly approved or ratified any unlawful, deliberate, | 117. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the | 117. Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. |

malicious, reckless or wanton conduct of Officers Gendreau and Karschamroon or any other Garden Grove  Police Department employee. Specifically the City does not have a custom, policy, or practice, nor acted with deliberate indifference: a) by allowing or condoning arrests made without probable cause; b) by allowing or condoning the use of excessive force, c) by allowing or condoning the writing of false reports, and/or; d) by allowing arrests due to bias, ethnicity, race or political views; e) by allowing officers to engage in the code of silence or any type of conspiracy to deprive any individual of any right, or f) by otherwise depriving citizens of their constitutional and statutory rights, privileges and immunities.

*117.  Declaration of Chief Kevin Raney*

lawsuit was filed and was not the Chief of Police on the date the incident occurred.

Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  There is not foundation laid as to whether, how, or to what extent Chief Raney is familiar with or has had a part in creating or implementing the policies andn procedures of the City of Garden Grove or the Garden Grove Police Department.  Lastly, Defendants have not provided the foundation necessary to categorize Chief Raney as a personal qualified to give a legal opinion. Objection.  Defendants are calling for

Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose.  However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.

| ¶ 20 | speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating whether, how, or to what extent the City of Garden Grove implements its policies, procedures, and practices. Without personal knowledge of these policies, procedures, and practices, Chief Raney is merely speculating about same. Objection.  Defendants' assertion calls for a legal conclusion and/or opinkon. The legality of the polices, customs, and practices of the Garden Grove Police Department or of the City of Garden Grove, whether written or unwritten, is not an issue to be determined by Chief Raney. Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation | *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

| | | |
|---|---|---|
| | on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | |
| 118.   In summary, the City undertakes a number of measures to monitor and | 118.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney | 118.  Plaintiffs do not dispute the Material Facts offered by Defendants in |

assure that unlawful arrests, use of force, or other misconduct did not occur.  They include the following:  a) review procedures when there is an allegation of an unlawful arrest, or other misconduct; b) close monitoring, review and supervision of police officers; c) internal affairs investigations; d) citizen complaint procedure; e) disciplinary proceedings and measures; f) extensive and continuous training of officers; and g) compliance with P.O.S.T. standards.

*118.  Declaration of Chief Kevin Raney ¶ 21*

was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Whether the City of Garden Grove currently has policies and procedures in place to address instances of misconduct on the part of its police force is not an issue in this case. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have shown no indication as to whether, how, or to what extent Chief Raney was aware of or any part in any policy, practice, or custom of the Garden Grove Police Department or the City of Garden Grove during the time periods

support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his

| | | |
|---|---|---|
| | relevant to this case.<br><br>Objection.  Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating.<br><br>Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be | replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

|  | unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. |  |
|---|---|---|
| 119  Chief Raney denies that he had any reason to believe that any actions that he took or neglected to take were violative of Plaintiffs' constitutional rights or were otherwise unlawful. *119.  Declaration of Chief Kevin Raney ¶ 22* | 119. **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred. Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.  Defendants have failed to provide any foundation as to whether, how, or to what extent Chief | 119.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. |

| | | |
|---|---|---|
| | Raney played any role in the events at the heart of this case.  Lastly, Defendants have not provied the foundation necessary to categorize Chief Raney as a person qualified to give a legal opinion.<br><br>Objection.  Defendants are calling for speculation in this assertion.  Defendants are attempting to introduce Chief Raney's statement speculating the legality of his involvement, if any, in the events at the heart of this case.<br><br>Objection.  Defendants' assertion calls for a legal conclusion and/or opinion.  The legality and/or constitutionality of the polices, customs, and practices of the Garden Grove Police Department, wiether written or unwritten, or of Chief Raney's actions, if any in this case, is not an issue to be determined by Chief Raney. | However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney.<br><br>*Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

Discovery violation: Plaintiffs have never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief

| | Raney as a witness. | |
|---|---|---|
| 120.   At all relevant times, Chief Raney reasonably believed that everything that he did as it relates to Plaintiffs was entirely proper.<br><br>*120.  Declaration of Chief Kevin Raney ¶ 22* | 120.  **Disputed:** Objection.  This fact is irrelevant to this case as Chief Raney was not Chief of Police when the lawsuit was filed and was not the Chief of Police on the date the incident occurred.<br><br>Objection. This assertion lacks foundation. Defendants have not provided any foundation whatsoever as to how and to what extent Chief Raney has any personal knowledge of the facts and circumstances upon which this lawsuit is based.<br><br> Objection.  Defendants are calling for speculation in this assertion. Defendants are attempting to introduce Chief Raney's statement speculating on the legality of his involvement, if any, in the events at the heart of this case.<br><br>Discovery violation: Plaintiffs have | 120.  Plaintiffs do not dispute the Material Facts offered by Defendants in support of Adjudication Number 4. Rather, the Plaintiffs objection is without merit.  Although Kevin Raney is the current Police Chief of Garden Grove, and is clearly qualified to testify as to the matters asserted in his declaration, the Plaintiffs had previously noticed the deposition of former Police Chief Joseph Polisar, who had retired.  When a scheduling conflict necessitated changing the date set for deposition, Plaintiffs were given new dates from which to choose. However, Plaintiffs failed to take any further action and never deposed former Chief Polisar.  They cannot now claim prejudice or surprise from a declaration from Garden Grove's Police |

| | | |
|---|---|---|
| | never once seen or heard Chief Raney's name appear in the course of litigation on or before the June 10,2011 discovery cutoff date. Chief Raney's involvement in this case was only brought to Plaintiffs' attention through Defendants' Motion for Summary Judgment. Defendants have inexplicably failed to provide any notice or disclosure as to the inclusion of Chief Raney in this litigation. Faced with a new witness introduced beyond the discovery deadline, without notice, and without allowing for any preparation, Plaintiffs would be unfairly prejudiced if Defendants were allowed to retain this new witness, Chief Raney, and thus ask that the Court not consider Chief Raney's declaration and also exclude Chief Raney as a witness. | Chief, when they took no action to depose retired Chief Polisar, a fact of which counsel was aware, or his replacement, Chief Raney. *Supp. Dec. of Sherman, ¶s 1-13; Supp. Dec. of Raney, ¶s 1-14.* |

|  |  |  |
|---|---|---|
| ***ADJUDICATION NUMBER 5*** <br><br> **THE SURVIVAL CLAIM BROUGHT BY DECEDENT'S SUCCESSOR IN INTEREST FAILS DUE TO LACK OF** <br><br> **CONSTITUTIONAL VIOLATIONS, OR, THE APPLICATION OF QUALIFIED IMMUNITY** |  |  |
| 121.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved. <br><br> *121.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* | 121.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never <br> said Andy had weapons, the dispatcher made a mistake. <br><br> **Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsitent with both their Internal | 121  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon. <br><br> *Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/ Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | Affairs interviews and Deposition Testimony. Supporting Evidence: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | |
|---|---|---|
| 122.   Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *122.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.* | 122. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispatch. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; | 122.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of |

| | Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 123..  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, | 123.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived. **Supporting Evidence:** Exhibit A, | 123.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not |

| | | |
|---|---|---|
| his body halfway into the window and he appeared to be trying to grab something from inside.<br><br>*123.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 124.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br><br>*124.  Karschamroon Decl., ¶¶ 8-10.* | 124. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | 124.  The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual |

| | | |
|---|---|---|
| | | resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 125..  Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression.<br><br>*125.  Karschamroon Decl., ¶¶ 11, 12* | 125. **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.<br>Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.<br>244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, | 125.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a |

| | Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
|---|---|---|
| 126.. Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did. Andy never spoke, but did appear to understand what was being said. *126. Karschamroon Decl., ¶¶ 13, 14* | 126. **Undisputed** | 126.  **Undisputed.** |
| 127.   Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was | 127. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller | 127.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to |

| | | |
|---|---|---|
| a violent mental individual with a weapon.<br><br>*127.  Karschamroon Decl., ¶¶ 14* | never<br><br>said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5;*<br><br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br><br>*Transcript/Audio 911 Recording;*<br><br>*Exhibit 3, Dispatch CAD.* |
| 128.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists. | 128. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw | 128.   Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon |

| 128.  *Karschamroon Decl., ¶ 15* | Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive. **Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
| 129.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a | 129.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self | 129. Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that |

concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist. *129. Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9.

Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position. This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured. Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.*

| | | |
|---|---|---|
| 130.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.<br><br>*130.  Karschamroon Decl., ¶ 16*<br><br>*Gendreau Decl., ¶ 9* | 130.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with | 130.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist |

| | suspicion. | after Gendreau arrived.  Further, Mark |
| | **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| 131..  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer | 131. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would | 113.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was |

| | | |
|---|---|---|
| Gendreau felt like Andy was looking straight through him.<br><br>*131.  Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25.* |
| 132.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to | 132.  **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his | 132.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary |

| | | |
|---|---|---|
| relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *132. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 133.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A | 133.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and | 133.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders.  Although he did testify he had not |

pain compliance technique performed by Officer Gendreau did nothing.

133.  *Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16*

Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1,

received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony

| | 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that |

| | | |
|---|---|---|
| | | Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle *Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 134.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety. *134.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 134.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon. | 134.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon |

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21.

also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.

*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19,*

| | | |
|---|---|---|
| | | *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 135.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.<br><br>*135.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | 135.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers    Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him. | 135.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.<br><br>*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | | |
|---|---|---|
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 136.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and | 136. **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS | 136. Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased |

rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts.

*136.  Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20*

Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork.

**Supporting Evidence:** Exhibit C,

audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure. ummoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances.

*General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"*

| | Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | |
|---|---|---|
| 137.   Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.<br><br>*137.  Gendreau Decl., ¶ 22* | 137. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no | 137.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical |

| | | |
|---|---|---|
| | rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. | questioning and not on facts relevant to this case. |
| | | *Karschamroon Depo., 251:21-252:6,* |
| | | *Gendreau Depo., 178:5-16.* |
| | Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy. | |
| | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, | |

| | Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| --- | --- | --- |
| 138.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*138.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 138.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, | 138.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from |

| | Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence *Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
|---|---|---|
| 139.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was | 139.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46. **Supporting Evidence:** Exhibit D, | 139.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. |

| | | |
|---|---|---|
| dispatched to the incident scene in reference to Andy being tased.<br><br>*139.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | *General Orders, "Statement by the Police Chief"* |
| 140.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br><br>*140.  Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | 140.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman | 140.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements |

said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan,

were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 141.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.<br><br>*141.  Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8* | 141.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also | 141.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto |

| | | |
|---|---|---|
| | testified Andy died immediately after the tasering. | testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. |
| | Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered. | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25* |
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 142.   Given Andy's dilated pupils in | 142.  **Disputed:** Gendreau testified he | 142.  Plaintiff's evidence does not |

bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation.

*142.  Gendreau Decl., ¶ 37*

believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General

Order 2.6 and Lux testified he trained

constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

his students including Gendreau not taser such subjects.

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209:

| | 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 143.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling. *143.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 143. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed | 143.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified |

Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-

that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | 19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 144.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *144.  Karschamroon Decl., ¶¶ 35-36;* | 144.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. | 144.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. |

| *Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
|---|---|---|
| 145.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.<br><br>*145.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 145. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and | 145.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
|---|---|---|
| 146.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties. | 146. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an | 146.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of |

| | | |
|---|---|---|
| *146.  El-Farra Decl., ¶ 13-17* | officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.<br><br>   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br> Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiac distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, | approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| --- | --- | --- |
| 147.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *147.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 147.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Zimmerman testified Andy fell hard to the ground after the tasering like  a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the | 147.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he |

ground.  Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted.  Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 148.   Although the paramedics | 148.  **Disputed:** Zimmerman testified | 148.  Plaintiff's evidence does not |

rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.

*148.  Exhibit 6, Toxicology Report*

all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy

constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25*

was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0,

| | Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259: 2-23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 149.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."<br><br>*149. Exhibit 7, Autopsy Report* | 149.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, | 149.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he |

| | M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25* |

### ADJUDICATION NUMBER 6

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE SUBSTANTIVE DUE PROCESS CLAIMS REGARDING FAMILIAL RELATIONS BECAUSE THE OFFICERS DID NOT ACT WITH A PURPOSE TO CAUSE HARM

| 150.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" | 150.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the | 150.   Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of |

| | | |
|---|---|---|
| involved<br><br>*150.  Karschamroon Decl., ¶¶ 1-5;*<br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br>*Transcript/Audio 911 Recording;*<br>*Exhibit 3, Dispatch CAD.* | dispatcher made a mistake.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsitent with both their Internal Affairs interviews and Deposition Testimony.<br><br>**Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5;*<br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br>*Transcript/Audio 911 Recording;*<br>*Exhibit 3, Dispatch CAD*. |
| 151.   Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy | 151. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispacth. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further | 151.   Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and |

| | | |
|---|---|---|
| Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *151. Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.* | information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault. Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |

| | | |
|---|---|---|
| 152.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside.<br>*152.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | 152.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | 152.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.  In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 153.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned | 153.  **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing | 153  The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate |

| | | |
|---|---|---|
| around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br><br>*153.  Karschamroon Decl., ¶¶ 8-10.* | Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 154.   Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly | 154.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help. Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he | 154.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that |

| | | |
|---|---|---|
| approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression.<br><br>*154.  Karschamroon Decl., ¶¶ 11, 12* | complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
| 155.  Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did. Andy never spoke, but did appear to understand what was being said. *155.* | 155. **Undisputed** | 155.  **Undisputed.** |

| *Karschamroon Decl., ¶¶ 13, 14* | | |
|---|---|---|
| 156.   Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*156.  Karschamroon Decl., ¶¶ 14* | 156.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | 156.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5;*<br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br>*Transcript/Audio 911 Recording;*<br>*Exhibit 3, Dispatch CAD.* |

| | | |
|---|---|---|
| 157.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists. *157.  Karschamroon Decl., ¶ 15* | 157. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive.<br>**Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | 157.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |

158.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist.

*158.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

158.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C,

158.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's

| | | |
|---|---|---|
| | Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.* |
| 159.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move. *159.  Karschamroon Decl., ¶ 16 Gendreau Decl., ¶ 9* | 159.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both | 159.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively |

| | | |
|---|---|---|
| | Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."<br>Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| 160.  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see | 160.  **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never | 160.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did |

| | | |
|---|---|---|
| that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him.<br><br>*160.  Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.<br><br>*Karschamroon Depo., 348:9-15,*<br>*355:16-19, Zimmerman Depo., 217:3-*<br>*9, 222:11-223:13, 276:22-25* |
| 161.   In a casual manner, Officer | 161.  **Disputed:** Officer Karschamroon | 161.  Plaintiffs do not dispute |

Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *161. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13*

testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16.

Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19*

162.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A pain compliance technique performed by Officer Gendreau did nothing.

*162.  Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16*

162.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts

162.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders. Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer

the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25, 85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222: 17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21.

Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell

| | | what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 163.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had | 163.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands | 163.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's |

exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety.

*163.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19*

behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21.

testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what

|  |  | appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 164.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five | 164.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers   Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". | 164. Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about |

| | | |
|---|---|---|
| seconds.<br><br>*164. Karschamroon Decl., ¶¶ 22-25;*<br>*Gendreau Decl., ¶¶ 20-23* | Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi | 20 seconds before stepping to the side to taser him.<br><br>*Karschamroon Depo., 331:6-12,*<br>*Zimmerman Depo., 208:8-209:17* |

| | Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 165.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts. *165.  Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20* | 165.  **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the | 165.  Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.  Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. |

| | Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"* |
|---|---|---|
| 166.   Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.<br><br>*166.  Gendreau Decl., ¶ 22* | 166. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a | 166.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first |

subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon,

handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

| | pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 167.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once | 167.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. | 167. Plaintiff's evidence does not constitute enuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the |

| | | |
|---|---|---|
| the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*167.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | totality of the circumstances confronting the officers during that detention. Zimmerman has had no medical training. Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence<br><br>*Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 168.   At approximately 11:38 a.m., Officer Gendreau advised over his | 168.  **Disputed:** GG Fire Department paramedics were not dispached until | 168. Plaintiff's evidence does not constitute a genuine issue of material |

| | | |
|---|---|---|
| police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased. *168.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46. **Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. *General Orders, "Statement by the Police Chief"* |
| 169.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained | 169.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have | 169.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no |

unresponsive but continued to look around.

169.  *Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27*

placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel

medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25*

| | Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 170.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in. *170.  Karschamroon Decl., ¶¶ 29-34;* | 170.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy | 170.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not |

| | | |
|---|---|---|
| *Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8* | chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br> Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, | tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 171.   Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation. *171.  Gendreau Decl., ¶ 37* | 171. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said | 171.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to |

Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-

throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

| | 10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 172.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and | 172. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit | 172  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he |

| | | |
|---|---|---|
| Officer El-Farra could see Andy's chest rising and falling.<br><br>172.  *Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br> Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br> Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardial distress and taken off the handcuffs at a minimum. | never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | | |
|---|---|---|
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 173.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone | 173.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on | 173. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. |

| | | |
|---|---|---|
| had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *173. Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 174.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed. *174. Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 174. **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally | 174.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a |

| | observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | struggle with Andy. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
|---|---|---|
| 175.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer | 175. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat | 175.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. |

El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties.

*175.  El-Farra Decl., ¶ 13-17*

guy and the officer could not have placed him gently down if they wanted.  Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

   Dr. Fukumoto also testified that if officers did see labored or heavy

In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5,*

| | | |
|---|---|---|
| | breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | *258:7-259:25* |
| 176.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They | 176.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking | 176.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *176.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38*

increasingly more concerned because Andy was not moving.  Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground.  Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted.  Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face

immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

| | | |
|---|---|---|
| | and saying "to stop faking". Bua Phan also testified Andy died immediately after tasering.<br><br>Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6- 11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7- 19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25* |

| | 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243:1:16-18, 256.1:2-5. | |
|---|---|---|
| 177.   Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>*177.  Exhibit 6, Toxicology Report* | 177.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police | 177.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way |

rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.

 Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiac distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.

of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25*

| | 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259: 2-23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 178.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."<br><br>*178. Exhibit 7, Autopsy Report* | 178.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics | 178.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed |

| | | |
|---|---|---|
| | arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25* |

**ADJUDICATION NUMBER 7**

**PLAINTIFFS' FOURTH CAUSE OF ACTION FOR VIOLATION OF THE BANE ACT (CAL.CIV.CODE § 52.1) FAILS AS A MATTER OF LAW**

| | | |
|---|---|---|
| 179.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel | 179.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill | 179.   Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to |

| | | |
|---|---|---|
| Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved.<br><br>*179. Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* | male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony.<br><br>**Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 180.   Police Dispatch as well as the | 180. **Disputed:** Dispatch apparently | 180.  180.  Plaintiffs do not dispute |

CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital."
*180.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.*

did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispatch. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital.
**Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18.

Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the

| | | |
|---|---|---|
| | | totality of the circumstances confronting the officers during that detention.<br><br>*Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 181.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside.<br><br>*181.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | 181.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | 181.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that |

| | | detention. |
| | | *Zimmerman Depo., 50:1-19, 52:7-16* |
| 182.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides. *182.  Karschamroon Decl., ¶¶ 8-10.* | 182. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | 182. The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  *Karschamroon Depo., 245:15-25,* |

| | | 246:1-4 |
|---|---|---|
| 183.   Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression.<br><br>*183.  Karschamroon Decl., ¶¶ 11, 12* | 183.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.<br><br>Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | 183.   Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |

| | | |
|---|---|---|
| 184.  Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did.  Andy never spoke, but did appear to understand what was being said. *184. Karschamroon Decl., ¶¶ 13, 14* | 184. **Undisputed** | 184.  **Undisputed.** |
| 185.   Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.   *185.  Karschamroon Decl., ¶¶ 14* | 185. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs | 185  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does |

| | Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 186.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists.<br><br>*186.  Karschamroon Decl., ¶ 15* | 186.. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. | 186.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy |

| | He also testified Andy was never aggressive. **Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
|---|---|---|
| 187.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist. *187.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8* | 187. **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of | 187.   Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told |

| | what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.* |
| 188.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his | 188.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is | 188.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer |

fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.

188.  *Karschamroon Decl., ¶ 16*
*Gendreau Decl., ¶ 9*

Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13;

Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."

Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20

| | Karschamroon GGPD Internal Affairs Interview, pp. 9. | seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
|---|---|---|
| 189..  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him. *189.  Karschamroon Decl., ¶ 16 Gendreau Decl., ¶¶ 10, 11* | 189. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, | 189.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle |

| | | |
|---|---|---|
| | 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
| 190.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *190. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | 190.  **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed. **Supporting Evidence:** Exhibit B, | 190.   Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony |

| | | |
|---|---|---|
| | Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 191.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A pain compliance technique performed by Officer Gendreau did nothing. *191.  Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16* | 191.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's arm | 191. Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders. Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively |

behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,85:1-10,87: 3-7/16-23,97: 5-6, 100:

resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother

| | | |
|---|---|---|
| | 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle *Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7,* |

| | | *82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| --- | --- | --- |
| 192.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety.<br><br>*192.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 192.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, | 192.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' |

| | | |
|---|---|---|
| | Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21. | cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |

193.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.

*193.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23*

193.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers   Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25,

193  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.

*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17*

| | | |
|---|---|---|
| | 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 194.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote activation. Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts. *194.  Karschamroon Decl., ¶ 41;* | 194.  **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving | 194.  Plaintiffs do not dispute any material fact precluding summary judgment.  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 20* | events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.  Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"* |
| 195.   Officer Gendreau was trained that one of the best ways to get a subject on | 195.  **Disputed:** Gendreau testified he believed that Andy was under the | 195.  Plaintiff's evidence does not constitute a genuine issue of material |

the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.

*195.  Gendreau Decl., ¶ 22*

influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*
*Gendreau Depo., 178:5-16.*

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp.

| | 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 196.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*196.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 196.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | 196.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training. Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after |

| | | being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence *Zimmerman Depo., p. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
|---|---|---|
| 197.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased. *197.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | 197.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46.   **Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; | 197.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. *General Orders, "Statement by the Police Chief"* |

| | Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | |
|---|---|---|
| 198.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br><br>*198.  Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | 198.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is | 198.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based |

| | consistent with Andy being dead immediately after he saw tasered. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
|---|---|---|
| 199.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the | 199.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy | 199.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed |

front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.

199.  *Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8*

being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19,*

| | | |
|---|---|---|
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | *180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 200.   Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation. | 200. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. | 200.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances |

| | | |
|---|---|---|
| *200.  Gendreau Decl., ¶ 37* | Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.<br><br>  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified | confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.<br><br>*Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.* |

Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15.

| | | |
|---|---|---|
| 201.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling. *201.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 201.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after | 201.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing |

the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

 Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25,

when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 202.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *202.  Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 202.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | 202.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 203.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it | 203.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking | 203.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.

203.  *Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen*

increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp.

immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.

*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25*

| | 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
|---|---|---|
| 204.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties.

*204.  El-Farra Decl., ¶ 13-17* | 204.  Disputed: Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and | 204.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his |

| | | belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
|---|---|---|
| 205.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *205.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 205.  Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.   Dr. Fukumoto also testified that if officers did see labored or heavy | 205.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the |

|  | breathing they should have known Andy was in cardial distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 206.   Although the paramedics rendered emergency care and transported to the hospital, Andy Tran | 206.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking | 206.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.

*206.  Exhibit 6, Toxicology Report*

increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and

immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25*

saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259: 2-

| | 23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 207.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."<br><br>*207. Exhibit 7, Autopsy Report* | 207.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated.  Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2- | 207.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way |

| | 3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
|---|---|---|

### ADJUDICATION NUMBER 8

**PLAINTIFFS' FIFTH CAUSE OF ACTION FOR ASSAULT AND BATTERY FAILS AS A MATTER OF LAW**

| 208.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved. *208.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording;* | 208.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. **Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As | 208.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon. |
|---|---|---|

| | | |
|---|---|---|
| *Exhibit 3, Dispatch CAD.* | will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony. **Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | *Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 209.   Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *209.  Karschamroon Decl., ¶ 6* | 209. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispatch. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, | 209.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.  Further, the |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.* | Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 210.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into | 210.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then | 210.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the |

| | | |
|---|---|---|
| or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside. *210.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | turned towards him at the same time Karschamroon arrived. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Zimmerman Depo., 50:1-19, 52:7-16* |
| 211.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his | 211. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times. **Supporting Evidence:** Exhibit B, | 211. The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute |

| | | |
|---|---|---|
| sides.<br><br>211.  *Karschamroon Decl., ¶¶ 8-10.* | Deposition of Daniel Karschamroon, pp. 245:15-25, 246: 1-4. | a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 212.   Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression.<br><br>212.  *Karschamroon Decl., ¶¶ 11, 12* | 212.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.<br>Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, | 212.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" |

| | pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
|---|---|---|
| 213.  Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did.  Andy never spoke, but did appear to understand what was being said. <br><br> *213.  Karschamroon Decl., ¶¶ 13, 14* | 213. **Undisputed** | 213.  **Undisputed.** |
| 214.   Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it | 214. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this | 214.  214.     Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the |

| | | |
|---|---|---|
| was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*214.  Karschamroon Decl., ¶¶ 14* | was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsitent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5;*<br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br>*Transcript/Audio 911 Recording;*<br>*Exhibit 3, Dispatch CAD.* |
| 215.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to | 215. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he | 215.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy |

| | | |
|---|---|---|
| separate Andy's now-clenched fists. *215.  Karschamroon Decl., ¶ 15* | was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive. **Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
| 216.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be | 216.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon | 216.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that |

cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist. *216.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9.

Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-21; Gendreau Depo., 175:20-24; Karschamroon Depo.,*

| | | 285:11-14. |
|---|---|---|
| 217.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.<br><br>*217. Karschamroon Decl., ¶ 16*<br><br>*Gendreau Decl., ¶ 9* | 217. **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with | 217.   Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist |

|  | suspicion. | after Gendreau arrived.  Further, Mark |
|  | **Supporting Evidence:** Exhibit C, | Zimmerman testified that Officer |
|  | Deposition of Richard Gendreau, pp. | Gendreau did assist Officer |
|  | 175: 1-25, 176: 1-25, 177: 1-5,206: 19- | Karschamroon by putting "his hands on |
|  | 25; Exhibit B, Deposition of Daniel | Andy's hands or on the other officer's |
|  | Karschamroon, pp. 285: 11-13; | hands or in that vicinity" for "about 20 |
|  | Karschamroon GGPD Internal Affairs | seconds" in what appeared to him as an |
|  | Interview, pp. 9. | effort to "keep more control" of Andy. |
|  |  | *Karschamroon Depo., 321:22-322:22,* |
|  |  | *280:12-23, 362:12-17, 366:14-19,* |
|  |  | *Zimmerman Depo., 92:19-25, 93:16-* |
|  |  | *19, 209:7-22* |
| 218.  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer | 218. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would | 218.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was |

| | | |
|---|---|---|
| Gendreau felt like Andy was looking straight through him.<br><br>218. *Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.<br>*Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
| 219.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to relax as well, but he was also shaking | 219. **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from | 219.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that |

| | | |
|---|---|---|
| Andy's still clenched hands to let him know he still needed to be handcuffed. *219. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 220.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A pain compliance technique performed | 220.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never | 220.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders.  Although he did testify he had not received training that such commands |

by Officer Gendreau did nothing.

*220.  Karschamroon Decl., ¶¶ 21, 22;*

*Gendreau Decl., ¶¶ 12, 14-16*

struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11;

were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."

Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes the officers' account of Andy's

| | Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all |
|---|---|---|

| | | |
|---|---|---|
| | | times, he cannot say whether there was any kind of struggle<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 221.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similar<br><br>*221.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 221.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon.<br><br>**Supporting Evidence:** Exhibit B, | 221.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy |

| | | |
|---|---|---|
| | Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21. | was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18,* |

|  |  | *92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
|---|---|---|
| 222.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased.  Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.<br><br>*222.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | 222.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers    Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.<br><br>**Supporting Evidence:** Exhibit A, | 222.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.<br><br>*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | | |
|---|---|---|
| | Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 223.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and rapidly evolving events, activating a | 223.  **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he | 223.  Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement |

recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts.

*223. Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20*

thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp.

related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.   Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"*

| | 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | |
|---|---|---|
| 224.   Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.<br><br>*224.  Gendreau Decl., ¶ 22* | 224. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore | 224.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to |

| | | |
|---|---|---|
| | a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.<br><br> Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: | this case.<br><br>*Karschamroon Depo., 251:21-252:6,*<br><br>*Gendreau Depo., 178:5-16.* |

| | | |
|---|---|---|
| | 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 225.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms. *225.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 225.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. | 225.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet |

| | 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence

*Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| --- | --- | --- |
| 226.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in | 226.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46.

**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, | 226.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. |

| | | |
|---|---|---|
| reference to Andy being tased.<br><br>*226.  Karschamroon Decl., ¶ 27;<br>Gendreau Decl., ¶ 26; Exhibit 3<br>Dispatch CAD* | M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | *General Orders, "Statement by the Police Chief"* |
| 227.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br><br>*227.  Karschamroon Decl., ¶ 30;<br>Gendreau Decl., ¶ 27* | 227. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's | 227. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified |

face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5.

that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

228.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.

228.  *Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8*

228.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after

228.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing

| | | |
|---|---|---|
| | the tasering.<br><br>Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| 229.   Given Andy's dilated pupils in bright sunlight and his rapid pulse, | 229. **Disputed:** Gendreau testified he believed that Andy was under the | 229.   Plaintiff's evidence does not constitute a genuine issue of material |

Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation. *229. Gendreau Decl., ¶ 37*

influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy. Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist. Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch. Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case. *Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.*

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp.

| | 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 230.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.<br><br>*230.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 230.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy | 230.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he |

was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

 Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D,

just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| --- | --- | --- |
| 231.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *231.  Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 231.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense | 231.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | Exhibit 3, Dispatch CAD. | |
|---|---|---|
| 232.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.<br><br>*232.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 232.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached | 232.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
|---|---|---|
| 233.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties.<br><br>*204.  El-Farra Decl., ¶ 13-17* | 233.  Disputed: Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly | 233.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements |

not breathing.  Karschamroon testified
Gendreau opened up Andy's eyes and
Karschamroon could not tell if Andy
was breathing.  Zimmerman said he
saw Gendreau slapping Andy's face
and saying "to stop faking".  Bua Phan
also testified Andy died immediately
after tasering.

  Dr. Fukumoto testified the evidence
is consistent with Andy being dead
immediately after he saw tasered.
 Dr. Fukumoto also testified that if
officers did see labored or heavy
breathing they should have known
Andy was in cardiad distress and taken
off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A,
Deposition of Mark Zimmerman,
pp.108: 1-11/18-24, 110: 1-13/22-25,
111: 10- 17/18-22, 112: 25, 12l: 6-
11/15-24, 123: 15-25, 240: 21-25, 242:

were occurring.  Zimmerman testified
that it was possible that Andy was
breathing after being tased and that he
just did not observe it, and that his
belief that Andy was dead is not based
on any actual evidence.  Dr. Fukumoto
testified that he has no way of knowing
when Andy died and that he relies on
the physician's death pronouncement as
to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19,*
*180:20-21; 201:6-12, 293:23-294:12;*
*Fukumoto Depo.,  187:19-188:5,*
*258:7-259:25*

| | | |
|---|---|---|
| | 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 234.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *234.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 234.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground.  Zimmerman testified Andy was a fat guy and the officer could not | 234.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the |

have placed him gently down if they wanted.  Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.
 Dr. Fukumoto also testified that if officers did see labored or heavy

incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 235.   Although the paramedics rendered emergency care and transported to the hospital, Andy Tran | 235.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking | 235.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.

235.  *Exhibit 6, Toxicology Report*

increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and

immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25*

saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259: 2-

| | 23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 236.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication." <br><br> *236. Exhibit 7, Autopsy Report* | 236.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts. <br><br> **Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2- | 236.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way |

| | | |
|---|---|---|
| | 3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |

## ADJUDICATION NUMBER 9

### PLAINTIFFS' SIXTH CAUSE OF ACTION FOR NEGLIGENCE FAILS AS A MATTER OF LAW

| | | |
|---|---|---|
| 237.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved | 237.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. **Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As | 237.   Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon. |

| | will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony.<br><br>**Supporting Evidence**: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | *Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/ Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
|---|---|---|
| 238.   Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *238.  Karschamroon Decl., ¶ 6* | 238. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispacth. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital.<br>**Supporting Evidence:** Exhibit C, | 238.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.  Further, the |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.* | Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 239.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual | 239.  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as | 239.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing |

| | | |
|---|---|---|
| who appeared to be trying to break into or enter the residence through a window, and broken screen nearby. As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside.<br><br>*239.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 240.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer | 240. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times. | 240.  The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the |

| | | |
|---|---|---|
| Karschamroon with his hands at his sides.<br><br>*240. Karschamroon Decl., ¶¶ 8-10.* | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 241.   Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but | 241.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.<br>Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer. | 241.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with |

| | | |
|---|---|---|
| maintained his blank expression. 241. *Karschamroon Decl., ¶¶ 11, 12* | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
| 242.  Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did. Andy never spoke, but did appear to understand what was being said. *242. Karschamroon Decl., ¶¶ 13, 14* | 242. **Undisputed** | 242.  **Undisputed.** |
| 243.  Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," | 243. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill | 243.  243.      Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor |

| | | |
|---|---|---|
| "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*243.  Karschamroon Decl., ¶¶ 14* | male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 244.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. | 244. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he | 244.    Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his |

| | | |
|---|---|---|
| Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists. *244. Karschamroon Decl., ¶ 15* | testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive. **Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling." Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent." *Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
| 245.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that | 245.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's | 245.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer |

one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist. *245.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13;

Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-*

| | Karschamroon GGPD Internal Affairs Interview, pp. 9. | *19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14.* |
|---|---|---|
| 246.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.<br>*246. Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶ 9* | 246. **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and | 246.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." |

| | Deposition Testimony their Declarations should be viewed with suspicion. | Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| | **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | |
| 247..  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of | 247. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know | 247.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned |

| | | |
|---|---|---|
| his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him.<br><br>*247.  Karschamroon Decl., ¶ 16*<br><br>*Gendreau Decl., ¶¶ 10, 11* | he was still behind him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.<br><br>*Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
| 248.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer | 248.  **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down".  Karschamrron testified Gendreau never | 248.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of |

| | | |
|---|---|---|
| Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *248. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 249.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not | 249.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order?  Further, Karschamroon testified that neither "relax" or "dude calm down" were | 249. Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders. |

overcome his flexed/locked position. A pain compliance technique performed by Officer Gendreau did nothing.

*249. Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16*

lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsistent with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon,

Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.

| | | |
|---|---|---|
| | pp. 273: 8-11, 274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25,85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222:17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or |

| | | |
|---|---|---|
| | | hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 250.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety.<br><br>*250.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 250.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by | 250.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers |

Karschamroon.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21.

were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22,*

|  |  | *280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 251.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds. *251.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | 251.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers   Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said | 251.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him. *Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | | |
|---|---|---|
| | Gendreau stepped to Andy's side and immediatly tasered him.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 252.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he | 252.  **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw | 252.  252.  Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of |

was too far away for remote avtivation. Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts.

*252.  Karschamroon Decl., ¶ 41;*
*Gendreau Decl., ¶ 20*

Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the

the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure. Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances.

*General Order 2.24, 5.31, General*
*Order, "Statement by the Chief of*
*Police"*

| | required paperwwork. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | |
|---|---|---|
| 253.  Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself. *253.  Gendreau Decl., ¶ 22* | 253.  **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said | 253.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to |

Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-

throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

*Gendreau Depo., 178:5-16.*

| | | |
|---|---|---|
| | 10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 254.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms. | 254.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit | 254.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight |

| | | |
|---|---|---|
| *254.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence<br><br>*Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 255.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine | 255.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a | 255.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. |

| | | |
|---|---|---|
| Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased. *255.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | tasering. Sergeant Wagner was not requested until 11 :46. **Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | General Orders are guidelines and not an independent mechanism to pursue civil liability. *General Orders, "Statement by the Police Chief"* |
| 256.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around. *256.  Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | 256. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon | 256.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident |

testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24,

from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 257.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.<br><br>*257.  Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8* | 257.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy | 257.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he |

was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-

just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | 23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 258.   Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation. *258.  Gendreau Decl., ¶ 37* | 258. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore | 258.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to |

| | | |
|---|---|---|
| | a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects. | this case. |
| | Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy. | *Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.* |
| | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: | |

| | 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 259.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.<br><br>*259.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra* | 259. **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy | 259.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not |

| | | |
|---|---|---|
| *Decl., ¶¶10* | chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br> Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br> Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6- | tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | | |
|---|---|---|
| | 11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 260.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds | 260.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. | 260.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost |

| | | |
|---|---|---|
| thereafter prior to medics arriving, *260. Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 261.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed. *261.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 261.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another | 261.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.  *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | | |
|---|---|---|
| | example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
| 262.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El- | 262.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved | 262.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact |

Farra hear or see Andy stop breathing, or notice any other physical difficulties.

*262. El-Farra Decl., ¶ 13-17*

again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.  Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiac distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A,

lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12; 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25*

| | Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 263.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *263. Karschamroon Decl., ¶¶39;* | 263.  Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have | 263.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 38* | placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.  Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known | medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | | |
|---|---|---|
| | Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 264.   Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results | 264.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being | 264. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual |

| | | |
|---|---|---|
| revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>*264.  Exhibit 6, Toxicology Report* | tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
| 265.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to | 265.  **Disputed: Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at | 265.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."

*265. Exhibit 7, Autopsy Report*

fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.  Dr. Fukumoto testified he wass provided an incorrect history including being told Andy was breathing when paramedicas arrived and was never told exactly what type of struggle Andy was alleged to have been involved in with police.  After being provided the true facts, including Dr. Karschamroon's deposition, Dr. Fukumoto concluded Andy died from the tasering.  The Defense objected to Dr. Fukumoto reading the Internal

immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25*

| | Affairs transcripts of Officer Gendreau and Karschamroon even though Dr. Fukumoto thought they could define the facts.<br><br>Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.63: 1-8,66: 18-22,67:4-5,90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3,228:13-25, 229: 20-25, 239: 10-14/19-25,240: 1-25,243: 1-25,245: 17-25,260:1-10,283: 4-16/21-23,296: 1-7,304: 1-3/16-18,305: 8-25,306: 1-2/10-14,307:1-8/22-25,308: 5-7,309: 1-5/18-22,347: 1-4,355: 2-9. | |
|---|---|---|
| **ADJUDICATION NUMBER 10**<br><br>**PLAINTIFFS' SEVENTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS FAILS AS A MATTER OF LAW** | | |
| 266.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel | 266.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill | 266.   Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to |

Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved.

*266.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.*

male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake.

**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony.

Supporting Evidence: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18.

[Andy Tran] as being crazy, with weapons, and having committed an assault. Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.

*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.*

267..  Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital." *257.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.*

267. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispatch. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18.

267.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.   Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the

| | | |
|---|---|---|
| 268.. Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive. He noticed a male individual | 268. **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as | 268. The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion. Zimmerman testified that Andy stopped "directing |

| | | |
|---|---|---|
| who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab something from inside. *268.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Zimmerman Depo., 50:1-19, 52:7-16* |
| 269..  Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer | 269. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times. | 269.   The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the |

| | | |
|---|---|---|
| Karschamroon with his hands at his sides.<br><br>*269.  Karschamroon Decl., ¶¶ 8-10.* | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245:15-25,246: 1-4. | Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
| 270..  Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression. | 270.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help. Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br><br>**Supporting Evidence:** Exhibit B, | 270.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy |

| | | |
|---|---|---|
| *270.  Karschamroon Decl., ¶¶ 11, 12* | Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any time prior to being so instructed, and would be an immaterial variance regardless. |
| 271.. Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did.  Andy never spoke, but did appear to understand what was being said. *271. Karschamroon Decl., ¶¶ 13, 14* | 271. **Undisputed** | 271. **Undisputed.** |
| 272.  Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to | 272. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor | 272.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by |

| | | |
|---|---|---|
| "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a weapon.<br><br>*272.  Karschamroon Decl., ¶¶ 14* | assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5;*<br>*Gendreau Decl., ¶¶ 1-5; Exhibit 2,*<br>*Transcript/Audio 911 Recording;*<br>*Exhibit 3, Dispatch CAD.* |
| 273.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to | 273.. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he | 273.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy |

| | | |
|---|---|---|
| separate Andy's now-clenched fists.<br><br>*273. Karschamroon Decl., ¶ 15* | was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive.<br><br>**Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling." Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent."<br><br>*Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
| 274.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be | 274.  **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon | 274.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that |

cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the first handcuff was placed on his wrist. *274.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8*

never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9.

Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Zimmerman Depo., 92:19-25, 93:16-19, 209:7-21; Gendreau Depo., 175:20-24; Karschamroon Depo.,*

|  |  | 285:11-14. |
|---|---|---|
| 275.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.<br><br>*275. Karschamroon Decl., ¶ 16*<br><br>*Gendreau Decl., ¶ 9* | 275.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with | 275.  Plaintiffs' evidence does not dispute any material fact, and does not indicate that Officer Karschamroon had full control of Andy or that there was no resistance.  Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist |

| | | |
|---|---|---|
| | suspicion.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| 276..  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer | 276. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would | 276.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was |

| | | |
|---|---|---|
| Gendreau felt like Andy was looking straight through him.<br><br>276.  *Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25 |
| 277.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to | 277. **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his | 277.  Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary |

| | | |
|---|---|---|
| relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *277. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention.<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 278.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A | 278.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order? Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and | 278.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders.  Although he did testify he had not |

pain compliance technique performed by Officer Gendreau did nothing.

278.  *Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16*

Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.

Karschamroon testified he always had ahold of the loose handcuff so it could not be dangling and used as a weapon. Again, given the many new statements which are completely inconsient with statements made to Internal Affairs ·and during Deposition testimony puts the credibilty of Karschamroon and Gendreau is great doubt and their Declarations should be viewed with extreme caution.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273: 8-11, 274, 292: 17-23, 293: 1,

received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy. Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony

| | | |
|---|---|---|
| | 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20,80: 10-16, 81: 4-5, 83: 18-25, 85:1-10,87: 3-7/16-23,97: 5-6, 100: 1-25, 102: 4-9/20-24,150: 20-25, 151: 9-11, 197:20-25,198: 1-5,209:23-25,222: 17-25,224: 6-12, 276: 10-20,277: 1-4, 278: 18-21. | disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that |

| | | |
|---|---|---|
| | | Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 279.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety.<br>*279.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 279.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon. | 279.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon |

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21.

also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19,*

| | | |
|---|---|---|
| | | *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 280.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased. Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds. <br><br> *280.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23* | 280.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers Andy was only told to relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him. | 280.   Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him. <br><br> *Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17* |

| | | |
|---|---|---|
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 281.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and | 281. **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS | 281.  Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased |

rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts.

*281. Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20*

Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork.

**Supporting Evidence:** Exhibit C,

audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.   Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances.

*General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"*

| | Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | |
|---|---|---|
| 282.   Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to Andy, Officer Karschamroon or himself.<br><br>*282.  Gendreau Decl., ¶ 22* | 282. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no | 282.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical |

| | | |
|---|---|---|
| | rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.<br><br>  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, | questioning and not on facts relevant to this case.<br>*Karschamroon Depo., 251:21-252:6,*<br>*Gendreau Depo., 178:5-16.* |

| | Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 283.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*283.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 283.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, | 283.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from |

| | Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence *Zimmerman Depo.,pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| --- | --- | --- |
| 284.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was | 284.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46.  **Supporting Evidence:** Exhibit D, | 284.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. |

| | | |
|---|---|---|
| dispatched to the incident scene in reference to Andy being tased.<br><br>*284.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | *General Orders, "Statement by the Police Chief"* |
| 285.   As he was handcuffed and on the ground, Andy looked in various directions.  Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention.  When asked if he was doing okay, Andy remained unresponsive but continued to look around.<br><br>*285.  Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27* | 285.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman | 285.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements |

said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan,

were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 286.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.<br><br>*286.  Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8* | 286.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also | 286.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto |

| | testified Andy died immediately after the tasering.<br><br>Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25* |
| 287.   Given Andy's dilated pupils in | 287.  **Disputed:** Gendreau testified he | 287.  287.  Plaintiff's evidence does not |

bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation.

287.  *Gendreau Decl., ¶ 37*

believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau

constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6,*

| | | |
|---|---|---|
| | not taser such subjects. | *Gendreau Depo., 178:5-16.* |
| | Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, | |

| | 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 288.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling. *288.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10* | 288.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and | 288.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was |

Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel

breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 289.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *289.  Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra* | 289.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18- | 289.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | | |
|---|---|---|
| *Decl., ¶ 11-12* | 25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
| 290.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped elbow.  Her injury was measured and photographed.<br><br>*290. Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | 290.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of | 290.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | |
| --- | --- | --- |
| 291.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties. | 291.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy | 291. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not |

| 291. El-Farra Decl., ¶ 13-17 | chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering. | tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. |
| | Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.  Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum. | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
| | **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6- | |

| | | |
|---|---|---|
| | 11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp.243.1: 16-18; 256.1: 2-5. | |
| 292.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El- | 292. .  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved | 292.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact |

Farra hear or see Andy stop breathing, or notice any other physical difficulties.

*292.  El-Farra Decl., ¶ 13-17*

again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately after tasering.

  Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.
 Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.
**Supporting Evidence:** Exhibit A,

lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12; 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp.243.1: 16-18; 256.1: 2-5. | |
| 293.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers. *293. Karschamroon Decl., ¶¶39;* | 293..  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of | 293.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that |

| | | |
|---|---|---|
| *Gendreau Decl., ¶ 38* | potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.<br><br>  Dr. Fukumoto testified the evidence is | detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25* |

consistent with Andy being dead '
immediately after he saw tasered.
 Dr. Fukumoto also testified that if
officers did see labored or heavy
breathing they should have known
Andy was in cardiad distress and taken
off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A,
Deposition of Mark Zimmerman, pp.
108: 1-11118-24, 110: 1-13/22-25,
111:10-17/18-22,112: 25,121: 6-11/15-
24,123: 15-25,240: 21-25,242: 13-25,
243: 11-16,244: 12-15,246: 7-19;
Exhibit B, Deposition of Daniel
Karschamroon, pp. 397: 7-8; Exhibit 0,
Deposition of Richard Fukumoto,
M.D., pp. 90: 13-16,258: 16-19,259: 2-
23, 260: 1-10,261: 13-15,264: 21-
24,266:13-22,268:6-22,280: 19-25,281:
10-25,282: 7-15,283: 4-16/21-23;
Exhibit E, Deposition of Bua Thi Phan,

| | pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 294.   Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive.   Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>294.  *Exhibit 6, Toxicology Report* | 294.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, | 294.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5,* |

| | 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | *206:23 - 207:11, 258:7-259:25* |
|---|---|---|

| | | |
|---|---|---|
| 295.  The Coroner listed the cause of death as "Cardiac arrhythmia during struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."<br><br>*295. Exhibit 7, Autopsy Report* | 295.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser.  Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated.  Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.  Dr. Fukumoto testified he wass provided an incorrect history including being told Andy was breathing when paramedicas arrived and was never told exactly what type of struggle Andy was alleged to have been involved in with police. After being provided the true facts, including· Dr. Karschamroon's deposition, Dr. Fukumoto concluded Andy died from the tasering. The | 295.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25 |

| ADJUDICATION NUMBER 11 |
|---|
| **PLAINTIFFS' EIGHTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAILS AS A MATTER OF LAW** |

| | | |
|---|---|---|
| 296.   On September 3, 2008, at approximately 11:29 a.m., GGPD officers Richard Gendreau and Daniel Karschamroon were dispatched to a report of a "violent, mentally ill male" trying to break into the residence, that someone had been assaulted, and that there was an unknown "weapon" involved. <br><br> *296.  Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* | 296.  **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to' be taken to a hospital. The 911 caller never said Andy had weapons, the dispatcher made a mistake. <br><br> **Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CD.  As will be shown throughout Gendreau's and Karshamroon's Declaration are inconsistent with both their Internal Affairs interviews and Deposition Testimony. | 296.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon. <br><br> *Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |

| | Supporting Evidence: Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | |
|---|---|---|
| 297.   Police Dispatch as well as the CAD printout noted the male subject (Andy Tran) was a "mental case" and "crazy," that he had weapons, and that a crying child could be heard in the background.  The reporting party indicated that he was dizzy and he would not answer questions about Andy Tran's location, and kept repeating "send someone right now, send someone right now. Take to hospital."  *297.  Karschamroon Decl., ¶ 6 Gendreau Decl., ¶ 6; Exhibit 2, Transcript/Audio 911 recording; Exhibit 3, Dispatch CAD.* | 297. **Disputed:** Dispatch apparently did not understand 911 call because the 911 caller said nothing about weapons. Dispatch does indicate major languange barrier between 911 caller and dispacth. The CAD printout clearly shows this was a 5150 call and Gendreau testified he was given further information of Andy's prior mental health history. The CAD clearly states Andy needs to be taken to the hospital. **Supporting Evidence:** Exhibit C, Deposition of Gendreau, pp. 305: 5-25; Exhibit I, Gendreau GGPD Internal Affairs Interview, pp. 17-18. | 297.  Plaintiffs do not dispute Defendants' UMF, but rather argue that police dispatch erroneously concluded that Andy had weapons.  This does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon, and it remains undisputed that Dispatch relayed information that Andy was crazy, with weapons, and had committed an assault.  Further, the Plaintiffs citation to Officer Gendreau's deposition testimony does not support their assertion that he was aware of Andy's mental health history before arriving on scene, but rather only that |

| | | |
|---|---|---|
| | | he did not recall telling Internal Affairs that he acquired such knowledge.  In any event, such knowledge would be immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention. *Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD; Gendreau Depo., 305:5-25* |
| 298.  Officers Karschamroon and Gendreau arrived at approximately 11:36 a.m., with Karschamroon first to arrive.  He noticed a male individual who appeared to be trying to break into or enter the residence through a window, and broken screen nearby.  As Officer Karschamroon approached him, his body halfway into the window and he appeared to be trying to grab | 298..  **Disputed:** Mark Zimmerman testified he never saw Andy place any portion of his body in the window; in fact he testified he began yelling as Andy taking off screen and Andy then turned towards him at the same time Karschamroon arrived. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 51: 9-22, 52: 1-24. | 298.  The Plaintiff's citation to Mark Zimmerman's deposition does not support their assertion.  Zimmerman testified that Andy stopped "directing his attention towards opening the window and getting in the house" **after** Officer Karschamroon ordered Andy to stop.   In any event, this does not constitute a genuine issue of material fact precluding summary judgment; it is |

| | | |
|---|---|---|
| something from inside.<br><br>*298.  Karschamroon Decl., ¶ 7; Exhibit 3, Dispatch CAD.* | | immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.<br><br>*Zimmerman Depo., 50:1-19, 52:7-16* |
| 299.   Officer Karschamroon was aware through Dispatch the subject's name was Andy Tran, so he called out "Andy" three to four times to get his attention.  Andy stopped, slowly turned around, and faced Officer Karschamroon.  Andy was instructed to come down from the porch, which he eventually did, approaching Officer Karschamroon with his hands at his sides.<br><br>*299.  Karschamroon Decl., ¶¶ 8-10.* | 299. **Disputed:** Officer Karschamroon testified he called Andy by his name Andy and he was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch. Karschamroon testified Andy responded immediately and never testified he yelled 3-4 times.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.<br>245:15-25,246: 1-4. | 299.  The Plaintiffs do not dispute Officer Karschamroon called Andy by name, only the source of that information.  Further, the cited deposition testimony does not indicate how many times Officer Karschamroon called Andy's name.  The remainder of Defendants' UMF remains unchallenged.  In any event, the Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances |

| | | confronting the officers during that detention.<br><br>*Karschamroon Depo., 245:15-25, 246:1-4* |
|---|---|---|
| 300..  Officer Karschamroon could Andy had a blank stare and appeared to be confused or unsure of what was going on.  Andy stopped his approach when he was approximately 20 feet from the officer, who then asked Andy to come closer.  As Andy slowly approached to within 10 feet of Officer Karschamroon's location, he was instructed to stop.  Andy stopped, but maintained his blank expression.<br>*300.  Karschamroon Decl., ¶¶ 11, 12* | 300.  **Disputed:** Karschamroon testified Andy had a confused, puzzled look on his face and appeared in need of medical help.<br>Karschamroon testified he told Andy to stop when he was 10-15 feet away and put his hands on his head and he complied. He never testified Andy ever stopped before being told to do so and was told to come closer.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 244: 15-25, 259: 1-7, 257: 15-22, 276: 19-25, 279: 14-16; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 5-6. | 300.  Plaintiffs' evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.   In any event, the deposition testimony of Officer Karschamroon cited by Plaintiffs is consistent with Defendants' UMF, namely, that Andy was instructed to stop either "10 feet" or "10-15 feet" from Officer Karschamroon's location.  The cited deposition testimony does not include a question whether Andy stopped at any |

| | | time prior to being so instructed, and would be an immaterial variance regardless. |
|---|---|---|
| 301.. Andy was instructed to put his hands on top of his head and turn around, and he slowly complied with the directive.  Officer Karschamroon then approached Andy and told him to interlock his fingers, which he did.  Andy never spoke, but did appear to understand what was being said. *301. Karschamroon Decl., ¶¶ 13, 14* | 301. **Undisputed** | 301.  **Undisputed.** |
| 302.   Grabbing Andy's hands, Officer Karschamroon sought to reassure him by saying "there's nothing wrong," "we're just here to help you," and to "calm down" and "relax." However, it was important to get Andy secured and handcuffed as the call indicated he was a violent mental individual with a | 302. **Disputed:** Neither the 911 Transcript nor the Dispatch CAD state anything about a "violent, mentally ill male" trying to break into residence nor assaulting anyone. They both say this was a 5150 call and Andy needs to be taken to a hospital. The 911 caller never said Andy had weapons, the | 302.  Plaintiffs' evidence does not dispute that Officer Karschamroon attempted to calm and relax Andy, nor the nature of the call received by Dispatch.  Neither the 911 audio nor the CAD dispatch refer to "5150" as claimed by Plaintiffs, but do refer to [Andy Tran] as being crazy, with |

| | | |
|---|---|---|
| weapon.<br><br>*302.  Karschamroon Decl., ¶¶ 14* | dispatcher made a mistake. Given most of Karschamroon's Declaration is vastly different than his Internal Affairs Interview and Deposition Testimony anything he says he did is subject to impeachment now for prior inconsistent statements, thereby everything in his Declaration should be viewed with Suspicion.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, Dispatch CAD. | weapons, and having committed an assault.  Although requests were made to take [Andy] to the hospital, that does not constitute a genuine issue of material fact precluding summary judgment; officer actions are judged as to all information known or relied upon.<br><br>*Karschamroon Decl., ¶¶ 1-5; Gendreau Decl., ¶¶ 1-5; Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 303.   As the first handcuff went on Andy's right wrist, his hands immediately tensed up into fists. Officer Richard Gendreau arrived Officer Karschamroon was trying to separate Andy's now-clenched fists.<br><br>*303.  Karschamroon Decl., ¶ 15* | 303.. **Disputed:** Officer Karschamroon never told Internal Affairs Andy's hands ever balled into fists and he testified repeatedly that Andy's hands always remained interlocked after he was told to do so and he never saw Andy's hands ball into fists. Karschamroon further testified he did | 303.  Plaintiffs argue semantics but do not dispute any material fact.  Officer Karschamroon testified at his deposition that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked |

| | not know whether Andy's tension was a result of his attempt to follow the last command given to interlock his fingers. He also testified Andy was never aggressive.<br><br>**Supporting Evidence:** Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 7-8; Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 265: 13-18, 268: 9-10, 270: 10-11, 281: 9-25, 284: 1-25, 285: 1-6. | position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" and that he "thought it might turn violent."<br><br>*Karschamroon Depo., 321:22-322:22, 362:12-17, 366:14-19* |
|---|---|---|
| 304.   Officer Gendreau noticed the struggle to get Andy's arms behind his back, so he immediately ran over to assist.   Officer Gendreau was told that one handcuff was secured, but that Andy was not allowing himself to be cuffed.  Officer Karschamroon had a concern that the encounter might turn violent due to Andy's reaction when the | 304. **Disputed:** Officer Gendreau said he walked fast and did not run. Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but | 304.  Plaintiffs do not dispute any material fact, argue semantics, and mischaracterize testimony.  Mark Zimmerman confirmed that Officer Gendreau approached at "a pretty fast pace."  Officer Gendreau testified that Officer Karschamroon told him that Andy was tensed up and that he couldn't get Andy's hands behind his |

| | | |
|---|---|---|
| first handcuff was placed on his wrist. *304.  Karschamroon Decl., ¶¶ 16, 17; Gendreau Decl., ¶¶ 7, 8* | hands tensed when placed first handcuff on. Also Karschamroon and Zimmerman disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5, 206: 19-25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | back into a handcuffing position.  This is consistent with Officer Karschamroon's testimony that he told Gendreau that Andy was complying and tensed up after one handcuff was secured.  Nothing in the cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22; Gendreau Depo., 175:20-24; Karschamroon Depo., 285:11-14. |
| 305.   Andy continued to resist, failed to obey commands, and did not speak. Officer Gendreau could see that Andy's | 305.  **Disputed:** Officer Karschamroon had full control of Andy and there was never a  struggle between the two. | 305.  Plaintiffs' evidence does not dispute any  material fact, and does not indicate that Officer Karschamroon had full control of |

method of resistance was "complete rigidity"; both of his arms were up, his fists were balled, and he was shaking. Despite Officer Karschamroon's best efforts to pull Andy's arms down behind his back, his arms would not move.

*305. Karschamroon Decl., ¶ 16*

*Gendreau Decl., ¶ 9*

Officer Karschamroon testified he never struggled with Andy is Gendreau's presence nor tried to force Andy's hands behind his back. Karschamroon never said Andy would not allow self to be handcuff and said he told Gendreau Andy was complying but hands tensed when placed first handcuff on. Also given Karschamroon and Zimmennan disagree with most of what Gendreau said occured and both Gendreau and Karschamroon have now filed Declarations which are filed with inconsistent statements from their Internal Affairs Interviews and Deposition Testimony their Declarations should be viewed with suspicion.

**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5,206: 19-

Andy or that there was no resistance. Plaintiffs ignore Officer Karschamroon testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling." Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.

| | 25; Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22 |
|---|---|---|
| 306..  To prevent a possible escape, Officer Gendreau moved in front of Andy.  From that position, he could see that Andy was shaking and he began to growl.  Andy was not blinking, his pupils appeared to be dilated, and he had saliva coming from the corner of his mouth, almost as though he was foaming at the mouth.  Officer Gendreau felt like Andy was looking straight through him.<br><br>*306.  Karschamroon Decl., ¶ 16*<br>*Gendreau Decl., ¶¶ 10, 11* | 306. **Disputed:** Officer Karschamroon testified he was a foot from Andy and 1-3 feet from Gendreau and He never heard Andy growl or see his foaming at the mouth, or see Andy shaking other than when Karschamroon shook Andy hands, which moved, to let Andy know he was still behind him. Gendreau testified he never feared Andy would flee or run. Karschamroon testified Andy never made a movement consisting with fleeing or running away<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20, 284: 1-25, 285: 1-6, 330: 11-15; Declaration of Daniel Karschamroon, pp. 384: 18, | 306.  Plaintiffs do not dispute any material fact precluding summary judgment.  The assertion that Andy did not try to escape does dispute Officer Gendreau's motivation for positioning himself in front of Andy.  Further, Officer Karschamroon was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and that there could |

| | 385: 1-5; Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10,182: 2-23,187: 1-8,220: 1-24, 225: 17-24, 266: 1-10. | have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
|---|---|---|
| 307.   In a casual manner, Officer Gendreau said words to the effect of, "Hey, dude, just calm down," and advised Andy to relax, put his hands behind his back, and that "we're not here to hurt you."  Officer Karschamroon was reminding Andy to relax as well, but he was also shaking Andy's still clenched hands to let him know he still needed to be handcuffed. *307. Karschamroon Decl., ¶¶ 19, 20; Gendreau Decl., ¶¶ 12, 13* | 307.  **Disputed:** Officer Karschamroon testified the only thing he heard Gendreau say was "Hey, dude, calm down." Gendreau never ackowledged he said "dude calm down". Karschamrron testified Gendreau never told Andy to put his hands behind his back and the only shaking he saw from Andy was Karschamroon shaking Andy to let him know he was there. Karschamroon testifed he never said anything to Andy about being handcuffed.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1- | 307. Plaintiffs do not dispute Defendants' UMF that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken.  This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention.  Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing |

| | 4; 419, Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 11-15/17-25, 337: 10-16, 340: 8-9, 341: 7-16. | tension to pull his arms together demonstrates resistance to that intention.<br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
|---|---|---|
| 308.   Andy continued to ignore the officers' orders, and concern grew that the dangling handcuff could be used as a weapon if Andy decided to swing his arm.  Both officers then attempted to pry Andy's arms down but could not overcome his flexed/locked position.  A pain compliance technique performed by Officer Gendreau did nothing.<br>*308.  Karschamroon Decl., ¶¶ 21, 22; Gendreau Decl., ¶¶ 12, 14-16* | 308.  **Disputed:** Gendreau said he did not believe Andy understood anything he said so how can he claim Andy ignored an order?  Further, Karschamroon testified that neither "relax" or "dude calm down" were lawful orders. Both Karshamroon and Zimmennan said Gendreau never struggled with Andy except to taser him. Karschamroon testified repeatedly he never saw Gendreau touch Andy and did not struggle either alone or with Gendreau to get Andy's ann behind his back.<br>Karschamroon testified he always had ahold of the loose handcuff so it could | 308.  Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize testimony.  Officer Karschamroon did not testify that "relax" and "calm down" were not lawful orders.  Although he did testify he had not received training that such commands were lawful orders, he stated that the commands given were appropriate given the goal of relaxing Andy.  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he |

not be dangling and used as a weapon.
Again, given the many new statements
which are completely inconsistent with
statements made to Internal Affairs
·and during Deposition testimony puts
the credibilty of Karschamroon and
Gendreau is great doubt and their
Declarations should be viewed with
extreme caution.

**Supporting Evidence:** Exhibit B,
Deposition of Daniel Karschamroon,
pp. 273: 8-11, 274, 292: 17-23, 293: 1,
331: 16-25, 332: 18-21, 333: 7-11;
Karschamroon GGPD Internal Affairs
Interview, pp. 7-8.; Exhibit A,
Deposition of Mark Zimmerman, pp.
79:11-20,80: 10-16, 81: 4-5, 83: 18-
25,85:1-10,87: 3-7/16-23,97: 5-6, 100:
1-25, 102: 4-9/20-24,150: 20-25, 151:
9-11, 197:20-25,198: 1-5,209:23-
25,222:17-25,224: 6-12, 276: 10-

"thought it might turn violent."
Nothing in Plaintiffs' cited testimony
disputes that Andy continued to resist
after Gendreau arrived.  Further, Mark
Zimmerman testified that Officer
Gendreau did assist Officer
Karschamroon by putting "his hands on
Andy's hands or on the other officer's
hands or in that vicinity" for "about 20
seconds" in what appeared to him as an
effort to "keep more control" of Andy.
Nothing in Zimmerman's testimony
disputes the officers' account of Andy's
resistance other than his own
speculation.  Zimmerman testified that
he could see subtle movement going on
between the officers and Andy and that
there could have been a "whole 'nother
[sic] set of scenarios going on" that he
did not see.  He could not hear what
was being said, and although his

| | 20,277: 1-4, 278: 18-21. | eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle *Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-* |

| | | |
|---|---|---|
| | | *9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 309.  Officer Gendreau thought that if a fight ensued, it was going to be a bad one given the strength that Andy had exhibited when resisting both officers attempt to lower his arms.  Officer Karschamroon was similarly concerned about officer safety. *309.  Karschamroon Decl., ¶ 21; Gendreau Decl., ¶ 19* | 309.  **Disputed:** Karschamroon and Zimmerman both testified Gendreau never struggled to force Andy's hands behind back. Karschamroon said Gendreau never touched Andy. Karschamroon testified when he shook Andy's hands they moved so the extraordinary strength Gendreau said Andy had is disputed by Karschamroon. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp.273: 8-11 ,274, 292: 17-23, 293: 1, 331: 16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8.; Exhibit A, Deposition of Mark Zimmerman, pp.79: 11-20, 80: 10-16, 81:4-5, 83: 18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, | 309.  Plaintiffs' evidence does not dispute any material fact.  Plaintiffs ignore Officer Karschamroon's testimony that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."  Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived.  Further, Mark Zimmerman |

| | | |
|---|---|---|
| | 100: 1-25, 102: 4-9/20-24, 150: 20-25, 151: 9-11, 197:20-25, 198: 1-5, 209 :23-25, 222: 17-25, 224: 6-12, 276: 10-20, 277: 1-4, 278: 18-21. | testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 310.  As Andy continued to resist officer commands by remaining rigid and non-responsive, Officer Gendreau | 310.  **Disputed:** Karschamroon testified after he told Andy to interlock his fingers    Andy was only told to | 310. Plaintiffs do not dispute any material fact precluding summary judgment and mischaracterize |

decided to take out his Taser.  Andy was informed several times that if he did not comply, he would be tased.  Andy continued to resist, so Officer Gendreau deployed his taser once in Andy's thigh for a cycle of five seconds.

*310.  Karschamroon Decl., ¶¶ 22-25; Gendreau Decl., ¶¶ 20-23*

relax or "dude calm down" which Karschamroon testified were not lawful orders. Gendreau testified he did pot believe Andy understood anything he said so it would be difficult for him to "resist" non lawful "commands". Karschamroon testified Gendreau told him "Danny I'm just going to Tase him" and Karschamroom testified Gendreau never told Andy he was going to be tasered. Zimmerman said Gendreau stepped to Andy's side and immediatly tasered him.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D,

testimony.  Officer Karschamroon testified that Officer Gendreau did warn Andy that he would be tased if he did not calm down, and Zimmerman testified that Officer Gendreau had his hands on top of Andy's hands for about 20 seconds before stepping to the side to taser him.

*Karschamroon Depo., 331:6-12, Zimmerman Depo., 208:8-209:17*

| | Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E,  Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 311.  Prior to deploying the taser, Officer Gendreau also attempted to activate his audio recording system and the one in his police unit, although he was too far away for remote avtivation. Based on the nature of the call and rapidly evolving events, activating a recorder or his in-unit video during this incident was "not at the forefront" of Officer Karschamroon's thoughts. *311.  Karschamroon Decl., ¶ 41; Gendreau Decl., ¶ 20* | 311.  **Disputed:** GGPD General Order 5.31 states the IVS Unit must be activated when a detention was going to occur. Gendreau testified he saw Karschamroon detaining Andy when he arrived yet failed to activate his IVS Unit; Karschamroon testified he thought IVS Unit activation was completely within his discretion. No where in the GGPD General Orders does it indicate "rapidly evolving events" warrant ignoring orders. The fact Gendreau claims to have attempted to activate his IVS Unit shows he had | 311.   Plaintiffs do not dispute any material fact precluding summary judgment .  The General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.  The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as |

| | time and should have called for a supervisor and medics before tasering Andy as required by GGPD General Order 2.25. Further, given the major credibility issues of all involved officers Plaintiffs do not believe the Court should not accept the IVS recordings were destroyed. GGPD General Order 5.31 states if IVS fails to activate a work order must be completed and Gendreau never did the required paperwwork. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97-98, 109: 20-23; Exhibit H, GGPD General Order 2.24, 5.31. | demonstrated by repeated instances of his/her failure.  Summoning Fire Department Paramedics before the use of a Taser is only recommended, if practical, under the circumstances. *General Order 2.24, 5.31, General Order, "Statement by the Chief of Police"* |
| --- | --- | --- |
| 312.   Officer Gendreau was trained that one of the best ways to get a subject on the ground is to tase them in the leg. His goal was to take Andy into custody without any further risk of injury to | 312.  **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering | 312.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the |

| | | |
|---|---|---|
| Andy, Officer Karschamroon or himself.<br><br>*312.  Gendreau Decl., ¶ 22* | Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.<br><br>  Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau | totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.<br><br>*Karschamroon Depo., 251:21-252:6,*<br><br>*Gendreau Depo., 178:5-16.* |

was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD

| | Internal Affairs Interview, pp. 15. | |
|---|---|---|
| 313.  Once Andy was tased, he began to fall backward toward Officer Karschamroon, who caught him and laid him forward onto the ground. Andy also released his grip, and once the taser cycle stopped, the officers were able to bring his left arm behind his back and apply the other handcuff to secure his arms.<br><br>*313.  Karschamroon Decl., ¶ 26; Gendreau Decl., ¶¶ 24, 25* | 313.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13, 240: 21-25, 242: 13-25,243: 11-16. | 313. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual |

| | | evidence |
|---|---|---|
| | | *Zimmerman Depo., pp. 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 314.   At approximately 11:38 a.m., Officer Gendreau advised over his police radio that the situation was stable, but that Andy had been tased and he requested Garden Grove Fire Department to respond to examine Andy per their protocol when a subject is tased.  At approximately 11:39 a.m., Garden Grove Fire Department was dispatched to the incident scene in reference to Andy being tased. *314.  Karschamroon Decl., ¶ 27; Gendreau Decl., ¶ 26; Exhibit 3 Dispatch CAD* | 314.  **Disputed:** GG Fire Department paramedics were not dispached until 11:39:38.  Per Lux and GGPD General Order 2.24 states medics should be called before any tasering and a supervisor must be called before a tasering. Sergeant Wagner was not requested until 11 :46. **Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 282: 7-15, 283:4-16/21-23; Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25, 250: 9-10, 260: 13-25, 262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24; Exhibit K., Sergeant Wagner's report. | 314.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it remains undisputed that GG Fire Department paramedics were promptly dispatched after Andy was tased. General Orders are guidelines and not an independent mechanism to pursue civil liability. *General Orders, "Statement by the Police Chief"* |
| 315.   As he was handcuffed and on the | 315.  **Disputed:** Zimmerman testified | 315.  315.  Plaintiff's evidence does not |

ground, Andy looked in various directions. Officer Gendreau continued to instruct him to relax, and informed him they were in the process of getting him medical attention. When asked if he was doing okay, Andy remained unresponsive but continued to look around.

315. *Karschamroon Decl., ¶ 30; Gendreau Decl., ¶ 27*

Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering. Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A,

constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on

| | Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 121: 6-11/15-24,123: 15,- 25, 240: 21-25, 242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259:2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | the physician's death pronouncement as to the time of death. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25* |
|---|---|---|
| 316.   After the tasing, a third officer arrived on scene, Officer Amir El-Farra. The officers decided to roll Andy over on his back to observe him from the front.  His eyes were closed, but a check by Officer Gendreau found they were dilated.  Because of that and Andy's | 316.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have | 316.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no |

labored breathing, the officers decided to sit him up against Officer El-Farra's leg, thinking it might help with his breathing and help snap him out of the trance he appeared to be in.

316. *Karschamroon Decl., ¶¶ 29-34; Gendreau Decl., ¶¶ 31-32; El-Farra Decl., ¶¶6-8*

placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmennan, pp. 108: 1-11/18-24, 110: 1-13/22-25, 111:

medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo., 187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | 10-17/18-22,112: 25, 121: 6-11/15-24, 123: 15-25; 240: 21-25; 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24,266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15, 283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 317.   Given Andy's dilated pupils in bright sunlight and his rapid pulse, Officer Gendreau did consider that he may be under the influence of a controlled substance, but he never had the opportunity to do a full evaluation. *317.  Gendreau Decl., ¶ 37* | 317. **Disputed:** Gendreau testified he believed that Andy was under the influence of a Central Nervous System stimulant before he tasered Andy and knew and had been trained that tasering Andy could cause his immediate death. Given theses facts it is difficult to believe Gendreau did not believe to injure Andy.  Further, GGPD General | 317.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Officer Karschamroon testified that he did not feel it was |

Orders state a medic and supervisor should be called prior to tasering a subject. Gendreau testified he tried to activate his IVS and Lux testified it would have take 1-3 seconds to call for a medic and supervisor. Gendreau said Andy was not resisting, being aggressive or looking like would flee when he wass tasered so there was no rush to taser Andy. Andy was therefore a non comabative subject per GGPD General Order 2.6 and Lux testified he trained his students including Gendreau not taser such subjects.

Karschamroon testified he saw no reason to take out any weapons against Andy and had no idea why Gendreau was tasering Andy. Lux testified Karshamroon as the first officer on scene should have detennined why Gendreau was going to taser Andy.

necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist.  Officer Gendreau testified that Andy's conduct and appearance was indicative of someone who potentially is going to throw a punch.  Plaintiffs' misrepresent the testimony of Benedict Lux, which was based on incomplete hypothetical questioning and not on facts relevant to this case.

*Karschamroon Depo., 251:21-252:6, Gendreau Depo., 178:5-16.*

| | | |
|---|---|---|
| | **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25, 252: 1-118, 355: 21-24, 357: 3-18, 360: 1-6; Exhibit C, Deposition of Richard Gendreau, pp. 96: 1-16,174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23, 187: 1-8, 220: 1-24, 225: 17-24, 266: l-10, 327: 17-22, 328: 1-14/20-25, 329: 1-18; Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,178:5-14,179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22, 209: 1-25, 210: 8-18, 211: 9-11, 212: 13-18, 244: 14-25, 247: 21-25, 252: 21-25, pp. 253: 1-3/5-12, 254, 255: 1-5/12-15; Exhibit H, GGPD General Order 2.24, 2.6; Exhibit J, Karschamroon GGPD Internal Affairs Interview, pp. 15. | |
| 318.   As Andy was seated upright and leaning against Officer El-Farra's leg, his breathing was observed to be | 318.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and | 318.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

labored but no officer believed the situation to be critical.  Officer Karschamroon saw nothing to suggest a life-threatening situation, Officer Gendreau "felt comfortable" upon hearing the approach of the medics, and Officer El-Farra could see Andy's chest rising and falling.

*318.  Karschamroon Decl., ¶ 35; Gendreau Decl., ¶¶ 33-34; El-Farra Decl., ¶¶10*

saw, nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead

immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

| | | |
|---|---|---|
| | immediately after he saw tasered. Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25, 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |

| | | |
|---|---|---|
| 319.   Officer Gendreau asked Officer El-Farra to stay with Andy as he and Officer Karschamroon ascertained the welfare or condition of the calling party or family considering the nature of the call and the need to determine if anyone had been injured or attacked by Andy. Officer El-Farra estimates that he was in front of the residence, with Andy, for approximately 15 to 20 seconds thereafter prior to medics arriving. *319.  Karschamroon Decl., ¶¶ 35-36; Gendreau Decl., ¶ 33-34; El-Farra Decl., ¶ 11-12* | 319.  Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving.  Per Exhibit 3 of Defendants Motion El-Farra was on scene at 11:38 and Paramedics did not arrive until 11:44 so El-Farra was on scene for several minutes prior to the paramedics arrival. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4, 264: 18-25,265: 5-14118-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | 319.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them. *Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |
| 320.   Officers Gendreau and Karschamroon then contacted Andy's family inside the residence, but it appeared the only individual who sustained an injury was Plaintiff Bua Thi Phan, who had sustained a scraped | 320.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Per Exhibit 3 of Defedants Motion EI-Farra was on | 320. Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. |

| | | |
|---|---|---|
| elbow.  Her injury was measured and photographed.<br><br>*320.  Karschamroon Decl., ¶¶37-38; Gendreau Decl., ¶ 35; Exhibit 4, Photograph of Injury; Exhibit 5, Photograph of Screen* | scene at 11:38 and Paramedics did not arrive until 11:44 so EI-Farra was on scene for minutes prior to the paramedics arrival. There has been no testimony by Karschamroon or Gendreau that they ever personally observed any injury nor photographed any injury to Bua Phan so there is a complete lack of foundation for this "new" testimony. Again, another example of recreating history by Karschamroon and Gendreau and another reason to disbelieve both of their Declarations. Further, the attached photographs were submitted late and beyond the Motion Cut-Off time. Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25,246: 7-19, 251: 4,264: 18-25,265: 5-14/18-25,267: 6-8.; Defense Exhibit 3, Dispatch CAD. | In any event, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.  Further, Plaintiffs do not deny that Bua Thi Phan was injured in a struggle with Andy.<br><br>*Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25* |

| | | |
|---|---|---|
| 321.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties.

321.  *El-Farra Decl., ¶ 13-17* | 321.  **Disputed:** Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmerman testified Andy was a fat guy and the officer could not have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own.  Zimmerman testified when the police rolled Andy against an officers legs he could clearly see Andy chest and stomach and he was clearly not breathing.  Karschamroon testified Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing.  Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking".  Bua Phan also testified Andy died immediately | 321.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing |

after tasering.

   Dr. Fukumoto testified the evidence is consistent with Andy being dead immediately after he saw tasered.

   Dr. Fukumoto also testified that if officers did see labored or heavy breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.108: 1-11/18-24, 110: 1-13/22-25, 111: 10- 17/18-22, 112: 25, 12l: 6-11/15-24, 123: 15-25, 240: 21-25, 242: 13-25, 243: 11-16, 244: 12-15, 246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16, 258: 16-19, 259: 2-23, 260: 1-10, 261: 13-15, 264: 21-24, 266: 13-22, 268:6-22, 280: 19-25,

when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | 281: 10-25, 282: 7-15,  283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
|---|---|---|
| 322.   An approaching medic was informed by Officer El-Farra about the tasing and Andy's labored breathing. The medic checked for Andy's pulse and informed Officer El-Farra that he needed to start CPR. This took Officer El-Farra completely by surprise.  When he had looked away from Andy to speak to the medic, Andy had been breathing.  At no time did Officer El-Farra hear or see Andy stop breathing, or notice any other physical difficulties. *322.  El-Farra Decl., ¶ 13-17* | 322. **Disputed:** Upon hitting the ground, immediatley after being tasered, Andy was already lifeless.

Mark Zimmerman, pp. 294:6-15.Officer Karschamroon cannot even recall whether Andy was breathing after the officers finished propping Andy's body against Officer El-Farra's legs.  Supporting Evidence: Exhibit B, Deposition of Daniel Karschamroon, pp.397:7-8.While Andy was propped against the officer's leg, his chest was not moving and he was not breathing heavily or otherwise.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.124:17-25. | 322.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his |

| | | belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25* |
|---|---|---|
| 323.   After checking the house, the Officers Gendreau and Karschamroon started toward the front door.  They could then see the paramedics performing CPR on Andy.  This was a "shock" and "surprise" to both officers.<br><br>*323.  Karschamroon Decl., ¶¶39; Gendreau Decl., ¶ 38* | 323.  **Disputed:** Zimmerman testified all police officers arrived outside until the paramedics arrived looking increasingly more concerned because Andy was not moving. Zimmerman testified Andy fell hard to the ground after the tasering like a "sack of potatoes" and saw nothing consistent with Andy being gently placed on the ground. Zimmeman testified Andy was a fat guy and the officers could not | 323.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the |

have placed him gently down if they wanted. Zimmerman testified when Andy hit the ground was dead and never moved again on his own. Zimmerman testified when the police rolled Andy against an officer's legs he could clearly see Andy chest and stomach and he was clearly not breathing. Karschamroon testifed Gendreau opened up Andy's eyes and Karschamroon could not tell if Andy was breathing. Zimmerman said he saw Gendreau slapping Andy's face and saying "to stop faking". Bua Phan also testified Andy died immediately after the tasering.

 Dr. Fukumoto testified the evidence is consistent with Andy being dead ' immediately after he saw tasered.

 Dr. Fukumoto also testified that if officers did see labored or heavy

incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12; Fukumoto Depo.,  187:19-188:5, 258:7-259:25*

| | | |
|---|---|---|
| | breathing they should have known Andy was in cardiad distress and taken off the handcuffs at a minimum.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11118-24, 110: 1-13/22-25, 111:10-17/18-22,112: 25,121: 6-11/15-24,123: 15-25,240: 21-25,242: 13-25, 243: 11-16,244: 12-15,246: 7-19; Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8; Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 90: 13-16,258: 16-19,259: 2-23, 260: 1-10,261: 13-15,264: 21-24,266:13-22,268:6-22,280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit E, Deposition of Bua Thi Phan, pp. 243.1: 16-18; 256.1: 2-5. | |
| 324.  Although the paramedics rendered emergency care and transported to the hospital, Andy Tran did not survive. | 324.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's death and none where at fatal levels. | 324.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is |

| | | |
|---|---|---|
| Toxicology results revealed substantial levels of Diphenhydramine and Trihexylphenidyl in his system at the time of death.<br><br>*324.  Exhibit 6, Toxicology Report* | He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser. Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated. Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25,243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3/16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. | immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
| 325.  The Coroner listed the cause of death as "Cardiac arrhythmia during | 325.  **Disputed:** Dr. Fukumoto testified no drug played any role in Andy's | 325.  Plaintiff's evidence does not constitute a genuine issue of material |

struggle with law enforcement due to dilated hyertropic cardiomyopathy with diphenhydramine and trihexylphenidl intoxication."

*325. Exhibit 7, Autopsy Report*

death and none where at fatal levels. He testified Andy died from being tasered and the evidence was consistent with Andy dying immediatly after being hit with the taser.  Andy was in full cardiac arrest when the paramedics arrived and his eyes were fixed and dilated.  Dr. Fukumoto has been qualified as an expert in interpreting toxicology results in Courts.  Dr. Fukumoto testified he wass provided an incorrect history including being told Andy was breathing when paramedicas arrived and was never told exactly what type of struggle Andy was alleged to have been involved in with police. After being provided the true facts, including· Dr. Karschamroon's deposition, Dr. Fukumoto concluded Andy died from the tasering. The Defense objected to Dr. Fukumoto

fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. In any event, the Plaintiffs' do not dispute the Defendants' UMF, but Dr. Fukumoto opinion that the tasering was a factor in Andy's death was because he already had a bad heart and liver.  Dr. Fukumoto testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.

*Fukumoto Depo.,  187:19-188:5, 206:23 - 207:11, 258:7-259:25*

|  | reading the  Internal Affair transcripts of Officer Gendreau and Karschamroon even though Dr. Fukumoto thought they could define the facts.<br><br>**Supporting Evidence:** Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13-16, 141: 5-25, 142: 6-7, 143: 2-3, 228: 13-25, 229: 20-25, 239: 10-14/19-25, 240: 1-25, 243: 1-25, 245: 17-25, 260: 1-10, 283: 4-16/21-23, 296: 1-7, 304: 1-3-16-18, 305: 8-25, 306: 1-2/10-14, 307: 1-8/22-25, 308: 5-7, 309: 1-5/18-22, 347: 1-4, 355: 2-9. |  |

| ***PLAINTIFFS' UNDISPUTED FACTS & EVIDENCE*** | ***DEFENDANTS' REPLY*** |
|---|---|
| 326.  On September 3, 2008, Mr. Andy Tran (hereinafter referred to as "Andy" since every witness identified him as Andy) lived at 13253 Barnett Way in the City of Garden Grove. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 18: 9-23, 19: 1-8. | 326.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 327.   13253 Barnett way is located at the corner of Paloma Drive and Barnett Way. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 18; 9-23, 19:1-8. | 327.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

328.  Independent Witness Mark Zimmerman lived directly acrtoss the street from Mr. Tran's residence on the opposite corner of Paloma Drive and Barnett Way.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 18; 9-23, 19"1-8/

328.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed that Mark Zimmerman lives at the stated address.  Disputed to the extent Zimmerman witnessed the incident in a material way.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.  He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to

| | |
|---|---|
| 329.  Mark Zimmerman had lived across from the Tran's for several year and although did not have a real relationship with the Tran's he could see the Tran's were a close knit family and would often see Mr. Tran outside playing with his son, doing chores or sitting down. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.23, 1-23, 24:2-12. | 329.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 330.  Mr. Zimmerman testified that sometimes Andy appeared normal and other times he appeared a bit mentally unstable. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.33:1-25, 34:1-19 | 330.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 331.  Had never felt threatened by Andy or seen him act violently. **Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 36:22-25, 37:1-4. | 331.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 332.  At approximately 11:30 a.m., Mr. Zimmerman drove his utility truck from his work to his home and turned left from Paloma Drive to Barnett Way passing directly past Mr. | 332.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| Tran's house.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 29:6-25. | |
| 333.  Mr. Zimmerman noticed Mr. Tran sitting on the curb in front of his house as he pulled up and parked his truck directly in front of his (Mr. Zimmerman's house).<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 28:11-21. | 333.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 334.  When Mr. Zimmerman exited his truck he saw Mr. Tran get up from the curb and move to the grassy section of his lawn and go to his knees and let out a moan or cry.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 30:11-25, 31:6-14. | 334.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 335.  Because of Mr. Tran's behavior Mr. Zimmerman stayed near his truck to observe Mr. Tran.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp, 36:1-21. | 335.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| 336.  Mr. Zimmerman watched as Mr. Tran got up and went towards the front door of Mr. Tran's house.<br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp.  38:1018. | 336.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 337.  Once on the front porch of his house Mr. Tran fully removed a screen which covered a window immediately adjacent to the front door.<br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 38:1-18 | 337.  This is not a material fact creating a genuine issue precluding summary judgment. However, Zimmerman testified that Andy "ripped off the screen."<br>*Zimmerman Depo., 167:11-20* |
| 338.  Mr. Zimmerman could see Mr. Tran's father, Mr. Nam Tran, inside the house as well as an adult woman.<br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 73:4-25, 74:9-16. | 338.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 339.  Once Mr. Zimmerman saw Mr. Tran remove the screen he began walking across Barnett Way towards Mr. Tran's house and began yelling "that's enough" and "stop".<br>**Supporting Evidence:**  Exhibit A, Deposition | 339.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| of Mark Zimmerman, pp. 39:1-23, 40:1-16. | |
|---|---|
| 340.  Unbeknownst to Mr. Zimmerman Mr. Tran's father had called the Garden Grove Police Department and requested Mr. Tran be taken to the hospital.<br><br>**Supporting Evidence:** Defense Exhibit 3, Dispatch CAD. | 340.  This is not a material fact creating a genuine issue precluding summary judgment. However, Andy's father did more than request Andy be taken to the hospital.  Officers were dispatched in response to the call were informed that Andy was also crazy, with weapons, and that he had committed an assault.<br><br>*Exhibit 2, Transcript/Audio 911 Recording;*<br><br>*Exhibit 3, Dispatch CAD.* |
| 341.  Three (3) officers were dispatched to Andy's house as a result of Andy's father's 911 call.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/ Audio 911; Defense Exhibit 3, Dispatch CAD. | 341.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 342.  The dispatched Officers were Richard Gendreau, Daniel Karschamroon and Amir El-Farra.<br><br>**Supporting Evidence:** Defense Exhibit 2, Transcript/Audio 911; Defense Exhibit 3, | 342.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| Dispatch CAD. | |
| 343.  Because of a language barrier between the dispatcher and Mr. Nam Tran the dispatcher mistakenly believed Mr. Tran said his son had a weapon.<br><br>**Supporting Evidence:** Defense Exhibit 2, 911; Defense Exhibit 3, Dispatch CAD. | 343.  This is not a material fact creating a genuine issue precluding summary judgment. Further, the Plaintiffs' UMF lacks foundation, calls for speculation, and is irrelevant to the issue of what was reported to officers by Dispatch.<br><br>*Exhibit 2, Transcript/Audio 911 Recording; Exhibit 3, Dispatch CAD.* |
| 344.  Dispatch made responding officers aware they were responding to a California Welfare and Institutions 5150 call (hereinafter "5150"); a gravely disables individual who may be a danger to himself or others.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 115:8-14, 225:1-25 | 344.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 345.  Dispatch also made responding officers aware that offices had been dispatched on several prior occasions to 5150 calls involving Andy at the same address.<br><br>**Supporting Evidence:** Exhibit C, Deposition of | 345.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| Richard Gendreau, pp. 305:5-25, 306:1-25. | |
|---|---|
| 346.  As Mr. Zimmerman was walking across Barnett Way towards Mr. Tran's house yelling "stop" and "that's enough" at Andy he saw a marked Garden Grove Police car directly alongside Mr. Zimmerman's car and saw Officer Karschamroon exit and walk towards Andy's house (Mr. Zimmerman referred to him as Officer one throughout his deposition but there is not dispute Officer Karschamroon was the first arriving officer).<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 43:7-19, 44:7-21, 45:3-25. | 346.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 347.  Mr. Zimmerman testified Andy was wearing a tight fitting t-shirt that was too small for him as was also wearing work out type shorts.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 41:8-15, 42:2-18. | 347.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 348.  Mr. Zimmerman said it was clear by the | 348.  This is not a material fact creating a |

| | |
|---|---|
| way Andy was dressed that he did not have any weapons on him.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 41:19-23, 42:2-18. | genuine issue precluding summary judgment. For the purposes of the present Motion, it undisputed that Zimmerman held that opinion, but such testimony is irrelevant, speculative, and lacks foundation. |
| 349.  Mr. Zimmerman said Officer Karschamroon also began yelling things like stop towards Andy.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 49:8-25, 50:5-12. | 349.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 350.  Mr. Zimmerman said that Andy immediately snapped out of whatever state he was in when he heard Mr. Zimmerman and Officer Karschamroon yell towards him and that Andy turned towards Mr. Zimmerman and Officer Karschamroon and stopped what he was dong with the window screen.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 51:9-22, 52:1-24. | 350.  This is not a material fact creating a genuine issue precluding summary judgment. For the purposes of the present Motion, it is undisputed that Zimmerman testified as stated, but his opinion as to Andy's actual mental state is speculative and lacks foundation. |
| 351.  Mr. Zimmerman testified that once he saw Officer Karschamroon arrive he stopped | 351.  Disputed.  Zimmerman testified that the distance was between 40-50 feet, and despite |

| | |
|---|---|
| walking towards Andy and went to the back of his truck in order to watch from a distacne of approximately 40 feet away with no obstructions of any kind between he and the scene of the incident.<br><br>**Supporting Evidence:**  Exhibit A, Deposition of Mark Zimmerman, pp. 49:8-25, 50:5-12, 65:8-10. | admittedly impaired vision, he does not wear his prescription contact lens.<br><br>*Zimmerman Depo., 22:3-7, 65:1-12, 162:14-19* |
| 352.  Officer Karschamroon testified he knew he was responding to a 5150 call and knew that dealing with the mentally ill was part of his job responsibilities.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 109:12-25, 115:8-14, 193:10-12, 225:1-25, 239:1-13 | 352.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 353.  However, Officer Karschamroon testified he could not recall anything specifically he was trained to do with 5150/mentally ill suspects.<br><br>**Supporting Evidence:**  Deposition of Daniel Karschamroon, pp. 11:1-25, 112:1-25, 210:11-19. | 353.  This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Karschamroon testified that he had "scenario training" with respect to dealing with the mentally ill.<br><br>*Karschamroon Depo., 110:1-13* |

| | |
|---|---|
| 354.  Officer Karschamroon never testified that the Garden Grove Police Department has a General Order ("GGPD General Orders") specifically dealing with the mentally ill and 5150's.<br><br>**Supporting Evidence:** Exhibit H, GGPD General Order 5.9. | 354. This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent the proffered evidence does not show what Officer Karschamroon was asked about said General Order. |
| 355.  Officer Karschamroon also testified was unable to explain what he was trined regarding the 4th Amendment to the United States Constitution, excessive force, the proper use of the GGPD IVS Unit or taser policies.<br><br>**Supporting Evidence:**  Deposition of Daniel Karschamroon, pp.  87:7-25, 88-90, 107:17-24, 16:1-26, 168:6-7/15-22, 169:5-8, 170:12-14, 224:14-25. | 355.  This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent Officer Karschamroon testified that he did receive training on such matters<br>*Karschamroon Depo., 88:8-89:19; 94:12-20, 108:8-109:25* |
| 356. However, both Officer Karschamroon and Gendreau testified that they had been trained at the Academy and during GGPD Field Training to use the minimum amount of force required under the circumstances. | 356.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| **Supporting Evidence:**  Deposition of Daniel Karschamroon, pp. 123:17-21, Exhibit C, Deposition of Richard Gendreau, pp. 123:22-25, 124:1-20. | |
| 357.  Officer Karschamroon testified that he became a sworn Garden Grove Police Officer on November 17, 2007<br>**Supporting Evidence:**  Deposition of Daniel Karschamroon, pp.  69:1-2. | 357.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 358.  Before becoming a police officer Officer Karschamroon testified he had been in the United States Marine Corps since 2003 and remained in the reserves from the time he became a police officer until September 3, 2008.<br>**Supporting Evidence:**  Deposition of Daniel Karschamroon, pp.  25:5-24. | 358.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 359.  Officer Karschamroon testified that on September 3, 2008, he was a Staff Sergeant in the Marine Corps reserves and was a brown belt martial instructor in the Marine Corps. | 359.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| **Supporting Evidence:** Deposition of Daniel Karschamroon, pp. 39:10-13, 63:15-22, 65:16-22. | |
| 360. As a brown belt martial instructor he would train fellow Marines in pain compliance moves, wrist control, arm bar take downs, hip throws and other techniques to subdue people. **Supporting Evidence:** Deposition of Daniel Karschamroon, pp. 58:12-25. | 360. This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 361. Officer Karschamroon testified he positined his patrol car adjacent to Mr. Zimmerman's house on Paloma Drive with the front of his car facing Mr. Tran's house. **Supporting Evidence:** Deposition of Daniel Karschamroon, pp. 229:1-22. | 361. This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 362. Officer Karschamroon testified that his car was equipped with an In-Car Video System (hereinafter "IVS Unit"). **Supporting Evidence:** Deposition of Daniel Karschamroon, pp. 229:1-22. | 362. This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 363. Officer Karschamroon testified that his car | 363. This is not a material fact creating a |

| | |
|---|---|
| was positioned in such a fashion that his IVS Unit would have videotaped the encounter between he and Mr. Tran.<br><br>**Supporting Evidence:**  Deposition of Daniel Karschamroon, pp. 229:1-22 | genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 364.  Garden Grove General Order 5.31 states that all officer must activate their IVS unite anytime they are going to detain someone.<br><br>**Supporting Evidence:** Exhibit H, GGPD General Order 5.31. | 364.  This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent all General Orders are "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.   The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.<br><br>*General Order 5.31; General Order, "Statement by the Chief of Police"* |

| | |
|---|---|
| 365.  Officer Karschamroon testified he was unaware of the Garden Grove General Order 5.31 regarding the mandatory uses of the IVS Unit believing, wrongly, that he had complete discretion to either activate or not activate his IVS Unit.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 169: 5-8; Exhibit H, GGPD General Order 5.31. | 365.  This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent all General Orders are "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.   The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.<br><br>*General Order 5.31; General Order, "Statement by the Chief of Police"* |
| 366.  Officer Karschamroon testified inconsistently with Mr. Zimmerman that Andy had part of his body inside the window where the screen was removed when he arrived; Mr. Zimmerman testified that Andy had just taken | 366. This is not a material fact creating a genuine issue precluding summary judgment, any variance in the proffered testimony is not germane to the legal issues in dispute. |

| | |
|---|---|
| the screen on the window when he and Officer Karschamroon began yelling at him and never saw Andy reach inside the window.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 235: 13-14; Exhibit A, Deposition of Mark Zimmerman, pp. 38: 1-18, 39: 1-23, 52: 1-24 | |
| 367.  Officer Karschamroon testified when he yelled at Andy he immediately atopped what he was doing and turned towards Officer Karschamroon.<br><br>**Supporting Evidence:** Exhibit B, Deposition on Daniel Karschamroon, pp. 244: 15-25, 246: 12-15. | 367.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 368.  Officer Karschamroon testified that he called Andy by his name Andy and was uncertain if he learned Andy's name from hearing Mr. Zimmerman saying it or hearing Andy's name from dispatch.<br><br>**Supporting Evidence:** Exhibit B, Deposition of | 368.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| Daniel Karschamroon, pp. 245: 15-25 | |
|---|---|
| 369. Officer Karschamroon testified he commanded Andy to walk towards him and Andy complied.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel  Karschamroon, pp. 247: 8-12, 257: 4-8 | 369.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 370.  Officer Karschamroon testified that while Andy was walking towards him Andy appeared confused, had a puzzled look on his face and appeared in need of some type of medical help.<br><br>**Supporting Evidence:** Deposition of Officer Karschamroon, pp. 103: 1-25, 256: 7-8, 279: 1-6/14-16. | 370.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 371.  Officer Karschamroon testified Andy appeared confused throughout his entire encounter with Andy.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 259: 1-7. | 371.  This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent that the proffered testimony only pertains to the time from when Andy turned around on the porch and the time he stopped 10-15 feet away from Officer Karschamroon, after which Andy turned around. |

| | Karshamroon Depo., pp. 258:24-259:16 |
|---|---|
| 372. Mr. Zimmerman also testified that Andy appeared confused during his time with the police.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 71: 14-20, 72: 16-20, 73: 4-5, 193: 4-24. | 372.  This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent that Zimmerman also described Andy as "agitated" and "not calm."<br>Zimmerman Depo., 38:3-7, 77:17-24 |
| 373.  Officer Karschamroon testified that when Andy was approximately 10-15 feet from him he told Andy to stop and he did.<br>**Supporting Evidence:** Exhibit b, Deposition of Daniel Karschamroon, pp. 244: 15-25. | 373.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 374.  Officer Karschamroon testified that when Andy stopped 10-15 feet away he told Andy to turn around with his back facing Officer Karschamroon and Andy complied<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245: 1-8. | 374.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 375.  Officer Karschamroon testified that when Andy turned around Officer Karschamroon told Andy to put his hands on his head and Andy | 375.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the |

| | |
|---|---|
| complied.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245: 1-20, 259: 22-23. | present Motion. |
| 376.  Officer Karschamroon testified that once Andy has is back towards him with his hands on his head Officer Karschamroon approached Andy and told him to interlock his fingers and Andy complied.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 245: 1-15, 262: 1-4. | 376.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 377.  Officer Karschamroon testified he wanted Andy to have his back to him so that Officer Karschamroon would be in position of advantage.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 267: 13-24. | 377.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 378.  Officer Karschamroon testified he then went "hands on" with Andy by placing a handcuff on Andy's right wrist and placing his other hand on Andy'r left wrist in order to | 378.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| maintain control of Andy.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 267:13-24. | |
| 379.  Officer Karschamroon testified that up to this point Andy had followed every order given, that Officer Karschamroon had not see Andy be violent at all, that Andy made no aggressive moves of any kind and did not look as if he may try to flee.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 261: 12-18, 264: 17-20: pp. 284: 1-25; 285:1-6. | 379.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 380.  Officer Karschamroon testified that he had been trained to not approach a suspect or go "hands on" with a suspect if he reasonably believed the suspect was armed.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 50: 8-25, 51: 1-10, 227: 15-25, 228: 1-6, 244: 1-8, 271: 1-6 | 380.  This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Karschamroon also testified that "it depends on the situation."<br><br>*Karschamroon Depo., 50:8-16* |
| 381.  Officer Karschamroon testified he knew two other officers were also responding but he | 381.  This is not a material fact creating a genuine issue precluding summary judgment. |

| | |
|---|---|
| did not feel he needed to wait for back-up because Andy had complied with all commands and could see Andy's hands.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 271: 1-6. | However, undisputed for the purposes of the present Motion. |
| 382.  Officer Karschamroon testified that telling Andy to interlock his fingers was the last "command" he or anyone ever gave to Andy.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 281: 9-25, 282. | 382.  This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Karschamroon testified that telling Andy to "relax" and "calm down" were orders as well, stating that the commands given were appropriate given the goal of relaxing Andy.<br>*Karschamroon Depo., 283:20-284:20, 299:20-22* |
| 383.  Officer Karschamroon testified that once he put a handcuff on Andy's right wrist his hands tensed.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 265: 13-18, 268: 9-10. | 383.  Disputed.  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's |

| | right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
|---|---|
| 384.  Officer Karschamroon testified he did not know whether Andy's fingets tensed in an effort to obey the last command given; to interlock his fingers.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 281: 9-25. | 384.  Disputed.  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |

| | |
|---|---|
| 385.  Officer Karschamroon testified that the entire encounter with Andy up until this point was between 20-45 seconds.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 177: 14-24. | 385.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 386.  Officer Karschamroon testified that never saw Andy's hands become non interlocked.<br><br>**Supporting Evidence:** Exhibit B: Deposition of Daniel Karschamroon, pp. 270: 10-11. | 386.  Disputed.  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 387.  This testimony is in sharp contrast to paragraph 15 of Officer Karschamroon's | 387.  This is not a material fact creating a genuine issue precluding summary judgment. |

| | |
|---|---|
| Declaration wherein he declares: "he essentially released his interlocking grip and closed his hands into fists."  In reality, Officer Karschamroon told Internal Addairs and testified repeatedly that he never saw Andy's hands ball into fists.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 290: 5-8, 291: 20-24, 292: 1-10; Karschamroon GGPD Internal Affairs Interview, pp. 7-8 | Plaintiffs are arguing semantics.  Officer Karschamroon stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 388.  Officer Karschamroon testified that he was aware Officer Gendreau told Internal Affairs that Andy's hands balled into fists and he was also present with Officer Gendreau testified he saw Andy's hands ball up into fists yet Officer Karschamroon repeatedly said he never saw Andy's hands balled into fists at any | 388.  This is not a material fact creating a genuine issue precluding summary judgment. Plaintiffs are arguing semantics.  Officer Karschamroon stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he |

| | |
|---|---|
| time.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp/ 292: 1-10. | "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close as if the fingers were curling."<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 389.  In truth, Officer Karschamroon told Internal Affairs during deposition testimony that Andy never actively resisted any command at anytime; Officer Karschamroon said and testified that at most he thought Andy may resist.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 364, 365: 9-13, 366: 1-3, 20-25; Karschamroon GGPD Internal Affairs Interview, pp. 6. | 389.  This is not a material fact creating a genuine issue precluding summary judgment. Plaintiffs are arguing semantics.  Officer Karschamroon testified that his statement to Internal Affairs regarding Andy's resistance included active resistance.<br><br>*Karschamroon Depo., 362:12-363:11, 365:4-18* |
| 390.  Mr Zimmerman also testified that while Officer Karschamroon was alone with Andy | 390  Disputed.  Nothing in Zimmerman's testimony disputes the officers' account of |

there was no evidence of any type of struggle and everything looked "routine" and under control.

**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 79: 11-20, 80: 10-16, 81: 4-5, 83:18-25, 85: 1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9, 103: 1-2, 197: 20-25, 198: 1-5, 209: 23-25, 276: 10-20.

Andy's resistance other than his own speculation.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle. *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-*

| | |
|---|---|
| | *11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 391.  Officer Karschamroon testified that when Andy's hands tensed up he told Andy to "relax" yet acknowledged that he did not know if this was relaxed for Andy and that he had never been trained that "relax" or "calm down" were lawful orders.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 338: 1-25, 339: 15-18, 345: 1-18. | 391.  Disputed.  Officer Karschamroon testified that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."   Officer Karschamroon testified that telling Andy to "relax" and "calm down" were orders as well, stating that the commands given were appropriate given the goal of relaxing Andy.  *Karschamroon Depo., 321:22-322:22, 280:12-23, 283:20-284:20, 299:20-22, 362:12-17, 366:14-19* |

| | |
|---|---|
| 392.  Officer Karschamroon testified he was trained that put your hands behind your back was a lawful order.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 339: 15-18. | 392.  This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 393.  However, Officer Karschamroon testified he never told Andy to separate his fingers, put his hands behind his back or inform Andy that he was going to be handcuffed.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 345: 1-18, 268: 19-23, 269: 1-4. | 393.  Disputed.  Officer Karschamroon testified that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Officer Karschamroon's also testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."   Further, it is immaterial that Officer Karschamroon may not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention. Officer Karschamroon's deposition testimony |

| | that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
|---|---|
| 394.  Officer Karschamroon could not explain why he did not tell Andy to un-interlock his fingers, or to hands behind back behind his back or theat he was going to handcuff Andy. **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 268: 19-23, 169: 1-4. | 394.  This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Karschamroon testified that telling Andy to "relax" and "calm down" were orders, stating that the commands given were appropriate given the goal of relaxing Andy. *Karschamroon Depo., 283:20-284:20, 299:20-22* |
| 395.  Mr. Zimmerman testified that it was right after Officer Karschamroon put his hands near Andy's hands on top of Andy's head when Officer Gendreau arrived. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 199; 2-6. | 395.  This is not a material fact creating a genuine issue precluding summary judgment. However, Zimmerman testified that Andy had his hands on top of his head for approximately 30 seconds before Officer Gendreau arrived. *Zimmerman Depo., 200:9-17* |
| 396.  Officer Karschamroon testified that he had | 396.   This is not a material fact creating a |

| | |
|---|---|
| never worked with Officer Gendreau personally and had never responded to a call Officer Gendreau was present at either before or after September 3, 2008.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 142: 3-25, 144: 1-5, 145: 1-25. | genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 397. Officer Karschamroon testified that Officer Gendreau positioned one to three feet away from Officer Karschamroon at all times.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 336: 17-19. | 397.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 398. Officer Karschamroon told Internal Affairs and testified repeatedly that he never saw Officer Gendreau ever touch Andy and he never asked Officer Gendreau to help him handcuff Andy.<br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 273:8-11,274,292: 17-23,293: 1,331:16-25,332: 18-21, 333: 7-11. | 398.   This is not a material fact creating a genuine issue precluding summary judgment. However, to the extent that Plaintiffs seek to imply that Officer Gendreau did not touch Andy or attempt to assist Officer Karschamroon, Mr. Zimmerman testified that Officer Gendreau assisted Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" |

| | in what appeared to him as an effort to "keep more control" of Andy.<br><br>*Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
|---|---|
| 399. Officer Gendreau testified that he became a sworn Garden Grove Police Officer on September 9, 2005.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 38:10 | 399.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 400. Similar to Officer Karschamroon, Officer Gendreau testified that before he became a police officer he had taken martial arts training for two and one half years and had obtained a brown belt in karate.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 27:21-25,28: 1-21,29: 1-25. | 400.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 401.  Officer Gendreau testified he knew he was responding to a 5150.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 119: 19-24. | 401.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| 402. Officer Gendreau told Internal Affairs that he was made aware of Andy's mental health history prior to arriving at the scene.<br><br>**Supporting Evidence:** Gendreau GGPD Internal Affairs Interview, pp. 18. | 402.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 403. Officer Gendreau testified the only training he received concerning the mentally was they could become violent<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 119: 19-24. | 403.   This is not a material fact creating a genuine issue precluding summary judgment. However, disputed to the extent that in the testimony cited by Plaintiffs, Officer Gendreau also included "deescalate the situation" and "keep them as calm as possible" as part of his training.<br><br>*Gendreau Depo., 119:19-24* |
| 404. Officer Gendreau was unable to articulate his training dealing with the mentally ill or the 4th Amendment to the United States Constitution, excessive force, the IVS unit, or the GGPD Taser policies.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 53:11-22, 112: 1-25, 119: 19-24, 160: 10-13,161: 1-3. | 404.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau did testify that he has been trained to use the minimum amount of force under the circumstances.<br><br>*Gendreau Depo., 123:22-1243* |

| | |
|---|---|
| 405. Regarding the IVS Unit, Officer Gendreau testified he knew the IVS Unit should, not must as GGPD General Order 5.31 states, be activated when a subject was being detained.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 81:4-9. | 405.   This is not a material fact creating a genuine issue precluding summary judgment. However, the General Orders are simply "guidelines," and the purpose of the In-Car Video System (IVS) is to provide an accurate, unbiased audiovisual record of enforcement related and non-criminal incidents that will enhance criminal prosecutions and limit civil liabilities.   The policy is non-punitive in nature, and no disciplinary action for violations of this policy will be proposed unless the employee refuses either actively or passively, as demonstrated by repeated instances of his/her failure.<br><br>*General Order 5.31, General Order, "Statement by the Chief of Police"* |
| 406. However, Officer Gendreau testified he did not attempt to activate his IVS Unit upon arrival notwithstanding he considered this a "high priority" call and he knew Andy was being detained. | 406.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau did attempt to activate his IVS when the officers were having difficulty with Andy and that a taser may need |

| | |
|---|---|
| **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 93:1-4, 94: 1-16, 95: 1-17, 107: 24-25, 108:1-3, 108: 5-14. | to be deployed.<br>*Gendreau Depo., 96:3-20* |
| 407. Officer Gendreau testified he arrived 20-30 seconds after Officer Karschamroon<br>**Supporting Evidence:** Deposition of Officer Gendreau, pp. 136: 8-14. | 407.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 408. Officer Gendreau testified when he arrived he saw an elderly couple and a small boy, Plaintiffs Bua Phan, Van Tran and Kenny Tran, near Andy's front door when he arrived.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 207: 5-11. | 408.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 409. Officer Gendreau declared in paragraph 8 of his Declaration that he witnessed Officer Karschamroon "clearly struggling" to get Andy's hands behind his back. However, Officer Gendreau never testified that he ever saw Officer Karschamroon struggling with Andy.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp.175: 1-25,176: 1-25,177: | 409.   Disputed.  Officer Gendreau testified that he saw Both of officer Karschamroon's hands engaged when he arrived on the scene, and that he was concerned that Andy was not compliant the very second he arrived.<br>*Gendreau Depo.,120:24-121:11,175:20-177:6* |

| 1-5. | |
|---|---|
| 410. Officer Gendreau testified Officer Karscamroon had a hold of both of Andy's arms and maintained control of Andy's hands.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 175: 1-25, 176: 1-25, 177: 1-5. | 410.   Disputed.  Officer Gendreau testified that Andy's hands were under "some" control, and that there was still the possibility that Andy could break free and swing his arms.<br><br>*Gendreau Depo., 176:23-177:6* |
| 411. Further, Officer Karschamroon testified he never struggled with Andy in the presence of Officer Gendreau.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 285: 11-13; Karschamroon GGPD Internal Affairs Interview, pp. 9. | 411.   This is not a material fact creating a genuine issue precluding summary judgment. However, to the extent that Plaintiffs seek to imply that Officer Gendreau did not touch Andy or attempt to assist Officer Karschamroon, Mr. Zimmerman testified that Officer Gendreau assisted Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.<br><br>*Zimmerman Depo., 92:19-25, 93:16-19, 209:7-22* |
| 412.  Karschamroonm, he saw no movements | 412.   This is not a material fact creating a |

| | |
|---|---|
| by Andy indicative that he was attempting to run or flee (inconsistent with paragraph 10 of Gendreau's Declaration) and saw no movements by Andy which led him to believe Andy was trying to hit, kick, or push he or Officer Karschamroon.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23,187: 1-8,220: 1-24,225: 17-24,266:1-10. | genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser him.<br><br>*Gendreau Depo., 178:5-16, 197:7-14, 220:21-24* |
| 413. Officer Gendreau testified that it did not appear Andy understood anything Officer Gendreau told him yet in paragraph 14 of Gendreau's Declaration he states Andy continued to ignore orders.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp.183: 2-23, 184: 2-7/18-22, 187: 1-8,302:18-25, 303: 9-12. | 413.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy showed no indication that he did not understand the directions given to him either.<br><br>*Gendreau Depo., 182:22-183:8* |

| | |
|---|---|
| 414. Officer Gendreau told Internal Affairs that he was made aware of Andy's mental health history prior to arriving at the scene.<br><br>**Supporting Evidence:** Gendreau GGPD Internal Affairs Interview, pp. 18. | 414.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 415. However, Officer Gendreau testified that he "did not feel it prudent to try and spend time trying to make sure he understood" prior to tasering Andy.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 299: 1-25. | 415.   Disputed.  Officer Gendreau did not feel it prudent to spend time trying to make sure that Andy understood the multiple warnings given that he would be tased based upon the fact Andy had not responded previously to commands and continued to display the same behavior<br><br>*Gendreau Depo., 299:9-24* |
| 416. Officer Gendreau testified that Andy was not "actively resisting" when he was tasered<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 264: 19-25) | 416.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser |

| | him. |
| | *Gendreau Depo., 178:5-16, 197:7-14, 220:21-24* |
| 417. Both Officers Karschamroon and   Gendreau testified Officer Gendreau was on scene between 30-60 seconds before Officer Gendreau tasered Andy.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 197: 1; Exhibit B, Deposition of Daniel Karschamroon, pp. 342: 23-25) | 417.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| 418. GGPD General Order 5.9 (GGPD Mental Illness & 515 0 Bookings) states in pertinent part: "When responding to a call that involves a person who is mentally ill, officers should obtain as much information as possible to assess and stabilize the scene";"Communication: It's better to spend 15 minutes talking than 5 minutes fighting";"Time is on your side ( a) slow down, (b) reassess" . <br><br>**Supporting Evidence:** Exhibit H, GGPD General Order 5.9. | 418.   This is not a material fact creating a genuine issue precluding summary judgment. However, the General Orders are simply "guidelines" for officers and do not impose an independent basis for a civil action. <br><br>*General Order, "Statement by the Chief of Police"* |
| 419. Officer Gendreau Declared in paragraph 1 7 that he stood in front of Andy and said things like put your hands behind your back. However, Officer Karschamroon, who was one to three feet away from Officer Gendreau, told Internal Affairs and testified that he only heard Officer Gendreau say things like "dude calm down" to Andy and never heard Officer Gendreau say get your hands behind your back. | 419.   This is not a material fact creating a genuine issue precluding summary judgment. The Plaintiffs are arguing semantics.  Plaintiffs do not dispute that the officers attempted to relax and calm Andy while attempting to secure him, but rather dispute the exact words spoken. This does not create a genuine issue of material fact precluding summary judgment.  Further, it is immaterial that Officer Karschamroon may |

| | |
|---|---|
| **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 328: 1-7,330: 17-25,337: 10-16,340: 8-9,341: 7-16. | not have said anything to Andy about being handcuffed since the act of attempting to handcuff him established the officer's intention. Officer Karschamroon's deposition testimony that Andy was not allowing his arms to be pulled apart and was providing tension to pull his arms together demonstrates resistance to that intention. *Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 420. Officer Gendreau also Declared in paragraph 10 that he heard Andy growling and saw Andy frothing at the mouth. Officer Karschamroon testified he was one foot from Andy and never heard him growl and never saw Andy drool or froth coming from Andy's mouth at anytime. **Supporting Evidence:** Declaration of Daniel Karschamroon, pp. 384: 18, 385:1-5. | 420.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Karschamroon testified that he was positioned behind Andy, and was not in a position to see Andy's face at the time he was tased.  As to the issue of Andy growling, Mark Zimmerman testified that although he never saw Andy's lips moving, he heard some audible things coming out of his mouth.  Zimmerman also testified that he could see subtle movement going on between the officers and Andy and |

| | that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see. *Karschamroon Depo., 348:9-15, 355:16-19, Zimmerman Depo., 217:3-9, 222:11-223:13, 276:22-25* |
|---|---|
| 421. Officer Gendreau testified that he stood in front of Andy for several seconds and then moved to Andy's side and placed both of his hands on Andy's left arm and Officer Karschamroon also had one of his hands on Andy's left arm. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 121: 21-25, 122: 1-2, 210: 5-6. | 421.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that the pain compliance technique he used prior to tasing Andy lasted approximately 5 to 10 seconds. *Gendreau Depo., 209:21-210: 6* |
| 422. Officer Gendreau testified that he and Officer Karschamroon then together tried to pull Andy's left arm behind his back but could not move Andy's arm at all. **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 121: 21-25,122: 1-2,210: | 422.    This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| 5-6). | |
| 423. Officer Karschamroon told Internal Affairs and testified repeatedly that he never saw Officer Gendreau touch Andy and he did not try to force Andy's arm behind his back either alone or with Officer Gendreau.<br><br>**Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon , pp.273: 8-11,274,292: 17-23,293: 1,331:16-25, 332: 18-21, 333: 7-11; Karschamroon GGPD Internal Affairs Interview, pp. 7-8. | 423.   Officer Karschamroon testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Nothing in Zimmerman's testimony disputes |

| | |
|---|---|
| | the officers' account of Andy's resistance other than his own speculation.<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 424. Mr. Zimmerman also testified that he never saw Officer Gendreau step to Andy's side and place two hands on Andy's arm and try to force Andy's arm behind his back.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp.100: 1-25, 102: 4-9 and: 20-24, pp. 150:20-25, 151: 9-11. | 424.   Disputed.  Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.<br><br>*Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9,* |

| | |
|---|---|
| | *222:11-223:13, 276:22-25, 287:25-288:12.* |
| 425. Mr. Zimmerman said he never saw any type of struggle of any kind involving Andy and Officers Karschamroon and Gendreau.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 79:11-20, 80: 10-16, 81: 4-5, 83: 18-25, 85:1-10, 87: 3-7/16-23, 97: 5-6, 100: 1-25, 102: 4-9,103: 1-2, 150: 20-25,151: 9-11, 197: 20-25, 198: 1-5,209: 23-25, 222: 17-25,224:6-12,276: 10-20,277:1-4,278: 18-21. | 425.   This is not a material fact creating a genuine issue precluding summary judgment. However, nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet could not |

| | |
|---|---|
| | tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle. *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 426. In fact, Mr. Zimmerman testified that Officer Karschamroon appeared to have everything under control and Officer Gendreau brought with him a "cowboy" attitude and appeared overzealous, impatient and instantly raised the "stress level" of what was happening. **Supporting Evidence:** Exhibit A, Deposition | 426.   This is not a material fact creating a genuine issue precluding summary judgment. However, Zimmerman bases his "cowboy" characterization of Officer Gendreau on "reading" his attitude, the fact he "shot" Andy for no apparent reason "in his opinion," that it's an "intuition thing" even though he "[has] no |

| | |
|---|---|
| of Mark Zimmerman, pp. 98:12-24, 104: 8-9, 119: 8-12/8-12, 120: 14-25, 121: 6-11, 122: 4-8, 276: 10-20, 282:18-25,283: 1-15,286: 5-9/13-14). | basis for it."  Further, nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.  Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the |

| | officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle. *Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 119:13-120:3, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:8-12, 276:22-25, 282:18-283:15, 287:25-288:12.* |
|---|---|
| 427. Officer Karschamroon and Mr. Zimmerman both testified that the only time Officer stepped to the side of Andy was when he tasered Andy. **Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 94:11-16, 104: 8-9, 105: 1-25, 118: 16-17, 232: 10-14, 276: 10-20; Exhibit B, Deposition of Daniel Karschamroon, pp. 333: 7-11,335: 9-20, 347: 16-18. | 427.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| 428. Mr. Zimmerman was very clear that Officer Gendreau did only two things: he first stood in front of Andy for approximately 20 seconds and then quickly stepped to Andy's side, withdrew a Taser and immediately shot the Taser into Andy's upper right thigh area.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 94:11-16,104: 8-107,118: 16-17,232:10-14,238: 8-16, 276: 10-20. | 428.   This is not a material fact creating a genuine issue precluding summary judgment. However, nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens. Zimmerman observed the incident from a distance of approximately 40-50 feet could not |

| | |
|---|---|
| | tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at all times, he cannot say whether there was any kind of struggle.<br><br>*Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 429. Officer Gendreau testified that once he decided to taser Andy he attempted to activate his IVS Unit by flipping a switch on his belt.<br>**Supporting Evidence:** Exhibit C,  Deposition of Richard Gendreau, pp. 96:1-16. | 429.   This is not a material fact creating a genuine issue precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 430. Officer Gendreau, contrary to paragraph 20 of his Declaration, said his IVS Unit did not activate but did not know why. | 430.   This is not a material fact creating a genuine issue precluding summary judgment.  However, Officer Gendreau's declaration stated |

| | |
|---|---|
| **Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 96:1-16. | that it was later determined that his vehicle was too far away for the systems to be remotely activated.<br>*Gendreau Decl., ¶ 20* |
| 431. Officer Gendreau never documented his IVS Unit's alleged failure to activate as was required by the GGPD General Orders 5.31.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 97- 98, 109: 20-23; Exhibit H, GGPD General Order 5.31. | 431.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 432. Both Officer Gendreau and Karschamroon testified they were trained on how to use a taser by then Sergeant Benedict Lux.<br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 151: 15; Exhibit B, Deposition of Daniel Karschamroon, pp. 136: 3-17. | 432.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 433. Mr. Lux testified that he had been a Taser instructor for the GGPD from 2002 until his retirement in 2010. | 433.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the |

| | |
|---|---|
| **Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 65: 1-9, 66: 1-3. | present Motion. |
| 434. Mr. Lux testified that during Taser training he would read verbatim GGPD General Order 2.24 and make sure each trainee understood the Order, he would show videos of taser deployments and conduct a powerpoint presentation of proper and improper taser deployments.<br><br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 151: 17-19, 153: 1, 199: 1-24. | 434.   This is not a material fact creating a genuine issue precluding summary judgment. However, undisputed for the purposes of the present Motion. |
| 435. Mr. Lux testified that taser should never be used against Non Combative Subjects as defined in GGPD General Order 2.6: Use of Physical Force.<br><br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 176: 15-22,177:7-20,179:5-12,204: 1-25,205:1-15,206:9-22,209: 1-25,210:8-18, 211: 9-11,21: 13-18. | 435.   This is not a material fact creating a genuine issue precluding summary judgment. However, per the Plaintiff's evidence, Mr. Lux did not testify that that either officer Karschamroon or Gendreau were, in his opinion, in violation of General Order 2.6. |
| 436.  436. GGPD General Order 2.6 defines Non Combative Subjects as: (1) An individual | 436.   This is not a material fact creating a genuine issue precluding summary judgment. |

| | |
|---|---|
| does not respond to an officer's requests or commands and may be argumentative, or (2) An individual's verbal or non-verbal actions indicate he is not complying with the officer's requests or demands, or (3) An individual is actively resisting handcuffing techniques, but is reasonably under control by the officer(s).<br>**Supporting Evidence:** Exhibit H, GGPD General Order 2.6. | However, it is undisputed that General Order 2.6 exists, and that it is only as a guideline for officers. |
| 437. Mr. Lux said an example of a Non Combative Subject would be someone who lies on their stomach with their hands beneath them in order to not be handcuffed<br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 178: 5- | 437.   This is not a material fact creating a genuine issue precluding summary judgment. However, per the Plaintiff's evidence, Mr. Lux did not testify that that either officer Karschamroon or Gendreau were, in his opinion, in violation of General Order 2.6. |

| | |
|---|---|
| 438. Mr. Lux testified that someone who may try to frustrate the handcuffing process but is not actively violent or assaultive would be a Non Combative Subject and should not be tasered.<br><br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 1 78: 5-14, 176: 15-22, 177: 7-20, 178: 5-14, 179: 5-12, 204: 1-25, 205: 1-15, 206: 9-22,209: 1-25, 210: 8-18, 211: 9-11,21:13-18. | 438.   This is not a material fact creating a genuine issue precluding summary judgment. However, per the Plaintiff's evidence, Mr. Lux did not testify that that either officer Karschamroon or Gendreau were, in his opinion, in violation of General Order 2.6. |
| 439. Mr. Lux testified that he trained that tasers should be used with extreme caution against suspects believed to be under the influence of Central Nervous System stimulants because those suspects can suffer immediate death from the tasering.<br><br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 252: 21-25, pp. 253: 1-3/5-12,254, 255: 1-5/12-15) | 439.   This is not a material fact creating a genuine issue precluding summary judgment. However, per the Plaintiff's evidence, Mr. Lux did not testify that the tasing of Andy was inappropriate, in his opinion. |
| 440. Mr. Lux testified that he trained pursuant to GGPD General Order 2.24 that before a taser | 440.   This is not a material fact creating a genuine issue precluding summary judgment. |

| | |
|---|---|
| is used a Supervisor must be summoned before the use of taser and paramedics should be called before a taser is used.<br><br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 249: 15-25,250:9-10,260: 13-25,262: 15-25, 263: 1-3; Exhibit H, GGPD General Order 2.24. | However, per the Plaintiff's evidence, Mr. Lux did not testify that the tasing of Andy was inappropriate, in his opinion. |
| 441. Lux testified it would take 1-3 seconds to call for a supervisor or paramedics. (Exhibit F, Deposition of Benedict Lux, pp. 264: 4-11) Garden Grove General Orders 2.6 and 2.24 mandate that whenever a taser is used the involved officers must write a report documenting their use of a taser.<br><br>**Supporting Evidence:** Exhibit H, GGPD General Order 2.24, 2.6 | 441.   This is not a material fact creating a genuine issue precluding summary judgment. However, the General Orders do not "mandate," but are provided as guidelines for the officers to follow.  Moreover, because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br><br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |

| | |
|---|---|
| 442. Mr. Lux testified that a Use of Force Memo addressed to the Chief of Police must be written by the Field Sergeant. Sergeant Wagner, following a taser deployment<br>**Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 81: 5-20, 82: 2-3/11-25, 83: 1-3,266: 12-18, 268: 7-18/19-25; Exhibit H, GGPD General Order 2.6, 2.24. | 442.   This is not a material fact creating a genuine issue precluding summary judgment. |
| 443. Officer Gendreau testified that he does not believe a taser application to be painful.<br>**Supporting Evidence:** Exhibit C,. Deposition of  Richard Gendreau, pp. 310: 16. | 443.   This is not a material fact creating a genuine issue precluding summary judgment. |
| 444. Officer Gendreau testified before he decided to Taser Andy he believed Andy was under the influence of a Central Nervous System stimulant and knew that tasering Andy could cause Andy to die immediately.<br>**Supporting Evidence:** Deposition of Officer Gendreau, pp. 327: 17-22, 328:1-14,20-25, 329: 1-18. | 444.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser him. |

| | *Gendreau Depo., 178:5-16, 197:7-14, 220:21-24* |
|---|---|
| 445. Officer Gendreau testified he was trained to exercise caution when tasering someone appearing to be under the influence of a Central Nervous System stimulant because tasering those subjects could cause their instant death.<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau p, pp. 327: 17-22,328: 1-14/20-25,329: 1-18. | 445.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser him.<br>*Gendreau Depo., 178:5-16, 197:7-14, 220:21-24* |
| 446. Officer Gendreau said when he took out his taser Andy was not being violent towards he or Officer Karschamroon and he did not believe Andy was attempting to assault anyone or to flee<br><br>**Supporting Evidence:** Exhibit C, Deposition of Richard Gendreau, pp. 174: 14-17; 176: 1-25, 177: 1-10, 182: 2-23,187: 1-8,220: 1-24,225: | 446.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser |

| | |
|---|---|
| 17-24,266:1-10. | him.  Officer Karschamroon  testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." *Gendreau Depo., 178:5-16, 197:7-14, 220:21-24, Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 447. Officer Karschamroon told Internal Affairs and testified that he personally never saw a reason to take out a weapon against Andy and he had no idea why Officer Gendreau was going to taser Andy and he made no efforts to determine why Officer Gendreau was going to taser Andy. | 447.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Officer Karschamroon testified that he did not feel it was necessary to take out any weapon only up to the point of placing the first handcuff on Andy's wrist. |

| | |
|---|---|
| **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 251: 17-25,252: 1-118,355: 21-24,357:3-18, 360: 1-6; Karschamroon GGPDInternal Affairs Interview, pp. 15. | *Karschamroon Depo., 251:21-252:6* |
| 448. Officer Karschamroon testified that because Andy would not "calm down" Officer Karschamroon told him "hey Danny I'm just going to tase him" to which Officer Karschamroon said "O.K." Supporting Evidence: Exhibit B, Deposition of Daniel Karschamroon, pp., pp. 333: 18-25, 335: 9-20. | 448.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser him.  Officer Karschamroon  testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing |

| | |
|---|---|
| | his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." *Gendreau Depo., 178:5-16, 197:7-14, 220:21-24, Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 449. Mr. Lux said as the first responding officer Officer Karschamroon should have tried to determine why Officer Gendreau was going to deploy a taser. **Supporting Evidence:** Exhibit F, Deposition of Benedict Lux, pp. 244: 14-25, 247: 21-25. | 449.   This is not a material fact creating a genuine issue precluding summary judgment. However, per the Plaintiff's evidence, Mr. Lux did not testify that Officer Karschamroon should have tried to determine why Officer Gendreau was going to deploy a taser in the situation they encountered. |
| 450. Officer Karschamroon testified the only thing Andy failed to do prior to being tasered was to "relax". **Supporting Evidence:** Exhibit B, Deposition of Daniel Karschamroon, pp. 282, 300: 1-2, 383: 10-16. | 450.   This is not a material fact creating a genuine issue precluding summary judgment. However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch. Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser |

| | |
|---|---|
| | him.  Officer Karschamroon  testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent." *Gendreau Depo., 178:5-16, 197:7-14, 220:21-24, Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19* |
| 451. Mr. Zimmerman testified he saw Officer Gendreau step to Andy's side, withdraw his Taser and immediately fire the Taser into Andy's right thigh.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 94:11-16, 104: 8-9, 107: 1-3/12-25, 118: 16-17;232: 10-14,238:8- | 451.   This is not a material fact creating a genuine issue precluding summary judgment. However, nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by |

| 16,276: 10-20. | putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy. Zimmerman testified that he could see subtle movement going on between the officers and Andy and that there could have been a "whole 'nother [sic] set of scenarios going on" that he did not see.   He could not hear what was being said, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet could not tell what small, detailed movements were occurring.  He does not know whether the officers tried to move Andy's hands from the top of his head, and admits that many things could have been said or done which he could not observe or hear.  While Zimmerman testified that Andy's hands were on his head at |

| | |
|---|---|
| | all times, he cannot say whether there was any kind of struggle<br><br>*Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
| 452. Mr. Zimmerman said he heard a loud "pop" and Andy fell forward "like a sack of potatoes" and landed face down on his stomach hitting the ground very hard hard.<br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 108: 1-11/18-24, 110: 1-13,240: 21-25, 242: 13-25,243: 11-16. | 452.   This is not a material fact creating a genuine issue precluding summary judgment. |
| 453. Mr. Zimmerman said because Andy's shirt was too small and tight part of Andy's stomach became exposed when he hit the ground<br>**Supporting Evidence**: Exhibit A, Deposition of Mark Zimmerman, pp. 111: 10-1 7, 244: 12-15. | 453.   This is not a material fact creating a genuine issue precluding summary judgment |
| 454. Both Mr. Zimmerman and Andy's mother, Ms. Bua Phan, both said Andy showed absolutely no signs of life when | 454.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of |

| | |
|---|---|
| he hit the ground and both believed he was dead when he hit the ground.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 110: 1-13/22-25, 111: 10-17/18-22,112:25; .Exhibit E, Deposition of Bua Thi han, pp. 243.1: 16-18. | Andy's actual resistance while being detained, and the totality of the circumstances confronting the officers during that detention.  Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring. Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence.<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 455. Mr. Zimmerman said he was very concerned because he saw no reason for Andy to be Tasered and that after he was Tasered he was clearly not moving or breathing. | 455.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of Andy's actual resistance while being detained, the totality of the circumstances confronting the |

| | |
|---|---|
| **Supporting Evidence**: Exhibit A, Deposition of Mark Zimmerman, pp. 110: 1-13/22-25, 111: 10-17/18-22, 112:25, 114: 9-25, 115: 12-17, 124: 1-12/17-25, 125: 1-19. | officers during that detention, and in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. Further, Officer Karschamroon testified that when a handcuff was placed on Andy's right wrist, Andy "tensed" and Officer Karschamroon "could feel his fingers closing, kind of curling up from that interlocked position" and "close up as if the fingers were curling."  Officer Karschamroon also stated in his deposition that Andy was "actively resisting" by not allowing his arms to be pulled apart and providing tension to pull his arms together, and that he "thought it might turn violent."   Nothing in Plaintiffs' cited testimony disputes that Andy continued to resist after Gendreau arrived. Further, Mark Zimmerman testified that Officer Gendreau did assist Officer Karschamroon by putting "his hands on Andy's hands or on the other officer's hands or in that vicinity" for |

|  | "about 20 seconds" in what appeared to him as an effort to "keep more control" of Andy.  This is not a material fact creating a genuine issue precluding summary judgment.  However, Officer Gendreau testified that Andy's aggressive appearance resembled individuals who are prone to throwing a punch.  Gendreau also testified that Andy resisted his attempts to get his hands behind his back, and that the only way of subduing Andy was to taser him.  Nothing in Zimmerman's testimony disputes the officers' account of Andy's resistance other than his own speculation.<br><br>*Karschamroon Depo., 321:22-322:22, 280:12-23, 362:12-17, 366:14-19, Gendreau Depo., 178:5-16, 197:7-14, 220:21-24, Zimmerman Depo., 22:3-7, 82:11-18, 92:19-25, 93:16-19, 96:2-10, 100:7-20, 162:11-19, 187:3-11, 200:11-24, 201:6-12, 209:7-22, 217:3-9, 222:11-223:13, 276:22-25, 287:25-288:12.* |
|---|---|

| | |
|---|---|
| 456. Mr. Zimmerman testified that the three officers stood around doing nothing to help Andy and appeared to become increasingly concerned with the Andy was not moving.<br><br>**Supporting Evidence:** Exhibit A, Deposition of Mark Zimmerman, pp. 123: 15-25, 246: 7-19. | 456.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned.  In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 457. Mr. Zimmerman testified that Officer Gendreau leaned over Andy and slapped him | 457.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding |

| | |
|---|---|
| several times of the face saying words to the effect for Andy to "stop faking." <br><br> Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman 121: 6-11/15-24. | summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned.  In any event, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. <br><br> *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 458. Officer Karschamroon testified that Officer Gendreau leaned down and opened up Andy's closed eyes and at that time Officer Karschamroon testified he could not tell if Andy | 458.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department |

| | |
|---|---|
| was breathing.<br><br>Supporting Evidence: Exhibit B, Deposition of Daniel Karschamroon, pp. 397: 7-8. | Paramedics were promptly summoned. However, in the testimony cited by Plaintiff's Officer Karschamroon testified he "could not recall" whether Andy was breathing when Gendreau open his eyelids.<br><br>*Karschamroon Depo., 397:7-8* |
| 459. Mr. Zimmerman testified that Officers Karschamroon, Gendreau and EI-Farra all remained outside near Andy until the paramedics arrived; this is contrary to Officers Karschamroon and Gendreau's Declarations that they went inside Andy's house and came out "surprised" to learn that Andy was in full cardiac arrest.<br><br>Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 251: 4, 264: 18-25, 265: 5-14/18-25, 267: 6-8. | 459.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, Zimmerman "thinks" Officers Karschamroon and Gendreau remained with Andy until the paramedics arrived but concedes he lost track of them.<br><br>Zimmerman Depo., 264:18-23, 267:12-14, 307:21-25 |

| | |
|---|---|
| 460. Mr. Zimmerman testified he saw the police roll Andy's lifeless body into a seated position leaning against an officers legs and he could clearly see Andy's chest and stomach Andy and could see Andy was neither moving nor breathing.<br><br>Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp. 110: 1-13/22-25, 111: 10-17/18-22, 112:25, 114: 9-25, 115: 12-17, 124: 1-12/17-25, 125: 1-19. | 460.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, Zimmerman has had no medical training.  Although his eyesight is admittedly impaired, he never wears his prescription contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence<br><br>*Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 461. Officer Gendreau declared in paragraph 26 that he contacted dispatch in order for a supervisor and medics to arrive "pursuant to GPD | 461.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of |

| | |
|---|---|
| policy and my training". However, the supervisor, Sergeant Wagner wrote he was not requested until 11 :46, 8 minutes or more minutes post tasering.<br>Supporting Evidence: Exhibit C, Deposition of Richard Gendreau, pp. 280: 8-13; Exhibit K, Sergeant Wagner's police report. | the undisputed fact that GG Fire Department Paramedics were promptly summoned.  Further, the Plaintiffs do not dispute that Officer Gendreau called a supervisor. |
| 462. Further, paramedics were not dispatched until 11 :39:48 and arrived at Andy's house at 11 :44.<br>Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.90: 13-16,282:7-15,283:4-16/21-23. | 462.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, undisputed for the purposes of the present Motion. |
| 463. When paramedics arrived Andy was in full cardiac arrest; meaning he had no heart beat and was not breathing.<br>Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.90: *13-16,282:7-15,283:4-16/21-* | 463.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, undisputed for the purposes of the |

| 23. | present Motion. |
|---|---|
| 464. The first responding paramedic immediately ordered the handcuffs on ndy to be removed.<br><br>Supporting Evidence: Exhibit A, Deposition of Mark Zimmerman, pp.136: 2-6, 139: 22-25 | 464.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, undisputed for the purposes of the present Motion. |
| 465. GGPD General Order 2.6 and 2.24 required Officers Karschamroon and Gendreau to either (1) write a report about the use of force that resulted in an in-custody death or (2) provide a statement to Orange County District Attorney (hereinafter "OCDA") Investigators.<br>Supporting Evidence: Exhibit H, GGPD General Order 2.6, 2.24. | 465.   This is not a material fact creating a genuine issue precluding summary judgment. However, the General Orders do not "mandate," but are provided as guidelines for the officers to follow.  Moreover, because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 466. Both Officer Karschamroon and | 466.   Plaintiff's evidence does not constitute a |

| | |
|---|---|
| Gendreau stated they did not write reports about the incident and refused to provide an interview to investigators from the OCDA's Office. Supporting Evidence: Exhibit B, Deposition of Daniel Karschamroon, pp. 210: 21-24,212: 19-25; Exhibit C, Deposition of Richard Gendreau, pp. 316: 1-10,317: 1. | genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 467. Officer Gendreau testified that after he refused to be interviewed by investigators from the OCDA's Office he spoke with then Sergeant and now Lieutenant Ted Peaslee. Supporting Evidence: Exhibit C, Deposition of Richard Gendreau, pp. 323: 3-6 | 467.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 468. Lieutenant Peaslee had been assigned to the Crimes Against Persons Unit of the GGPD on September 3, 2008. Supporting Evidence: Exhibit C, Deposition of Richard Gendreau, pp. 320: 14-16. | 468.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 469. Lieutenant Peaslee testified that Sergeant Wagner who was the Field Supervisor at the | 469.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding |

| | |
|---|---|
| scene called him and told him a subject had been tasered, the subject was in full cardiac arrest, the subject was on his way to the hospital and not expected to live and he wanted someone from the Crimes against Persons Unit to respond to the location.<br>Supporting Evidence: Exhibit G, Deposition of Ted Peaslee, pp. 16: 6-8, 43: 20-25, 44: 1-5. | summary judgment.  However, because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 470. Lieutenant Peaslee testified that he instructed Officer Gendreau to not write a report about his taser use and allegedly did not inquire whether Officer Gendreau had already refused to be interviewed by the OCDA's Office. "<br>Supporting Evidence: Exhibit G, Deposition of Ted Peaslee, pp. 90: 8-17. | 470.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 471. Officer Karschamroon also stated Lieutenant Peaslee also instructed him to not write a report about the force used against | 471.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  Because the incident |

| | |
|---|---|
| Andy.<br><br>Supporting Evidence: Exhibit L, Daniel Karschamroon's Response to Request for Admissions, number 39. | investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br><br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 472. GGPD General Orders 2.6 and 2.24 require a Use of Force Memo to be written by a Field Supervisor to the Chief of Police after a taser deployment and a use of force resulting in a death.<br>Supporting Evidence: Exhibit H, GGPD General Order 2.6, 2.24. | 472.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  Because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br><br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 473. Sergeant Wagner was the Field Supervisor who responded to the scene following the tasering of Andy.<br>Supporting Evidence: Exhibit G, Deposition of | 473.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| Ted Peaslee, pp. 16: 5-10. | |
| 474. However, Sergeant Wagner never wrote a Use of Force Memo addressed to the Chief of Police as required by GGPD General Order 2.6 and 2.24.<br>Supporting Evidence: Exhibit F, Deposition of Benedict Lux, pp. 82: 2-3/11-25. | 474.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  Because the incident investigation was being conducted by the Orange County District Attorney's Office, no officer use of force report was implicated by the General Orders.<br>*Peaslee Depo., 9:14-19, 55:22-56:11, 58:12-20, 61:3-25, General Orders, "Statement by the Chief of Police"* |
| 475. Sergeant Wagner did take statements from Officers Gendreau and Karschamroon when the paramedics were still present at the scene and Sergeant Wagner told Leutenant Peaslee hen he arrived on scene what the officers had said.<br>Supporting'Eviden'ce: Exhibit G, Deposition of Ted Peaslee, pp. 221-222:1-25. | 475.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 476. Leutenant Peaslee told Sergeant Wagner to write a report about what the officers told him | 476.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding |

| | |
|---|---|
| and he reviewed the report later and found no difference from what Sergeant Wagner told him at the scene.<br><br>Supporting Evidence: Exhibit G, Deposition of Ted Peaslee, pp. 212: 20-15,221-222: 11-1. | summary judgment.  However, undisputed for the purposes of the present Motion. |
| 477. Sergeant Wagner's report is devoid of any statements by Officer Gendreau and/or Karschamroon about Officer Gendreau ever touching Andy at any time and there are no statements concerning Officers Gendreau and/or Karschamroon struggling to get Andy's hand behind his back<br><br>Supporting Evidence: Exhibit K, Sergeant Wagner's police report. | 477.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 478. Sergeant Wagner ultimately sent Officer Gendreau to the following the paramedics to the hospital and Officer Gendreau's IVS Unit was functioning at that point because Officer Gendreau's IVS Unit recorded his trip to the hospital.<br><br>Supporting Evidence: Sergeant Wagner | 478.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| police report. Defense Exhibit 1, CD Copy of Officer Gendreau's IVS Unit attached. | |
| 479. On September 4, 2008, Orange County Forensic Pathologist Dr. Richard Fukumoto performed an autopsy on the body of Andy Tran. Supporting Evidence: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 30: 15-25. | 479.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 480. Dr. Fukumoto has been a Forensic Pathologist since 1965 and haspersonally performed more than 15,000 autopsies. Supporting Evidence: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp.17:4-14,26:9-16. | 480.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 481. Dr. Fukumoto has performed numerous autopsies involving police involved in-custody deaths including deaths following taserings. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 58: 3-6/23-25, 59: 5-15, 60: 11-15, 61: 1,215:15-20, 216: 15-18. | 481.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto has only been involved in only two cases where deaths were related to tasering. *Fukumoto Depo., 216:10-18* |

| | |
|---|---|
| 482. Dr. Fukumoto has done extensive research on the effects oftasering on the human body prior to the time of Andy Tran's autopsy. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.304: 1-3/16-18,305: 8-25,306: 1-2/10-14,307: 1-8/22-25,308: 5-7,309:1-5/18-22. | 482.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 483. In preparation for his deposition testimony Dr. Fukumoto fully reviewed all relevant files including the deposition transcript of Officer Karschamroon.<br>Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 141: 5-25, 142: 6-7, 143: 2-3. | 483.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 484. Dr. Fukumoto, who has been deemed an expert in interpreting blood toxicology results, testified that Andy blood results showed no presence of alcohol or controlled substances but it did show the presence of several psychiatric medications which were within thereuputic levels and also showed the presence of | 484.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |

| | |
|---|---|
| diphenhydramine (Benedryl). Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.228: 13-25,229:20-25,239: 10-14:19-25,240: 1-25,243: 1-25,245: 17-18:19-25, 347: 1-4. | |
| 485. Dr. Fukumoto testified that no drug found in Andy's system was the cause of his death. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.97:6-19,228: 13-25,229:20-25, 239: 10-14: 19-25, 240: 1-25, 243: 1-25, 245: 17-18: 19-25,347: 1-4. | 485.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion. |
| 486. Dr. Fukumoto described this case as not very complicated based upon the extensive records he reviewed and compare with other cases. Supporting Evidence: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp.161:9-24. | 486.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, undisputed for the purposes of the present Motion |

| | |
|---|---|
| 487. Dr. Fukumoto testified that based on the observations of Officer Karschamroon prior to the tasering event their is no indication Andy was suffering from cardiac symptoms prior to the time he was tasered.<br><br>Supporting Evidence: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp. 260: 1-10,317: 5-25,318: 11-16, 370: 1-8,370:20-25,372:3-12. | 487.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto stated Andy already had a bad heart and liver and he has no way of knowing when Andy died.  *Fukumoto Depo., 187:19-188:5, 206:23 - 207:11, 258:7-259:25* |
| 488. Dr. Fukumoto did find Andy had an enlarged heart which placed him at a greater risk of a cardiac event but determined Andy did not die from an enlarged heart but rather the circumstances he encountered during his contact with the police which overloaded it, i.e. the tasering.<br><br>Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.63: 1-8,66: 18-22,67:4-5,98:5- 10/20-22,296: 1-7,311: 22-23,355: 2-9, 367: 19-25, 368: 1-2. | 488.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto testified that a relatively healthy person being tased by a single discharge of taser for 5 seconds would not have caused death, and that Andy's enlarged heart was a factor in his death. *Fukumoto Depo., 207:12 – 209:16* |

| | |
|---|---|
| 489. Dr. Fukumoto testified that people with similarly enlarged hearts can live long lives. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 96: 8-1l. | 489.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto testified that he believes Andy would have had a less than normal life span due to his enlarged heart and liver disease. *Fukumoto Depo., 346:3-12* |
| 490. Dr. Fukumoto ultimately testified that in his opinion Andy died as a result of his struggle with law enforcement which was limited to the tasering event. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.63: 1-8,66: 18-22,67:4-5,260: 1- 10,296: 1-7,311: 22-23, 355: 2-9. | 490.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto testified that a relatively healthy person being tased by a single discharge of taser for 5 seconds would not have caused death, and that Andy's enlarged heart was a factor in his death. *Fukumoto Depo., 207:12 – 209:16* |

| | |
|---|---|
| 491. Dr. Fukumoto testified that the records from the paramedics reasonably show that Andy died almost immediately after the tasering event because the tasering happened around 11 :38 a.m., paramedics vy~re  dispatched at 11 :39:38, the paramedics arrived around 11 :43 a.m. and when they arrived Andy was in full cardiac arrest and his eyes were fixed and dilated.<br><br>Supporting Evidence: Exhibit 0, Deposition of Richard Fukumoto, M.D., pp.90: 13-16,282: 7-15,283:4-16/21-23. | 491.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment.  However, Dr. Fukumoto testified that a relatively healthy person being tased by a single discharge of taser for 5 seconds would not have caused death, and that Andy's enlarged heart was a factor in his death. Dr. Fukumoto also testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death.<br><br>*Fukumoto Depo.,  187:19-188:5, 206:23 - 209:16, 258:7-259:25* |
| 492. Dr. Fukumoto explained that once a person goes into full cardiac arrest the brain can continue to function for six to eight minutes and the fact that Andy's eyes were fixed and dilated is an indication that brain activity has totally ceased indicated Andy went into full cardiac arrest immediately following the tasering; which is consistent with the observations of Mr. | 492.  Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, Zimmerman has had no medical training, and although his eyesight is admittedly impaired, he never wears his prescription |

| | |
|---|---|
| Zimmerman, Ms. Phan. Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp.90: 13-16,258: 16-19"pp.280: 19-25,281: 10-25,282: 7-15,283: 4-16/21-23; Exhibit A, Deposition of Mark Zimmerman, pp. 110: 1-13/22-25, 111: 10-17/18-22, 112: 25, 114: 9-25, 115:12-17, 124: *1-12/17-25,* 125: 1-19; Exhibit E, Deposition of Bua Thi Phan, pp. 256.1: 2-5. | contact lens.  Zimmerman observed the incident from a distance of approximately 40-50 feet and could not tell what small, detailed movements were occurring.  Zimmerman testified that it was possible that Andy was breathing after being tased and that he just did not observe it, and that his belief that Andy was dead is not based on any actual evidence. *Zimmerman Depo., 22:3-7, 162:11-19, 180:20-21; 201:6-12, 293:23-294:12* |
| 493. Dr. Fukumoto also testified that if the police did see Andy was suffering from labored breathing, breathing rapidly and/or breathing heavily these would have been a clear indications Andy was suffering cardiac distress (cardiac arrhythmia) which would have been further exacerbated by Andy's hands being handcuffed behind his back based upon Andy's body size and the handcuffs would have limited his ability to breath fully. | 493.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, Dr. Fukumoto testified that recognizing symptoms is an important aspect and that "cops" are not doctors. *Fukumoto Depo., 253:13-255:5* |

| | |
|---|---|
| Supporting Evidence: Exhibit D, Deposition of Richard Fukumoto, M.D., pp. 63: 1-8, 66: 18-22, 67: 4-5, 90: 13- 16/21-23, 260: 1-10,283: 4-16,296: 1-7, 311:22-23,317:5-25,318: 11-16,355:2-9,367: 19-25,368: 1-2,370: 1-8,370: 20-25, 372: 3-12, 282: 7-15. | |
| | 494.   Plaintiff's evidence does not constitute a genuine issue of material fact precluding summary judgment; it is immaterial in light of the undisputed fact that GG Fire Department Paramedics were promptly summoned. However, Dr. Fukumoto testified that a relatively healthy person being tased by a single discharge of taser for 5 seconds would not have caused death, and that Andy's enlarged heart was a factor in his death.  Dr. Fukumoto also testified that he has no way of knowing when Andy died and that he relies on the physician's death pronouncement as to the time of death. *Fukumoto Depo.,  187:19-188:5, 206:23 -* |

| | |
|---|---|
| | *209:16, 258:7-259:25* |