O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUYEN KIM DANG, individually and as a guardian ad litem for Kenny Minh Cao Tran, a minor, and personal representative of Andy Tran, deceased, et. al.,<br><br>Plaintiff(s),<br><br>v.<br><br>CITY OF GARDEN GROVE, et. al.,<br><br>Defendant(s).<br>_____ | CASE NO. SACV 10-00338 DOC (MLGx)<br><br>**O R D E R GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Before the Court is a Motion for Summary Judgment filed by Defendants the City of Garden Grove et. al. in the above-captioned case ("Motion for Summary Judgment") (Docket 19). After considering the moving, opposing and replying papers, as well as oral argument, the Court GRANTS in part and DENIES in part the Motion for Summary Judgment.

**I.  BACKGROUND**

At approximately 11:30 a.m. on September 3, 2008, defendant police officers Daniel Karschamroon ("Karschamroon") and Richard Gendreau ("Gendreau"), were dispatched, separately, to 13253 Barnett Way in Garden Grove, California, as a result of several 911 calls

placed by Mr. Nam Tran ("Nam"), the father of the now-deceased Andy Tran ("Andy" or "Decedent"). In his 911 calls, Nam frantically requested assistance with his son, Andy, who was acting "crazy" and who needed to be taken to the hospital. Transcript of 911 Call, Exh. 2 to Decl. of S. Sherman ("911 Call") at 1, 5. Although a language barrier prevented the clear communication of further details, *see e.g.* 911 Call at 4 (caller stating, "I don't understand English well . . ."), Nam intimated that Andy had hit his mother and may have indicated that Andy possessed a weapon. 911 Call at 1. The dispatch report lists the call as a "5150," which is police jargon for a report made under California Welfare and Institutions Code § 5150 regarding a disabled individual who may be posing a danger to himself or others. Dispatch Log, Exh. 1 to Decl. of R. Gendreau ("Dispatch Log"). The dispatch notes also mention a "243," which is police code for an assault and battery. *Id.* Both Karschamroon and Gendreau testified at their depositions that they knew that they were responding to a 5150 call. Deposition of D. Karschamroon ("Karshamroon Decl.") at 225; Deposition of R. Gendreau ("Gendreau Decl.") at 112.

One of Andy's neighbors, Mark Zimmerman ("Zimmerman") observed at least part of the events surrounding Nam's 911 call. Specifically, as Zimmerman drove up to his house at approximately 11:30 a.m. on September 3, 2008, Zimmerman saw Andy sitting on the front curb outside of his house. Deposition of M. Zimmerman ("Zimmerman Depo.") at 29. Zimmerman proceeded to watch Andy rise from the curb, move to a grassy section of his lawn and collapse onto his knees emitting a moan or cry. *Id*. at 29-32. Zimmerman further saw Andy get up, walk to his front door and remove the screen on the window near the door. *Id.* at 38. At this point, Zimmerman states that he crossed the street towards Andy, shouting at Andy to stop his behavior. *Id.* at 39. According to Zimmerman, Andy was wearing a tight fitting t-shirt and work-out shorts; it was clear to Zimmerman from the way Andy was dressed that Andy did not have any weapons on him. *Id.* at 40-42. Zimmerman further testified at his deposition that, in his many years as Andy's neighbor, he had suspected that Andy suffered from mental illness but had never felt threatened by Andy or seen him act violently. *Id.* at 33-36.

As Zimmerman began to cross the street towards Andy's house, Officer Karschamroon

arrived and proceeded to yell commands at Andy. *Id.* at 51-52. Zimmerman testified that as soon as Andy noticed the officer, Andy "came to himself," *id.* at 51, immediately stopped acting aggressively and began to "pay[] attention to what was going on around him." *Id.* at 52. Karschamroon stated at his deposition that, upon arriving at the scene, he could see that Andy did not have any weapons in his hands. Karschamroon Depo. at 244. Karschamroon testified that he ordered Andy to walk towards him and that Andy complied. *Id.* at 247. When Andy reached a point approximately ten to fifteen feet away from the officer, Karschamroon told Andy to stop walking, which Andy did. *Id.* at 244. Karschamroon then ordered Andy to turn around, to place his hands on his head and to interlock his fingers. *Id.* Andy once again complied with all of Karschamroon's commands. *Id.* Karschamroon testified that, throughout this interaction, Andy appeared "confused," *id.* at 256, and in need of medical help. *Id.* at 279.

Once Andy had his fingers interlocked on top of his head, Karschamroon approached Andy from behind and began to handcuff him. *Id.* at 266. Karschamroon testified that, at the moment he approached Andy, he knew that backup officers were on their way to the scene, but that he did not feel the need to wait for the other officers because Andy had complied with all of his directives. *Id.* at 271. Karschamroon also had not seen Andy make any motions suggesting that he would attack the officer. *Id.* at 261. As he approached Andy, Karschamroon grabbed both of Andy's wrists and placed a cuff around Andy's right hand. Decl. of D. Karschamroon ("Karschamroon Decl."), ¶¶ 14-15. Karschamroon states that, at this moment, he felt Andy's hands become tense.[1] Karschamroon Depo. at 266. As a result of the rigidity in Andy's hands, Karschamroon reports that he had trouble fitting the other handcuff around Andy's left wrist. Karschamroon Decl. at 15. Karschamroon reports asking Andy to relax but acknowledges that he never specifically instructed Andy to separate his fingers in order to facilitate the placement

---

[1] In his Declaration, Karschamroon states that Andy's hands balled into fists. Karschamroon Decl., ¶ 15. This assertion, however, contradicts statements Karschamroon made at his deposition, where Karschamroon said that he could not recall if Andy ever clenched his hands into fists and acknowledged that he never told Internal Affairs that Andy had done so when interviewed approximately three weeks after the event. Karschamroon Depo. at 290.

of handcuffs. Karschamroon Depo. at 284.

Karschamroon had been attempting to place the left handcuff around Andy's wrist for between five to fifteen seconds when Officer Gendreau arrived. *Id*. at 266. Gendreau claims that, upon arriving at the scene, he approached Andy and grabbed his left wrist,[2] Gendreau Depo. at 121, giving the officers, in Gendreau's words, "some control" over Andy's hands. *Id*. at 177. Gendreau did not see Andy make any movements suggesting that he was about to attack either of the officers or that he was about to attempt to flee. *Id.* at 177, 182, 220. Karschamroon also had not given Gendreau any indication that anything like that had occurred prior to Gendreau's arrival. *Id.*

Despite Andy's lack of aggressive behavior, after struggling to fit Andy's wrists into handcuffs for, in Gendreau's estimation, approximately five to ten seconds, the officers made the decision to taser Andy. *Id.* at 210. The amount of conversation that took place between the officers before deploying the Taser is in dispute. Gendreau claims that he warned Andy before tasing him. Gendreau Decl., ¶ 22. Gendreau's account is contradicted by Zimmerman's, however, who testified that Gendreau took out his Taser immediately upon approaching Andy and that Andy did not see the Taser prior to the time that it was activated against his body. Zimmerman Depo. at 105-07. Gendreau applied the Taser to Andy's leg. *Id.* at 220. According to Andy's mother, Bua Phan Tran, who observed the events from her front door, upon application of the taser to Andy's leg, Andy instantaneously turned "purple" and fell to the floor, completely motionless. Deposition of Bua Phan Tran ("Bua Phan Depo.") at 85. Zimmerman concurs with Andy's mother's description, testifying at his deposition that Andy dropped swiftly to the floor as soon as the Taser was deployed. Zimmerman Depo. at 108. The officers called for paramedics, but Andy was beyond medical help by the time the paramedics arrived. Andy died shortly thereafter.

Autopsy reports from Plaintiff's experts showed that the cause of death was cardiac arrest

---

[2] By contrast, Karschamroon, at his deposition, could not recall if Gendreau attempted to assist him in handcuffing Andy before deploying the taser. Karschamroon Depo. at 292.

4

caused by the application of the Taser. Before using the Taser on Andy, Gendreau testified that he believed Andy to be under the influence of a "controlled substance, particularly a stimulant." Gendreau Decl. at 327. Gendreau also testified that, as a result of his training, he understood that people under the influence of a nervous system stimulant face a higher risk of sudden death due to the excited delirium caused by the application of a Taser. *Id.* at 328. Benedict Lux, a former Taser instructor at the Garden Grove Police Department from 2002 to 2010, corroborated Gendreau's account of what Gendreau would have learned in training: Lux testified at his deposition that he warned all officers that Tasers should be used only with extreme caution against suspects who appear to be under the influence of a nervous system stimulant, because these suspects "have elevated pulses [and] elevated blood pressure," rendering them particularly vulnerable to heart attacks. Deposition of B. Lux ("Lux Depo.") at 252-55.

As a result of the above-described events, Plaintiffs – a group consisting of Quyen Kim Dang, individually and as gaurdian ad litem for Kenny Minh Cao Tran, a minor, and personal representative of Andy Tran, deceased; Kenny Minh Cao Tran, a minor, by and through his guardian ad litem, Quyen Kim Dang; Nam Van Tran, biological father of Andy Tran, deceased; and Bua Thi Phan, biological mother of Andy Tran, deceased (collectively, "Plaintiffs") – bring suit against Defendants the City of Garden Grove ("City"), Garden Grove Chief of Police Joseph M. Polisar ("Polisar"), Officer Gendreau, and Officer Karschamroon (collectively, "Defendants").[3] Plaintiffs assert three causes of action under 42 U.S.C. § 1983; a claim for violation of the Bane Act, Cal. Civ. Code § 52.1; a cause of action for assault and battery; a cause of action for negligence; and claims for negligent and intentional infliction of emotional distress. With the instant Motion, Defendants request that the Court enter summary judgment in their favor on each of Plaintiff's claims.

## II.     LEGAL STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on

---

[3] Plaintiffs initially named Taser International, Inc. ("Taser Inc.") as an additional defendant, but the causes of action against Taser Inc. were voluntarily dismissed on June 18, 2010.

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). When the non-moving party bears the burden of proving the claim or defense at trial, the moving party can meet its burden for summary judgment by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

**III.    DISCUSSION**

Defendants move for summary judgment on each of Plaintiffs' claims. The Court analyzes each cause of action in turn.

    **a.    Excessive Force – 42 U.S.C. § 1983**.

        **i.    Constitutional Violation**

            **1.    *Fourth Amendment***

Plaintiffs' first two causes of action under Section 1983 invoke the Fourth Amendment's ban on the use of excessive force by a police officer. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. When a plaintiff claims that she was not "secure in [her] person" because law enforcement officers used excessive and, therefore, "unreasonable" force in the course of an arrest, the body reviewing the case must determine whether the level of force employed was objectively unreasonable by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at

stake.'" *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir.2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This inquiry typically proceeds in three steps. *Mattos v. Agarano*, 590 F.3d 1082, 1086 (9th Cir. 2010). "First, [the relevant body] assess[es] the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller*, 340 F.3d at 965. Second, one must analyze "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *id*., as well as other factors such as "the availability of alternative methods of capturing or subduing a suspect." *Smith* v. *City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Finally, we weigh the gravity of the intrusion against the government's interest. *Miller*, 340 F.3d at 964.

### A. Gravity of the Intrusion

In this case, genuine issues of material fact exist regarding whether the officers' use of force was objectively reasonable. A reasonable jury certainly could find that the application of the Taser on Andy's leg constituted a substantial invasion of the young man's rights under the Fourth Amendment. The Ninth Circuit has described Tasers as capable of delivering an "impact . . .as powerful as it is swift." *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). The electrical current charged into a person's skin through the use of a Taser "instantly overrides the victim's central nervous system, paralyzing muscles throughout the body, rendering the target limp and helpless." *Id.* Accordingly, the Ninth Circuit – joining other circuits around the country – has held that the use of a Taser, although generally non-lethal, constitutes a "significant level of force."[4] *Id.* at 826. In fact, because of the "physiological effects, the high levels of pain, and foreseeable risk of physical injury," that Tasers cause, the Ninth Circuit has concluded that the use of a Taser often entails a "greater intrusion" on a victim's constitutional

---

[4]The Ninth Circuit noted in *Bryan* that "like any generally non-lethal force, the taser is capable of being employed in a manner to cause the victim's death." *Bryan*, 630 F.3d at 825 n.7. The tragic circumstances of this case illustrate the verity of that warning.

7

rights than most other methods of generally non-lethal force.[5] *Id.* at 825. *See also Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010) ("[W]e have no difficulty concluding that the Taser stun was a serious intrusion into the core of the interests protected by the Fourth Amendment."). And this is the case even when a tasering victim otherwise appears healthy. In this case, Andy appeared – at least to Officer Gendreau – to be under the influence of a central nervous system stimulant that subjected him to increased risk of cardiac arrest upon application of a Taser. Andy's perceptible vulnerability to the impact of the Taser makes the officers' decision to tase Andy even more problematic. In light of these facts, a reasonable jury undoubtedly could conclude that the intrusion onto Andy's constitutional rights was significant. This factor weighs heavily against the entrance of summary judgment in Defendants' favor.

### B. Government's Interest

Under *Graham*, courts evaluate the government's interest in the use of force by examining three core factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. "These factors, however, are not exclusive. Rather, [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."

---

[5] Ninth Circuit law distinguishes between Tasers deployed in "dart" mode and Tasers deployed in "stun" mode, describing the former exercise of force as substantially more severe than the latter. *See Brooks v. City of Seattle*, 599 F.3d 1018, 1027-28 (9th Cir. 2010). Here, neither party cites to specific evidence regarding the "mode" of the Taser used on Andy. The content of the parties' briefing, however, indicates that the Taser was set to "dart" mode. *See* Pl.'s Opp. at 13 (stating that "[i]n *Bryan* . . . the Ninth Circuit considered the use of a Taser in dart mode; such as was used against Andy."); Def.'s Rep. at 6 (stating that "[i]t is only recently that the Ninth Circuit has definitively determined the level of force associated with Tasers deployed in dart mode."). For the purposes of the present Order, the Court presumes that the Taser applied to Andy's leg was in "dart" mode. But even if the Taser was set to "stun," a reasonable fact-finder still could conclude that the quantum of force used was substantial, given the devastating, immediate impact that the Taser had on Andy. *See Mattos,* 590 F.3d at 1087 (finding that Tasers deployed in "stun" mode have the potential to work a serious intrusion on a suspect's constitutional rights).

*Bryan*, 630 F.3d at 826 (internal citations and quotations omitted). Other factors examined may include "the availability of alternative methods of capturing or subduing a suspect," *Smith*, 394 F.3d at 701, although courts must remember that an officer need not employ the "least intrusive" degree of force possible in order for their actions to be deemed reasonable. *See Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008); *see also Bryan*, 630 F.3d at 831, n.15 (explaining that the "settled principle" that police officers need not employ the least intrusive amount of force possible does not conflict with the "equally settled principle" that requires officers to at least consider less intrusive means of effectuating the arrest).

Here, the jury could conclude that the police were not called to Andy's residence on suspicion of a "crime," but rather in response to a "5150" call indicating that Andy needed medical attention. In addition, Defendants do not dispute that Andy never attempted to flee the scene. The first and third *Graham* factors thus point decisively away from the use of the Taser. The Court therefore turns to what courts have deemed the "most important" factor in the *Graham* analysis: whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702. Although courts must judge any asserted safety concerns "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007), a "simple statement by the officer that he fears for his safety or the safety of others in not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Moreover, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Id.*

In this case, ample facts exist that would allow a reasonable jury to conclude that Andy did not pose a threat to anyone's safety. For instance, Zimmerman, a percipient witness, testified that although Andy was behaving erratically before the police officers arrived, as soon as Andy noticed Karschamroon, he "came to himself," Zimmerman Depo. at 51, immediately stopped acting aggressively and began to "pay[] attention to what was going on around him." *Id.* at 52. Corroborating Zimmerman's account, Karschamroon stated at his deposition that, with the

1 exception of maintaining tense hands as the officers attempted to handcuff him, Andy had
2 complied with all of his orders. Karschamroon Depo. at 244, 247. Similarly, Gendreau testifed
3 at his deposition that, prior to the application of the Taser, Andy did not make any movements
4 suggesting that he was about to attack either of the officers. *Id.* at 177, 182, 220. In addition,
5 despite the questionable indication on the 911 call that Andy possessed a weapon, from the way
6 that Andy was dressed when the officers arrived, a jury could find that it should have been
7 apparent that Andy was unarmed. *See* Zimmerman Depo. at 40-42 (explaining that Andy was
8 wearing a tight fitting t-shirt and work-out shorts and that it was clear to Zimmerman from the
9 way Andy was dressed that Andy did not have any weapons on him); Karschamroon Depo. at
10 244 (stating that the officer observed that Andy did not have any weapons in his hand); *Bryan*,
11 630 F.3d at 826 ("It is undisputed that Bryan was unarmed and, as Bryan was only dressed in
12 tennis shoes and boxer shorts, it should have been apparent that he was unarmed."); *cf. Deorle*,
13 272 F.3d at 1281 ("Deorle was wearing no shirt or shoes, only a pair of cut-off jean shorts.
14 There was nowhere for him to secrete any weapons.").

15 Furthermore, given the nature of the "5150" call, a jury could conclude that the officers
16 should have known that they were dealing with a mentally ill person in need of help, not a
17 violent criminal. The Ninth Circuit has counseled that "the problems posed by, and thus the
18 tactics to be employed against an unarmed, emotionally distraught individual . . . are ordinarily
19 different from those involved in law enforcement efforts to subdue an armed and dangerous
20 criminal who has recently committed a serious offense." *Doerle*, 272 F.3d at 1282-83;
21 *Drummond ex. rel Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (same);
22 *Bryan*, 630 F.3d at 829 (same). Although the Ninth Circuit has refused to create two tracks of
23 excessive force analyses – one for the mentally ill and one for serious criminals – the court has
24 repeatedly emphasized that a suspect's evident mental illness typically diminishes the
25 government's interest in using significant force, given that swift force employed against an
26 emotionally distraught individual often serves only to exacerbate, rather than defuse, a
27 potentially dangerous situation. *Doerle*, 272 F.3d at 1282-83.
28 Ultimately, Defendants claims of safety fears rest on the notion that Andy had tensed his

10

hands (arguably into a shape resembling fists), making it difficult for the officers to place the second handcuff around Andy's left wrist  Following the Supreme Court's instruction in *Graham*, courts in the Ninth Circuit distinguish between "passive" and "active" resistance, finding, as a general proposition, that the former justifies less force than the latter.  "Passive" resistance has been described to include actions like "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary.  *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994).  The action of tensing one's wrists seems to fall within this general category of resistance.  Accordingly, although the officers' alleged struggle handcuffing Andy is a fact that Defendants can argue to a jury in attempting to resist liability, it does not establish the lack of a constitutional violation as a matter of law.  Consideration of the government's interest in the use of force does not entitle Defendants to summary judgment.

#### C. Balancing

Balancing the severity of the intrusion experienced by Andy against the government's interest, the Court concludes that triable issues remain regarding whether the officers use of force violated the Fourth Amendment.  Indeed, the situation at hand is strikingly similar to the scenario the Ninth Circuit reviewed in *Bryan*, where officers confronted a man who "was agitated, standing outside his car, yelling gibberish and hitting his thighs, clad only in boxer shorts and tennis shoes," *Bryan*, 630 F.3d at 822, but who did not make any moves to threaten the officers or to attempt to flee the scene.  Faced with these facts, the Ninth Circuit held that although the suspect's "volatile, erratic conduct could lead an officer to be wary," *id.* at 826, the "circumstances . . . show that [the officer] was confronted by, at most, a disturbed and upset young man, not an immediately threatening one." *Id.* at 827.  Accordingly, the Circuit held that, although the officers' desire to resolve the situation "quickly and decisively" was "understandable," the officers decision to tase the suspect was not reasonable under the Fourth Amendment. *Id.* at 832.[6]  A reasonable jury could find that the same is true here.

---

[6]Although only Officer Gendreau deployed his Taser, both officers may be liable for the force inflicted.  Typically, placing an officer at the scene of an alleged constitutional violation does not suffice to assert individual liability against that officer.

### *2. Fourteenth Amendment*

Plaintiffs' third cause of action under Section 1983 is asserted by Andy's parents and invokes the Fourteenth Amendment's protection of a parent's liberty interest in the companionship and society of his or her child. *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). In order to prove a claim for violation of the Fourteenth Amendment, parents must show that the conduct of the officer alleged to have caused the child's death "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008). Police conduct "shocks the conscience" when the officer evinces "deliberate indifference" to a suspect's well-being, or when the officer acts "with a purpose to harm . . . unrelated to legitimate law enforcement objectives." *Id.* at 1137. The Ninth Circuit has counseled that when reviewing cases where officers are met with "fast-paced circumstances presenting competing public safety obligations, the [more stringent] purpose to harm standard must apply." *Id.* at 1139. In this case, however, as articulated above, Defendants have not established that the circumstances facing the officers were particularly frantic or that significant "competing public safety concerns" existed. Plaintiffs thus can demonstrate a constitutional violation if they can show that the officers' conduct evinced deliberate indifference to Andy's well-being.[7]

The Court concludes that genuine issues of fact exist regarding whether Officer Gendreau's action exhibited deliberate indifference. Gendreau testified that, before using the Taser on Andy, he perceived Andy to be under the influence of a "controlled substance,

---

*See Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (rejecting an "inference of individual liability of individual officers based on merely being present at the scene of the [illegal] search."). The Ninth Circuit, however, has recognized that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen," so long as a "realistic opportunity" to intercede existed. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (internal citations and quotations invented). Here, it is disputed whether Officer Karschamroon had an opportunity to intercede in order to prevent Officer Gendreau from applying the Taser to Andy's legs. In light of this principle, genuine issues of material fact exist regarding whether Officer Karschamroon violated Andy's rights.

[7]Defendants are free to revisit this ruling after the close of evidence, if the facts elucidated at trial indicate that the purpose to harm standard should apply.

particularly a stimulant." Gendreau Decl. at 327. Gendreau also testified that, as a result of his training, he understood that people under the influence of a nervous system stimulant face a higher risk of sudden death due to the excited delirium caused by the application of a Taser. *Id.* at 328. A reasonable jury could conclude that Gendreau's decision to tase Andy in spite of this known risk evinced deliberate indifference to Andy's well-being. *Cf. Coleman v. Wilson*, 912 F. Supp. 2d 1282, 1323 (E.D. Cal. 1995) (finding that the use of a Taser on inmates with known mental disorders without regard to the effect of the weapon on the inmate's mental condition constituted deliberate indifference in violation of the Eighth Amendment.). By contrast, Plaintiffs have adduced no evidence tending to show that Officer Karschamroon was aware that Andy was under the influence of substances subjecting him to increased risks from application of the Taser. Summary judgment in Officer Karschamroon's favor on the Fourteenth Amendment-based claim is therefore warranted.

### ii. Qualified Immunity

Even where a constitutional violation has occurred, a police officer is entitled to qualified immunity from suit under Section 1983 where an objectively reasonable officer would not have known that her conduct was unconstitutional under the circumstances of the case. *Saucier v. Katz,* 533 U.S. 194, 202 (2001). The qualified immunity inquiry asks two questions: (1) was there a violation of a constitutional right, and, if so (2) was the right at issue clearly established such that it would have been clear to a reasonable officer that his conduct was unlawful in that situation. *Brooks v. City of Seattle*, 599 F.3d 1018, 1022 (9th Cir. 2010). As the Court has already resolved the first question in the affirmative, the Court turns its attention to the second question.

Prior to September 3, 2008, no Supreme Court or Ninth Circuit decision had discussed the constitutionality of Tasers. In 2010, the Ninth Circuit issued its decision in *Bryan*, holding that the use of a Taser in a closely analogous factual situation violated the Constitution. If the events at issue in this case had taken place after the publication of the *Bryan* decision, there is no doubt that the officers' claim of qualified immunity would fail. The lack of on-point case law discussing this issue prior to September 3, 2008, however, makes the qualified immunity

13

question a much closer call. Indeed, the Ninth Circuit in *Bryan* granted the police officers qualified immunity precisely because the state of the law surrounding Taser use was acknowledged to be murky as of the date of the violation. Although the events in this case took place nearly three years after the incident in *Bryan*, little binding, on point case law was issued between 2005 and September 3, 2008. Given this lack of clarity, the Court declines to find that a per se proscription against Taser use in situations like the one at hand was clearly established as of the date of the violation. Accordingly, a reasonable officer in Karschamroon's shoes could have believed that the use of the Taser was permissible.

By contrast, given the evidence suggesting that Officer Gendreau was aware that Andy, at the time of the tasering, faced an increased risk of cardiac arrest from the application of the Taser, the qualified immunity doctrine does not shield Officer Gendreau from liability. Although the Court cannot locate prior binding case law discussing a scenario where an officer used a Taser on a mentally ill, non-combative subject stopped for a minor violation, in spite of a known risk that the subject could suffer cardiac arrest, the Court finds that this action was so "patently violative" of Andy's constitutional rights that no specific guidance from the court was needed to put a reasonable officer on notice that such conduct is forbidden. *See Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) ("When the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established.") (internal citations and quotations omitted); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Officials can still be on notice that their conduct violates established law even in novel factual circumstances."). The Section 1983 claims against Officer Gendreau thus survive summary judgment.

For these reasons, Defendants' Motion for Summary Judgment is GRANTED with respect to the Section 1983 claims asserted against Officer Karschamroon, but DENIED with respect to the Section 1983 claims asserted against Officer Gendreau.

### iii. Municipal Liability

Plaintiffs assert their Section 1983 claims not only against the individual officers, but

14

against City of Garden Grove ("City"). Although Section 1983 does not impose vicarious liability on municipalities for the actions of its employees, a municipality may be held liable for unlawful police conduct when that conduct results from a failure of the city to properly train its employees, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989), or when the unlawful conduct forms part of the city's custom, policy or practice. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Here, Plaintiffs have presented evidence that Officer Karschamroon was improperly trained, noting Karschamroon's statements that he did not recall receiving any training on procedures for dealing with the mentally ill, Karschamroon Depo. at 112, and that he did not remember any specifics regarding his training on compliance with the Fourth Amendment's ban on excessive force. *Id.* at 88. However, "evidence of the failure to train a single officer is insufficient" to establish municipal liability. *Blackenhorn*, 485 F.3d at 484 (9th Cir. 2007). As Plaintiffs have not presented any other evidence suggesting systemic problems in police training or tending to establish a deliberate custom, policy or practice on the part of the City, summary judgment must be granted in the City's favor.

The Court accordingly GRANTS Defendants' Motion for Summary Judgment with respect to the Section 1983 claims asserted against the City.

### iv. Supervisorial Liability

Plaintiffs also attempt to hold Chief of Police Joseph Polisar ("Polisar") liable under Section 1983. Polisar may be held liable in his individual capacity only if Plaintiffs can point to evidence establishing Polisar's "own culpable action in the training, supervision, or control of his subordinates; . . . his acquiescence in the constitutional deprivation[;] or for conduct that showed a reckless or callous indifference to the rights of others.'" *Blackenhorn*, 485 F.3d at 485 (internal citations and quotations omitted). Because Plaintiffs have come forward with no evidence regarding Polisar's role either in providing inadequate training or in helping to facilitate the use of the Taser against Andy, Polisar is entitled to judgment as a matter of law on the Section 1983 claims against him.

The Court GRANTS Defendants' Motion for Summary Judgment with respect to the

Section 1983 claims asserted against Chief Polisar.[8]

### b. **Violation of the Bane Act**

In addition to their Section 1983 claims, Plaintiffs also bring suit under the Bane Act, Cal. Civ. Code § 52.1 ("Bane Act"), which the California Legislature enacted in order "to stem a tide of hate crimes." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (1998). Successful Bane Act claims require proof that "(1) the defendant interfered with or attempted to interfere with plaintiff's constitutional or statutory rights, (2) the plaintiff reasonably believed that if he exercised his constitutional right the defendant would commit violence against him, or defendant injured plaintiff to prevent him from exercising his constitutional rights, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Davis v. Kissinger*, 2009 WL 256574, at *7 (E.D. Cal. Feb. 3, 2009)**.** Other than a single line conclusory asserting that "there is no evidence to support [the allegation] that defendant officers wrongfully interfered with Andy Tran's constitutional rights," Defendants advance no arguments with respect to the substantive merits of Plaintiffs' Bane Act claims. Rather, Defendants' request for summary judgment is based on the proposition that the Bane Act does not provide a right of action for parents or children of a decedent.

Defendants are correct that the Bane Act creates only a personal cause of action for the individual actually subjected to violence or threats that interfere with a constitutional right. *Bay Area Rapid Transit District v. Superior Court of Alameda County*, 38 Cal. App. 4th 141, 144 (1995) ("The Bane Act is simply not a wrongful death provision. It clearly provides for a *personal* cause of action for the victim of a hate crime" and is "limited to plaintiffs who themselves have been the subject of violence or threats.") (emphasis in original). Accordingly, summary judgment must be granted in Defendants' favor on any Bane Act claims brought by

---

[8]In fact, summary judgment is warranted in full with respect to Chief Polisar. Although Polisar, in his individual capacity, is listed as a Defendant for each of Plaintiff's state law causes of action, Plaintiffs have come forward with no evidence whatsoever to suggest that Polisar was involved in the actions that gave rise to those claims. The Court proceeds to consider Plaintiffs' state law claims as if they were asserted only against Karschamroon, Gendreau and the City of Garden Grove.

Plaintiffs on their own behalf. On the other hand, Plaintiff Quyen Kim Dang, as Andy's successor-in-interest, may pursue the Bane Act claim on Andy's behalf. *See* Cal. Code Civ. Pro. § 377.20(a) ("Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable statute of limitations period."); Cal. Code Civ. Pro. § 377.30 ("A cause of action that survives the death of a person passes on to the decedent's successor in interest.")

Defendants' Motion for Summary Judgment is thus GRANTED with respect to claims under the Bane Act filed by Plaintiffs on their own behalf, but DENIED with respect to claims under the Bane Act filed by Plaintiff Quyen Kim Dang, as Andy's successor-in-interest**.**

### c. Assault and Battery

Defendants next move for summary judgment on Plaintiffs' assault and battery claims under California state law. Proving claims for assault and for battery against a police officer effectuating an arrest requires a showing that the officer used unreasonable force. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998). The test employed under California law to determine if the force used was unreasonable is identical to the test employed under federal law applying Section 1983. *See Saman v. Robbins*, 173 F.3d 1150, 1156 n.6 (9th Cir.1999) (applying the same standard for excessive force under both federal and California law); *Edson*, 63 Cal. App. 4th at 1273 (citing to the *Graham* reasonableness standard in resolution of state law assault and battery claim against a police officer). In other words, Plaintiff's claims for assault and battery under California law meet the same fate as Plaintiff's Section 1983 claim for excessive force under the Fourth Amendment. *See Nelson v. City of Davis*, 709 F.Supp.2d 978, 992 (E.D.Cal. 2010) ("Because the same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force, the fact that Plaintiff's § 1983 claims under the Fourth Amendment survive summary judgment also mandates that the assault and battery claims similarly survive.").

For the reasons stated above, Defendants' Motion for Summary Judgment on the assault and battery cause of action against Karschamroon and Gendreau is DENIED.

### d. Negligence

Plaintiffs further assert a cause of action for negligence under California state law. In requesting summary judgment on this claim, Defendants argue only that municipalities cannot be held directly liable for torts committed by their employees. This argument, of course, pertains only to the City, not to the individual officers. Moreover, this argument does not absolve the City Defendants of all liability. Although California Government Code § 815 precludes direct tort liability for municipal defendants (absent a specific statute to the contrary), California Government Code § 815.2 permits vicarious tort liability against a municipal employer when the employee commits the tort at issue while acting within the scope and course of her employment. Here, Plaintiffs seek to impose vicarious liability against the City for actions taken by Gendreau and Karshamroon within the course and scope of their employment. Defendants efforts to resist liability on Plaintiffs' negligence claim fail.

Defendants' Motion for Summary Judgment on the negligence claim is DENIED.

### e. Negligent Infliction of Emotional Distress

Defendants next move for summary judgment on Plaintiffs' claims for negligent infliction of emotional distress. Negligent infliction of emotional distress is not an independent tort, but rather a specific iteration of the tort of negligence to which the traditional elements of duty, breach of duty, causation, and damages apply. *Wong v. Tai Jing*, 189 Cal. App. 4th 1354 (2010). "In the absence of physical injury or impact to the plaintiff himself, damages for [negligent infliction of] emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event, and (3) suffers emotional distress beyond that which would be anticipated in a disinterested witness." *Burgess v. Superior Court*, 2 Cal. 4th 1502, 1509-1510 (2009). In light of the facts discussed above, a reasonable jury could conclude that Plaintiffs have proven the elements of this claim.

Defendants' Motion for Summary Judgment on Plaintiffs' negligent infliction of emotional distress claim against Karschamroon and Gendreau is DENIED..

### f. Intentional Infliction of Emotional Distress

Plaintiffs' final cause of action is for intentional infliction of emotional distress ("IIED"). To recover on an IIED claim, a plaintiff must prove: 1) that the defendant committed extreme

and outrageous conduct with the intention of causing, or with the reckless disregard for the probability of causing, emotional distress; 2) that plaintiff suffers from severe or extreme emotional distress; and 3) that defendant's conduct actually and proximately caused the distress. *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1001 (1993). The parties disagree as to whether Defendants' conduct in this case may be considered "extreme and outrageous." To qualify as extreme and outrageous, a defendant's conduct must be "so extreme as to exceed all bounds of that usually tolerated by a civilized community." *Id*. Whether a defendant's conduct rises to the level of extreme and outrageous ordinarily is a question for the jury. The Court thus may grant summary judgment only if no reasonable jury could find Defendants' conduct to have been so extreme and outrageous as to warrant recovery. *See Trerice v. Blue Cross of Cal.*, 209 Cal.App.3d 878, 883 (1989).

This is a close call. Ultimately, however, the Court finds that summary judgment on this claim must be granted with respect to Officer Karschamroon, but denied with respect to Officer Gendreau. For the reasons discussed in the qualified immunity section of the Order, genuine issues of material fact remain regarding whether Officer Gendreau's conduct qualified as extreme and outrageous. The Court notes, however, that Plaintiffs may not succeed in their intentional infliction of emotional distress claim merely by proving that Officer Gendreau's conduct was "unreasonable." *See Nelson v. City of Davis*, 709 F.Supp.2d 978, 993 (E.D.Cal., 2010). Showing extreme and outrageous behavior is a much harder task.

Defendants' Motion for Summary Judgment on Plaintiffs' IIED claim is GRANTED with respect to Officer Karschamroon but DENIED with respect to Officer Gendreau.

### g. Municipal Liability for Plaintiffs' State Law Causes of Action

The Court finally considers the liability of the City for Plaintiffs' state law claims. On the issue of municipal liability, California law diverges from federal law. California Government Code § 815.2 provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." This provision of California law "clearly allows for

19

vicarious liability of a public entity" for the unlawful conduct of its police officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007). Plaintiffs accordingly may pursue all of their successful claims based on California law against the City, as well as against the individual officers.

## IV. DISPOSITION

For the reasons articulated above, the Court GRANTS Defendants' Motion for Summary Judgment with respect to all claims asserted against Polisar, the Section 1983 claims asserted against the City of Garden Grove and Officer Karschamroon; the Bane Act claims brought by Plaintiffs on their own behalf; and the IIED claim against Officer Karschamroon.

The Court DENIES Defendants' Motion for Summary Judgment with respect to the Section 1983 claims asserted against Officer Gendreau; the Bane Act claim brought by Quyen Kim Dang as Andy Tran's successor-in-interest; and the remainder of Plaintiffs' claims under California state law against Gendreau, Karscharoom, and the City.

IT IS SO ORDERED.

DATED: August 2, 2011

                                                              _____
                                                                DAVID O. CARTER
                                                             United States District Judge